UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE #: 1:22-cv-20748-JAL

SERGIO PEREZ,

    Plaintiff,

v.

CITY OF OPA-LOCKA and
STEVEN BARREIRA,

    Defendants.
_____/

**DEFENDANT, CITY OF OPA-LOCKA'S, STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendant, CITY OF OPA-LOCKA ("Defendant" or "City"), by and through its undersigned counsel, and pursuant to Local Rule 56.1(a), files this statement of undisputed material facts in support of its motion for summary judgment as follows:

1. At all material times, Plaintiff, Sergio Perez ("Plaintiff"), served as a police Captain in the City's police department. [DE 37] at ¶ 2.

2. Section 3.3 of the City's Code of Ordinances provides that the City Manager possesses the sole decision-making authority regarding the personnel decisions of all City employees excluding the City Attorney, City Clerk, and all employees of the Offices of the City Attorney and Clerk. Exhibit 1, Section 3.3 of the City's Code of Ordinances; Exhibit 2, Pate Deposition, at 7: 7-22.

3. John Pate served as City Manager at all material times. Exhibit 2, Pate Deposition, at 6: 19-25; 7: 1-2.

4. City Manager Pate promoted Plaintiff to Captain in February 2021. Exhibit 3, Plaintiff Deposition, at 24: 23-25; 25:9-14.

5. As Captain, Plaintiff was not subject to any protections or due process rights afforded under the operative Collective Bargaining Agreement ("CBA"). The CBA exclusively protected the property rights of Officers, Corporals, and Sergeants. Exhibit 4, Krotenberg Declaration at ¶ 4; Exhibit 5, Collective Bargaining Agreement, Article 1.

6. The CBA did not apply to Captains or any other member of the City's police department's command staff at the time Plaintiff held the position of Captain from February 2021 through January 2022. The CBA currently still does not apply to Captains or any other member of the police department's command staff. Exhibit 4, Krotenberg Declaration at ¶ 5.

7. Any member of the City's police department who accepts a position outside the protections of the CBA is treated as an at-will employee. There are no due process rights afforded to these employees in connection with any claimed adverse action taken against them. Exhibit 4, Krotenberg Declaration at ¶ 6.

8. Members of the command staff (i.e., Lieutenants, Captains, Chiefs) can pay dues to the union as an arm of law enforcement. These individuals' dues are paid solely as a means to provide them with legal representation if they are involved in a shooting or charged with a crime resulting from their work. Exhibit 4, Krotenberg Declaration at ¶ 7.

9. The payment of these dues does not afford the members of the command staff any property or due process rights under the CBA that are otherwise afforded to Officers, Corporals, and Sergeants. Exhibit 4, Krotenberg Declaration at ¶ 8.

10. Steven Barreira ("Chief Barreira") served as the City's Chief of Police from April 2021 through his voluntary resignation on October 21, 2021. Exhibit 6, Barreira Declaration, at ¶

2.

11. In his capacity as the Chief of Police, Chief Barreira specifically instructed Plaintiff to investigate the City's expenditures of $1,200.00 per month on the storage of contraband. These costs were being incurred by the City prior to Chief Barreira's arrival at the City. Chief Barreira received word that the seizures were not legitimate and he therefore wanted to understand the seizure process, ensure that the process was legitimate, and confirm whether the City was lawfully entitled to seize the contraband. Chief Barreira assigned this task to Plaintiff in his capacity as a Captain. Plaintiff never "complained" to Chief Barreira or "objected" that the City was wasting money in connection with the storage of the contraband. Exhibit 3, Plaintiff Deposition, at 126: 9-25; 127: 1-17; Exhibit 6, Barreira Declaration, at ¶¶ 4-5.

12. Plaintiff explicitly admitted that Chief Barreira instructed him to analyze this issue and Plaintiff subsequently relayed his findings to Chief Barreira. Exhibit 3, Plaintiff Deposition, at 128: 14-25; 129: 1-8.

13. Plaintiff was familiar with these seizures because he oversaw the Criminal Investigations Division that made the arrests, participated in confiscating the stored contraband and assisted in deciding where the contraband would be stored. Exhibit 3, Plaintiff Deposition, at 126: 16-25; 128: 3-5; 129: 15-17.

14. Plaintiff's role in the oversight, participation, and decisionmaking regarding the storage of the contraband allowed Plaintiff to learn the amount the City was paying to store the contraband. Exhibit 3, Plaintiff Deposition, at 129: 23-25; 130:1; 131: 13-16.

15. All of Plaintiff's conversations with Chief Barreira regarding the contraband storage occurred in the workplace and any written communications were authored by Plaintiff to Chief Barreira using his City-issued email with his City signature block in the body of the email.

Exhibit 3, Plaintiff Deposition, at 130: 13-22.

16. Plaintiff testified that he has no evidence that any claimed adverse action taken against him occurred in retaliation for any conversations or alleged concerns Plaintiff raised to Chief Barreira regarding the storage fees associated with the contraband. Exhibit 3, Plaintiff Deposition, at 131: 8-12.

17. Plaintiff never "complained" to Chief Barreira or "objected" that the City was wasting funds associated with a police K-9 purchased by the police department. City Manager Pate authorized the purchase of the police K-9. Plaintiff participated in this purchase with the City Manager without Chief Barreira's knowledge. In his capacity as the Chief of Police, Chief Barreira instructed Plaintiff in his capacity as Captain to draft an updated K-9 policy for his review. Chief Barreira believed the City's K-9 policy at the time the K-9 was purchased was outdated and inadequate. Plaintiff wanted to deploy the K-9 into service without an adequate or sufficient policy in place. Exhibit 6, Barreira Declaration, at ¶ 6.

18. Additionally, Chief Barreira believed the K-9 was not adequately trained yet. Police K-9s inherently expose the City to potential additional liability. Chief Barreira wanted to ensure that the police department had an adequate K-9 policy in place and that the K-9 was sufficiently trained before the K-9 was deployed. The K-9 was withheld from deployment for a period of no more than a few weeks. Exhibit 6, Barreira Declaration, at ¶7; Exhibit 3, Plaintiff Deposition, at 119:1-25; 120:1-25.

19. Plaintiff testified that he participated in the purchase of the K-9, "spearheaded" the K-9 unit, and described the K-9 unit as his "baby." Exhibit 3, Plaintiff Deposition, at 114: 18-25; 115: 1-25.

20. All purported "concerns" raised by Plaintiff pertaining to the K-9 deployment were

authored by Plaintiff from his City email with his signature block on the bottom, while in the workplace, or while discussing City business outside of the workplace. Exhibit 3, Plaintiff Deposition, at 121:23-25; 122: 1-9; 123:13-23.

21. Plaintiff explicitly admitted that Chief Barreira advised Plaintiff that the Chief did not want to deploy the K-9 until the City's K-9 policy was updated. Exhibit 3, Plaintiff Deposition, at 118: 11-25.

22. Plaintiff has no evidence that any claimed adverse action taken against him occurred in retaliation for raising purported issues relating to the deployment of the K-9. Exhibit 3, Plaintiff Deposition, at 126: 4-8.

23. Plaintiff only possessed information and knowledge relating to the K-9 deployment by virtue of his position in the City's police department. Exhibit 3, Plaintiff Deposition, at 123: 23-35; 124: 1-3.

24. Plaintiff never "complained" to Chief Barreira or "objected" that the City was wasting money in connection with a proposed Lexipol contract as a means to obtain accreditation for the police department. The usage of Lexipol was already being discussed and considered at the City before Chief Barreira began working for the City because City Manager Pate had prior experience with Lexipol. The City Manager advocated for Lexipol, and it was his idea to explore and potentially retain the services. Exhibit 6, Barreira Declaration, at ¶¶ 4, 8.

25. Within a short time after Chief Barreira commenced employment at the City, a proposed Lexipol agreement was sent to him. The City Manager knew about this. Chief Barreira signed the agreement and gave it to his staff assistant to send to the City Manager for approval. For whatever reason, the agreement did not make it to Pate but rather was sent to Lexipol. When the inadvertent error was realized, Lexipol advised that it would nullify the agreement and treat it

as void. Again, the City Manager possessed the final approval regarding any expenditure to Lexipol. The City never spent any monies in connection with Chief Barreira's inadvertent execution of that particular agreement and Lexipol never provided any services to the City. It was a non-issue. Exhibit 6, Barreira Declaration, at ¶ 8.

26. Plaintiff only possessed information and knowledge relating to Lexipol by virtue of his position in the police department. Exhibit 3, Plaintiff Deposition, at 124: 4-8.

27. All purported "concerns" raised by Plaintiff pertaining to Lexipol were authored by Plaintiff from his City email with his signature block on the bottom and in the workplace. Exhibit 3, Plaintiff Deposition, at 122: 10-17.

28. Plaintiff cannot pinpoint any claimed Lexipol "objection" to his purported September 10, 2021, relief of duty or any other claimed adverse action. Exhibit 3, Plaintiff Deposition, at 113:2-9.

29. Chief Barreira never once considered Plaintiff to be exercising First Amendment rights in connection with any of these claimed issues. Again, as the Chief of Police, Chief Barreira assigned these duties and tasks to Plaintiff in his role as a police Captain during working hours for the City. As an administrative Captain, Plaintiff was actively involved in these issues and Chief Barreira relied on Plaintiff as a member of his command staff to provide him with information he requested Plaintiff to obtain or investigate. Exhibit 6, Barreira Declaration, at ¶ 9.

30. Chief Barreira never took any claimed retaliatory action against Plaintiff in connection with any alleged "complaint" or "objection" Plaintiff contends he made regarding the above issues. Exhibit 6, Barreira Declaration, at ¶ 10.

31. Plaintiff never raised any purported concerns or objections regarding the storage of the contraband, the deployment of the K-9, or Lexipol at a public City Commission or to the press.

Exhibit 3, Plaintiff Deposition, at 131: 17-25; 132: 1-12.

32. On September 1, 2021, Plaintiff held the position of administrative Captain. Chief Barreira learned that Plaintiff discharged a department-issued taser at then-Sergeant Michael Steel ("Steel") while inside of the City's police station ("taser incident"). Exhibit 3, Plaintiff Deposition, at 79: 10-25; 80: 1-19; Exhibit 6, Barreira Declaration, at ¶ 11; [DE 37] at ¶ 27.

33. Chief Barreira believed the allegations regarding the September 1, 2021, taser incident were serious and an internal affairs investigation was initiated. In his over 25 years of law enforcement experience (the majority of which he held supervisory positions), Chief Barreira had never experienced or heard of a member of a command staff like Plaintiff discharging a taser at a fellow officer. The incident was unprecedented. Exhibit 6, Barreira Declaration, at ¶ 12; [DE 37] at ¶ 33.

34. Plaintiff himself is not aware of any other Captain, Sergeant, Lieutenant or member of the command staff who was charged with a crime with respect to alleged misconduct towards a fellow officer. Exhibit 3, Plaintiff Deposition, at 91: 3-18.

35. Given the serious nature of the allegations levied against Plaintiff in connection with the taser incident and the fact that the incident was being investigated by both the City and the Florida Department of Law Enforcement, Chief Barreira instructed Plaintiff to perform his administrative duties from home. Exhibit 6, Barreira Declaration, at ¶ 13; Exhibit 11, September 10, 2021, Memorandum.

36. Chief Barreira did not instruct Plaintiff to work from home in retaliation for any protected activity Plaintiff claims to have engaged in or because Plaintiff engaged in alleged protected speech. Chief Barreira's instruction to Plaintiff to work from home in September 2021 stemmed solely from the taser incident. Exhibit 6, Barreira Declaration, at ¶ 14.

37. Chief Barreira would have sent Plaintiff home regardless of any alleged protected speech given the seriousness of the taser incident allegations as he did not find it appropriate for Plaintiff to be at the City during the pendency of an investigation that he was the subject of. Exhibit 6, Barreira Declaration, at ¶ 14.

38. Plaintiff maintained the same title of Captain, and there was no change to Plaintiff's pay or status, throughout Chief Barreira's entire tenure as the Chief of Police. Exhibit 6, Barreira Declaration, at ¶ 15.

39. Chief Barreira voluntarily resigned from the City in October 2021. He had no further involvement regarding any personnel decision relating to Plaintiff's employment after his resignation. Exhibit 6, Barreira Declaration, at ¶ 16.

40. Neither Chief Barreira nor the City ever violated Plaintiff's claimed procedural due process rights.  Exhibit 6, Barreira Declaration, at ¶ 18.

41. Neither Chief Barreira nor the City ever retaliated against Plaintiff in any way. Exhibit 6, Barreira Declaration, at ¶ 21.

42. Plaintiff contends that a September 28, 2021, letter authored by his lawyer, James Casey, and addressed to City Manager Pate, constitutes a whistleblower complaint. Exhibit 3, Plaintiff Deposition, at 139: 14-18; Exhibit 7, September 28, 2021, letter.

43. Plaintiff admits that he did not author the September 28, 2021, letter. Exhibit 3, Plaintiff Deposition, at 140: 4-8.

44. Chief Barreira never considered Plaintiff to be a whistleblower. Chief Barreira was unaware, and remains unaware, of any whistleblower complaint Plaintiff may now claim to have submitted to the City, and he has never otherwise taken any claimed adverse action against Plaintiff because Plaintiff submitted any purported whistleblower complaint. Exhibit 6, Barreira

Declaration, at ¶¶ 19-20.

45. City Manager Pate never took any adverse action against Plaintiff because of the September 28, 2021, letter. Exhibit 3, Plaintiff Deposition, at 141: 1-3.

46. Plaintiff does not contend that any other City employee or official took any action against him because of the September 28, 2021, letter. Exhibit 3, Plaintiff Deposition, at 141: 4-7.

47. Plaintiff has no evidence that anyone outside of City Manager Pate or City Attorney Burnadette Norris-Weeks knew of the September 28, 2021, letter. Exhibit 3, Plaintiff Deposition, at 141:21-25; 142: 1-4.

48. City Manager Pate has no knowledge that anyone other than City Attorney Norris-Weeks knew of the September 28, 2021, letter. Exhibit 2, Pate Depo: 62:1-25; 63:1-5; 64:18-23.

49. In her capacity as City Attorney, Norris-Weeks received the September 28, 2021, letter from City Manager Pate. Exhibit 8, Norris-Weeks Declaration, at ¶¶ 4-5.

50. City Attorney Norris-Weeks never discussed the September 28, 2021, letter with any City employee or official other than Plaintiff. Exhibit 8, Norris-Weeks Declaration, at ¶ 5.

51. Plaintiff was charged with criminal battery for the taser incident in January 2022. Exhibit 3, Plaintiff Deposition, at 17:23-24; Exhibit 6, Barreira Declaration, at ¶ 17.

52. Subsequent to the criminal charge, City Manager Pate demoted Plaintiff from Captain to Sergeant effective January 14, 2022. Exhibit 3, Plaintiff Deposition, at 95: 2-9; Exhibit 9, January 14, 2022, Personnel Action Form.

53. Plaintiff never attempted to exhaust any grievance procedure under the CBA nor did he attempt to obtain legal representation from the union. Exhibit 3, Plaintiff Deposition at 97:15-25; 98: 1-25; 99: 1-7; 101:24-25; 102: 1-3.

54. Steel never "refused" to approve Plaintiff's 2021-2022 evaluation because Plaintiff

sued the City, because Plaintiff contends to be a whistleblower, or because Plaintiff submitted any other alleged complaint to the City. Exhibit 10, Steel Deposition, at 155:9-19.

55. Nobody at the City ever instructed Steel to not approve or modify Plaintiff's 2021-2022 evaluation because Plaintiff sued the City, because Plaintiff claims to be an alleged whistleblower, or because Plaintiff submitted any other alleged complaint. Exhibit 10, Steel Deposition, at 155:20-25; 156: 3-23; 158: 2-6, 14-18.

56. Steel never took any improper action with respect to Sergio Perez's 2021-2022 performance evaluation because Plaintiff sued the City or because Plaintiff contends to be an alleged whistleblower. Exhibit 10, Steel Deposition, at 156: 24-25; 157: 1-3, 17-22.

57. Steel never instructed Alvin Rogers to reduce or modify Plaintiff's ratings or narratives within Plaintiff's 2021-2022 performance evaluation because Plaintiff sued the City. Exhibit 10, Steel Deposition, at 157: 23-25; 158: 1, 9-13.

58. Steel never retaliated against Plaintiff nor did he ever take any improper action associated with Plaintiff's employment at the City. Exhibit 10, Steel Deposition, at 158: 19-23.

59. Plaintiff's pay was never reduced, his benefits were never taken away, and his job duties remained the same during the period of time his performance evaluation was pending approval. Exhibit 3, Plaintiff Deposition, at 151:22-25; 152:1-4.

60. Plaintiff received all of the $2,500.00 longevity bonus owed to him in connection with the City's ultimate approval of his 2021-2022 performance evaluation. Exhibit 3, Plaintiff Deposition, at 150:24-25; 151:1-21.

61. The record is devoid of evidence establishing an unconstitutional City custom or policy of violating employees' claimed procedural due process rights or retaliating against employees for exercising claimed First Amendment rights.

## **CERTIFICATE OF SERVICE**

     I HEREBY CERTIFY that on this 23rd day of June 2023, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system or by email to all parties. I further certify that I either mailed the foregoing document and the Notice of Electronic Filing by first class mail to any non-CM/ECF participants and/or the foregoing document was served via transmission of Notice of Electronic Filing generated by CM/ECF to any and all active CM/ECF participants.

BY: */s/Christopher J. Stearns*
CHRISTOPHER J. STEARNS
Florida Bar No.: 557870

*/s/Jonathan H. Railey*
JONATHAN H. RAILEY
Florida Bar No.: 111717

JOHNSON, ANSELMO, MURDOCH,
BURKE, PIPER & HOCHMAN, PA
2455 E. Sunrise Boulevard, Suite 1000
Fort Lauderdale, Florida 33304
Telephone:   (954) 463-0100
Facsimile:   (954) 463-2444
stearns@jambg.com / berens@jambg.com
railey@jambg.com / garrido@jambg.com

**Attorneys for City of Opa-Locka**

## **SERVICE LIST**

**BRIAN H. POLLOCK, ESQ.**
FAIRLAW FIRM
**Attorney for Plaintiff**
135 San Lorenzo Ave.
Suite 770
Coral Gables, FL 33146
(305) 230-4884 (Phone)
brian@fairlawattorney.com

**CHRISTOPHER J. STEARNS, ESQ.**
**JONATHAN H. RAILEY, ESQ.**
JOHNSON, ANSELMO, MURDOCH,
BURKE, PIPER & HOCHMAN, PA
**Attorneys for Defendants**
2455 E. Sunrise Blvd., Suite 1000
Fort Lauderdale, FL 33304
stearns@jambg.com / young@Jambg.com
railey@jambg.com / garrido@jambg.com
(954) 463-0100 (Phone)
(954) 463-2444 (Fax)