1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2
                     Case No.   0:22-cv-20748-JAL
3

4        _____

5        SERGIO PEREZ,

6                         Plaintiff,

7        vs.

8        CITY OF OPA-LOCKA,

9                         Defendant.

10       _____

11

12

13                   DEPOSITION OF SERGIO PEREZ
                          Pages 1 through 190
14                           (Videotaped)

15

16

17                   Tuesday, November 15, 2022
                        10:04 a.m. - 3:19 p.m.
18               Remote Videoconference Deposition

19

20
                     Stenographically Reported By:
21               Janet L. McKinney, RPR, FPR-C, CLR
                    Registered Professional Reporter
22                   Florida Professional Reporter
                      Certified LiveNote Reporter
23

24

25

1          Q.  Do you remember the other one?

2          A.  No.

3          Q.  Have you ever been convicted of a crime --

4          A.  I can -- no.

5          Q.  I'm sorry, you were about to say something

6     else.  Go ahead.

7          A.  I said I can review my interrogatories here

8     and better answer your question if you like.

9          Q.  No, that's okay.  I have a copy of those.  If

10    you want to say you defer to what's in the

11    interrogatory answers we can take that as --

12         A.  Okay.

13         Q.  -- your answer.

14         A.  So I'll defer.

15         Q.  That's fine.

16             All right.  You've never been convicted of a

17    crime.  Have you ever been charged with a crime?

18         A.  Yes.

19         Q.  Okay.  When?

20         A.  Most recently last week I was charged with

21    misdemeanor battery for a use of force case which I was

22    cleared from in 2020.

23             I was charged with misdemeanor battery in

24    January of this year against Michael Steel.

25         Q.  Any other charges?

```
 1        A.  Yes, sir.

 2        Q.  Okay.  And during those eight years if I

 3   understand your testimony correctly, tell me if I'm

 4   wrong, the corporal was kind of used interchangeably

 5   with lieutenant or captain?

 6        A.  With sergeant.

 7        Q.  With sergeant, I'm sorry.  Okay.

 8        A.  Yes.  We were the line supervisors.

 9        Q.  Got it.

10        A.  There was no sergeant in our place.  We were

11   the sergeants.

12        Q.  It's a problem when I can't read my own

13   handwriting.

14             Okay.  After 2021 what position did you

15   hold -- I'm sorry, strike that.

16             What was your next position after the

17   corporal/sergeant position?

18        A.  I -- so the city was doing away with the

19   corporals and gave a sergeant's test in 2019 which I

20   took and passed, I scored number one.  And after that I

21   was promoted to lieutenant in 2020 and then promoted to

22   captain in 2021.

23        Q.  When in 2021 were you promoted to captain?

24        A.  If my memory serves me well it was February of

25   '21.
```

```
 1        Q.  Is the captain position or at the time was the
 2   captain position a tested position?
 3        A.  No.
 4        Q.  Do you know what I mean by tested position?
 5        A.  Yes, like a Civil Service tested rank.
 6        Q.  Right, okay.  So it was more -- fair to say it
 7   was an appointment?
 8        A.  Yes.
 9        Q.  Okay.  And who appointed you to captain in --
10   again, I'm not holding you to a specific date, but you
11   testified February 2021?
12        A.  Who appointed me is your question?
13        Q.  Yeah.
14        A.  John Pate.
15        Q.  Did John Pate --
16        A.  City manager.
17        Q.  Okay, city manager.
18            Did John Pate in February of 2021 have that
19   final authority to appoint you captain?
20        A.  Yes.
21        Q.  Are you familiar with the Collective
22   Bargaining Agreement which we'll refer to as the CBA?
23        A.  Yes.
24        Q.  Okay.  What officers, from your understanding,
25   are covered by the CBA?
```

Sergio Perez
November 15, 2022                                                    79

1    agency policy.

2         Q.   Which agency policy in particular?

3         A.   The agency policy concerning discipline as

4    well as the Collective Bargaining Agreement.

5         Q.   I'll get to the CBA in just a moment.  I want

6    to focus on agency policy.  What, if you know, is the

7    policy that pertains to discipline?

8         A.   I don't -- I don't know.  I don't have it in

9    front of me.

10        Q.   Okay.  What provision at the CBA do you

11   contend provides for these occurrences?

12        A.   The section that speaks about investigations

13   against members.

14        Q.   At the time of the taser incident, again

15   September 1, 2021, what were your job duties?

16        A.   I was the administrative captain.  It included

17   procurement, it included supervision of staff.  It's

18   just a wide range of things operationally for the

19   police department.

20        Q.   A lot of administrative items?

21        A.   Yes.  Like procurement, discipline, I

22   supervise specialty units, the Street Crimes Unit.  I

23   was responsible for outfitting police vehicles.  I

24   oversaw civilian staff as well, records management,

25   property and evidence.  All of those things fell under

Sergio Perez
November 15, 2022                                                80

1    my purview.  Reserve officers.

2        Q.  How long prior to September 1, 2021, had you

3    been an administrative captain performing these duties?

4        A.  Before September '21 I was -- I was doing

5    those duties as a lieutenant the prior year, as well as

6    upon being promoted to captain.  So my responsibilities

7    really didn't change, just the title changed which was

8    more appropriate for everything that I was responsible

9    for.

10       Q.  Understood, but how long had that been

11   occurring then, month and year?

12       A.  These responsibilities?

13       Q.  Yes, sir.  You were --

14       A.  I was promoted to captain in February.

15       Q.  Okay.

16       A.  So from February on these were all my

17   obligations.  However, preceding February most of those

18   were still my obligations as a lieutenant, overseeing

19   the agency in conjunction with the other lieutenant.

20       Q.  Was there a point in time in 2020 where due to

21   the COVID-19 pandemic you were -- as well as others

22   were working remotely?

23       A.  Working remotely?  No.  Meetings were remote,

24   yes.  But I came to work every day.

25       Q.  There was no point in time where you worked

1    September 1, 2021?

2        A.   Sergeant.

3        Q.   Okay.   During your entire tenure as a city

4    police officer are you aware of any other captain,

5    sergeant, lieutenant, or member of the command staff

6    who was charged with a crime with respect to misconduct

7    or alleged misconduct towards another member of the

8    command staff or someone in the rank --

9        A.   No.

10       Q.   -- or someone in the rank of captain,

11   sergeant, or lieutenant?

12       A.   No.

13       Q.   During your tenure as a city police officer

14   are you aware of any other captain, sergeant,

15   lieutenant, or member of the command staff who was

16   charged with a crime with respect to alleged misconduct

17   towards any member of the city's police department?

18       A.   No.

19       Q.   We've referred to this a couple of times or

20   we've made reference to it, at least you have, a

21   memorandum from Interim Chief Jackson.   Do you have

22   that document in front of you?

23       A.   Yes.

24       Q.   All right.   And I'll put it up on my screen

25   just so we can mark it.

1    special operations divisions.

2        Q.  Did something change in January of 2022 with

3    respect to your rank and title and job duties?

4        A.  Yes.

5        Q.  What?  What changed?

6        A.  January 13th I was demoted without any due

7    process or conclusion of any investigation following my

8    charging decision for the misdemeanor battery against

9    Michael Steel.  And I was demoted to sergeant effective

10   immediately -- or effective a couple of days later, I

11   think the date is January 17th, and that was only

12   because that's the way they needed to do it for payroll

13   purposes and the closing of payroll.  And they stripped

14   me that day and I lost approximately $40,000 in

15   salary --

16       Q.  $40,000 --

17       A.  -- instantly.

18       Q.  -- in base salary?

19       A.  Correct.

20       Q.  What was your base salary as a captain?

21       A.  95,000.

22       Q.  What was your base as --

23       A.  68,000 --

24       Q.  -- a sergeant?

25       A.  -- as a sergeant.

Sergio Perez
November 15, 2022                                            97

1        A.  Yes.

2        Q.  Code enforcement is a division or branch of

3   the police department, is that fair -- or is that

4   correct?

5        A.  No, that's incorrect.  Code enforcement is a

6   different entity of the city.

7        Q.  They work in conjunction --

8        A.  It's a different department of the city.  They

9   do work in conjunction with the police department

10  often.  However, they have a civilian manager that

11  oversees civil code enforcement personnel.

12       Q.  You still maintained your city issued benefits

13  during this time; correct?

14       A.  Yes.

15       Q.  Now, you stated that you were demoted without

16  due process with respect to we'll call it January -- I

17  think you used January 17th from lieutenant -- I'm

18  sorry, from captain to sergeant.  How do you contend

19  that your due process rights were violated?

20       A.  I was demoted without cause, I was demoted

21  without the conclusion of any investigation, I was

22  demoted without any predetermination hearing, and --

23  and following this charging decision, which was an open

24  investigation from September that had not been

25  concluded, and, you know, that's basically my response

Sergio Perez
November 15, 2022                                              98

```
 1    in a nutshell.  You know, I was stripped, I wasn't
 2    found guilty of anything, I wasn't found guilty of
 3    violating any policy.  The demonstration practices that
 4    I -- I exhibited in September were consistent with
 5    those that, you know, other members of staff have done
 6    in the past, so...
 7         Q.  Are you contending -- do you contend that the
 8    city's actions or non-actions regarding the
 9    predetermination hearing, demotion without an
10    investigation being concluded, and demotion without
11    cause constitute violations of the CBA?
12         A.  Yes.
13         Q.  Okay.  What provision of the CBA do you
14    contend the city violated?
15         A.  The article involving investigations as well
16    as Statute 112 of the Officer Bill of Rights, and other
17    provisions in the law concerning due process.
18         Q.  Did you exhaust any grievance procedures
19    provided under the CBA with respect to these issues?
20         A.  That's a question -- so let me answer like
21    this.  Preceding this charging decision there were a
22    number of complaints that I made against the chief and
23    the things that he was doing that were unlawful,
24    against policy.  So this whole taser fiasco was the
25    work product of everything that I had been complaining
```

1    about and this was an opportunity to remove the thorn

2    out of the way for lack of a better word.

3            So I filed for whistleblower protection prior

4    to being charged with anything and this all came about

5    after that.  So the answer to your question is no as

6    far as the grievance procedure because of everything

7    else that was at play.

8        Q.  Did you attempt to go through any of the

9    procedures identified within the CBA with respect to

10   any of these issues?

11       A.  I followed the city's charter and I'm familiar

12   with the code and I filed a complaint through the city

13   in hopes that they would follow their code and give me

14   the panel so I could lay out all of these facts with

15   the evidence, but that never happened.

16       Q.  I appreciate what you're saying, but I

17   don't -- I know that doesn't answer the question.

18           I'm asking particularly about the CBA.  You've

19   been a police officer for quite some time; correct?

20   You have a lot of experience?

21       A.  Yes.

22       Q.  You're familiar with the CBA or what a CBA

23   entails in general?

24       A.  Yes.

25       Q.  And you're familiar with the CBA identifying

```
 1          Q.  And, again, on January 17th -- or January

 2   14th, 2022, when you were demoted from captain to

 3   sergeant you believe that you're covered under the CBA?

 4          A.  Yes.

 5          Q.  Okay.

 6          A.  However, and it's important, the right course

 7   of action for me to take was to follow the

 8   whistleblower provisions in the charter because of

 9   everything that occurred.  This wasn't a demotion as a

10   result of whatever, this was a demotion and all of this

11   occurred because of the complaints that I made prior

12   to.  There's so many violations from the chief and the

13   staff and I think -- and I don't want us to get away

14   from that because, yes, the Collective Bargaining

15   Agreement still applies to me.  However, there are

16   things that occurred prior to the demotion that

17   interplay here and the right course of action for me at

18   the time was to go through the city's charter and the

19   whistleblower code and that's why I went there.

20              That does not preclude me from being covered

21   by the Collective Bargaining Agreement and because I

22   didn't choose to go through the CBA at the time doesn't

23   preclude me from the benefits afforded to me therein.

24          Q.  Did you ever seek to obtain a PBA lawyer with

25   respect to the demotion without cause, a demotion
```

Sergio Perez
November 15, 2022                                                    102

1    without the conclusion of an investigation, or the

2    issue of no predetermination hearing?

3         A.   No.

4         Q.   Okay.  Aside from those three issues do you

5    contend in any other way that any due process right of

6    yours was violated?

7         A.   My answer is no at the moment.

8         Q.   There's an officer that has been identified in

9    your complaint, his name is Robert DeMoya.  Are you

10   familiar with Officer DeMoya?

11        A.   Yes.

12        Q.   Okay.  He no longer works for the city;

13   correct?

14        A.   No, he does.

15        Q.   Oh, he does, okay.  At some point in time he

16   was terminated from the city; correct?

17        A.   Yes.

18        Q.   When was that?

19        A.   Steven Barreira terminated him -- and I'm

20   referring to the emails that I told you I had, I know

21   you asked me to say that to you.  Let me go back here.

22   July 7th of 2021.

23        Q.   And what was Officer DeMoya's rank or title at

24   the time of his termination?

25        A.   Detective.

Sergio Perez
November 15, 2022                                    113

1    Lexipol thing.  It was, no, a combination of items.

2         Q.  You have -- as we sit here today you have

3    nothing though specifically to connect your Lexipol

4    objection or concern specifically to the

5    September 10th, 2021, relief of duty or any other

6    adverse action; correct?

7              MR. POLLOCK:  Objection to the form.

8         A.  Correct.

9    BY MR. RAILEY:

10        Q.  Okay.

11             Now, do you contend that John Pate ever took

12   any adverse action against you at any point during your

13   employment?

14        A.  No.

15        Q.  Okay.  Another issue that is raised in the

16   complaint is an issue regarding the city's police

17   department's utilization of a newly purchased K9; is

18   that correct?

19        A.  Yes.

20        Q.  Okay.  You know what I'm talking about?  We

21   don't have to go through the entire background as to

22   what is alleged in the complaint?

23        A.  I know what you're talking about.

24        Q.  All right.

25             Do you need a break right now?

Sergio Perez
November 15, 2022                                                    114

```
 1        A.  No.

 2        Q.  Okay.

 3            MR. RAILEY:  Janet, do you need a break?

 4            THE REPORTER:  No.

 5            MR. RAILEY:  Kyle?  I guess everyone's good.

 6            VIDEO TECHNICIAN:  I'm good.  Thank you

 7        though.

 8            MR. RAILEY:  No problem.

 9            THE WITNESS:  Hey, Jon, you didn't ask my

10        lawyer if he needed a break.  That's not fair.

11            MR. RAILEY:  Brian would tell me if he needed

12        a break.  Just like I tell him that I need a break.

13            MR. POLLOCK:  Exactly.  Let's go for another

14        30 and then maybe we can take a break.

15            MR. RAILEY:  I'm just trying to move as fast

16        as I can or as efficiently as I can through this.

17    BY MR. RAILEY:

18        Q.  All right.  In 2021 were you part of the

19    decision to purchase a police K9 for the city's police

20    department?

21        A.  Yes.

22        Q.  Okay.  How were you part of that decision?

23        A.  Well, I recreated the K9 unit that we did not

24    have for some years.  I purchased or -- what was it,

25    two police vehicles to be upfitted for K9.  I think
```

Sergio Perez
November 15, 2022                                                      115

```
 1    it's an important resource that we needed to have in
 2    our city.  And I drove up to Central Florida to select
 3    a dog along with a certified trainer that was hosting
 4    the K9 school that the officers were attending.
 5        Q.  Who authorized you to be part of this decision
 6    to purchase the K9?
 7        A.  John Pate.
 8        Q.  Okay.  Was John Pate involved in the decision
 9    as well to purchase the K9?
10        A.  Yes.
11        Q.  Okay.  You were involved.  Who else was
12    involved?
13        A.  That was -- what we say in law enforcement
14    that was my baby, but Nikeya Jenkins was involved.
15        Q.  I'm sorry, you kind of -- you kind of faded
16    out there a little bit.  You said in law enforcement we
17    call it what?
18        A.  Oh, I'm sorry, my earpiece went out.  That
19    was -- can you hear me?
20        Q.  It broke up.  At least on my end it phased out
21    again.
22        A.  Okay.  I was saying that was my baby the K9
23    unit.  So I spearheaded it, Mr. Pate was involved in
24    that, and Nikeya Jenkins was involved in it too in a --
25    in a limited capacity.
```

```
 1   not free, right?

 2        A.  Well, the training was free.  That was a

 3   relationship that I had with that agency and, you know,

 4   when you're -- when you're a policeman for a long time

 5   you build relationships, you know, with a lot of people

 6   and they help you, you know, similar to the policies

 7   and procedures that we could have gotten.  So the

 8   training was free.

 9        Q.  Okay.  And who trained the dog?

10        A.  Fort Lauderdale Police.

11        Q.  So what were your concerns that you had

12   regarding the K9 as related to Steven Barreira?

13        A.  He ordered me to make the officer stay home

14   with his dog after the dog was certified by all

15   standards to include the FDLE certification, the dog

16   was medically cleared, the police vehicle was upfitted,

17   and the unit had started, and there was no legitimate

18   reason for him ordering me to do so.  And he cited --

19   maybe I'm getting ahead.  I'll wait for your next

20   question.

21        Q.  Well, did he give you a reason as to why he

22   wanted you to order the police officer to stay home

23   with the dog?

24        A.  Yeah, he didn't like one of the policies in

25   our SOP in relation to K9 that he wanted to change.
```

Sergio Perez
November 15, 2022                                        119

1         Q.   In your opinion, as an experienced law

2    enforcement officer, is that an unreasonable request?

3         A.   It's very unreasonable.

4         Q.   Why is that?

5         A.   Because the chief had the power to issue a

6    directive immediately changing temporarily the policy

7    or directing the K9 unit not to follow or he could have

8    modified whatever he did not like temporarily up until

9    he redid the policy.  So there was no need to have a K9

10   unit not come to work after the city spent all this

11   money because of that reason.

12        Q.   Were you familiar with the policy that was in

13   place at the time?

14        A.   Yes.

15        Q.   Do you believe the policy was sufficient?

16        A.   Yes.

17        Q.   You don't believe it needed to be updated in

18   any way?

19        A.   We can always update policies.  I'm not saying

20   that any policy is good forever.  But to disallow a K9

21   unit from coming to work because you don't like a

22   sentence in the policy is unreasonable.

23        Q.   Well, would you agree that with K9s there's

24   potential additional liability by having a K9 on the

25   streets as related to --

Sergio Perez
November 15, 2022                                              120

1        A.   Yes.

2        Q.   -- liability -- liability towards the city?

3        A.   There's liability in this profession

4   altogether based on the nature of work that we do.

5   It's no different than a police officer carrying a gun.

6        Q.   And how do you contend or do you contend that

7   by Steven Barreira asking you to order the police

8   officer who had the K9 to keep the K9 home, how do you

9   contend that -- strike that.

10            Did you contend that constituted a waste of

11  funds?

12       A.   Yes.

13       Q.   How so?

14       A.   Well, we invested probably somewhere in the

15  ballpark of $100,000 for this one K9 unit to be used to

16  apprehend criminal suspects, to locate narcotics, to do

17  what a K9 unit is supposed to do, and that wasn't the

18  intended for him to sit at home.

19       Q.   But you think it was unreasonable for Steven

20  Barreira to have the dog stay at home for a period of

21  time because he believed that the policy needed to be

22  updated?

23       A.   It is unreasonable, yes.

24       Q.   How long was the dog home for?

25       A.   A couple of weeks, I believe.

Sergio Perez
November 15, 2022                                         121

```
 1        Q.  Did Steven Barreira ask you to draft or get
 2   him a proposed updated K9 policy?
 3        A.  I don't remember if he asked me for that.  I
 4   do remember him bringing a concern about the policy and
 5   I do remember telling him what the alternative was.  I
 6   was not responsible for drafting policy.
 7        Q.  So you don't recall whether he asked you to
 8   draft a policy?
 9        A.  No.  And it wouldn't be a part of what I'm
10   supposed to do --
11        Q.  Who would be?
12        A.  -- because --
13        Q.  Go ahead.
14        A.  The chief.  The chief of police would be and
15   that has to go through legal, it has to go to the city
16   manager's office, so by it's very nature that wouldn't
17   be something that I do.
18        Q.  The chief can delegate those types of tasks,
19   right?
20        A.  I have never heard of any captain or
21   lieutenant to draft agency policies.  It's always been
22   the chief of police.
23        Q.  How did you raise any concerns that we
24   discussed pertaining to the K9 staying at home to
25   Steven Barreira?  Were they verbally or in writing?
```

 1          A.   I believe it was a combination of both.

 2          Q.   The writing, were those emails?

 3          A.   Yes.

 4          Q.   Were they authored from Opa-Locka Police

 5   Department email?

 6          A.   Yes.

 7          Q.   Okay.  With your signature block on the

 8   bottom?

 9          A.   Yes.

10          Q.   Okay.  And backing up to the Lexipol issue,

11   any emails that you sent in connection with the Lexipol

12   issue were sent from your city issued email as well;

13   correct?

14          A.   Yes.

15          Q.   With your police signature -- police

16   department signature block at the bottom; correct?

17          A.   Yes.

18          Q.   How many times did you raise concerns or

19   issues pertaining to the K9 staying at home with

20   Barreira?

21          A.   Several.  Less than five.

22          Q.   All right.

23          A.   I remember vividly, and I'll share this with

24   you, I had a very I would say heated argument with him

25   over the phone where he called me when he gave me this

Sergio Perez
November 15, 2022                                    123

1    order because I remember I was having lunch.  And he

2    gave me this order and I told him that it was wrong, it

3    was unreasonable, we spent all this money.  So I

4    vividly remember that conversation and I'm sure that

5    I -- that there is email communication regarding the

6    same.

7         Q.  When did you discuss the K9 issue with

8    Barreira?

9         A.  Immediately when the dog certified and passed

10   the certification.  When he was ready to go.

11        Q.  Do you recall when specifically that was?

12        A.  No.

13        Q.  Your conversations that you had with Steven

14   Barreira regarding the K9 all occurred in the

15   workplace; correct?

16        A.  Yes, or over the phone, like I told you, while

17   I was at lunch, or via email.

18        Q.  And all during working hours as a city police

19   officer; correct?

20        A.  I don't know about that because we spoke

21   outside of working hours too.

22        Q.  Discussing city business though; correct?

23        A.  Yes.

24        Q.  Fair to say that you only had access to this

25   type of information and knowledge regarding the K9 by

Sergio Perez
November 15, 2022                                    124

```
 1    virtue of your position in the city's police
 2    department; correct?
 3         A.  Yes.
 4         Q.  And same question with respect to the Lexipol
 5    issue.  You wouldn't have had knowledge of that issue
 6    but for your employment as a city police officer;
 7    correct?
 8         A.  Yes.
 9         Q.  What adverse action do you contend was taken
10    against you because of issues that you contend you
11    raised regarding the K9?
12         A.  I was relieved of duty.  I was demoted.  I was
13    prohibited from working off-duties.  I was stripped of
14    all of my authority.  I was stripped of my police
15    credentials.  I was -- I mean, everything I've
16    described to you earlier in the depo.
17         Q.  You contend that Steven Barreira did all this
18    to you?
19         A.  He set it in motion, yes.
20         Q.  Did any -- are you contending that anyone else
21    aside from Steven Barreira took any of these adverse --
22    claimed adverse actions against you?
23         A.  No.
24         Q.  I'm sorry, was that no?
25         A.  No.
```

Sergio Perez
November 15, 2022                                    126

1   clear on that, you know.  I wanted our resources to be

2   deployed appropriately for the money that we spent on

3   them.

4        Q.  With respect -- we'll call it the issue then.

5   With respect to the K9 issue what evidence do you have

6   to link the K9 issue with any claimed adverse action

7   taken against you in this case?

8        A.  None.

9        Q.  Now, there's another item that's part of your

10  First Amendment claim against the city pertaining to

11  the storage of contraband seized at the city's flea

12  market.  Do you know what I'm --

13       A.  Yes --

14       Q.  -- talking about there?

15       A.  -- I do.

16       Q.  Can you describe that issue for me, please.

17       A.  There was a time where the Criminal

18  Investigations Division, which is one of the divisions

19  that I oversaw, made an arrest and confiscated what

20  would have been tens of thousands of dollars in

21  equipment that was stolen or otherwise unaccounted for

22  by its owners or the owners didn't -- you know, it was

23  a lot of equipment that was stolen and we could not

24  verify who owned them for some of them is what I'm

25  trying to say, I'm sorry.  This equipment was so

Sergio Perez
November 15, 2022                                    127

 1    extensive that it required overtime usage for staff, it
 2    required the renting of large containers like the ones
 3    you see on cargo ships to be placed in our police
 4    department lot for our old station and at the public
 5    works department, and some that were placed at the flea
 6    market itself to be loaded with the evidence and then
 7    transported to a designated location.  So the law says
 8    that when we confiscate something that is unclaimed or
 9    we cannot verify who the owner is we have -- we're able
10    to auction that off after 90 days.
11            We do have to make an effort to locate the
12    owners of the equipment, we do have to advertise it in
13    the paper, but once that time has elapsed it is our
14    responsibility to discard of that evidence or get rid
15    of it for lack of a better word.  And that would have
16    prevented us from paying all this money for these
17    containers month after month after month.
18            I think that answers your question, right?
19    Your first question at least.
20        Q.  Sure.  Okay.  So the city was incurring
21    storage costs of how much money per month?
22        A.  I want to say it was about 1200, but I think
23    it was more.  I'm being conservative by saying 1200.
24        Q.  And these items were seized from the flea
25    market prior to Steven Barreira's arrival at the city;

```
 1    correct?

 2         A.  Yes.

 3         Q.  And you already told me you played a part in

 4    that seizure as an officer; correct?

 5         A.  Yes.

 6         Q.  Okay.  Did Steven Barreira ever instruct you

 7    to investigate the seizure of that money to make sure

 8    it was legitimate?

 9         A.  There was no money, it was --

10         Q.  Items.

11         A.  -- items.

12         Q.  Yeah.

13         A.  Did he ever tell me to investigate it?  No.

14         Q.  Did he ever instruct you to analyze whether

15    the items seized were legitimately or lawfully obtained

16    by the city?

17         A.  Yes.  So he had a conversation with somebody

18    from that division that wasn't able to adequately

19    answer his question which resulted in him asking me,

20    you know, to look into it.  And I explained to him what

21    it was and that was a done issue the same day.

22         Q.  Did you have any subsequent conversation with

23    Steven Barreira regarding your findings of what he

24    requested you to look into?

25         A.  Yes.
```

Sergio Perez
November 15, 2022                                    129

```
 1        Q.  Okay.

 2        A.  The same day.

 3        Q.  Tell me about the substance of that

 4   conversation.

 5        A.  I sent him an email, I quoted the statute, I

 6   gave him the statute number, and I said that the

 7   confiscation of these items was completely legal and

 8   this was the process they needed to follow.

 9        Q.  Where was the contraband being stored?

10        A.  It was stored at our old police station lot.

11   I think some of the containers, because these are very

12   large containers, so imagine one container being the

13   size of a semi, 18-wheeler, so I believe some were

14   stored at public works also.

15        Q.  Did you help choose where to store these

16   items?

17        A.  Yes.

18        Q.  Okay.

19        A.  So because they were evidence they needed to

20   be secured in one of our facilities and there needed to

21   be cameras that monitored them.  We couldn't just put

22   them anywhere.

23        Q.  In that capacity that's how you learned how

24   much the city was paying per month to store the items;

25   correct?
```

Sergio Perez
November 15, 2022                                                    130

```
 1        A.  Yes.
 2        Q.  Now, the complaint in this case, docket entry
 3   37, alleges that you raised concerns or issues to Chief
 4   Barreira regarding this storage fee.  Is that accurate?
 5        A.  Yes.
 6        Q.  How many times did you raise concerns or
 7   issues to Barreira regarding these storage fees?
 8        A.  I think this one was more than five because I
 9   think we communicated about this about three times via
10   email, somewhere around that number.  And there were
11   conversations in the workplace in addition to those
12   emails.
13        Q.  All the conversations regarding the storage
14   fees occurred in the workplace with Steven Barreira?
15        A.  Yes.
16        Q.  And the emails that you referenced, those were
17   authored by you from your city issued email; correct?
18        A.  Yes.
19        Q.  And contained your signature block or the City
20   of Opa-Locka's signature block in the body of that
21   email; correct?
22        A.  Yes.
23        Q.  When did you have these conversations with
24   Steven Barreira regarding the storage fees?
25        A.  I'm just reviewing some of these emails to see
```

Sergio Perez
November 15, 2022                                    131

```
 1   if I can give you a precise date because I don't
 2   remember.
 3           They began in June of '21, I see some emails
 4   here that the city also has.  August 30th I'm
 5   requesting that the advertisements -- advertisement's
 6   required prior to being auctioned.  Yeah, so
 7   August 30th, '21.  Yeah, so right around those months.
 8       Q.  Do you have any evidence to link any
 9   conversation or concerns you had with the storage fees
10   communicated to Steven Barreira with any claimed
11   adverse action in this case?
12       A.  No.
13       Q.  Is it fair to say that you had access or you
14   learned of these storage fees by virtue of your role as
15   a city police officer?
16       A.  Yes.
17       Q.  Did you ever go to a public city commission
18   meeting to voice your concerns or objections over any
19   of the issues that we just discussed?
20       A.  Did I go before the dais in a commission
21   meeting?  No.
22       Q.  Yes, okay.
23           Did you ever raise any concerns or objections
24   regarding the issues that we just discussed to the
25   media or the press?
```

Sergio Perez
November 15, 2022                                          132

```
 1      A.  No.
 2          I'm sorry, let's me retract that.  Can you ask
 3   the question again?  Did I ever -- was this after I
 4   filed the lawsuit?
 5      Q.  I'm not talking about going or discussing your
 6   lawsuit in general with any member of the media.  I'm
 7   talking specifically related to the Lexipol issue, the
 8   K9 issue, or the flea market issue did you go to the
 9   media or the press specifically at those times --
10      A.  No, I did not.
11      Q.  -- regarding those issues?
12      A.  No, I did not.
13      Q.  Okay.  Are there any other issues or
14   statements that you -- issues that you raised or
15   statements that you made that you contend are protected
16   by the First Amendment?
17      A.  No.
18      Q.  You referenced this earlier, but the city has
19   been subject to financial oversight for the better part
20   of six years; is that correct?
21      A.  Yes.
22      Q.  Where that every expenditure has to be
23   reviewed and approved by the state oversight board?
24      A.  Yes.
25      Q.  Was there a point in time in the last three
```

Sergio Perez
November 15, 2022                                    139

```
 1        A.   Yes.

 2        Q.   Okay.   Can you describe this document for me?

 3   What's the date and who was it sent to?

 4        A.   September 28th of '21 it was sent to John Pate

 5   by James Casey and it was our request for whistleblower

 6   protection.

 7        Q.   Okay.   Aside from this document which I've

 8   labeled or marked as the city's Exhibit 4 do you

 9   contend that any other document contends -- constitutes

10   a whistleblower complaint?

11        A.   Can you ask that question again?

12        Q.   Sure.   Let me back up and ask you a threshold

13   question.

14             What I've marked as Exhibit 4 in front of you,

15   a September 28th, 2021, letter from James Casey to

16   Mr. Pate, do you contend this document is a

17   whistleblower complaint?

18        A.   Yes.

19        Q.   Okay.   Do you contend that any other document

20   that you authored or was authored on your behalf

21   constitutes a whistleblower complaint?

22        A.   Any other document.   What document are you

23   referring to?

24        Q.   I'm asking you if there are any other

25   documents aside from this one that you believe was a
```

Sergio Perez
November 15, 2022                                    140

```
 1    whistleblower complaint?

 2         A.   Okay.   Then the answer is no.

 3         Q.   Okay.

 4              All right.   Did you author this document what

 5    I've marked as Exhibit 4?

 6         A.   No.

 7         Q.   Who did?

 8         A.   My lawyer.

 9         Q.   Okay.   Did you personally provide this

10    document to John Pate?

11         A.   I don't remember whether it was -- I don't

12    remember how it was provided.

13         Q.   Okay.   I didn't ask how I asked who.  Do you

14    recall whether you or Mr. Casey provided this document

15    to Mr. Pate?

16         A.   Yes, and my answer was I don't remember.

17         Q.   Okay.   Do you know how it was sent to

18    Mr. Pate?

19         A.   From reading the document it says via email.

20         Q.   Okay.   Do you know whether Pate received this

21    document?

22         A.   Yes.

23         Q.   How do you know that?

24         A.   Because following this letter the city

25    attorney contacted me to give her a statement via Zoom.
```

Sergio Perez
November 15, 2022                                    141

1        Q.   Okay.  Did John Pate ever take any adverse

2   action against you because of this letter?

3        A.   No.

4        Q.   Do you contend that any city employee or

5   official took any adverse action against you

6   specifically because of this letter?

7        A.   No.

8        Q.   Do you have any evidence that anyone at the

9   city has ever harbored any retaliatory animus against

10  you?

11       A.   Direct evidence, no.

12       Q.   Okay.  What about indirect evidence?

13       A.   Jon, I think everything I provided you speaks

14  for itself.  All the evidence and everything I've

15  spoken to you for the last several hours.  Indirectly

16  anybody will draw the same conclusions.  You know,

17  directly, like direct evidence, of course, the answer

18  to that would be no.  But if you -- if you read through

19  the evidence and you examine everything anybody,

20  including you, would draw the same conclusions.

21       Q.   Do you know whether any city employee or

22  official outside of John Pate knew of the existence of

23  this letter?

24       A.   No, I don't.  Well, the city attorney.

25       Q.   Fair enough.  Outside of John Pate and the

Sergio Perez
November 15, 2022                                               142

 1   city attorney you have no knowledge that anybody else,

 2   city official, employee, or representative knew of this

 3   September 28, 2021, letter; correct?

 4         A.  Correct.

 5         Q.  Okay.  Let's turn to Count IV of your

 6   complaint.

 7         A.  I'm flipping a page to Count IV.  Just as a

 8   reference I'm letting you know.

 9         Q.  Okay.  That's a First Amendment retaliation

10   claim that you've asserted against the city and I want

11   to make sure I understand what the nature of the claim

12   is.

13             Are you contending that the city retaliated

14   against you because you filed the original complaint on

15   this matter on March 11th, 2022?

16         A.  Yes.

17         Q.  Okay.

18             Aside from the filing of this complaint are

19   you contending that anything else you did with respect

20   to your employment led to any retaliatory action taken

21   against you after March 11, 2022?

22         A.  Yes.

23         Q.  What else?

24         A.  Well, I have filed complaints in addition to

25   the whistleblower concerning Michael Steel.  As I

 1    Jenkins which was the assistant chief of police.

 2         Q.  And to be clear this evaluation is the 2021 to

 3    2022 evaluation?

 4         A.  Yes.

 5         Q.  Okay.  Had Nikeya Jenkins already retired by

 6    the time this evaluation was to be completed?

 7         A.  I believe so, yes.

 8         Q.  Do you have any evidence to link the notion

 9    that your evaluation was lowered or directed to be

10    lowered from 4.38 to 3.38 specifically because you

11    filed a complaint in this action?

12         A.  No direct, no.

13         Q.  What evidence do you have that the alleged

14    direction to lower the evaluation from 4.38 to 3.38 was

15    done as a result of the filing of your complaint?

16         A.  I don't have any direct evidence, but I think

17    the facts speak for themselves.

18         Q.  Okay.  What indirect evidence do you have to

19    support a contention that your evaluation was directed

20    to be lowered because you filed suit against the city?

21         A.  And that goes back to everything that I have

22    shared with you throughout this deposition.  All of the

23    facts and the occurrences as they took place.

24         Q.  Okay.  Now, the -- you alluded to this before,

25    something about a pay increase associated with a 4.38

Sergio Perez
November 15, 2022                                          151

1  rating.  Are you contending that you did not receive a

2  pay increase as a result of the --

3       A.  The bonus, the bonus I received later on, but

4  not when it was due.

5       Q.  Okay.  Tell me about that.

6       A.  That bonus came several weeks or several pay

7  periods after the fact and absent the evaluation which

8  is a violation of policy as well because both have to

9  go hand in hand in order for it to be processed.

10      Q.  What was the amount of that bonus?

11      A.  It was a longevity bonus pursuant to the CBA.

12  I think it may have been 2500 bucks.

13      Q.  Now, a longevity bonus, what does that have to

14  do with a performance evaluation?

15      A.  So the city's policy is that in order to get

16  the longevity bonus the evaluation has to be completed

17  because it's an anniversary date type of thing.

18      Q.  So you've received, as we sit here today, all

19  monies that you contend you're owed in connection with

20  this evaluation issue; correct?

21      A.  Yes.

22      Q.  In connection with the non-approval of the

23  evaluation that's alleged in your complaint, was your

24  pay ever reduced?

25      A.  No.

Sergio Perez
November 15, 2022

152

```
1        Q.  Were your benefits ever taken away?

2        A.  No.

3        Q.  And have your job duties remained the same?

4        A.  Yes.

5        Q.  Any other action you contend was taken against

6    you because you filed a complaint against the City of

7    Opa-Locka on March 11th, 2022?

8        A.  No.

9        Q.  What do you want from the city in this case?

10        A.  I would like to be restored and compensated

11    for my damages.  I think -- I think you would agree or

12    everybody would agree that my rights were violated.  I

13    lost a great deal of money that I would have earned

14    otherwise.  What you may or may not know was that in

15    addition to my employment here I was a criminal justice

16    professor at St. Thomas University where I was teaching

17    and as a direct result of this I lost that job, you

18    know.  I had -- I had a pre-construction home that I

19    was committed to buy and that was taken away from me

20    because of my reduction in pay.  And I was demoralized,

21    embarrassed to say the least.

22            So -- and I think it's important for you to

23    know, Jon, that I've never sued anybody in my life,

24    okay, and this is not who I am or what I like to do.

25    But, unfortunately, the way that everything played out
```