Page 1

1                  UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
2
                   Case No.  0:22-cv-20748-JAL
3

4        _____

5     SERGIO PEREZ,

6                       Plaintiff,

7     vs.

8     CITY OF OPA-LOCKA,

9                       Defendant.
      _____
10

11

12

13              DEPOSITION OF SERGIO PEREZ
                   Pages 1 through 190
14                    (Videotaped)

15

16

17             Tuesday, November 15, 2022
                 10:04 a.m. - 3:19 p.m.
18           Remote Videoconference Deposition

19

20
                Stenographically Reported By:
21           Janet L. McKinney, RPR, FPR-C, CLR
               Registered Professional Reporter
22             Florida Professional Reporter
                Certified LiveNote Reporter
23

24

25

Sergio Perez
November 15, 2022                              2 to 5

Page 2

```
 1  APPEARANCES:
 2  ON BEHALF OF THE PLAINTIFF:
 3     FAIRLAW FIRM
        7300 N. Kendall Drive
 4      Suite 450
        Miami, Florida 33156
 5      305.230.4884
        Brian@fairlawattorney.com
 6      BY: BRIAN H. POLLOCK, ESQ.
 7
    ON BEHALF OF THE DEFENDANT:
 8
       JOHNSON, ANSELMO, MURDOCH, BURKE,
 9     PIPER & HOCHMAN, P.A.
       2455 E. Sunrise Boulevard
10     Suite 1000
       Fort Lauderdale, Florida 33304
11     954.463.0100
       Railey@jambg.com
12     BY: JONATHAN H. RAILEY, ESQ.
13
    Also Present:
14
       Kyle Hankins, Video Technician
15     U.S. Legal Support
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              I N D E X
 2  SERGIO PEREZ                            Page
 3  Direct Examination By Mr. Railey          5
    Cross-Examination By Mr. Pollock        173
 4  Certificate of Oath                     187
    Certificate of Reporter                 188
 5  Witness Notification Letter             189
    Errata Sheet                            190
 6
 7           E X H I B I T S
 8  PLF'S
    No.    Description                      Page
 9
                 None
10
11  DEFT'S
    No.    Description                      Page
12
     1    Email Bates stamped Plaintiff,     73
13        Perez 000222-000223
14   2    Memorandum City of Opa-Locka       81
          September 10, 2021 Bates stamped
15        Plaintiff, Perez 000271
16   3    11/15/2021 Memorandum from Interim 92
          Chief Jackson to John Pate Bates
17        stamped Plaintiff, Perez 000288
18   4    Letter dated September 28, 2021   138
          from Slesnick & Casey, LLP Bates
19        stamped Plaintiff, Perez
          000272-000273
20
     5    Text message string Nov. 7, 2020  170
21        Bates stamped Plaintiff, Perez
          000575
22
23
24
25
```

Page 4

```
 1         Videotape deposition taken before JANET L.
 2  MCKINNEY, Registered Professional Reporter, Florida
 3  Professional Reporter, Certified LiveNote Reporter and
 4  Notary Public in and for the State of Florida at Large
 5  in the above cause.
 6                        *****
 7         VIDEO TECHNICIAN:  Good morning.  We're now on
 8  video record.
 9         Participants should be aware this proceeding
10  is being recorded and as such all conversations
11  held will be recorded unless there's a request and
12  an agreement to go off the record.
13         This is the recorded deposition of Sergio
14  Perez taken on Tuesday, the 15th of November, 2022.
15  The time is 3:05 p.m. UTC which is 10:05 a.m.
16  Eastern Standard Time.
17         At this time would all counsel state their
18  appearances for the record beginning with
19  plaintiff's counsel first, please.
20         MR. POLLOCK:  Brian Pollock for the plaintiff.
21         MR. RAILEY:  Good morning.  John Railey for
22  the city.
23         VIDEO TECHNICIAN:  Madam Court Reporter, you
24  may proceed.
25         THE REPORTER:  Sir, would you please display
```

Page 5

```
 1  your government-issued identification to the camera
 2  for us.
 3         THE WITNESS:  Sure.
 4         THE REPORTER:  Thank you very much.
 5         Now would you raise your right hand.
 6         Do you solemnly swear or affirm the testimony
 7  you are about to give will be the truth and nothing
 8  but the truth?
 9         THE WITNESS:  I do.
10  THEREUPON:
11              SERGIO PEREZ
12  having been first duly sworn or affirmed, was examined
13  and testified as follows:
14              DIRECT EXAMINATION
15  BY MR. RAILEY:
16     Q.  Good morning, sir.
17     A.  Good morning.
18     Q.  My name is Jon Railey.  I'm with the law firm
19  of Johnson Anselmo in Fort Lauderdale and together with
20  my law partner Chris Stearns we represent the City of
21  Opa-Locka with respect to the lawsuit that you've
22  initiated against the City of Opa-Locka.
23         For brevity purposes if I say "city" moving
24  forward will you understand that to mean the City of
25  Opa-Locka?
```

Page 6

1    A. Yes.
2    Q. Okay. Now, I don't think we've had the
3  pleasure of meeting before. You stated that you've had
4  many occasions to meet or consult with Chris Stearns in
5  other matters; is that correct?
6    A. Yes.
7    Q. Okay. But you did say, "Oh, the famous Jon
8  Railey, I've heard you're a nice guy," so...
9    A. Correct, I did.
10    Q. Who told you I was a nice guy?
11    A. Brian told me you were a nice guy for
12  starters, so...
13    Q. Okay. Anybody else?
14    A. People, lawyers, you know.
15    Q. Anyone at the city?
16    A. No.
17    Q. What other lawyers?
18    A. Not to me at least. Not to me at least.
19    Q. What other lawyers?
20    A. I don't really remember.
21    Q. All right. Well, I do like to think I'm a
22  nice guy, so I don't think anyone's fabricating that,
23  especially if it's coming from Brian's mouth.
24       All right. So we're here today to take your
25  deposition with respect to the lawsuit that you've

Page 7

1  initiated against the city. Do you understand that?
2    A. Yes.
3    Q. All right. Have you ever given a deposition
4  before?
5    A. Many times.
6    Q. Okay. How many times?
7    A. Hundreds.
8    Q. Hundreds, all right. Have those been in your
9  professional, personal, combination of both?
10    A. A combination.
11    Q. All right. What percentage have been in your
12  professional capacity versus your personal capacity?
13    A. Probably 99 percent in my capacity.
14    Q. Okay. As a -- as a police officer?
15    A. Yes, sir.
16    Q. Okay. The 1 percent regarding your, I guess,
17  personal experience giving a deposition, what was that
18  with respect to?
19    A. Relative to matters like this. Relative to
20  suits that I have been a part of as a defendant or a
21  plaintiff.
22    Q. Got it. All right. We'll get into that in
23  just a moment. When is the last time you've given a
24  deposition?
25    A. Perhaps sometime last year.

Page 8

1    Q. All right.
2    A. I don't remember exactly.
3    Q. No problem. What was that deposition with
4  respect to?
5    A. A defendant that was charged with a crime
6  during my official, you know, capacity as a police
7  officer.
8    Q. Okay.
9    A. Whether it be supervisor or not, I don't
10  remember.
11    Q. All right. So you were just a witness with
12  respect to that deposition?
13    A. Yes.
14    Q. Okay. All right. We'll go over a couple
15  rules just so we have it for the record. I'm sure you
16  know these rules.
17       Just as you're doing now please respond with
18  verbal answers. The court reporter cannot take down
19  ah-has, head nods, stuff like that. So if I ask you to
20  verbalize an answer it's so we that -- it's so that we
21  have a clear record. Does that make sense?
22    A. Yes.
23    Q. On that same line, please let me finish my
24  question before proceeding with your answer. You're
25  likely going to anticipate a number of my questions,

Page 9

1  but the court reporter cannot take both of us talking
2  at the same time, so it's important that we do not talk
3  over each other. Does that make sense?
4    A. Understood.
5    Q. If my question is unclear to you or you do not
6  understand it, will you please let me know?
7    A. Yes.
8    Q. Okay. If you answer my question I'm going to
9  assume that you understood it; is that fair?
10    A. Yes.
11    Q. From time to time your attorney may place an
12  objection on the record. You'll hear him say, "Object
13  to the form." That's the legal stuff for the attorneys
14  and the judge to figure out at a later time. Unless
15  Mr. Pollock instructs you otherwise you still are
16  required to answer the question.
17       Do you understand that?
18    A. Yes.
19    Q. Okay. Before we get started is there any
20  reason why you cannot testify truthfully today?
21    A. None.
22    Q. All right. In the last 24 hours have you
23  consumed any drugs, medication, or alcohol that would
24  inhibit your ability to provide truthful testimony?
25    A. No.

Page 10

1    Q.  Where are you currently giving this
2  deposition?
3    A.  At my home.
4    Q.  Okay.  Is anybody home with you?
5    A.  No.
6    Q.  Are you expecting in the next two to three
7  hours anyone to come home or to enter your home?
8    A.  No.
9    Q.  Okay.  If for any reason someone does enter
10 the room or your house will you please let me know?
11   A.  Sure.
12   Q.  Aside from speaking to your attorney, and just
13 as a ground rule I don't ever want to know the
14 substance of any conversation that you had with
15 Mr. Pollock or any other lawyer that you've retained or
16 consulted with in connection with this matter and
17 potentially other matters, but aside from meeting with
18 your attorney did you do anything to prepare for
19 today's deposition?
20   A.  No.
21   Q.  Did you review any documents relative to this
22 case?
23   A.  I have documents in front of me relative to
24 the case just to refer to it if I need to.
25   Q.  Yeah, that was my next question.  You answered

Page 11

1  yes.  What documents do you have in front of you
2  relative to this case?
3    A.  I have a set of emails, the complaint itself,
4  memorandums relative to this case, my evaluations.
5  That's the extent of it.
6    Q.  Do the documents that you have in front of you
7  have what we call in our field Bates labels, like on
8  the bottom right they have a name and a number?
9    A.  Like exhibits?  No, they don't.
10   Q.  The complaint that you have in front of you,
11 is that the Second Amended Complaint?
12   A.  Yes.
13   Q.  Okay.  The set of emails that you have in
14 front of you, can you describe those emails for me if
15 they don't have Bates labels?
16   A.  Sure.  Sure.  These emails began somewhere
17 around July of '21.  They're between myself and the
18 former chief of police, Steven Barreira.  They're on
19 different topics, different issues that arose at that
20 time that I brought to the attention of the former
21 chief.
22   Q.  Have all these emails been provided to
23 Mr. Pollock?
24   A.  Yes.
25   Q.  Okay.  You said you have some memos relative

Page 12

1  to this case.  Do those have any Bates label numbers or
2  names on the bottom right?
3    A.  No, they do not.
4    Q.  Okay.  Can you describe what memos you have in
5  front of you?
6    A.  Sure.  The one memo I have is from Chief
7  Steven Barreira when he stripped me of my law
8  enforcement duties on September -- I'm going to tell
9  you the date right now, I think it's September 10th,
10 but I will verify that in a second here.
11       Yep, that's September 10th of '21 when I was
12 stripped of my responsibilities by Chief Steven
13 Barreira accompanied by a property receipt, which I
14 didn't mention earlier, where my police credentials, my
15 vehicle, and my city equipment was also confiscated by
16 the chief or his staff.
17   Q.  What is the date of that property receipt?
18   A.  The same, September 10th.
19   Q.  Any other memos in front of you?
20   A.  I have a November 15th memorandum from then
21 Chief Dennis Jackson reinstating me to my position of
22 captain.  And that is it.
23   Q.  Okay.  I believe you said you had some
24 evaluations, your own evaluations; is that accurate?
25   A.  Yes.

Page 13

1    Q.  What years or year of evaluations --
2    A.  Okay.
3    Q.  -- do you have in front of you?
4    A.  Let's see, I have my 2020 through 2021
5  evaluation.
6        And then my Exhibit 10 is several versions of
7  my evaluation from March 8th, '21 to March 8th, '22.
8  And when I say several versions because they were
9  changed by the then interim chief of police.
10   Q.  Do you have a final version in front of you?
11   A.  I don't know what the final version is, I'm
12 sorry.  I have these two copies, but I don't know -- to
13 this date I haven't received the official executed
14 evaluation for that time period.
15   Q.  And all the documents in front of you today
16 have been provided to Mr. Pollock in advance of this
17 deposition?
18   A.  Yes.
19   Q.  Okay.  What is your highest level of
20 education?
21   A.  I have a master's degree.
22   Q.  Okay.  In what?
23   A.  Criminal justice management.
24   Q.  And from where?
25   A.  St. Thomas University.

Page 14

1    Q. And when did you obtain that master's degree?
2    A. In 2018.
3    Q. What other degrees do you have higher
4  education-wise?
5    A. Sure. I have a bachelor's degree from Barry
6  University in public administration and I also have a
7  vocational program or vocational degree, if you would
8  call it, from Northwestern University School of Police
9  Staff and Command.
10   Q. When did you obtain your bachelor's degree
11 from Barry University?
12   A. 2016.
13   Q. And the Northwestern University School of --
14 I'm sorry, the final part of that was Police --
15   A. Police Staff and Command.
16   Q. And command. When did you obtain that degree?
17   A. In 2020.
18   Q. Now, that's a bachelor's degree?
19   A. That's a vocational leadership program from a
20 university.
21   Q. Understood.
22      Did the city pay for any of your either
23 master's degree, bachelor's degree, or vocational
24 leadership degree?
25   A. They paid for the leadership degree.

Page 15

1    Q. Okay. In full or in part?
2    A. In full.
3    Q. Do you know how much that was?
4    A. It was a few thousand, but I don't remember
5  exactly.
6    Q. Okay. Was that online?
7    A. Maybe 4500. Yes.
8    Q. Yes, it was online?
9    A. Yes.
10   Q. Okay. How long was that program?
11   A. Six months.
12   Q. Any other degrees?
13   A. No.
14   Q. You reference prior lawsuits where you've
15 either been a plaintiff or a defendant. What cases
16 have you been a plaintiff in aside from this -- this
17 case?
18   A. My divorce. It was a family court case, I
19 don't remember the specifics, and that was it.
20   Q. Okay. Where was that case filed?
21   A. Miami-Dade.
22   Q. And what cases have you been named
23 individually as a defendant in?
24   A. Individually there was a wrongful death claim
25 filed against the city and I in 2014, I believe. And I

Page 16

1  think I've had maybe two more after that, but I really
2  don't remember, all within the scope of my duties as a
3  police officer for the city.
4      And, of course, Michael Steel filed a federal
5  suit which was dismissed, but he -- I've since learned
6  that he filed a state tort case against me individually
7  in state court the day he was terminated.
8    Q. Any other cases that you can think of that you
9  were a named defendant in?
10   A. No.
11   Q. You mentioned a wrongful death claim, a tort
12 claim filed against you by Michael Steel, and then two
13 others that you recall and you stated all within your
14 scope as a city police officer. What was the nature of
15 those two cases?
16   A. They were excessive use of force and I think
17 one I was the sergeant for -- supervising some officers
18 that made an arrest, so I was named as a defendant
19 along with them in that case.
20   Q. Do you remember the name of the plaintiff in
21 either of those cases?
22   A. One of them Crayton was the guy, but the judge
23 dismissed that recently. But I think he was having a
24 hearing again to hear some of the facts again, I'm not
25 sure.

Page 17

1    Q. Do you remember the other one?
2    A. No.
3    Q. Have you ever been convicted of a crime --
4    A. I can -- no.
5    Q. I'm sorry, you were about to say something
6  else. Go ahead.
7    A. I said I can review my interrogatories here
8  and better answer your question if you like.
9    Q. No, that's okay. I have a copy of those. If
10 you want to say you defer to what's in the
11 interrogatory answers we can take that as --
12   A. Okay.
13   Q. -- your answer.
14   A. So I'll defer.
15   Q. That's fine.
16      All right. You've never been convicted of a
17 crime. Have you ever been charged with a crime?
18   A. Yes.
19   Q. Okay. When?
20   A. Most recently last week I was charged with
21 misdemeanor battery for a use of force case which I was
22 cleared from in 2020.
23      I was charged with misdemeanor battery in
24 January of this year against Michael Steel.
25   Q. Any other charges?

Sergio Perez
November 15, 2022                                      18 to 21

Page 18

1      A.  And I was charged with reckless driving in
2   2006, but that was a traffic offense.  It is considered
3   a misdemeanor traffic offense, so I'll inform you of
4   that.
5      Q.  Okay.  The reckless driving in 2006, was that
6   while you were a city police officer?
7      A.  No.
8      Q.  Personal?
9      A.  Yes.
10     Q.  The misdemeanor battery charge that you were
11  arrested for last week you said for the use of force,
12  have those charges been filed against you to your
13  knowledge?
14     A.  Yes.  So I was issued a summons to appear, I'd
15  like to clarify that for the record.  You know, I
16  wasn't arrested or transported in any of the -- but I
17  was issued a criminal notice to appear.  And what was
18  your question, I'm sorry?
19     Q.  Just whether you had been -- whether those --
20  it's one charge, correct, whether that charge has
21  been --
22     A.  Yeah.
23     Q.  -- filed?
24     A.  To my understanding, yes.
25     Q.  Okay.  Now, is that use of force -- you

Page 19

1   mentioned a couple of the civil actions.  Is that
2   related to the other -- or one of the other excessive
3   use of force cases where you were named individually as
4   a defendant?
5      A.  Yes.
6      Q.  Okay.
7      A.  Yes.
8      Q.  And in January 2022 you were charged with
9   misdemeanor battery with respect to an incident that
10  occurred with Michael Steel?
11     A.  Yes.
12     Q.  That's the subject or one of the subjects of
13  this lawsuit; correct?
14     A.  Yes.
15     Q.  When I say the subject I'm referring to -- I'm
16  going to use the word taser incident on September 1,
17  2021, between you and Steel; is that fair?
18     A.  Yes.
19     Q.  Okay.  We'll get to that.
20         Has that charge been filed against you to your
21  knowledge?
22     A.  Yes.
23     Q.  Okay.  Where is it pending?
24     A.  Miami-Dade courts.
25     Q.  Okay.  Has trial been set in that case?

Page 20

1      A.  For January 23rd.
2      Q.  Of 2023?
3      A.  Yes, sir.  If it makes it to trial.
4      Q.  Understood.
5         All right.  Let's talk about your employment
6   with the city.  How long have you been employed by the
7   city?
8      A.  Since March 8th of 2008.
9      Q.  Let me back up too.  Before March 8th, 2008,
10  did you have any prior law enforcement experience?
11     A.  No.
12     Q.  Okay.  What did you do occupation-wise prior
13  to March 8th, 2008?
14     A.  I worked security, I was a dispatcher, I was a
15  store manager at Off-- -- I'm sorry, an assistant store
16  manager at Office Depot.  I had retail jobs for the
17  most part.
18     Q.  Did you go to the police academy?
19     A.  Yes.
20     Q.  When?
21     A.  In 2006.
22     Q.  Were you sponsored by the city?
23     A.  I was sponsored -- I was self-sponsored when I
24  graduated.  The city hired me while I was in the
25  academy nearing graduation.

Page 21

1      Q.  You say you were self-sponsored when you
2   graduated.  Are you trying to make a distinction from
3   the time that you graduated from the time that you
4   started?
5      A.  Well, they hired me while I was in the academy
6   and started paying me then, so, you know, it was
7   towards the end.
8      Q.  Okay, I understand.
9         What was your first position that you held
10  upon hire with the city?
11     A.  Police officer.
12     Q.  Road patrol?
13     A.  Yes.
14     Q.  What -- not holding you to a specific month,
15  if you want to give me general dates or years, what
16  years did you hold that position?
17     A.  From start till I want to say 2011 I was on
18  uniform patrol.
19     Q.  Okay.  Did you get promoted in 2011?
20     A.  Yes.
21     Q.  To what?
22     A.  I was made a detective in the Crime
23  Suppression Team at the time.
24     Q.  How long did you hold that position?
25     A.  The unit itself lived for about six months

Page 22

1  until it was dismantled and everyone placed back on
2  patrol.
3      Q.  Okay.  I'm sorry, it was two years, is that
4  what you said?
5      A.  Six months.
6      Q.  Six months.  All right.  And then you went
7  back to road patrol.  How long were you then on road
8  patrol for?
9      A.  After CST for years.
10     Q.  What was your next position?
11     A.  In 2012 I was made to be a police corporal
12 which was a supervisory rank.
13     Q.  Before going any further can you tell me what
14 the structure is in the City of Opa-Locka's police
15 department regarding ranks?
16     A.  I don't mean to be funny, but it depends on
17 what the flavor is of the day.  At the time the
18 corporals were the sergeants.  We didn't have any
19 sergeants.  Then that changed.  So what -- I'll say
20 this.  The structure now is chief of police, then
21 second-in-command will be the deputy chief of police,
22 third-in-command will be a captain, and then fourth
23 will be the line supervisors which are now sergeants.
24 The rank of corporal doesn't exist anymore.
25     Q.  Okay.  And then --

Page 23

1      A.  But throughout --
2      Q.  Go ahead.
3      A.  But throughout the years we have had changes
4  where we've had majors and no captains, or we've had
5  lieutenants and no captains, so it all depends.  And
6  the roles have -- have changed and the responsibilities
7  have changed.  So it all depends on what, you know,
8  year we're talking about.
9      Q.  Okay.  What about in September -- let me back
10 up.  What about just in 2019 in general do you recall
11 what the structure was or the rankings?
12     A.  Well, in 2019 it was chief, assistant chief,
13 lieutenants, sergeants, corporals, and then officer.
14     Q.  Any captains?
15     A.  None.  No captains, no majors, no commanders,
16 no.
17     Q.  How about in 2021?
18     A.  In 2021 it was chief, assistant chief,
19 captain, and then sergeant.
20     Q.  Okay.
21     A.  And then officer.  No corporals.
22     Q.  Okay.  So in 2012 you received a promotion to
23 corporal.  How long did you hold that position for?
24     A.  Eight years.
25     Q.  Eight years?

Page 24

1      A.  Yes, sir.
2      Q.  Okay.  And during those eight years if I
3  understand your testimony correctly, tell me if I'm
4  wrong, the corporal was kind of used interchangeably
5  with lieutenant or captain?
6      A.  With sergeant.
7      Q.  With sergeant, I'm sorry.  Okay.
8      A.  Yes.  We were the line supervisors.
9      Q.  Got it.
10     A.  There was no sergeant in our place.  We were
11 the sergeants.
12     Q.  It's a problem when I can't read my own
13 handwriting.
14         Okay.  After 2021 what position did you
15 hold -- I'm sorry, strike that.
16         What was your next position after the
17 corporal/sergeant position?
18     A.  I -- so the city was doing away with the
19 corporals and gave a sergeant's test in 2019 which I
20 took and passed, I scored number one.  And after that I
21 was promoted to lieutenant in 2020 and then promoted to
22 captain in 2021.
23     Q.  When in 2021 were you promoted to captain?
24     A.  If my memory serves me well it was February of
25 '21.

Page 25

1      Q.  Is the captain position or at the time was the
2  captain position a tested position?
3      A.  No.
4      Q.  Do you know what I mean by tested position?
5      A.  Yes, like a Civil Service tested rank.
6      Q.  Right, okay.  So it was more -- fair to say it
7  was an appointment?
8      A.  Yes.
9      Q.  Okay.  And who appointed you to captain in --
10 again, I'm not holding you to a specific date, but you
11 testified February 2021?
12     A.  Who appointed me is your question?
13     Q.  Yeah.
14     A.  John Pate.
15     Q.  Did John Pate --
16     A.  City manager.
17     Q.  Okay, city manager.
18         Did John Pate in February of 2021 have that
19 final authority to appoint you captain?
20     A.  Yes.
21     Q.  Are you familiar with the Collective
22 Bargaining Agreement which we'll refer to as the CBA?
23     A.  Yes.
24     Q.  Okay.  What officers, from your understanding,
25 are covered by the CBA?

Page 26

1    A. All -- all paying members are covered by the
2  CBA. And I have examples that I can give you.
3    Q. What do you mean by examples?
4    A. Examples of captains and lieutenants when the
5  rank was a part of the organizational chart that were
6  all represented by the PBA in addition to officers,
7  corporals, and sergeants.
8    Q. Is there a document that reflects that?
9    A. I'm sure I have an email between me and the
10  PBA concerning a demoted lieutenant at the time that
11  they were representing. And, of course, as you may or
12  may not know they're representing Michael Steel in his
13  termination.
14    Q. Is it your contention that at all times
15  relevant to the issues presented in this case you were
16  a covered employee under the CBA?
17    A. Yes.
18    Q. Isn't it true that the CBA excludes
19  lieutenants and captains?
20    A. No.
21    Q. Is there any document that you can point to
22  that shows me that a lieutenant and captain are covered
23  under the CBA?
24    A. I can show you communication with the PBA
25  where they were covering a lieutenant and a captain.

Page 27

1    Q. Do you have that communication in front of
2  you?
3    A. No.
4    Q. Okay. Have you provided that communication to
5  your attorney?
6    A. No.
7    Q. Okay. So I'll do what's called a request for
8  production in this case and I'll go through your lawyer
9  to obtain those communications/documents, whatever they
10  may be, okay?
11    A. Sure.
12    That would be just for the lieutenant. The
13  Captain Steel case I don't have any documents for that,
14  I just want to be clear on that. But I am aware that
15  they're representing him.
16    Q. Okay. I want to just talk about you. I
17  understand that you were saying your understanding is
18  that it does cover captains because they, meaning the
19  CBA lawyers -- or union lawyers may be covering Steel.
20  I want to focus on you, Sergio Perez.
21    A. Sure.
22    Q. Are there any documents that you can point me
23  to that show that you, Sergio Perez, were protected by
24  the CBA at the time period that you were a captain for
25  the city?

Page 28

1    A. I don't think any documents would exist, so
2  the answer is no, other than the Collective Bargaining
3  Agreement itself and my payments as a union member
4  which continued. I'm not sure if that would help.
5    Q. Do you have receipts for those payments as a
6  union member?
7    A. I'm sure I can get them because they're
8  deducted automatically through the payroll system of
9  the city.
10    Q. Okay, understood.
11    What is your current title or position with
12  the city?
13    A. Police sergeant.
14    Q. Let me back up one moment. Have you ever held
15  the title of chief of police for the City of Opa-Locka?
16    A. I was an acting.
17    Q. When was that?
18    A. In 2020. So I was promoted to lieutenant, but
19  I was in an acting role because I was the highest
20  ranking officer in the police department at the time.
21    Q. The city was without a chief?
22    A. Yes.
23    Q. What -- what months did that occur? Month or
24  months did that occur in 2020?
25    A. August.

Page 29

1    Q. Okay. Who appointed you acting chief of
2  police in August of 2020?
3    A. John Pate appointed myself and Jenkins was the
4  other lieutenant that he promoted, so we both ran the
5  department together.
6    Q. Were you formally appointed acting chief of
7  police?
8    A. What do you mean by formally?
9    Q. Is there a document from John Pate to the City
10  of Opa-Locka's Police Department appointing you or
11  memorializing your appointment as an acting chief of
12  police in August of 2020?
13    A. Not that I'm aware of, but I know there was an
14  article on the news that came out that said that I was
15  in that role.
16    Q. And you said John Pate appointed both you and
17  Jenkins to run or oversee the department?
18    A. Yes.
19    Q. What is Jenkins first name?
20    A. Nikeya, N-I-K-E-Y-A.
21    Q. Does Nikeya Jenkins still work for the city?
22    A. She retired.
23    Q. She retired? Okay.
24    When did she retire?
25    A. I want to say March of this year.

Page 30

1   Q. And did Nikeya Jenkins receive any temporary
2   or acting title at the same time that you testified
3   that John Pate appointed you acting chief of police in
4   August 2020?
5       A. Not that I'm aware of.  Again, we were both
6   made lieutenants, promoted the same day, and charged
7   with leading and running the department.
8       Q. And how long were you tasked with leading or
9   running the department?
10      A. Up until the time that we got a chief of
11  police.  A national search was underway and I would say
12  until the point that Steven Barreira got hired.
13      Q. So approximately what amount of time was that?
14      A. Well, when I was promoted to captain he was
15  already there, so maybe -- maybe a year and some
16  change.
17      Q. Does the year --
18      A. Don't quote me on my dates.
19      Q. That's fair.  I'm going to use your language
20  though.  Is it fair to say a year -- one year and some
21  change you were acting chief of police for the City of
22  Opa-Locka?
23      A. Myself in conjunction with Lieutenant Jenkins.
24      Q. But Jenkins --
25      A. We had equal authority --

Page 31

1       Q. But Jenkins --
2       A. -- yes.
3       Q. -- to your knowledge had no such title;
4   correct?
5       A. No.
6       Q. No, that's not correct or no, she had no
7   title?
8       A. She had the title of lieutenant like I did.  I
9   never wore stars on my sleeve, but we both ran the
10  department.  You know, we had our share of
11  responsibilities.
12      Q. Who -- during this period who did you directly
13  report to?
14      A. John Pate.
15      Q. And then Barreira was hired as the chief of
16  police and you --
17      A. I was promoted to captain then.
18      Q. Okay.
19      A. And Nikeya Jenkins was promoted to assistant
20  chief.
21      Q. You're currently a sergeant?
22      A. Yes.
23      Q. How long have you been a sergeant?  Let me
24  know if you don't understand the question.
25      A. Are you saying when was I demoted, is that

Page 32

1   your question?
2       Q. From the time that we sit here today moving
3   backwards how long have you held the rank of sergeant?
4   Does that make sense?
5       A. I was demoted the day after I was charged with
6   this misdemeanor battery.
7       Q. Okay.
8       A. But I'll tell you --
9       Q. Go ahead, I'm sorry.
10      A. But there are very -- and I think this is
11  important to your questions because I'll say this.
12  John Pate was on a telephone call with a sitting
13  commissioner that was demanding him that he either
14  demote me or fire me.  And that commissioner is Audrey
15  Dominguez.
16      Q. All right.  Let me break that down.
17          So you said you were demoted the day after you
18  were charged with and you used the word "this"
19  misdemeanor battery.  We've got two misdemeanor battery
20  charges, one as recent as last week and one related to
21  Michael Steel; correct?
22      A. The one relating to Michael Steel.
23      Q. That's what you're referring to right now?
24  Okay.
25      A. Yes.

Page 33

1       Q. When was that?
2       A. When was what, the phone call or --
3       Q. Strike that.  I apologize.
4           When was the demotion, in your words, the day
5   after you were charged with the misdemeanor battery
6   with respect to Michael Steel?
7       A. January 13th.
8       Q. What year?
9       A. '22.
10      Q. Okay.  And prior to January 13th, 2022, what
11  was your position or rank?
12      A. Captain.
13      Q. All right.  You mentioned a phone call.  John
14  Pate was on a call with Commissioner Dominguez with --
15      A. Yes.
16      Q. -- Commissioner Dominguez allegedly demanding
17  to terminate you?
18      A. Yes.
19      Q. Okay.  Were you part of that phone call
20  yourself?
21      A. I was nearby and I can hear it.
22      Q. Okay.  When you said nearby where were you?
23      A. He was in an office with the chief at the
24  time.  The door was open and I was I think in the
25  doorway.

Sergio Perez
November 15, 2022                                    34 to 37

Page 34

1    Q.  You said "he" referring to John Pate?
2    A.  He John Pate and the former chief, Dennis
3  Jackson.
4    Q.  Okay.
5    A.  The one that reinstated me November of '21.
6    Q.  Got it.  Okay.
7        Did you ever have any subsequent conversation
8  with John Pate regarding that telephone call with
9  Audrey Dominguez?
10   A.  No.
11   Q.  Did you ever have any subsequent conversation
12  with Dennis -- Dennis Jackson regarding that telephone
13  call with Audrey Dominguez?
14   A.  No.
15   Q.  And when did you overhear -- you used the word
16  you were in the doorway.  When did you overhear that
17  conversation when you were in the doorway?
18   A.  I don't understand that question.
19   Q.  Sure.  What date did that incident occur?
20   A.  That was the day after I was charged, so that
21  would have been January 13th.
22   Q.  Okay.  And on January 13th who advised you
23  that your new rank or title would be sergeant?
24   A.  I received the PA form that had the human
25  resource director's signature, the chief of police, and

Page 35

1  the city manager's signature.
2        MR. POLLOCK:  Sergio, do you want to explain
3     what a PA form is?
4    A.  It's a personnel action form that --
5        MR. POLLOCK:  Okay.
6    A.  Yeah, personnel action form.  They use this
7  form anytime that there is a change in your rank or
8  status or anything of such.
9    Q.  And -- okay.  Regarding the change in rank or
10  status who holds the final decision regarding that
11  change, is it the city manager?
12   A.  Yes.
13       MR. RAILEY:  Give me one second.  The light
14     from my window is making it very tough to read my
15     paper.  Give me one second.
16       MR. POLLOCK:  No problem.
17       (Brief interruption.)
18       MR. RAILEY:  All right, much better.
19  BY MR. RAILEY:
20   Q.  All right.  Are you currently suspended?
21   A.  Yes.
22   Q.  As of when?
23   A.  Last week.
24   Q.  Okay.  And that was -- the suspension occurred
25  as a result of the misdemeanor battery charge?

Page 36

1    A.  Misdemeanor and summons, yes.
2    Q.  Summons, okay.
3        And who suspended you?
4    A.  The chief of police, Scott Israel.
5    Q.  And did that have to be approved by the city
6  manager?
7    A.  It's supposed to be, yes.
8    Q.  Do you have any reason to tell me that it was
9  not approved by the city manager?
10   A.  Well, I'll share this with you.  When he
11  called me in last week to suspend me there was a
12  conversation and -- and it ended with me going up to
13  the manager's office to discuss the action that was
14  being taken against me.  There's a lot of factors
15  surrounding that action that are inappropriate and
16  there's some procedural violations in relation to how
17  this new case, new charge came about, especially after
18  I was cleared in 2020.  So this suspension is still up
19  in the air.
20   Q.  Okay.
21   A.  That's my opinion of it.
22   Q.  Got you.  And I'm not going to go into too
23  much more detail.  I have a couple of follow-up
24  questions, then I'm going to move on to what's
25  contained in the complaint.

Page 37

1    A.  Sure.  Sure.
2    Q.  Is this suspension currently with or without
3  pay?
4    A.  Without.
5    Q.  Without.  Are you working in any capacity
6  during the suspension?
7    A.  No.
8    Q.  Okay.  And, lastly, a couple of follow-up
9  questions.  You said you spoke to the city manager
10  regarding this suspension; is that correct?
11   A.  Yes.
12   Q.  Who is the city manager?
13   A.  Darvin Williams.
14   Q.  And what did Mr. Williams -- strike that.
15       What did you tell Mr. Williams with respect to
16  the suspension?
17   A.  We had a conversation in regards to the IA
18  investigation that was conducted where I was cleared.
19  I informed him that there were serious violations of
20  the Fifth and Fourteenth Amendment, Statute 112 the
21  Officer Bill of Rights concerning an interview that was
22  conducted by Scott Israel on May 16th regarding the
23  same case.  And that is three days after he, himself,
24  requested the Florida Department of Law Enforcement to
25  reopen a criminal investigation into me after I was

Page 38

1  cleared and that was just six days after he was hired
2  by the city as the new police chief.  So I conveyed all
3  of these things to the manager during this meeting and
4  I was informed that the IA file hadn't even been
5  reviewed before these decisions were made against me.
6       Q.  Was anyone else present for your conversation
7  with the city manager?
8       A.  No.  The chief was told to leave.
9       Q.  By who?
10      A.  Mr. Williams.
11      Q.  And is the suspension for a finite or infinite
12  amount of time?
13      A.  It's infinite.  Suspended without pay
14  infinitely pending -- and let me just point out this
15  because it's very important.  I am the only police
16  officer in the history of this department that was
17  charged with a misdemeanor summons, you know, for the
18  notice to appear that his pay has been taken.  Every
19  single police officer has been suspended with pay
20  pending the outcome of this or whatever investigation
21  it is to include one officer in 2017 that was charged
22  with a felony battery and he was still suspended with
23  pay.  And I can give you their names if you're
24  interested.
25      Q.  The names of officers who have been --

Page 39

1       A.  Charged.
2       Q.  -- charged with misdemeanors yet have received
3  pay?
4       A.  Yes.
5       Q.  Who are those officers?
6       A.  Lowrie Simon was charged with felony battery
7  in 2017, suspended with pay.
8          Jamesha McKinney charged with domestic battery
9  and some other charges, suspended with pay.
10         Stanley Jean-Francois charged with I believe
11  aggravated battery, it might have been a felony too,
12  suspended with pay.
13         And there's a few others.
14      Q.  I have a couple other background questions and
15  then we'll get into the crux of the allegations.
16         Have you ever --
17      A.  Sure.
18      Q.  Have you ever lived in the City of Opa-Locka?
19      A.  No.
20      Q.  Have you ever owned any real property in the
21  City of Opa-Locka?
22      A.  No.
23      Q.  Have you ever owned any business in the City
24  of Opa-Locka?
25      A.  No.

Page 40

1       Q.  Any family member of yours ever owned any
2  property in the City of Opa-Locka?
3       A.  No.
4       Q.  Has any family member ever -- did I ask you if
5  they've lived there or owned real property?
6       A.  Both.
7       A.  Both.
8       A.  And the answer's no to both.
9       Q.  All right.  Save me a sentence there.
10         During your entire tenure with the City of
11  Opa-Locka have you ever applied for any law enforcement
12  jobs elsewhere?
13      A.  During my tenure?  Yes.
14      Q.  Okay.  Where?
15      A.  I applied -- well, I was offered a job and I
16  turned it down at the Palm Beach County Sheriff's
17  Office.  I had completed the entire process actually.
18  And I think I may have applied to -- I can't remember
19  who I applied for, but it was earlier in my career
20  because the pay wasn't great in Opa-Locka.
21      Q.  So you were offered a job by Palm Beach County
22  Sheriff's Office.  That means you applied for that
23  position if you're offered a job; correct?
24      A.  Yes.
25      Q.  Do you recall when you applied and when you

Page 41

1  were offered a position by the Palm Beach County
2  Sheriff's Office?
3       A.  I applied when I -- it was somewhere around
4  2019 and they gave me a conditional offer of employment
5  shortly thereafter after I completed all of the
6  testing, required testing.
7       Q.  Why did you apply for this position?
8       A.  The turmoil in my department that was ongoing,
9  the environment just wasn't a place where I wanted to
10  continue, and that was up until the point that the
11  entire administration was removed and then, you know,
12  things got better there.
13      Q.  Why did you not accept the job offer from Palm
14  Beach County Sheriff's Office?
15      A.  I was -- at the time myself and the other
16  lieutenant were running the agency and I was very
17  interested in changing the department and I was, you
18  know, working hard and doing different things, getting
19  equipment, vehicles, you know, and that's what I wanted
20  to do.  My aspirations were to remain here, you know,
21  and do, you know, these things.  Those were my true
22  aspirations.
23      Q.  Are you married?
24      A.  I'm divorced.
25      Q.  That was the divorce proceedings that you told

Sergio Perez
November 15, 2022

42 to 45

Page 42

1  me from --
2      A.  Yes.
3      Q.  -- 2013?
4      A.  Yeah, or '14, somewhere around there.  Maybe
5  '14 is a more accurate date.
6      Q.  No problem.  Do you have any children?
7      A.  I have two.
8      Q.  Are they under the age of 18?
9      A.  Yes.
10     Q.  Okay.  Do you financially support them?
11     A.  Yes.
12     Q.  Since the filing of your lawsuit which my
13  records show is March 11th, 2022, the original
14  complaint, have you spoken to any current City of
15  Opa-Locka employee regarding anything contained in your
16  lawsuit?
17     A.  Anything contained in my lawsuit?  The
18  answer's no.
19     Q.  What about any past employees of the city
20  regarding any allegations or issues presented in your
21  lawsuit?
22     A.  I don't discuss my lawsuit with anybody other
23  than my lawyer.
24     Q.  Okay.  And let's make sure we're on the same
25  page here.  I'm not asking, you know, the status of the

Page 43

1  lawsuit per se, you know, what is the procedural
2  history of it.  I'm talking about any issue presented
3  in the complaint regarding the taser incident,
4  regarding a suspension, regarding a claimed demotion,
5  anything like that.  Have you had conversations with
6  any current city employee regarding any of those issues
7  since the filing of your complaint?
8      A.  I've spoken about my demotion, I've spoken
9  about, you know, the emails or the complaints that I
10  brought forward, you know, on Barreira and the things
11  that were being done at the time that resulted in this.
12  This is where everything stems from, you know, and I
13  can show it to you and anybody else, you know.  So,
14  yeah, I've spoken to people, I've spoken to the former
15  city manager.  I speak to him to this day.  Not about
16  the lawsuit, but we talk.
17     Q.  The former city manager being John Pate?
18     A.  John Pate, yes.
19     Q.  When is the last time that you've spoken to
20  John Pate?
21     A.  He called me this morning actually.
22     Q.  What did you guys discuss this morning?
23     A.  He was just seeing how I was doing, that was
24  it.  And then I had to hang up on him because I had to
25  get ready for this depo.

Page 44

1      Q.  Did you talk to him in any manner about this
2  deposition?
3      A.  No.
4      Q.  Did you tell him that you were sitting for a
5  deposition at 10:00 a.m.?
6      A.  I said, "I got to go, I got to get ready for a
7  depo," that was it.  He doesn't know that it's this
8  depo, but he knows it's a depo.
9      Q.  Understood.  Do you know that John Pate
10  currently has a lawsuit against the city?
11     A.  I saw it in the news, yes.
12     Q.  Have you ever discussed John Pate's lawsuit
13  with John Pate?
14     A.  No.
15     Q.  Have you ever discussed your lawsuit against
16  the city with John Pate?
17     A.  No.
18     Q.  Have you ever asked John Pate to assist you in
19  any way with any issue in this case such as an
20  affidavit or a declaration, anything like that?
21     A.  None whatsoever.
22     Q.  Has John Pate ever reached out to you to
23  assist him in any manner with his case against the
24  city?
25     A.  No.  No.

Page 45

1      Q.  Has any representative of John Pate, the
2  lawyer, not an accountant but we'll say a lawyer, has
3  any lawyer for John Pate ever reached out to you to
4  attempt to have you assist John Pate with his lawsuit
5  against the city?
6      A.  No.
7          MR. RAILEY:  My email is going nuts right now.
8  Hold on, let me exit out.
9          MR. POLLOCK:  Not me.
10         MR. RAILEY:  What's that?
11         MR. POLLOCK:  Not me.
12         MR. RAILEY:  Some of it's you, Brian,
13  actually, or your office.
14         MR. POLLOCK:  My office.
15         MR. RAILEY:  Yeah.
16         MR. POLLOCK:  They're coordinating that
17  hearing or something.
18         MR. RAILEY:  I got to exit out of my email
19  because every time one comes in it makes a noise.
20  BY MR. RAILEY:
21     Q.  Do you know who John Pate's lawyers are?
22     A.  Yes, I do.
23     Q.  Who are they?
24     A.  I know of John -- is it Pizzi?  Is it John
25  Pizzi?  Not John Pizzi.  Mike Pizzi, I'm sorry.

Page 46

1   Q.  Okay.  Have you ever spoken to Mike Pizzi
2   regarding John Pate's lawsuit?
3       A.  Not regarding John Pate's lawsuit, no.
4       Q.  Regarding something else?
5       A.  Yes.
6       Q.  What have you spoken to Mike Pizzi about?
7       A.  Well, he was interested in taking this case.
8           MR. POLLOCK:  Whoa, whoa, whoa, hold on.
9           MR. RAILEY:  Yeah, if it's -- go ahead, Brian,
10  you can give him the instruction.
11          MR. POLLOCK:  What we're both going to say is
12      if you were consulting with a lawyer for the
13      purpose of obtaining legal advice or legal
14      representation those communications are protected
15      by the attorney-client privilege whether you end up
16      working with that lawyer or not.  So if you had
17      spoken with Michael Pizzi about his possibly
18      providing you with legal services you can leave it
19      at that.  I think Jon can probably ask you when
20      that occurred, but as far as the substance of those
21      conversations those would be privileged and I would
22      instruct you to not answer or provide any further
23      information other than the fact that you had a
24      consultation and possibly the date of the
25      consultation, as well as who else was present in

Page 47

1   the room.  So with that instruction you can go
2   ahead and answer.
3       A.  Can you restate the question, please?
4   BY MR. RAILEY:
5       Q.  Sure.  So Brian's instructions were correct.
6   Not to sound like I'm echoing him, but I think I need
7   to to some extent to have you answer the questions --
8   the limited question I'm going to ask you.
9           You said you had a conversation with Michael
10  Pizzi at some point regarding he was interested in
11  taking the case, yes or no?
12      A.  Yes.
13      Q.  When I say the case it's your case, Sergio
14  Perez v. City of Opa-Locka?
15      A.  I'll just -- if you'll allow me to make
16  one statement this is what I'll say in regards to that.
17          MR. POLLOCK:  It's your privilege.  You can do
18      what you want with it.
19  BY MR. RAILEY:
20      Q.  Yeah.
21      A.  Okay.  I consulted with Mr. Pizzi not knowing
22  that he was representing Jafet Castro against the city.
23  And I will more than likely be filing a bar complaint
24  on Mr. Pizzi.
25      Q.  Okay.

Page 48

1       A.  And I'll share that.
2       Q.  Understood, okay.
3       A.  And I think you can draw where I'm coming
4   from.
5       Q.  Understood.  I'll just ask two questions.
6   When did that conversation occur between you and
7   Mr. Pizzi?
8       A.  I'm grabbing my phone, I'm going to look at
9   the text messages.  Give me one second.
10      Q.  Take your time.
11      A.  I met with him January 28th and there was
12  another time after or before, I don't remember exactly.
13      Q.  Of this year, January 28th, 2022?
14      A.  Yes.
15      Q.  You met with him in person?
16      A.  Yes.
17      Q.  Was anyone else present?
18      A.  Well, his secretary was the one that greeted
19  me at his office and said that he would be right with
20  me, so...
21          Was anybody present in the meeting?  No.
22      Q.  That's a very technical answer, I appreciate
23  that.  Anyone in the meeting itself with you and
24  Mr. Pizzi the answer is no?
25      A.  No.

Page 49

1       Q.  Okay.  And then you obviously hired a
2   tremendous lawyer in Brian Pollock.
3       A.  A much better lawyer, yes.
4       Q.  Okay.  Brian's not smiling at that.
5       A.  I don't think they compare.  It's not a
6   fair -- you know.
7       Q.  Just to circle back on something, you
8   referenced the Jafet Castro case.  Is that the other
9   excessive force case where you've been named as an
10  individual defendant?
11      A.  Where I've been named as a defendant and where
12  I've been charged with a misdemeanor battery, yes.
13      Q.  The misdemeanor battery charge that's -- I'm
14  not a criminal lawyer, I'm trying to use the right
15  term.  The misdemeanor battery charge that was brought
16  against you last week; correct?
17      A.  Yes.
18      Q.  Okay.  All right.  By the way, I should have
19  given you this instruction at the beginning.  This is
20  not supposed to be a marathon, I'm not testing any type
21  of endurance.  If you need to take a couple minute
22  break for comfort, food, water, restroom just let me
23  know.  I may need to finish up a line of questions, but
24  I'll be more than happy to accommodate that request.
25  And, of course, I'd like to give the court reporter and

Page 50

1   the videographer a break at some point too, so just let
2   me know if you want to go a little longer or if you
3   want to take that break right now.
4        A.  No, no, I'm good.  I want to get it done.  I
5   have to get my kids later, so I'm good.
6        Q.  All right.  You just let me know.  I should
7   have given you that instruction at the beginning.
8            All right.  We'll go for a little bit more,
9   cover one topic, and then, I don't know, take a five
10  minute break, okay?
11       A.  Sure.
12       Q.  All right.  Let's talk about what the
13  complaint refers to and what we'll refer to, because I
14  think you know what I'm talking about, an event that
15  occurred September 1, 2021, between you and Michael
16  Steel.  We'll call it the taser incident.  Do you know
17  what I'm referring to when I say taser incident?
18       A.  Yes.
19       Q.  On September 1, 2021, what rank or position
20  did you hold with the city?
21       A.  Captain.
22       Q.  Tell me your version of events with respect to
23  the taser incident on September 1, 2021.
24       A.  My version of events?
25            This was a demonstration of a new taser device

Page 51

1   that we had just received.  I demonstrated it in
2   several offices prior to entering Michael Steel's
3   office.  I deployed it with training cartridges that
4   did not have the traditional prongs nor did they emit
5   any electricity.
6            As we have done in the past, me and Steel and
7   other officers, I deployed it in his office.  I tried
8   to startle him and scare him because that's a known
9   thing in the law enforcement community, everybody's
10  afraid of the noise of the taser, and he pointed his
11  real taser at me.  We joked around and that was it.  He
12  didn't tell me that any of the Velcro ends had struck
13  him at the time.  And I don't know if you have anymore
14  questions other than that, but I don't know what else
15  to tell you.  I mean, I deployed it in Tequila Brown's
16  office prior to Michael Steel, I deployed it in the
17  presence of Chief Steven Barreira at the time.  I
18  deployed it -- I did a deployment demonstration for
19  Mohan Britton, the internal affairs investigator.
20            And, again, in my role as a captain I was in
21  charge of procurement, issuing equipment, I oversaw all
22  of these things.  So naturally, you know, it was me and
23  nobody else in the department that would, you know,
24  handle the new equipment and make decisions as to where
25  it went.

Page 52

1        Q.  You'd agree with me that the issuance of a
2   taser is separate and apart from deploying a taser;
3   correct?
4        A.  No, I wouldn't agree with you.
5        Q.  Why don't you agree?
6        A.  Can you ask me the question again?  I didn't
7   understand it to be honest.
8        Q.  Sure.  So you told me that you deployed a
9   taser in the direction of Michael Steel; correct?
10           MR. POLLOCK:  Objection to the form.
11       A.  No.
12  BY MR. RAILEY:
13       Q.  No?  Okay.
14           Where did you aim the taser when you deployed
15  it?
16       A.  At the rug behind Michael Steel.
17       Q.  Okay.  You stated as captain you were in
18  charge of procurement and the issuance of the tasers?
19       A.  Yes.
20       Q.  Were you issuing Michael Steel a new taser on
21  September 1, 2021?
22       A.  No.
23       Q.  Why did you deploy the taser on September 1,
24  2021?
25       A.  As a demonstration and also to scare him as a

Page 53

1   joke.
2        Q.  Why were you trying to scare him?
3        A.  It's something that we've done in the past me
4   and him.  We -- everybody jokes around in the police
5   department.
6        Q.  Why were you trying to demonstrate it at that
7   time?
8        A.  Because he hadn't seen the new taser, nobody
9   had.  It's a new device.  You know, everybody's always
10  excited about new equipment, especially Michael Steel
11  himself.  He worked for a law enforcement supply store
12  before he became an officer here and he was very
13  involved with me in acquiring new equipment and stuff
14  like that.
15       Q.  On September 1, 2021, what was your -- or how
16  would you describe your relationship, we'll start with
17  personal relationship between you and Michael Steel?
18       A.  Personal.  I don't -- I don't know if you're
19  asking me did we hang out outside of work.  We don't or
20  we didn't.
21       Q.  Not friends?
22       A.  No.  We were friends at work.  We had a good
23  relationship at work.  Like I said, I -- when I was in
24  charge of running the department I moved him to work
25  under me to save him from himself, one, and to assist

Page 54

1   me, you know, in acquiring everything that the agency
2   needed.
3       Q.  Did you always have a good relationship with
4   Michael Steel at work?
5       A.  No.
6       Q.  Okay.  At what point in time did you not have
7   a good relationship with Michael Steel at work?
8       A.  I can't tell you dates.  I can tell you in
9   2019 myself and a whole squad of officers complained on
10  him for acts of retaliation and, you know, hostile work
11  environment to name a few.  He was subsequently removed
12  from supervision.
13      I can tell you that in 2011 I complained on
14  him with two other officers where he asked me to do
15  illegal and unethical things to try to overthrow the
16  deputy chief of police and chief of police at the time.
17      I can tell you that he was removed from the
18  police department supervision for many years before he
19  was brought back.  Dates exactly I can't really tell
20  you.
21      Q.  All right.  Do you think Steel was a competent
22  officer?
23      A.  Competency would be the opinion of the
24  beholder.  So will I say was he competent?  Yes, he was
25  a competent as a police officer, but he was not as a

Page 55

1   supervisor in any capacity.
2       Q.  Did he ever supervise you?
3       A.  Yes.
4       Q.  When?
5       A.  There came a time prior to the dissolve -- the
6   doing away with the corporal position where the
7   sergeants were placed back on patrol because the agency
8   had like two or three sergeants, maybe a little bit
9   more that were fulfilling administrative roles.  So
10  there came a time when the former chief, Dobson, placed
11  those sergeants back on uniformed patrol and he became
12  my sergeant.  Although I was a corporal on the shift he
13  was the highest ranking on the shift and that was in
14  2019.
15      Q.  Okay.  Do you find --
16      A.  He was also -- I'm sorry, I hate to interrupt
17  you.  He was also my sergeant in 2011.  He was in
18  charge of the Crime Suppression Team that I was
19  promoted to be a detective in.  So he was recently
20  promoted as a sergeant and all the detectives that made
21  up that unit were promoted to detective all at the same
22  time and this unit was created.
23      Q.  Do you find Steel to be trustworthy?
24      A.  No.
25      Q.  Do you find him to be honest?

Page 56

1       A.  Say again.
2       Q.  Did you find him to be honest?
3       A.  Honest?  No.
4       Q.  Do you find him to have integrity?
5       A.  No.
6       Q.  You referenced this earlier, but Michael Steel
7   has sued you personally; correct?
8       A.  Yes.
9       Q.  How does that make you feel?
10      A.  He's suing me for an event where he falsified
11  the facts of that event in his effort to get promoted
12  and remove me out of the way.  So it's disappointing,
13  it's disgusting for lack of a better word, and I look
14  forward to the conclusion of this when all the facts
15  are revealed.
16      I should tell you that Michael Steel is under
17  criminal investigation for false statements in relation
18  to this very case.  And although you haven't asked I
19  think it's important for me to tell you that Michael
20  Steel lied to internal affairs in relation to this case
21  and his secret meeting with the former chief that was
22  completely inappropriate and against policy.
23      And I think it all has -- it's the crux of
24  this case and where it stemmed from.
25      Q.  I'm going to get back to the incident, I just

Page 57

1   have a couple more questions about your relationship
2   with Steel.
3       Was there a point in time where you had
4   supervising authority over Steel last year?
5       A.  Yes.
6       Q.  Okay.  And at that time was Steel working a
7   second job?
8       A.  Are you asking me if he was the off-duty
9   coordinator?
10      Q.  No.  Was he working outside employment to your
11  knowledge?
12      A.  Yes.
13      Q.  Okay.  Did you tell him that he was unable to
14  work that outside employment?
15      A.  No.  You might be confusing the two with the
16  role of an off-duty coordinator, so that may be
17  considered for you guys as outside employment.  So
18  outside employment for us are off-duty jobs.  He was
19  able to work whatever he wanted.
20      Now, the responsibility of coordinating the
21  off-duties, which there is some income that the person
22  gets, that was taken away from him by Captain Alvin
23  Rogers.
24      Q.  You never took away any of that from Michael
25  Steel?

Sergio Perez
November 15, 2022                                    58 to 61

Page 58

1    A.  No.  Let me see, and I'm just going to make
2  sure, that might be part of some of the emails here
3  because I want to answer everything correctly.
4    Q.  Do me a favor --
5    A.  From what I recall -- go ahead.
6    Q.  If you're going to refer to a document -- you
7  know, because we're remote I can't see what you're
8  looking at, so if you're going to read or look at a
9  document just identify that document for me in the
10  record, please.
11    A.  Sure.  I don't have the document with me.  I
12  believe, if my memory serves me well, I took away the
13  reserve officer program, which there isn't any money
14  entitled to that, and I think Rogers took away the
15  off-duty coordinator position because it needed to be
16  centralized to one person and we had -- it was a mess.
17    Q.  You stated -- going back to September 1, 2021,
18  you stated that you deployed the taser in multiple
19  other offices before Michael Steel.  You stated that
20  you deployed it in Tequila Brown's office; is that
21  correct?
22    A.  Yes.
23    Q.  What other offices did you deploy the taser in
24  prior to Michael Steel's office?
25    A.  Mohan Britton.  That's the internal affairs

Page 59

1  lieutenant.
2    Q.  Were you intending to scare Tequila Brown with
3  deploying the taser?
4    A.  No.  She had never seen a deployment and she
5  wanted to see what it was like.  She's the executive
6  secretary.
7    Q.  Did she ask you to deploy the taser in her
8  office?
9    A.  I don't remember what the conversation was,
10  but she wanted -- she wanted me to deploy it so she can
11  see.
12    Q.  Did you intend to scare Mohan Britton when you
13  deployed the taser in his office?
14    A.  I don't remember what the conversation was in
15  his office.  But, again, the intent all along was to
16  demonstrate the new taser.
17    Q.  Were you tasked with demonstrating the new
18  taser?
19    A.  Was I tasked by anybody?
20    Q.  Yes, sir.
21    A.  No.  This was a natural function in my role.
22    Q.  Had you ever been certified as a taser
23  instructor?
24    A.  As a taser instructor, no, but I am certified
25  with a taser as everyone else is in the department.

Page 60

1    Q.  Okay.
2    A.  And one more thing, Jon, if you don't mind
3  because I think that's important too.  The new Taser 7,
4  contrary to the belief of some, the new Taser 7 did not
5  require and there isn't a single policy that will
6  reflect the same, did not require you to undergo any
7  training with the Taser 7 device itself.  The
8  functionality is the same as the one we had, there was
9  just a video that needed to be watched.  And that is
10  per the taser company itself.  And that video was
11  watched by me and I was very familiar with the
12  functionality of this new device.  And I just want to
13  make sure.
14    Q.  Sure.  When did you watch that video?
15    A.  Don't remember exactly, but it's a USB drive
16  that came with the box and it was -- and it was watched
17  months before by me and it was done in my office.
18    Q.  Was the USB containing that video sent to you
19  prior to the actual tasers being delivered to the
20  city's police department?
21    A.  No, they all came in one box together.
22    Q.  And do you recall how long or short before
23  September 1, 2021, did you receive that one box
24  altogether?
25    A.  So I received two taser devices, two boxes

Page 61

1  months and months prior which I had issued to two other
2  officers already.  This is when I observed the training
3  video and I made them observe the training video.  One
4  of the officers was Simon, which he was on the road, he
5  was actually part of the Street Crimes Unit utilizing
6  the new device.  Again, there's no specific training
7  that you have to attend to handle this device.  This is
8  how T&Es work, that's what they call it.  I don't know
9  what the T&E stands for, but anytime we have new
10  devices we issue them out with the training that's
11  given via the USB to be tested to see if the agency is
12  going to purchase the device for the rest of the staff.
13    Q.  You mentioned Simon and a second officer
14  watched the video with you.  Who is that second
15  officer?
16    A.  No, I was the second officer.
17    Q.  Oh, okay.
18    A.  I watched it and Simon.
19    Q.  Why only you two?
20    A.  I -- because I selected him.  He was in a
21  proactive unit where he may be exposed to using the
22  device more than somebody else, and myself because I
23  wanted to test the device out and see if this was
24  something that the agency could benefit from.
25        However, those two initial devices the levers

Page 62

1  became broken on them, the activation levers, which is
2  why we ordered the two new devices that were sent, you
3  know, afterwards.
4       Q.  You don't dispute that you intended to
5  discharge the taser; correct?
6            MR. POLLOCK:  Objection to form.
7       A.  No.
8  BY MR. RAILEY:
9       Q.  No, you don't dispute that?
10           MR. POLLOCK:  Objection.
11      A.  No.
12 BY MR. RAILEY:
13      Q.  And did you intend to aim it in the direction
14 of Michael Steel to scare him?
15      A.  No.
16           MR. POLLOCK:  Objection to form.
17      A.  Of course, not.
18 BY MR. RAILEY:
19      Q.  Are you contending or do you contend that
20 Michael Steel fabricated the incident in its entirety?
21      A.  Yes.
22      Q.  Yes.
23           Have you ever seen pictures, I guess, of
24 Michael Steel's waist area showing taser prongs?
25      A.  Yes.

Page 63

1       Q.  Okay.  Do you believe --
2       A.  I wouldn't say -- I wouldn't say taser prongs.
3       Q.  How would you describe the pictures or what
4  are they depicting?
5       A.  There's two bruises on the side.
6       Q.  Okay.  You think he fabricated those pictures?
7       A.  I can't answer what Michael Steel did, but I
8  know that he didn't say the truth as to what occurred.
9  And what's even more interesting is that I've always
10 known to be -- there to be a surveillance camera in
11 that very same office and the video is missing.
12      Q.  Do you classify the incident that occurred
13 between you and Michael Steel as a training incident?
14      A.  No, this wasn't a -- this was a demonstration.
15 This is a small agency.  I was demonstrating the taser.
16 I explained to you exactly what I did and I've
17 maintained the same all along, you know.  He
18 mischaracterized it, he didn't report this alleged
19 battery, and that's where we're at, you know.  This was
20 not a battery.  There was no reason for me to batter
21 Michael Steel, I think that needs to be clear.  And if
22 you -- if you look at all the evidence even -- even the
23 memorandum to file that he himself wrote it totally
24 contradicts his sworn statement.
25      Q.  What memo did he write that you're referring

Page 64

1  to?
2       A.  He wrote a memo to file to himself I suppose
3  when this incident occurred or thereafter where he says
4  that he asked me not to tase him and he turned his
5  chair several inches to the right and I shot him.
6            Now, it's hard for me to explain this to you
7  via Zoom, but if I am sitting exactly where you see me
8  and I'm facing north, and Captain Perez, me, was
9  standing to my right if I turned to the right as he
10 alleges via his own memorandum and I shot him, the
11 bruising or the prongs would be in the front of him.
12           And, again, I find it highly suspect that the
13 camera that is right on top that would have captured
14 this entire incident is missing, the surveillance
15 footage.
16      Q.  I'll get to that in just a second.
17           Do you contend, believe that Michael Steel
18 shot himself with his own taser?
19      A.  I don't know --
20           MR. POLLOCK:  Objection to form.
21      A.  -- what Michael Steel did.
22           MR. POLLOCK:  Objection to the form.
23 BY MR. RAILEY:
24      Q.  Now, you said you were trying to demonstrate
25 the taser.  Are demonstrations normally performed in,

Page 65

1  let's say, like a classroom or group setting?
2       A.  No.
3       Q.  What about in a common area or a roll call
4  area?
5       A.  Or in an office.
6       Q.  Well, I'm asking typically how they're -- how
7  they're done.
8       A.  There's --
9            MR. POLLOCK:  Objection to the form.
10           Go ahead, answer.
11      A.  Yes, there's no typical location.  This is not
12 a large agency where you may be able to say it's
13 typical to do something in this area designated for
14 that.  We don't have -- we're in a third floor of the
15 city hall building.  It's not even a secure facility
16 for that matter.  So there's no typical place to do
17 anything here.
18      Q.  So you believe Michael Steel fabricated the
19 entire version of events relating to the taser
20 incident.  What would be, in your opinion, his
21 incentive to fabricate this incident?
22      A.  His incentive was that he got me removed from
23 captain, I was demoted.  His friend James Wright became
24 the city manager.  He was promoted to captain and
25 interim chief immediately thereafter on the same day,

Page 66

1  and he was able to attack me and others when he assumed
2  that role of power.  So that was his incentive and that
3  has always been his incentive to have a position of
4  power over other people so that he can come after them.
5  When I told you earlier in this deposition when I said
6  I assigned him to assist me to save him from himself,
7  this is what I was referring to.  So many police
8  officers, so many civilian staff have complained on
9  Michael Steel over the years that he presented a
10  problem for my administration and I wanted to alleviate
11  potential lawsuits against the city by members of the
12  department, complaints and grievances to the PBA, so
13  this is all why we made the decisions that we made
14  concerning Michael Steel.
15       Q.  You referenced a video in the office of
16  Michael Steel; is that correct?
17       A.  Yes.
18       Q.  You laughed I think, I perceived it to be a
19  sarcastic laugh that it wasn't working.  Is that an
20  accurate --
21       A.  There's --
22       Q.  -- presumption of what you're trying to
23  testify to?
24       A.  Jon, there's no sarcasm here at all.  This is
25  very serious to me.  There is a camera.  I -- the laugh

Page 67

1  that you heard it's just that it's inconceivable to me
2  that the camera that was in the very same location
3  where he alleges I committed this battery against him
4  is missing.  And why would I, as an individual, go into
5  an office while on duty and shoot another officer with
6  a taser intentionally?  That notion is preposterous and
7  it's just not conceivable.  And then the same gentleman
8  gets promoted to chief of police.  And then when there
9  is a demand for discovery in my criminal case and in
10  this case for the video it's missing and nobody can
11  explain that.
12       Q.  Prior to September 1, 2021, have you ever had
13  an occasion to review any footage from that camera
14  within Michael Steel's office?
15       A.  I've never reviewed any footage in the police
16  department because I didn't have access to that.
17       Q.  Okay.  Do you know one way or the other
18  whether that camera in Michael Steel's office is what's
19  called a dummy camera?
20       A.  I've never heard of our agency in this
21  building which is a newer building or in -- or at 2495
22  Ali Baba, which is a self-standing police department
23  that was condemned, we have never had any dummy
24  cameras.  I don't think any police department in this
25  nation would have dummy cameras.  I've never heard of

Page 68

1  such a thing and I don't think you have either.
2       Q.  Are you contending that Michael Steel altered
3  any purported or alleged surveillance video that may
4  exist from a video -- sorry, from a camera that was
5  present in his office on September 1, 2021?
6       A.  I don't know what Michael Steel did, but I
7  know that there was a camera in that office.  And I
8  know that we have never had any dummy cameras anywhere.
9       Q.  Now, you said you requested the camera as part
10  of the criminal case, is that what I understood
11  correctly?
12       A.  Yes.
13       Q.  Okay.
14       A.  Yes.
15       Q.  Which camera specifically did you want -- did
16  you request as part of the criminal matter?
17       A.  We requested all the cameras.
18       Q.  You say "we" I don't want to get any
19  privilege, but is it you and your attorney.
20       A.  Me and my attorney.
21       Q.  What's the name --
22       A.  Or my attorney made the request on behalf of
23  me is the right way to say it.
24       Q.  No, I understand that.  I appreciate that.
25  Who is the attorney?

Page 69

1       A.  Richard Diaz.
2       Q.  Okay.  And you made a -- or Richard Diaz made
3  a demand on your behalf to whom or what agency for the
4  cameras?
5       A.  The City of Opa-Locka.
6       Q.  Anyone else?
7       A.  We actually sent them a subpoena for that
8  information.
9       Q.  Did you -- when I say you, again, you or
10  Richard Diaz on your behalf make a demand to the
11  Florida Department of Law Enforcement for those videos?
12       A.  Yes.
13       Q.  And did the Florida Department of Law
14  Enforcement respond to you or Mr. Diaz?
15       A.  They don't have an explanation for that
16  camera.  Neither does the state attorney.
17       Q.  I think that wasn't -- let me make sure I get
18  an answer to my question.  You made a request to the
19  FDLE regarding these cameras.  Did they respond to you,
20  they meaning the FDLE?
21       A.  They -- the answer to your question was their
22  response was they don't know what happened to that
23  camera or the video thereof.  They have no explanation.
24       Q.  Did --
25       A.  We made the same request to the state

Sergio Perez
November 15, 2022

70 to 73

Page 70

1  attorney, the answer was the same.
2      Q.  Did the FDLE tell you that they have the
3  cameras or that they did not have the cameras?
4      A.  The FDLE responded that they provided all of
5  the surveillance footage that they have.
6      Q.  Provided that to you or Mr. Diaz?
7      A.  Yes.
8      Q.  And you have that in your possession
9  currently?
10     A.  The videos?
11     Q.  Yes, sir, from the FDLE.
12     A.  No.  No, no, my lawyer does.
13     Q.  That's fair.  Diaz?
14     A.  Yes.
15     Q.  Probably Mr. Pollock as well.
16     MR. POLLOCK:  Objection to the form and move
17     to strike the last comment.
18     Go ahead.
19  BY MR. RAILEY:
20     Q.  The State Attorney's Office, did they respond
21  to your request or Mr. Diaz's request regarding a
22  request for surveillance footage?
23     A.  Yes.
24     Q.  Okay.  And what was the State Attorney's
25  Office response?

Page 71

1      A.  They have provided all the videos that they
2  have available to me.
3      Q.  And provided to Mr. Diaz?
4      A.  Yes.
5      Q.  Mr. Diaz has those in his possession?
6      A.  Yes.
7      Q.  Is there a portion of the videos that you're
8  contending is missing?
9      A.  We're missing footage from inside the office
10  and I can see that there's a camera there.
11     Q.  Okay.  Let me make sure we're on the same
12  page.  The surveillance footage that's already been
13  provided to you by the FDLE and the State Attorney's
14  Office, that is from a camera that is in the common
15  area?
16     A.  Yes.
17     Q.  Okay.  So you have that footage already;
18  correct?
19     A.  Yes.
20     Q.  Okay.  Now, the FDLE and the State Attorney's
21  Office advised you, and tell me if I'm wrong, I'm just
22  trying to make this as simple or clear as possible,
23  that they don't have video with respect to the camera
24  inside of Michael Steel's office?
25     A.  Can you ask that again?  I lost you for a

Page 72

1  second.
2      Q.  Sure.  Let me start over and I'm going to try
3  to streamline this, okay?
4      You made a request via your attorney to the
5  FDLE and the State Attorney's Office for all
6  surveillance footage pertaining to the taser incident;
7  correct?
8      A.  Yes.
9      Q.  In response you received or your attorney
10  received surveillance footage from the cameras located
11  in the common area of the police department; correct?
12     A.  Yes.
13     Q.  With respect to the -- did you receive a
14  response in particular relating to the camera in
15  Michael Steel's office from the FDLE or the State
16  Attorney's Office?
17     A.  I haven't received a response, but what I
18  shared with you was that they don't have an explanation
19  and they say that they have shared everything that they
20  have.
21     MR. RAILEY:  Okay.
22     All right.  Let's take you want to say ten
23  minutes, come back at 11:50?
24     MR. POLLOCK:  Okay, perfect.
25     THE WITNESS:  Okay.

Page 73

1      MR. RAILEY:  All right, thanks.
2      VIDEO TECHNICIAN:  The time is 11:42 a.m.
3  We're off video record.
4      (Recess taken at 11:42 a.m.)
5      (Deposition resumed at 12:00 p.m.)
6      VIDEO TECHNICIAN:  The time is 12:00 p.m.
7  We're back on the video record.
8  BY MR. RAILEY:
9      Q.  I'm attempting to share my screen.  Can you
10  see it right now?
11     A.  Yes.
12     Q.  What are you looking at?
13     A.  The email from Gaylon White.  This is -- I'm
14  familiar with this.  This is the email, the anonymous
15  email.
16     Q.  Okay.  That was my first question.
17     MR. RAILEY:  I'm going to mark this as
18     Exhibit -- City's Exhibit 1 which is Bates labeled
19     Plaintiff, Perez 222 to 223.
20     (Whereupon, Defendant's Exhibit 1 was marked
21  for identification.)
22  BY MR. RAILEY:
23     Q.  You've already told me that you're familiar
24  with this document; correct?
25     A.  Yes.

Sergio Perez
November 15, 2022                                          74 to 77

Page 74

1    Q. And you've classified it as an anonymous email
2  dated Monday, September 6th, 2021, at 9:56 p.m.?
3    A. Yes.
4    Q. Okay. Do you have any idea who wrote this
5  email?
6    A. Factually or presum- -- or a presumption?
7    Q. Well, factually certainly tell me that.
8    A. No, I don't.
9    Q. Okay. Presumptively who do you think wrote
10 this email?
11   A. Michael Steel.
12   Q. And why do you make that presumption?
13   A. Well, this has his name written all over it,
14 aside from the fact that in 2011 he encouraged me and
15 the two other officers to write an anonymous email to
16 the commission on the administration at the time. And
17 there's a recording of that too. So this is his MO.
18   Q. Aside from that occurrence that you just
19 described to me any other reason you have to believe --
20 to support your presumption that Michael Steel authored
21 what's been marked as the city's Exhibit 1?
22   A. No. Other than that, no. And knowing who he
23 is, no.
24   Q. What do you mean when you say knowing who he
25 is?

Page 75

1    A. Well, meaning this is, again, what he does or,
2  you know, the type of efforts that he has displayed in
3  the past. And from reading this email, I'm sure you
4  have read it, it says in there that I threatened a
5  squad of officers, that I tased them in front of a
6  bunch of people. It's filled with lies.
7         And then it says that the IT department will
8  delete the surveillance -- the surveillance footage.
9  That in itself is interesting because the surveillance
10 footage is missing from the office. So I don't know.
11 And not a single police officer, not a single person
12 that is seen on video in the common area attested to
13 anything that's in this anonymous email and it's filled
14 with lies.
15   Q. Now, the taser incident is the subject of a
16 current and ongoing investigation by the FDLE; correct?
17   A. The investigation has been completed.
18   Q. It has been completed?
19   A. Yes.
20   Q. But the criminal proceedings have not;
21 correct?
22   A. Correct.
23   Q. Now, you told me earlier that the trial in
24 this matter is set for -- if it goes to a trial January
25 of 2023. Is that what you testified to?

Page 76

1    A. January 23rd, 2023, is the trial date.
2    Q. Okay. That case is filed in Miami-Dade County
3  presumably; correct?
4    A. Yes.
5    Q. Do you know the case number?
6    A. The last -- or the case number is 637, so it
7  would be M -- if it was filed in -- M22-637 is the case
8  number.
9    Q. Is Mr. Diaz your attorney in that case?
10   A. Yes.
11   Q. Is that representation through the Collective
12 Bargaining Agreement or outside of it?
13   A. No. They -- they didn't represent me in this
14 case.
15   Q. You say "they." Can you clarify?
16   A. The PBA.
17   Q. The PBA give you a reason as to why they did
18 not represent you in this case?
19   A. They said that a horseplay incident, which is
20 how they characterized it, did not fall under the scope
21 of their coverage.
22   Q. Is there a written document to that extent
23 from the PBA to you?
24   A. No. That was a verbal, so I would defer to
25 them to be able to provide you such a document.

Page 77

1    Q. Who verbally advised you of that
2  declination --
3    A. Andrew Axelrad.
4    Q. Let me finish the question just for the
5  clarity of the record. Who verbally advised you of the
6  PBA's declination of representation with respect to the
7  taser incident in the criminal matter?
8    A. Ax- -- Andrew Axelrad.
9    Q. Okay.
10        Now, I think we covered this with respect to
11 videos. You requested videos from -- related to
12 the incident from the FDLE and you received a response,
13 and that response included production of those videos;
14 correct?
15   A. All the videos they had available to them,
16 yes.
17   Q. Did you request any recorded statements as
18 well from the FDLE?
19   A. Yes.
20   Q. And did you receive those recorded statements?
21   A. Yes.
22   Q. Did you give a recorded statement to the FDLE?
23   A. Yes.
24   Q. When was that?
25   A. January 11th, the day before I was charged.

Sergio Perez
November 15, 2022                                    78 to 81

Page 78

1      Q.  Now, let's talk about the internal affairs
2   investigation.  The city conducted an internal affairs
3   investigation into the taser incident; correct?
4      A.  Um --
5      Q.  Or started to at least?
6      A.  The chief was directed to initiate one, yes.
7      Q.  Who directed the chief to initiate one?
8      A.  John Pate directed Steven Barreira to initiate
9   an investigation.
10     Q.  What is the status of that investigation to
11  your knowledge?
12     A.  It's nonexistent at this point.
13     Q.  Why do you say it's --
14     A.  Never --
15     Q.  Sorry, go ahead.
16     A.  Well, a part of any IA investigation is to get
17  a statement from the subject officer and that has not
18  occurred, that never occurred, and I was never given a
19  hearing prior to being demoted or any of such.  And
20  those are all things that must occur, you know, at the
21  conclusion of any investigation.
22     Q.  You say they must occur.  Is there a document
23  memorializing that these things must occur?
24     A.  It's memorialized in Statute 112 of the
25  Officer Bill of Rights and it's also memorialized in

Page 79

1   agency policy.
2      Q.  Which agency policy in particular?
3      A.  The agency policy concerning discipline as
4   well as the Collective Bargaining Agreement.
5      Q.  I'll get to the CBA in just a moment.  I want
6   to focus on agency policy.  What, if you know, is the
7   policy that pertains to discipline?
8      A.  I don't -- I don't know.  I don't have it in
9   front of me.
10     Q.  Okay.  What provision at the CBA do you
11  contend provides for these occurrences?
12     A.  The section that speaks about investigations
13  against members.
14     Q.  At the time of the taser incident, again
15  September 1, 2021, what were your job duties?
16     A.  I was the administrative captain.  It included
17  procurement, it included supervision of staff.  It's
18  just a wide range of things operationally for the
19  police department.
20     Q.  A lot of administrative items?
21     A.  Yes.  Like procurement, discipline, I
22  supervise specialty units, the Street Crimes Unit.  I
23  was responsible for outfitting police vehicles.  I
24  oversaw civilian staff as well, records management,
25  property and evidence.  All of those things fell under

Page 80

1   my purview.  Reserve officers.
2      Q.  How long prior to September 1, 2021, had you
3   been an administrative captain performing these duties?
4      A.  Before September '21 I was -- I was doing
5   those duties as a lieutenant the prior year, as well as
6   upon being promoted to captain.  So my responsibilities
7   really didn't change, just the title changed which was
8   more appropriate for everything that I was responsible
9   for.
10     Q.  Understood, but how long had that been
11  occurring then, month and year?
12     A.  These responsibilities?
13     Q.  Yes, sir.  You were --
14     A.  I was promoted to captain in February.
15     Q.  Okay.
16     A.  So from February on these were all my
17  obligations.  However, preceding February most of those
18  were still my obligations as a lieutenant, overseeing
19  the agency in conjunction with the other lieutenant.
20     Q.  Was there a point in time in 2020 where due to
21  the COVID-19 pandemic you were -- as well as others
22  were working remotely?
23     A.  Working remotely?  No.  Meetings were remote,
24  yes.  But I came to work every day.
25     Q.  There was no point in time where you worked

Page 81

1   from home during the COVID-19 pandemic?
2      A.  No.
3      Q.  Regarding your job duties as of September 1,
4   2021, was there anything specific or particularly --
5   particular to these job duties that had to be performed
6   in the confines of the city's police department itself?
7      A.  I don't understand the question.
8      Q.  Sure.  Is there any duty that you just
9   described to me, administrative duties, overseeing
10  staff, overseeing reserves, records management, things
11  of that sort, were any of those duties only able to be
12  performed if you were in the confines of the city's
13  police department?
14     A.  I don't know if you could perform them
15  outside.  I didn't.  I was there at the police station,
16  so I don't know how to answer that.
17     Q.  Okay.  I'll show you another document we'll
18  mark as the city's Exhibit 2.
19        Do you recognize this document?
20     A.  Yep, I do.
21        (Whereupon, Defendant's Exhibit 2 was marked
22  for identification.)
23        MR. RAILEY:  And so this will be the city's
24  Exhibit 2.  For the record it is Plaintiff, Perez
25  271 Bates labeled.

Sergio Perez
November 15, 2022                                          82 to 85

Page 82

1  BY MR. RAILEY:
2      Q.  Sir, is this your signature at the bottom of
3  271?
4      A.  Yes.
5      Q.  Okay.
6      A.  Which for the record is the same memorandum
7  that I told you about earlier in the deposition.
8      Q.  That was in front of you; right?
9      A.  Yes.
10     Q.  Okay.  How did you receive this document?
11     A.  It was delivered to my home while I was off,
12  coupled with the requirement that I relinquish
13  everything described therein, which is also the
14  property receipt that I received when I turned all of
15  my equipment in.  That's this blue form here that I can
16  give you a copy of.
17         MR. POLLOCK:  You don't have to.  I'm sure he
18  has it in the police department's or the city's
19  files.
20     A.  Yes, the city has it as well.
21  BY MR. RAILEY:
22     Q.  You said you were at home when you received
23  this document.  Was that a scheduled day off?
24     A.  I was -- I was already home off for that day,
25  I had worked that morning.  And I went home and

Page 83

1  internal affairs was sent to my house to retrieve my
2  police vehicle, my credentials, and all of my
3  equipment.
4      Q.  That was my next question.  So who provided
5  you this document at your house?
6      A.  Mohan Britton.
7      Q.  Anybody else?
8      A.  Alvin Rogers.  And they both came so that
9  Alvin Rogers could drive my police vehicle back to
10  the -- to the city.  That was the reason for him being
11  there.
12     Q.  Anybody else with them?
13     A.  No.
14     Q.  Do you know who drafted this document?
15     A.  The chief of police.
16     Q.  Do you know that for sure?
17     A.  His signature is on it, yes.
18     Q.  Did you ever have a conversation with Steven
19  Barreira regarding this document?
20     A.  Not that I recall.
21     Q.  Subsequent to receiving this document did you
22  have a conversation in general with Steven Barreira
23  regarding your work situation?
24     A.  I believe that he sent me a text message to
25  see how I was doing after the fact, but I never

Page 84

1  responded to him.
2      Q.  Did you ever have a conversation with Steven
3  Barreira regarding working from home upon or after
4  receiving this document?
5      A.  No.  There's -- that doesn't exist.  There's
6  no way to be relieved of duty and relinquish all of
7  your city property when you hold the rank of captain or
8  any other rank and be able to perform your duties from
9  home.  That's inconceivable.
10     Q.  Were you performing any duties at home after
11  your receipt of this document?
12     A.  No, I was not.
13     Q.  Do you deny having a conversation with Steven
14  Barreira regarding his instructions for you to perform
15  your job duties from home?
16     A.  I vehemently deny that.  It's just -- that's
17  not what happened.  In fact, Alvin Rogers was given my
18  responsibilities when I was relieved of duty.  And you
19  can depose all of the units and the staff that worked
20  under me and they'll tell you exactly who they reported
21  to when I was relieved of duty.
22     Q.  Were you still paid after receiving this
23  document?
24     A.  I was paid my base salary, but I was denied
25  the ability to make off-duty jobs or make extra money

Page 85

1  as I had done, you know, for all of my years employed
2  with the city.
3         And, again, there is no way for a police
4  officer to be able to do his job without a badge, a
5  gun, an ID, a police vehicle, his uniforms.  So I don't
6  know how -- how it can be construed that I was doing my
7  job from home without any equipment or credentials or
8  police vehicles or anything.  It just doesn't make any
9  sense.
10     Q.  You were not on road patrol at this time;
11  correct?
12     A.  No, I was a captain.
13     Q.  During this time that you were home did you
14  receive the same city issued benefits such as health
15  insurance, dental insurance, stuff like that?
16     A.  Yes.
17     Q.  And it's your testimony as you sit here today
18  that during the period that you were home you never
19  once performed any job duty for the City of Opa-Locka?
20     A.  Never performed any job duty, I don't know
21  what you mean by that.
22     Q.  All right.
23     A.  Because when you're relieved of duty you're
24  still responsible for answering to subpoenas, things of
25  that nature.  So I may have participated in some sort

Sergio Perez
November 15, 2022                                          86 to 89

Page 86

1  of meeting in relation to a subpoena or -- something
2  of that nature, but I was not, and this is my testimony
3  and I'll be clear, I was not performing any of my
4  duties as a captain, nor was I supervising any of my
5  staff.
6      Q.  You weren't suspended; correct?
7      A.  This is suspended.  This is what relieved of
8  duty means.  It's the same thing.
9      Q.  If you're suspended you wouldn't be doing any
10  job duties; fair?
11      A.  Again, when you're suspended you're still
12  required to fulfill some of these obligations such as
13  answering to subpoenas or attending court appearances.
14  So I was suspended.  This is a suspension.  Relieved of
15  duty is a suspension.
16      Q.  Did you ever tell Steven Barreira or John Pate
17  that you believed you were being improperly suspended?
18      A.  Yes, I did.
19      Q.  Who?  Which one?
20      A.  I had a meeting with the chief, a very brief
21  meeting with Steven Barreira prior to -- not being
22  suspended, so this was prior to when the email came
23  out.  So I -- I retract my statement.  I never had a
24  meeting with Steven Barreira or John Pate with regard
25  to me being improperly suspended.  The answer to that

Page 87

1  is no.  I did have a meeting with Steven Barreira prior
2  to me being suspended where I told him that the
3  allegations in the email were false.
4      Q.  That's fine.  And just so --
5      A.  And that is the anonymous email.  I'm sorry.
6      Q.  That's okay.  I understand what you're saying.
7  I want to be clear that we're talking about after
8  receipt of what I've marked as the city's Exhibit 2,
9  the September 10th, 2021, memorandum that you received
10  at home, did you ever have a conversation with the
11  chief or John Pate regarding your belief that you were
12  being improperly suspended and you've told me no;
13  correct?
14      A.  No, correct.
15      Q.  Did you ever tell Steven Barreira or John Pate
16  after receipt of the Exhibit 2 that you believed you
17  were being improperly demoted?
18      A.  Yes.
19      Q.  Who?
20      A.  John Pate.
21      Q.  And when did that conversation occur?
22      A.  It was, I believe, following the conversation
23  with the commissioner that I told him that.
24      Q.  When was this conversation with the
25  commissioner?  The one in January?

Page 88

1      A.  The day after I was -- yes.
2      Q.  Okay.  And what did John Pate respond to you,
3  if he did respond?
4      A.  That he was going to be fired if he didn't
5  take this course of action.  And he was fired the next
6  day.
7      Q.  You said didn't take this course of action.
8  What was the course of action you're referring to?
9      A.  Demoting me or firing me.
10      Q.  Do you consider yourself or did you consider
11  yourself demoted upon receipt of Exhibit 2?
12      A.  This suspension memo?  Did I consider myself
13  demoted?  Yes.  I was stripped of everything.  This
14  stripped me of everything and I wasn't even allowed to
15  come to the police station, and it says that in the
16  memorandum.
17      Q.  You still received your same rate of pay just
18  no overtime; correct?
19      A.  No overtime, no off-duties, no nothing.
20      Q.  How much off-duty were you working let's say
21  in the summer months of 2021?
22      A.  I don't know how to answer that, but I can
23  tell you what I made for the year.  I can't tell you
24  what I made in each month, but I worked consistently
25  and in 2020 and 2021, both years respectively, I made

Page 89

1  somewhere in the ballpark of $180,000 a year, which was
2  inclusive of salary --
3      Q.  What year?
4      A.  '20 and '21 both.
5          MR. POLLOCK:  You mean in each year or in both
6      years combined?
7          THE WITNESS:  No, in each year, so 360 for
8      both.
9  BY MR. RAILEY:
10      Q.  You would agree with me that off-duty
11  opportunities vary; correct?  Meaning that there's not
12  a guaranteed off-duty assignment every single day of
13  the week?
14      A.  I won't agree with you because there is.  And
15  we can't fill all of them most of the time.  So
16  there -- there is, and you can go back for many years.
17  There are hundreds of jobs posted sometimes daily, you
18  know, so -- and, again, it's not that the City of
19  Opa-Locka has all of the jobs.  We work for different
20  agencies and different municipalities, so all of their
21  jobs are available to us also.  That's what makes this
22  number so astronomical.
23      Q.  For how long were you unable to work off-duty
24  assignments?
25      A.  I haven't worked off-duty since that day to

Page 90

1    present.
2         Q.  All because of the taser incident is your
3    testimony?
4         A.  Yes.
5              MR. RAILEY:  One second.  The sun switched
6    again.
7    BY MR. RAILEY:
8         Q.  During the time that you were working from
9    home -- I'm sorry, strike that.
10             During the time that you were home upon
11   receipt of the September 10, 2021, memorandum was your
12   access to your work email cut off at any time?
13        A.  I don't believe so, no.
14        Q.  Okay.  Did you send any work-related emails
15   during the time period that you were home?
16        A.  I don't recall, but it's possible.
17        Q.  Did you make any work-related calls during the
18   time period that you were home?
19        A.  I do not recall, but it is possible.  I did
20   get a bunch of calls from, like, the other captain to
21   ask me about certain things that I may have been
22   working on prior to him assuming my role.  So I did
23   need to communicate with them and tell them, you know,
24   about these things.
25        Q.  What was Michael Steel's rank or title on

Page 91

1    September 1, 2021?
2         A.  Sergeant.
3         Q.  Okay.  During your entire tenure as a city
4    police officer are you aware of any other captain,
5    sergeant, lieutenant, or member of the command staff
6    who was charged with a crime with respect to misconduct
7    or alleged misconduct towards another member of the
8    command staff or someone in the rank --
9         A.  No.
10        Q.  -- or someone in the rank of captain,
11   sergeant, or lieutenant?
12        A.  No.
13        Q.  During your tenure as a city police officer
14   are you aware of any other captain, sergeant,
15   lieutenant, or member of the command staff who was
16   charged with a crime with respect to alleged misconduct
17   towards any member of the city's police department?
18        A.  No.
19        Q.  We've referred to this a couple of times or
20   we've made reference to it, at least you have, a
21   memorandum from Interim Chief Jackson.  Do you have
22   that document in front of you?
23        A.  Yes.
24        Q.  All right.  And I'll put it up on my screen
25   just so we can mark it.

Page 92

1         Q.  Can you see my screen?
2         A.  Yes.
3         Q.  Okay.  You recognize this document?
4         A.  Yes.
5              MR. RAILEY:  All right.  So I'll mark Perez --
6    Plaintiff, Perez 288 as the city's Exhibit 3.
7              (Whereupon, Defendant's Exhibit 3 was marked
8    for identification.)
9    BY MR. RAILEY:
10        Q.  What is this document, sir?
11        A.  That's when I was reinstated back to work.
12        Q.  You say reinstated back to work.  What do you
13   mean by that in particular?
14        A.  Reinstated back to work to assume my role,
15   reissued my police vehicle, everything was put back the
16   way it was.
17        Q.  Did you know Dennis Jackson prior to him
18   serving as the city's interim chief of police?
19        A.  You cut out.  Did what, I'm sorry?
20        Q.  Yeah, sorry.  Did you know Dennis Jackson
21   prior to him taking over as the city's chief of
22   police -- interim chief of police?
23        A.  Not at all.
24        Q.  Okay.  Where did he come from, if you know?
25        A.  City of -- City of Miami Police.

Page 93

1         Q.  Okay.
2              All right.  So you returned to the office;
3    correct?
4         A.  Yes.
5         Q.  You performed all of the job duties that you
6    were performing prior to working from home; correct?
7    I'm sorry --
8         A.  Yes.
9         Q.  -- prior to being home.  You disagree with my
10   assessment that you were working from home.  You've
11   made that clear; correct?
12        A.  Yes.
13        Q.  Okay.  Prior -- so you were home for about two
14   months?
15        A.  Yes.
16        Q.  Were you allowed to work off-duty upon
17   returning to the city in November of 2021?
18        A.  The chief asked that I didn't because of the
19   appearance that it would give, so I did not.  However,
20   I did have my police vehicle and I was back in the
21   office.  I am aware that there was some rumors or
22   communication that originated from Steel that he was
23   upset that how could they bring me back to work and all
24   of these things.  So I was laying low at that time, for
25   lack of a better word.

Sergio Perez
November 15, 2022                                              94 to 97

Page 94

1    Q. Did anybody affirmatively tell you that you
2  could not request to work off-duty?
3    A. Well, the chief's conversation to me was
4  enough for me. So when you say affirmatively, you
5  know, I conformed to that conversation and that's, you
6  know, my statement, you know. I -- I followed the
7  direction that I was given.
8    Q. Did the chief ever say to you, "Captain Perez,
9  you cannot work off-duty"?
10   A. I don't remember what he said exactly to me,
11 but I can tell you I did not work off-duty from
12 November to January.
13   Q. You've told me that you haven't worked
14 off-duty from September 10th, 2021, to present. Is
15 that still accurate?
16   A. That is accurate, yes.
17   Q. Well, I just want to make sure because you
18 said from November 2021 to January 2022 you didn't work
19 off-duty.
20   A. Correct. And that was all as a result of the
21 same incident which I was relieved for in September, so
22 the statement is accurate.
23   Q. Okay. Upon returning to the office in
24 November of 2021 what was your rank and title?
25   A. Captain overseeing the administration of

Page 95

1  special operations divisions.
2    Q. Did something change in January of 2022 with
3  respect to your rank and title and job duties?
4    A. Yes.
5    Q. What? What changed?
6    A. January 13th I was demoted without any due
7  process or conclusion of any investigation following my
8  charging decision for the misdemeanor battery against
9  Michael Steel. And I was demoted to sergeant effective
10 immediately -- or effective a couple of days later, I
11 think the date is January 17th, and that was only
12 because that's the way they needed to do it for payroll
13 purposes and the closing of payroll. And they stripped
14 me that day and I lost approximately $40,000 in
15 salary --
16   Q. $40,000 --
17   A. -- instantly.
18   Q. -- in base salary?
19   A. Correct.
20   Q. What was your base salary as a captain?
21   A. 95,000.
22   Q. What was your base as --
23   A. 68,000 --
24   Q. -- a sergeant?
25   A. -- as a sergeant.

Page 96

1    Q. Okay.
2    A. My numbers might be a little off. So it's
3  27,000 is what I lost.
4    Q. Who advised you that you were going to be
5  demoted from a captain to a sergeant?
6    A. The manager and the police chief following the
7  conversation with Audrey Dominguez.
8    Q. Okay. And what were you --
9    A. Only because --
10   Q. Go ahead.
11   A. -- John Pate was going to be fired if he did
12 not.
13   Q. Now, did the -- strike that.
14      What were your job duties at this time
15 regarding being a sergeant?
16   A. I was assigned to code enforcement. A couple
17 of days after that, I don't remember exactly, but I was
18 assigned to code enforcement.
19   Q. Was your badge ever taken away?
20   A. Yes. Everything was.
21   Q. Weapon, uniform, and vehicle?
22   A. Yep. Yep. Yes.
23   Q. And this was during the pendency of the
24 criminal investigation pertaining to the misdemeanor
25 battery against Michael Steel; correct?

Page 97

1    A. Yes.
2    Q. Code enforcement is a division or branch of
3  the police department, is that fair -- or is that
4  correct?
5    A. No, that's incorrect. Code enforcement is a
6  different entity of the city.
7    Q. They work in conjunction --
8    A. It's a different department of the city. They
9  do work in conjunction with the police department
10 often. However, they have a civilian manager that
11 oversees civil code enforcement personnel.
12   Q. You still maintained your city issued benefits
13 during this time; correct?
14   A. Yes.
15   Q. Now, you stated that you were demoted without
16 due process with respect to we'll call it January -- I
17 think you used January 17th from lieutenant -- I'm
18 sorry, from captain to sergeant. How do you contend
19 that your due process rights were violated?
20   A. I was demoted without cause, I was demoted
21 without the conclusion of any investigation, I was
22 demoted without any predetermination hearing, and --
23 and following this charging decision, which was an open
24 investigation from September that had not been
25 concluded, and, you know, that's basically my response

Page 98

1  in a nutshell.  You know, I was stripped, I wasn't
2  found guilty of anything, I wasn't found guilty of
3  violating any policy.  The demonstration practices that
4  I -- I exhibited in September were consistent with
5  those that, you know, other members of staff have done
6  in the past, so...
7      Q.  Are you contending -- do you contend that the
8  city's actions or non-actions regarding the
9  predetermination hearing, demotion without an
10  investigation being concluded, and demotion without
11  cause constitute violations of the CBA?
12      A.  Yes.
13      Q.  Okay.  What provision of the CBA do you
14  contend the city violated?
15      A.  The article involving investigations as well
16  as Statute 112 of the Officer Bill of Rights, and other
17  provisions in the law concerning due process.
18      Q.  Did you exhaust any grievance procedures
19  provided under the CBA with respect to these issues?
20      A.  That's a question -- so let me answer like
21  this.  Preceding this charging decision there were a
22  number of complaints that I made against the chief and
23  the things that he was doing that were unlawful,
24  against policy.  So this whole taser fiasco was the
25  work product of everything that I had been complaining

Page 99

1  about and this was an opportunity to remove the thorn
2  out of the way for lack of a better word.
3          So I filed for whistleblower protection prior
4  to being charged with anything and this all came about
5  after that.  So the answer to your question is no as
6  far as the grievance procedure because of everything
7  else that was at play.
8      Q.  Did you attempt to go through any of the
9  procedures identified within the CBA with respect to
10  any of these issues?
11      A.  I followed the city's charter and I'm familiar
12  with the code and I filed a complaint through the city
13  in hopes that they would follow their code and give me
14  the panel so I could lay out all of these facts with
15  the evidence, but that never happened.
16      Q.  I appreciate what you're saying, but I
17  don't -- I know that doesn't answer the question.
18          I'm asking particularly about the CBA.  You've
19  been a police officer for quite some time; correct?
20  You have a lot of experience?
21      A.  Yes.
22      Q.  You're familiar with the CBA or what a CBA
23  entails in general?
24      A.  Yes.
25      Q.  And you're familiar with the CBA identifying

Page 100

1  or enumerating a process that's in place to where if a
2  bargaining member of the CBA believes they've been
3  harmed or a violation of the CBA has occurred there's a
4  process that must be followed to address a claimed
5  violation; correct?
6      A.  Yes.
7      Q.  You've already told me that you didn't exhaust
8  in this case those claimed violations that you've
9  identified for me already with respect to due process
10  issues; correct?
11      A.  No, that's not entirely correct.  What I told
12  you was --
13      Q.  Well, I'm talking about --
14      A.  Go ahead, I'm sorry.
15      Q.  I'm talking about under the CBA.  I understand
16  what you did under the city code and whistleblower, and
17  I promise you we'll get to the whistleblower claim in
18  just a moment, but I'm focusing solely on the CBA.
19          You told me that you -- let me ask you this
20  threshold question.  Again, you believe that you're
21  covered under the CBA as a captain on September 1,
22  2021?
23      A.  Yes.
24      Q.  Okay.
25      A.  Yes.

Page 101

1      Q.  And, again, on January 17th -- or January
2  14th, 2022, when you were demoted from captain to
3  sergeant you believe that you're covered under the CBA?
4      A.  Yes.
5      Q.  Okay.
6      A.  However, and it's important, the right course
7  of action for me to take was to follow the
8  whistleblower provisions in the charter because of
9  everything that occurred.  This wasn't a demotion as a
10  result of whatever, this was a demotion and all of this
11  occurred because of the complaints that I made prior
12  to.  There's so many violations from the chief and the
13  staff and I think -- and I don't want us to get away
14  from that because, yes, the Collective Bargaining
15  Agreement still applies to me.  However, there are
16  things that occurred prior to the demotion that
17  interplay here and the right course of action for me at
18  the time was to go through the city's charter and the
19  whistleblower code and that's why I went there.
20          That does not preclude me from being covered
21  by the Collective Bargaining Agreement and because I
22  didn't choose to go through the CBA at the time doesn't
23  preclude me from the benefits afforded to me therein.
24      Q.  Did you ever seek to obtain a PBA lawyer with
25  respect to the demotion without cause, a demotion

Page 102

1  without the conclusion of an investigation, or the
2  issue of no predetermination hearing?
3      A.  No.
4      Q.  Okay.  Aside from those three issues do you
5  contend in any other way that any due process right of
6  yours was violated?
7      A.  My answer is no at the moment.
8      Q.  There's an officer that has been identified in
9  your complaint, his name is Robert DeMoya.  Are you
10 familiar with Officer DeMoya?
11     A.  Yes.
12     Q.  Okay.  He no longer works for the city;
13 correct?
14     A.  No, he does.
15     Q.  Oh, he does, okay.  At some point in time he
16 was terminated from the city; correct?
17     A.  Yes.
18     Q.  When was that?
19     A.  Steven Barreira terminated him -- and I'm
20 referring to the emails that I told you I had, I know
21 you asked me to say that to you.  Let me go back here.
22 July 7th of 2021.
23     Q.  And what was Officer DeMoya's rank or title at
24 the time of his termination?
25     A.  Detective.

Page 103

1      Q.  All right.  You have -- let me ask you this.
2  The Second Amended Complaint that you have in front of
3  you, docket entry 37, is quite voluminous, it's
4  27 pages.  Have you reviewed that document or did you
5  review that document in its entirety prior to your
6  attorney filing it?
7      A.  Yes.
8      Q.  Okay.  I want to talk to you about what you've
9  alleged in Count II which is a First Amendment
10 violation claim asserted under 42 USC 1983.
11          What do you contend constitutes protected
12 speech by the First Amendment that forms the subject or
13 the basis of your First Amendment Count II claim
14 against the city?
15     A.  Could you simplify that question?  It's pretty
16 long and I'm not a lawyer, I'm not as good as you guys
17 are.
18     Q.  All right.  You've asserted that the city --
19     A.  That was a --
20     Q.  What's that?
21     A.  Ah-ha.  No, no, that was a very long question
22 and I kind of lost you.
23     Q.  That's fine, I'll rephrase.  You've asserted
24 that the city violated your First Amendment rights in
25 Count II of the complaint.  Is that your understanding

Page 104

1  of what you've alleged in Count II?
2      A.  Yes.
3      Q.  How do you contend that the city violated your
4  First Amendment rights?
5      A.  They retaliated against me when they demoted
6  me.  I didn't have an obligation to report financial
7  mismanagement and that wasn't a part of my job
8  description or duties.  But when I did everything went
9  bad for me at work because I went against the chief and
10 from that point on the same chief meets with a
11 complainant of an alleged crime and then I'm relieved
12 of duty and I'm stripped and I'm charged and I
13 basically lost everything.  And -- and that came about
14 because of me speaking out about how the chief didn't
15 follow the code.  There's a code in the city that any
16 expenditure over $25,000 needs to go before the
17 commission.  There's also a policy in the police
18 department that requires the chief to go to the city
19 manager, the city attorney, and somebody else.  And I
20 know this because I reviewed that policy before.
21     Q.  When did you review that policy?
22     A.  That was just one -- I'm familiar with the
23 policies that we have in the department.  I've been
24 there a long time, so I can't tell you when
25 specifically.  I didn't review it yesterday, I didn't

Page 105

1  review it a month ago, but I'm familiar with it.
2      Q.  When did you review it prior to the issue that
3  we're talking about here regarding the -- your
4  knowledge that anything over $25,000 had to be brought
5  before the commission?
6      A.  I want to say last year sometime maybe or in
7  2020.  I don't remember exactly.
8      Q.  You're referring to -- when you're talking
9  about this code or procurement code are you talking
10 about the Lexipol issue identified in your complaint?
11     A.  Yes.
12     Q.  Am I saying that correctly?  Probably not.
13     A.  Yes.  Lexipol is the right way to say it,
14 yeah.
15     Q.  Lexipol, okay.  All right.  What were your
16 alleged concerns or issue regarding the Lexipol
17 agreement identified in the complaint?
18     A.  Well, Jon, the city's under financial
19 oversight.  The city has a limited amount of funding
20 and monies.  And committing the city to pay $53,000 a
21 year in addition to other fees associated with this was
22 just not needed.  Aside from it not being needed,
23 Steven Barreira didn't have the authority to go into
24 contract with Lexipol, but he signed the agreement and
25 it never went before the commission to be approved.

Sergio Perez
November 15, 2022                                    106 to 109

Page 106

1  The commission approved it after the fact because they
2  were already committed to pay for it because he went
3  into agreement with Lexipol.
4      Q.  That agreement was subsequently reversed;
5  correct?
6      A.  I sent an email, that the city has, at the
7  direction of -- what's his name -- at the direction of
8  Dennis Jackson where he directed me to send the city
9  attorney an email to see how we could rescind or get
10 out of the Lexipol thing because it was not needed.
11 And he agreed with me when he came onboard.  We have
12 relationships with many jurisdictions and if we wanted
13 to update any policies it was just a matter of making a
14 phone call and say, "Hey, can you send me your
15 policies?" and us, you know, incorporating those same
16 policies as ours.  So committing the city for all this
17 money was just not needed, it was wrong, and it was an
18 unnecessary expenditure -- expenditure, I'm sorry.
19     Q.  And I'll get back to that, but you brought
20 this up.  When did you send an email to the city
21 attorney at the direction of Dennis Jackson regarding
22 the requested rescindment of the Lexipol contract?
23     A.  That was in December or early January.
24     Q.  December of '21 or January 2022?
25     A.  Yes.

Page 107

1      Q.  To your knowledge has the city ever paid
2  $53,000 to Lexipol?
3      A.  They have, yes.
4      Q.  When?
5      A.  You would have to ask them, I'm not sure, but
6  I know that they paid it because we had committed to
7  pay them.
8      Q.  Do you know whether the money was returned to
9  the city?
10     A.  I don't think so --
11     Q.  Does the city --
12     A.  -- but I --
13     Q.  Go ahead.
14     A.  But I'm not sure, you would have to ask the
15 city.
16     Q.  Is the city's police department currently
17 utilizing or operating under the Lexipol contract that
18 you complain of in the complaint?
19     A.  No.
20     Q.  How did you raise issues -- strike that.
21         Who did you raise issues to regarding the
22 Lexipol contract?
23     A.  Initially Steven Barreira and then John Pate.
24     Q.  Okay.  Let's start with Steven Barreira.  How
25 did you raise these issues?  Were they verbally?  In

Page 108

1  writing?
2      A.  I don't remember.
3      Q.  Do you recall where you raised these concerns
4  or issues to Steven Barreira?
5      A.  No, I don't.
6      Q.  Do you remember when?
7      A.  Right around the time that he went into
8  contract with them.
9      Q.  Did you raise them while you were at work?
10     A.  Yes.
11     Q.  At the police station?
12     A.  Yes.
13     Q.  You were on duty at the time you raised these
14 concerns?
15     A.  Yes.
16     Q.  How did you come to learn about the issue
17 associated with the Lexipol contract?
18     A.  He informed all of his staff, to include me,
19 that he wanted to go with Lexipol.  And he made me to
20 sit in a meeting -- or a Zoom meeting in regards to
21 Lexipol.
22     Q.  How many times did you raise issues or
23 concerns to Steven Barreira regarding Lexipol?
24     A.  Several times.
25     Q.  Can you be a little more specific?

Page 109

1      A.  I'd be lying to you if I was more specific
2  because I really don't remember, but it was a
3  conversation more than once that occurred.
4      Q.  More than five?
5      A.  More than five?  No, I don't think it was more
6  than five.  Maybe two or three.
7      Q.  Okay.  And you don't recall whether these were
8  verbally or in writing?
9      A.  No, I don't recall.
10     Q.  Do you recall the substance --
11     A.  Possibly --
12     Q.  Go ahead.
13     A.  Possibly a combination thereof, but I'm not
14 sure.
15     Q.  Okay.  Did Chief Barreira respond to you?
16     A.  He responded to me.  I don't remember what he
17 said.
18     Q.  Okay.  Do you contend that any adverse action
19 was taken against you because of raising concerns to
20 Steven Barreira regarding the Lexipol issue?
21     A.  Yes.
22     Q.  What adverse action was taken against you
23 because of alleged raised concerns to Steven Barreira
24 pertaining to the Lexipol issue?
25     A.  Well, to be fair it had to do with the Lexipol

Page 110

1  issue, I challenged him on the termination of Robert
2  DeMoya, I challenged him on the misuse of our newly
3  acquired K9, and I had a meeting with John Pate and him
4  in John Pate's office at my request where I outlined
5  all of these things.  And soon thereafter,
6  September 1st and September 10th came an opportunity to
7  remove me.
8          And I'd like to tell you too that when you
9  listen to Steven Barreira's statement to FDLE for the
10  taser incident as you call it, he told the agents
11  himself that he didn't promote me and he did not want
12  me there.
13          And I think that statement alone is very
14  telling as to what his motive was during the pendency
15  of all these complaints and issues into his management
16  and violations of policy.
17      Q.  So you're contending that Barreira relieved
18  you of duty via September 10, 2020 -- '21 -- 2021
19  memorandum as a result of raising concerns pertaining
20  to the Lexipol issue?
21      A.  100 percent.
22      Q.  What evidence do you have to support that
23  contention?
24      A.  I have all of the emails that I submitted
25  complaining and telling him that he was violating

Page 111

1  policy and he could not do what he was doing.  I had a
2  number of conversations, more so arguments in the
3  building verbally with him telling him that he could
4  not do what he was doing.
5          Then I find out afterwards that he met with
6  Michael Steel, as the chief of police, to discuss an
7  incident that Michael Steel was making against me or an
8  allegation, which is completely inappropriate and
9  against policy for him to do so.  And that only
10  occurred because of everything that preceded in the
11  months prior.
12      Q.  Did Steven Barreira ever tell you that he was
13  relieving you of duty on September 10, 2021, because of
14  any concern you raised with respect to the Lexipol
15  issue?
16      A.  No.
17      Q.  Did any other city employee or official tell
18  you that you were being relieved of duty on September
19  10, 2021, as a result of any issue raised in connection
20  with the Lexipol issue?
21      A.  Let me clear something up.  September 10th
22  Steven Barreira sent a piece of paper to my house with
23  two other members of staff, so he never spoke to me,
24  one.
25          And two, I heard a sitting commissioner

Page 112

1  violate the law and demand the city manager fire me,
2  okay, in conjunction with this investigation.  Which I
3  will say that this sitting commissioner was very
4  friendly with Steven Barreira and that's something that
5  everybody knew about.  And she wanted him to stay and
6  she verbalized this during commission meetings.  So
7  this is why I contend what I am contending to you.
8      Q.  My question was very direct though.  My
9  question was did any city official or employer -- or
10  employee ever tell you that you were being relieved of
11  duty in September of 2021 as a result of any issue you
12  raised with respect to the Lexipol?
13      A.  The answer is no and I don't think they would
14  do such a thing.
15      Q.  Do you contend that any other adverse action
16  was taken against you because of the Lexipol issue?
17      A.  Because of the combination of items inclusive
18  of the Lexipol issue, yes.
19      Q.  Okay.  What other adverse actions do you
20  contend were taken against you because of the Lexipol
21  issue inclusive of the other concerns?
22      A.  Oh, what other -- no, none, other than the
23  ones I've told you about.
24      Q.  Okay.
25      A.  I thought you were just saying it was just the

Page 113

1  Lexipol thing.  It was, no, a combination of items.
2      Q.  You have -- as we sit here today you have
3  nothing though specifically to connect your Lexipol
4  objection or concern specifically to the
5  September 10th, 2021, relief of duty or any other
6  adverse action; correct?
7          MR. POLLOCK:  Objection to the form.
8      A.  Correct.
9  BY MR. RAILEY:
10      Q.  Okay.
11          Now, do you contend that John Pate ever took
12  any adverse action against you at any point during your
13  employment?
14      A.  No.
15      Q.  Okay.  Another issue that is raised in the
16  complaint is an issue regarding the city's police
17  department's utilization of a newly purchased K9; is
18  that correct?
19      A.  Yes.
20      Q.  Okay.  You know what I'm talking about?  We
21  don't have to go through the entire background as to
22  what is alleged in the complaint?
23      A.  I know what you're talking about.
24      Q.  All right.
25          Do you need a break right now?

Page 114

1    A.  No.
2    Q.  Okay.
3        MR. RAILEY:  Janet, do you need a break?
4        THE REPORTER:  No.
5        MR. RAILEY:  Kyle?  I guess everyone's good.
6        VIDEO TECHNICIAN:  I'm good.  Thank you
7    though.
8        MR. RAILEY:  No problem.
9        THE WITNESS:  Hey, Jon, you didn't ask my
10   lawyer if he needed a break.  That's not fair.
11       MR. RAILEY:  Brian would tell me if he needed
12   a break.  Just like I tell him that I need a break.
13       MR. POLLOCK:  Exactly.  Let's go for another
14   30 and then maybe we can take a break.
15       MR. RAILEY:  I'm just trying to move as fast
16   as I can or as efficiently as I can through this.
17   BY MR. RAILEY:
18   Q.  All right.  In 2021 were you part of the
19   decision to purchase a police K9 for the city's police
20   department?
21   A.  Yes.
22   Q.  Okay.  How were you part of that decision?
23   A.  Well, I recreated the K9 unit that we did not
24   have for some years.  I purchased or -- what was it,
25   two police vehicles to be upfitted for K9.  I think

Page 115

1    it's an important resource that we needed to have in
2    our city.  And I drove up to Central Florida to select
3    a dog along with a certified trainer that was hosting
4    the K9 school that the officers were attending.
5    Q.  Who authorized you to be part of this decision
6    to purchase the K9?
7    A.  John Pate.
8    Q.  Okay.  Was John Pate involved in the decision
9    as well to purchase the K9?
10   A.  Yes.
11   Q.  Okay.  You were involved.  Who else was
12   involved?
13   A.  That was -- what we say in law enforcement
14   that was my baby, but Nikeya Jenkins was involved.
15   Q.  I'm sorry, you kind of -- you kind of faded
16   out there a little bit.  You said in law enforcement we
17   call it what?
18   A.  Oh, I'm sorry, my earpiece went out.  That
19   was -- can you hear me?
20   Q.  It broke up.  At least on my end it phased out
21   again.
22   A.  Okay.  I was saying that was my baby the K9
23   unit.  So I spearheaded it, Mr. Pate was involved in
24   that, and Nikeya Jenkins was involved in it too in a --
25   in a limited capacity.

Page 116

1    Q.  Okay.  When was the K9 purchased?
2    A.  I don't remember exactly.
3    Q.  Was it before Steven Barreira coming to the
4    city?
5    A.  Yes.  Because the dog had to attend the K9
6    school with the handler and that school was six months,
7    so...
8    Q.  Did you drive up alone to Central Florida to
9    select the dog?
10   A.  No, I was -- I was with the trainer, his name
11   is Erik Good.  He's a Fort Lauderdale police officer.
12   And I don't remember exactly who was there, but I know
13   he was there and a handler was there, and maybe Jenkins
14   too, but I really don't remember.  And the other K9
15   handler as well.
16   Q.  That's who you drove with?
17   A.  No, we were in separate cars.
18   Q.  Okay.  Anyone --
19   A.  Kind of like caravanning up there.
20   Q.  Okay.  Was anyone in your car that you recall?
21   A.  The handler was in my car, I think Jenkins was
22   in my car, and I do remember that our other handler was
23   following because we didn't have an upfitted K9 vehicle
24   for the new dog yet.  I had already purchased one dog
25   before this one.

Page 117

1    Q.  How much did the dog cost?
2    A.  I think it was 10,000.
3    Q.  And were there additional funds that had to be
4    expended for the retrofitting of the police vehicle?
5    A.  Yes.
6    Q.  How much was that?
7    A.  Very expensive.  I don't remember, but it cost
8    a lot of money, the dog cage, the alarm system, you
9    know, the heat alarm.  It's a lot that goes into, you
10   know, just a single vehicle for a K9 unit.
11   Q.  More than 50,000?
12   A.  Probably right around there to include the
13   purchase of the car, you know.
14   Q.  Were there additional funds expended for
15   equipment for the K9?
16   A.  Yes.
17   Q.  Do you know what that amounted to?
18   A.  I don't remember, but I know you -- naturally
19   you would understand that there were a lot of equipment
20   for the officer, the uniforms are different, protection
21   for the dog, medical expenses for the dog, maintenance
22   for the dog to include food and all that stuff were,
23   you know, expenses that the city, you know, absorbed.
24   Q.  And, of course, there's -- you already
25   referenced that there was training.  That training is

Sergio Perez
November 15, 2022                                118 to 121

Page 118

1  not free, right?
2      A.  Well, the training was free.  That was a
3  relationship that I had with that agency and you, know,
4  when you're -- when you're a policeman for a long time
5  you build relationships, you know, with a lot of people
6  and they help you, you know, similar to the policies
7  and procedures that we could have gotten.  So the
8  training was free.
9      Q.  Okay.  And who trained the dog?
10     A.  Fort Lauderdale Police.
11     Q.  So what were your concerns that you had
12 regarding the K9 as related to Steven Barreira?
13     A.  He ordered me to make the officer stay home
14 with his dog after the dog was certified by all
15 standards to include the FDLE certification, the dog
16 was medically cleared, the police vehicle was upfitted,
17 and the unit had started, and there was no legitimate
18 reason for him ordering me to do so.  And he cited --
19 maybe I'm getting ahead.  I'll wait for your next
20 question.
21     Q.  Well, did he give you a reason as to why he
22 wanted you to order the police officer to stay home
23 with the dog?
24     A.  Yeah, he didn't like one of the policies in
25 our SOP in relation to K9 that he wanted to change.

Page 119

1      Q.  In your opinion, as an experienced law
2  enforcement officer, is that an unreasonable request?
3      A.  It's very unreasonable.
4      Q.  Why is that?
5      A.  Because the chief had the power to issue a
6  directive immediately changing temporarily the policy
7  or directing the K9 unit not to follow or he could have
8  modified whatever he did not like temporarily up until
9  he redid the policy.  So there was no need to have a K9
10 unit not come to work after the city spent all this
11 money because of that reason.
12     Q.  Were you familiar with the policy that was in
13 place at the time?
14     A.  Yes.
15     Q.  Do you believe the policy was sufficient?
16     A.  Yes.
17     Q.  You don't believe it needed to be updated in
18 any way?
19     A.  We can always update policies.  I'm not saying
20 that any policy is good forever.  But to disallow a K9
21 unit from coming to work because you don't like a
22 sentence in the policy is unreasonable.
23     Q.  Well, would you agree that with K9s there's
24 potential additional liability by having a K9 on the
25 streets as related to --

Page 120

1      A.  Yes.
2      Q.  -- liability -- liability towards the city?
3      A.  There's liability in this profession
4  altogether based on the nature of work that we do.
5  It's no different than a police officer carrying a gun.
6      Q.  And how do you contend or do you contend that
7  by Steven Barreira asking you to order the police
8  officer who had the K9 to keep the K9 home, how do you
9  contend that -- strike that.
10         Did you contend that constituted a waste of
11 funds?
12     A.  Yes.
13     Q.  How so?
14     A.  Well, we invested probably somewhere in the
15 ballpark of $100,000 for this one K9 unit to be used to
16 apprehend criminal suspects, to locate narcotics, to do
17 what a K9 unit is supposed to do, and that wasn't the
18 intended for him to sit at home.
19     Q.  But you think it was unreasonable for Steven
20 Barreira to have the dog stay at home for a period of
21 time because he believed that the policy needed to be
22 updated?
23     A.  It is unreasonable, yes.
24     Q.  How long was the dog home for?
25     A.  A couple of weeks, I believe.

Page 121

1      Q.  Did Steven Barreira ask you to draft or get
2  him a proposed updated K9 policy?
3      A.  I don't remember if he asked me for that.  I
4  do remember him bringing a concern about the policy and
5  I do remember telling him what the alternative was.  I
6  was not responsible for drafting policy.
7      Q.  So you don't recall whether he asked you to
8  draft a policy?
9      A.  No.  And it wouldn't be a part of what I'm
10 supposed to do --
11     Q.  Who would be?
12     A.  -- because --
13     Q.  Go ahead.
14     A.  The chief.  The chief of police would be and
15 that has to go through legal, it has to go to the city
16 manager's office, so by it's very nature that wouldn't
17 be something that I do.
18     Q.  The chief can delegate those types of tasks,
19 right?
20     A.  I have never heard of any captain or
21 lieutenant to draft agency policies.  It's always been
22 the chief of police.
23     Q.  How did you raise any concerns that we
24 discussed pertaining to the K9 staying at home to
25 Steven Barreira?  Were they verbally or in writing?

Sergio Perez
November 15, 2022                                            122 to 125

Page 122

1     A.  I believe it was a combination of both.
2     Q.  The writing, were those emails?
3     A.  Yes.
4     Q.  Were they authored from Opa-Locka Police
5  Department email?
6     A.  Yes.
7     Q.  Okay.  With your signature block on the
8  bottom?
9     A.  Yes.
10    Q.  Okay.  And backing up to the Lexipol issue,
11 any emails that you sent in connection with the Lexipol
12 issue were sent from your city issued email as well;
13 correct?
14    A.  Yes.
15    Q.  With your police signature -- police
16 department signature block at the bottom; correct?
17    A.  Yes.
18    Q.  How many times did you raise concerns or
19 issues pertaining to the K9 staying at home with
20 Barreira?
21    A.  Several.  Less than five.
22    Q.  All right.
23    A.  I remember vividly, and I'll share this with
24 you, I had a very I would say heated argument with him
25 over the phone where he called me when he gave me this

Page 123

1  order because I remember I was having lunch.  And he
2  gave me this order and I told him that it was wrong, it
3  was unreasonable, we spent all this money.  So I
4  vividly remember that conversation and I'm sure that
5  I -- that there is email communication regarding the
6  same.
7     Q.  When did you discuss the K9 issue with
8  Barreira?
9     A.  Immediately when the dog certified and passed
10 the certification.  When he was ready to go.
11    Q.  Do you recall when specifically that was?
12    A.  No.
13    Q.  Your conversations that you had with Steven
14 Barreira regarding the K9 all occurred in the
15 workplace; correct?
16    A.  Yes, or over the phone, like I told you, while
17 I was at lunch, or via email.
18    Q.  And all during working hours as a city police
19 officer; correct?
20    A.  I don't know about that because we spoke
21 outside of working hours too.
22    Q.  Discussing city business though; correct?
23    A.  Yes.
24    Q.  Fair to say that you only had access to this
25 type of information and knowledge regarding the K9 by

Page 124

1  virtue of your position in the city's police
2  department; correct?
3     A.  Yes.
4     Q.  And same question with respect to the Lexipol
5  issue.  You wouldn't have had knowledge of that issue
6  but for your employment as a city police officer;
7  correct?
8     A.  Yes.
9     Q.  What adverse action do you contend was taken
10 against you because of issues that you contend you
11 raised regarding the K9?
12    A.  I was relieved of duty.  I was demoted.  I was
13 prohibited from working off-duties.  I was stripped of
14 all of my authority.  I was stripped of my police
15 credentials.  I was -- I mean, everything I've
16 described to you earlier in the depo.
17    Q.  You contend that Steven Barreira did all this
18 to you?
19    A.  He set it in motion, yes.
20    Q.  Did any -- are you contending that anyone else
21 aside from Steven Barreira took any of these adverse --
22 claimed adverse actions against you?
23    A.  No.
24    Q.  I'm sorry, was that no?
25    A.  No.

Page 125

1     MR. RAILEY:  Okay.  You're breaking up a
2     little bit.  It shows that you have yellow bars on
3     your end.  I can still hear you okay, but I just
4     want to bring that up before it gets to be a
5     problem.
6        THE WITNESS:  Okay.
7  BY MR. RAILEY:
8     Q.  Okay.  What evidence do you have that any of
9  the claimed adverse actions that you just described to
10 me were taken against you because of issues you spoke
11 to Barreira about pertaining to the K9s?
12    A.  I don't -- is that something I answered
13 already, what action?  I didn't -- I'm sorry, can you
14 repeat it?
15    Q.  Sure.  I'm asking you particularly regarding
16 your issues with the K9 that you said you had multiple
17 conversations with Steven Barreira about, you did not
18 like the fact that the K9 was at home; correct?
19    A.  It's not that I didn't like the fact, it's
20 that it was unreasonable and a waste of funds.
21 Everything -- everything that I did were as part of
22 what our obligations were to the taxpayers, what
23 investments we made as a police department, and for --
24 and for what reason.  So it wasn't anything to my
25 liking.  So I don't -- you know, I just want to be

Page 126

1  clear on that, you know.  I wanted our resources to be
2  deployed appropriately for the money that we spent on
3  them.
4       Q.  With respect -- we'll call it the issue then.
5  With respect to the K9 issue what evidence do you have
6  to link the K9 issue with any claimed adverse action
7  taken against you in this case?
8       A.  None.
9       Q.  Now, there's another item that's part of your
10 First Amendment claim against the city pertaining to
11 the storage of contraband seized at the city's flea
12 market.  Do you know what I'm --
13      A.  Yes --
14      Q.  -- talking about there?
15      A.  -- I do.
16      Q.  Can you describe that issue for me, please.
17      A.  There was a time where the Criminal
18 Investigations Division, which is one of the divisions
19 that I oversaw, made an arrest and confiscated what
20 would have been tens of thousands of dollars in
21 equipment that was stolen or otherwise unaccounted for
22 by its owners or the owners didn't -- you know, it was
23 a lot of equipment that was stolen and we could not
24 verify who owned them for some of them is what I'm
25 trying to say, I'm sorry.  This equipment was so

Page 127

1  extensive that it required overtime usage for staff, it
2  required the renting of large containers like the ones
3  you see on cargo ships to be placed in our police
4  department lot for our old station and at the public
5  works department, and some that were placed at the flea
6  market itself to be loaded with the evidence and then
7  transported to a designated location.  So the law says
8  that when we confiscate something that is unclaimed or
9  we cannot verify who the owner is we have -- we're able
10 to auction that off after 90 days.
11      We do have to make an effort to locate the
12 owners of the equipment, we do have to advertise it in
13 the paper, but once that time has elapsed it is our
14 responsibility to discard of that evidence or get rid
15 of it for lack of a better word.  And that would have
16 prevented us from paying all this money for these
17 containers month after month after month.
18      I think that answers your question, right?
19 Your first question at least.
20      Q.  Sure.  Okay.  So the city was incurring
21 storage costs of how much money per month?
22      A.  I want to say it was about 1200, but I think
23 it was more.  I'm being conservative by saying 1200.
24      Q.  And these items were seized from the flea
25 market prior to Steven Barreira's arrival at the city;

Page 128

1  correct?
2       A.  Yes.
3       Q.  And you already told me you played a part in
4  that seizure as an officer; correct?
5       A.  Yes.
6       Q.  Okay.  Did Steven Barreira ever instruct you
7  to investigate the seizure of that money to make sure
8  it was legitimate?
9       A.  There was no money, it was --
10      Q.  Items.
11      A.  -- items.
12      Q.  Yeah.
13      A.  Did he ever tell me to investigate it?  No.
14      Q.  Did he ever instruct you to analyze whether
15 the items seized were legitimately or lawfully obtained
16 by the city?
17      A.  Yes.  So he had a conversation with somebody
18 from that division that wasn't able to adequately
19 answer his question which resulted in him asking me,
20 you know, to look into it.  And I explained to him what
21 it was and that was a done issue the same day.
22      Q.  Did you have any subsequent conversation with
23 Steven Barreira regarding your findings of what he
24 requested you to look into?
25      A.  Yes.

Page 129

1       Q.  Okay.
2       A.  The same day.
3       Q.  Tell me about the substance of that
4  conversation.
5       A.  I sent him an email, I quoted the statute, I
6  gave him the statute number, and I said that the
7  confiscation of these items was completely legal and
8  this was the process they needed to follow.
9       Q.  Where was the contraband being stored?
10      A.  It was stored at our old police station lot.
11 I think some of the containers, because these are very
12 large containers, so imagine one container being the
13 size of a semi, 18-wheeler, so I believe some were
14 stored at public works also.
15      Q.  Did you help choose where to store these
16 items?
17      A.  Yes.
18      Q.  Okay.
19      A.  So because they were evidence they needed to
20 be secured in one of our facilities and there needed to
21 be cameras that monitored them.  We couldn't just put
22 them anywhere.
23      Q.  In that capacity that's how you learned how
24 much the city was paying per month to store the items;
25 correct?

Sergio Perez
November 15, 2022                                    130 to 133

Page 130

1    A.  Yes.
2    Q.  Now, the complaint in this case, docket entry
3  37, alleges that you raised concerns or issues to Chief
4  Barreira regarding this storage fee.  Is that accurate?
5    A.  Yes.
6    Q.  How many times did you raise concerns or
7  issues to Barreira regarding these storage fees?
8    A.  I think this one was more than five because I
9  think we communicated about this about three times via
10  email, somewhere around that number.  And there were
11  conversations in the workplace in addition to those
12  emails.
13    Q.  All the conversations regarding the storage
14  fees occurred in the workplace with Steven Barreira?
15    A.  Yes.
16    Q.  And the emails that you referenced, those were
17  authored by you from your city issued email; correct?
18    A.  Yes.
19    Q.  And contained your signature block or the City
20  of Opa-Locka's signature block in the body of that
21  email; correct?
22    A.  Yes.
23    Q.  When did you have these conversations with
24  Steven Barreira regarding the storage fees?
25    A.  I'm just reviewing some of these emails to see

Page 131

1  if I can give you a precise date because I don't
2  remember.
3        They began in June of '21, I see some emails
4  here that the city also has.  August 30th I'm
5  requesting that the advertisements -- advertisement's
6  required prior to being auctioned.  Yeah, so
7  August 30th, '21.  Yeah, so right around those months.
8    Q.  Do you have any evidence to link any
9  conversation or concerns you had with the storage fees
10  communicated to Steven Barreira with any claimed
11  adverse action in this case?
12    A.  No.
13    Q.  Is it fair to say that you had access or you
14  learned of these storage fees by virtue of your role as
15  a city police officer?
16    A.  Yes.
17    Q.  Did you ever go to a public city commission
18  meeting to voice your concerns or objections over any
19  of the issues that we just discussed?
20    A.  Did I go before the dais in a commission
21  meeting?  No.
22    Q.  Yes, okay.
23        Did you ever raise any concerns or objections
24  regarding the issues that we just discussed to the
25  media or the press?

Page 132

1    A.  No.
2        I'm sorry, let's me retract that.  Can you ask
3  the question again?  Did I ever -- was this after I
4  filed the lawsuit?
5    Q.  I'm not talking about going or discussing your
6  lawsuit in general with any member of the media.  I'm
7  talking specifically related to the Lexipol issue, the
8  K9 issue, or the flea market issue did you go to the
9  media or the press specifically at those times --
10    A.  No, I did not.
11    Q.  -- regarding those issues?
12    A.  No, I did not.
13    Q.  Okay.  Are there any other issues or
14  statements that you -- issues that you raised or
15  statements that you made that you contend are protected
16  by the First Amendment?
17    A.  No.
18    Q.  You referenced this earlier, but the city has
19  been subject to financial oversight for the better part
20  of six years; is that correct?
21    A.  Yes.
22    Q.  Where that every expenditure has to be
23  reviewed and approved by the state oversight board?
24    A.  Yes.
25    Q.  Was there a point in time in the last three

Page 133

1  years where you modified your police vehicle in any
2  way, in particular with respect to putting new rims on
3  your vehicle?
4    A.  New rims on my vehicle?  On my police vehicle?
5    Q.  Or new wheels?
6    A.  No.
7    Q.  No.
8        Have you modified your vehicle in any way in
9  the last three years?
10    A.  On the city's dime, no.
11    Q.  On your own dime?
12    A.  Yes.
13    Q.  Oh, you have?  Okay.  What did you do?
14    A.  Probably added a few more lights or something
15  because I like the car to be lit up and all the
16  lights --
17    Q.  Okay.
18    A.  -- but, yes.
19    Q.  Where did you add those lights to?
20    A.  The dashboard.
21    Q.  Okay.  So you've never used any city funds to
22  modify your police vehicle in any way?
23    A.  No.  Let me tell you how -- and this is
24  important because you're getting that information from
25  somebody, so I just want to clarify something.

Sergio Perez
November 15, 2022                                          134 to 137

Page 134

1        Each police vehicle as part of the lease
2   agreement with Enterprise where we acquire these police
3   vehicles comes an upfit dollar amount.  So the city
4   manager approves the leasing of the vehicle and the
5   upfit cost which is incorporated into the monthly
6   payment of that vehicle.  So nobody in the police
7   department can go and say, "Hey, for this car right
8   here I want another $10,000 of lights."  I don't know
9   if you understand what I'm saying.  There's a dollar
10  amount and there's a -- a worksheet that's used across
11  the board for all of the cars with the equipment that's
12  going to be installed in all of the cars.  So I just
13  want you to be clear on that, you know, so you
14  understand.
15       Q.  Do you think Steven Barreira was a competent
16  police chief?
17       A.  No.
18       Q.  Do you think he was good at his job?
19       A.  No.
20       Q.  Did you trust him as a chief of police?
21       A.  I gave him the benefit of the doubt when he
22  got here, but I came to find out afterwards that he was
23  a regular deputy on the road prior to being hired here.
24  And his decision-making was inconsistent with that of a
25  competent police chief.

Page 135

1        Q.  Is that the basis for you saying he was not
2   competent or good at his job?
3        A.  Yes.
4        Q.  Okay.  Did you find Chief Barreira honest?
5        A.  Now or before?
6        Q.  Well, I guess we'll go before at the time you
7   worked with him.
8        A.  He appeared to be honest, yes.
9        Q.  And has your opinion since changed?
10       A.  Yes.
11       Q.  Okay.  So you don't believe he's honest now?
12       A.  No.
13       Q.  And why do you say that?
14       A.  Well, the things that I didn't know then that
15  I know now, like his meeting with Steel, the statements
16  he made to FDLE that I didn't know about up until now.
17  That's why I feel the way that I do.
18       Q.  Do you find him trustworthy?
19       A.  No.  Not now.
20       Q.  Okay.  What about the time that you worked
21  with him?
22       A.  Trustworthy I didn't have an opinion because
23  he was new.  So I didn't not trust him, but I'm not
24  going to say that I trusted him.  So, like I said, he
25  got the benefit of the doubt.

Page 136

1        Q.  You've already told me that John Pate never
2   took any adverse action against you; correct?
3        A.  Correct.
4        Q.  And you told me that your -- are you friends
5   with John Pate?
6        A.  I would say yes, I talk to him to this day.
7        Q.  Were you friends with John Pate at the time
8   that you worked for the city?
9        A.  Yes.
10       Q.  You socialize, hang outside of work?  Hangout
11  outside of work, sorry?
12       A.  No, that we've never done.
13       Q.  To this day you've never done?
14       A.  No.
15       Q.  Did you believe that John Pate was a competent
16  city manager?
17       A.  Yes.
18       Q.  You believed he was good at his job?
19       A.  Yes.
20       Q.  Did you find John Pate honest?
21       A.  Yes.
22       Q.  Did you find him trustworthy?
23       A.  Yes.
24       Q.  And I've already asked you all those questions
25  about Michael Steel.

Page 137

1        A.  Yes.
2        Q.  We won't go through those again.
3        MR. RAILEY:  All right.  Let's take a break.
4   We can go off the record and I'll discuss how much
5   I think I have longer because I don't want to take
6   much of a break if that's okay with you guys to --
7        MR. POLLOCK:  Sure.
8        MR. RAILEY:  -- continue on, so we'll go off
9   for now.
10       VIDEO TECHNICIAN:  The time is 1:40 p.m.
11  we're off video record.
12       (Recess taken at 1:40 p.m.)
13       (Deposition resumed at 1:56 p.m.)
14       VIDEO TECHNICIAN:  The time is 1:56 p.m.
15  We're back on the video record.
16  BY MR. RAILEY:
17       Q.  All right.  Referring to Count III in the
18  Second Amended Complaint that is your claim asserted
19  under Florida's Public Whistle-blower's Act.
20       A.  Yes.
21       Q.  What do you contend you blew the whistle on?
22       A.  The misappropriation of funds.  Violation of
23  due process rights afforded to police officers.  Misuse
24  of -- or expenditures associated with the flea market
25  case.  Misappropriation or misuse of -- or nonuse of

Page 138

1 acquired resources by the city concerning the K9.
2      Q.  Are you reading from a document right now?
3      A.  Yes.
4      Q.  What document are you reading from?
5      A.  I -- when you mentioned the Count III I
6 switched the page to Count III of the --
7      Q.  Got it.  So you're reading from the complaint.
8 Correct?
9      A.  Am I reading from the complaint?  No, I just
10 went to the count and answered your question.
11      Q.  The issues that you just described to me, did
12 you author any written document to the city regarding
13 your alleged whistleblower concerns pertaining to each
14 issue?
15      A.  One of my lawyers at the time authored a
16 document for me to the city.
17      Q.  Okay.  Can you see my screen?
18      A.  Yes.
19          MR. RAILEY:  We'll go ahead and mark what's
20      been Bates labeled Perez 272 and 273 as Exhibit 4.
21          (Whereupon, Defendant's Exhibit 4 was marked
22      for identification.)
23 BY MR. RAILEY:
24      Q.  Is this the document that you just referenced
25 regarding being authored by an attorney on your behalf?

Page 139

1      A.  Yes.
2      Q.  Okay.  Can you describe this document for me?
3 What's the date and who was it sent to?
4      A.  September 28th of '21 it was sent to John Pate
5 by James Casey and it was our request for whistleblower
6 protection.
7      Q.  Okay.  Aside from this document which I've
8 labeled or marked as the city's Exhibit 4 do you
9 contend that any other document contends -- constitutes
10 a whistleblower complaint?
11      A.  Can you ask that question again?
12      Q.  Sure.  Let me back up and ask you a threshold
13 question.
14          What I've marked as Exhibit 4 in front of you,
15 a September 28th, 2021, letter from James Casey to
16 Mr. Pate, do you contend this document is a
17 whistleblower complaint?
18      A.  Yes.
19      Q.  Okay.  Do you contend that any other document
20 that you authored or was authored on your behalf
21 constitutes a whistleblower complaint?
22      A.  Any other document.  What document are you
23 referring to?
24      Q.  I'm asking you if there are any other
25 documents aside from this one that you believe was a

Page 140

1 whistleblower complaint?
2      A.  Okay.  Then the answer is no.
3      Q.  Okay.
4          All right.  Did you author this document what
5 I've marked as Exhibit 4?
6      A.  No.
7      Q.  Who did?
8      A.  My lawyer.
9      Q.  Okay.  Did you personally provide this
10 document to John Pate?
11      A.  I don't remember whether it was -- I don't
12 remember how it was provided.
13      Q.  Okay.  I didn't ask how I asked who.  Do you
14 recall whether you or Mr. Casey provided this document
15 to Mr. Pate?
16      A.  Yes, and my answer was I don't remember.
17      Q.  Okay.  Do you know how it was sent to
18 Mr. Pate?
19      A.  From reading the document it says via email.
20      Q.  Okay.  Do you know whether Pate received this
21 document?
22      A.  Yes.
23      Q.  How do you know that?
24      A.  Because following this letter the city
25 attorney contacted me to give her a statement via Zoom.

Page 141

1      Q.  Okay.  Did John Pate ever take any adverse
2 action against you because of this letter?
3      A.  No.
4      Q.  Do you contend that any city employee or
5 official took any adverse action against you
6 specifically because of this letter?
7      A.  No.
8      Q.  Do you have any evidence that anyone at the
9 city has ever harbored any retaliatory animus against
10 you?
11      A.  Direct evidence, no.
12      Q.  Okay.  What about indirect evidence?
13      A.  Jon, I think everything I provided you speaks
14 for itself.  All the evidence and everything I've
15 spoken to you for the last several hours.  Indirectly
16 anybody will draw the same conclusions.  You know,
17 directly, like direct evidence, of course, the answer
18 to that would be no.  But if you -- if you read through
19 the evidence and you examine everything anybody,
20 including you, would draw the same conclusions.
21      Q.  Do you know whether any city employee or
22 official outside of John Pate knew of the existence of
23 this letter?
24      A.  No, I don't.  Well, the city attorney.
25      Q.  Fair enough.  Outside of John Pate and the

Sergio Perez
November 15, 2022                                    142 to 145

Page 142

1  city attorney you have no knowledge that anybody else,
2  city official, employee, or representative knew of this
3  September 28, 2021, letter; correct?
4      A.  Correct.
5      Q.  Okay.  Let's turn to Count IV of your
6  complaint.
7      A.  I'm flipping a page to Count IV.  Just as a
8  reference I'm letting you know.
9      Q.  Okay.  That's a First Amendment retaliation
10  claim that you've asserted against the city and I want
11  to make sure I understand what the nature of the claim
12  is.
13          Are you contending that the city retaliated
14  against you because you filed the original complaint on
15  this matter on March 11th, 2022?
16      A.  Yes.
17      Q.  Okay.
18          Aside from the filing of this complaint are
19  you contending that anything else you did with respect
20  to your employment led to any retaliatory action taken
21  against you after March 11, 2022?
22      A.  Yes.
23      Q.  What else?
24      A.  Well, I have filed complaints in addition to
25  the whistleblower concerning Michael Steel.  As I

Page 143

1  provided to you earlier on in the depo there is an
2  ongoing criminal investigation for perjury into Michael
3  Steel as a direct result of my complaint and his false
4  statements to internal affairs concerning this very
5  same case, not the whistleblower, but what you named
6  the taser incident.
7          I have filed an ethics complaint against
8  Michael Steel, but that one probably won't be so
9  relevant because that's more recent and after the
10  filing of this.  But that has transpired.
11          I did discover that Michael Steel was
12  dishonest and falsified his application to the City of
13  Opa-Locka and I disclosed that as well.
14          So I believe all of these things are also
15  playing a role in this.
16      Q.  To be clear if you want to turn to
17  paragraph 27 of your complaint it's on page -- page 4.
18      A.  Page 4.  Okay.
19      Q.  Paragraph 27.  You told me that you reviewed
20  this complaint before it was filed and presumably
21  drafted by your attorney, but you, yourself, reference
22  the September 1, 2021 incident with Michael Steel as
23  the taser incident; is that correct?
24      A.  Yes.
25      Q.  Okay.  How do you contend that you were

Page 144

1  retaliated against because you filed the original
2  complaint in this matter?
3      A.  Well, when he became interim chief of police
4  he utilized that position to prohibit me from receiving
5  my evaluation that had a monetary attachment to it as a
6  bonus -- like a bonus.  He made sure that I was made to
7  ride around in a code enforcement vehicle without my
8  weapon or any credentials.  He demoralized me, along
9  with the city, to ride around in a code enforcement
10  vehicle in a community that I had served for the last
11  15 years as a police officer.  And I must say this is
12  something that has never been done to anybody else but
13  me.
14      Q.  Now, riding around in a code enforcement
15  vehicle were you not instructed to do that in January
16  of 2022?
17      A.  No.  I was to sit in code enforcement, but
18  then afterwards I was made to ride around in a code
19  enforcement vehicle, so I wasn't riding around in the
20  code enforcement vehicle immediately.  So a little bit
21  of time passed and then they wanted to demoralize me,
22  they made me ride around, they made me enforce parking
23  violations with a code enforcement officer in a marked
24  code enforcement vehicle.  And I was in the view of
25  police officers working the road that I commanded over

Page 145

1  before, the community, which I know many people in the
2  community, and it's just -- it was embarrassing, it
3  was -- it was terrible.
4      Q.  Are you contending that Michael Steel had you
5  ride around in a code enforcement vehicle because you
6  filed a complaint?
7      A.  Yes.
8      Q.  What evidence do you have to support that
9  statement?
10      A.  Direct evidence none.
11      Q.  Okay.  What about indirect?
12      A.  As I described throughout the several hours of
13  deposition.  Everything that I have shared with you in
14  the evidence, the falsehoods brought, you know, by him,
15  and everything else that I've presented here.
16      Q.  When is the first time that Michael Steel
17  instructed you to -- using your words I think, I don't
18  want to put words in your mouth, but ride around in a
19  code enforcement vehicle?
20      A.  I don't remember when exactly that came about.
21  I can't give you a date, but it did not come from the
22  mouth of Michael Steel, it came from the civilian
23  manager that I answered to and she shared with me that
24  it came from the city manager and Steel.
25      Q.  Who was the civilian manager at that time?

Page 146

1     A.  Wilma Wilcox.
2     Q.  And who was the city manager at the time?
3     A.  James Wright which was Steel's friend.
4     Q.  You don't know specifically the first time
5  that you were instructed to ride around in a vehicle --
6  a code enforcement vehicle?
7     A.  No.  No.
8     Q.  There are some allegations in Count IV on page
9  25 regarding the approval of a performance evaluation.
10  Are you familiar with those allegations?
11     A.  Yes, that's the evaluation with the bonus that
12  I just mentioned to you.
13     Q.  Tell me about that, please.
14     A.  The city and I have email communication
15  where -- or let me retract.
16         The city has a policy that evaluations are
17  done annually on its members.  That evaluation is due
18  on the anniversary date of the affected member.  This
19  was also one of the audit findings from the oversight
20  that needed to be corrected by the city because the
21  city had a pattern or practice not to complete these
22  evaluations.  So when the time my anniversary date
23  came, which was March 8th, Alvin Rogers completed my
24  evaluation, which I signed, and it was submitted to
25  human resources.

Page 147

1         However, Michael Steel, who had just become
2  the interim chief, instructed Alvin Rogers to reduce my
3  rating, reduce my score, and add negative commentary on
4  my evaluation even though he never supervised me for
5  that entire year.  So that's how I got the several
6  versions of evaluations here that I shared with you
7  earlier.  And to this day I haven't received a response
8  from the city in regards to the evaluation.
9     Q.  What do you mean you haven't received a
10  response from the city in regards to the evaluation?
11     A.  I requested it.  I requested a copy of it
12  because I wanted to be given something from the city
13  officially, even though Rogers gave me a copy of it
14  when he and I signed it.  But I became aware that Steel
15  was reducing it after I had signed it, and Alvin Rogers
16  made me aware of that.
17     Q.  Do you have a version where your score is
18  reduced from 4.38 to --
19     A.  Yes, I do.
20     Q.  What was it reduced to?
21     A.  Yes, I do.
22         Give me one second.  4.38 was the original.
23  Then it was reduced to 3.38 and those are the two
24  versions that I have.  But Rogers told me there's more.
25  In fact -- and when you speak to him, because I'm sure

Page 148

1  you probably will, my evaluation was reduced or there
2  was, like, three or four different versions.  And
3  Rogers himself told Steel that he believed that it was
4  in the best interest of the city and Steel himself
5  being that him and I were involved in this taser
6  incident to remove himself from this process.
7     Q.  Who reduced the score from 4.38 to 3.38?
8     A.  Alvin Rogers at the direction of Michael
9  Steel.
10     Q.  Did Alvin Rogers tell you that Steel directed
11  him to do that?
12     A.  Yes.
13     Q.  When did he tell you that?
14     A.  I don't -- I don't recall exactly when.
15     Q.  How did he tell you that Steel directed him to
16  lower the evaluation, was it verbally or in writing?
17     A.  He told me over the phone during a phone call.
18     Q.  Tell me about that conversation.
19     A.  He told me that he needed me to sign another
20  version, that Steel was ordering him to reduce my
21  rating and include negative commentary on there.
22     Q.  Anything beyond that?
23     A.  That's all I remember.
24     Q.  In the 3.38 version is there any negative
25  commentary included about you?

Page 149

1     A.  Let me see.  I'm just going to read through it
2  really quick if you give me a moment.
3     Q.  Fine.
4     A.  This is one example.
5         "Sergeant Perez issued a Taser 7 device to
6  Officer Simon who was not formally trained to use this
7  device."  That's incorrect.
8         But then he writes:
9         "I cannot personally attest to this because I
10  was not present."
11         He also writes:
12         "This evaluation is being prepared by me,
13  however, I was not directly supervising Sergeant Perez
14  during this time period."
15         This is Alvin Rogers' evaluation when he
16  reduced it.
17         Let me see what else.  And the 4.38 evaluation
18  I believe may be a second version, but I'm not sure
19  because I think I may have had a higher rating than
20  this initially.
21     Q.  Who was supervising you during this time
22  period?
23     A.  It would have been Dennis Jackson.  A
24  combination of Dennis Jackson, Steven Barreira, but
25  they were no longer with the agency.  And Nikeya

Sergio Perez
November 15, 2022                    150 to 153

Page 150

1  Jenkins which was the assistant chief of police.
2      Q.  And to be clear this evaluation is the 2021 to
3  2022 evaluation?
4      A.  Yes.
5      Q.  Okay.  Had Nikeya Jenkins already retired by
6  the time this evaluation was to be completed?
7      A.  I believe so, yes.
8      Q.  Do you have any evidence to link the notion
9  that your evaluation was lowered or directed to be
10 lowered from 4.38 to 3.38 specifically because you
11 filed a complaint in this action?
12     A.  No direct, no.
13     Q.  What evidence do you have that the alleged
14 direction to lower the evaluation from 4.38 to 3.38 was
15 done as a result of the filing of your complaint?
16     A.  I don't have any direct evidence, but I think
17 the facts speak for themselves.
18     Q.  Okay.  What indirect evidence do you have to
19 support a contention that your evaluation was directed
20 to be lowered because you filed suit against the city?
21     A.  And that goes back to everything that I have
22 shared with you throughout this deposition.  All of the
23 facts and the occurrences as they took place.
24     Q.  Okay.  Now, the -- you alluded to this before,
25 something about a pay increase associated with a 4.38

Page 151

1  rating.  Are you contending that you did not receive a
2  pay increase as a result of the --
3      A.  The bonus, the bonus I received later on, but
4  not when it was due.
5      Q.  Okay.  Tell me about that.
6      A.  That bonus came several weeks or several pay
7  periods after the fact and absent the evaluation which
8  is a violation of policy as well because both have to
9  go hand in hand in order for it to be processed.
10     Q.  What was the amount of that bonus?
11     A.  It was a longevity bonus pursuant to the CBA.
12 I think it may have been 2500 bucks.
13     Q.  Now, a longevity bonus, what does that have to
14 do with a performance evaluation?
15     A.  So the city's policy is that in order to get
16 the longevity bonus the evaluation has to be completed
17 because it's an anniversary date type of thing.
18     Q.  So you've received, as we sit here today, all
19 monies that you contend you're owed in connection with
20 this evaluation issue; correct?
21     A.  Yes.
22     Q.  In connection with the non-approval of the
23 evaluation that's alleged in your complaint, was your
24 pay ever reduced?
25     A.  No.

Page 152

1      Q.  Were your benefits ever taken away?
2      A.  No.
3      Q.  And have your job duties remained the same?
4      A.  Yes.
5      Q.  Any other action you contend was taken against
6  you because you filed a complaint against the City of
7  Opa-Locka on March 11th, 2022?
8      A.  No.
9      Q.  What do you want from the city in this case?
10     A.  I would like to be restored and compensated
11 for my damages.  I think -- I think you would agree or
12 everybody would agree that my rights were violated.  I
13 lost a great deal of money that I would have earned
14 otherwise.  What you may or may not know was that in
15 addition to my employment here I was a criminal justice
16 professor at St. Thomas University where I was teaching
17 and as a direct result of this I lost that job, you
18 know.  I had -- I had a pre-construction home that I
19 was committed to buy and that was taken away from me
20 because of my reduction in pay.  And I was demoralized,
21 embarrassed to say the least.
22         So -- and I think it's important for you to
23 know, Jon, that I've never sued anybody in my life,
24 okay, and this is not who I am or what I like to do.
25 But, unfortunately, the way that everything played out

Page 153

1  here and what was done to me I had no other choice.
2  And I never had any interest to be here having this
3  type of deposition with you.
4      Q.  The criminal justice teaching position that
5  you had at -- I'm sorry, was it St. Thomas University?
6      A.  Yes.
7      Q.  When did you first obtain that position?
8      A.  That was a new position.  It was in 2021 right
9  around the time that I became captain if my memory
10 serves me well.
11     Q.  Who hired you?
12     A.  Who hired me?
13     Q.  Yes, at St. Thomas University.
14     A.  The university.  I don't know, I don't
15 remember who that person's name is.
16     Q.  Did you --
17     A.  The HR -- HR director.
18     Q.  Okay.  And how long did you teach there for?
19     A.  Up until January.
20     Q.  And why did you cease teaching there?
21     A.  I -- they discontinued my employment there as
22 a result of this taser incident charge.
23     Q.  Did they tell you that?
24     A.  Yes.
25     Q.  Was that in writing or verbally?

Page 154

1   A. Both.
2   Q. Okay. You have a copy of I'm assuming it's a
3   letter terminating your employment?
4   A. Yes.
5   Q. Okay. And verbally who did you have a
6   conversation with at St. Thomas University regarding
7   terminating your employment at St. Thomas?
8   A. It was the HR director.
9   Q. Okay. Do you remember his or her name?
10  A. No, but it's the same person that is on the
11  letter.
12  Q. Okay.
13  A. When I give you a copy of it you'll know who
14  it is.
15  Q. How much were you earning as an adjunct
16  professor at St. Thomas University?
17  A. I think it was like four grand a class and I
18  had four each semester.
19  Q. I'm sorry, you cut out there. Four grand for
20  what?
21  A. And I believe I had four classes each
22  semester.
23  Q. And each class was four grand?
24  A. Yes.
25  Q. How many semesters did you teach in total?

Page 155

1   A. Four or two, I'm not sure. It's one of the
2   two.
3   Q. It's either four or two?
4   A. Yeah.
5   Q. Okay.
6      Do you have any knowledge that any individual
7   at the city spoke to anyone at St. Thomas University
8   regarding St. Thomas's decision to terminate your
9   employment there?
10  A. I don't have any personal knowledge, no.
11  Q. Now, I'm looking at your interrogatory
12  answers, so if you want to refer to that it might be
13  easiest. The first page, Interrogatory No. 3.
14  A. Okay.
15  Q. The city asked you to identify claimed
16  economic losses and in part you stated that you lost
17  off-duty hours, $50 an hour times 70 hours a week was
18  $3500 per week?
19  A. Yeah.
20  Q. It's your testimony that you worked --
21  A. Yes.
22  Q. -- 70 off-duty hours a week on average?
23  A. On average, yes.
24  Q. In addition to your 40 on-duty hours?
25  A. Yes.

Page 156

1   Q. So you work about on average 110 hours per
2   week?
3   A. On average.
4   Q. Okay. And I think we covered this, but I just
5   want to make sure to bring it full circle.
6   A. Let me -- let me clarify something for you as
7   well.
8   Q. Go ahead.
9   A. Off-duty jobs pay a three-hour minimum, okay?
10  So there were times where you arrive to a job, you're
11  there 15 or 20 minutes, the job ends, you're paid three
12  hours. So 70 hours a week might not mean 70 work
13  hours, like physical being there work hours. I don't
14  know if you understand what I'm saying.
15  Q. Okay. And that was from September 1 -- I'm
16  sorry, September 10, 2021, to the present, that's how
17  you get this calculation 3500 per week?
18  A. That was -- that was what I would do
19  throughout the year, so if you look at -- because I
20  gave you all of my tax documents and 1099s, you will
21  see that for different entities I may have 60 grand
22  here, 40 grand here, and those are all off-duty jobs.
23  Q. I'm just trying to --
24  A. When you -- go ahead.
25  Q. I'm just trying to figure out what you're

Page 157

1   seeking from the city economic damages-wise. So it's
2   $3500 per week and that's every week from today backing
3   up to September 10th, 2021, so that's about 14 months?
4   A. Yeah.
5   Q. Okay.
6   A. Yes.
7   Q. 14 months worth of overtime pay -- I'm sorry,
8   of --
9   A. Off-duty. Off-duty, yes.
10  Q. At $3500 a week.
11     All right. Now, you referenced this and it's
12  also in your interrogatories. You state losses for a
13  home that cannot be purchased due to demotion and
14  reduction in pay $10,000. What does the $10,000 figure
15  represent?
16  A. It represents furniture, it represents items
17  that were bought, and just preparation. Monies that
18  were spent on things for the home.
19  Q. Okay. It's not a down payment for the home?
20  A. No.
21  Q. Okay.
22  A. That's separate.
23  Q. Okay. The furniture and items bought for the
24  home, where are those items currently?
25  A. My current home, my mother's home.

Page 158

1    Q. So you still have them; correct?
2    A. Yes. Nowhere to put them, but, yes.
3    Q. And a final item that you're seeking with
4  respect to economic damages is a lost wage item due to
5  demotion from 95,000 to 68,000 and change. That's what
6  we talked about earlier?
7    A. Yes. Yes.
8    Q. And to be clear what demotion or demotions are
9  you referring to?
10   A. From captain to sergeant.
11   THE WITNESS: Can I take this call for one
12   second? Can you give me two seconds? It's the
13   school.
14   MR. RAILEY: Absolutely, yeah.
15   VIDEO TECHNICIAN: The time is 2:31 p.m.
16   We're off video record.
17   (Recess taken at 2:31 p.m.)
18   (Deposition resumed at 2:36 p.m.)
19   VIDEO TECHNICIAN: The time is 2:36 p.m.
20   We're back on video record.
21 BY MR. RAILEY:
22   Q. The lost wages that you're seeking in
23 connection with the demotion or demotions from captain
24 to sergeant, I'm trying to identify the time period.
25 So is it one demotion or two demotions that you're

Page 159

1  seeking lost wages with respect to?
2    A. One demotion. They took my pay in January.
3    Q. Okay, from January --
4    A. To present.
5    Q. Got it. Okay.
6    A. And I'm seeking to be restored as well.
7    Q. When you say restored are you talking to the
8  captain position?
9    A. Yes.
10   Q. Anything else economic-wise that you're
11 seeking in damages from the city?
12   A. Economic-wise, no.
13   Q. Non-economically are you claiming any
14 emotional distress damages as a result of any issue
15 asserted in the complaint?
16   A. Yes. This is -- this has been really rough on
17 me and my family.
18   Q. What has caused you emotional distress?
19   A. Well, to be demoted, from my children not
20 understanding why their father doesn't have the police
21 car anymore and, you know, what's gon'g on with me, the
22 stress associated with something like this. I mean,
23 any person would suffer distress emotionally and it's
24 very draining.
25       My elderly mother, having to borrow money from

Page 160

1  my elderly mother and her retirement, you know, to pay
2  for these things to defend myself. I mean, it's
3  been -- it's been the worst time of my life. This has
4  been the worst thing I've been involved in in my life.
5    Q. How much money have you borrowed from your
6  mother's retirement account?
7    A. In excess of $25,000.
8    Q. Have you sought any treatment with any mental
9  health professional in connection with claimed
10 emotional distress damages in this case?
11   A. No. No.
12   Q. As we sit here today, do you have any
13 appointments scheduled with any mental health
14 professional in connection with claimed emotional
15 distress damages?
16   A. No.
17   Q. Have you ever sought any treatment with any
18 mental health professional in connection with any
19 issue?
20   A. No.
21   Q. Okay. Are you taking any medications in
22 connection with any claimed emotional distress damages?
23   A. No.
24   Q. Do you have the interrogatories in front of
25 you?

Page 161

1    A. Yes.
2    Q. I'm going to ask you a couple follow-up
3  questions regarding some of the items within that
4  document. Let me know when you're ready.
5    A. I'm ready.
6    Q. Okay. No. 4 the city asked you to identify
7  essentially potential witnesses in the matter. I'm
8  going to skip down to Antonio Sanchez.
9    A. Okay.
10   Q. What specifically does Antonio Sanchez have
11 knowledge of regarding any issue in the complaint?
12   A. He is aware of Steel's background. He's the
13 deputy chief of police at the time that terminated
14 Steel. He is aware of the false statements made by
15 Steel in the past. He is also the deputy chief of the
16 administration for which Steel wanted me and the other
17 officers to send anonymous emails to the commission to
18 overthrow.
19       He initiated multiple investigations
20 concerning Steel's integrity and dishonesty and acts of
21 retaliation in the past, so I think that is what his
22 involvement, knowledge would be, you know, in a
23 nutshell.
24   Q. Who -- I'm sorry. When is the last time that
25 you've spoken to Antonio Sanchez?

Page 162

1     A.  Recently.  A few days ago.
2     Q.  About what?
3     A.  He checks up on me often to see how I am.
4     Q.  Have you ever discussed any matter contained
5  in this lawsuit with Antonio Sanchez?
6     A.  No.
7     Q.  Do you consider yourself friends with Antonio
8  Sanchez?
9     A.  Yes.
10    Q.  Do you socialize with him?
11    A.  Yes.
12    Q.  Have you sought Antonio Sanchez's assistance
13 with regards to obtaining a declaration or affidavit in
14 this case?
15    A.  No.
16    Q.  Do you intend to call Antonio Sanchez as a
17 witness at trial?
18    A.  Yes.
19    Q.  Flip to the next page, please.
20        Who is Victor Fonseca?
21    A.  Victor Fonseca is one of the other officers
22 that Michael Steel attempted to enlist the assistance
23 of to overthrow the administration.
24    Q.  Do you still -- when's the last time that
25 you've spoken to Victor Fonseca?

Page 163

1     A.  A few days ago.
2     Q.  Is he a friend of yours?
3     A.  Yes.
4     Q.  Have you sought his assistance in connection
5  with this case by virtue of obtaining or requesting to
6  obtain a declaration or affidavit in this case?
7     A.  No.
8     Q.  Do you intend to call him as a trial witness?
9     A.  Yes.
10    Q.  What was Victor Fonseca's position when he
11 worked for the city?
12    A.  He was a police officer.  He's currently a
13 sergeant with schools police.
14    Q.  Schools?
15    A.  Yes.
16    Q.  Which schools?
17    A.  Miami-Dade Schools Police.
18    Q.  Oh, Miami-Dade, okay.
19        Who is Kirby Nord (phonetic)?
20    A.  Kirby Nord is an officer with the Opa-Locka
21 Police Department that has filed multiple complaints
22 against Steel in the past and is familiar with Steel's
23 integrity and his credibility and the history.
24    Q.  Are you friends with Kirby Nord?
25    A.  He's -- so everybody on this list are

Page 164

1  professional.  I don't hang out with anybody here other
2  than Victor.  I want to make that clear with Antonio
3  Sanchez too.  We don't go out to dinner or anything
4  like that.  These are all work-related.  I call them my
5  friends because I had a good relationship with them and
6  we've maintained contact, but, you know, nobody here I
7  go to their Christmas parties or Thanksgiving or
8  anything like that.  So I just want to make that clear.
9     Q.  That's fine.
10        So beginning at the start of Answer No. 4,
11 John Pate all the way down through Kent Jurney, your
12 testimony is that only Victor Fonseca you socialize
13 with outside of a professional setting?
14    A.  Yes.
15    Q.  Okay.  All right.  Who is Hugo Alvarado?
16    A.  He is a captain, recently appointed captain
17 employed by the city who himself has made a --
18 whistleblower complaints against the city and Steel and
19 has filed complaints.  And he was one of the officers
20 in 2019 that complained on Steel.  If you recall I told
21 you about that earlier in the depo.
22    Q.  Okay.  Do you intend to call Mr. Alvarado or
23 Captain Alvarado at trial?
24    A.  Yes.
25    Q.  And what about Kirby Nord?

Page 165

1     A.  Same.
2     Q.  Okay.  What knowledge does Johane Taylor have
3  of any issue in this complaint?
4     A.  The same.  So just to be clear the 2019
5  complaint on Steel involved Gabriela Llanes, Johane
6  Taylor, Alvarado, Nord.  Those were all the squad
7  members.
8        In addition to that complaint in 2019 against
9  Steel some of these individually filed other complaints
10 against Michael Steel during other settings or
11 schedules within the police department during the
12 course of their employment.
13    Q.  Do you intend to call Johane Taylor as a trial
14 witness?
15    A.  Yes.
16    Q.  Same with Gabriela Llanes?
17    A.  Yes.
18    Q.  With respect to Gabriela Llanes, Johane
19 Taylor, Hugo Alvarado, and Kirby Nord have you asked
20 any of these individuals to author an affidavit or
21 declaration to assist you in this case?
22    A.  No.
23    Q.  Do you intend --
24    A.  You should be aware --
25    Q.  Go ahead.

Page 166

1    A.  I'm sorry.  You should be aware that the
2  majority of these witnesses have recently, and this is
3  after my reassignment and demotion and all of that,
4  they have all filed hostile work environment complaints
5  against Michael Steel and some other misconduct that
6  I'm not familiar with because I'm yet to obtain the
7  copies of their complaints because that investigation
8  was recently concluded when Michael Steel was
9  terminated by the city.
10    Q.  Do you intend to call Kent Jurney as a trial
11  witness?
12    A.  Yes.
13    Q.  Have you solicited Kent Jurney's -- or
14  requested Kent Jurney to assist you with the drafting
15  or -- of an affidavit or a declaration in this case?
16    A.  No.  He's an independent polygrapher that I
17  took a polygraph with.  So I don't know him, I've never
18  met him prior to this, so...
19    Q.  You have all statements that the FDLE took in
20  connection with the investigation into the taser
21  incident; correct?
22    A.  Yes.
23    Q.  The same with the videos?
24    A.  Yes.
25    Q.  Okay.  Turn your attention to No. 10.

Page 167

1    A.  Okay.
2    Q.  The -- as part of the answer the second full
3  paragraph, and I'm just going to read it, the last
4  sentence.
5    "This was different than how the city treated
6  other employees which were also being investigated at
7  the very same time."
8    If you need to read the whole paragraph let me
9  know and do that, but if you understand --
10    A.  I don't.
11    Q.  You don't, okay.
12    You say the city treated other employees
13  differently.  Who in particular are you referring to?
14    A.  Hugo Alvarado was a subject of a criminal
15  investigation during the same time period.
16    Jacksonville Palaez was a subject of a
17  criminal investigation by the State Attorney's Office
18  during the same time period.
19    None of them were relieved of duty.  All of
20  them were allowed to work off-duty, make their money,
21  continue to come to work.  And I was the only person
22  that was stripped completely the way that I was.
23    Q.  You said Hugo Alvarado, I'm sorry the last --
24  the other name?
25    A.  Jacksonville like the city is his first name,

Page 168

1  Pelaez, P-E-L-A-E-Z.
2    Q.  Okay.
3    A.  And those were officers during the same time
4  period as me that were under investigation.  But in the
5  past there have been others who are under criminal
6  investigation by the state attorney and were not
7  stripped or suspended as I was.
8    Q.  What was Hugo Alvarado's title at the time
9  that he was under criminal investigation?
10    A.  Both of them were sergeants.
11    Q.  What was Alvarado under criminal investigation
12  for?
13    A.  I'm not sure.
14    Q.  What was Jacksonville Palaez under
15  investigation for?
16    A.  A battery.
17    Q.  Misdemeanor battery or felony battery?
18    A.  I'm not sure.  Steven Barreira would know.  He
19  was privy to that information.
20    Q.  No. 16.
21    A.  Okay.
22    Q.  Again the last sentence.
23    "The city delayed the approval of my 2021-2022
24  annual evaluation which resulted in me losing wages and
25  ultimately a home I was under contract to purchase."

Page 169

1    The wages that you're referencing there it's
2  the $2500 bonus?
3    A.  Yes.
4    Q.  Which you have been paid; correct?
5    A.  Yes.
6    Q.  Okay.  And you reference a home that you were
7  under contract to purchase.  Are you contending that
8  you lost money in connection with the home contract --
9  I'm sorry, the contract to purchase?
10    A.  Not for the 2500, for the reduction in pay
11  from captain to sergeant.
12    Q.  Okay.
13    A.  And those 2500 didn't come when they were
14  supposed to come either, I just want to be clear.
15    Q.  So you were under contract to purchase a home?
16    A.  Yes.
17    Q.  When was that?
18    A.  When did I sign the contract?
19    Q.  Yes.
20    A.  New Year's Day.
21    Q.  Of this year?
22    A.  Yes.
23    Q.  Okay.  And when did the contract fall through?
24    A.  Right before closing which would have been --
25  it's a few months back.

Sergio Perez
November 15, 2022                                    170 to 173

Page 170

1    Q. A few months back meaning from today or a few
2  months from --
3    A. No, a few months from --
4    Q. -- when you signed the contract?
5    A. -- from today.  A few months from today.  And
6  that is only because they requested my salary
7  information and W -- I'm sorry, pay stubs again, and
8  this time they reflected the reduction in pay that was
9  different from the ones I provided in January when I
10  first went to purchase the home.
11    Q. Does this have to do with financing then?
12    A. Yes.
13    Q. Okay.  Did they specifically attribute the --
14  assuming there was a loss of financing to the reduction
15  in pay?
16    A. Yes.
17    Q. Okay.  I'm going to show you one more
18  document, bear with me.
19      Can you see that?  Sir?
20    A. Yes.
21    MR. RAILEY:  Okay.  This -- I'll go ahead and
22    mark this, I think this is 5, city Exhibit 5.
23      (Whereupon, Defendant's Exhibit 5 was marked
24    for identification.)
25

Page 171

1  BY MR. RAILEY:
2    Q. Do you recognize this document?
3    A. Yes.
4    Q. What is this document?
5    A. Text messages between me and Steel.
6    Q. Okay.  From November 7, 2020?
7    A. Yes.
8    Q. Okay.  I received only this page as part of a
9  production, Perez 575.  Do you have more text messages
10  between you and Michael Steel in your possession?
11    A. I have to look.  What's the date on that?
12  November, can you go up a little bit?
13    Q. Sure.
14    A. November 7th, 2020.  Yeah, I would have to
15  look.  Maybe in my cloud or something I'm not sure.
16  But I do remember the messages.
17    Q. Okay.  Because here you agree with me that
18  this message cuts off.  It says, "I was done wrong by
19  them and I'm," so there's at least one more text
20  message following that I presume because that's part of
21  the sentence; correct?
22    A. That's -- that's what Steel was writing to me.
23  I wrote:
24      "I'm very busy.  Can't entertain you today."
25    Q. I understand.

Page 172

1    A. That's what I wrote to him.
2    Q. But you would agree with me that this response
3  down below is incomplete?
4    A. I can't agree with you because I don't know
5  how long his message was or what he was saying.  It
6  appears incomplete based on the fact that the sentence
7  isn't concluded.  "I was done wrong by them and I'm,"
8  and then it stops.  So I'm not sure if it's
9  discontinued or he just sent that by mistake, I don't
10  know.
11      Can you go back up a little bit in the
12  message --
13    Q. Yes.
14    A. -- if you don't mind.
15      "You haven't spoken to the city manager about
16  my lawsuit."  Oh, I remember this vividly now.  You may
17  or may not know Michael Steel has filed several actions
18  against the city and in his message here he wanted me
19  to utilize my position to convince the manager to pay
20  him some money for something that occurred prior to my
21  tenure in command, which I clearly did not do and was
22  inappropriate.
23      Oh, and if you go back to the message again he
24  also wanted me to change an internal affairs
25  investigation.  "You haven't fixed my IA from 2019."

Page 173

1  He wanted me to change an internal affairs
2  investigation that had been adjudicated and where it
3  was sustained against him and -- and he -- and that's
4  illegal.  He wanted me to change it.
5      And look at the -- "I do a lot for you and I'm
6  starting to feel very unappreciated and last on your
7  list."  I mean, if that doesn't show you the motive and
8  who this person is then I don't know what will.
9    MR. RAILEY:  I don't have anymore questions
10    for you.  I appreciate your time.  I think your
11    attorney made an indication that he had some
12    questions for you.  I reserve my right to ask you a
13    couple follow-ups if needed.
14        CROSS-EXAMINATION
15  BY MR. POLLOCK:
16    Q. Sergio, I just wanted to find out you
17  mentioned that Jacksonville Palaez had been under
18  criminal investigation around the same time that you
19  were for battery.  And my question to you is whether
20  that battery was alleged to have occurred in the course
21  of his duty as a law enforcement officer for the city?
22    A. No, it was on his personal time.  An incident
23  that he was involved in.
24    Q. You referred earlier in the deposition to
25  emails concerning the Collective Bargaining Agreement

Page 174

1  and lieutenants as having been covered by the
2  Collective Bargaining Agreement at Opa-Locka.  Do you
3  remember talking about that?
4       A.  Yes.
5       Q.  Is it your experience that those emails would
6  have been maintained by the City of Opa-Locka on its
7  either servers or cloud service?
8       A.  It must be maintained by the city.  Those are
9  public documents so they do have it, yes.
10      Q.  Okay.  And so is it true that the city would
11 be in a better position to find emails about
12 lieutenants being covered by the Collective Bargaining
13 Agreement than by asking you for those emails?
14      MR. RAILEY:  Form.
15      A.  Yes.  Yes.  And, in fact, the city took away
16 my city laptop where all of my emails were.
17 BY MR. POLLOCK:
18      Q.  Okay.  So as a result of the city taking away
19 your laptop is it a fair statement that you cannot
20 provide any additional documentation that would be
21 maintained on the city servers for your emails -- your
22 city emails?
23      A.  Yes.
24      Q.  Okay.  And so is it also true that any request
25 for additional emails from you should be directed to

Page 175

1  the city and/or its either IT or public records
2  departments?
3       MR. RAILEY:  Form.
4       A.  Yes.
5  BY MR. POLLOCK:
6       Q.  As far as receipts for payments as a union
7  member, is it your experience that the city maintains
8  its payroll records?
9       A.  Yes.
10      Q.  And in the city's payroll records do you sign
11 documentation to authorize the city to pay dues from
12 your paychecks directly to the union?
13      A.  Yes.
14      Q.  And so as far as payments from you to the
15 union is it true that all documentation regarding those
16 payments would be in the city's possession?
17      MR. RAILEY:  Form.
18      A.  Yes.
19 BY MR. POLLOCK:
20      Q.  As far as you understand it what ranks are
21 members of the command staff at the City of Opa-Locka
22 Police Department currently, and then we can work
23 backwards?
24      A.  Currently is chief, captain.
25      Q.  Okay.  How about before that what would they

Page 176

1  have been?
2       A.  Chief, assistant chief, captain.
3       Q.  How about before that?
4       A.  Chief, assistant chief, lieutenant.
5       Q.  As we sit here today, do you know whether
6  Article 14 of the Collective Bargaining Agreement would
7  have provided you with the ability to utilize the
8  grievance procedure at the time you occupied the
9  position of captain with the police department?
10      A.  Yes.
11      Q.  As we sit here today, has the city suspended
12 you without pay?
13      A.  Yes.
14      Q.  Do you believe that the city complied with the
15 Collective Bargaining Agreement in suspending you
16 without pay prior to conducting any hearing?
17      A.  Do I -- can you ask that again?  I'm sorry.
18      Q.  Sure.  Do you believe that the city complied
19 with the requirements of the Collective Bargaining
20 Agreement in suspending you without pay before
21 conducting a hearing?
22      A.  No.
23      Q.  In your experience has the city disregarded
24 the requirements of its Collective Bargaining Agreement
25 in how it has treated you?

Page 177

1       MR. RAILEY:  Form.
2       A.  Yes.
3  BY MR. POLLOCK:
4       Q.  Do you believe that the city has uniformly
5  applied the Collective Bargaining Agreement to its
6  employed law enforcement officers during the time that
7  you've been an employed law enforcement officer at the
8  city?
9       A.  No.
10      Q.  Do you believe that the city's practice is to,
11 in fact, disregard the requirements of the Collective
12 Bargaining Agreement as it relates to its employed law
13 enforcement officers?
14      MR. RAILEY:  Form.
15      A.  Yes.
16 BY MR. POLLOCK:
17      Q.  Following your complaints and objections to
18 Mr. Barreira about wasting money, is it your testimony
19 that he relieved you of duty on September 10th because
20 that was his first opportunity to retaliate against
21 you?
22      MR. RAILEY:  Form.
23      A.  Absolutely.
24 BY MR. POLLOCK:
25      Q.  And so when you talk -- when Mr. Railey asked

Sergio Perez
November 15, 2022                                     178 to 181

Page 178

1   you about whether you thought Mr. Barreira was truthful
2   and honest do you -- let me relate that to something
3   that Mr. Barreira testified to as true in his
4   deposition, which is Mr. Barreira testified that he did
5   not relieve you of duty on or about September 10th of
6   2021.  In making that statement do you believe
7   Mr. Barreira was truthful and honest?
8          MR. RAILEY:  Form.
9          A.  No.  That was a complete lie.
10  BY MR. POLLOCK:
11         Q.  And if you had not been relieved of duty would
12  there have been any requirement to reinstate you?
13         MR. RAILEY:  Form.
14         A.  Of course, not.
15  BY MR. POLLOCK:
16         Q.  If you had not been relieved of duty would
17  there have been any reason to redistribute to you your
18  badge, your uniforms, and your service issued firearm?
19         MR. RAILEY:  Form.
20         A.  No.
21  BY MR. POLLOCK:
22         Q.  When you returned the badge, your service
23  issued firearm, your uniform, and all the other service
24  issued items, is it your understanding that
25  Mr. Barreira would have either received that property

Page 179

1   or the receipt for that property?
2          A.  The receipt, yes.
3          Q.  Okay.  And when you signed for a receipt to
4   return property as an officer, in other words, you're
5   tendering that equipment back to the department, is
6   that a multi-page form?
7          A.  Yes.
8          Q.  In other words, you write through it and
9   there's multiple copies kind of like an old school
10  police ticket?
11         A.  Yes.
12         Q.  So the blue copy that you showed us in your
13  deposition, was that the copy that was left with you?
14         A.  Yes.
15         Q.  Would there be other copies, possibly a yellow
16  and/or a white that would have been returned to the
17  city?
18         A.  Absolutely, yes.
19         Q.  And as a matter of public record was the city
20  required to keep and maintain that property receipt?
21         MR. RAILEY:  Form.
22         A.  Yes.
23  BY MR. POLLOCK:
24         Q.  Should that property receipt have made its way
25  into your personnel file?

Page 180

1          MR. RAILEY:  Form.
2          A.  Yes.
3   BY MR. POLLOCK:
4          Q.  When your service issued weapon, your badge,
5   your uniform, and the other items that were taken from
6   you on or around September 10th through 17th, right,
7   that's when they were first taken?
8          A.  September 10th.
9          Q.  Okay.  When they were ultimately returned to
10  you after you were restored to your position in
11  December should there have been a receipt for issuing
12  or reissuing those items back to you?
13         A.  Yes.
14         Q.  Should that receipt for reissuing those items
15  to you also have been maintained in your personnel
16  file?
17         MR. RAILEY:  Form.
18         A.  Yes.
19  BY MR. POLLOCK:
20         Q.  As the chief of police was Michael -- did
21  Michael Steel have access to your pers- -- your
22  physical personnel file?
23         A.  Yes.
24         Q.  Are personnel files in your experience scanned
25  down at anytime to ensure that their contents are

Page 181

1   unadulterated?
2          A.  They should be, yes.
3          Q.  Is there any documentation that is created
4   when somebody checks out or reviews a personnel file at
5   the police department?
6          A.  There should be a log, yes.
7          Q.  Is the same also true with reviewing internal
8   affairs investigation files?  Is there also supposed to
9   be a log to identify who reviewed the contents of an
10  internal affairs investigation file and when that
11  review -- and then when that review happened?
12         A.  Yes.
13         Q.  You've seen the materials that have been
14  produced by the city in response to our request.  Has
15  the city produced to you any of those logs?
16         A.  No.
17         Q.  Does the city have a policy in place that
18  precludes you from utilizing personal emails while you
19  are on duty on a city computer?
20         A.  Yes.
21         Q.  And so if you were to send emails to
22  Mr. Barreira, the chief of police at the time,
23  complaining about his misuse of taxpayer funding would
24  you have been violating the city's policies and/or
25  procedures if you had to log in to a personal email

Page 182

1 account to send those emails?
2        MR. RAILEY:  Form.
3     A.  No.
4 BY MR. POLLOCK:
5     Q.  In other words, were you allowed to go ahead
6 and send those emails from a personal email address
7 while sitting at a work computer during the workday to
8 complain to Chief Barreira?
9        MR. RAILEY:  Form.
10    A.  That I'm not sure because I don't have the
11 policy in front of me.
12 BY MR. POLLOCK:
13    Q.  If there were a policy in place that said that
14 you were not allowed to use the computers for personal
15 use while you were on duty would that --
16    A.  Then yes.
17    Q.  Okay.
18       MR. RAILEY:  Form.
19 BY MR. POLLOCK:
20    Q.  Besides demoralizing you in having you sit
21 passenger in a code enforcement vehicle were there
22 other concerns that you have after having been demoted
23 from captain to sergeant and then sergeant to riding in
24 the code enforcement vehicle?
25    A.  Do I have any other concerns?

Page 183

1     Q.  Sure.  When you were a uniformed --
2     A.  There were officer safety concerns.
3     Q.  Okay.  When you were a uniformed police
4 officer did you have the responsibility of arresting
5 dangerous criminals?
6     A.  Yes.
7     Q.  And --
8     A.  So to answer your question when I said officer
9 safety concerns, I was put in the very neighborhoods
10 where I have had to arrest people, where I have engaged
11 combative and violent people that know me, I've been
12 there 15 years.  And, yeah, it was very scary to be
13 placed in those same environments, you know, without
14 anything to defend myself should I be confronted by any
15 of these individuals.  There have been threats that
16 have been made to me in the past by dangerous felons.
17 So, yeah, there were serious officer safety concerns.
18 And, again, I was the only person in the history of
19 this department to be placed in such a position.
20    Q.  When you say placed in such a position you
21 mean to riding around without a badge, without a
22 firearm, and without a uniform as a passenger in a code
23 enforcement vehicle; is that right?
24    A.  Correct.
25    Q.  In an administrative department that's run by

Page 184

1 a civilian?
2     A.  Correct.  And I'd like to make one more point
3 to your other question in regards to Steel having
4 access to personnel files and restricted areas.  I'm
5 not sure if Mr. Railey knows or not knows, but I think
6 it's relative and it goes again to the motive and the
7 theory.  Michael Steel was also being investigated by
8 the department recently for breaking into the city
9 manager's office and removing files, a box of files.
10 And I think Mr. Railey should know that as well.
11    Q.  When was the first time that you heard that
12 the video camera in the office formerly occupied by
13 Michael Steel was a, quote, "dummy camera"?
14    A.  The other day.  A day ago.
15    Q.  Who is responsible for reviewing the
16 surveillance footage inside the police department?
17    A.  The IT department and whoever is given access,
18 usually it's the police chief.  And, of course, the
19 city manager.
20    Q.  Having worked as the acting chief of police do
21 you believe that it is a life safety issue to have
22 cameras inside of the police department to be operable?
23       MR. RAILEY:  Form.
24    A.  Absolutely.
25

Page 185

1 BY MR. POLLOCK:
2     Q.  And was it ITs responsibility to review the
3 video cameras to make sure that each one was operable
4 and recording inside the department?
5        MR. RAILEY:  Form.
6     A.  Aside from IT that's also an FDLE requirement.
7 BY MR. POLLOCK:
8     Q.  What's an FDLE requirement?
9     A.  That we have the cameras working inside of the
10 building.  I mean, I've never heard of a dummy camera
11 in any police station in this country.
12    Q.  I mean, a dummy camera is used for what,
13 deterrence, right?
14    A.  Yeah, deterring crime.
15    Q.  And so what crime do you believe would be
16 deterred by having a dummy camera on an internal office
17 of a member of a command staff in a police department?
18       MR. RAILEY:  Form.
19    A.  It's -- that notion is preposterous.  There's
20 no -- I'm sorry, I just -- I'm in shock that somebody
21 in the city is saying that we have dummy cameras in the
22 building.
23       MR. POLLOCK:  Nothing further at this time.
24       MR. RAILEY:  Read or waive?
25       MR. POLLOCK:  We'll read.

Page 186

```
 1        THE WITNESS:  Read.
 2        VIDEO TECHNICIAN:  The time is 3:18 p.m.
 3   We're off the video record.
 4        MR. RAILEY:  Janet, we'll order the
 5   transcript.
 6        MR. POLLOCK:  I'll get a copy too.
 7        THE REPORTER:  I'm sorry, you wanted a copy?
 8        MR. POLLOCK:  Yes, I do.  I guess I don't need
 9   the exhibits, Jon can just email those to me.
10        THE REPORTER:  Jon, are you going to send me
11   the exhibits?
12        MR. RAILEY:  Yeah, I can do that.
13        THE REPORTER:  Okay.  Thank you very much.
14        (The deposition was concluded at 3:19 p.m.
15        (Reading and signing of the deposition was not
16   waived by the witness and all parties.)
17
18
19
20
21
22
23
24
25
```

Page 187

```
 1             CERTIFICATE OF OATH
 2   STATE OF FLORIDA
 3   COUNTY OF BROWARD
 4
 5        I, Janet L. McKinney, Registered Professional
 6   Reporter, Florida Professional Reporter, Certified
 7   LiveNote Reporter, Notary Public, State of Florida,
 8   certify that SERGIO PEREZ personally appeared before me
 9   on November 15, 2022 and was duly sworn.
10        Signed this 28th day of November, 2022.
11
12
13
14
15
               Janet L. McKinney
16             Registered Professional Reporter
               Florida Professional Reporter
17             Certified LiveNote Reporter
               Notary Public, State of Florida
18             Commission No.:  HH250024
               Expires:  June 2, 2026
19
20
21
22
23
24
25
```

Page 188

```
 1             CERTIFICATE OF REPORTER
 2   STATE OF FLORIDA
 3   COUNTY OF BROWARD
 4
 5        I, Janet McKinney, Registered Professional
 6   Reporter, Florida Professional Reporter, Certified
 7   LiveNote Reporter, certify that I was authorized to and
 8   did stenographically report the deposition of SERGIO
 9   PEREZ, pages 5 through 186; that a review of the
10   transcript was requested; and that the transcript is a
11   true record of my stenographic notes.
12        I further certify that I am not a relative,
13   employee, attorney, or counsel of any of the parties,
14   nor am I a relative or employee of any of the parties'
15   attorneys or counsel connected with the action, nor am
16   I financially interested in the action.
17        Dated this 28th day of November, 2022.
18
19
20
21
22   _____
23             Janet L. McKinney, RPR, FPR, CLR
               Registered Professional Reporter
               Florida Professional Reporter
24             Certified LiveNote Reporter
25
```

Page 189

```
 1          WITNESS NOTIFICATION LETTER
 2
     November 28th, 2022
 3
 4   SERGIO PEREZ
     c/o Brian H. Pollock, Esq.
 5   Fairlaw Firm
     7300 N. Kendall Drive
 6   Suite 450
     Miami, Florida 33156
 7
     In re:   Sergio Perez v. City of Opa-Locka
 8            Deposition taken on November 15, 2022
              Job No. 6263751
 9
     The transcript of the above-referenced proceeding has
10   been prepared and is being provided to your office for
     review by the witness.
11
     We respectfully request that the witness complete their
12   review within a reasonable amount of time and return
     the errata sheet to our office.
13
14   Sincerely,
15   Janet L. McKinney, RPR, FPR, CLR
     U.S. Legal Support
16   100 Northeast 3rd Avenue
     Suite 1050
17   Fort Lauderdale, Florida 33301
     954.463.2933
18
19   CC via transcript:
20   Brian H. Pollock, Esq.
     Jonathan H. Railey, Esq.
21
22   Email or mail errata sheet to:
23   SoutheastProduction@uslegalsupport.com
24   U.S. Legal Support Production Department
     16825 Northchase Dr., Suite 900
25   Houston, TX 77060
```

```
                                              Page 190
 1                    ERRATA SHEET
                DO NOT WRITE ON THE TRANSCRIPT
 2               ENTER CHANGES ON THIS PAGE
         IN RE:  Sergio Perez v. City of Opa-Locka
 3                    SERGIO PEREZ
                   November 15, 2022
 4                  Job No. 6263751
 5    |Page |Line |Change                      |Reason     |
      |_____|_____|_____|_____|
 6    |_____|_____|_____|_____|
      |_____|_____|_____|_____|
 7    |_____|_____|_____|_____|
      |_____|_____|_____|_____|
 8    |_____|_____|_____|_____|
      |_____|_____|_____|_____|
 9    |_____|_____|_____|_____|
      |_____|_____|_____|_____|
10    |_____|_____|_____|_____|
      |_____|_____|_____|_____|
11    |_____|_____|_____|_____|
      |_____|_____|_____|_____|
12    |_____|_____|_____|_____|
      |_____|_____|_____|_____|
13    |_____|_____|_____|_____|
      |_____|_____|_____|_____|
14    |_____|_____|_____|_____|
      |_____|_____|_____|_____|
15    |_____|_____|_____|_____|
16    Under penalties of perjury, I declare that I have read
      the foregoing document and that the facts stated in it
17    are true.
18    _____        _____
      Date                    SERGIO PEREZ
19
20
21
22
23
24
25
```

---

**Exhibits**

---

**EX 0001 Sergi
o Perez DEFT
111522**
  73:18,20
  74:21
**EX 0002 Sergi
o Perez DEFT
111522**
  81:18,21,24
  87:8,16
  88:11
**EX 0003 Sergi
o Perez DEFT
111522**
  92:6,7
**EX 0004 Sergi
o Perez DEFT
111522**
  138:20,21
  139:8,14
  140:5
**EX 0005 Sergi
o Perez DEFT
111522**
  170:22,23

---

**$**

---

**$10,000**
  134:8  157:14
**$100,000**
  120:15
**$180,000**
  89:1
**$25,000**
  104:16  105:4
  160:7
**$2500**
  169:2
**$3500**
  155:18
  157:2,10
**$40,000**
  95:14,16

**$50**
  155:17
**$53,000**
  105:20  107:2

---

**1**

---

**1**
  7:16  19:16
  50:15,19,23
  52:21,23
  53:15  58:17
  60:23  67:12
  68:5  73:18,
  20  74:21
  79:15  80:2
  81:3  91:1
  100:21
  143:22
  156:15
**10**
  13:6  90:11
  110:18
  111:13,19
  156:16
  166:25
**10,000**
  117:2
**100**
  110:21
**1099s**
  156:20
**10:00**
  44:5
**10:05**
  4:15
**10th**
  12:9,11,18
  87:9  94:14
  110:6  111:21
  113:5  157:3
  177:19  178:5
  180:6,8
**11**
  142:21
**110**
  156:1

**112**
  37:20  78:24
  98:16
**11:42**
  73:2,4
**11:50**
  72:23
**11th**
  42:13  77:25
  142:15  152:7
**1200**
  127:22,23
**12:00**
  73:5,6
**13th**
  33:7,10
  34:21,22
  95:6
**14**
  42:4,5
  157:3,7
  176:6
**14th**
  101:2
**15**
  144:11
  156:11
  183:12
**15th**
  4:14  12:20
**16**
  168:20
**16th**
  37:22
**17th**
  95:11  97:17
  101:1  180:6
**18**
  42:8
**18-wheeler**
  129:13
**1983**
  103:10
**1:40**
  137:10,12
**1:56**
  137:13,14

**1st**
  110:6

---

**2**

---

**2**
  81:18,21,24
  87:8,16
  88:11
**20**
  89:4  156:11
**2006**
  18:2,5  20:21
**2008**
  20:8,9,13
**2011**
  21:17,19
  54:13  55:17
  74:14
**2012**
  22:11  23:22
**2013**
  42:3
**2014**
  15:25
**2016**
  14:12
**2017**
  38:21  39:7
**2018**
  14:2
**2019**
  23:10,12
  24:19  41:4
  54:9  55:14
  164:20
  165:4,8
  172:25
**2020**
  13:4  14:17
  17:22  24:21
  28:18,24
  29:2,12  30:4
  36:18  80:20
  88:25  105:7
  110:18
  171:6,14

Sergio Perez
November 15, 2022

2

**2021**
13:4 19:17
23:17,18
24:14,22,23
25:11,18
50:15,19,23
52:21,24
53:15 58:17
60:23 67:12
68:5 74:2
79:15 80:2
81:4 87:9
88:21,25
90:11 91:1
93:17 94:14,
18,24 100:22
102:22
110:18
111:13,19
112:11 113:5
114:18
139:15 142:3
143:22 150:2
153:8 156:16
157:3 178:6
**2021-2022**
168:23
**2022**
4:14 19:8
33:10 42:13
48:13 94:18
95:2 101:2
106:24
142:15,21
144:16 150:3
152:7
**2023**
20:2 75:25
76:1
**21**
11:17 12:11
13:7 24:25
34:5 80:4
89:4 106:24
110:18
131:3,7
139:4

**22**
13:7 33:9
**222**
73:19
**223**
73:19
**23rd**
20:1 76:1
**24**
9:22
**2495**
67:21
**25**
146:9
**2500**
151:12
169:10,13
**27**
103:4
143:17,19
**27,000**
96:3
**271**
81:25 82:3
**272**
138:20
**273**
138:20
**28**
142:3
**288**
92:6
**28th**
48:11,13
139:4,15
**2:31**
158:15,17
**2:36**
158:18,19

---

**3**

**3**
92:6,7
155:13

**3.38**
147:23
148:7,24
150:10,14
**30**
114:14
**30th**
131:4,7
**3500**
156:17
**360**
89:7
**37**
103:3 130:3
**3:05**
4:15
**3:18**
186:2
**3:19**
186:14

---

**4**

**4**
138:20,21
139:8,14
140:5
143:17,18
161:6 164:10
**4.38**
147:18,22
148:7 149:17
150:10,14,25
**40**
155:24
156:22
**42**
103:10
**4500**
15:7

---

**5**

**5**
170:22,23
**50,000**

117:11
**575**
171:9

---

**6**

**60**
156:21
**637**
76:6
**68,000**
95:23 158:5
**6th**
74:2

---

**7**

**7**
60:3,4,7
149:5 171:6
**70**
155:17,22
156:12
**7th**
102:22
171:14

---

**8**

**8th**
13:7 20:8,9,
13 146:23

---

**9**

**90**
127:10
**95,000**
95:21 158:5
**99**
7:13
**9:56**
74:2

Sergio Perez
November 15, 2022                                                3

**A**

**a.m.**
  4:15 44:5
  73:2,4
**ability**
  9:24 84:25
  176:7
**able**
  57:19 65:12
  66:1 76:25
  81:11 84:8
  85:4 127:9
  128:18
**above**
  4:5
**absent**
  151:7
**Absolutely**
  158:14
  177:23
  179:18
  184:24
**absorbed**
  117:23
**academy**
  20:18,25
  21:5
**accept**
  41:13
**access**
  67:16 90:12
  123:24
  131:13
  180:21
  184:4,17
**accommodate**
  49:24
**accompanied**
  12:13
**account**
  160:6 182:1
**accountant**
  45:2
**accurate**
  12:24 42:5

66:20 94:15,
16,22 130:4
**acquire**
  134:2
**acquired**
  110:3 138:1
**acquiring**
  53:13 54:1
**across**
  134:10
**Act**
  137:19
**acting**
  28:16,19
  29:1,6,11
  30:2,3,21
  184:20
**action**
  35:4,6
  36:13,15
  88:5,7,8
  101:7,17
  109:18,22
  112:15
  113:6,12
  124:9 125:13
  126:6 131:11
  136:2 141:2,
  5 142:20
  150:11 152:5
**actions**
  19:1 98:8
  112:19
  124:22 125:9
  172:17
**activation**
  62:1
**acts**
  54:10 161:20
**actual**
  60:19
**add**
  133:19 147:3
**added**
  133:14
**addition**
  26:6 105:21

130:11
142:24
152:15
155:24 165:8
**additional**
  117:3,14
  119:24
  174:20,25
**address**
  100:4 182:6
**adequately**
  128:18
**adjudicated**
  173:2
**adjunct**
  154:15
**administratio
n**
  14:6 41:11
  66:10 74:16
  94:25 161:16
  162:23
**administrativ
e**
  55:9 79:16,
  20 80:3 81:9
  183:25
**advance**
  13:16
**adverse**
  109:18,22
  112:15,19
  113:6,12
  124:9,21,22
  125:9 126:6
  131:11 136:2
  141:1,5
**advertise**
  127:12
**advertisement
's**
  131:5
**advertisement
s**
  131:5
**advice**
  46:13

**advised**
  34:22 71:21
  77:1,5 96:4
**affairs**
  51:19 56:20
  58:25 78:1,2
  83:1 143:4
  172:24 173:1
  181:8,10
**affected**
  146:18
**affidavit**
  44:20 162:13
  163:6 165:20
  166:15
**affirm**
  5:6
**affirmatively**
  94:1,4
**affirmed**
  5:12
**afforded**
  101:23
  137:23
**afraid**
  51:10
**afterwards**
  62:3 111:5
  134:22
  144:18
**age**
  42:8
**agencies**
  89:20
**agency**
  41:16 54:1
  55:7 61:11,
  24 63:15
  65:12 67:20
  69:3 79:1,2,
  3,6 80:19
  118:3 121:21
  149:25
**agents**
  110:10
**aggravated**
  39:11

Sergio Perez
November 15, 2022
4

ago
105:1 162:1
163:1 184:14
agree
52:1,4,5
89:10,14
119:23
152:11,12
171:17
172:2,4
agreed
106:11
agreement
4:12 25:22
28:3 76:12
79:4 101:15,
21 105:17,24
106:3,4
134:2 173:25
174:2,13
176:6,15,20,
24 177:5,12
Ah-ha
103:21
ah-has
8:19
ahead
17:6 23:2
32:9 46:9
47:2 58:5
65:10 70:18
78:15 96:10
100:14
107:13
109:12
118:19
121:13
138:19
156:8,24
165:25
170:21 182:5
aim
52:14 62:13
air
36:19
alarm
117:8,9

alcohol
9:23
Ali
67:22
allegation
111:8
allegations
39:15 42:20
87:3 146:8,
10
alleged
63:18 68:3
91:7,16
103:9 104:1,
11 105:16
109:23
113:22
138:13
150:13
151:23
173:20
allegedly
33:16
alleges
64:10 67:3
130:3
alleviate
66:10
allow
47:15
allowed
88:14 93:16
167:20
182:5,14
alluded
150:24
altered
68:2
alternative
121:5
altogether
60:24 120:4
Alvarado
164:15,22,23
165:6,19
167:14,23
168:11

Alvarado's
168:8
Alvin
57:22 83:8,9
84:17 146:23
147:2,15
148:8,10
149:15
Amended
11:11 103:2
137:18
Amendment
37:20 103:9,
12,13,24
104:4 126:10
132:16 142:9
amount
30:13 38:12
105:19
134:3,10
151:10
amounted
117:17
analyze
128:14
and/or
175:1 179:16
181:24
Andrew
77:3,8
animus
141:9
anniversary
146:18,22
151:17
annual
168:24
annually
146:17
anonymous
73:14 74:1,
15 75:13
87:5 161:17
Anselmo
5:19
answer
8:20,24 9:8,

16 17:8,13
28:2 46:22
47:2,7
48:22,24
58:3 63:7
65:10 69:18,
21 70:1
81:16 86:25
88:22 98:20
99:5,17
102:7 112:13
128:19
140:2,16
141:17
164:10 167:2
183:8
answer's
40:8 42:18
answered
10:25 125:12
138:10
145:23
answering
85:24 86:13
answers
8:18 17:11
127:18
155:12
anticipate
8:25
Antonio
161:8,10,25
162:5,7,12,
16 164:2
anybody
6:13 10:4
42:22 43:13
48:21 59:19
83:7,12 94:1
141:16,19
142:1 144:12
152:23 164:1
anymore
22:24 51:13
159:21 173:9
anyone
6:15 10:7
38:6 48:17,

23 69:6
116:18,20
124:20 141:8
155:7
**anyone's**
6:22
**anytime**
35:7 61:9
180:25
**apart**
52:2
**apologize**
33:3
**appearance**
93:19
**appearances**
4:18 86:13
**appeared**
135:8
**appears**
172:6
**application**
143:12
**applied**
40:11,15,18,
19,22,25
41:3 177:5
**applies**
101:15
**apply**
41:7
**appoint**
25:19
**appointed**
25:9,12
29:1,3,6,16
30:3 164:16
**appointing**
29:10
**appointment**
25:7 29:11
**appointments**
160:13
**appreciate**
48:22 68:24
99:16 173:10

**apprehend**
120:16
**appropriate**
80:8
**appropriately**
126:2
**approval**
146:9 168:23
**approved**
36:5,9
105:25 106:1
132:23
**approves**
134:4
**approximately**
30:13 95:14
**area**
62:24 65:3,
4,13 71:15
72:11 75:12
**areas**
184:4
**argument**
122:24
**arguments**
111:2
**arose**
11:19
**around**
11:17 41:3
42:4 51:11
53:4 108:7
117:12
130:10 131:7
144:7,9,14,
18,19,22
145:5,18
146:5 153:9
173:18 180:6
183:21
**arrest**
16:18 126:19
183:10
**arrested**
18:11,16
**arresting**
183:4

**arrival**
127:25
**arrive**
156:10
**article**
29:14 98:15
176:6
**asked**
44:18 54:14
56:18 64:4
93:18 102:21
121:3,7
136:24
140:13
155:15 161:6
165:19
177:25
**asking**
42:25 53:19
57:8 65:6
99:18 120:7
125:15
128:19
139:24
174:13
**aspirations**
41:20,22
**asserted**
103:10,18,23
137:18
142:10
159:15
**assessment**
93:10
**assigned**
66:6 96:16,
18
**assignment**
89:12
**assignments**
89:24
**assist**
44:18,23
45:4 53:25
66:6 165:21
166:14

**assistance**
162:12,22
163:4
**assistant**
20:15 23:12,
18 31:19
150:1 176:2,
4
**associated**
105:21
108:17
137:24
150:25
159:22
**assume**
9:9 92:14
**assumed**
66:1
**assuming**
90:22 154:2
170:14
**astronomical**
89:22
**attachment**
144:5
**attack**
66:1
**attempt**
45:4 99:8
**attempted**
162:22
**attempting**
73:9
**attend**
61:7 116:5
**attending**
86:13 115:4
**attention**
11:20 166:25
**attest**
149:9
**attested**
75:12
**attorney**
9:11 10:12,
18 27:5
68:19,20,22,

Sergio Perez
November 15, 2022                                                      6

25 69:16
70:1 72:4,9
76:9 103:6
104:19
106:9,21
138:25
140:25
141:24 142:1
143:21 168:6
173:11
**Attorney's**
70:20,24
71:13,20
72:5,16
167:17
**attorney-client**
46:15
**attorneys**
9:13
**attribute**
170:13
**auction**
127:10
**auctioned**
131:6
**audit**
146:19
**Audrey**
32:14 34:9,
13 96:7
**August**
28:25 29:2,
12 30:4
131:4,7
**author**
138:12 140:4
165:20
**authored**
74:20 122:4
130:17
138:15,25
139:20
**authority**
25:19 30:25
57:4 105:23
124:14

**authorize**
175:11
**authorized**
115:5
**automatically**
28:8
**available**
71:2 77:15
89:21
**average**
155:22,23
156:1,3
**aware**
4:9 27:14
29:13 30:5
91:4,14
93:21
147:14,16
161:12,14
165:24 166:1
**Ax-**
77:8
**Axelrad**
77:3,8

─────────────
**B**
─────────────

**Baba**
67:22
**baby**
115:14,22
**bachelor's**
14:5,10,18,
23
**back**
20:9 22:1,7
23:9 28:14
49:7 54:19
55:7,11
56:25 58:17
72:23 73:7
83:9 89:16
92:11,12,14,
15 93:20,23
102:21
106:19
137:15

139:12
150:21
158:20
169:25 170:1
172:11,23
179:5 180:12
**background**
39:14 113:21
161:12
**backing**
122:10 157:2
**backwards**
32:3 175:23
**bad**
104:9
**badge**
85:4 96:19
178:18,22
180:4 183:21
**ballpark**
89:1 120:15
**bar**
47:23
**bargaining**
25:22 28:2
76:12 79:4
100:2
101:14,21
173:25
174:2,12
176:6,15,19,
24 177:5,12
**Barreira**
11:18 12:7,
13 30:12
31:15 43:10
51:17 78:8
83:19,22
84:3,14
86:16,21,24
87:1,15
102:19
105:23
107:23,24
108:4,23
109:15,20,23
110:17
111:12,22

112:4 116:3
118:12
120:7,20
121:1,25
122:20
123:8,14
124:17,21
125:11,17
128:6,23
130:4,7,14,
24 131:10
134:15 135:4
149:24
168:18
177:18
178:1,3,4,7,
25 181:22
182:8
**Barreira's**
110:9 127:25
**Barry**
14:5,11
**bars**
125:2
**base**
84:24 95:18,
20,22
**based**
120:4 172:6
**basically**
97:25 104:13
**basis**
103:13 135:1
**Bates**
11:7,15 12:1
73:18 81:25
138:20
**batter**
63:20
**battery**
17:21,23
18:10 19:9
32:6,19 33:5
35:25 38:22
39:6,8,11
49:12,13,15
63:19,20
67:3 95:8

Sergio Perez
November 15, 2022

7

96:25
168:16,17
173:19,20
**Beach**
40:16,21
41:1,14
**bear**
170:18
**began**
11:16 131:3
**beginning**
4:18 49:19
50:7 164:10
**behalf**
68:22 69:3,
10 138:25
139:20
**behind**
52:16
**beholder**
54:24
**belief**
60:4 87:11
**believe**
12:23 15:25
39:10 58:12
63:1 64:17
65:18 74:19
83:24 87:22
90:13 100:20
101:3
119:15,17
120:25 122:1
129:13
135:11
136:15
139:25
143:14
149:18 150:7
154:21
176:14,18
177:4,10
178:6 184:21
185:15
**believed**
86:17 87:16
120:21
136:18 148:3

**believes**
100:2
**below**
172:3
**benefit**
61:24 134:21
135:25
**benefits**
85:14 97:12
101:23 152:1
**Besides**
182:20
**best**
148:4
**better**
17:8 35:18
41:12 49:3
56:13 93:25
99:2 127:15
132:19
174:11
**Bill**
37:21 78:25
98:16
**bit**
50:8 55:8
115:16 125:2
144:20
171:12
172:11
**blew**
137:21
**block**
122:7,16
130:19,20
**blue**
82:15 179:12
**board**
132:23
134:11
**body**
130:20
**bonus**
144:6 146:11
151:3,6,10,
11,13,16
169:2

**borrow**
159:25
**borrowed**
160:5
**bottom**
11:8 12:2
82:2 122:8,
16
**bought**
157:17,23
**box**
60:16,21,23
184:9
**boxes**
60:25
**branch**
97:2
**break**
32:16 49:22
50:1,3,10
113:25
114:3,10,12,
14 137:3,6
**breaking**
125:1 184:8
**brevity**
5:23
**Brian**
4:20 6:11
45:12 46:9
49:2 114:11
**Brian's**
6:23 47:5
49:4
**brief**
35:17 86:20
**bring**
93:23 125:4
156:5
**bringing**
121:4
**Britton**
51:19 58:25
59:12 83:6
**broke**
115:20

**broken**
62:1
**brought**
11:20 43:10
49:15 54:19
105:4 106:19
145:14
**Brown**
59:2
**Brown's**
51:15 58:20
**bruises**
63:5
**bruising**
64:11
**bucks**
151:12
**build**
118:5
**building**
65:15 67:21
111:3
185:10,22
**bunch**
75:6 90:20
**business**
39:23 123:22
**busy**
171:24
**buy**
152:19

---

C

---

**cage**
117:8
**calculation**
156:17
**call**
11:7 14:8
32:12 33:2,
13,14,19
34:8,13
50:16 61:8
65:3 97:16
106:14
110:10

115:17 126:4
148:17
158:11
162:16 163:8
164:4,22
165:13
166:10
**called**
27:7 36:11
43:21 67:19
122:25
**calls**
90:17,20
**camera**
5:1 63:10
64:13 66:25
67:2,13,18,
19 68:4,7,9,
15 69:16,23
71:10,14,23
72:14
184:12,13
185:10,12,16
**cameras**
67:24,25
68:8,17
69:4,19 70:3
72:10 129:21
184:22
185:3,9,21
**capacity**
7:12,13 8:6
37:5 55:1
115:25
129:23
**captain**
12:22 22:22
23:19 24:5,
22,23 25:1,
2,9,19
26:22,25
27:13,24
30:14 31:17
33:12 50:21
51:20 52:17
57:22 64:8
65:23,24
79:16 80:3,

6,14 84:7
85:12 86:4
90:20 91:4,
10,14 94:8,
25 95:20
96:5 97:18
100:21 101:2
121:20 153:9
158:10,23
159:8
164:16,23
169:11
175:24
176:2,9
182:23
**captains**
23:4,5,14,15
26:4,19
27:18
**captured**
64:13
**car**
116:20,21,22
117:13
133:15 134:7
159:21
**caravanning**
116:19
**career**
40:19
**cargo**
127:3
**carrying**
120:5
**cars**
116:17
134:11,12
**cartridges**
51:3
**case**
10:22,24
11:2,4 12:1
15:17,18,20
16:6,19
17:21 19:25
26:15 27:8,
13 36:17
37:23 44:19,

23 46:7
47:11,13
49:8,9
56:18,20,24
67:9,10
68:10 76:2,
5,6,7,9,14,
18 100:8
126:7 130:2
131:11
137:25 143:5
152:9 160:10
162:14
163:5,6
165:21
166:15
**cases**
15:15,22
16:8,15,21
19:3
**Casey**
139:5,15
140:14
**Castro**
47:22 49:8
**caused**
159:18
**CBA**
25:22,25
26:2,16,18,
23 27:19,24
79:5,10
98:11,13,19
99:9,18,22,
25 100:2,3,
15,18,21
101:3,22
151:11
**cease**
153:20
**Central**
115:2 116:8
**centralized**
58:16
**certain**
90:21
**certainly**
74:7

**certification**
118:15
123:10
**certified**
4:3 59:22,24
115:3 118:14
123:9
**chair**
64:5
**challenged**
110:1,2
**change**
30:16,21
35:7,9,11
80:7 95:2
118:25 158:5
172:24
173:1,4
**changed**
13:9 22:19
23:6,7 80:7
95:5 135:9
**changes**
23:3
**changing**
41:17 119:6
**characterized**
76:20
**charge**
18:10,20
19:20 35:25
36:17 49:13,
15 51:21
52:18 53:24
55:18 153:22
**charged**
8:5 17:17,
20,23 18:1
19:8 30:6
32:5,18 33:5
34:20 38:17,
21 39:1,2,6,
8,10 49:12
77:25 91:6,
16 99:4
104:12
**charges**

17:25 18:12
32:20 39:9
**charging**
95:8 97:23
98:21
**chart**
26:5
**charter**
99:11 101:8,
18
**checks**
162:3 181:4
**chief**
11:18,21
12:6,12,16,
21 13:9
22:20,21
23:12,18
28:15,21
29:1,6,11
30:3,10,21
31:15,20
33:23 34:2,
25 36:4
38:2,8 51:17
54:16 55:10
56:21 65:25
67:8 78:6,7
83:15 86:20
87:11 91:21
92:18,21,22
93:18 94:8
96:6 98:22
101:12
104:9,10,14,
18 109:15
111:6 119:5
121:14,18,22
130:3
134:16,20,25
135:4 144:3
147:2 150:1
161:13,15
175:24
176:2,4
180:20
181:22 182:8
184:18,20

**chief's**
94:3
**children**
42:6 159:19
**choice**
153:1
**choose**
101:22
129:15
**Chris**
5:20 6:4
**Christmas**
164:7
**circle**
49:7 156:5
**cited**
118:18
**city**
4:22 5:20,
22,23,24
6:15 7:1
12:15 14:22
15:25 16:3,
14 18:6
20:6,7,22,24
21:10 22:14
24:18 25:16,
17 27:25
28:9,12,15,
21 29:9,21
30:21 35:1,
11 36:5,9
37:9,12
38:2,7
39:18,21,23
40:2,10
42:14,19
43:6,15,17
44:10,16,24
45:5 47:14,
22 50:20
65:15,24
66:11 69:5
78:2 82:20
83:10 84:7
85:2,14,19
89:18 91:3,
13 92:25

93:17 97:6,
8,12 98:14
99:12 100:16
102:12,16
103:14,18,24
104:3,15,18,
19 105:19,20
106:6,8,16,
20 107:1,9,
11,15 111:17
112:1,9
115:2 116:4
117:23
119:10 120:2
121:15
122:12
123:18,22
124:6 126:10
127:20,25
128:16
129:24
130:17,19
131:4,15,17
132:18
133:21 134:3
136:8,16
138:1,12,16
140:24
141:4,9,21,
24 142:1,2,
10,13 143:12
144:9 145:24
146:2,14,16,
20,21 147:8,
10,12 148:4
150:20
152:6,9
155:7,15
157:1 159:11
161:6 163:11
164:17,18
166:9 167:5,
12,25 168:23
170:22
172:15,18
173:21
174:6,8,10,
15,16,18,21,
22 175:1,7,

11,21
176:11,14,
18,23 177:4,
8 179:17,19
181:14,15,
17,19 184:8,
19 185:21
**city's**
60:20 73:18
74:21 81:6,
12,18,23
82:18 87:8
91:17 92:6,
18,21 98:8
99:11 101:18
105:18
107:16
113:16
114:19 124:1
126:11
133:10 139:8
151:15
175:10,16
177:10
181:24
**civil**
19:1 25:5
97:11
**civilian**
66:8 79:24
97:10
145:22,25
184:1
**claim**
15:24 16:11,
12 100:17
103:10,13
126:10
137:18
142:10,11
**claimed**
43:4 100:4,8
124:22 125:9
126:6 131:10
155:15
160:9,14,22
**claiming**
159:13

Sergio Perez
November 15, 2022
10

**clarify**
18:15 76:15
133:25 156:6
**clarity**
77:5
**class**
154:17,23
**classes**
154:21
**classified**
74:1
**classify**
63:12
**classroom**
65:1
**clear**
8:21 27:14
63:21 71:22
86:3 87:7
93:11 111:21
126:1 134:13
143:16 150:2
158:8 164:2,
8 165:4
169:14
**cleared**
17:22 36:18
37:18 38:1
118:16
**clearly**
172:21
**closing**
95:13 169:24
**cloud**
171:15 174:7
**code**
96:16,18
97:2,5,11
99:12,13
100:16
101:19
104:15 105:9
144:7,9,14,
17,18,20,23,
24 145:5,19
146:6
182:21,24

183:22
**Collective**
25:21 28:2
76:11 79:4
101:14,21
173:25
174:2,12
176:6,15,19,
24 177:5,11
**combative**
183:11
**combination**
7:9,10
109:13
112:17 113:1
122:1 149:24
**combined**
89:6
**come**
10:7 66:4
72:23 88:15
92:24 108:16
119:10
145:21
167:21
169:13,14
**comes**
45:19 134:3
**comfort**
49:22
**command**
14:9,15,16
91:5,8,15
172:21
175:21
185:17
**commanded**
144:25
**commanders**
23:15
**comment**
70:17
**commentary**
147:3
148:21,25
**commission**
74:16 104:17

105:5,25
106:1 112:6
131:17,20
161:17
**commissioner**
32:13,14
33:14,16
87:23,25
111:25 112:3
**committed**
67:3 106:2
107:6 152:19
**committing**
105:20
106:16
**common**
65:3 71:14
72:11 75:12
**communicate**
90:23
**communicated**
130:9 131:10
**communication**
26:24 27:1,4
93:22 123:5
146:14
**communications**
46:14
**communications/documents**
27:9
**community**
51:9 144:10
145:1,2
**company**
60:10
**compare**
49:5
**compensated**
152:10
**Competency**
54:23
**competent**
54:21,24,25
134:15,25
135:2 136:15

**complain**
107:18 182:8
**complainant**
104:11
**complained**
54:9,13 66:8
164:20
**complaining**
98:25 110:25
181:23
**complaint**
11:3,10,11
36:25 42:14
43:3,7 47:23
50:13 99:12
102:9 103:2,
25 105:10,17
107:18
113:16,22
130:2 137:18
138:7,9
139:10,17,21
140:1 142:6,
14,18 143:3,
7,17,20
144:2 145:6
150:11,15
151:23 152:6
159:15
161:11
165:3,5,8
**complaints**
43:9 66:12
98:22 101:11
110:15
142:24
163:21
164:18,19
165:9 166:4,
7 177:17
**complete**
146:21 178:9
**completed**
40:17 41:5
75:17,18
146:23 150:6
151:16

completely
  56:22 111:8
  129:7 167:22
complied
  176:14,18
computer
  181:19 182:7
computers
  182:14
conceivable
  67:7
concern
  111:14 113:4
  121:4
concerns
  105:16
  108:3,14,23
  109:19,23
  110:19
  112:21
  118:11
  121:23
  122:18
  130:3,6
  131:9,18,23
  138:13
  182:22,25
  183:2,9,17
concluded
  97:25 98:10
  166:8 172:7
  186:14
conclusion
  56:14 78:21
  95:7 97:21
  102:1
conclusions
  141:16,20
condemned
  67:23
conditional
  41:4
conducted
  37:18,22
  78:2
conducting
  176:16,21

confines
  81:6,12
confiscate
  127:8
confiscated
  12:15 126:19
confiscation
  129:7
conformed
  94:5
confronted
  183:14
confusing
  57:15
conjunction
  30:23 80:19
  97:7,9 112:2
connect
  113:3
connection
  10:16 111:19
  122:11
  151:19,22
  158:23
  160:9,14,18,
  22 163:4
  166:20 169:8
conservative
  127:23
consider
  88:10,12
  162:7
considered
  18:2 57:17
consistent
  98:4
consistently
  88:24
constitute
  98:11
constituted
  120:10
constitutes
  103:11
  139:9,21
construed
  85:6

consult
  6:4
consultation
  46:24,25
consulted
  10:16 47:21
consulting
  46:12
consumed
  9:23
contact
  164:6
contacted
  140:25
contained
  36:25 42:15,
  17 130:19
  162:4
container
  129:12
containers
  127:2,17
  129:11,12
contend
  62:19 64:17
  79:11 97:18
  98:7,14
  102:5 103:11
  104:3 109:18
  112:7,15,20
  113:11
  120:6,9,10
  124:9,10,17
  132:15
  137:21
  139:9,16,19
  141:4 143:25
  151:19 152:5
contending
  62:19 68:2
  71:8 98:7
  110:17 112:7
  124:20
  142:13,19
  145:4 151:1
  169:7

contends
  139:9
contention
  26:14 110:23
  150:19
contents
  180:25 181:9
continue
  41:10 137:8
  167:21
continued
  28:4
contraband
  126:11 129:9
contract
  105:24
  106:22
  107:17,22
  108:8,17
  168:25
  169:7,8,9,
  15,18,23
  170:4
contradicts
  63:24
contrary
  60:4
conversation
  10:14 34:7,
  11,17 36:12
  37:17 38:6
  47:9 48:6
  59:9,14
  83:18,22
  84:2,13
  87:10,21,22,
  24 94:3,5
  96:7 109:3
  123:4
  128:17,22
  129:4 131:9
  148:18 154:6
conversations
  4:10 43:5
  46:21 111:2
  123:13
  125:17
  130:11,13,23

conveyed
  38:2
convicted
  17:3,16
convince
  172:19
coordinating
  45:16 57:20
coordinator
  57:9,16
  58:15
copies
  13:12 166:7
  179:9,15
copy
  17:9 82:16
  147:11,13
  154:2,13
  179:12,13
  186:6,7
corporal
  22:11,24
  23:23 24:4
  55:6,12
corporal/
sergeant
  24:17
corporals
  22:18 23:13,
  21 24:19
  26:7
correct
  6:5,9 18:20
  19:13 31:4,6
  32:21 37:10
  40:23 47:5
  49:16 52:3,9
  56:7 58:21
  62:5 66:16
  71:18 72:7,
  11 73:24
  75:16,21,22
  76:3 77:14
  78:3 85:11
  86:6 87:13,
  14 88:18
  89:11 93:3,
  6,11 94:20

95:19 96:25
97:4,13
99:19 100:5,
10,11
102:13,16
106:5 113:6,
8,18 122:13,
16 123:15,
19,22 124:2,
7 125:18
128:1,4
129:25
130:17,21
132:20
136:2,3
138:8 142:3,
4 143:23
151:20 158:1
166:21 169:4
171:21
183:24 184:2
corrected
  146:20
correctly
  24:3 58:3
  68:11 105:12
cost
  117:1,7
  134:5
costs
  127:21
counsel
  4:17,19
count
  103:9,13,25
  104:1 137:17
  138:5,6,10
  142:5,7
  146:8
country
  185:11
County
  40:16,21
  41:1,14 76:2
couple
  8:14 19:1
  36:23 37:8
  39:14 49:21

57:1 91:19
95:10 96:16
120:25 161:2
173:13
coupled
  82:12
course
  16:4 26:11
  49:25 62:17
  88:5,7,8
  101:6,17
  117:24
  141:17
  165:12
  173:20
  178:14
  184:18
court
  4:23 8:18
  9:1 15:18
  16:7 49:25
  86:13
courts
  19:24
cover
  27:18 50:9
coverage
  76:21
covered
  25:25 26:1,
  16,22 77:10
  100:21
  101:3,20
  156:4 174:1,
  12
covering
  26:25 27:19
COVID-19
  80:21 81:1
Crayton
  16:22
created
  55:22 181:3
credentials
  12:14 83:2
  85:7 124:15
  144:8

credibility
  163:23
crime
  8:5 17:3,17
  21:22 55:18
  91:6,16
  104:11
  185:14,15
Crimes
  61:5 79:22
criminal
  13:23 18:17
  37:25 49:14
  56:17 67:9
  68:10,16
  75:20 77:7
  96:24 120:16
  126:17 143:2
  152:15 153:4
  167:14,17
  168:5,9,11
  173:18
criminals
  183:5
CROSS-
EXAMINATION
  173:14
crux
  39:15 56:23
CST
  22:9
current
  28:11 42:14
  43:6 75:16
  157:25
cut
  90:12 92:19
  154:19
cuts
  171:18

_____

          D
_____

daily
  89:17
dais
  131:20

Sergio Perez
November 15, 2022                                                13

damages
    152:11 158:4
    159:11,14
    160:10,15,22
damages-wise
    157:1
dangerous
    183:5,16
Darvin
    37:13
dashboard
    133:20
date
    12:9,17
    13:13 25:10
    34:19 42:5
    46:24 76:1
    95:11 131:1
    139:3 145:21
    146:18,22
    151:17
    171:11
dated
    74:2
dates
    21:15 30:18
    54:8,19
day
    16:7 22:17
    30:6 32:5,17
    33:4 34:20
    43:15 65:25
    77:25 80:24
    82:23,24
    88:1,6
    89:12,25
    95:14 128:21
    129:2 136:6,
    13 147:7
    169:20
    184:14
days
    37:23 38:1
    95:10 96:17
    127:10 162:1
    163:1
deal
    152:13

death
    15:24 16:11
December
    106:23,24
    180:11
decision
    35:10 95:8
    97:23 98:21
    114:19,22
    115:5,8
    155:8
decision-
making
    134:24
decisions
    38:5 51:24
    66:13
declaration
    44:20 162:13
    163:6 165:21
    166:15
declination
    77:2,6
deducted
    28:8
defend
    160:2 183:14
defendant
    7:20 8:5
    15:15,23
    16:9,18 19:4
    49:10,11
Defendant's
    73:20 81:21
    92:7 138:21
    170:23
defer
    17:10,14
    76:24
degree
    13:21 14:1,
    5,7,10,16,
    18,23,24,25
degrees
    14:3 15:12
delayed
    168:23

delegate
    121:18
delete
    75:8
delivered
    60:19 82:11
demand
    67:9 69:3,10
    112:1
demanding
    32:13 33:16
demonstrate
    53:6 59:16
    64:24
demonstrated
    51:1
demonstrating
    59:17 63:15
demonstration
    50:25 51:18
    52:25 63:14
    98:3
demonstration
s
    64:25
demoralize
    144:21
demoralized
    144:8 152:20
demoralizing
    182:20
demote
    32:14
demoted
    26:10 31:25
    32:5,17
    65:23 78:19
    87:17 88:11,
    13 95:6,9
    96:5 97:15,
    20,22 101:2
    104:5 124:12
    159:19
    182:22
Demoting
    88:9

demotion
    33:4 43:4,8
    98:9,10
    101:9,10,16,
    25 157:13
    158:5,8,23,
    25 159:2
    166:3
demotions
    158:8,23,25
Demoya
    102:9,10
    110:2
Demoya's
    102:23
denied
    84:24
Dennis
    12:21 34:2,
    12 92:17,20
    106:8,21
    149:23,24
dental
    85:15
deny
    84:13,16
department
    22:15 28:20
    29:5,10,17
    30:7,9 31:10
    37:24 38:16
    41:8,17
    51:23 53:5,
    24 54:18
    59:25 60:20
    66:12 67:16,
    22,24 69:11,
    13 72:11
    75:7 79:19
    81:6,13
    91:17 97:3,
    8,9 104:18,
    23 107:16
    114:20
    122:5,16
    124:2 125:23
    127:4,5
    134:7 163:21

Sergio Perez
November 15, 2022

14

165:11
175:22 176:9
179:5 181:5
183:19,25
184:8,16,17,
22 185:4,17
**department's**
82:18 113:17
**departments**
175:2
**depends**
22:16 23:5,7
**depicting**
63:4
**deploy**
52:23 58:23
59:7,10
**deployed**
51:3,7,15,
16,18 52:8,
14 58:18,20
59:13 126:2
**deploying**
52:2 59:3
**deployment**
51:18 59:4
**depo**
43:25 44:7,8
124:16 143:1
164:21
**depose**
84:19
**deposition**
4:1,13 6:25
7:3,17,24
8:3,12 10:2,
19 13:17
44:2,5 66:5
73:5 82:7
137:13
145:13
150:22 153:3
158:18
173:24 178:4
179:13
186:14,15

**Depot**
20:16
**deputy**
22:21 54:16
134:23
161:13,15
**describe**
11:14 12:4
53:16 63:3
126:16 139:2
**described**
74:19 81:9
82:13 124:16
125:9 138:11
145:12
**description**
104:8
**designated**
65:13 127:7
**detail**
36:23
**detective**
21:22 55:19,
21 102:25
**detectives**
55:20
**deterred**
185:16
**deterrence**
185:13
**deterring**
185:14
**device**
50:25 53:9
60:7,12
61:6,7,12,
22,23 149:5,
7
**devices**
60:25 61:10,
25 62:2
**Diaz**
69:1,2,10,14
70:6,13
71:3,5 76:9
**Diaz's**
70:21

**different**
11:19 41:18
89:19,20
97:6,8
117:20 120:5
148:2 156:21
167:5 170:9
**differently**
167:13
**dime**
133:10,11
**dinner**
164:3
**direct**
5:14 112:8
141:11,17
143:3 145:10
150:12,16
152:17
**directed**
78:6,7,8
106:8
148:10,15
150:9,19
174:25
**directing**
119:7
**direction**
52:9 62:13
94:7 106:7,
21 148:8
150:14
**directive**
119:6
**directly**
31:12 141:17
149:13
175:12
**director**
153:17 154:8
**director's**
34:25
**disagree**
93:9
**disallow**
119:20

**disappointing**
56:12
**discard**
127:14
**discharge**
62:5
**discipline**
79:3,7,21
**disclosed**
143:13
**discontinued**
153:21 172:9
**discover**
143:11
**discovery**
67:9
**discuss**
36:13 42:22
43:22 111:6
123:7 137:4
**discussed**
44:12,15
121:24
131:19,24
162:4
**discussing**
123:22 132:5
**disgusting**
56:13
**dishonest**
143:12
**dishonesty**
161:20
**dismantled**
22:1
**dismissed**
16:5,23
**dispatcher**
20:14
**display**
4:25
**displayed**
75:2
**dispute**
62:4,9
**disregard**
177:11

Sergio Perez
November 15, 2022

15

**disregarded**
176:23
**dissolve**
55:5
**distinction**
21:2
**distress**
159:14,18,23
160:10,15,22
**division**
97:2 126:18
128:18
**divisions**
95:1 126:18
**divorce**
15:18 41:25
**divorced**
41:24
**Dobson**
55:10
**docket**
103:3 130:2
**document**
26:8,21 29:9
58:6,9,11
73:24 76:22,
25 78:22
81:17,19
82:10,23
83:5,14,19,
21 84:4,11,
23 91:22
92:3,10
103:4,5
138:2,4,12,
16,24 139:2,
7,9,16,19,22
140:4,10,14,
19,21 161:4
170:18
171:2,4
**documentation**
174:20
175:11,15
181:3
**documents**
10:21,23

11:1,6 13:15
27:13,22
28:1 139:25
156:20 174:9
**dog**
115:3 116:5,
9,24 117:1,
8,21,22
118:9,14,15,
23 120:20,24
123:9
**doing**
8:17 24:18
41:18 43:23
55:6 80:4
83:25 85:6
86:9 98:23
111:1,4
**dollar**
134:3,9
**dollars**
126:20
**domestic**
39:8
**Dominguez**
32:15 33:14,
16 34:9,13
96:7
**door**
33:24
**doorway**
33:25 34:16,
17
**doubt**
134:21
135:25
**draft**
121:1,8,21
**drafted**
83:14 143:21
**drafting**
121:6 166:14
**draining**
159:24
**draw**
48:3 141:16,
20

**drive**
60:15 83:9
116:8
**driving**
18:1,5
**drove**
115:2 116:16
**drugs**
9:23
**due**
80:20 95:6
97:16,19
98:17 100:9
102:5 137:23
146:17 151:4
157:13 158:4
**dues**
175:11
**duly**
5:12
**dummy**
67:19,23,25
68:8 184:13
185:10,12,
16,21
**duties**
12:8 16:2
79:15 80:3,5
81:3,5,9,11
84:8,10,15
86:4,10 93:5
95:3 96:14
104:8 152:3
**duty**
67:5 81:8
84:6,18,21
85:19,20,23
86:8,15
104:12
108:13
110:18
111:13,18
112:11 113:5
124:12
167:19
173:21
177:19
178:5,11,16

181:19
182:15

___

**E**

___

**earlier**
12:14 40:19
56:6 66:5
75:23 82:7
124:16
132:18 143:1
147:7 158:6
164:21
173:24
**early**
106:23
**earned**
152:13
**earning**
154:15
**earpiece**
115:18
**easiest**
155:13
**Eastern**
4:16
**echoing**
47:6
**economic**
155:16 157:1
158:4
**economic-wise**
159:10,12
**education**
13:20
**education-
wise**
14:4
**effective**
95:9,10
**efficiently**
114:16
**effort**
56:11 127:11
**efforts**
75:2

Sergio Perez
November 15, 2022                                          16

**eight**
  23:24,25
  24:2
**either**
  14:22 15:15
  16:21 32:13
  68:1 155:3
  169:14 174:7
  175:1 178:25
**elapsed**
  127:13
**elderly**
  159:25 160:1
**electricity**
  51:5
**email**
  26:9 45:7,18
  73:13,14,15
  74:1,5,10,15
  75:3,13
  86:22 87:3,5
  90:12 106:6,
  9,20 122:5,
  12 123:5,17
  129:5
  130:10,17,21
  140:19
  146:14
  181:25 182:6
  186:9
**emails**
  11:3,13,14,
  16,22 43:9
  58:2 90:14
  102:20
  110:24
  122:2,11
  130:12,16,25
  131:3 161:17
  173:25
  174:5,11,13,
  16,21,22,25
  181:18,21
  182:1,6
**embarrassed**
  152:21
**embarrassing**
  145:2

**emit**
  51:4
**emotional**
  159:14,18
  160:10,14,22
**emotionally**
  159:23
**employed**
  20:6 85:1
  164:17
  177:6,7,12
**employee**
  26:16 42:15
  43:6 111:17
  112:10
  141:4,21
  142:2
**employees**
  42:19 167:6,
  12
**employer**
  112:9
**employment**
  20:5 41:4
  57:10,14,17,
  18 113:13
  124:6 142:20
  152:15
  153:21
  154:3,7
  155:9 165:12
**encouraged**
  74:14
**end**
  21:7 46:15
  115:20 125:3
**ended**
  36:12
**ends**
  51:12 156:11
**endurance**
  49:21
**enforce**
  144:22
**enforcement**
  12:8 20:10
  37:24 40:11

  51:9 53:11
  69:11,14
  96:16,18
  97:2,5,11
  115:13,16
  119:2 144:7,
  9,14,17,19,
  20,23,24
  145:5,19
  146:6 173:21
  177:6,7,13
  182:21,24
  183:23
**engaged**
  183:10
**enlist**
  162:22
**ensure**
  180:25
**entails**
  99:23
**enter**
  10:7,9
**entering**
  51:2
**Enterprise**
  134:2
**entertain**
  171:24
**entire**
  40:10,17
  41:11 64:14
  65:19 91:3
  113:21 147:5
**entirely**
  100:11
**entirety**
  62:20 103:5
**entities**
  156:21
**entitled**
  58:14
**entity**
  97:6
**entry**
  103:3 130:2

**enumerating**
  100:1
**environment**
  41:9 54:11
  166:4
**environments**
  183:13
**equal**
  30:25
**equipment**
  12:15 41:19
  51:21,24
  53:10,13
  82:15 83:3
  85:7 117:15,
  19 126:21,
  23,25 127:12
  134:11 179:5
**Erik**
  116:11
**essentially**
  161:7
**ethics**
  143:7
**evaluation**
  13:5,7,14
  144:5 146:9,
  11,17,24
  147:4,8,10
  148:1,16
  149:12,15,17
  150:2,3,6,9,
  14,19 151:7,
  14,16,20,23
  168:24
**evaluations**
  11:4 12:24
  13:1 146:16,
  22 147:6
**event**
  50:14 56:10,
  11
**events**
  50:22,24
  65:19
**everybody**
  53:4 112:5

Sergio Perez
November 15, 2022                                                          17

152:12
163:25
**everybody's**
51:9 53:9
**everyone**
22:1 59:25
**everyone's**
114:5
**evidence**
63:22 79:25
99:15 110:22
125:8 126:5
127:6,14
129:19 131:8
141:8,11,12,
14,17,19
145:8,10,14
150:8,13,16,
18
**exactly**
8:2 15:5
48:12 54:19
60:15 63:16
64:7 84:20
94:10 96:17
105:7 114:13
116:2,12
145:20
148:14
**EXAMINATION**
5:14
**examine**
141:19
**examined**
5:12
**examples**
26:2,3,4
**excess**
160:7
**excessive**
16:16 19:2
49:9
**excited**
53:10
**excludes**
26:18

**executed**
13:13
**executive**
59:5
**exhaust**
98:18 100:7
**Exhibit**
13:6 73:18,
20 74:21
81:18,21,24
87:8,16
88:11 92:6,7
138:20,21
139:8,14
140:5
170:22,23
**exhibited**
98:4
**exhibits**
11:9 186:9,
11
**exist**
22:24 28:1
68:4 84:5
**existence**
141:22
**exit**
45:8,18
**expecting**
10:6
**expended**
117:4,14
**expenditure**
104:16
106:18
132:22
**expenditures**
137:24
**expenses**
117:21,23
**expensive**
117:7
**experience**
7:17 20:10
99:20 174:5
175:7 176:23
180:24

**experienced**
119:1
**explain**
35:2 64:6
67:11
**explained**
63:16 128:20
**explanation**
69:15,23
72:18
**exposed**
61:21
**extensive**
127:1
**extent**
11:5 47:7
76:22
**extra**
84:25

––––––––––––––

**F**

––––––––––––––

**fabricate**
65:21
**fabricated**
62:20 63:6
65:18
**fabricating**
6:22
**facilities**
129:20
**facility**
65:15
**facing**
64:8
**fact**
46:23 74:14
83:25 84:17
106:1
125:18,19
147:25 151:7
172:6 174:15
177:11
**factors**
36:14
**facts**
16:24 56:11,

14 99:14
150:17,23
**factually**
74:6,7
**faded**
115:15
**fair**
9:9 19:17
25:6 30:19,
20 49:6
70:13 86:10
97:3 109:25
114:10
123:24
131:13
141:25
174:19
**fall**
76:20 169:23
**false**
56:17 87:3
143:3 161:14
**falsehoods**
145:14
**falsified**
56:10 143:12
**familiar**
25:21 60:11
73:14,23
99:11,22,25
102:10
104:22 105:1
119:12
146:10
163:22 166:6
**family**
15:18 40:1,4
159:17
**famous**
6:7
**far**
46:20 99:6
175:6,14,20
**fast**
114:15
**father**
159:20

favor
  58:4
FDLE
  69:19,20
  70:2,4,11
  71:13,20
  72:5,15
  75:16 77:12,
  18,22 110:9
  118:15
  135:16
  166:19
  185:6,8
February
  24:24 25:11,
  18 80:14,16,
  17
federal
  16:4
fee
  130:4
feel
  56:9 135:17
  173:6
fees
  105:21
  130:7,14,24
  131:9,14
fell
  79:25
felons
  183:16
felony
  38:22 39:6,
  11 168:17
fiasco
  98:24
field
  11:7
Fifth
  37:20
figure
  9:14 156:25
  157:14
file
  38:4 63:23
  64:2 179:25

180:16,22
181:4,10
filed
  15:20,25
  16:4,6,12
  18:12,23
  19:20 76:2,7
  99:3,12
  132:4
  142:14,24
  143:7,20
  144:1 145:6
  150:11,20
  152:6 163:21
  164:19 165:9
  166:4 172:17
files
  82:19 180:24
  181:8 184:4,
  9
filing
  42:12 43:7
  47:23 103:6
  142:18
  143:10
  150:15
fill
  89:15
filled
  75:6,13
final
  13:10,11
  14:14 25:19
  35:10 158:3
financial
  104:6 105:18
  132:19
financially
  42:10
financing
  170:11,14
find
  55:15,23,25
  56:2,4 64:12
  111:5 134:22
  135:4,18
  136:20,22
  173:16

174:11
findings
  128:23
  146:19
fine
  17:15 87:4
  103:23 149:3
  164:9
finish
  8:23 49:23
  77:4
finite
  38:11
fire
  32:14 112:1
firearm
  178:18,23
  183:22
fired
  88:4,5 96:11
firing
  88:9
firm
  5:18
first
  4:19 5:12
  21:9 29:19
  73:16 103:9,
  12,13,24
  104:4 126:10
  127:19
  132:16 142:9
  145:16 146:4
  153:7 155:13
  167:25
  170:10
  177:20 180:7
  184:11
five
  50:9 109:4,
  5,6 122:21
  130:8
fixed
  172:25
flavor
  22:17

flea
  126:11
  127:5,24
  132:8 137:24
Flip
  162:19
flipping
  142:7
floor
  65:14
Florida
  4:2,4 37:24
  69:11,13
  115:2 116:8
Florida's
  137:19
focus
  27:20 79:6
focusing
  100:18
follow
  99:13 101:7
  104:15 119:7
  129:8
follow-up
  36:23 37:8
  161:2
follow-ups
  173:13
followed
  94:6 99:11
  100:4
following
  87:22 95:7
  96:6 97:23
  116:23
  140:24
  171:20
  177:17
follows
  5:13
Fonseca
  162:20,21,25
  164:12
Fonseca's
  163:10

food
  49:22 117:22
footage
  64:15 67:13,
  15 70:5,22
  71:9,12,17
  72:6,10
  75:8,10
  184:16
force
  16:16 17:21
  18:11,25
  19:3 49:9
forever
  119:20
form
  9:13 34:24
  35:3,4,6,7
  52:10 62:6,
  16 64:20,22
  65:9 70:16
  82:15 113:7
  174:14
  175:3,17
  177:1,14,22
  178:8,13,19
  179:6,21
  180:1,17
  182:2,9,18
  184:23
  185:5,18
formally
  29:6,8 149:6
forms
  103:12
Fort
  5:19 116:11
  118:10
forward
  5:24 43:10
  56:14
found
  98:2
four
  148:2
  154:17,18,
  19,21,23
  155:1,3

Fourteenth
  37:20
fourth
  22:22
free
  118:1,2,8
friend
  65:23 146:3
  163:2
friendly
  112:4
friends
  53:21,22
  136:4,7
  162:7 163:24
  164:5
front
  10:23 11:1,
  6,10,14
  12:5,19
  13:3,10,15
  27:1 64:11
  75:5 79:9
  82:8 91:22
  103:2 139:14
  160:24
  182:11
fulfill
  86:12
fulfilling
  55:9
full
  15:1,2 156:5
  167:2
function
  59:21
functionality
  60:8,12
funding
  105:19
  181:23
funds
  117:3,14
  120:11
  125:20
  133:21
  137:22

funny
  22:16
furniture
  157:16,23

———————————

               G

———————————

Gabriela
  165:5,16,18
gave
  24:19 41:4
  122:25 123:2
  129:6 134:21
  147:13
  156:20
Gaylon
  73:13
general
  21:15 23:10
  83:22 99:23
  132:6
gentleman
  67:7
getting
  41:18 118:19
  133:24
give
  5:7 21:15
  26:2 35:13,
  15 38:23
  46:10 48:9
  49:25 76:17
  77:22 82:16
  93:19 99:13
  118:21 131:1
  140:25
  145:21
  147:22 149:2
  154:13
  158:12
given
  7:3,23 49:19
  50:7 61:11
  78:18 84:17
  94:7 147:12
  184:17

giving
  7:17 10:1
goes
  75:24 117:9
  150:21 184:6
going
  8:25 9:8
  12:8 19:16
  22:13 30:19
  36:12,22,24
  45:7 46:11
  47:8 48:8
  56:25 58:1,
  6,8,17 61:12
  72:2 73:17
  88:4 96:4,11
  132:5 134:12
  135:24 149:1
  159:21
  161:2,8
  167:3 170:17
  186:10
good
  4:7,21 5:16,
  17 50:4,5
  53:22 54:3,7
  103:16
  114:5,6
  116:11
  119:20
  134:18 135:2
  136:18 164:5
government-
issued
  5:1
grabbing
  48:8
graduated
  20:24 21:2,3
graduation
  20:25
grand
  154:17,19,23
  156:21,22
great
  40:20 152:13
greeted
  48:18

Sergio Perez
November 15, 2022

20

grievance
98:18 99:6
176:8
grievances
66:12
ground
10:13
group
65:1
guaranteed
89:12
guess
7:16 62:23
114:5 135:6
186:8
guilty
98:2
gun
85:5 120:5
guy
6:8,10,11,22
16:22
guys
43:22 57:17
103:16 137:6

―――――――――

**H**

―――――――――

hall
65:15
hand
5:5 151:9
handle
51:24 61:7
handler
116:6,13,15,
21,22
handwriting
24:13
hang
43:24 53:19
136:10 164:1
Hangout
136:10
happened
69:22 84:17
99:15 181:11

happy
49:24
harbored
141:9
hard
41:18 64:6
harmed
100:3
hate
55:16
head
8:19
health
85:14 160:9,
13,18
hear
9:12 16:24
33:21 115:19
125:3
heard
6:8 67:1,20,
25 111:25
121:20
184:11
185:10
hearing
16:24 45:17
78:19 97:22
98:9 102:2
176:16,21
heat
117:9
heated
122:24
held
4:11 21:9
28:14 32:3
help
28:4 118:6
129:15
Hey
106:14 114:9
134:7
higher
14:3 149:19
highest
13:19 28:19

55:13
highly
64:12
hire
21:10
hired
20:24 21:5
30:12 31:15
38:1 49:1
134:23
153:11,12
history
38:16 43:2
163:23
183:18
hold
21:16,24
23:23 24:15
45:8 46:8
50:20 84:7
holding
21:14 25:10
holds
35:10
home
10:3,4,7
81:1 82:11,
22,24,25
84:3,9,10,15
85:7,13,18
87:10 90:9,
10,15,18
93:6,9,10,13
118:13,22
120:8,18,20,
24 121:24
122:19
125:18
152:18
157:13,18,
19,24,25
168:25
169:6,8,15
170:10
honest
52:7 55:25
56:2,3
135:4,8,11

136:20
178:2,7
hopes
99:13
horseplay
76:19
hostile
54:10 166:4
hosting
115:3
hour
155:17
hours
9:22 10:7
123:18,21
141:15
145:12
155:17,22,24
156:1,12,13
house
10:10 83:1,5
111:22
HR
153:17 154:8
Hugo
164:15
165:19
167:14,23
168:8
human
34:24 146:25
hundreds
7:7,8 89:17

―――――――――

**I**

―――――――――

IA
37:17 38:4
78:16 172:25
ID
85:5
idea
74:4
identificatio
n
5:1 73:21
81:22 92:8

Sergio Perez
November 15, 2022
21

138:22
170:24
**identified**
99:9 100:9
102:8
105:10,17
**identify**
58:9 155:15
158:24 161:6
181:9
**identifying**
99:25
**II**
103:9,13,25
104:1
**III**
137:17
138:5,6
**illegal**
54:15 173:4
**imagine**
129:12
**immediately**
65:25 95:10
119:6 123:9
144:20
**important**
9:2 32:11
38:15 56:19
60:3 101:6
115:1 133:24
152:22
**improperly**
86:17,25
87:12,17
**inappropriate**
36:15 56:22
111:8 172:22
**incentive**
65:21,22
66:2,3
**inches**
64:5
**incident**
19:9,16
34:19 43:3
50:16,17,23

56:25 62:20
63:12,13
64:3,14
65:20,21
72:6 75:15
76:19 77:7,
12 78:3
79:14 90:2
94:21 110:10
111:7 143:6,
22,23 148:6
153:22
166:21
173:22
**include**
38:21 108:18
117:12,22
118:15
148:21
**included**
77:13 79:16,
17 148:25
**including**
141:20
**inclusive**
89:2 112:17,
21
**income**
57:21
**incomplete**
172:3,6
**inconceivable**
67:1 84:9
**inconsistent**
134:24
**incorporated**
134:5
**incorporating**
106:15
**incorrect**
97:5 149:7
**increase**
150:25 151:2
**incurring**
127:20
**independent**
166:16

**indication**
173:11
**indirect**
141:12
145:11
150:18
**Indirectly**
141:15
**individual**
49:10 67:4
155:6
**individually**
15:23,24
16:6 19:3
165:9
**individuals**
165:20
183:15
**infinite**
38:11,13
**infinitely**
38:14
**inform**
18:3
**information**
46:23 69:8
123:25
133:24
168:19 170:7
**informed**
37:19 38:4
108:18
**inhibit**
9:24
**initial**
61:25
**initially**
107:23
149:20
**initiate**
78:6,7,8
**initiated**
5:22 7:1
161:19
**inside**
71:9,24
184:16,22

185:4,9
**installed**
134:12
**instantly**
95:17
**instruct**
46:22 128:6,
14
**instructed**
144:15
145:17 146:5
147:2
**instruction**
46:10 47:1
49:19 50:7
**instructions**
47:5 84:14
**instructor**
59:23,24
**instructs**
9:15
**insurance**
85:15
**integrity**
56:4 161:20
163:23
**intend**
59:12 62:13
162:16 163:8
164:22
165:13,23
166:10
**intended**
62:4 120:18
**intending**
59:2
**intent**
59:15
**intentionally**
67:6
**interchangeab
ly**
24:4
**interest**
148:4 153:2
**interested**
38:24 41:17

46:7 47:10
**interesting**
63:9 75:9
**interim**
13:9 65:25
91:21 92:18,
22 144:3
147:2
**internal**
51:19 56:20
58:25 78:1,2
83:1 143:4
172:24 173:1
181:7,10
185:16
**interplay**
101:17
**interrogatories**
17:7 157:12
160:24
**interrogatory**
17:11
155:11,13
**interrupt**
55:16
**interruption**
35:17
**interview**
37:21
**invested**
120:14
**investigate**
128:7,13
**investigated**
167:6 184:7
**investigation**
37:18,25
38:20 56:17
75:16,17
78:2,3,9,10,
16,21 95:7
96:24 97:21,
24 98:10
102:1 112:2
143:2 166:7,
20 167:15,17

168:4,6,9,
11,15 172:25
173:2,18
181:8,10
**investigations**
79:12 98:15
126:18
161:19
**investigator**
51:19
**investments**
125:23
**involved**
53:13 115:8,
11,12,14,23,
24 148:5
160:4 165:5
173:23
**involvement**
161:22
**involving**
98:15
**Israel**
36:4 37:22
**issuance**
52:1,18
**issue**
43:2 44:19
61:10 102:2
105:2,10,16
108:16
109:20,24
110:1,20
111:15,19,20
112:11,16,
18,21
113:15,16
119:5
122:10,12
123:7 124:5
126:4,5,6,16
128:21
132:7,8
138:14
151:20
159:14
160:19

161:11 165:3
184:21
**issued**
18:14,17
61:1 85:14
97:12 122:12
130:17 149:5
178:18,23,24
180:4
**issues**
11:19 26:15
42:20 43:6
98:19 99:10
100:10 102:4
107:20,21,25
108:4,22
110:15
122:19
124:10
125:10,16
130:3,7
131:19,24
132:11,13,14
138:11
**issuing**
51:21 52:20
180:11
**item**
126:9 158:3,
4
**items**
79:20 112:17
113:1 127:24
128:10,11,15
129:7,16,24
157:16,23,24
161:3 178:24
180:5,12,14
**IV**
142:5,7
146:8

─────────────

**J**

─────────────

**Jackson**
12:21 34:3,
12 91:21
92:17,20

106:8,21
149:23,24
**Jacksonville**
167:16,25
168:14
173:17
**Jafet**
47:22 49:8
**James**
65:23 139:5,
15 146:3
**Jamesha**
39:8
**Janet**
4:1 114:3
186:4
**January**
17:24 19:8
20:1 33:7,10
34:21,22
48:11,13
75:24 76:1
77:25 87:25
94:12,18
95:2,6,11
97:16,17
101:1
106:23,24
144:15
153:19
159:2,3
170:9
**Jean-francois**
39:10
**Jenkins**
29:3,17,19,
21 30:1,23,
24 31:1,19
115:14,24
116:13,21
150:1,5
**job**
40:15,21,23
41:13 57:7
79:15 81:3,5
84:15 85:4,
7,19,20
86:10 93:5

95:3 96:14
104:7 134:18
135:2 136:18
152:3,17
156:10,11
**jobs**
  20:16 40:12
  57:18 84:25
  89:17,19,21
  156:9,22
**Johane**
  165:2,5,13,
  18
**John**
  4:21 25:14,
  15,18 29:3,
  9,16 30:3
  31:14 32:12
  33:13 34:1,
  2,8 43:17,
  18,20 44:9,
  12,13,16,18,
  22 45:1,3,4,
  21,24,25
  46:2,3 78:8
  86:16,24
  87:11,15,20
  88:2 96:11
  107:23
  110:3,4
  113:11
  115:7,8
  136:1,5,7,
  15,20 139:4
  140:10
  141:1,22,25
  164:11
**Johnson**
  5:19
**joke**
  53:1
**joked**
  51:11
**jokes**
  53:4
**Jon**
  5:18 6:7
  46:19 60:2

66:24 105:18
114:9 141:13
152:23
186:9,10
**judge**
  9:14 16:22
**July**
  11:17 102:22
**June**
  131:3
**jurisdictions**
  106:12
**Jurney**
  164:11
  166:10,14
**Jurney's**
  166:13
**justice**
  13:23 152:15
  153:4

---

### K

**K9**
  110:3 113:17
  114:19,23,25
  115:4,6,9,22
  116:1,5,14,
  23 117:10,15
  118:12,25
  119:7,9,20,
  24 120:8,15,
  17 121:2,24
  122:19
  123:7,14,25
  124:11
  125:16,18
  126:5,6
  132:8 138:1
**K9s**
  119:23
  125:11
**keep**
  120:8 179:20
**Kent**
  164:11
  166:10,13,14

**kids**
  50:5
**kind**
  24:4 103:22
  115:15
  116:19 179:9
**Kirby**
  163:19,20,24
  164:25
  165:19
**knew**
  112:5 141:22
  142:2
**know**
  6:14 8:6,16
  9:6 10:10,13
  13:11,12
  15:3 18:15
  21:6 23:7
  25:4 26:12
  29:13 31:10,
  24 38:17
  41:11,18,19,
  20,21 42:25
  43:1,9,10,
  12,13 44:7,9
  45:21,24
  49:6,23
  50:2,6,9,14,
  16 51:13,14,
  22,23 53:9,
  18 54:1,10
  58:7 61:8
  62:3 63:8,
  17,19 64:19
  67:17 68:6,
  7,8 69:22
  75:2,10 76:5
  78:20 79:6,8
  81:14,16
  83:14,16
  85:1,6,20
  88:22 89:18
  90:23 92:17,
  20,24 94:5,6
  97:25 98:1,5
  99:17 102:20
  104:20

106:15
107:6,8
113:20,23
116:12
117:9,10,13,
17,18,23
118:3,5,6
123:20
125:25
126:1,12,22
128:20
134:8,13
135:14,15,16
140:17,20,23
141:16,21
142:8 145:1,
14 146:4
152:14,18,23
153:14
154:13
156:14
159:21 160:1
161:4,22
164:6 166:17
167:9 168:18
172:4,10,17
173:8 176:5
183:11,13
184:10
**knowing**
  47:21 74:22,
  24
**knowledge**
  18:13 19:21
  31:3 57:11
  78:11 105:4
  107:1 123:25
  124:5 142:1
  155:6,10
  161:11,22
  165:2
**known**
  51:8 63:10
**Kyle**
  114:5

Sergio Perez
November 15, 2022                                              24

**L**

**label**
12:1
**labeled**
73:18 81:25
138:20 139:8
**labels**
11:7,15
**lack**
56:13 93:25
99:2 127:15
**language**
30:19
**laptop**
174:16,19
**large**
4:4 65:12
127:2 129:12
**lastly**
37:8
**Lauderdale**
5:19 116:11
118:10
**laugh**
66:19,25
**laughed**
66:18
**law**
5:18,20 12:7
20:10 37:24
40:11 51:9
53:11 69:11,
13 98:17
112:1
115:13,16
119:1 127:7
173:21
177:6,7,12
**lawfully**
128:15
**lawsuit**
5:21 6:25
19:13 42:12,
16,17,21,22
43:1,16

44:10,12,15
45:4 46:2,3
132:4,6
162:5 172:16
**lawsuits**
15:14 66:11
**lawyer**
10:15 27:8
42:23 45:2,3
46:12,16
49:2,3,14
70:12 101:24
103:16
114:10 140:8
**lawyers**
6:14,17,19
27:19 45:21
138:15
**lay**
99:14
**laying**
93:24
**leadership**
14:19,24,25
**leading**
30:7,8
**learn**
108:16
**learned**
16:5 129:23
131:14
**lease**
134:1
**leasing**
134:4
**leave**
38:8 46:18
**led**
142:20
**left**
179:13
**legal**
9:13 46:13,
18 121:15
129:7
**legitimate**
118:17 128:8

**legitimately**
128:15
**letter**
139:15
140:24
141:2,6,23
142:3 154:3,
11
**letting**
142:8
**level**
13:19
**levers**
61:25 62:1
**Lexipol**
105:10,13,
15,16,24
106:3,10,22
107:2,17,22
108:17,19,
21,23
109:20,24,25
110:20
111:14,20
112:12,16,
18,20 113:1,
3 122:10,11
124:4 132:7
**liability**
119:24
120:2,3
**lie**
178:9
**lied**
56:20
**lies**
75:6,14
**lieutenant**
24:5,21
26:10,22,25
27:12 28:18
29:4 30:23
31:8 41:16
59:1 80:5,
18,19 91:5,
11,15 97:17
121:21 176:4

**lieutenants**
23:5,13
26:4,19 30:6
174:1,12
**life**
152:23
160:3,4
184:21
**light**
35:13
**lights**
133:14,16,19
134:8
**liking**
125:25
**limited**
47:8 105:19
115:25
**line**
8:23 22:23
24:8 49:23
**link**
126:6 131:8
150:8
**list**
163:25 173:7
**listen**
110:9
**lit**
133:15
**little**
50:2,8 55:8
96:2 108:25
115:16 125:2
144:20
171:12
172:11
**lived**
21:25 39:18
40:5
**Livenote**
4:3
**Llanes**
165:5,16,18
**loaded**
127:6

Sergio Perez
November 15, 2022                                                25

locate
  120:16
  127:11
located
  72:10
location
  65:11 67:2
  127:7
log
  181:6,9,25
logs
  181:15
long
  15:10 20:6
  21:24 22:7
  23:23 30:8
  31:23 32:3
  60:22 80:2,
  10 89:23
  103:16,21
  104:24 118:4
  120:24
  153:18 172:5
longer
  50:2 102:12
  137:5 149:25
longevity
  151:11,13,16
look
  48:8 56:13
  58:8 63:22
  128:20,24
  156:19
  171:11,15
  173:5
looking
  58:8 73:12
  155:11
losing
  168:24
loss
  170:14
losses
  155:16
  157:12
lost
  71:25 95:14

96:3 103:22
104:13
152:13,17
155:16
158:4,22
159:1 169:8
lot
  36:14 79:20
  99:20 117:8,
  9,19 118:5
  126:23 127:4
  129:10 173:5
low
  93:24
lower
  148:16
  150:14
lowered
  150:9,10,20
Lowrie
  39:6
lunch
  123:1,17
lying
  109:1

———————————

M

M22-637
  76:7
Madam
  4:23
made
  16:18 21:22
  22:11 30:6
  38:5 55:20
  61:3 66:13
  68:22 69:2,
  18,25 72:4
  88:23,24,25
  91:20 93:11
  98:22 101:11
  108:19
  125:23
  126:19
  132:15
  135:16

144:6,18,22
147:16
161:14
164:17
173:11
179:24
183:16
maintain
  179:20
maintained
  63:17 97:12
  164:6 174:6,
  8,21 180:15
maintains
  175:7
maintenance
  117:21
majority
  166:2
majors
  23:4,15
make
  8:21 9:3
  21:2 32:4
  42:24 47:15
  51:24 56:9
  58:1 60:13
  69:10,17
  71:11,22
  74:12 84:25
  85:8 90:17
  94:17 118:13
  127:11 128:7
  142:11 156:5
  164:2,8
  167:20 184:2
  185:3
makes
  20:3 45:19
  89:21
making
  35:14 106:13
  111:7 178:6
management
  13:23 79:24
  81:10 110:15
manager

20:15,16
25:16,17
35:11 36:6,9
37:9,12
38:3,7
43:15,17
65:24 96:6
97:10 104:19
112:1 134:4
136:16
145:23,24,25
146:2
172:15,19
184:19
manager's
  35:1 36:13
  121:16 184:9
manner
  44:1,23
marathon
  49:20
March
  13:7 20:8,9,
  13 29:25
  42:13
  142:15,21
  146:23 152:7
mark
  73:17 81:18
  91:25 92:5
  138:19
  170:22
marked
  73:20 74:21
  81:21 87:8
  92:7 138:21
  139:8,14
  140:5 144:23
  170:23
market
  126:12
  127:6,25
  132:8 137:24
married
  41:23
master's
  13:21 14:1,
  23

Sergio Perez
November 15, 2022                                    26

materials
  181:13
matter
  10:16 65:16
  68:16 75:24
  77:7 106:13
  142:15 144:2
  161:7 162:4
  179:19
matters
  6:5 7:19
  10:17
Mckinney
  4:2 39:8
mean
  5:24 22:16
  25:4 26:3
  29:8 51:15
  74:24 85:21
  89:5 92:13
  124:15 147:9
  156:12
  159:22 160:2
  173:7 183:21
  185:10,12
meaning
  27:18 69:20
  75:1 89:11
  170:1
means
  40:22 86:8
media
  131:25
  132:6,9
medical
  117:21
medically
  118:16
medication
  9:23
medications
  160:21
meet
  6:4
meeting
  6:3 10:17
  38:3 48:21,

23 56:21
86:1,20,21,
24 87:1
108:20 110:3
131:18,21
135:15
meetings
  80:23 112:6
meets
  104:10
member
  28:3,6 40:1,
  4 91:5,7,15,
  17 100:2
  132:6 146:18
  175:7 185:17
members
  26:1 66:11
  79:13 98:5
  111:23
  146:17 165:7
  175:21
memo
  12:6 63:25
  64:2 88:12
memorandum
  12:20 63:23
  64:10 82:6
  87:9 88:16
  90:11 91:21
  110:19
memorandums
  11:4
memorialized
  78:24,25
memorializing
  29:11 78:23
memory
  24:24 58:12
  153:9
memos
  11:25 12:4,
  19
mental
  160:8,13,18
mention
  12:14

mentioned
  16:11 19:1
  33:13 61:13
  138:5 146:12
  173:17
mess
  58:16
message
  83:24
  171:18,20
  172:5,12,18,
  23
messages
  48:9 171:5,
  9,16
met
  48:11,15
  111:5 166:18
Miami
  92:25
Miami-dade
  15:21 19:24
  76:2 163:17,
  18
Michael
  16:4,12
  17:24 19:10
  26:12 32:21,
  22 33:6
  46:17 47:9
  50:15 51:2,
  16 52:9,16,
  20 53:10,17
  54:4,7 56:6,
  16,19 57:24
  58:19,24
  62:14,20,24
  63:7,13,21
  64:17,21
  65:18 66:9,
  14,16 67:14,
  18 68:2,6
  71:24 72:15
  74:11,20
  90:25 95:9
  96:25 111:6,
  7 136:25
  142:25

143:2,8,11,
22 145:4,16,
22 147:1
148:8 162:22
165:10
166:5,8
171:10
172:17
180:20,21
184:7,13
Mike
  45:25 46:1,6
mind
  60:2 172:14
minimum
  156:9
minute
  49:21 50:10
minutes
  72:23 156:11
misappropriat
ion
  137:22,25
mischaracteri
zed
  63:18
misconduct
  91:6,7,16
  166:5
misdemeanor
  17:21,23
  18:3,10 19:9
  32:6,19 33:5
  35:25 36:1
  38:17 49:12,
  13,15 95:8
  96:24 168:17
misdemeanors
  39:2
mismanagement
  104:7
missing
  63:11 64:14
  67:4,10
  71:8,9 75:10
mistake
  172:9

misuse
  110:2
  137:23,25
  181:23
MO
  74:17
modified
  119:8 133:1,
  8
modify
  133:22
Mohan
  51:19 58:25
  59:12 83:6
moment
  7:23 28:14
  79:5 100:18
  102:7 149:2
Monday
  74:2
monetary
  144:5
money
  58:13 84:25
  106:17 107:8
  117:8 119:11
  123:3 126:2
  127:16,21
  128:7,9
  152:13
  159:25 160:5
  167:20 169:8
  172:20
  177:18
monies
  105:20
  151:19
  157:17
monitored
  129:21
month
  21:14 28:23
  80:11 88:24
  105:1
  127:17,21
  129:24

monthly
  134:5
months
  15:11 21:25
  22:5,6
  28:23,24
  60:17 61:1
  88:21 93:14
  111:11 116:6
  131:7 157:3,
  7 169:25
  170:1,2,3,5
morning
  4:7,21 5:16,
  17 43:21,22
  82:25
mother
  159:25 160:1
mother's
  157:25 160:6
motion
  124:19
motive
  110:14 173:7
  184:6
mouth
  6:23 145:18,
  22
move
  36:24 70:16
  114:15
moved
  53:24
moving
  5:23 32:2
multi-page
  179:6
multiple
  58:18 125:16
  161:19
  163:21 179:9
municipalitie
s
  89:20

——————————

N

——————————

N-I-K-E-Y-A
  29:20
name
  5:18 11:8
  16:20 29:19
  54:11 68:21
  74:13 102:9
  106:7 116:10
  153:15 154:9
  167:24,25
named
  15:22 16:9,
  18 19:3
  49:9,11
  143:5
names
  12:2 38:23,
  25
narcotics
  120:16
nation
  67:25
national
  30:11
natural
  59:21
naturally
  51:22 117:18
nature
  16:14 85:25
  86:2 120:4
  121:16
  142:11
nearby
  33:21,22
nearing
  20:25
need
  10:24 47:6
  49:21,23
  90:23 113:25
  114:3,12
  119:9 167:8
  186:8

needed
  54:2 58:15
  60:9 95:12
  105:22
  106:10,17
  114:10,11
  115:1 119:17
  120:21
  129:8,19,20
  146:20
  148:19
  173:13
needs
  63:21 104:16
negative
  147:3
  148:21,24
neighborhoods
  183:9
never
  17:16 31:9
  57:24 59:4
  67:15,20,23,
  25 68:8
  78:14,18
  83:25 85:18,
  20 86:23
  99:15 105:25
  111:23
  121:20
  133:21
  136:1,12,13
  144:12 147:4
  152:23 153:2
  166:17
  185:10
newer
  67:21
newly
  110:2 113:17
news
  29:14 44:11
nice
  6:8,10,11,22
Nikeya
  29:20,21
  30:1 31:19
  115:14,24

149:25 150:5
**nods**
  8:19
**noise**
  45:19 51:10
**non-actions**
  98:8
**non-approval**
  151:22
**Non-
economically**
  159:13
**nonexistent**
  78:12
**nonuse**
  137:25
**Nord**
  163:19,20,24
  164:25
  165:6,19
**north**
  64:8
**Northwestern**
  14:8,13
**Notary**
  4:4
**notice**
  18:17 38:18
**notion**
  67:6 150:8
  185:19
**November**
  4:14 12:20
  34:5 93:17
  94:12,18,24
  171:6,12,14
**number**
  8:25 11:8
  24:20 76:5,
  6,8 89:22
  98:22 111:2
  129:6 130:10
**numbers**
  12:1 96:2
**nuts**
  45:7

**nutshell**
  98:1 161:23

---

**O**

---

**Object**
  9:12
**objection**
  9:12 52:10
  62:6,10,16
  64:20,22
  65:9 70:16
  113:4,7
**objections**
  131:18,23
  177:17
**obligation**
  104:6
**obligations**
  80:17,18
  86:12 125:22
**observe**
  61:3
**observed**
  61:2
**obtain**
  14:1,10,16
  27:9 101:24
  153:7 163:6
  166:6
**obtained**
  128:15
**obtaining**
  46:13 162:13
  163:5
**obviously**
  49:1
**occasion**
  67:13
**occasions**
  6:4
**occupation-
wise**
  20:12
**occupied**
  176:8 184:12

**occur**
  28:23,24
  34:19 48:6
  78:20,22,23
  87:21
**occurred**
  19:10 35:24
  46:20 50:15
  63:8,12 64:3
  78:18 100:3
  101:9,11,16
  109:3 111:10
  123:14
  130:14
  172:20
  173:20
**occurrence**
  74:18
**occurrences**
  79:11 150:23
**occurring**
  80:11
**Off-**
  20:15
**off-duties**
  57:21 88:19
  124:13
**off-duty**
  57:8,16,18
  58:15 84:25
  88:20 89:10,
  12,23,25
  93:16 94:2,
  9,11,14,19
  155:17,22
  156:9,22
  157:9 167:20
**offense**
  18:2,3
**offer**
  41:4,13
**offered**
  40:15,21,23
  41:1
**office**
  20:16 33:23
  36:13 40:17,

22 41:2,14
  45:13,14
  48:19 51:3,
  7,16 58:20,
  24 59:8,13,
  15 60:17
  63:11 65:5
  66:15 67:5,
  14,18 68:5,7
  70:20,25
  71:9,14,21,
  24 72:5,15,
  16 75:10
  93:2,21
  94:23 110:4
  121:16
  167:17
  184:9,12
  185:16
**officer**
  7:14 8:7
  16:3,14 18:6
  21:11 23:13,
  21 28:20
  37:21 38:16,
  19,21 53:12
  54:22,25
  58:13 61:13,
  15,16 67:5
  75:11 78:17,
  25 85:4
  91:4,13
  98:16 99:19
  102:8,10,23
  116:11
  117:20
  118:13,22
  119:2 120:5,
  8 123:19
  124:6 128:4
  131:15
  144:11,23
  149:6
  163:12,20
  173:21 177:7
  179:4 183:2,
  4,8,17
**officers**

16:17 25:24
26:6 38:25
39:5 51:7
54:9,14
61:2,4 66:8
74:15 75:5
80:1 115:4
137:23
144:25
161:17
162:21
164:19 168:3
177:6,13
**offices**
  51:2 58:19,
  23
**official**
  8:6 13:13
  111:17 112:9
  141:5,22
  142:2
**officially**
  147:13
**okay**
  6:2,7,13
  7:6,14,16
  8:8,14 9:8,
  19 10:4,9
  11:13,25
  12:4,23
  13:2,19,22
  15:1,6,10,20
  17:9,12,19
  18:5,25
  19:6,19,23,
  25 20:12
  21:8,19
  22:3,25
  23:9,20,22
  24:2,7,14
  25:6,9,17,24
  27:4,7,10,16
  28:10 29:1,
  23 31:18
  32:7,24
  33:10,19,22
  34:4,6,22
  35:5,9,24

36:2,20 37:8
40:14 42:10,
24 46:1
47:21,25
48:2 49:1,4,
18 50:10
52:13,17
54:6 55:15
57:6,13 60:1
61:17 63:1,6
67:17 68:13
69:2 70:24
71:11,17,20
72:3,21,24,
25 73:16
74:4,9 76:2
77:9 79:10
80:15 81:17
82:5,10 87:6
88:2 90:14
91:3 92:3,24
93:1,13
94:23 96:1,8
98:13 100:24
101:5 102:4,
12,15 103:8
105:15
107:24
109:7,15,18
112:2,19,24
113:10,15,20
114:2,22
115:8,11,22
116:1,18,20
118:9 122:7,
10 125:1,3,
6,8 127:20
128:6 129:1,
18 131:22
132:13
133:13,17,21
135:4,11,20
137:6 138:17
139:2,7,19
140:2,3,9,
13,17,20
141:1,12
142:5,9,17
143:18,25

145:11
150:5,18,24
151:5 152:24
153:18
154:2,5,9,12
155:5,14
156:4,9,15
157:5,19,21,
23 159:3,5
160:21
161:6,9
163:18
164:15,22
165:2 166:25
167:1,11
168:2,21
169:6,12,23
170:13,17,21
171:6,8,17
174:10,18,24
175:25 179:3
180:9 182:17
183:3 186:13
**on-duty**
  155:24
**onboard**
  106:11
**once**
  85:19 109:3
  127:13
**one**
  12:6 16:17,
  22 17:1
  18:20 19:2,
  12 24:20
  28:14 30:20
  32:20,22
  34:5 35:13,
  15 38:21
  45:19 47:16
  48:9,18 50:9
  53:25 58:16
  60:2,8,21,23
  61:3 67:17
  78:6,7 86:19
  87:25 90:5
  104:22
  111:24

116:24,25
118:24
120:15
126:18
129:12,20
130:8 138:15
139:25 143:8
146:19
147:22 149:4
155:1
158:11,25
159:2 162:21
164:19
170:17
171:19 184:2
185:3
**ones**
  112:23 127:2
  170:9
**ongoing**
  41:8 75:16
  143:2
**online**
  15:6,8
**Opa-locka**
  5:21,22,25
  28:15 30:22
  39:18,21,24
  40:2,11,20
  42:15 47:14
  69:5 85:19
  89:19 122:4
  143:13 152:7
  163:20
  174:2,6
  175:21
**Opa-locka's**
  22:14 29:10
  130:20
**open**
  33:24 97:23
**operable**
  184:22 185:3
**operating**
  107:17
**operationally**
  79:18

Sergio Perez
November 15, 2022                                                    30

operations
  95:1
opinion
  36:21 54:23
  65:20 119:1
  135:9,22
opportunities
  89:11
opportunity
  99:1 110:6
  177:20
order
  118:22 120:7
  123:1,2
  151:9,15
  186:4
ordered
  62:2 118:13
ordering
  118:18
  148:20
organizationa
l
  26:5
original
  42:13 142:14
  144:1 147:22
originated
  93:22
outcome
  38:20
outfitting
  79:23
outlined
  110:4
outside
  53:19 57:10,
  14,17,18
  76:12 81:15
  123:21
  136:10,11
  141:22,25
  164:13
overhear
  34:15,16
oversaw
  51:21 79:24

126:19
oversee
  29:17
overseeing
  80:18 81:9,
  10 94:25
oversees
  97:11
oversight
  105:19
  132:19,23
  146:19
overthrow
  54:15 161:18
  162:23
overtime
  88:18,19
  127:1 157:7
owed
  151:19
owned
  39:20,23
  40:1,5
  126:24
owner
  127:9
owners
  126:22
  127:12

───────────

P
───────────

P-E-L-A-E-Z
  168:1
p.m.
  4:15 73:5,6
  74:2 137:10,
  12,13,14
  158:15,17,
  18,19 186:2,
  14
PA
  34:24 35:3
page
  42:25 71:12
  138:6 142:7
  143:17,18

146:8 155:13
  162:19 171:8
pages
  103:4
paid
  14:25 84:22,
  24 107:1,6
  156:11 169:4
Palaez
  167:16
  168:14
  173:17
Palm
  40:16,21
  41:1,13
pandemic
  80:21 81:1
panel
  99:14
paper
  35:15 111:22
  127:13
paragraph
  143:17,19
  167:3,8
parking
  144:22
part
  7:20 14:14
  15:1 20:17
  26:5 33:19
  58:2 61:5
  68:9,16
  78:16 104:7
  114:18,22
  115:5 121:9
  125:21 126:9
  128:3 132:19
  134:1 155:16
  167:2 171:8,
  20
Participants
  4:9
participated
  85:25
particular
  72:14 79:2

81:5 92:13
  133:2 167:13
parties
  164:7 186:16
partner
  5:20
passed
  24:20 123:9
  144:21
passenger
  182:21
  183:22
past
  42:19 51:6
  53:3 75:3
  98:6 161:15,
  21 163:22
  168:5 183:16
Pate
  25:14,15,18
  29:3,9,16
  30:3 31:14
  32:12 33:14
  34:1,2,8
  43:17,18,20
  44:9,13,16,
  18,22 45:1,
  3,4 78:8
  86:16,24
  87:11,15,20
  88:2 96:11
  107:23 110:3
  113:11
  115:7,8,23
  136:1,5,7,
  15,20 139:4,
  16 140:10,
  15,18,20
  141:1,22,25
  164:11
Pate's
  44:12 45:21
  46:2,3 110:4
patrol
  21:12,18
  22:2,7,8
  55:7,11
  85:10

Sergio Perez
November 15, 2022
31

**pattern**
146:21
**pay**
14:22 37:3
38:13,18,19,
23 39:3,7,9,
12 40:20
88:17 105:20
106:2 107:7
150:25
151:2,6,24
152:20 156:9
157:7,14
159:2 160:1
169:10
170:7,8,15
172:19
175:11
176:12,16,20
**paychecks**
175:12
**paying**
21:6 26:1
127:16
129:24
**payment**
134:6 157:19
**payments**
28:3,5
175:6,14,16
**payroll**
28:8 95:12,
13 175:8,10
**PBA**
26:6,10,24
66:12 76:16,
17,23 101:24
**PBA's**
77:6
**Pelaez**
168:1
**pendency**
96:23 110:14
**pending**
19:23 38:14,
20

**people**
6:14 43:14
66:4 75:6
118:5 145:1
183:10,11
**perceived**
66:18
**percent**
7:13,16
110:21
**percentage**
7:11
**Perez**
4:14 5:11
27:20,23
47:14 64:8
73:19 81:24
92:5,6 94:8
138:20
149:5,13
171:9
**perfect**
72:24
**perform**
81:14 84:8,
14
**performance**
146:9 151:14
**performed**
64:25 81:5,
12 85:19,20
93:5
**performing**
80:3 84:10
86:3 93:6
**period**
13:14 27:24
31:12 85:18
90:15,18
120:20
149:14,22
158:24
167:15,18
168:4
**periods**
151:7

**perjury**
143:2
**pers-**
180:21
**person**
48:15 57:21
58:16 75:11
154:10
159:23
167:21 173:8
183:18
**person's**
153:15
**personal**
7:9,12,17
18:8 53:17,
18 155:10
173:22
181:18,25
182:6,14
**personally**
56:7 140:9
149:9
**personnel**
35:4,6 97:11
179:25
180:15,22,24
181:4 184:4
**pertaining**
72:6 96:24
109:24
110:19
121:24
122:19
125:11
126:10
138:13
**pertains**
79:7
**phased**
115:20
**phone**
33:2,13,19
48:8 106:14
122:25
123:16
148:17

**phonetic**
163:19
**physical**
156:13
180:22
**pictures**
62:23 63:3,6
**piece**
111:22
**Pizzi**
45:24,25
46:1,6,17
47:10,21,24
48:7,24
**place**
9:11 24:10
41:9 65:16
100:1 119:13
150:23
181:17
182:13
**plaintiff**
4:20 7:21
15:15,16
16:20 73:19
81:24 92:6
**plaintiff's**
4:19
**play**
99:7
**played**
128:3 152:25
**playing**
143:15
**please**
4:19,25
8:17,23 9:6
10:10 47:3
58:10 126:16
146:13
162:19
**pleasure**
6:3
**point**
26:21 27:22
30:12 38:14
41:10 47:10

Sergio Perez
November 15, 2022
32

50:1 54:6
57:3 78:12
80:20,25
102:15
104:10
113:12
132:25 184:2
pointed
51:10
police
7:14 8:6
11:18 12:14
13:9 14:8,
14,15 16:3,
14 18:6
20:18 21:11
22:11,14,20,
21 28:13,15,
20 29:2,7,
10,12 30:3,
11,21 31:16
34:25 36:4
38:2,15,19
53:4 54:16,
18,25 60:20
66:7 67:8,
15,22,24
72:11 75:11
79:19,23
81:6,13,15
82:18 83:2,
9,15 85:3,5,
8 88:15
91:4,13,17
92:15,18,22,
25 93:20
96:6 97:3,9
99:19 104:17
107:16
108:11 111:6
113:16
114:19,25
116:11 117:4
118:10,16,22
120:5,7
121:14,22
122:4,15
123:18

124:1,6,14
125:23 127:3
129:10
131:15
133:1,4,22
134:1,2,6,
16,20,25
137:23
144:3,11,25
150:1 159:20
161:13
163:12,13,
17,21 165:11
175:22 176:9
179:10
180:20
181:5,22
183:3
184:16,18,
20,22
185:11,17
policeman
118:4
policies
104:23
106:13,15,16
118:6,24
119:19
121:21
181:24
policy
56:22 60:5
79:1,2,3,6,7
98:3,24
104:17,20,21
110:16
111:1,9
119:6,9,12,
15,20,22
120:21
121:2,4,6,8
146:16
151:8,15
181:17
182:11,13
Pollock
4:20 9:15
10:15 11:23

13:16 35:2,
5,16 45:9,
11,14,16
46:8,11
47:17 49:2
52:10 62:6,
10,16 64:20,
22 65:9
70:15,16
72:24 82:17
89:5 113:7
114:13 137:7
173:15
174:17
175:5,19
177:3,16,24
178:10,15,21
179:23
180:3,19
182:4,12,19
185:1,7,23,
25 186:6,8
polygraph
166:17
polygrapher
166:16
portion
71:7
position
12:21 21:9,
16,24 22:10
23:23 24:14,
16,17 25:1,
2,4 28:11
33:11 40:23
41:1,7 50:19
55:6 58:15
66:3 124:1
144:4 153:4,
7,8 159:8
163:10
172:19
174:11 176:9
180:10
183:19,20
possession
70:8 71:5
171:10

175:16
possible
71:22 90:16,
19
possibly
46:17,24
109:11,13
179:15
posted
89:17
potential
66:11 119:24
161:7
potentially
10:17
power
66:2,4 119:5
practice
146:21
177:10
practices
98:3
pre-
construction
152:18
preceded
111:10
preceding
80:17 98:21
precise
131:1
preclude
101:20,23
precludes
181:18
predeterminat
ion
97:22 98:9
102:2
preparation
157:17
prepare
10:18
prepared
149:12
preposterous
67:6 185:19

Sergio Perez
November 15, 2022                                    33

presence
  51:17
present
  38:6 46:25
  48:17,21
  68:5 90:1
  94:14 149:10
  156:16 159:4
presented
  26:15 42:20
  43:2 66:9
  145:15
press
  131:25 132:9
presum-
  74:6
presumably
  76:3 143:20
presume
  171:20
presumption
  66:22 74:6,
  12,20
Presumptively
  74:9
pretty
  103:15
prevented
  127:16
prior
  15:14 20:10,
  12 33:10
  51:2,16 55:5
  58:24 60:19
  61:1 67:12
  78:19 80:2,5
  86:21,22
  87:1 90:22
  92:17,21
  93:6,9,13
  99:3 101:11,
  16 103:5
  105:2 111:11
  127:25 131:6
  134:23
  166:18
  172:20

176:16
privilege
  46:15 47:17
  68:19
privileged
  46:21
privy
  168:19
proactive
  61:21
probably
  7:13 46:19
  70:15 105:12
  117:12
  120:14
  133:14 143:8
  148:1
problem
  8:3 24:12
  35:16 42:6
  66:10 114:8
  125:5
procedural
  36:16 43:1
procedure
  99:6 176:8
procedures
  98:18 99:9
  118:7 181:25
proceed
  4:24
proceeding
  4:9 8:24
proceedings
  41:25 75:20
process
  40:17 95:7
  97:16,19
  98:17 100:1,
  4,9 102:5
  129:8 137:23
  148:6
processed
  151:9
procurement
  51:21 52:18
  79:17,21

105:9
produced
  181:14,15
product
  98:25
production
  27:8 77:13
  171:9
profession
  120:3
professional
  4:2,3 7:9,12
  160:9,14,18
  164:1,13
professor
  152:16
  154:16
program
  14:7,19
  15:10 58:13
prohibit
  144:4
prohibited
  124:13
promise
  100:17
promote
  110:11
promoted
  21:19 24:21,
  23 28:18
  29:4 30:6,14
  31:17,19
  55:19,20,21
  56:11 65:24
  67:8 80:6,14
promotion
  23:22
prongs
  51:4 62:24
  63:2 64:11
property
  12:13,17
  39:20 40:2,5
  79:25 82:14
  84:7 178:25
  179:1,4,20,

24
proposed
  121:2
protected
  27:23 46:14
  103:11
  132:15
protection
  99:3 117:20
  139:6
provide
  9:24 46:22
  76:25 140:9
  174:20
provided
  11:22 13:16
  27:4 70:4,6
  71:1,3,13
  83:4 98:19
  140:12,14
  141:13 143:1
  170:9 176:7
provides
  79:11
providing
  46:18
provision
  79:10 98:13
provisions
  98:17 101:8
public
  4:4 14:6
  127:4 129:14
  131:17
  137:19 174:9
  175:1 179:19
purchase
  61:12 114:19
  115:6,9
  117:13
  168:25
  169:7,9,15
  170:10
purchased
  113:17
  114:24
  116:1,24

Sergio Perez
November 15, 2022                                    34

157:13
**purported**
  68:3
**purpose**
  46:13
**purposes**
  5:23 95:13
**pursuant**
  151:11
**purview**
  80:1
**put**
  91:24 92:15
  129:21
  145:18 158:2
  183:9
**putting**
  133:2

———————————

**Q**

———————————

**question**
  8:24 9:5,8,
  16 10:25
  17:8 18:18
  25:12 31:24
  32:1 34:18
  47:3,8 52:6
  69:18,21
  73:16 77:4
  81:7 83:4
  98:20 99:5,
  17 100:20
  103:15,21
  112:8,9
  118:20 124:4
  127:18,19
  128:19 132:3
  138:10
  139:11,13
  173:19 183:8
  184:3
**questions**
  8:25 32:11
  36:24 37:9
  39:14 47:7
  48:5 49:23

51:14 57:1
136:24 161:3
173:9,12
**quick**
  149:2
**quite**
  99:19 103:3
**quote**
  30:18 184:13
**quoted**
  129:5

———————————

**R**

———————————

**Railey**
  4:21 5:15,18
  6:8 35:13,
  18,19 45:7,
  10,12,15,18,
  20 46:9
  47:4,19
  52:12 62:8,
  12,18 64:23
  70:19 72:21
  73:1,8,17,22
  81:23 82:1,
  21 89:9
  90:5,7 92:5,
  9 113:9
  114:3,5,8,
  11,15,17
  125:1,7
  137:3,8,16
  138:19,23
  158:14,21
  170:21 171:1
  173:9 174:14
  175:3,17
  177:1,14,22,
  25 178:8,13,
  19 179:21
  180:1,17
  182:2,9,18
  184:5,10,23
  185:5,18,24
  186:4,12
**raise**
  5:5 107:20,

21,25 108:9,
22 121:23
122:18 130:6
131:23
**raised**
  108:3,13
  109:23
  111:14,19
  112:12
  113:15
  124:11 130:3
  132:14
**raising**
  109:19
  110:19
**ran**
  29:4 31:9
**range**
  79:18
**rank**
  22:12,24
  25:5 26:5
  32:3 33:11
  34:23 35:7,9
  50:19 84:7,8
  90:25 91:8,
  10 94:24
  95:3 102:23
**ranking**
  28:20 55:13
**rankings**
  23:11
**ranks**
  22:15 175:20
**rate**
  88:17
**rating**
  147:3 148:21
  149:19 151:1
**reached**
  44:22 45:3
**read**
  24:12 35:14
  58:8 75:4
  141:18 149:1
  167:3,8
  185:24,25

186:1
**reading**
  75:3 138:2,
  4,7,9 140:19
  186:15
**ready**
  43:25 44:6
  123:10
  161:4,5
**real**
  39:20 40:5
  51:11
**reason**
  9:20 10:9
  36:8 63:20
  74:19 76:17
  83:10
  118:18,21
  119:11
  125:24
  178:17
**reassignment**
  166:3
**recall**
  16:13 23:10
  40:25 58:5
  60:22 83:20
  90:16,19
  108:3 109:7,
  9,10 116:20
  121:7 123:11
  140:14
  148:14
  164:20
**receipt**
  12:13,17
  82:14 84:11
  87:8,16
  88:11 90:11
  179:1,2,3,
  20,24
  180:11,14
**receipts**
  28:5 175:6
**receive**
  30:1 60:23
  72:13 77:20
  82:10 85:14

Sergio Perez
November 15, 2022                                                        35

151:1
**received**
  13:13 23:22
  34:24 39:2
  51:1 60:25
  72:9,10,17
  77:12 82:14,
  22 87:9
  88:17 140:20
  147:7,9
  151:3,18
  171:8 178:25
**receiving**
  83:21 84:4,
  22 144:4
**recent**
  32:20 143:9
**recently**
  16:23 17:20
  55:19 162:1
  164:16
  166:2,8
  184:8
**recess**
  73:4 137:12
  158:17
**reckless**
  18:1,5
**recognize**
  81:19 92:3
  171:2
**record**
  4:8,12,18
  8:15,21 9:12
  18:15 58:10
  73:3,7 77:5
  81:24 82:6
  137:4,11,15
  158:16,20
  179:19 186:3
**recorded**
  4:10,11,13
  77:17,20,22
**recording**
  74:17 185:4
**records**
  42:13 79:24

81:10 175:1,
8,10
**recreated**
  114:23
**redid**
  119:9
**redistribute**
  178:17
**reduce**
  147:2,3
  148:20
**reduced**
  147:18,20,23
  148:1,7
  149:16
  151:24
**reducing**
  147:15
**reduction**
  152:20
  157:14
  169:10
  170:8,14
**refer**
  10:24 25:22
  50:13 58:6
  155:12
**reference**
  15:14 91:20
  142:8 143:21
  169:6
**referenced**
  49:8 56:6
  66:15 117:25
  130:16
  132:18
  138:24
  157:11
**referencing**
  169:1
**referred**
  91:19 173:24
**referring**
  19:15 32:23
  34:1 50:17
  63:25 66:7
  88:8 102:20

105:8 137:17
139:23 158:9
167:13
**refers**
  50:13
**reflect**
  60:6
**reflected**
  170:8
**reflects**
  26:8
**regard**
  86:24
**regarding**
  7:16 22:15
  34:8,12
  35:9,10
  37:10,22
  42:15,20
  43:3,4,6
  46:2,3,4
  47:10 69:19
  70:21 81:3
  83:19,23
  84:3,14
  87:11 96:15
  98:8 105:3,
  16 106:21
  107:21
  108:23
  109:20
  113:16
  118:12
  123:5,14,25
  124:11
  125:15
  128:23
  130:4,7,13,
  24 131:24
  132:11
  138:12,25
  146:9 154:6
  155:8 161:3,
  11 175:15
**Registered**
  4:2
**regular**
  134:23

**reinstate**
  178:12
**reinstated**
  34:5 92:11,
  12,14
**reinstating**
  12:21
**reissued**
  92:15
**reissuing**
  180:12,14
**relate**
  178:2
**related**
  19:2 32:20
  77:11 118:12
  119:25 132:7
**relates**
  177:12
**relating**
  32:22 65:19
  72:14
**relation**
  36:16 56:17,
  20 86:1
  118:25
**relationship**
  53:16,17,23
  54:3,7 57:1
  118:3 164:5
**relationships**
  106:12 118:5
**relative**
  7:19 10:21,
  23 11:2,4,25
  184:6
**relevant**
  26:15 143:9
**relief**
  113:5
**relieve**
  178:5
**relieved**
  84:6,18,21
  85:23 86:7,
  14 94:21
  104:11

110:17
111:18
112:10
124:12
167:19
177:19
178:11,16
**relieving**
111:13
**relinquish**
82:12 84:6
**remain**
41:20
**remained**
152:3
**remember**
6:20 8:2,10
15:4,19
16:2,20 17:1
40:18 48:12
59:9,14
60:15 94:10
96:17 105:7
108:2,6
109:2,16
116:2,12,14,
22 117:7,18
121:3,4,5
122:23
123:1,4
131:2
140:11,12,16
145:20
148:23
153:15 154:9
171:16
172:16 174:3
**remote**
58:7 80:23
**remotely**
80:22,23
**remove**
56:12 99:1
110:7 148:6
**removed**
41:11 54:11,
17 65:22

**removing**
184:9
**renting**
127:2
**reopen**
37:25
**repeat**
125:14
**rephrase**
103:23
**report**
31:13 63:18
104:6
**reported**
84:20
**reporter**
4:2,3,23,25
5:4 8:18 9:1
49:25 114:4
186:7,10,13
**represent**
5:20 76:13,
18 157:15
**representatio
n**
46:14 76:11
77:6
**representativ
e**
45:1 142:2
**represented**
26:6
**representing**
26:11,12
27:15 47:22
**represents**
157:16
**request**
4:11 27:7
49:24 68:16,
22 69:18,25
70:21,22
72:4 77:17
94:2 110:4
119:2 139:5
174:24
181:14

**requested**
37:24 68:9,
17 77:11
106:22
128:24
147:11
166:14 170:6
**requesting**
131:5 163:5
**require**
60:5,6
**required**
9:16 41:6
86:12 127:1,
2 131:6
179:20
**requirement**
82:12 178:12
185:6,8
**requirements**
176:19,24
177:11
**requires**
104:18
**rescind**
106:9
**rescindment**
106:22
**reserve**
58:13 80:1
173:12
**reserves**
81:10
**resource**
34:25 115:1
**resources**
126:1 138:1
146:25
**respect**
5:21 6:25
7:18 8:4,12
19:9 33:6
37:15 50:22
71:23 72:13
77:6,10
91:6,16 95:3
97:16 98:19

99:9 100:9
101:25
111:14
112:12 124:4
126:4,5
133:2 142:19
158:4 159:1
165:18
**respectively**
88:25
**respond**
8:17 69:14,
19 70:20
88:2,3
109:15
**responded**
70:4 84:1
109:16
**response**
69:22 70:25
72:9,14,17
77:12,13
97:25 147:7,
10 172:2
181:14
**responsibilit
ies**
12:12 23:6
31:11 80:6,
12 84:18
**responsibilit
y**
57:20 127:14
183:4 185:2
**responsible**
79:23 80:8
85:24 121:6
184:15
**rest**
61:12
**restate**
47:3
**restored**
152:10
159:6,7
180:10
**restricted**

Sergio Perez
November 15, 2022                                                    37

184:4

**restroom**
49:22

**result**
35:25 94:20
101:10
110:19
111:19
112:11 143:3
150:15 151:2
152:17
153:22
159:14
174:18

**resulted**
43:11 128:19
168:24

**resumed**
73:5 137:13
158:18

**retail**
20:16

**retained**
10:15

**retaliate**
177:20

**retaliated**
104:5 142:13
144:1

**retaliation**
54:10 142:9
161:21

**retaliatory**
141:9 142:20

**retire**
29:24

**retired**
29:22,23
150:5

**retirement**
160:1,6

**retract**
86:23 132:2
146:15

**retrieve**
83:1

**retrofitting**
117:4

**return**
179:4

**returned**
93:2 107:8
178:22
179:16 180:9

**returning**
93:17 94:23

**revealed**
56:15

**reversed**
106:4

**review**
10:21 17:7
67:13 103:5
104:21,25
105:1,2
181:11 185:2

**reviewed**
38:5 67:15
103:4 104:20
132:23
143:19 181:9

**reviewing**
130:25 181:7
184:15

**reviews**
181:4

**Richard**
69:1,2,10

**rid**
127:14

**ride**
144:7,9,18,
22 145:5,18
146:5

**riding**
144:14,19
182:23
183:21

**right**
5:5 6:21,24
7:3,8,11,22
8:1,11,14
9:22 11:8

12:2,9 17:16
20:5 22:6
25:6 32:16,
23 33:13
35:18,20
40:9 45:7
48:19 49:14,
18 50:3,6,8,
12 54:21
64:5,9,13
68:23 72:22
73:1,10 82:8
85:22 91:24
92:5 93:2
101:6,17
102:5 103:1,
18 105:13,15
108:7
113:24,25
114:18
117:12 118:1
121:19
122:22
127:18 131:7
134:7 137:3,
17 138:2
140:4 153:8
157:11
164:15
169:24
173:12 180:6
183:23
185:13

**rights**
37:21 78:25
97:19 98:16
103:24 104:4
137:23
152:12

**rims**
133:2,4

**road**
21:12 22:7
61:4 85:10
134:23
144:25

**Robert**
102:9 110:1

**Rogers**
57:23 58:14
83:8,9 84:17
146:23
147:2,13,15,
24 148:3,8,
10

**Rogers'**
149:15

**role**
28:19 29:15
51:20 57:16
59:21 66:2
90:22 92:14
131:14
143:15

**roles**
23:6 55:9

**roll**
65:3

**room**
10:10 47:1

**rough**
159:16

**rug**
52:16

**rule**
10:13

**rules**
8:15,16

**rumors**
93:21

**run**
29:17 183:25

**running**
30:7,9 41:16
53:24

---

**S**

---

**safety**
183:2,9,17
184:21

**salary**
84:24 89:2
95:15,18,20
170:6

Sergio Perez
November 15, 2022                                    38

Sanchez
  161:8,10,25
  162:5,8,16
  164:3
Sanchez's
  162:12
sarcasm
  66:24
sarcastic
  66:19
save
  40:9 53:25
  66:6
saying
  27:17 31:25
  87:6 99:16
  105:12
  112:25
  115:22
  119:19
  127:23 134:9
  135:1 156:14
  172:5 185:21
says
  64:3 75:4,7
  88:15 127:7
  140:19
  171:18
scanned
  180:24
scare
  51:8 52:25
  53:2 59:2,12
  62:14
scary
  183:12
scheduled
  82:23 160:13
schedules
  165:11
school
  14:8,13
  115:4 116:6
  158:13 179:9
schools
  163:13,14,
  16,17

scope
  16:2,14
  76:20
score
  147:3,17
  148:7
scored
  24:20
Scott
  36:4 37:22
screen
  73:9 91:24
  92:1 138:17
search
  30:11
second
  11:11 12:10
  35:13,15
  48:9 57:7
  61:13,14,16
  64:16 72:1
  90:5 103:2
  137:18
  147:22
  149:18
  158:12 167:2
second-in-
command
  22:21
seconds
  158:12
secret
  56:21
secretary
  48:18 59:6
section
  79:12
secure
  65:15
secured
  129:20
security
  20:14
see
  13:4 58:1,7
  59:5,11
  61:11,23

  64:7 71:10
  73:10 83:25
  92:1 106:9
  127:3 130:25
  131:3 138:17
  149:1,17
  156:21 162:3
  170:19
seeing
  43:23
seek
  101:24
seeking
  157:1 158:3,
  22 159:1,6,
  11
seized
  126:11
  127:24
  128:15
seizure
  128:4,7
select
  115:2 116:9
selected
  61:20
self-
sponsored
  20:23 21:1
self-standing
  67:22
semester
  154:18,22
semesters
  154:25
semi
  129:13
send
  90:14 106:8,
  14,20 161:17
  181:21
  182:1,6
  186:10
sense
  8:21 9:3
  32:4 85:9

sentence
  40:9 119:22
  167:4 168:22
  171:21 172:6
separate
  52:2 116:17
  157:22
September
  12:8,9,11,18
  19:16 23:9
  50:15,19,23
  52:21,23
  53:15 58:17
  60:23 67:12
  68:5 74:2
  79:15 80:2,4
  81:3 87:9
  90:11 91:1
  94:14,21
  97:24 98:4
  100:21
  110:6,18
  111:13,18,21
  112:11 113:5
  139:4,15
  142:3 143:22
  156:15,16
  157:3 177:19
  178:5 180:6,
  8
sergeant
  16:17 23:19
  24:6,7,10
  28:13 31:21,
  23 32:3
  34:23 55:12,
  17,20 91:2,
  5,11,14
  95:9,24,25
  96:5,15
  97:18 101:3
  149:5,13
  158:10,24
  163:13
  169:11
  182:23
sergeant's
  24:19

sergeants
  22:18,19,23
  23:13 24:11
  26:7 55:7,8,
  11 168:10
Sergio
  4:13 5:11
  27:20,23
  35:2 47:13
  173:16
serious
  37:19 66:25
  183:17
served
  144:10
servers
  174:7,21
serves
  24:24 58:12
  153:10
service
  25:5 174:7
  178:18,22,23
  180:4
services
  46:18
serving
  92:18
set
  11:3,13
  19:25 75:24
  124:19
setting
  65:1 164:13
settings
  165:10
several
  13:6,8 51:2
  64:5 108:24
  122:21
  141:15
  145:12 147:5
  151:6 172:17
share
  31:10 36:10
  48:1 73:9
  122:23

shared
  72:18,19
  145:13,23
  147:6 150:22
Sheriff's
  40:16,22
  41:2,14
shift
  55:12,13
ships
  127:3
shock
  185:20
shoot
  67:5
short
  60:22
shortly
  41:5
shot
  64:5,10,18
show
  26:24 27:23
  42:13 43:13
  81:17 170:17
  173:7
showed
  179:12
showing
  62:24
shows
  26:22 125:2
side
  63:5
sign
  148:19
  169:18
  175:10
signature
  34:25 35:1
  82:2 83:17
  122:7,15,16
  130:19,20
signed
  105:24
  146:24
  147:14,15

  170:4 179:3
signing
  186:15
similar
  118:6
Simon
  39:6 61:4,
  13,18 149:6
simple
  71:22
simplify
  103:15
single
  38:19 60:5
  75:11 89:12
  117:10
sir
  4:25 5:16
  7:15 20:3
  24:1 59:20
  70:11 80:13
  82:2 92:10
  170:19
sit
  32:2 85:17
  108:20 113:2
  120:18
  144:17
  151:18
  160:12
  176:5,11
  182:20
sitting
  32:12 44:4
  64:7 111:25
  112:3 182:7
situation
  83:23
size
  129:13
skip
  161:8
sleeve
  31:9
small
  63:15

smiling
  49:4
socialize
  136:10
  162:10
  164:12
solely
  100:18
solemnly
  5:6
solicited
  166:13
SOP
  118:25
sort
  81:11 85:25
sought
  160:8,17
  162:12 163:4
sound
  47:6
speak
  43:15 147:25
  150:17
speaking
  10:12 104:14
speaks
  79:12 141:13
spearheaded
  115:23
special
  95:1
specialty
  79:22
specific
  21:14 25:10
  61:6 81:4
  108:25 109:1
specifically
  68:15 104:25
  113:3,4
  123:11
  132:7,9
  141:6 146:4
  150:10
  161:10
  170:13

specifics
  15:19
speech
  103:12
spent
  119:10 123:3
  126:2 157:18
spoke
  37:9 111:23
  123:20
  125:10 155:7
spoken
  42:14 43:8,
  14,19 46:1,
  6,17 141:15
  161:25
  162:25
  172:15
sponsored
  20:22,23
squad
  54:9 75:5
  165:6
St
  13:25 152:16
  153:5,13
  154:6,7,16
  155:7,8
staff
  12:16 14:9,
  15 61:12
  66:8 79:17,
  24 81:10
  84:19 86:5
  91:5,8,15
  98:5 101:13
  108:18
  111:23 127:1
  175:21
  185:17
Standard
  4:16
standards
  118:15
standing
  64:9

stands
  61:9
Stanley
  39:10
stars
  31:9
start
  21:17 53:16
  72:2 107:24
  164:10
started
  9:19 21:4,6
  78:5 118:17
starters
  6:12
starting
  173:6
startle
  51:8
state
  4:4,17 16:6,
  7 69:16,25
  70:20,24
  71:13,20
  72:5,15
  132:23
  157:12
  167:17 168:6
stated
  6:3 16:13
  52:17 58:17,
  18,19 97:15
  155:16
statement
  47:16 63:24
  77:22 78:17
  86:23 94:6,
  22 110:9,13
  140:25 145:9
  174:19 178:6
statements
  56:17 77:17,
  20 132:14,15
  135:15 143:4
  161:14
  166:19

station
  81:15 88:15
  108:11 127:4
  129:10
  185:11
status
  35:8,10
  42:25 78:10
statute
  37:20 78:24
  98:16 129:5,
  6
stay
  112:5
  118:13,22
  120:20
staying
  121:24
  122:19
Stearns
  5:20 6:4
Steel
  16:4,12
  17:24 19:10,
  17 26:12
  27:13,19
  32:21,22
  33:6 50:16
  51:6,16
  52:9,16,20
  53:10,17
  54:4,7,21
  55:23 56:6,
  16,20 57:2,
  4,6,25 58:19
  62:14,20
  63:7,13,21
  64:17,21
  65:18 66:9,
  14,16 68:2,6
  74:11,20
  93:22 95:9
  96:25 111:6,
  7 135:15
  136:25
  142:25
  143:3,8,11,
  22 145:4,16,

22,24 147:1,
14 148:3,4,
9,10,15,20
161:14,15,16
162:22
163:22
164:18,20
165:5,9,10
166:5,8
171:5,10,22
172:17
180:21
184:3,7,13
Steel's
  51:2 58:24
  62:24 67:14,
  18 71:24
  72:15 90:25
  146:3
  161:12,20
  163:22
stemmed
  56:24
stems
  43:12
Steven
  11:18 12:7,
  12 30:12
  51:17 78:8
  83:18,22
  84:2,13
  86:16,21,24
  87:1,15
  102:19
  105:23
  107:23,24
  108:4,23
  109:20,23
  110:9
  111:12,22
  112:4 116:3
  118:12
  120:7,19
  121:1,25
  123:13
  124:17,21
  125:17
  127:25

128:6,23
130:14,24
131:10
134:15
149:24
168:18
**stolen**
126:21,23
**stops**
172:8
**storage**
126:11
127:21
130:4,7,13,
24 131:9,14
**store**
20:15 53:11
129:15,24
**stored**
129:9,10,14
**streamline**
72:3
**Street**
61:5 79:22
**streets**
119:25
**stress**
159:22
**strike**
24:15 33:3
37:14 70:17
90:9 96:13
107:20 120:9
**stripped**
12:7,12
88:13,14
95:13 98:1
104:12
124:13,14
167:22 168:7
**struck**
51:12
**structure**
22:14,20
23:11
**stubs**
170:7

**stuff**
8:19 9:13
53:13 85:15
117:22
**subject**
19:12,15
75:15 78:17
103:12
132:19
167:14,16
**subjects**
19:12
**submitted**
110:24
146:24
**subpoena**
69:7 86:1
**subpoenas**
85:24 86:13
**subsequent**
34:7,11
83:21 128:22
**subsequently**
54:11 106:4
**substance**
10:14 46:20
109:10 129:3
**sued**
56:7 152:23
**suffer**
159:23
**sufficient**
119:15
**suing**
56:10
**suit**
16:5 150:20
**suits**
7:20
**summer**
88:21
**summons**
18:14 36:1,2
38:17
**sun**
90:5

**supervise**
55:2 79:22
**supervised**
147:4
**supervising**
16:17 57:4
86:4 149:13,
21
**supervision**
54:12,18
79:17
**supervisor**
8:9 55:1
**supervisors**
22:23 24:8
**supervisory**
22:12
**supply**
53:11
**support**
42:10 74:20
110:22 145:8
150:19
**suppose**
64:2
**supposed**
36:7 49:20
120:17
121:10
169:14 181:8
**Suppression**
21:23 55:18
**sure**
5:3 8:15
10:11 11:16
12:6 14:5
16:25 26:9
27:11,21
28:4,7 34:19
37:1 39:17
42:24 47:5
50:11 52:8
58:2,11
60:13,14
69:17 71:11
72:2 75:3
81:8 82:17

83:16 94:17
107:5,14
109:14 123:4
125:15
127:20 128:7
137:7 139:12
142:11 144:6
147:25
149:18 155:1
156:5
168:13,18
171:13,15
172:8 176:18
182:10 183:1
184:5 185:3
**surrounding**
36:15
**surveillance**
63:10 64:14
68:3 70:5,22
71:12 72:6,
10 75:8,9
184:16
**suspect**
64:12
**suspects**
120:16
**suspend**
36:11
**suspended**
35:20 36:3
38:13,19,22
39:7,9,12
86:6,7,9,11,
14,17,22,25
87:2,12
168:7 176:11
**suspending**
176:15,20
**suspension**
35:24 36:18
37:2,6,10,16
38:11 43:4
86:14,15
88:12
**sustained**
173:3

Sergio Perez
November 15, 2022

42

swear
  5:6
switched
  90:5 138:6
sworn
  5:12 63:24
system
  28:8 117:8

---

**T**

T&e
  61:9
T&es
  61:8
take
  6:24 8:18
  9:1 17:11
  48:10 49:21
  50:3,9 72:22
  88:5,7 101:7
  114:14
  137:3,5
  141:1 158:11
taken
  4:1,14 36:14
  38:18 57:22
  73:4 96:19
  109:19,22
  112:16,20
  124:9 125:10
  126:7 137:12
  142:20
  152:1,5,19
  158:17
  180:5,7
taking
  46:7 47:11
  92:21 160:21
  174:18
talk
  9:2 20:5
  27:16 43:16
  44:1 50:12
  78:1 103:8
  136:6 177:25

talked
  158:6
talking
  9:1 23:8
  43:2 50:14
  87:7 100:13,
  15 105:3,8,9
  113:20,23
  126:14
  132:5,7
  159:7 174:3
tase
  64:4
tased
  75:5
taser
  19:16 43:3
  50:16,17,23,
  25 51:10,11
  52:2,9,14,
  20,23 53:8
  58:18,23
  59:3,7,13,
  16,18,22,24,
  25 60:3,4,7,
  10,25 62:5,
  24 63:2,15
  64:18,25
  65:19 67:6
  72:6 75:15
  77:7 78:3
  79:14 90:2
  98:24 110:10
  143:6,23
  148:5 149:5
  153:22
  166:20
tasers
  52:18 60:19
tasked
  30:8 59:17,
  19
tasks
  121:18
tax
  156:20
taxpayer
  181:23

taxpayers
  125:22
Taylor
  165:2,6,13,
  19
teach
  153:18
  154:25
teaching
  152:16
  153:4,20
Team
  21:23 55:18
technical
  48:22
TECHNICIAN
  4:7,23 73:2,
  6 114:6
  137:10,14
  158:15,19
  186:2
telephone
  32:12 34:8,
  12
tell
  12:8 22:13
  24:3 32:8
  36:8 37:15
  44:4 50:22
  51:12,15
  54:8,13,17,
  19 56:16,19
  57:13 70:2
  71:21 74:7
  84:20 86:16
  87:15 88:23
  90:23 94:1,
  11 104:24
  110:8
  111:12,17
  112:10
  114:11,12
  128:13 129:3
  133:23
  146:13
  148:10,13,
  15,18 151:5
  153:23

telling
  110:14,25
  111:3 121:5
temporarily
  119:6,8
temporary
  30:1
ten
  72:22
tendering
  179:5
tens
  126:20
tenure
  40:10,13
  91:3,13
  172:21
Tequila
  51:15 58:20
  59:2
term
  49:15
terminate
  33:17 155:8
terminated
  16:7 102:16,
  19 161:13
  166:9
terminating
  154:3,7
termination
  26:13 102:24
  110:1
terrible
  145:3
test
  24:19 61:23
tested
  25:2,4,5
  61:11
testified
  5:13 25:11
  30:2 75:25
  178:3,4
testify
  9:20 66:23

Sergio Perez
November 15, 2022                                    43

testimony
  5:6 9:24
  24:3 85:17
  86:2 90:3
  155:20
  164:12
  177:18
testing
  41:6 49:20
text
  48:9 83:24
  171:5,9,19
Thank
  5:4 114:6
  186:13
thanks
  73:1
Thanksgiving
  164:7
theory
  184:7
thereof
  69:23 109:13
thing
  51:9 60:2
  68:1 86:8
  106:10
  112:14 113:1
  151:17 160:4
things
  38:3 41:12,
  18,21 43:10
  51:22 54:15
  78:20,23
  79:18,25
  81:10 85:24
  90:21,24
  93:24 98:23
  101:16 110:5
  135:14
  143:14
  157:18 160:2
think
  6:2,21,22
  12:9 16:1,8,
  16,23 28:1
  32:10 33:24
  40:18 46:19

  47:6 48:3
  49:5 50:14
  54:21 56:19,
  23 58:14
  60:3 63:6,21
  66:18 67:24
  68:1 69:17
  74:9 77:10
  95:11 97:17
  101:13
  107:10 109:5
  110:13
  112:13
  114:25
  116:21 117:2
  120:19
  127:18,22
  129:11
  130:8,9
  134:15,18
  137:5 141:13
  145:17
  149:19
  150:16
  151:12
  152:11,22
  154:17 156:4
  161:21
  170:22
  173:10
  184:5,10
third
  65:14
third-in-
command
  22:22
Thomas
  13:25 152:16
  153:5,13
  154:6,7,16
  155:7
Thomas's
  155:8
thorn
  99:1
thought
  112:25 178:1

thousand
  15:4
thousands
  126:20
threatened
  75:4
threats
  183:15
three
  10:6 37:23
  55:8 102:4
  109:6 130:9
  132:25 133:9
  148:2 156:11
three-hour
  156:9
threshold
  100:20
  139:12
ticket
  179:10
till
  21:17
time
  4:15,16,17
  7:23 9:2,11,
  14 11:20
  13:14 21:3,
  23 22:17
  25:1 26:10
  27:24 28:20
  30:2,10,13
  32:2 33:24
  38:12 41:15
  43:11,19
  45:19 48:10,
  12 51:13,17
  53:7 54:6,16
  55:5,10,22
  57:3,6 73:2,
  6 74:16
  79:14 80:20,
  25 85:10,13
  89:15 90:8,
  10,12,15,18
  93:24 96:14
  97:13 99:19
  101:18,22

  102:15,24
  104:24
  108:7,13
  118:4 119:13
  120:21
  126:17
  127:13
  132:25
  135:6,20
  136:7
  137:10,14
  138:15
  144:21
  145:16,25
  146:2,4,22
  149:14,21
  150:6 153:9
  158:15,19,24
  160:3
  161:13,24
  162:24
  167:7,15,18
  168:3,8
  170:8
  173:10,18,22
  176:8 177:6
  181:22
  184:11
  185:23 186:2
times
  7:5,6 26:14
  91:19
  108:22,24
  122:18
  130:6,9
  132:9 155:17
  156:10
title
  28:11,15
  30:2 31:3,7,
  8 34:23 80:7
  90:25 94:24
  95:3 102:23
  168:8
today
  6:24 9:20
  13:15 32:2
  85:17 113:2

Sergio Perez
November 15, 2022                                              44

today's 10:19
told 6:10,11 38:8 41:25 52:8 66:5 73:23 75:23 82:7 87:2,12,23 94:13 100:7,11,19 102:20 110:10 112:23 123:2,16 128:3 136:1,4 143:19 147:24 148:3,17,19 164:20

151:18 157:2 160:12 170:1,5 171:24 176:5,11

top 64:13
topic 50:9
topics 11:19
tort 16:6,11
total 154:25
totally 63:23
tough 35:14
traditional 51:4
traffic 18:2,3
trained 118:9 149:6
trainer 115:3 116:10
training 51:3 60:7

transcript 186:5
transpired 143:10
transported 18:16 127:7
treated 167:5,12 176:25
treatment 160:8,17
tremendous 49:2
trial 19:25 20:3 75:23,24 76:1 162:17 163:8 164:23 165:13 166:10
true 26:18 41:21 174:10,24 175:15 178:3 181:7
trust 134:20 135:23
trusted 135:24
trustworthy 55:23 135:18,22 136:22
truth 5:7,8 63:8
truthful 9:24 178:1,7
truthfully 9:20
try 54:15 72:2
trying 21:2 49:14

61:2,3,6,10 63:13 117:25 118:2,8

53:2,6 64:24 66:22 71:22 114:15 126:25 156:23,25 158:24
Tuesday 4:14
turmoil 41:8
turn 142:5 143:16 166:25
turned 40:16 64:4,9 82:14
two 10:6 13:12 16:1,12,15 22:3 32:19 42:7 48:5 54:14 55:8 57:15 60:25 61:1,19,25 62:2 63:5 74:15 93:13 109:6 111:23,25 114:25 147:23 155:1,2,3 158:12,25
type 49:20 75:2 123:25 151:17 153:3
types 121:18
typical 65:11,13,16
typically 65:6

——————————

U

ultimately 168:25 180:9

unable 57:13 89:23
unaccounted 126:21
unadulterated 181:1
unappreciated 173:6
unclaimed 127:8
unclear 9:5
undergo 60:6
understand 5:24 7:1 9:6,17 21:8 24:3 27:17 31:24 34:18 52:7 68:24 81:7 87:6 100:15 117:19 134:9,14 142:11 156:14 167:9 171:25 175:20
understanding 18:24 25:24 27:17 103:25 159:20 178:24
understood 9:4,9 14:21 20:4 28:10 44:9 48:2,5 68:10 80:10
underway 30:11
unethical 54:15
uniform 21:18 96:21 178:23 180:5 183:22

Sergio Perez
November 15, 2022                                    45

uniformed
    55:11 183:1,
    3
uniformly
    177:4
uniforms
    85:5 117:20
    178:18
union
    27:19 28:3,6
    175:6,12,15
unit
    21:25 55:21,
    22 61:5,21
    79:22 114:23
    115:23
    117:10
    118:17
    119:7,10,21
    120:15,17
units
    79:22 84:19
university
    13:25 14:6,
    8,11,13,20
    152:16
    153:5,13,14
    154:6,16
    155:7
unlawful
    98:23
unnecessary
    106:18
unreasonable
    119:2,3,22
    120:19,23
    123:3 125:20
update
    106:13
    119:19
updated
    119:17
    120:22 121:2
upfit
    134:3,5
upfitted
    114:25

116:23
118:16
upset
    93:23
usage
    127:1
USB
    60:15,18
    61:11
USC
    103:10
UTC
    4:15
utilization
    113:17
utilize
    172:19 176:7
utilized
    144:4
utilizing
    61:5 107:17
    181:18

——————————

        V

vary
    89:11
vehemently
    84:16
vehicle
    12:15 83:2,9
    85:5 92:15
    93:20 96:21
    116:23
    117:4,10
    118:16
    133:1,3,4,8,
    22 134:1,4,6
    144:7,10,15,
    19,20,24
    145:5,19
    146:5,6
    182:21,24
    183:23
vehicles
    41:19 79:23
    85:8 114:25

134:3
Velcro
    51:12
verbal
    8:18 76:24
verbalize
    8:20
verbalized
    112:6
verbally
    77:1,5
    107:25 109:8
    111:3 121:25
    148:16
    153:25 154:5
verify
    12:10 126:24
    127:9
version
    13:10,11
    50:22,24
    65:19 147:17
    148:20,24
    149:18
versions
    13:6,8
    147:6,24
    148:2
versus
    7:12
Victor
    162:20,21,25
    163:10
    164:2,12
video
    4:7,8,23
    60:9,10,14,
    18 61:3,14
    63:11 66:15
    67:10 68:3,4
    69:23 71:23
    73:2,3,6,7
    75:12 114:6
    137:10,11,
    14,15
    158:15,16,
    19,20 184:12

185:3 186:2,
    3
videographer
    50:1
videos
    69:11 70:10
    71:1,7
    77:11,13,15
    166:23
Videotape
    4:1
view
    144:24
violate
    112:1
violated
    97:19 98:14
    102:6 103:24
    104:3 152:12
violating
    98:3 110:25
    181:24
violation
    100:3,5
    103:10
    137:22 151:8
violations
    36:16 37:19
    98:11 100:8
    101:12
    110:16
    144:23
violent
    183:11
virtue
    124:1 131:14
    163:5
vividly
    122:23 123:4
    172:16
vocational
    14:7,19,23
voice
    131:18
voluminous
    103:3

Sergio Perez
November 15, 2022
46

**W**

**wage**
  158:4
**wages**
  158:22 159:1
  168:24 169:1
**waist**
  62:24
**wait**
  118:19
**waive**
  185:24
**waived**
  186:16
**want**
  10:13 17:10
  21:15,17
  27:14,16,20
  29:25 35:2
  47:18 50:2,
  3,4 58:3
  60:12 68:15,
  18 72:22
  79:5 87:7
  94:17 101:13
  103:8 105:6
  110:11
  125:4,25
  127:22
  133:25
  134:8,13
  137:5 142:10
  143:16
  145:18 152:9
  155:12 156:5
  164:2,8
  169:14
**wanted**
  41:9,19
  57:19 59:5,
  10 61:23
  66:10 106:12
  108:19 112:5
  118:22,25
  126:1 144:21
  147:12

  161:16
  172:18,24
  173:1,4,16
  186:7
**waste**
  120:10
  125:20
**wasting**
  177:18
**watch**
  60:14
**watched**
  60:9,11,16
  61:14,18
**water**
  49:22
**way**
  44:19 49:18
  56:12 67:17
  68:23 84:6
  85:3 92:16
  95:12 99:2
  102:5 105:13
  119:18
  133:2,8,22
  135:17
  152:25
  164:11
  167:22
  179:24
**weapon**
  96:21 144:8
  180:4
**week**
  17:20 18:11
  32:20 35:23
  36:11 49:16
  89:13
  155:17,18,22
  156:2,12,17
  157:2,10
**weeks**
  120:25 151:6
**went**
  22:6 51:25
  82:25 101:19
  104:8,9
  105:25 106:2

  108:7 115:18
  138:10
  170:10
**whatsoever**
  44:21
**wheels**
  133:5
**when's**
  162:24
**whistle**
  137:21
**Whistle-
blower's**
  137:19
**whistleblower**
  99:3 100:16,
  17 101:8,19
  138:13
  139:5,10,17,
  21 140:1
  142:25 143:5
  164:18
**white**
  73:13 179:16
**whoa**
  46:8
**wide**
  79:18
**Wilcox**
  146:1
**Williams**
  37:13,14,15
  38:10
**Wilma**
  146:1
**window**
  35:14
**witness**
  5:3,9 8:11
  72:25 89:7
  114:9 125:6
  158:11
  162:17 163:8
  165:14
  166:11
  186:1,16

**witnesses**
  161:7 166:2
**word**
  19:16 32:18
  34:15 56:13
  93:25 99:2
  127:15
**words**
  33:4 145:17,
  18 179:4,8
  182:5
**wore**
  31:9
**work**
  29:21 53:19,
  22,23,24
  54:4,7,10
  57:14,19
  61:8 80:24
  83:23 89:19,
  23 90:12
  92:11,12,14
  93:16,23
  94:2,9,11,18
  97:7,9 98:25
  104:9 108:9
  119:10,21
  120:4
  136:10,11
  156:1,12,13
  166:4
  167:20,21
  175:22 182:7
**work-related**
  90:14,17
  164:4
**workday**
  182:7
**worked**
  20:14 53:11
  80:25 82:25
  84:19 88:24
  89:25 94:13
  135:7,20
  136:8 155:20
  163:11
  184:20

Sergio Perez
November 15, 2022

47

**working**
37:5 41:18
46:16 57:6,
10 66:19
80:22,23
84:3 88:20
90:8,22
93:6,10
123:18,21
124:13
144:25 185:9
**workplace**
123:15
130:11,14
**works**
102:12 127:5
129:14
**worksheet**
134:10
**worst**
160:3,4
**worth**
157:7
**Wright**
65:23 146:3
**write**
63:25 74:15
179:8
**writes**
149:8,11
**writing**
108:1 109:8
121:25 122:2
148:16
153:25
171:22
**written**
74:13 76:22
138:12
**wrong**
24:4 71:21
106:17 123:2
171:18 172:7
**wrongful**
15:24 16:11
**wrote**
63:23 64:2

74:4,9
171:23 172:1

---

**Y**

**yeah**
10:25 18:22
25:13 35:6
42:4 43:14
45:15 46:9
47:20 92:20
105:14
118:24
128:12
131:6,7
155:4,19
157:4 158:14
171:14
183:12,17
185:14
186:12
**year**
7:25 13:1
17:24 23:8
29:25 30:15,
17,20 33:8
48:13 57:4
80:5,11
88:23 89:1,
3,5,7 105:6,
21 147:5
156:19
169:21
**Year's**
169:20
**years**
13:1 21:15,
16 22:3,9
23:3,24,25
24:2 54:18
66:9 85:1
88:25 89:6,
16 114:24
132:20
133:1,9
144:11
183:12

**yellow**
125:2 179:15
**yesterday**
104:25

---

**Z**

**Zoom**
64:7 108:20
140:25