UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.:  0:22-cv-20748-JAL

SERGIO PEREZ,

      Plaintiff,

vs.

CITY OF OPA-LOCKA and
STEVEN BARREIRA,

      Defendants.

ZOOM DEPOSITION

OF

JOHN PATE

Wednesday - June 14, 2023
1:35 P.M. -  3:10 P.M.
Zoom Videoconference

Stenographically Reported By:

MARSHA C. BRANNON

John Pate
June 14, 2023

Page 2

```
 1
     APPEARANCES:
 2
         ON BEHALF OF THE PLAINTIFF:
 3
             FAIRLAW FIRM
 4           135 San Lorenzo Avenue - Suite 770
             Coral Gables, Florida 33146
 5           brian@fairlawattorney.com
             305-230-4884
 6           BY:  BRIAN H. POLLOCK, ESQ.
 7
         ON BEHALF OF THE DEFENDANTS:
 8
             JOHNSON ANSELMO MURDOCK BURKE
 9           PIPER & HOCHMAN, P.A.
             2455 East Sunrise Boulevard
10           Suite 1000
             Fort Lauderdale, Florida 33304
11           railey@jambg.com
             954-463-0100
12           BY:  JONATHAN H. RAILEY, ESQ.
13
         ON BEHALF OF THE DEPONENT:
14
             REINER & REINER, P.A.
15           9100 South Dadeland Boulevard
             Suite 901
16           Miami, Florida 33156
             dpr@reinerslaw.com
17           305-670-8282
             BY:  DAVID P. REINER, II, ESQ.
18
19
20
21
22
23
24
25
```

Page 3

```
 1              INDEX OF PROCEEDINGS
 2
 3   Deposition of JOHN PATE            Page
     Direct Examination by Mr. Railey     4
 4   Cross Examination by Mr. Pollock    80
     Redirect Examination by Mr. Railey  85
 5
 6
 7
 8                   EXHIBITS
 9
10   DEFENDANT'S              FOR IDENTIFICATION
11   No. 1       texts               10
     No. 2       declaration         18
12   No. 3       9-28-2021 letter    61
13
14
15   (The exhibits were retained by Mr. Railey.)
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1        Deposition taken before Marsha C. Brannon,
 2   Notary Public in and for the State of Florida at
 3   Large in the above cause.
 4                 ---------
 5        THE COURT REPORTER:  Do you swear the
 6   testimony you are about to give will be the truth,
 7   the whole truth, and nothing but the truth?
 8        THE WITNESS:  Yes, I do.
 9   THEREUPON,
10              JOHN PATE
11   having been first duly sworn, was examined and
12   testified as follows:
13             DIRECT EXAMINATION
14   BY MR. RAILEY
15   Q.   Good afternoon, Mr. Pate.
16   A.   Good afternoon.
17   Q.   Good to see you again.
18   A.   Good to see you as well.
19   Q.   Thank you.
20        As you know, along with Chris Stearns we
21   represent the City of Opa-Locka in connection with a
22   lawsuit filed by Sergio Perez.
23        Moving forward, if I say city, will you
24   understand that to mean the City of Opa-Locka?
25   A.   Yes.
```

Page 5

```
 1   Q.   All right.  And I know you've given a
 2   deposition before; correct?
 3   A.   Yes.
 4   Q.   You know the rules, but just so we have it
 5   on the record, please, respond with verbal answers,
 6   no head nods, uh-huhs, stuff like that.  So, it's
 7   important that you verbalize.
 8        Okay?
 9   A.   Yes.
10   Q.   If my question is unclear or you do not
11   understand it, will you, please, let me know?
12   A.   Yes.
13   Q.   If you answer my question, I'm going to
14   assume that you understood it; is that fair?
15   A.   Yes.
16   Q.   I don't think this is going to be overly
17   long, but I do have a series of questions to go
18   through.  If you need to take a break at some point,
19   so long as there is no question pending, just,
20   please, let me know and I'll be more than happy to
21   accommodate that request.
22        Okay?
23   A.   Thank you.
24   Q.   Before we get started, is there any reason
25   why you cannot testify truthfully today?
```

John Pate
June 14, 2023

Page 6

1    A.   No.
2    Q.   In the last 24 hours have you consumed any
3  drugs or alcohol that would inhibit your ability to
4  provide truthful testimony?
5    A.   No.
6    Q.   And I see we've been joined by David
7  Reiner on this screen.  Is he representing you today
8  in connection with this case?
9    A.   Yes.
10   Q.   Okay.  Where are you currently giving this
11 deposition?
12   A.   Chicago, Illinois.
13   Q.   Are you currently employed?
14   A.   No.
15   Q.   When's the last time you've been employed?
16   A.   January of 2022.
17   Q.   Was that with the City of Opa-Locka?
18   A.   Yes.
19   Q.   When did you first begin working for the
20 City of Opa-Locka?
21   A.   October of 2019.
22   Q.   And in what capacity were you hired by the
23 city?
24   A.   City manager.
25   Q.   And at what point did you stop working for

Page 7

1  the city?
2    A.   January 14th -- February 1st of 2022.
3    Q.   And why did you stop working for the city
4  at that time?
5    A.   The city separated my employment not for
6  cause.
7    Q.   As the city manager, did you have final
8  decision making authority regarding all employment
9  decisions pertaining to all employees outside of a
10 few charter positions?
11   A.   Yes.
12   Q.   Did you have final decision making
13 authority with respect to chief of police?
14   A.   Yes.
15   Q.   And what about all of the police officers
16 underneath the chief of police?
17   A.   Final authority, but it's typically
18 intermediary authority, recommendation from the
19 chief of police.
20   Q.   But as city manager you had to be the one
21 to approve or disprove the recommendation; correct?
22   A.   That's correct.
23   Q.   It was also made -- those employment
24 decisions regarding the hiring and firing or
25 promotions, demotions, those decisions ultimately

Page 8

1  rested with you; correct?
2    A.   Correct.
3    Q.   Do you know the Plaintiff in this case
4  Sergio Perez?
5    A.   Yes.
6    Q.   So, if I say Plaintiff, we'll understand
7  that to mean Sergio Perez?
8    A.   Yes.
9    Q.   Are you friends with Mr. Perez?
10   A.   Yes.
11   Q.   Do you socialize with Mr. Perez?
12   A.   No.
13   Q.   Have you ever socialized with Mr. Perez?
14   A.   Only business related gatherings.
15   Q.   When is the last business related
16 gathering that you attended with Mr. Perez?
17   A.   Sometime in 2021.  I don't recall.  It was
18 a police department related gathering.
19   Q.   Have you seen Mr. Perez since your
20 separation from the city in January of 2022?
21   A.   No.
22   Q.   Have you talked to him since?
23   A.   Yes.
24   Q.   When is the last time that you talked to
25 Sergio Perez?

Page 9

1    A.   Maybe a week or so ago.
2    Q.   What did you talk to Sergio Perez a week
3  ago about?
4    A.   Talked about his general life related
5  stuff.  Nothing related to the City of Opa-Locka at
6  all whatsoever.
7    Q.   Have you ever discussed anything related
8  to the City of Opa-Locka with Sergio Perez following
9  your separation from the city?
10   A.   No.
11   Q.   How often do you communicate with Sergio
12 Perez in general?
13   A.   Maybe once a month, once every month
14 and-a-half or so, maybe a couple of times every
15 month and-a-half or so.  Nothing regular at all
16 whatsoever.
17   Q.   Have you ever discussed Sergio Perez's
18 lawsuit against the city?
19   A.   Sergio Perez initially sent me an article,
20 a news article related to litigation filed against
21 the city.  Other than that, that's the only time
22 we've discussed the wrongful action.
23   Q.   Share my screen real quickly.
24        Can you see my screen?
25   A.   Yes.

John Pate
June 14, 2023

Page 10

1     Q.  This is a text message produced in this
2 litigation by Sergio Perez.  Is this the text
3 message communications that you just referred to?
4     A.  Yes.
5           MR. RAILEY:  And I'll go ahead and
6 mark -- it will be two, Composite Exhibit 1, the
7 text messages.
8          (The text messages were marked as
9 Defendant's Composite Exhibit No. 1 for
10 identification.)
11     Q.  Is this you that says great?
12     A.  Yes.
13     Q.  And this was Sergio Perez who sent you the
14 article that reads:  Opa-Locka police sergeant sues
15 city claiming retaliation over department criticism?
16     A.  Correct.
17     Q.  And then you wrote:  I'm proud of you,
18 buddy, you are finally fighting back publically.
19     A.  Correct.
20     Q.  What did you mean by you are finally
21 fighting back publically?
22     A.  Mr. Perez had written and verbalized a
23 series of complaints that he had within the
24 workplace during his tenure and during my tenure as
25 city manager and a lot of those issues I tried to

Page 11

1 resolve internally within my control.  Most times I
2 was not able to resolve those things and I guess
3 this is one of those situations where I guess it
4 didn't result to that.
5     Q.  What complaints and issues are you
6 referring to?
7     A.  So, Mr. Perez has came to me in regards to
8 issues that he had spread.  He may have issues of
9 work.  He may request my counseling.  He may have
10 issues with regards to superiors such as Chief
11 Dodson or somebody or in -- in the -- that will come
12 in my office for review because of course Chief
13 Dodson report to me at the time.
14         So, varying in regards to a lot of day to
15 day matters.  Mr. Railey, I can sit here and we can
16 talk for hours about employee issues, complaints.  I
17 mean, is there anything specific you want to
18 discuss?  I mean, you asked a very broad question.
19     Q.  And that's fair and I'll ask you some more
20 specific questions as we move on --
21     A.  Okay.
22     Q.  -- but I just wanted to know complaints
23 and issues what you were referring to.
24         Let me show you one more series of text
25 messages.  This is a continuation I believe of the

Page 12

1 prior text message I just showed you; correct?
2     A.  Uh-huh.
3     Q.  Is that a yes?
4     A.  Uh-huh.
5     Q.  Is that a yes?
6     A.  Sorry.  I'm sorry.  My apologies.  This
7 video communication of depos is a little bit
8 confusing.  I'm sorry.  Yes.  I'm sorry.
9     Q.  Okay.  No problem.
10         Then there's an article the next day,
11 Thursday March 17th at 2:09 -- I guess maybe later
12 that -- later that night or early the next evening,
13 early the next morning there was an article about
14 appears to be attorney Burnadette Norris-Weeks; is
15 that correct?
16     A.  Based on what I'm reading, it seems like
17 that's something -- Yes.
18     Q.  Did you send that article?
19     A.  I don't recall.
20     Q.  Well, again, that you had wrote?
21     A.  That's my response.  I don't recall if I
22 sent that or not.
23     Q.  Did you ever have any subsequent
24 conversation or recall having any subsequent
25 conversation with Sergio Perez regarding I believe

Page 13

1 this is an article?
2     A.  No.
3     Q.  No.  Okay.
4         Did you do anything to prepare for this
5 deposition?
6     A.  No.
7     Q.  Review any documents?
8     A.  No.
9     Q.  Watch any videos?
10     A.  No.
11     Q.  Have you ever been provided with any
12 transcripts of depositions that have occurred in
13 this case?
14     A.  No.
15     Q.  Have you talked -- have you ever spoken to
16 Sergio Perez about any of the deposition testimony
17 that has been provided in this case?
18     A.  No.
19     Q.  Whether that be from Sergio Perez,
20 himself, or any other witness who's been deposed?
21     A.  No.
22     Q.  There's another attorney on the screen,
23 his name is Brian Pollock.  Do you know Mr. Pollock?
24     A.  No.
25     Q.  Have you ever spoken to him?

John Pate
June 14, 2023

1    A.   Not that I recall.
2    Q.   Have you ever read the complaint filed in
3  federal court that Mr. Perez filed against the city?
4    A.   No.
5    Q.   Are you familiar with any of the
6  allegations that Sergio Perez has raised in his
7  lawsuit against the city?
8    A.   Vaguely based on news article.
9    Q.   What is your understanding vaguely based
10 on news article as to the nature of the allegations
11 raised by Sergio Perez in this lawsuit?
12   A.   I believe Mr. Perez is alleging that he
13 was retaliated for actions he took in regards to
14 reporting financial malfeasance and other actions
15 within the police department under the tenure of
16 Chief Steven Barreira I believe.  Just generalized
17 based on what I had read.
18   Q.   Do you have any specific knowledge as to
19 what Sergio Perez claims he was retaliated for?
20   A.   Not -- not specifically, no.
21        Can you elaborate?
22   Q.   Do you have any specific knowledge as to
23 how Sergio Perez contends how he was retaliated
24 against?
25   A.   No.

1    Q.   Do you have any specific knowledge
2  regarding the nature of any complaint that Sergio
3  Perez contends forms the basis for a retaliation
4  claim?
5    A.   So, there's been multiple complaints that
6  he filed that could have led to retaliation.  I
7  don't know unless you provide any -- something
8  specific, counselor.
9    Q.   What are you referring to when you say --
10   A.   Anytime -- anytime an employee files an
11 complaint, anytime they file any allegation of
12 misconduct, anytime they work in the field of law
13 enforcement and anything occurs within the
14 department, outside the department, a person's
15 subject to retaliation.  So, there's a lot of things
16 somebody can do in the course of a day, the daily
17 work that can result in retaliation.
18        So, again, your question is very broad and
19 general.  There are many instances where complaints
20 could have been filed and retaliation could have
21 occurred.
22   Q.   And I understand what you're saying.  Just
23 so we have a general rule, just -- I know you're
24 probably anticipating my question, but, please, let
25 me finish it because the court reporter can't take

1  down two of us talking at the same time otherwise
2  the transcript will read dash, dash, dash and
3  someone who's reading this later on will have no
4  idea what we were talking about.
5        So, I understand what you're saying.  I'm
6  just asking you generally right now do you have any
7  knowledge as to have what complaint Sergio Perez
8  contends he made that forms the basis for his
9  retaliation claim in this case?
10   A.   No.
11   Q.   Were we not on video normally I would see
12 you in-person and I could see if you had anything in
13 front of you.  So, I have to ask this way:  Do you
14 have anything in front of you relative to Sergio
15 Perez's lawsuit?
16   A.   No.
17   Q.   Anything up on your computer screen or in
18 physical format?
19   A.   No.
20   Q.   Now, your deposition was previously set a
21 couple of times in this case.
22        Do you know that?
23   A.   No.  I was only made aware when you sent
24 me the email directly as my attorney directed you to
25 do.  The other notifications sent to attorney Pizzi

1  never reached me so I apologize.
2    Q.   Understood and I'm not accusing anyone of
3  any wrongdoing here.  I'm just trying to make a
4  timeline as to what -- where we're at now.
5        So, it's now June 14th.  Do you recall
6  appearing for a deposition noticed by Mr. Pollock,
7  Sergio Perez's lawyer, on January 3rd of this year?
8    A.   Yes.
9    Q.   And you appeared, but the deposition
10 didn't go forward.  I believe Mr. Pizzi was not
11 there; is that accurate?
12   A.   Correct.
13   Q.   All right.  Prior to that deposition did
14 you ever have any conversation with Mr. Pollock
15 regarding anything about this case?
16   A.   No, other than afterwards when my attorney
17 reached out to Mr. Pizzi and he said he had a
18 conversation with Mr. Pollock and Mr. Pollock was
19 going to send him over a document to review.  I
20 reviewed it.  There was some changes made and it
21 sent back to Mr. Pollock with my signature on it,
22 but that transaction occurred through Mr. Pizzi.
23   Q.   That leads me to my next series of
24 questions.
25        So, you never actually had a conversation

John Pate
June 14, 2023

Page 18

1  with Mr. Pollock, himself, regarding the execution
2  of that declaration?
3      A.   So, Mr. Pizzi contacted me.  Upon Mr.
4  Pizzi contacting me, he instructed me to contact Mr.
5  Pollock in regards this specific matter only in
6  order to discuss doing a sworn declaration I believe
7  in regards to the matter in order to not subject me
8  to potential deposition because of concerns I guess
9  that Mr. Pizzi had in regards to whatever issues he
10 discussed with you prior or -- whoever he
11 discussed -- Mr. Pollock or whoever he talked to
12 when the deposition was scheduled.
13     Q.   I understand.
14          I'm going to show you a declaration and
15 make sure we're on the same page.  I'll go ahead and
16 mark this as Exhibit 2.
17          (The declaration was marked as Defendant's
18 Exhibit No. 2 for identification.)
19     Q.   Is this the declaration that you're
20 referring to?
21     A.   Yes.
22     Q.   I still don't know if I got an answer to
23 my question.
24          Did you have ever subsequently talk to Mr.
25 Pollock about this declaration after originally

Page 19

1  being set up -- after originally the conversation
2  being set up between Mr. Pizzi and Mr. Pollock?
3      A.   Yes.
4      Q.   You did.  Okay.
5           Was that over the phone or by email?
6      A.   Over the phone.
7      Q.   Now, you said you there were a couple --
8  there was a proposed declaration sent to you by Mr.
9  Pollock; correct?
10     A.   Right, after our conversation.
11     Q.   All right.  And you said you made a couple
12 of changes; right?
13     A.   Right.
14     Q.   I'm going to scroll through this.  You
15 said you don't have anything in front of you right
16 now; correct?
17     A.   No.
18     Q.   So, let's go through this on my computer.
19 I'll scroll down, five page document.
20          Do you recognize this?
21     A.   Yes.
22     Q.   And on page four that's your signature,
23 electronic signature?
24     A.   Correct.
25     Q.   This was the same day that you were

Page 20

1  noticed for deposition; correct?
2      A.   Correct.
3      Q.   And the last page appears to be something
4  with Adobe as to edit and viewing and creations
5  amongst you and Mr. Pollock; correct?
6      A.   Uh-huh.
7      Q.   Is that a yes?
8      A.   Correct.
9      Q.   Okay.  You didn't create this document;
10 correct?
11     A.   No.
12     Q.   Who did?
13     A.   Mr. Pollock.
14     Q.   And you said you made some changes;
15 correct?
16     A.   Right.
17     Q.   What changes did you make?
18     A.   I don't recall.  We were discussing the
19 document over the phone and, as we were discussing
20 the document, we kept reading over various sections
21 of the document.  He didn't reference them as
22 various paragraphs.  We were just discussing the
23 document in general.
24          As he was discussing my recollection, I
25 clarified some things, you know, some wording

Page 21

1  changes, but I don't have a document to track
2  changes on or anything like that.  So, I can't tell
3  you specifically what version was there and what
4  appeared, but I know at the end I signed this
5  document, but I know there was discussion that
6  occurred prior to my signature being placed on the
7  document.
8      Q.   And to be clear, did you -- You said you
9  don't have tracking.  Did you actually physically go
10 into the document and type out anything?  Do you
11 remember that?
12     A.   No.  I didn't physically go in the
13 document and type anything, no.
14     Q.   Okay.  So, let's go over this declaration.
15 I'm going to ask you some pointed questions about
16 some of the paragraphs contained within the
17 declaration.
18          Okay?
19     A.   Okay.
20     Q.   If any point you can't see my screen or
21 you don't know what I'm reading from, please, let me
22 know.
23     A.   Understood.
24     Q.   Paragraph nine reads:  I promoted Sergio
25 Perez from the rank of sergeant to lieutenant in

John Pate
June 14, 2023

1  August of 2020 and then promoted him again from the
2  rank of lieutenant to captain in February of 2021.
3        Did I read that correct?
4     A.   Yes.
5     Q.   As a general matter while you had the
6  position of city manager, what role, if any, did you
7  play as related to the operations of the city's
8  police department?
9     A.   Other than reviewing and managing the
10  daily operation of every department, that's the only
11  kind of feedback kind of participation I had with
12  the department at that time.  So, with all
13  departments, every department has a department head
14  and they have staff and oversee all city operations.
15        So, that was my intent and involvement as
16  far as operations of the police department.
17     Q.   Did you involve yourself in all police
18  related decisions?
19     A.   No.
20     Q.   Did you involve yourself in the majority
21  of police department personnel decisions?
22     A.   No.
23     Q.   Why did you promote Sergio Perez to
24  lieutenant in August of 2020?
25     A.   So, the department went through

1  restructurings.  So, we went through assessment
2  through Miami-Dade County and in that assessment
3  they stated that the department's structure, based
4  on the number of officers and just what the
5  department dealt with generally in day to day
6  matter, required more middle management positions.
7        Those middle management positions were the
8  ranks of lieutenant and captain, which at the time
9  we did not have.  We actually did a hiring process
10  to promote to lieutenant and Mr. Perez was one of I
11  believe four or five have applicants that applied
12  for the position, that was screened by a panel.  So,
13  that did put the position of lieutenant and so that
14  occurred in August of 2020.
15        So, in February of 2021 in preparation of
16  Chief Barreira coming in, we discussed further
17  restructuring the department and the rank of captain
18  and naming some third lieutenant promotions.  So,
19  Chief Barreira was involved in this decision to
20  promote Mr. Perez to captain in February of 2021
21  prior to his state date as chief of police.
22     Q.   Steven Barreira didn't start working for
23  the city until April 16, 2021; correct?
24     A.   That's correct, yeah.  Sergio Perez was
25  promoted to captain shortly before.  So, the date

1  maybe is a typo, a typographical error as far as
2  date or promotion, but I know Mr. Perez was promoted
3  to captain shortly before Chief Barreira came aboard
4  with the city.
5     Q.   Okay.  I'm just asking if Chief Barreira
6  wasn't working for the city, how could he have been
7  involved in the decision to promote or appoint
8  Sergio Perez from lieutenant to captain?
9     A.   So, typically we did an actual search,
10  one, so Chief Barreira was notified his hire of the
11  city -- from the city I believe a month to two
12  months prior to the actual start date.  So, during
13  that time period we did a transition process where
14  Chief Barreira gave weekly briefings with the police
15  department staff prior to him starting.
16        So, Chief Barreira actually had
17  involvement in transiting to the police department
18  at least a month and a-half to two months prior to
19  him coming on.  During that time period, he was
20  involved in decision making process and
21  restructuring the police department and development
22  of the rank structure within the agency based on the
23  recommendation of Miami-Dade County.
24     Q.   Now, the employment decision you made in
25  paragraph nine, specifically in February of 2021,

1  from lieutenant to captain, that's an appointment;
2  correct?
3     A.   So, all employment decisions regardless of
4  if there's appointments, promotions, demotions, they
5  all have my signature on them.  They cannot occur
6  without my execution of the document per the
7  charter, as you may know.
8        So, just because my signature's on the
9  document and just because I executed the document or
10  a personal action form, does not mean that I say
11  made the final decision or even had somebody else
12  being involved in the process such as a panel.
13     Q.   Did Sergio Perez actually take a test in
14  order to become a captain?
15     A.   So, no, nor did he have to take test for
16  lieutenant.
17     Q.   All right.  Did you hire Steven Barreira?
18     A.   Yes.
19     Q.   Did you get along with Steven Barreira
20  while he worked for the city as chief of police?
21     A.   Yes.
22     Q.   Was there ever a time that you did not get
23  along with Steven Barreira?
24     A.   No.
25     Q.   Did you ever disagree with his management

John Pate
June 14, 2023

Page 26

1  style?
2      A.  I disagreed with decisions that he made
3  during the course of daily activities, but I
4  disagree with a lot of the decisions that a lot of
5  my subordinates make.  So, it's just the course of
6  doing business.
7      Q.  Did you ever disagree with any decisions
8  he made specifically pertaining to Sergio Perez?
9      A.  So, there are multiple decisions that he
10 made that I didn't agree with in regards to Sergio
11 Perez, in regards to the manner in which he was
12 treated after Mr. Perez put in writing that Chief
13 Barreira executed a financial document and went
14 above his spending scope, which was under $10,000.
15      So, he signed that agreement which was
16 $50,000, which actually requires city commission
17 approval, is actually beyond my spending.  The
18 document was executed I think -- I believe Mr. Perez
19 put something in writing to me in regards to that
20 and/or it was caught during either a meeting with
21 the commission or the financial emergency board
22 notices a signature on a document the financial
23 approval and they didn't see an ordinance or
24 resolution passed by the commission or document
25 approval with my signature on it when it came up for

Page 27

1  payment.  So, they kicked it back down.
2      So, based on that whole type of fiasco,
3  Chief Barreira started shunning Mr. Perez in regards
4  to doing things such as relocating his office,
5  giving him substandard vehicle, providing him
6  reduced duty assignments based on duties that he had
7  prior, basically diminishing his duties and
8  responsibilities while in office, placing Mr. Perez
9  in a mold infested area while it was infested with
10 mold, relocating his office, various other things as
11 well.
12      Q.  That's a lot.  Let's try to break it down.
13      You said that there were multiple
14 decisions that you disagree with, I'm paraphrasing,
15 with respect to how Steven Barreira treated Sergio
16 Perez and you -- you reference a Lexipol issue, that
17 we'll refer to that as Lexipol.
18      Are there any other issues that we can
19 generalize to make this conversation go a little
20 more efficient and effective?
21      A.  Sure.  Relocating -- moved his office to
22 an area of the station that was infested with mold.
23      Q.  When did he, mean Steven Barreira,
24 relocate Sergio Perez to an area infested with mold?
25      A.  Directly relocate Mr. Perez in an area

Page 28

1  infested in mold.  Mr. Perez had an issue with that
2  direction and actually sent an email to myself and
3  my office in regards to him being -- directly being
4  moved in mold, his office.
5      He was requested to have a meeting with
6  myself and Chief Barreira.  That meeting occurred.
7  Myself, him and Chief Barreira met in the office.
8  We discussed why he wanted him to relocate to an
9  area that was infested in mold.  Chief Barreira put
10 it under the guise that he wanted him to be close to
11 the people that he supervised, had command and
12 control over even though there were no command staff
13 members that were typically over in that area of the
14 building.
15      Somebody with his rank and duties and
16 responsibilities typically are placed in the suite
17 where the chief is, basically the command suite
18 where they have close proximity to one another so
19 they can discuss department issues.  Moving Captain
20 Perez to an area in the station that was isolated
21 from the everybody, actually isolated from
22 department, actually isolated from his own staff.
23      Q.  Did this --
24      A.  On top -- on top of the area having mold.
25      Q.  Did this relocation occur?

Page 29

1      A.  No.  I stopped it.
2      Q.  And do you have any evidence that Steven
3  Barreira wanted to relocate Sergio Perez to this
4  area because of any complaints that Sergio Perez
5  made about the issue of misuse of funds?
6      A.  The issues that Mr. Barreira and Mr. Perez
7  had with one another occurred after that issue
8  occurred.  Anytime before that issue, there was no
9  issue between Chief Barreira and Mr. Perez either in
10 communications from Chief Barreira to me or even
11 communications from Sergeant Perez or Captain Perez
12 to myself prior -- nothing prior to that incident.
13      Q.  Oaky.  So, let's talk about you said that
14 at some point Sergio Perez authored some kind of
15 writing disagreeing with or not approving of -- I'm
16 paraphrasing again -- the -- the execution of the
17 Lexipol agreement; is that correct?
18      A.  Correct.
19      Q.  At what point or when was that?
20      A.  So, counselor, based on my recollection,
21 and of course I don't have my city emails in front
22 or me so I have nothing to reference, I believe
23 Mr. Perez put something in writing to me, either via
24 email or a memo that he generated shortly after the
25 issue occurred.

John Pate
June 14, 2023

Page 30

1    And then there were developing
2  communications that was provided to me after a
3  commission meeting or a financial emergency board
4  meeting in which they brought up the transaction
5  again being submitted.
6    And then I had to get involved once again
7  in regards to why the issue still is occurring with
8  the contract going up for payment approval after
9  I -- after my involvement through Mr. Perez's
10 contacting me.  That's the first time, counselor.
11    The second time is I believe Mr. Perez
12 filed a whistleblower.  I don't recall the date of
13 that, you would have record of that in reference to
14 that, but I believe he filed a whistleblower
15 complaint speaking of the issue with regards to the
16 transaction.
17    THE REPORTER:  If I could just ask,
18 before it slides by me away, Lexipol?
19    MR. POLLOCK:  Lexipol, it's not a
20 medication.  L-E-X-I-P-O-L capital L.
21    Q.  Mr. Pate, are you stating that you believe
22 Chief Barreira retaliated against Sergio Perez for
23 submitting a writing pertaining to the Lexipol
24 agreement?
25    A.  So, what I'm saying is, if you're asking

Page 31

1  me if it's potentially possible that he retaliated,
2  I would say, yes, because the issues that Chief
3  Barreira and Mr. Perez started having occurred after
4  Mr. Perez brought the misuse issue to my attention.
5    At that time, when Chief Barreira
6  requested him to relocate to a different office
7  space, it is at that time some of his terms and
8  conditions of employment starting to be effected
9  such as I think off duty employment, various other
10 duties and responsibilities being diminished.
11    You know, like I said, I don't have the
12 file -- I don't have my emails in front of me.  I
13 don't have my notes in front of me, but, you know,
14 there were issues that occurred, but these issues
15 did not occur prior to the misuse matter happening.
16    Q.  Okay.  Do you have any evidence that
17 Steven Barreira took any retaliatory action against
18 Sergio Perez specifically because Sergio Perez
19 submitted some type if writing pertaining to the
20 Lexipol agreement?
21    A.  No, I didn't conduct any investigation to
22 conclude that, no.
23    Q.  So, you have no evidence to support any
24 link between the Lexipol complaint or writing and
25 any alleged retaliatory action; correct?

Page 32

1    A.  All I can state is time, I can speak on is
2  time.  The issues regarding Chief Barreira and Mr.
3  Perez did not occur until after the reporting of the
4  misuse issue.  That's all I'm saying.
5    Q.  Chief Barreira never told you that he was
6  taking any action against Sergio Perez because of
7  any Lexipol complaint or writing he made; correct?
8    A.  No.
9    Q.  No, that's not correct or Steven Barreira
10 never did?
11    A.  No, Steven Barreira never did.
12    Q.  All right.  Sometimes it comes out weird
13 in the transcript so I have to clarify.
14    And likewise you never heard anyone at the
15 city state Chief Barreira's taking X action against
16 Sergio Perez because Sergio Perez submitted some
17 type of writing pertaining to Lexipol; correct?
18    A.  No.  Other than Sergio Perez, no.
19    Q.  Now, we're going to get back to this
20 declaration.  I'm going to stop sharing the screen
21 for a moment.  We'll go back to it.
22    In September of 2021, did you become aware
23 of an incident involved a taser between Sergio Perez
24 and Michael Steel?
25    A.  Yes.

Page 33

1    Q.  How did you become aware of this incident?
2    A.  Anonymous email that came to me, to my
3  email.
4    Q.  Do you recall when you received that
5  email?
6    A.  I want to say it was a holiday.  It was
7  Sunday and I believe it was Memorial Day, that
8  Sunday was Memorial Day.  That Monday we were out.
9  I was in Chicago.  Yeah.  So, I believe he -- I got
10 the email on a Sunday, either late Sunday or early
11 Monday, and then that's how I was made aware.
12    Q.  Memorial Day is in May.  Are you maybe
13 referring to Labor Day?
14    A.  Labor Day.  Sorry.  Got the holidays mixed
15 up.
16    Q.  Do you have any knowledge as to who sent
17 the anonymous email?
18    A.  No.
19    Q.  Any speculation as who sent it?
20    A.  No.
21    Q.  Did you ever do any investigation as to
22 sent that email?
23    A.  IT Department conducted a trace.  The
24 email came from a email server out of Switzerland
25 that we have no access to so -- and that specific

John Pate
June 14, 2023

Page 34

1  company does not cooperate with outside entities
2  providing user information.  So, no, we were not
3  able to ascertain who sent the email.
4      Q.   Now, what did you come to learn -- we'll
5  call it the taser incident -- about the taser
6  incident?
7      A.   Based in the email, Sergio Perez and
8  Sergeant Steel had a verbal altercation in the squad
9  room area within the agency during an argument.
10 Sergeant Perez pointed a taser at Sergeant Steel and
11 tasered Sergeant Steel with a test cartridge in
12 Sergeant Steel's back in front of his squad, that I
13 was made aware of the incident and I threatened
14 everyone in the squad room area to cover up the
15 incident or everybody would be disciplined or
16 terminated and that, if anybody said anything about
17 it, they have me to deal with.
18      Then it alleges that Steel went to the --
19 got medical treatment and a huge cover up going on
20 with city staff and various other individuals.  This
21 is in general.  I don't have the email in front of
22 me.
23      Q.   You said someone threatened to cover up
24 the incident?
25      A.   Uh-huh.

Page 35

1      Q.   Who said that?
2      A.   Whoever wrote the email said that I
3  threatened to cover up the incident -- I threatened
4  individuals in the squad room at the time of the
5  incident, I threatened everybody in the squad room
6  and told them not to report the incident to
7  somebody.
8      Q.   Is that true?
9      A.   Ironically I was in Chicago at the time so
10 it's not possible that that occurred because I was
11 not in Florida at the time of the incident.
12      Q.   I want to put aside -- just so we're
13 clear, I want to put aside the anonymous email.  I
14 understand that's how you first became aware of the
15 incident.  At some point after receiving -- Let me
16 ask it this way.
17      After receiving the anonymous email, what
18 did you do next in relation to the taser incident?
19      A.   I forwarded the email to Barreira, asked
20 him to ask Internal Affairs to look into matter and
21 see if it's and, if it is, to come back to me and,
22 based on that information, we'll determine what to
23 do further.
24      Q.   Does Chief Barreira respond to you?
25      A.   Yes.  He responded to me and said he spoke

Page 36

1  to Sergeant Steel in regards to the matter.  I
2  clarified to him I asked him did he have Internal
3  Affairs speak to Sergeant Steel or did you,
4  yourself, speak to Sergeant Steel.
5      The reason I asked that questions is, if
6  we're going to open up an investigation, it's
7  prudent that Chief Barreira not really have contact
8  with the individual that's involved in the incident
9  and somebody's that's conducting the investigation
10 in case we have to take their statement or use what
11 they say as part of -- part of the record for the
12 investigation.
13      So, Chief Barreira stated to me that, no,
14 he actually met with Sergeant Steel outside the city
15 on airport property to ask if it occurred.  So, at
16 that point, you know, I had some issues procedurally
17 how you handle it.  At that point I directed him to
18 open up -- have Internal Affairs open up an
19 investigation and consider Captain Perez is the
20 subject of an investigation and to get a full
21 statement from Sergeant Steel.
22      Q.   You said you had some issues procedurally
23 with how Steven Barreira handled I'm assuming the
24 conversation with Steel; is that what you testified
25 to?

Page 37

1      A.   Correct.
2      Q.   Did you discipline Chief Barreira for
3  that?
4      A.   No.
5      So, Chief Barreira is a -- was at the time
6  a new chief of police.  Okay.  He had no experience
7  as a chief law enforcement officer for any agency.
8  So, I felt that maybe to overlook in regards to
9  policy and procedure, maybe never conducted any
10 internal affairs investigation in his career or
11 maybe he didn't knew the city's policies and
12 procedures or departmental policies and procedures
13 in regards to the conducting of an internal
14 investigation.
15      So, me counseling him.  So, I just
16 verbally counseled him and moved on with the day.
17 The issue was conducting an investigation, getting
18 it open and getting the situation neutralized as
19 quickly as possible.
20      Q.   So, you're not sitting here today claiming
21 that anything Sergio -- I'm sorry -- anything Chief
22 Barreira did in speaking to Michael Steel was an
23 intent to -- an intent to prohibit or otherwise
24 alter any type of investigation, you're not --
25 you're not maintaining that he did anything

John Pate
June 14, 2023

Page 38

1  improper; correct?
2              MR. POLLOCK:  Objection to the form.
3          You can answer.
4      A.  So, first I have no idea of the thought
5  process of Chief Barreira at the time when he spoke
6  to Sergeant Steel nor am I aware of his and Sergeant
7  Steel's relationship at the time of them having any
8  meeting.  So, I cannot speculate, counselor, if he
9  was doing this is a way of being malicious or it was
10  an oversight.  I have no idea.  I don't know the
11  intent.
12          I know it's wrong.  I know it's frowned
13  upon.  I -- But I just overlooked it and we keep
14  moving forward with getting the situation resolved.
15      Q.  The reason that I ask that is because in
16  your declaration paragraph 18, it states I directed
17  Steven Barreira to ask Michael Steel if the incident
18  occurred.  Barreira did that; correct?
19      A.  Yeah.
20          No.  When I said direct -- when I -- that
21  states I directed Steven Barreira to ask Michael
22  Steel, that's paraphrase.  That's through somebody,
23  not I asked him to directly ask Michael Steel.
24          So, Chief Barreira is a chief of police.
25  Okay.  Michael Steel is a sergeant.  Right?  And I'm

Page 39

1  having this descriptive thing.  I know you guys
2  can't see what I'm saying, but Chief Barreira's up
3  high, Sergeant Steel's down low and a whole bunch of
4  people in the middle.
5          I don't expect the chief of police to go
6  directly to a sergeant and ask did you get tasered
7  by Captain Perez.  I expect Chief Barreira to
8  delegate the responsibility down to the assistant
9  chief of police.  I'm sure there's another captain
10  there potentially, maybe not, I don't know, but
11  there's other people in-between Steven Barreira.
12          So, that doesn't mean I asked him directly
13  to speak to Michael Steel.  I just means I gave him
14  a directive to do a job.  It's his job to delegate
15  and get it done.
16      Q.  Well, this doesn't read I directed Steven
17  Barreira to delegate him.
18      A.  I'm clarifying the document for you,
19  counselor.
20      Q.  All right.  Understood.
21          The second part of that sentence reads
22  instead Steven Barreira conducted an unauthorized
23  clandestine meeting with Michael Steel?
24      A.  Correct.
25      Q.  Earlier you told me that you don't know

Page 40

1  what Steven Barreira's motive was; it could have
2  just been inexperience or oversight; correct?
3      A.  It's still not authorized.  Regardless of
4  inexperience or oversight it's still not authorized.
5      Q.  What are --
6      A.  Regardless if someone does something
7  unauthorized intentionally or accidentally, it
8  doesn't matter, it's still an unauthorized act.
9      Q.  What does the word clandestine mean you?
10      A.  Secret, outside.
11      Q.  Okay.  You stand by that statement today?
12      A.  Yes, I standard by the statement.  Chief
13  Barreira has a whole office, it's the entire
14  conference room and several areas within the city
15  hall including my conference room, my office and
16  various other offices in HR to meet with Sergeant
17  Steel.  Why would he meet with Sergeant Steel off
18  city property, on county property, on airport
19  property within the city and not his office?
20          So, yeah, I do call that unauthorized.  I
21  do call that clandestine.  I do call that secret.
22      Q.  As we sit here, do you have any evidence
23  that Steven Barreira's decision to meet or actually
24  meeting, itself, with Steel at that property was the
25  result of an improper motive?

Page 41

1      A.  At that time, no.
2      Q.  Subsequently do you now have an opinion
3  that Steven Barreira had an improper motive when he
4  met with Michael Steel that day?
5      A.  Yes.
6      Q.  What leads you to formulate that belief
7  now?
8      A.  So, as time has evolved and I -- and I
9  speak to people outside of this environment, outside
10  of this lawsuit and just speaking on the
11  investigation that was recently released on Michael
12  Steel showing his level of integrity and how he
13  operates, in looking at what I leaned to be him and
14  Chief Barreira's relationship, the closeness of
15  their relationship after the fact, then I can see
16  why they met the way they met.
17          I didn't -- I was not aware that him and
18  Chief Barreira was close or spoke outside of the
19  department or had any communication outside the
20  agency nor was I aware of Chief Barreira having any
21  type of closeness relationship with any staff member
22  other than just being a new chief coming into the
23  City of Opa-Locka.
24      Q.  Now, you stated that you reviewed an
25  investigation that was just released regarding

John Pate
June 14, 2023

1  Michael Steel.
2          Did I understand that correctly?
3      A.   Yeah.  There was a document, a public
4  document out there of the investigation the city
5  conducted on Michael Steel that resulted to his
6  termination and states in that document that there's
7  evidence of Michael Steel retaliating against people
8  that was above him and below him in order to get
9  ahead within the agency, and that based the series
10 of events and the series of complaints that Michael
11 Steel had over a number of years, that retaining the
12 employee would not be advantageous based on level of
13 of liability for the city.  At that point, the city
14 manager, not me, the current city manager terminated
15 Michael Steel for cause.
16     Q.   When did you review this investigation?
17     A.   I believe I saw the document out there
18 somewhere on social media or somewhere on the
19 Internet.  I don't recall exactly where I saw that.
20     Q.   Do you know who posted the document?
21     A.   Don't recall.
22     Q.   Do you recall what social media you saw it
23 on?
24     A.   I don't know.  I just Googled Michael
25 Steel and something appeared or came up.  So, I'm

1  not sure exactly where cause it's awhile back when
2  he was terminated.  It wasn't recently so --
3      Q.   Why did you Google Michael Steel at that
4  particular time?
5      A.   Because I heard he had been terminated.
6      Q.   Who told you he had been terminated?
7      A.   Individuals that contact me that work with
8  the city or previously worked with the city.
9      Q.   What individuals were those?
10     A.   So, for example, our previous acting
11 director that speaks to various staff members he
12 speak to catch-up every now and again and he speaks
13 to me about things that happen in Opa-Locka in the
14 past and asking me about me.  We talk about his
15 family.  We just kind of generally touch base.
16         I believe I saw some things on social
17 media.  I also believe I saw a commission meeting on
18 You Tube that spoke of an investigation and cause me
19 to kind of reference Michael Steel.  I think that
20 was brought by Chief Israel during the commission
21 meeting after he was terminated.
22         I think the chief and Mr. Williams
23 announced his termination and kind of summarized why
24 he was terminated and said investigations conducted.
25 So, I believe that kind of intrigued me to Google

1  Michael Steel.
2      Q.   The city IT director, is that Nelson?
3      A.   Maybe Lupo.  Maybe Nelson.
4      Q.   Now, turning back to the tasar incident.
5  Does a situation like that concern you as city
6  manager?
7      A.   Of course.
8      Q.   Why is that?
9      A.   An officer saying another officer
10 assaulted or battered him is a serious situation, as
11 any employee battery.  Even anything outside the
12 police department where one employed said that
13 another employee one another, those are serious
14 allegations.
15     Q.   Paragraph 16, I instructed Steven Barreira
16 to take no adverse action against Sergio Perez until
17 after the completion of the internal affairs
18 investigation, but Steven Barreira disregarded my
19 instructions and relieved Sergio Perez of duties
20 with pay.
21         What adverse actions do you contend Steven
22 Barreira took against Sergio Perez here?
23     A.   So, when you relief a officer of duty with
24 pay, basically you're stripping them of their police
25 powers.  You're taking their gun away.  You're

1  taking their off duty privileges away.
2          So, the terms of their employment are
3  effected.  They can't work off duty employment.
4  They can't do any extra details.  They can't do any
5  overtime.  They can't have or benefit from driving
6  or the use of a police vehicle to and from home and
7  within the general vicinity of their address and the
8  City of Opa-Locka.
9          So, there's some things that are removed
10 from them, yes.  He keeps his salary as far as base
11 pay, but there's other terms and conditions of
12 employment effected, use of a vehicle and various
13 other things such as that.
14     Q.   As city manager, you had to approve this
15 decision; correct?
16     A.   Not based on police department policy and
17 procedure.  Based on police department policy and
18 procedure the chief of police is the only person
19 that can authorize somebody to be relieved from
20 duty.
21         Now, in an organization where the police
22 department and the chief of police have a boss, you
23 would think that individual will come to his boss
24 and say, hey, Mr. City Manager, I have this employee
25 and I'm going to relieve him of duty with pay, I'm

John Pate
June 14, 2023

Page 46

1  requesting your permission.
2          That did not occur in this instance.
3  Chief Barreira did the action and, after the action
4  was done, then he came back to me and said it was
5  done.  At that point, it was already done, it was
6  already in motion.  So, at that point I spoke with
7  Chief Barreira about that as a second contention in
8  regards to this matter that we kind of missed up.
9  So, it missed up my material in regards to this
10 whole taser kind of matter.
11         One was Michael Steel.  The second one was
12 relieving Perez with pay without my direct
13 authorization and approval because it requires a
14 personnel action form.  I have to sign the form for
15 the transaction to occur, the final transaction, but
16 at that point he already signed documentations
17 within -- internally within the police department
18 and announced to command staff members and other
19 members of the agency that Mr. Perez was relieved
20 from duty with pay.
21     Q.   Couple of follow-up questions.
22         I thought you said that as chief of police
23 he would have the authority to do that because, when
24 I asked you would it be your ultimate decision
25 regarding relieving Sergio Perez with pay, you said,

Page 47

1  no, that rests with the chief of police; correct?
2      A.   So, what I'm saying is within police
3  department -- within their policy, when police
4  department personnel is considered, the word --
5  something the chief of police says a directive, then
6  the staff will assume it's through you with my
7  approval or not.
8          Staff was directed by chief of police to
9  relieve Perez of duty.  Okay?  All documentation in
10 the police department to relieve somebody of duty,
11 it's on chief of police, not signed by me.  Okay?
12 Of course the ultimate decision would be mine, but
13 I'm saying that all the department documentation
14 prepared is prepared and signed by the chief.  Chief
15 Barreira sign this documentation without my
16 authorization.
17     Q.   Did you have to approve this decision or
18 not?
19     A.   Yes.
20     Q.   Okay.  And your testimony today is that
21 Steven Barreira never had a conversation with you
22 regarding this decision until after he advised
23 Sergio Perez that he was going out on leave with
24 pay?
25     A.   Based on my conversation with Chief

Page 48

1  Barreira, yes.
2      Q.   Did you discipline Chief Barreira for
3  taking that action?
4      A.   No.
5      Q.   Why not?
6      A.   Again, new situation, new environment,
7  very stressful situation.  This is a -- a procedural
8  mishap that can be overcome.  At this point, once he
9  made the decision and articulate why he wanted
10 Mr. Perez to be off duty with pay, I disagreed with
11 Chief Barreira's position, but in order to allow him
12 to save face and in order to not show that there's a
13 break in communication between my office and the
14 police department, I allowed it to stand at that
15 time.
16     Q.   You said you disagreed with his position.
17 Did you understand his position?
18     A.   I understood his position based on his
19 objectivity and based on his subjectiveness.  What I
20 stated to him is that this doesn't rise to the
21 occasion where somebody should be sent home without
22 pay especially with the rank of Captain Perez and
23 the rank of Sergeant Steel.
24         Captain Perez and Sergeant Steel can be
25 segregated.  Right?  Captain Perez worked in the

Page 49

1  chief's suite.  Sergeant Steel worked on the street.
2  Captain Perez was not a direct supervisor of
3  Sergeant Steel.  Actually he worked outside of
4  Sergeant Steel's chain of command.
5          So, he had nothing do with directing the
6  terms and conditions of Sergeant Steel's employment,
7  directing Sergeant Steel or having any interactions
8  with Sergeant Steel.  I didn't think it rose to the
9  occasion of being relieved of duty because we were
10 still in discussion, we're still in preliminary kind
11 of thought process of how to move forward.
12         I think Chief Barreira kind of shot the
13 gun quickly and kind of moved forward with this
14 matter.  I think a lot of it had to do with it being
15 Sergio Perez.
16     Q.   You also state that you could have
17 reversed this decision; correct?
18     A.   Yes.  I could reverse the decision.
19     Q.   Why did you not reverse the decision?
20     A.   I didn't want to risk and damage the
21 credibility of Chief Barreira by reversing the
22 decision and looking like I'm undermining his
23 authority.
24     Q.   Well, this according to you was misstep
25 number two; correct?

John Pate
June 14, 2023

Page 50

1     A.   That's correct.
2     Q.   What point, if at all, did you ever
3  discipline Steven Barreira for any missteps?
4     A.   Unless something's egregious, typically
5  anybody gets three strikes, counselor, unless it's
6  something extremely egregious.  This is number two.
7  I don't think we got to number three and, if we did
8  get to number three, I think at that point Chief
9  Barreira resigned from the agency.
10        So, you know, I'm giving him the full
11 opportunity to run an agency and be in full control.
12 I'm trying to assist him and save face.  I think as
13 a leader I think that's something commendable that I
14 did and something that shouldn't be looked at in a
15 way -- in anyway other than trying to be somebody
16 that supports and knowing that people make mistakes.
17    Q.   What was your understanding as to why
18 Sergio Perez was being relieved of duty in September
19 following the taser incident?
20    A.   So, Chief Barreira's understanding was
21 that Sergeant Perez assaulted another officer and he
22 felt like Perez or any officer that's involved in
23 this conduct should be relieved of duty.  He
24 believed it should be a blanket policy for everybody
25 and I don't believe that to be a blanket policy.

Page 51

1        Also there may have been instances where
2  he had employees that were given allegations of
3  misconduct against them and he believed those
4  individuals should be removed.  So, when we compared
5  our notes and we looked at some of his past
6  decisions in the short time in regards to other
7  employee decisions, with other employees have been
8  named and various different things like that, this
9  did not kind of fall in realm and I felt that we
10 were kind of moving too quickly on this based on the
11 decisions he made in the past and based on the
12 circumstances involved in this particular situation.
13    Q.   I think you started that sentence or
14 paragraph with Sergio -- I'm sorry -- with Steven
15 Barreira's understanding.  I asked you what was your
16 understanding, John Pate's understanding as to why
17 Sergio Perez was being relieved of duty?
18    A.   I thought you were asking me my
19 understanding, my understanding what Chief Barreira
20 was saying.
21        Are you asking me what my -- So, can you
22 rephrase that question, counselor?
23    Q.   Sure.
24        Maybe you answered it and I just --
25 you know, make sure we're on the same page, but, you

Page 52

1  know, someone's on top and someone's on bottom of
2  that page and we'll meet in the middle.
3        I want to know what your understanding as
4  city manager was as to why Sergio Perez was being
5  relieved on duty in September of 2021?
6            MR. POLLOCK:  Objection to the form.
7        You can answer.
8     A.   Based on the incident related to Sergeant
9  Steel and the taser matter, he felt like Captain
10 Perez should be relieved of duty and I just
11 provided blanket justification, he should be
12 relieved of duty because he's involved in an
13 incident regarding another officer.  That's what he
14 said.
15        I said the other incidents with other
16 officers involved in other incidents with one
17 another, that would be verbal altercations, officers
18 alleging misconduct against a resident or citizen,
19 you know what, separate the officers.  We don't
20 relieve one and keep one on duty.  We don't do that
21 in all instances.
22        So, his issue was the issue of segregation
23 and also keeping them apart.  Captain Perez was a
24 captain.  Okay?  He worked up top.  Sergeant Steel
25 worked down the bottom.  Again, Captain Perez would

Page 53

1  never have any contact with Sergeant Steel.
2        So, those concerns I felt like were mute,
3  but my understanding that he generally he wanted to
4  relief Captain Perez of duty, of duties and he
5  didn't put it in writing.  There's no justification
6  document that he wrote.  He just did it and then he
7  came and explained it to me.
8     Q.   You said there were other incidents in the
9  department that did not result in an officer being
10 relieved of duty.
11        My question first to you is:  During
12 Steven Barreira's tenure was there any other
13 incident involving one office tasing another
14 officer?
15    A.   Counselor, number one, that question --
16 So, no.  No.  It's a one in a thousand incident.  I
17 don't see how a department of 40 individuals where
18 you see several individuals tasing each other within
19 a short timeframe, but, no.  No.
20    Q.   You would agree it was an unique incident;
21 correct?
22    A.   Yeah, unique.
23    Q.   It's one that raises serious allegations
24 and concerns; correct?
25    A.   Yes.  In inexperience, you get panicky and

John Pate
June 14, 2023

Page 54

1  make quick decisions and not make decisions that are
2  clear and calculated and in the best interest of
3  city.  So, we have to do things with consultation of
4  the city attorney and various other individuals.  We
5  just don't make -- The chief cannot make a
6  unilateral decision without involving the team
7  that's involved.
8      Q.   To be clear, I'm talking about the taser
9  incident, itself.  That is a unique situation;
10 correct?
11     A.   Yes.
12     Q.   You said people don't go around tasing
13 each other and it's a one in a thousand you said?
14     A.   Yes.
15     Q.   Okay.  And I also asked you if that's a
16 serious allegation if true; correct?
17     A.   Yes.
18     Q.   Now, do you have any evidence that -- Let
19 me back up.
20         Do you believe Steven Barreira relieved
21 Sergio Perez of duty following the taser incident in
22 retaliation for any complaint or statement Sergio
23 Perez made as part of his employment?
24     A.   So, counselor, first, after the incident
25 occurred with -- in regard to misuse of funds and

Page 55

1  Mr. Perez put it -- his issues in writing, Chief
2  Barreira on multiple occasions had met with me and
3  stated that he did not want Captain Perez on his
4  command team anymore, that he wanted to replace him,
5  that he no longer trusted him, no longer wanted him
6  around him.
7          I told him that's not something that you
8  just can unilaterally do, it requires progressive
9  discipline and, if you don't believe that he's not
10 performing in an proficient manner, then you do that
11 through evaluations and performance (inaudible) and
12 things like that.
13         So, Chief Barreira felt I guess upset
14 about Captain Perez reporting on him.  So, do I
15 believe that his decision to relieve Captain Perez
16 from duty was hinged on his prior interaction based
17 on issues?  Yes, because anything related to Sergio
18 Perez, Chief Barreira was always laser focused on,
19 very laser focused, anything relating to Captain
20 Perez.
21         Another officer, another individual in the
22 agency, he's not as focused and not really as
23 pressed to be focused on the individual.  Anytime
24 Sergio's name came up for anything, he was always
25 very excited, very agitated and very pressed to

Page 56

1  really involve himself in the affairs of Captain
2  Perez and making sure that he put his full force and
3  effort behind anything related to Captain Perez
4  whether it be an investigation or a personnel action
5  and/or a decision that needed to be made.
6      Q.   Do you have any evidence that Steven
7  Barreira relieved Sergio Perez of duty in
8  retaliation for Sergio Perez objecting or
9  complaining to alleged misuse or waste of city
10 money?
11     A.   Yes, based on his comments to me after the
12 incident.
13     Q.   What comments after the incident did he
14 make?
15     A.   That he didn't trust Captain Perez, that
16 he didn't want Captain Perez around him, he didn't
17 want him in his environment, he did not deserve to
18 be a command staff officer, he didn't deserve to be
19 on his command staff and various other comments he
20 made during various meetings that's he's had with
21 me, in passing, directly, indirectly after that
22 manner.
23         Like I said, counselor, in your previous
24 question, anything related to Sergio Perez, Chief
25 Barreira was always very focused on dealing with the

Page 57

1  manner in very expedient and very strict manner as
2  possible compared to other personnel involved in
3  misconduct related matters or any decision related
4  issues.
5      Q.   When did that conversation between you and
6  Steven Barreira occur?
7      A.   Every other day.  I talked to Chief
8  Barreira everyday.  As his boss, I talk to Chief
9  Barreira on an everyday basis.  And nearly everyday
10 basis he'd bring up Sergio Perez three or four times
11 a week.  So, out of seven days let's say four.
12     Q.   Did Steven Barreira ever bring up
13 specifically as part of those conversations Sergio
14 Perez's alleged complaint about misuse or wasting of
15 money?
16     A.   No.  He stated that he doesn't -- After he
17 reported him, he stated that he no longer trusts
18 Sergio Perez, no longer wants Sergio Perez around
19 him.  He didn't actually directly give a line to the
20 incident.
21         He's a law enforcement professional.  I
22 don't see him telling me due to the misuse incident,
23 I'm going to do X,Y,Z to Sergio Perez.  I don't
24 think he would be around saying that to me, but he
25 had made indirect comments after the incident in

John Pate
June 14, 2023

Page 58

1  regards to Sergio Perez and no longer desiring him
2  to be an employee working for him, being on his
3  command staff or even being around him.
4      Q.   Did Steven Barreira tell you why he didn't
5  want to be around Sergio Perez or why he didn't
6  trust Sergio Perez or anything of that sort?
7      A.   No, but all these issues happened after
8  the misuse matter.  So, I am assuming it's tied to
9  it because he didn't say it was tied to anything
10  else.
11     Q.   My question to you is:  Do you have any
12  evidence to support that assumption?
13     A.   I didn't conduct any investigation to have
14  any evidence.
15     Q.   You didn't conduct what investigation?
16     A.   I didn't conduct any investigation into
17  any of his comments in order to have any evidence to
18  say it's related to the misuse matter.
19          So, you're asking me do I have anything to
20  say it's pointed to the misuse incident?  No, I do
21  not.
22     Q.   Now, I'm not going to talk too much about
23  Michael Steel, but you did reference him earlier in
24  this deposition.  So, I'm going to ask you a couple
25  of follow-up questions.

Page 59

1          What was your working relationship with
2  Michael Steel, if any?
3      A.   He was an employee with the city.
4      Q.   Did you get along with him?
5      A.   He was an employee with city and I get
6  along with all my employees.
7      Q.   Did you ever have any negative
8  interactions with Michael Steel while you both
9  worked for the city?
10     A.   No.
11     Q.   Did you ever have any positive
12  interactions with Michael Steel while working with
13  the city?
14     A.   No.
15     Q.   But you have interactions with Michael
16  Steel; correct?
17     A.   Very neutral.  He was a very neutral
18  individual.  He's not someone I interact with a lot
19  because he's a sergeant.  I'm the city manager and I
20  don't really have any interactions with the
21  employees unless I'm meeting with an employee
22  directly.
23     Q.   Now, you talked earlier and referenced
24  earlier about a alleged whistleblower complaint.
25          You remember that testimony?

Page 60

1      A.   Yes.
2      Q.   Share my screen.
3          MR. RAILEY:  Madam court reporter,
4  did I mark the declaration of John Pate as Exhibit
5  3?
6          THE REPORTER:  Exhibit 2.
7          MR. RAILEY:  Exhibit 2.  That's what
8  I meant, yes.
9      Q.   Mr. Pate, do you recognize this document?
10     A.   Yes.
11     Q.   Was this the whistleblower complaint that
12  you referenced earlier?
13     A.   Yes.
14     Q.   This was authored and signed by a
15  gentleman by the name of James Casey; correct?
16     A.   That's correct.
17     Q.   And it was sent to you in the city
18  manager's office; is that correct?
19     A.   That's correct.
20     Q.   Do you have a specific recollection of
21  receiving this document?
22     A.   Yes.
23     Q.   Do you consider Mr. Perez to be a
24  whistleblower?
25     A.   Yes.

Page 61

1      Q.   Did you ever take any action against Mr.
2  Perez because he submitted this complaint to you?
3      A.   No.
4      Q.   Are you aware of anyone at the city who
5  took any action against Mr. Perez because of this
6  letter?
7      A.   Chief Barreira.
8          (The 9/28/2021 letter was marked as
9  Defendant's Exhibit No. 3 for identification.)
10     Q.   Did you ever provide a copy of this letter
11  to Chief Barreira?
12     A.   No.  That wouldn't be my responsibility to
13  do.
14     Q.   Do you have any knowledge as to whether
15  Chief Barreira has even seen this letter?
16     A.   I would say so.  So, counselor, so the
17  process when documents come in my office, they get
18  routed in two ways.  So, this was one that came in
19  through attorney.  So, typically I would send this
20  over to the city attorney's office.  They would
21  review it.  Either they would provide direct
22  response to the attorney or they tell me what to say
23  or what to respond to the attorney with, and that
24  would have been Burnadette Norris-Weeks.
25          In this particular matter, once it was

John Pate
June 14, 2023

Page 62

1  (inaudible) his file, then the city attorney's
2  office is directed per city statute based ordinance
3  to conduct an informal fact finding in regards to a
4  whistleblower complaint.
5        So, anything in regards to Chief Barreira
6  being questioned, seeing the document, being aware
7  of the document, that is something that falls under
8  the guise of Burnadette Norris-Weeks cause she would
9  be the one to interview the whistleblower, which in
10 this case would be Captain Perez.
11       In the case of Chief Barreira being the
12 subject of the complaint, I would assume that the
13 city attorney would question him in regards to what
14 occurred in order to provide some type of direction
15 to the three person panel that has to be appointed.
16 Q.   Let me get back to my original question
17 and I appreciate that explanation, but my question
18 was very direct.  It was:  Mr. Pate, do you have any
19 knowledge or evidence that Steven Barreira has seen
20 this document before?
21 A.   I have not shown him the document, but
22 that does not mean he's now been shown this
23 document.
24 Q.   Do you have any evidence that anyone has
25 ever shown Steven Barreira this document?

Page 63

1  A.   No.
2  Q.   Do you have any knowledge that Steven
3  Barreira has any knowledge of this document
4  whatsoever?
5  A.   I have no idea.
6  Q.   Okay.  Now, what action -- You stated
7  earlier that you nonetheless believe Steven Barreira
8  took action against Sergio Perez in connection with
9  Exhibit 3.
10       What action do you contend Steven Barreira
11 took against to Sergio Perez in connection with this
12 September 28, 2021 letter?
13 A.   Okay.  So, again, I have expressed
14 numerous times that Mr. Perez has came to me in
15 regards to an issue related to Chief Barreira.  I
16 even spoke a couple of meetings we had in regards
17 to the matters that Captain Perez brought up with
18 Chief Barreira in the office.
19       So, there is situations in which, again,
20 Captain Perez has been relieved from duty,
21 (inaudible) his off duty employment has been
22 effected, his reputation has been effected based on
23 being relieved from duty, various different ways, as
24 well as the use of a vehicle is a ramification of a
25 decision that Chief Barreira made.

Page 64

1        So, at this point I believe, because of
2  Mr. Perez's previous complaint regarding some issues
3  and various other complaints that he's made to me
4  verbally and in writing in the past to me and Chief
5  Barreira does have some type of play or factor in
6  his whistleblower complaint being factual.
7  Q.   Okay.  Did Steven Barreira ever discuss
8  that September 28, 2021 letter with you?
9  A.   No.
10 Q.   You said you believe Steven Barreira took
11 action against Sergio Perez for various complaints.
12       Do you again have any evidence
13 specifically that Steven Barreira took any action
14 against Sergio Perez specifically because Sergio
15 Perez or his lawyer authored that September 28, 2021
16 letter?
17 A.   Nothing directly.
18 Q.   You stated that you forwarded Exhibit 3 to
19 Burnadette Norris-Weeks; correct?
20 A.   Correct.
21 Q.   Do you have any knowledge or recollection
22 of forwarding the document to anybody else?
23 A.   Not that I know of.
24 Q.   Paragraph 21, City of Opa-Locka did not
25 thereafter follow the applicable ordinance Chapter

Page 65

1  23 upon receipt of the letter dated September 28,
2  2021.
3        Did I read that correctly?
4  A.   Yes.
5  Q.   You alluded to the fact earlier that
6  Burnadette Norris-Weeks actually interviewed Sergio
7  Perez in connection with this letter; correct?
8  A.   That's correct.
9  Q.   How do you contend in paragraph 21 that
10 the city did not follow Chapter 23 upon receipt of
11 the letter?
12 A.   So, Chapter 23 the city attorney has to do
13 a informal investigation.  It has to be done in
14 writing.  I don't remember that Ms. Weeks sent me
15 anything in writing in regards to be complaint and I
16 don't believe the three panel was called until I
17 believe Mr. Perez's attorney sent another email
18 reminding us that we haven't either interviewed
19 Mr. Perez or we haven't done something in regards to
20 the ordinance.
21       So, there's some time period issues in
22 regards to when something was done, if a three panel
23 was held, if the three panel was held.  There's
24 other actions in regards to Captain Perez.
25 Q.   So, summarizing are you contending here as

John Pate
June 14, 2023

Page 66

```
1   part of paragraph 21 that the city failed to comply
2   with its ordinance?
3       A.   That's correct.
4       Q.   As city manager, it was your role to
5   ensure that the city comply with the ordinance;
6   correct?
7       A.   No.  It was my role along with the city
8   attorney.  We both have rules, responsibilities with
9   regards to due process.  So, I get the complaint.
10  The city attorney does the informal investigation.
11  That informal investigation is sent to me in
12  writing.
13           At that point, myself and the city
14  attorney confer and we discuss a three panel.  The
15  city attorney will look over names with me in
16  regards to a three panel and ultimately I assign a
17  three panel, one panel member being director, one
18  being employee outside the individual's department
19  and one being a resident, but there's parts of the
20  process that other people are involved in other than
21  myself.
22      Q.   Did Sergio Perez ever get to a panel?
23      A.   I don't -- I don't recall.
24      Q.   But it would be part of your
25  responsibility to ensure that he would get to a
```

Page 67

```
1   panel; correct?
2       A.   Yeah, if I received the informal
3   investigation in a timely manner from the city
4   attorney.
5       Q.   And it's your contention you did not
6   receive any type of timely investigation from the
7   city attorney; is that correct?
8       A.   That is correct, no timely interview with
9   Mr. Perez and I believe no timely submittal of a
10  informal investigation finding or resulting in order
11  for me to call a three panel to provide information
12  and conduct their inquiry.
13      Q.   Did you ever raise this issue with the
14  city attorney?
15      A.   Of course.  Verbally of course.  I always
16  raise those issues with the city attorney.
17      Q.   When did you raise the issue specifically
18  to Sergio Perez pertaining to this issue?
19      A.   Multiple occasions.  Every week we talk,
20  every other -- three or four times a week we
21  discussed employee personnel matters on a constant
22  basis.  So, Mr. Perez's matter has been heard
23  probably on several occasions.  I believe she said
24  she gave it to her associate, who is Candace Cobb,
25  to work on and that's the last I heard of it.
```

Page 68

```
1            I believe, again, Mr. Perez's attorney had
2   to send a reminder email to me in regards to the
3   interview not being completed and I believe I
4   contacted the city attorney asked her if the
5   interview had been completed on Mr. Perez.  She said
6   no, and then at that point she moved on conducting a
7   interview.
8       Q.   Paragraph 24, I received a call from
9   Commission Audry Dominguez, that should probably say
10  Commissioner; correct?
11      A.   That's correct.
12      Q.   The day that Sergio Perez as charged with
13  misdemeanor battery.
14           Where were you when you received this
15  call?
16      A.   I believe I was on my way to the city
17  hall.  I believe -- I'm pretty sure I was in the
18  city hall parking lot on my cell phone and I had it
19  was myself, Ms. Dominguez and Chief Jackson on the
20  phone on a three-way.
21      Q.   Do you recall when this conversation
22  occurred?
23      A.   The day he was charged.  I don't know the
24  exact date, but it was whatever day he was charged
25  with the misdemeanor in regards to the incident
```

Page 69

```
1   related to the taser.
2       Q.   Do you recall it being sometime early
3   2022?
4       A.   Yeah, January, February timeframe.  Yeah.
5   January -- Yeah, January.  Yeah.  January 14th to be
6   exact.
7       Q.   How long was the call?
8       A.   25, maybe 30 minutes.  Maybe longer.
9       Q.   During that call, paragraph 25, Audry
10  Dominguez demanded that I fire Sergio Perez and
11  threatened to fire me and then fire Chief Jackson.
12           As a threshold issue, Audry Dominguez
13  cannot personally fire you; correct?
14      A.   No.
15      Q.   You knew that.  As city manager, your
16  employment was subject to majority vote of the city
17  commission; correct?
18      A.   Yes, but to be initiated by Commission
19  Dominguez.
20      Q.   Now, did she tell you why she wanted to
21  get Perez fired?
22      A.   She said -- Well, first, prior to his
23  being charged she stated that she had issues with
24  him being on the police department, residents had
25  complained about him, that she personally doesn't
```

John Pate
June 14, 2023

Page 70

1  like him and she doesn't agree with him holding a
2  role such as a captain within the police department.
3  So, that's prior to him being charged.
4           Then she said, upon him being charged,
5  that this is the final straw and that you fire him
6  today, he needs to go now, if you're not going to
7  it, I'll bring somebody else in to do it, I'll get
8  with other commissioners and I'll call a special
9  meeting to fire and then, once you're fired, I'll
10 fire Chief Jackson and I'll bring somebody in that's
11 going to fire Captain Perez.
12          That's exactly what she stated.
13    Q.   Did Commission Dominguez ever tell you to
14 take any action against Sergio Perez because of any
15 claimed whistleblower activity he engaged in?
16    A.   No.
17    Q.   Did Commissioner Dominguez ever tell you
18 to take any action against Sergio Perez in
19 retaliation for alleging any other type of complaint
20 in the workplace?
21    A.   No.
22    Q.   Ultimately you demoted Sergio Perez from
23 captain to sergeant; correct?
24    A.   That's correct.
25    Q.   Did you demote Sergio Perez in retaliation

Page 71

1  for any whistleblower activity?
2    A.   I demoted Sergio Perez cause I was
3  directed to do something to him or that I was going
4  to be fired and that Chief Jackson was going to be
5  demoted.  So, in compromise, instead of firing
6  Captain Perez, myself and Chief Jackson made the
7  decision to demote Captain Perez to sergeant to try
8  to suppress the issues that Commission Dominguez and
9  other commissioners had brought up in regards to
10 Captain Perez, but unfortunately that failed because
11 subsequently on January 14th I was terminated
12 anyway.
13    Q.   Okay.  It was your decision, right, as
14 city manager, whether to demote Sergio Perez from
15 captain to sergeant; correct?
16    A.   I was compelled in my role as city manager
17 based on threats of termination of myself and my
18 chief of police to demote Captain Perez to sergeant.
19    Q.   And did you demote Sergio Perez or engage
20 in any -- in any type of alleged whistleblower
21 activity or for levying any type of alleged
22 complaints in the workplace?
23    A.   Not specifically, no.
24    Q.   Generally did you?
25    A.   So, generally the commissioners had

Page 72

1  brought up issues with Sergio Perez that branched a
2  gap of potentially going into whistleblower related
3  activity based on complaints that he that he's made
4  in the past, based on the complaint he made towards
5  Chief Barreira.
6           Chief Barreira went to commissioners and
7  stated commissioners what Captain Perez did.  So,
8  commissioners called me in regards to their
9  displeasure with Captain Perez in regards to how
10 they treated -- how he treated Chief Barreira in
11 regards to (inaudible), in regards to the issue.
12          So, based on that and just based on just
13 general complaints that Captain Perez brought up in
14 the past, commissioners were very eager for
15 something to happen to Captain Perez.  You know, I
16 always try my best to be resistent and I'll do
17 anything as it pertains to employees in regards to
18 pressure with elected officials.
19          Well, in this situation, myself and Chief
20 Jackson kind of (inaudible) to that pressure and,
21 like I said, in compromise with Commissioner
22 Dominguez's demand for him to be fired immediately,
23 even after we told him we were doing due process, we
24 demoted him to sergeant.
25    Q.   In January of 2022, isn't it true that

Page 73

1  Commissioner Dominguez and no other commissioner
2  ever told you or pressured you to terminate or
3  demote Sergio Perez because of any claimed
4  whistleblower activity or complaint in the
5  workplace; fair?
6    A.   No.
7    Q.   Why is that not fair?
8    A.   Again, I just went through this whole maze
9  of long paragraphs and statements stating to you
10 that Sergio Perez has made complaints in regards to
11 Chief Barreira that range in the area of protected
12 activity in that Chief Barreira told commissioner
13 what occurred and commissioners came to me demanding
14 I do something to Captain Perez.
15          I resisted doing it for a very long time
16 until it came to a point when he was charged with a
17 misdemeanor and Ms. Dominguez made a call to myself
18 in which I made a call to Chief Jackson on a
19 three-way in which she demanded his termination and
20 that was the demands of the majority of the
21 commission.
22          So, based on what we just -- just based on
23 deductive reasoning, if the majority of the
24 commission wants an individual fired and they're
25 willing to fire me anyway and fire the chief if we

John Pate
June 14, 2023

Page 74

1  don't do it, graphically we just tried to kind of
2  suppress the issue and deal with it in the best way
3  possible, but, yes, due to pressure, based on
4  protected activity, that's my belief.
5      Q.   Your belief.
6           My question is very direct:  Did anyone
7  ever tell you to fire or demote Sergio Perez because
8  of protected activity?
9      A.   They didn't -- They're never going to tell
10  me to fire him because of protected activity.
11  Nobody's going to say fire an individual because
12  they involve themselves in protected activity.  So,
13  yeah, fire them.  Nobody's going to directly say
14  that.  So, no, that never was stated.
15      Q.   Now, you've used the word pressure a
16  couple of times with respect to commissioners.  Did
17  you ever file a complaint with the city, the OIG,
18  the County Ethics Board, anyone like that pertaining
19  to this pressure?
20      A.   Yes.
21      Q.   When?
22      A.   Several times, counselor.  You guys have
23  access to all my emails and documentation.
24      Q.   Outside of this declaration that I've
25  marked as Exhibit 2 have you executed any other

Page 75

1  declaration for Sergio Perez?
2      A.   Not that I recall.
3      Q.   Have you been asked by Sergio Perez or Mr.
4  Pollock to assist in any other way in this lawsuit?
5      A.   No.
6      Q.   Have you been asked to testify at trial,
7  if this case goes to a trial?
8      A.   No.
9      Q.   Do you intend to testify on Mr. Perez's
10  behalf should this case proceed to a trial?
11      A.   If subpoenaed, I testify based on whoever
12  sends me a subpoena.
13      Q.   Okay.  So, as you sit here today you don't
14  intent to voluntarily attend trial; correct?
15      A.   No.
16      Q.   Sorry.  No, that's not correct or, no, you
17  don't plan --
18      A.   No, I don't intend to voluntarily
19  participate as I didn't voluntarily want to be here
20  today so, no.
21      Q.   I appreciate your time.  I don't have much
22  longer.  I do have some more questions.  I think we
23  can probably take a break.  We've been going for an
24  hour and-a-half.  Let me --
25      A.   Let's go.  Counselor, unless somebody has

Page 76

1  to go to the bathroom, let's keep going.
2           MR. RAILEY:  Let's go off the record.
3           (Discussion off the record.)
4           (Thereupon, a short recess was taken.)
5      Q.   In 2021, Mr. Pate, did you participate in
6  the city's police department purchase of a K9?
7      A.   Yes.  Participate?  I thought I had to
8  authorize it, yeah.
9      Q.   Okay.  What was the extent of your
10  participation?
11      A.   It was requested.  I authorized the
12  purchase.  The purchase was authorized.  We
13  purchased I believe two.
14      Q.   Who requested the purchase of a K9?
15      A.   Captain Perez.
16      Q.   Where was the K9 purchased from?
17      A.   I don't recall, counselor.  I have to look
18  at the invoice.  I don't recall the exact company
19  that they were purchased from.
20      Q.   Did you drive and go pickup the K9?
21      A.   Yeah, one of them.  Yes.  I rode with him
22  to pick up one of them.
23      Q.   Who did you ride with?
24      A.   I believe I rode in the vehicle with
25  Captain Perez and Assistant Chief Jenkins.

Page 77

1      Q.   Did you tell Steven Barreira that the
2  department was purchasing a K9?
3      A.   No, I didn't tell him anything.  He was
4  advised and we asked him.  He was asked and he was
5  involved in the purchase of the K9.  He wasn't told
6  anything.
7      Q.   Okay.  What did he say, if anything, when
8  you advised him of the purchase?
9      A.   Again, you're saying I advised him of the
10  purchase.  What I'm saying is he was involved in the
11  purchase, purchasing process.  So, when you say I'm
12  advising him of the purchase, the purchase comes
13  from the police department to me, not from me to the
14  police department.
15      Q.   Okay.  What was the extent of -- to your
16  knowledge, of Steven Barreira's involvement in the
17  purchase of the K9?
18      A.   I believe they had staff meetings and he
19  was involve in the decision and purchasing the K9
20  and development of policy in regards to the K9.
21      Q.   At the time the K9 was purchased, was
22  there a K9 policy already in place at the city's
23  police department?
24      A.   Yes.  The city had a K9 in the past.
25      Q.   Do you believe the policy was sufficient?

John Pate
June 14, 2023

Page 78

1    A.   I don't have the policy in front of me.  I
2  haven't read it in a very long time, but what I can
3  tell you is the police department had a K9 in the
4  past.  So, the city had an existing K9 policy, but a
5  lot of the city's policies were outdated in the
6  police department.  So, I don't know if it was
7  sufficient or not.
8    Q.   Okay.  Fair enough.
9         As you sit here today, you don't know
10  whether the policy was sufficient or whether it
11  needed to be updated in anyway; correct?
12    A.   No.
13    Q.   No, it's not correct or, no, you don't
14  know?
15    A.   No, that's correct.  That's the chief of
16  police's responsibility to ensure the policy's
17  updated.  It's not mine.
18    Q.   Okay.  During your time as city manager at
19  the City of Opa-Locka were you aware or did you
20  become aware of any other captain, lieutenant or
21  member of the command staff who was charged with a
22  crime relative to conduct directed toward another
23  member of the command staff?
24    A.   Statistically impossible.  This one here
25  is in in the shot situation.  It wouldn't be a lot

Page 79

1  of instances where you have a situation like it.
2  So, no.  No.  It's a one in a lifetime situation.
3    Q.   If called to testify at trial, are you
4  going to testify regarding anything else that we
5  have not discussed today?
6         MR. POLLOCK:  Objection to form.
7         You can answer.
8    A.   No to my knowledge.  I don't know what I'm
9  going t be asked.
10    Q.   And if called to trial your going to
11  testify beyond anybody contained in the declaration
12  that we marked as Exhibit 2?
13         MR. POLLOCK:  Objection to form.
14         You can answer.
15    A.   Again, not to my knowledge.  I do not know
16  what I'm going to be asked, counselor.
17    Q.   Is there anything that we haven't
18  discussed today that you believe would be relevant
19  to Sergio Perez's claims or lawsuit against the
20  city?
21         MR. POLLOCK:  Objection to form.
22         You can answer.
23    A.   Not in my recollection currently.
24    Q.   And I appreciate the time.  I'm sure we'll
25  be seeing each other a little more down the road.

Page 80

1    A.   Oh, lord, I hope not.
2    Q.   We'll go through Mr. Reiner this time now
3  that we know that he's here on your behalf --
4    A.   Yes.
5    Q.   -- and we'll coordinate that way, but
6  there are probably three -- three to five more
7  lawsuits that have been filed where your name has
8  come up as a witness so we're going to have to take
9  your deposition.
10         So, I appreciate the time today.  I hope I
11  was not too long.  About an hour and-a-half, but --
12    A.   No.  Listen, I guess I'll see you four or
13  five more times.
14    Q.   Me or Mr. Stearns.  He might be the one
15  asking you questions.  We share the work so --
16         Anyway, I appreciate it.  I don't have any
17  further questions.  I'm not sure if Mr. Pollock
18  does.
19         MR. POLLOCK:  I just have a couple.
20              CROSS EXAMINATION
21  BY MR. POLLOCK
22    Q.   Mr. Pate, I have a couple questions for
23  you.  I'll be brief cause I know your attorney has a
24  hearing in a little bit.
25         I'll start off with this:  Did you draw

Page 81

1  your conclusions about the motivation behind Mr.
2  Barreira's actions based on the change in his
3  attitude and the change in his treatment of Sergio
4  Perez that you observed after Sergio started
5  complaining about financial irregularities in the
6  police department?
7         MR. RAILEY:  Object to form.
8    A.   Yes.
9    Q.   And then after you received the anonymous
10  email and forwarded it to Chief Barreira in early
11  September of 2021, did you believe it to be
12  inappropriate for Mr. Barreira to conduct his own
13  investigation before submitting the complaint for
14  investigation by the internal affairs department?
15         MR. RAILEY:  Object to the form.
16    A.   Yes.
17    Q.   Okay.  And then Mr. Railey asked you about
18  why you ultimately signed off on the decision to
19  relieve Sergio Perez of duty.  As part of your
20  concerns, did you believe that it would have been
21  detrimental to the moral in a police department that
22  had historical difficulty with its leadership to go
23  against a decision that had already been made without
24  your input?
25         MR. RAILEY:  Object to form.

John Pate
June 14, 2023

Page 82

1    A.   That is correct, counselor.
2    Q.   Okay.  And as far as the policies and
3  procedures in the police department in Opa-Locka, is
4  it your understanding that those policies and
5  procedures are implemented to address generalized
6  conduct and not every specific instance that comes
7  up?
8    A.   That's correct.
9    Q.   And I think you talked about this before,
10 but as far as your experience, do you have
11 experience as a law enforcement office, a sworn law
12 enforcement officer?
13   A.   Yes.
14   Q.   Okay.  And for how many years were you a
15 sworn law enforcement officer?
16   A.   About 15.
17   Q.   Did you hold any -- any -- any appointed
18 ranks above being a sworn law enforcement officer?
19   A.   Yes.  I held the rank of senior
20 investigator.  I held the rank of inspector.  I held
21 the rank of commander.  I held the rank of deputy
22 chief and I've held the rank of chief of police as
23 well as held the rank of director of public safety.
24   Q.   And based on your experience would you
25 expect someone like Chief Barreira to outright tell

Page 83

1  you his reasoning for actions that you believe to be
2  retaliatory?
3        In order words, would you expect
4  Mr. Barreira to come out and tell you that either
5  orally or in writing that he's, in fact, retaliating
6  against Sergio because of X or Y?
7        MR. RAILEY:  Object to the form.
8    A.   So, Mr. Pollock, I will tell you the
9  answer to the question is yes and there's two
10 reasoning behind it.
11       First, he's -- he's a seasoned law
12 enforcement professional.  He's retired from a lot
13 of county law enforcement agency as a command staff
14 member.  So, he's been doing this a long time.  He's
15 not going to directly tell me, hey, I'm going to go
16 ahead and violate this individual's whistleblower
17 rights, hey, I'm going to retaliate against this
18 individual.
19       Also, Chief Barreira is aware of my
20 background being a previous chief and used to do
21 internal affairs work and misconduct.  So, when he
22 kind of deal with me, he deals with me in a
23 conscious way because he knows my background and
24 experience.
25       So, he's not going to tell me exactly

Page 84

1  what's on his mind because he's fearful of my
2  responsibility.
3    Q.   And I don't know whether this was a
4  misspeak or what, but I asked you whether you
5  expected Mr. Barreira to tell you directly.  Your
6  answer was yes.
7        Do you mean that, you do not -- you did
8  not --
9    A.   No.  No.  No, I did not expect him to tell
10 me directly.
11   Q.   Okay.  I didn't want that to be taken out
12 of context.
13       The same thing for Commissioner Dominguez.
14 Would you have expected her or any of the other
15 commissioner to outright tell you that the reason
16 why they were calling for Sergio Perez's termination
17 in January of 2022 was because of the complaints
18 that he had made about irregularities at the police
19 department?
20       MR. RAILEY:  Object to the form.
21   A.   No, they would not directly tell me that.
22   Q.   Okay.
23       MR. POLLOCK:  That's all I have.
24       MR. RAILEY:  I have two follow-ups.
25 Sorry, David, I'll get you out of here though.

Page 85

1             REDIRECT EXAMINATION
2  BY MR. RAILEY:
3    Q.   Mr. Pate, you were asked a question, I'm
4  paraphrasing, but do you believe that it was
5  inappropriate for Chief Barreira to conduct an
6  "investigation" when Chief Barreira spoke to Michael
7  Steel at the airport parking lot.
8        Do you remember that question?
9    A.   Yes, that's correct.
10   Q.   And you answered yes.
11       My question to you is:  What makes you
12 believe -- Let me ask you this first question.
13       How do you define in your police
14 experience an investigation?
15   A.   So, anytime that you are taking somebody
16 off grounds, right, in a way to conceal a discussion
17 and that discussion leads to furthering of
18 information that confer they're into a potential
19 disciplinary or criminal investigatory issue.  So,
20 that's my definition.  Okay?
21       So, when Chief Barreira went off grounds
22 with Steel and he started questioning Steel in
23 regards to the incident, I think he crossed bounds
24 because, at the end of the day, he has to adjudicate
25 the case.  Right?  So, if he's talking to the star

Page 86

1    witness of an investigation and he's already getting
2    a preview of what the investigate's going to hold,
3    how is he going to be impartial when he's trying to
4    adjudicate discipline at the end?
5            So, that's why you have an intermediary,
6    why you have internal affairs investigate it, take a
7    sworn statement.  That's what I requested for Chief
8    Barreira to get a statement from Steel, not for him
9    to do it, but for an internal affairs standpoint to
10   do it.
11       Q.  Okay.  I'm just trying to understand then
12   what facts or evidence do you have that -- outside
13   of the fact that they met outside of city limits,
14   what facts do you have that Steven Barreira actually
15   conducted an investigation, as you define that term?
16       A.  So, Steven Barreira questioned Steel to
17   look into an incident related to Perez.  That's an
18   investigation in my opinion.
19       Q.  Okay.  Did Steven Barreira tell you
20   specifically what questions he asked of Michael
21   Steel?
22       A.  He stated he had a long and detailed
23   conversation with Steel in regards to Captain Perez.
24   I asked him did he verify that he was tased.  He
25   said, yes, he was tased.  I said beyond that do you

Page 87

1    have any other information provided.  He said they
2    had a lengthy conversation and not giving me details
3    nor do I want to know any details because at that
4    point an investigation has been initiated.
5            So, I don't want to know any further
6    details because internal affairs investigation --
7    investigator maybe -- may need to get Chief
8    Barreira's statement.  So, I don't know.
9            So beyond that that I didn't ask him for
10   any further details, didn't confirm that the
11   incident actually happened.
12       Q.  You wouldn't be a witness to that case;
13   correct?
14       A.  No.
15       Q.  You would or you wouldn't be?
16       A.  No, I wouldn't be.
17       Q.  Okay.  So, why wouldn't you want to get
18   more information as to what Barreira spoke about
19   with Steel in that parking lot?
20       A.  Because Chief Barreira could be a witness
21   to the case and I don't know any new information
22   that may lead to any issues that -- of any alleged
23   misconduct that Chief Barreira may have participated
24   in.
25            So, Chief Barreira has rights based upon

Page 88

1    Florida statute.  So, I don't want to get into any
2    questioning where, number one, there's a issue
3    between me and Steel outside the station on the
4    airport property.  So, that's a issue about -- that
5    that -- that, you know, strike two.  Right?
6            So, secondly, you know, I don't want to
7    put Chief Barreira -- I don't want to put Chief
8    Barreira in a situation where he says something to
9    potentially incriminate himself.
10           MR. RAILEY:  I don't have anything
11   further.
12           Brian?
13           MR. POLLOCK:  No.  I'm good.  Read or
14   waive?
15           MR. RAILEY:  David, do you want to
16   make that call or want me to give instruction to Mr.
17   Pate?
18           MR. REINER:  Yeah.  Jon, we'll go
19   ahead and waive.
20           THE REPORTER:  Transcribed, Jonathan?
21           MR. RAILEY:  Yes, please.
22           THE REPORTER:  Copy, Brian?
23           MR. POLLOCK:  Yes.
24           (Thereupon, the deposition was concluded
25   at 3:10 P.M.)

Page 89

1                 CERTIFICATE OF OATH
2
3    STATE OF FLORIDA
     COUNTY OF BROWARD
4
5
6            I, Marsha C. Brannon, Notary Public, State
7    of Florida, certify that John Pate personally
8    appeared before me on June 14, 2023 and was duly
9    sworn.
10           Signed this 17th day of June, 2023.
11
12
13           Marsha C. Brannon, FPR
             Notary Public, State of Florida
14           Commission No.: FF 051406
             Commission Expires: 11-13-2025
15
16
17
18
19
20
21
22
23
24
25

John Pate
June 14, 2023

Page 90

```
 1                    CERTIFICATE
 2    THE STATE OF FLORIDA
 3    COUNTY OF BROWARD
 4
 5           I, MARSHA C. BRANNON, certify that I
 6    was authorized to and did stenographically report
 7    the deposition of John Pate; pages 1 to and
 8    including 90; that a review of the transcript was
 9    not requested; and that the transcript is a true
10    record of my stenographic notes.
11           I hereby certify that I am not a
12    relative, attorney or counsel of any of the parties,
13    nor am I a relative or employee of any of the
14    parties' attorneys or counsel connected with the
15    action, nor am I financially interested in the
16    action.
17           Dated this 17th day of June, 2023.
18
19
20           Marsha C. Brannon, FPR
             Court Reporter, State of Florida
21
22
23
24
25
```

John Pate
June 14, 2023

**$**

**$10,000**
  26:14
**$50,000**
  26:16

**1**

**1**
  10:6,9
**14th**
  7:2 17:5
  69:5 71:11
**15**
  82:16
**16**
  23:23 44:15
**17th**
  12:11
**18**
  38:16
**1st**
  7:2

**2**

**2**
  18:16,18
  60:6,7 74:25
  79:12
**2019**
  6:21
**2020**
  22:1,24
  23:14
**2021**
  8:17 22:2
  23:15,20,23
  24:25 32:22
  52:5 63:12
  64:8,15 65:2
  76:5 81:11
**2022**
  6:16 7:2

  8:20 69:3
  72:25 84:17
**21**
  64:24 65:9
  66:1
**23**
  65:1,10,12
**24**
  6:2 68:8
**25**
  69:8,9
**28**
  63:12 64:8,
  15 65:1
**2:09**
  12:11

**3**

**3**
  60:5 61:9
  63:9 64:18
**30**
  69:8
**3:10**
  88:25
**3rd**
  17:7

**4**

**40**
  53:17

**9**

**9/28/2021**
  61:8

**A**

**ability**
  6:3
**able**
  11:2 34:3

**aboard**
  24:3
**above**
  4:3 26:14
  42:8 82:18
**access**
  33:25 74:23
**accidentally**
  40:7
**accommodate**
  5:21
**accurate**
  17:11
**accusing**
  17:2
**act**
  40:8
**acting**
  43:10
**action**
  9:22 25:10
  31:17,25
  32:6,15
  44:16 46:3,
  14 48:3 56:4
  61:1,5 63:6,
  8,10 64:11,
  13 70:14,18
**actions**
  14:13,14
  44:21 65:24
  81:2 83:1
**activities**
  26:3
**activity**
  70:15 71:1,
  21 72:3
  73:4,12
  74:4,8,10,12
**actual**
  24:9,12
**address**
  45:7 82:5
**adjudicate**
  85:24 86:4
**Adobe**
  20:4

**advantageous**
  42:12
**adverse**
  44:16,21
**advised**
  47:22 77:4,
  8,9
**advising**
  77:12
**affairs**
  35:20 36:3,
  18 37:10
  44:17 56:1
  81:14 83:21
  86:6,9 87:6
**afternoon**
  4:15,16
**afterwards**
  17:16
**agency**
  24:22 34:9
  37:7 41:20
  42:9 46:19
  50:9,11
  55:22 83:13
**agitated**
  55:25
**ago**
  9:1,3
**agree**
  26:10 53:20
  70:1
**agreement**
  26:15 29:17
  30:24 31:20
**ahead**
  10:5 18:15
  42:9 83:16
  88:19
**airport**
  36:15 40:18
  85:7 88:4
**alcohol**
  6:3
**allegation**
  15:11 54:16

John Pate
June 14, 2023

allegations
  14:6,10
  44:14 51:2
  53:23
alleged
  31:25 56:9
  57:14 59:24
  71:20,21
  87:22
alleges
  34:18
alleging
  14:12 52:18
  70:19
allow
  48:11
allowed
  48:14
alluded
  65:5
alter
  37:24
altercation
  34:8
altercations
  52:17
and-a-half
  9:14,15
  24:18 75:24
  80:11
and/or
  26:20 56:5
announced
  43:23 46:18
anonymous
  33:2,17
  35:13,17
  81:9
answer
  5:13 18:22
  38:3 52:7
  79:7,14,22
  83:9 84:6
answered
  51:24 85:10
answers
  5:5

anticipating
  15:24
anybody
  34:16 50:5
  64:22 79:11
anymore
  55:4
anyone
  17:2 32:14
  61:4 62:24
  74:6,18
anytime
  15:10,11,12
  29:8 55:23
  85:15
apart
  52:23
apologies
  12:6
apologize
  17:1
appeared
  17:9 21:4
  42:25
appearing
  17:6
appears
  12:14 20:3
applicable
  64:25
applicants
  23:11
applied
  23:11
appoint
  24:7
appointed
  62:15 82:17
appointment
  25:1
appointments
  25:4
appreciate
  62:17 75:21
  79:24 80:10,
  16

approval
  26:17,23,25
  30:8 46:13
  47:7
approve
  7:21 45:14
  47:17
approving
  29:15
April
  23:23
area
  27:9,22,24,
  25 28:9,13,
  20,24 29:4
  34:9,14
  73:11
areas
  40:14
argument
  34:9
around
  54:12 55:6
  56:16 57:18,
  24 58:3,5
article
  9:19,20
  10:14 12:10,
  13,18 13:1
  14:8,10
articulate
  48:9
ascertain
  34:3
asked
  11:18 35:19
  36:2,5 38:23
  39:12 46:24
  51:15 54:15
  68:4 75:3,6
  77:4 79:9,16
  81:17 84:4
  85:3 86:20,
  24
asking
  16:6 24:5
  30:25 43:14

51:18,21
  58:19 80:15
assaulted
  44:10 50:21
assessment
  23:1,2
assign
  66:16
assignments
  27:6
assist
  50:12 75:4
assistant
  39:8 76:25
associate
  67:24
assume
  5:14 47:6
  62:12
assuming
  36:23 58:8
assumption
  58:12
attend
  75:14
attended
  8:16
attention
  31:4
attitude
  81:3
attorney
  12:14 13:22
  16:24,25
  17:16 54:4
  61:19,22,23
  62:13 65:12,
  17 66:8,10,
  14,15 67:4,
  7,14,16
  68:1,4 80:23
attorney's
  61:20 62:1
Audry
  68:9 69:9,12
August
  22:1,24

John Pate
June 14, 2023

23:14
**authored**
  29:14 60:14
  64:15
**authority**
  7:8,13,17,18
  46:23 49:23
**authorization**
  46:13 47:16
**authorize**
  45:19 76:8
**authorized**
  40:3,4
  76:11,12
**aware**
  16:23 32:22
  33:1,11
  34:13 35:14
  38:6 41:17,
  20 61:4 62:6
  78:19,20
  83:19
**awhile**
  43:1

———————

**B**

———————

**back**
  10:18,21
  17:21 27:1
  32:19,21
  34:12 35:21
  43:1 44:4
  46:4 54:19
  62:16
**background**
  83:20,23
**Barreira**
  14:16 23:16,
  19,22 24:3,
  5,10,14,16
  25:17,19,23
  26:13 27:3,
  15,23 28:6,
  7,9 29:3,6,
  9,10 30:22
  31:3,5,17

32:2,5,9,11
35:19,24
36:7,13,23
37:2,5,22
38:5,17,18,
21,24 39:7,
11,17,22
40:13 41:3,
18,20 44:15,
18,22 46:3,7
47:15,21
48:1,2
49:12,21
50:3,9 51:19
54:20 55:2,
13,18 56:7,
25 57:6,8,9,
12 58:4
61:7,11,15
62:5,11,19,
25 63:3,7,
10,15,18,25
64:5,7,10,13
72:5,6,10
73:11,12
77:1 81:10,
12 82:25
83:4,19 84:5
85:5,6,21
86:8,14,16,
19 87:18,20,
23,25 88:7,8
**Barreira's**
32:15 39:2
40:1,23
41:14 48:11
50:20 51:15
53:12 77:16
81:2 87:8
**base**
43:15 45:10
**based**
12:16 14:8,
9,17 23:3
24:22 27:2,6
29:20 34:7
35:22 42:9,
12 45:16,17

47:25 48:18,
19 51:10,11
52:8 55:16
56:11 62:2
63:22 71:17
72:3,4,12
73:22 74:3
75:11 81:2
82:24 87:25
**basically**
27:7 28:17
44:24
**basis**
15:3 16:8
57:9,10
67:22
**bathroom**
76:1
**battered**
44:10
**battery**
44:11 68:13
**begin**
6:19
**behalf**
75:10 80:3
**behind**
56:3 81:1
83:10
**belief**
41:6 74:4,5
**believe**
11:25 12:25
14:12,16
17:10 18:6
23:11 24:11
26:18 29:22
30:11,14,21
33:7,9 42:17
43:16,17,25
50:25 54:20
55:9,15 63:7
64:1,10
65:16,17
67:9,23
68:1,3,16,17
76:13,24
77:18,25

79:18 81:11,
20 83:1
85:4,12
**believed**
50:24 51:3
**below**
42:8
**benefit**
45:5
**best**
54:2 72:16
74:2
**bit**
12:7 80:24
**blanket**
50:24,25
52:11
**board**
26:21 30:3
74:18
**boss**
45:22,23
57:8
**bottom**
52:1,25
**bounds**
85:23
**branched**
72:1
**Brannon**
4:1
**break**
5:18 27:12
48:13 75:23
**Brian**
13:23 88:12,
22
**brief**
80:23
**briefings**
24:14
**bring**
57:10,12
70:7,10
**broad**
11:18 15:18

John Pate
June 14, 2023

brought
30:4 31:4
43:20 63:17
71:9 72:1,13
buddy
10:18
building
28:14
bunch
39:3
Burnadette
12:14 61:24
62:8 64:19
65:6
business
8:14,15 26:6

---

C

calculated
54:2
call
34:5 40:20,
21 67:11
68:8,15
69:7,9 70:8
73:17,18
88:16
called
65:16 72:8
79:3,10
calling
84:16
Candace
67:24
capacity
6:22
capital
30:20
captain
22:2 23:8,
17,20,25
24:3,8 25:1,
14 28:19
29:11 36:19
39:7,9
48:22,24,25

49:2 52:9,
23,24,25
53:4 55:3,
14,15,19
56:1,3,15,16
62:10 63:17,
20 65:24
70:2,11,23
71:6,7,10,
15,18 72:7,
9,13,15
73:14 76:15,
25 78:20
86:23
career
37:10
cartridge
34:11
case
6:8 8:3
13:13,17
16:9,21
17:15 36:10
62:10,11
75:7,10
85:25 87:12,
21
Casey
60:15
catch-up
43:12
caught
26:20
cell
68:18
chain
49:4
change
81:2,3
changes
17:20 19:12
20:14,17
21:1,2
Chapter
64:25 65:10,
12

charged
68:12,23,24
69:23 70:3,4
73:16 78:21
charter
7:10 25:7
Chicago
6:12 33:9
35:9
chief
7:13,16,19
11:10,12
14:16 23:16,
19,21 24:3,
5,10,14,16
25:20 26:12
27:3 28:6,7,
9,17 29:9,10
30:22 31:2,5
32:2,5,15
35:24 36:7,
13 37:2,5,6,
7,21 38:5,24
39:2,5,7,9
40:12 41:14,
18,20,22
43:20,22
45:18,22
46:3,7,22
47:1,5,8,11,
14,25 48:2,
11 49:12,21
50:8,20
51:19 54:5
55:1,13,18
56:24 57:7,8
61:7,11,15
62:5,11
63:15,18,25
64:4 68:19
69:11 70:10
71:4,6,18
72:5,6,10,19
73:11,12,18,
25 76:25
78:15 81:10
82:22,25
83:19,20

85:5,6,21
86:7 87:7,
20,23,25
88:7
chief's
49:1
Chris
4:20
circumstances
51:12
citizen
52:18
city
4:21,23,24
6:17,20,23,
24 7:1,3,5,
7,20 8:20
9:5,8,9,18,
21 10:15,25
14:3,7 22:6,
14 23:23
24:4,6,11
25:20 26:16
29:21 32:15
34:20 36:14
40:14,18,19
41:23 42:4,
13,14 43:8
44:2,5 45:8,
14,24 52:4
54:3,4 56:9
59:3,5,9,13,
19 60:17
61:4,20
62:1,2,13
64:24 65:10,
12 66:1,4,5,
7,10,13,15
67:3,7,14,16
68:4,16,18
69:15,16
71:14,16
74:17 77:24
78:4,18,19
79:20 86:13
city's
22:7 37:11
76:6 77:22

John Pate
June 14, 2023

78:5
**claim**
  15:4 16:9
**claimed**
  70:15 73:3
**claiming**
  10:15 37:20
**claims**
  14:19 79:19
**clandestine**
  39:23 40:9,
  21
**clarified**
  20:25 36:2
**clarify**
  32:13
**clarifying**
  39:18
**clear**
  21:8 35:13
  54:2,8
**close**
  28:10,18
  41:18
**closeness**
  41:14,21
**Cobb**
  67:24
**come**
  11:11 34:4
  35:21 45:23
  61:17 80:8
  83:4
**comes**
  32:12 77:12
  82:6
**command**
  28:11,12,17
  46:18 49:4
  55:4 56:18,
  19 58:3
  78:21,23
  83:13
**commander**
  82:21
**commendable**
  50:13

**comments**
  56:11,13,19
  57:25 58:17
**commission**
  26:16,21,24
  30:3 43:17,
  20 68:9
  69:17,18
  70:13 71:8
  73:21,24
**commissioner**
  68:10 70:17
  72:21 73:1,
  12 84:13,15
**commissioners**
  70:8 71:9,25
  72:6,7,8,14
  73:13 74:16
**communicate**
  9:11
**communication**
  12:7 41:19
  48:13
**communications**
  10:3 29:10,
  11 30:2
**company**
  34:1 76:18
**compared**
  51:4 57:2
**compelled**
  71:16
**complained**
  69:25
**complaining**
  56:9 81:5
**complaint**
  14:2 15:2,11
  16:7 30:15
  31:24 32:7
  54:22 57:14
  59:24 60:11
  61:2 62:4,12
  64:2,6 65:15
  66:9 70:19
  72:4 73:4

74:17 81:13
**complaints**
  10:23 11:5,
  16,22 15:5,
  19 29:4
  42:10 64:3,
  11 71:22
  72:3,13
  73:10 84:17
**completed**
  68:3,5
**completion**
  44:17
**comply**
  66:1,5
**Composite**
  10:6,9
**compromise**
  71:5 72:21
**computer**
  16:17 19:18
**conceal**
  85:16
**concern**
  44:5
**concerns**
  18:8 53:2,24
  81:20
**conclude**
  31:22
**concluded**
  88:24
**conclusions**
  81:1
**conditions**
  31:8 45:11
  49:6
**conduct**
  31:21 50:23
  58:13,15,16
  62:3 67:12
  78:22 81:12
  82:6 85:5
**conducted**
  33:23 37:9
  39:22 42:5
  43:24 86:15

**conducting**
  36:9 37:13,
  17 68:6
**confer**
  66:14 85:18
**conference**
  40:14,15
**confirm**
  87:10
**confusing**
  12:8
**connection**
  4:21 6:8
  63:8,11 65:7
**conscious**
  83:23
**consider**
  36:19 60:23
**considered**
  47:4
**constant**
  67:21
**consultation**
  54:3
**consumed**
  6:2
**contact**
  18:4 36:7
  43:7 53:1
**contacted**
  18:3 68:4
**contacting**
  18:4 30:10
**contained**
  21:16 79:11
**contend**
  44:21 63:10
  65:9
**contending**
  65:25
**contends**
  14:23 15:3
  16:8
**contention**
  46:7 67:5
**context**
  84:12

John Pate
June 14, 2023

continuation
11:25
contract
30:8
control
11:1 28:12
50:11
conversation
12:24,25
17:14,18,25
19:1,10
27:19 36:24
47:21,25
57:5 68:21
86:23 87:2
conversations
57:13
cooperate
34:1
coordinate
80:5
copy
61:10 88:22
correct
5:2 7:21,22
8:1,2 10:16,
19 12:1,15
17:12 19:9,
16,24 20:1,
2,5,8,10,15
22:3 23:23,
24 25:2
29:17,18
31:25 32:7,
9,17 37:1
38:1,18
39:24 40:2
45:15 47:1
49:17,25
50:1 53:21,
24 54:10,16
59:16 60:15,
16,18,19
64:19,20
65:7,8 66:3,
6 67:1,7,8
68:10,11
69:13,17

70:23,24
71:15 75:14,
16 78:11,13,
15 82:1,8
85:9 87:13
correctly
42:2 65:3
counseled
37:16
counseling
11:9 37:15
counselor
15:8 29:20
30:10 38:8
39:19 50:5
51:22 53:15
54:24 56:23
61:16 74:22
75:25 76:17
79:16 82:1
county
23:2 24:23
40:18 74:18
83:13
couple
9:14 16:21
19:7,11
46:21 58:24
63:16 74:16
80:19,22
course
11:12 15:16
26:3,5 29:21
44:7 47:12
67:15
court
4:5 14:3
15:25 60:3
cover
34:14,19,23
35:3
create
20:9
creations
20:4
credibility
49:21

crime
78:22
criminal
85:19
criticism
10:15
CROSS
80:20
crossed
85:23
current
42:14

                    D

daily
15:16 22:10
26:3
damage
49:20
dash
16:2
date
23:21,25
24:2,12
30:12 68:24
dated
65:1
David
6:6 84:25
88:15
day
11:14,15
12:10 15:16
19:25 23:5
33:7,8,12,
13,14 37:16
41:4 57:7
68:12,23,24
85:24
days
57:11
deal
34:17 74:2
83:22
dealing
56:25

deals
83:22
dealt
23:5
decision
7:8,12 23:19
24:7,20,24
25:11 40:23
45:15 46:24
47:12,17,22
48:9 49:17,
18,19,22
54:6 55:15
56:5 57:3
63:25 71:7,
13 77:19
81:18,23
decisions
7:9,24,25
22:18,21
25:3 26:2,4,
7,9 27:14
51:6,7,11
54:1
declaration
18:2,6,14,
17,19,25
19:8 21:14,
17 32:20
38:16 60:4
74:24 75:1
79:11
deductive
73:23
Defendant's
10:9 18:17
61:9
define
85:13 86:15
definition
85:20
delegate
39:8,14,17
demand
72:22
demanded
69:10 73:19

John Pate
June 14, 2023

demanding
73:13
demands
73:20
demote
70:25 71:7,
14,18,19
73:3 74:7
demoted
70:22 71:2,5
72:24
demotions
7:25 25:4
department
8:18 10:15
14:15 15:14
22:8,10,12,
13,16,21,25
23:5,17
24:15,17,21
28:19,22
33:23 41:19
44:12 45:16,
17,22 46:17
47:3,4,10,13
48:14 53:9,
17 66:18
69:24 70:2
76:6 77:2,
13,14,23
78:3,6 81:6,
14,21 82:3
84:19
department's
23:3
departmental
37:12
departments
22:13
depos
12:7
deposed
13:20
deposition
4:1 5:2 6:11
13:5,16
16:20 17:6,

9,13 18:8,12
20:1 58:24
80:9 88:24
depositions
13:12
deputy
82:21
descriptive
39:1
deserve
56:17,18
desiring
58:1
detailed
86:22
details
45:4 87:2,3,
6,10
determine
35:22
detrimental
81:21
developing
30:1
development
24:21 77:20
different
31:6 51:8
63:23
difficulty
81:22
diminished
31:10
diminishing
27:7
direct
4:13 38:20
46:12 49:2
61:21 62:18
74:6
directed
16:24 36:17
38:16,21
39:16 47:8
62:2 71:3
78:22

directing
49:5,7
direction
28:2 62:14
directive
39:14 47:5
directly
16:24 27:25
28:3 38:23
39:6,12
56:21 57:19
59:22 64:17
74:13 83:15
84:5,10,21
director
43:11 44:2
66:17 82:23
disagree
25:25 26:4,7
27:14
disagreed
26:2 48:10,
16
disagreeing
29:15
disciplinary
85:19
discipline
37:2 48:2
50:3 55:9
86:4
disciplined
34:15
discuss
11:18 18:6
28:19 64:7
66:14
discussed
9:7,17,22
18:10,11
23:16 28:8
67:21 79:5,
18
discussing
20:18,19,22,
24

discussion
21:5 49:10
76:3 85:16,
17
displeasure
72:9
disprove
7:21
disregarded
44:18
document
17:19 19:19
20:9,19,20,
21,23 21:1,
5,7,10,13
25:6,9
26:13,18,22,
24 39:18
42:3,4,6,17,
20 53:6
60:9,21
62:6,7,20,
21,23,25
63:3 64:22
documentation
47:9,13,15
74:23
documentation
s
46:16
documents
13:7 61:17
Dodson
11:11,13
doing
18:6 26:6
27:4 38:9
72:23 73:15
83:14
Dominguez
68:9,19
69:10,12,19
70:13,17
71:8 73:1,17
84:13
Dominguez's
72:22

John Pate
June 14, 2023

draw
  80:25
drive
  76:20
driving
  45:5
drugs
  6:3
due
  57:22 66:9
  72:23 74:3
duly
  4:11
duties
  27:6,7 28:15
  31:10 44:19
  53:4
duty
  27:6 31:9
  44:23 45:1,
  3,20,25
  46:20 47:9,
  10 48:10
  49:9 50:18,
  23 51:17
  52:5,10,12,
  20 53:4,10
  54:21 55:16
  56:7 63:20,
  21,23 81:19

_____

E

eager
  72:14
earlier
  39:25 58:23
  59:23,24
  60:12 63:7
  65:5
early
  12:12,13
  33:10 69:2
  81:10
edit
  20:4

effected
  31:8 45:3,12
  63:22
effective
  27:20
efficient
  27:20
effort
  56:3
egregious
  50:4,6
either
  26:20 29:9,
  23 33:10
  61:21 65:18
  83:4
elaborate
  14:21
elected
  72:18
electronic
  19:23
email
  16:24 19:5
  28:2 29:24
  33:2,3,5,10,
  17,22,24
  34:3,7,21
  35:2,13,17,
  19 65:17
  68:2 81:10
emails
  29:21 31:12
  74:23
emergency
  26:21 30:3
employed
  6:13,15
  44:12
employee
  11:16 15:10
  42:12 44:11,
  13 45:24
  51:7 58:2
  59:3,5,21
  66:18 67:21

employees
  7:9 51:2,7
  59:6,21
  72:17
employment
  7:5,8,23
  24:24 25:3
  31:8,9 45:2,
  3,12 49:6
  54:23 63:21
  69:16
end
  21:4 85:24
  86:4
enforcement
  15:13 37:7
  57:21 82:11,
  12,15,18
  83:12,13
engage
  71:19
engaged
  70:15
ensure
  66:5,25
  78:16
entire
  40:13
entities
  34:1
environment
  41:9 48:6
  56:17
error
  24:1
Ethics
  74:18
evaluations
  55:11
evening
  12:12
events
  42:10
everybody
  28:21 34:15
  35:5 50:24

everyday
  57:8,9
everyone
  34:14
evidence
  29:2 31:16,
  23 40:22
  42:7 54:18
  56:6 58:12,
  14,17 62:19,
  24 64:12
  86:12
evolved
  41:8
exact
  68:24 69:6
  76:18
exactly
  42:19 43:1
  70:12 83:25
EXAMINATION
  4:13 80:20
  85:1
examined
  4:11
excited
  55:25
executed
  25:9 26:13,
  18 74:25
execution
  18:1 25:6
  29:16
Exhibit
  10:6,9
  18:16,18
  60:4,6,7
  61:9 63:9
  64:18 74:25
  79:12
existing
  78:4
expect
  39:5,7 82:25
  83:3 84:9
expected
  84:5,14

John Pate
June 14, 2023

expedient
  57:1
experience
  37:6 82:10,
  11,24 83:24
  85:14
explained
  53:7
explanation
  62:17
expressed
  63:13
extent
  76:9 77:15
extra
  45:4
extremely
  50:6

----

**F**

face
  48:12 50:12
fact
  41:15 62:3
  65:5 83:5
  86:13
factor
  64:5
facts
  86:12,14
factual
  64:6
failed
  66:1 71:10
fair
  5:14 11:19
  73:5,7 78:8
fall
  51:9
falls
  62:7
familiar
  14:5
family
  43:15

far
  22:16 24:1
  45:10 82:2,
  10
fearful
  84:1
February
  7:2 22:2
  23:15,20
  24:25 69:4
federal
  14:3
feedback
  22:11
felt
  37:8 50:22
  51:9 52:9
  53:2 55:13
fiasco
  27:2
field
  15:12
fighting
  10:18,21
file
  15:11 31:12
  62:1 74:17
filed
  4:22 9:20
  14:2,3 15:6,
  20 30:12,14
  80:7
files
  15:10
final
  7:7,12,17
  25:11 46:15
  70:5
finally
  10:18,20
financial
  14:14 26:13,
  21,22 30:3
  81:5
finding
  62:3 67:10

finish
  15:25
fire
  69:10,11,13
  70:5,9,10,11
  73:25 74:7,
  10,11,13
fired
  69:21 70:9
  71:4 72:22
  73:24
firing
  7:24 71:5
first
  4:11 6:19
  30:10 35:14
  38:4 53:11
  54:24 69:22
  83:11 85:12
five
  19:19 23:11
  80:6,13
Florida
  4:2 35:11
  88:1
focused
  55:18,19,22,
  23 56:25
follow
  64:25 65:10
follow-up
  46:21 58:25
follow-ups
  84:24
following
  9:8 50:19
  54:21
follows
  4:12
force
  56:2
form
  25:10 38:2
  46:14 52:6
  79:6,13,21
  81:7,15,25
  83:7 84:20

format
  16:18
forms
  15:3 16:8
formulate
  41:6
forward
  4:23 17:10
  38:14 49:11,
  13
forwarded
  35:19 64:18
  81:10
forwarding
  64:22
four
  19:22 23:11
  57:10,11
  67:20 80:12
friends
  8:9
front
  16:13,14
  19:15 29:21
  31:12,13
  34:12,21
  78:1
frowned
  38:12
full
  36:20 50:10,
  11 56:2
funds
  29:5 54:25
furthering
  85:17

----

**G**

gap
  72:2
gathering
  8:16,18
gatherings
  8:14
gave
  24:14 39:13

John Pate
June 14, 2023

67:24

**general**
  9:4,12
  15:19,23
  20:23 22:5
  34:21 45:7
  72:13
**generalize**
  27:19
**generalized**
  14:16 82:5
**generally**
  16:6 23:5
  43:15 53:3
  71:24,25
**generated**
  29:24
**gentleman**
  60:15
**get along**
  25:19 59:4
**getting**
  37:17,18
  38:14 86:1
**give**
  4:6 57:19
  88:16
**given**
  5:1 51:2
**giving**
  6:10 27:5
  50:10 87:2
**goes**
  75:7
**going**
  5:13,16
  17:19 18:14
  19:14 21:15
  30:8 32:19,
  20 34:19
  36:6 45:25
  47:23 57:23
  58:22,24
  70:6,11
  71:3,4 72:2
  74:9,11,13
  75:23 76:1

79:4,9,10,16
80:8 83:15,
17,25 86:2,3
**good**
  4:15,16,17,
  18 88:13
**Google**
  43:3,25
**Googled**
  42:24
**graphically**
  74:1
**great**
  10:11
**grounds**
  85:16,21
**guess**
  11:2,3 12:11
  18:8 55:13
  80:12
**guise**
  28:10 62:8
**gun**
  44:25 49:13
**guys**
  39:1 74:22

----

**H**

**hall**
  40:15 68:17,
  18
**handle**
  36:17
**handled**
  36:23
**happen**
  43:13 72:15
**happened**
  58:7 87:11
**happening**
  31:15
**happy**
  5:20
**head**
  5:6 22:13

**heard**
  32:14 43:5
  67:22,25
**hearing**
  80:24
**held**
  65:23 82:19,
  20,21,22,23
**hey**
  45:24 83:15,
  17
**high**
  39:3
**hinged**
  55:16
**hire**
  24:10 25:17
**hired**
  6:22
**hiring**
  7:24 23:9
**historical**
  81:22
**hold**
  82:17 86:2
**holding**
  70:1
**holiday**
  33:6
**holidays**
  33:14
**home**
  45:6 48:21
**hope**
  80:1,10
**hour**
  75:24 80:11
**hours**
  6:2 11:16
**HR**
  40:16
**huge**
  34:19

----

**I**

**idea**
  16:4 38:4,10
  63:5
**identificatio
n**
  10:10 18:18
  61:9
**Illinois**
  6:12
**immediately**
  72:22
**impartial**
  86:3
**implemented**
  82:5
**important**
  5:7
**impossible**
  78:24
**improper**
  38:1 40:25
  41:3
**in-between**
  39:11
**in-person**
  16:12
**inappropriate**
  81:12 85:5
**inaudible**
  55:11 62:1
  63:21 72:11,
  20
**incident**
  29:12 32:23
  33:1 34:5,6,
  13,15,24
  35:3,5,6,11,
  15,18 36:8
  38:17 44:4
  50:19 52:8,
  13 53:13,16,
  20 54:9,21,
  24 56:12,13
  57:20,22,25

58:20 68:25
85:23 86:17
87:11
**incidents**
52:15,16
53:8
**including**
40:15
**incriminate**
88:9
**indirect**
57:25
**indirectly**
56:21
**individual**
36:8 45:23
55:21,23
59:18 73:24
74:11 83:18
**individual's**
66:18 83:16
**individuals**
34:20 35:4
43:7,9 51:4
53:17,18
54:4
**inexperience**
40:2,4 53:25
**infested**
27:9,22,24
28:1,9
**informal**
62:3 65:13
66:10,11
67:2,10
**information**
34:2 35:22
67:11 85:18
87:1,18,21
**inhibit**
6:3
**initially**
9:19
**initiated**
69:18 87:4
**input**
81:24

**inquiry**
67:12
**inspector**
82:20
**instance**
46:2 82:6
**instances**
15:19 51:1
52:21 79:1
**instructed**
18:4 44:15
**instruction**
88:16
**instructions**
44:19
**integrity**
41:12
**intend**
75:9,18
**intent**
22:15 37:23
38:11 75:14
**intentionally**
40:7
**interact**
59:18
**interaction**
55:16
**interactions**
49:7 59:8,
12,15,20
**interest**
54:2
**intermediary**
7:18 86:5
**internal**
35:20 36:2,
18 37:10,13
44:17 81:14
83:21 86:6,9
87:6
**internally**
11:1 46:17
**Internet**
42:19
**interview**
62:9 67:8

68:3,5,7
**interviewed**
65:6,18
**intrigued**
43:25
**investigate**
86:6
**investigate's**
86:2
**investigation**
31:21 33:21
36:6,9,12,
19,20 37:10,
14,17,24
41:11,25
42:4,16
43:18 44:18
56:4 58:13,
15,16 65:13
66:10,11
67:3,6,10
81:13,14
85:6,14
86:1,15,18
87:4,6
**investigation
s**
43:24
**investigator**
82:20 87:7
**investigatory**
85:19
**invoice**
76:18
**involve**
22:17,20
56:1 74:12
77:19
**involved**
23:19 24:7,
20 25:12
30:6 32:23
36:8 50:22
51:12 52:12,
16 54:7 57:2
66:20 77:5,
10

**involvement**
22:15 24:17
30:9 77:16
**involving**
53:13 54:6
**Ironically**
35:9
**irregularitie
s**
81:5 84:18
**isolated**
28:20,21,22
**Israel**
43:20
**issue**
27:16 28:1
29:5,7,8,9,
25 30:7,15
31:4 32:4
37:17 52:22
63:15 67:13,
17,18 69:12
72:11 74:2
85:19 88:2,4
**issues**
10:25 11:5,
8,10,16,23
18:9 27:18
28:19 29:6
31:2,14 32:2
36:16,22
55:1,17 57:4
58:7 64:2
65:21 67:16
69:23 71:8
72:1 87:22

---

**J**

**Jackson**
68:19 69:11
70:10 71:4,6
72:20 73:18
**James**
60:15
**January**
6:16 7:2

John Pate
June 14, 2023

8:20 17:7
69:4,5 71:11
72:25 84:17
**Jenkins**
76:25
**job**
39:14
**John**
4:10 51:16
60:4
**joined**
6:6
**Jon**
88:18
**Jonathan**
88:20
**June**
17:5
**justification**
52:11 53:5

---

**K**

---

**K9**
76:6,14,16,
20 77:2,5,
17,19,20,21,
22,24 78:3,4
**keep**
38:13 52:20
76:1
**keeping**
52:23
**kept**
20:20
**kicked**
27:1
**kind**
22:11 29:14
43:15,19,23,
25 46:8,10
49:10,12,13
51:9,10
72:20 74:1
83:22
**knew**
37:11 69:15

**know**
4:20 5:1,4,
11,20 8:3
11:22 13:23
15:7,23
16:22 18:22
20:25 21:4,
5,21,22 24:2
25:7 31:11,
13 36:16
38:10,12
39:1,10,25
42:20,24
50:10 51:25
52:1,3,19
64:23 68:23
72:15 78:6,
9,14 79:8,15
80:3,23 84:3
87:3,5,8,21
88:5,6
**knowing**
50:16
**knowledge**
14:18,22
15:1 16:7
33:16 61:14
62:19 63:2,3
64:21 77:16
79:8,15

---

**L**

---

**L-E-X-I-P-O-L**
30:20
**Labor**
33:13,14
**Large**
4:3
**laser**
55:18,19
**late**
33:10
**law**
15:12 37:7
57:21 82:11,
15,18 83:11,

13
**lawsuit**
4:22 9:18
14:7,11
16:15 41:10
75:4 79:19
**lawsuits**
80:7
**lawyer**
17:7 64:15
**lead**
87:22
**leader**
50:13
**leadership**
81:22
**leads**
17:23 41:6
85:17
**leaned**
41:13
**learn**
34:4
**leave**
47:23
**led**
15:6
**lengthy**
87:2
**letter**
61:6,8,10,15
63:12 64:8,
16 65:1,7,11
**level**
41:12 42:12
**levying**
71:21
**Lexipol**
27:16,17
29:17 30:18,
19,23 31:20,
24 32:7,17
**liability**
42:13
**lieutenant**
21:25 22:2,
24 23:8,10,

13,18 24:8
25:1,16
78:20
**life**
9:4
**lifetime**
79:2
**likewise**
32:14
**limits**
86:13
**line**
57:19
**link**
31:24
**Listen**
80:12
**litigation**
9:20 10:2
**little**
12:7 27:19
79:25 80:24
**long**
5:17,19 69:7
73:9,15 78:2
80:11 83:14
86:22
**longer**
55:5 57:17,
18 58:1 69:8
75:22
**look**
35:20 66:15
76:17 86:17
**looked**
50:14 51:5
**looking**
41:13 49:22
**lord**
80:1
**lot**
10:25 11:14
15:15 26:4
27:12 49:14
59:18 68:18
78:5,25
83:12 85:7

87:19
**low**
  39:3
**Lupo**
  44:3

---

**M**

**Madam**
  60:3
**made**
  7:23 16:8,23
  17:20 19:11
  20:14 24:24
  25:11 26:2,
  8,10 29:5
  32:7 33:11
  34:13 48:9
  51:11 54:23
  56:5,20
  57:25 63:25
  64:3 71:6
  72:3,4
  73:10,17,18
  81:23 84:18
**maintaining**
  37:25
**majority**
  22:20 69:16
  73:20,23
**make**
  17:3 18:15
  20:17 26:5
  27:19 50:16
  51:25 54:1,5
  56:14 88:16
**makes**
  85:11
**making**
  7:8,12 24:20
  56:2
**malfeasance**
  14:14
**malicious**
  38:9
**management**
  23:6,7 25:25

**manager**
  6:24 7:7,20
  10:25 22:6
  42:14 44:6
  45:14,24
  52:4 59:19
  66:4 69:15
  71:14,16
  78:18
**manager's**
  60:18
**managing**
  22:9
**manner**
  26:11 55:10
  56:22 57:1
  67:3
**March**
  12:11
**mark**
  10:6 18:16
  60:4
**marked**
  10:8 18:17
  61:8 74:25
  79:12
**Marsha**
  4:1
**material**
  46:9
**matter**
  18:5,7 22:5
  23:6 31:15
  35:20 36:1
  40:8 46:8,10
  49:14 52:9
  58:8,18
  61:25 67:22
**matters**
  11:15 57:3
  63:17 67:21
**maze**
  73:8
**mean**
  4:24 8:7
  10:20 11:17,
  18 25:10

  27:23 39:12
  40:9 62:22
  84:7
**means**
  39:13
**meant**
  60:8
**media**
  42:18,22
  43:17
**medical**
  34:19
**medication**
  30:20
**meet**
  40:16,17,23
  52:2
**meeting**
  26:20 28:5,6
  30:3,4 38:8
  39:23 40:24
  43:17,21
  59:21 70:9
**meetings**
  56:20 63:16
  77:18
**member**
  41:21 66:17
  78:21,23
  83:14
**members**
  28:13 43:11
  46:18,19
**memo**
  29:24
**Memorial**
  33:7,8,12
**message**
  10:1,3 12:1
**messages**
  10:7,8 11:25
**met**
  28:7 36:14
  41:4,16 55:2
  86:13
**Miami-dade**
  23:2 24:23

**Michael**
  32:24 37:22
  38:17,21,23,
  25 39:13,23
  41:4,11
  42:1,5,7,10,
  15,24 43:3,
  19 44:1
  46:11 58:23
  59:2,8,12,15
  85:6 86:20
**middle**
  23:6,7 39:4
  52:2
**mind**
  84:1
**mine**
  47:12 78:17
**minutes**
  69:8
**misconduct**
  15:12 51:3
  52:18 57:3
  83:21 87:23
**misdemeanor**
  68:13,25
  73:17
**mishap**
  48:8
**missed**
  46:8,9
**misspeak**
  84:4
**misstep**
  49:24
**missteps**
  50:3
**mistakes**
  50:16
**misuse**
  29:5 31:4,15
  32:4 54:25
  56:9 57:14,
  22 58:8,18,
  20
**mixed**
  33:14

John Pate
June 14, 2023

mold
  27:9,10,22,
  24 28:1,4,9,
  24
moment
  32:21
Monday
  33:8,11
money
  56:10 57:15
month
  9:13,15
  24:11,18
months
  24:12,18
moral
  81:21
morning
  12:13
motion
  46:6
motivation
  81:1
motive
  40:1,25 41:3
move
  11:20 49:11
moved
  27:21 28:4
  37:16 49:13
  68:6
moving
  4:23 28:19
  38:14 51:10
multiple
  15:5 26:9
  27:13 55:2
  67:19
mute
  53:2

_____

        N
_____

name
  13:23 55:24
  60:15 80:7

named
  51:8
names
  66:15
naming
  23:18
nature
  14:10 15:2
need
  5:18 87:7
needed
  56:5 78:11
needs
  70:6
negative
  59:7
Nelson
  44:2,3
neutral
  59:17
neutralized
  37:18
never
  17:1,25
  32:5,10,11,
  14 37:9
  47:21 53:1
  74:9,14
news
  9:20 14:8,10
night
  12:12
nine
  21:24 24:25
Nobody's
  74:11,13
nods
  5:6
nonetheless
  63:7
Norris-weeks
  12:14 61:24
  62:8 64:19
  65:6
Notary
  4:2

notes
  31:13 51:5
noticed
  17:6 20:1
notices
  26:22
notifications
  16:25
notified
  24:10
number
  23:4 42:11
  49:25 50:6,
  7,8 53:15
  88:2
numerous
  63:14

_____

        O
_____

Oaky
  29:13
Object
  81:7,15,25
  83:7 84:20
objecting
  56:8
Objection
  38:2 52:6
  79:6,13,21
objectivity
  48:19
observed
  81:4
occasion
  48:21 49:9
occasions
  55:2 67:19,
  23
occur
  25:5 28:25
  31:15 32:3
  46:2,15 57:6
occurred
  13:12 15:21
  17:22 21:6
  23:14 28:6

29:7,8,25
  31:3,14
  35:10 36:15
  38:18 54:25
  62:14 68:22
  73:13
occurring
  30:7
occurs
  15:13
October
  6:21
office
  11:12 27:4,
  8,10,21
  28:3,4,7
  31:6 40:13,
  15,19 48:13
  53:13 60:18
  61:17,20
  62:2 63:18
  82:11
officer
  37:7 44:9,23
  50:21,22
  52:13 53:9,
  14 55:21
  56:18 82:12,
  15,18
officers
  7:15 23:4
  52:16,17,19
offices
  40:16
officials
  72:18
OIG
  74:17
Okay
  5:8,22 6:10
  11:21 12:9
  13:3 19:4
  20:9 21:14,
  18,19 24:5
  31:16 37:6
  38:25 40:11
  47:9,11,20
  52:24 54:15

63:6,13 64:7
71:13 75:13
76:9 77:7,15
78:8,18
81:17 82:2,
14 84:11,22
85:20 86:11,
19 87:17
**once**
9:13 30:6
48:8 61:25
70:9
**one**
7:20 11:3,24
23:10 24:10
28:18 29:7
44:12,13
46:11 52:16,
20 53:13,15,
16,23 54:13
61:18 62:9
66:17,19
76:21,22
78:24 79:2
80:14 88:2
**Opa-locka**
4:21,24
6:17,20 9:5,
8 10:14
41:23 43:13
45:8 64:24
78:19 82:3
**open**
36:6,18
37:18
**operates**
41:13
**operation**
22:10
**operations**
22:7,14,16
**opinion**
41:2 86:18
**opportunity**
50:11
**orally**
83:5

**order**
18:6,7 25:14
42:8 48:11,
12 58:17
62:14 67:10
83:3
**ordinance**
26:23 62:2
64:25 65:20
66:2,5
**organization**
45:21
**original**
62:16
**originally**
18:25 19:1
**outdated**
78:5
**outright**
82:25 84:15
**outside**
7:9 15:14
34:1 36:14
40:10 41:9,
18,19 44:11
49:3 66:18
74:24 86:12,
13 88:3
**overcame**
48:8
**overlook**
37:8
**overlooked**
38:13
**overly**
5:16
**oversee**
22:14
**oversight**
38:10 40:2,4
**overtime**
45:5

_____

**P**

_____

**P.M.**
88:25

**page**
18:15 19:19,
22 20:3
51:25 52:2
**panel**
23:12 25:12
62:15 65:16,
22,23 66:14,
16,17,22
67:1,11
**panicky**
53:25
**paragraph**
21:24 24:25
38:16 44:15
51:14 64:24
65:9 66:1
68:8 69:9
**paragraphs**
20:22 21:16
73:9
**paraphrase**
38:22
**paraphrasing**
27:14 29:16
85:4
**parking**
68:18 85:7
87:19
**part**
36:11 39:21
54:23 57:13
66:1,24
81:19
**participate**
75:19 76:5,7
**participated**
87:23
**participation**
22:11 76:10
**particular**
43:4 51:12
61:25
**parts**
66:19
**passed**
26:24

**passing**
56:21
**past**
43:14 51:5,
11 64:4
72:4,14
77:24 78:4
**Pate**
4:10,15
30:21 60:4,9
62:18 76:5
80:22 85:3
88:17
**Pate's**
51:16
**pay**
44:20,24
45:11,25
46:12,20,25
47:24 48:10,
22
**payment**
27:1 30:8
**pending**
5:19
**people**
28:11 39:4,
11 41:9 42:7
50:16 54:12
66:20
**Perez**
4:22 8:4,7,
9,11,13,16,
19,25 9:2,8,
12,19 10:2,
13,22 11:7
12:25 13:16,
19 14:3,6,
11,12,19,23
15:3 16:7
21:25 22:23
23:10,20,24
24:2,8 25:13
26:8,11,12,
18 27:3,8,
16,24,25
28:1,20
29:3,4,6,9,

John Pate
June 14, 2023

11,14,23
30:11,22
31:3,4,18
32:3,6,16,
18,23 34:7,
10 36:19
39:7 44:16,
19,22 46:12,
19,25 47:9,
23 48:10,22,
24,25 49:2,
15 50:18,21,
22 51:17
52:4,10,23,
25 53:4
54:21,23
55:1,3,14,
15,18,20
56:2,3,7,8,
15,16,24
57:10,18,23
58:1,5,6
60:23 61:2,5
62:10 63:8,
11,14,17,20
64:11,14,15
65:7,19,24
66:22 67:9,
18 68:5,12
69:10,21
70:11,14,18,
22,25 71:2,
6,7,10,14,
18,19 72:1,
7,9,13,15
73:3,10,14
74:7 75:1,3
76:15,25
81:4,19
86:17,23

**Perez's**
9:17 16:15
17:7 30:9
57:14 64:2
65:17 67:22
68:1 75:9
79:19 84:16

**performance**

55:11
**performing**
55:10
**period**
24:13,19
65:21
**permission**
46:1
**person**
45:18 62:15
**person's**
15:14
**personal**
25:10
**personally**
69:13,25
**personnel**
22:21 46:14
47:4 56:4
57:2 67:21
**pertaining**
7:9 26:8
30:23 31:19
32:17 67:18
74:18
**pertains**
72:17
**phone**
19:5,6 20:19
68:18,20
**physical**
16:18
**physically**
21:9,12
**pick**
76:22
**pickup**
76:20
**Pizzi**
16:25 17:10,
17,22 18:3,
4,9 19:2
**place**
77:22
**placing**
27:8

**Plaintiff**
8:3,6
**plan**
75:17
**play**
22:7 64:5
**please**
5:5,11,20
15:24 21:21
88:21
**point**
5:18 6:25
21:20 29:14,
19 35:15
36:16,17
42:13 46:5,
6,16 48:8
50:2,8 64:1
66:13 68:6
73:16 87:4
**pointed**
21:15 34:10
58:20
**police**
7:13,15,16,
19 8:18
10:14 14:15
22:8,16,17,
21 23:21
24:14,17,21
25:20 37:6
38:24 39:5,9
44:12,24
45:6,16,17,
18,21,22
46:17,22
47:1,2,3,5,
8,10,11
48:14 69:24
70:2 71:18
76:6 77:13,
14,23 78:3,6
81:6,21
82:3,22
84:18 85:13
**police's**
78:16

**policies**
37:11,12
78:5 82:2,4
**policy**
37:9 45:16,
17 47:3
50:24,25
77:20,22,25
78:1,4,10
**policy's**
78:16
**Pollock**
13:23 17:6,
14,18,21
18:1,5,11,25
19:2,9 20:5,
13 30:19
38:2 52:6
75:4 79:6,
13,21 80:17,
19,21 83:8
84:23 88:13,
23
**position**
22:6 23:12,
13 48:11,16,
17,18
**positions**
7:10 23:6,7
**positive**
59:11
**possible**
31:1 35:10
37:19 57:2
74:3
**posted**
42:20
**potential**
18:8 85:18
**potentially**
31:1 39:10
72:2 88:9
**powers**
44:25
**preliminary**
49:10

John Pate
June 14, 2023

preparation
  23:15
prepare
  13:4
prepared
  47:14
pressed
  55:23,25
pressure
  72:18,20
  74:3,15,19
pressured
  73:2
pretty
  68:17
preview
  86:2
previous
  43:10 56:23
  64:2 83:20
previously
  16:20 43:8
prior
  12:1 17:13
  18:10 21:6
  23:21 24:12,
  15,18 27:7
  29:12 31:15
  55:16 69:22
  70:3
privileges
  45:1
probably
  15:24 67:23
  68:9 75:23
  80:6
problem
  12:9
procedural
  48:7
procedurally
  36:16,22
procedure
  37:9 45:17,
  18
procedures
  37:12 82:3,5

proceed
  75:10
process
  23:9 24:13,
  20 25:12
  38:5 49:11
  61:17 66:9,
  20 72:23
  77:11
produced
  10:1
professional
  57:21 83:12
proficient
  55:10
progressive
  55:8
prohibit
  37:23
promote
  22:23 23:10,
  20 24:7
promoted
  21:24 22:1
  23:25 24:2
promotion
  24:2
promotions
  7:25 23:18
  25:4
property
  36:15 40:18,
  19,24 88:4
proposed
  19:8
protected
  73:11 74:4,
  8,10,12
proud
  10:17
provide
  6:4 15:7
  61:10,21
  62:14 67:11
provided
  13:11,17
  30:2 52:11

87:1
providing
  27:5 34:2
proximity
  28:18
prudent
  36:7
public
  4:2 42:3
  82:23
publically
  10:18,21
purchase
  76:6,12,14
  77:5,8,10,
  11,12,17
purchased
  76:13,16,19
  77:21
purchasing
  77:2,11,19
put
  23:13 26:12,
  19 28:9
  29:23 35:12,
  13 53:5 55:1
  56:2 88:7

Q

question
  5:10,13,19
  11:18 15:18,
  24 18:23
  51:22 53:11,
  15 56:24
  58:11 62:13,
  16,17 74:6
  83:9 85:3,8,
  11,12
questioned
  62:6 86:16
questioning
  85:22 88:2
questions
  5:17 11:20
  17:24 21:15

36:5 46:21
  58:25 75:22
  80:15,17,22
  86:20
quick
  54:1
quickly
  9:23 37:19
  49:13 51:10

R

Railey
  4:14 10:5
  11:15 60:3,7
  76:2 81:7,
  15,17,25
  83:7 84:20,
  24 85:2
  88:10,15,21
raise
  67:13,16,17
raised
  14:6,11
raises
  53:23
ramification
  63:24
range
  73:11
rank
  21:25 22:2
  23:17 24:22
  28:15 48:22,
  23 82:19,20,
  21,22,23
ranks
  23:8 82:18
reached
  17:1,17
read
  14:2,17 16:2
  22:3 39:16
  65:3 78:2
  88:13
reading
  12:16 16:3

John Pate
June 14, 2023

20:20 21:21
**reads**
    10:14 21:24
    39:21
**real**
    9:23
**realm**
    51:9
**reason**
    5:24 36:5
    38:15 84:15
**reasoning**
    73:23 83:1,
    10
**recall**
    8:17 12:19,
    21,24 14:1
    17:5 20:18
    30:12 33:4
    42:19,21,22
    66:23 68:21
    69:2 75:2
    76:17,18
**receipt**
    65:1,10
**receive**
    67:6
**received**
    33:4 67:2
    68:8,14 81:9
**receiving**
    35:15,17
    60:21
**recently**
    41:11 43:2
**recess**
    76:4
**recognize**
    19:20 60:9
**recollection**
    20:24 29:20
    60:20 64:21
    79:23
**recommendatio**
**n**
    7:18,21
    24:23

**record**
    5:5 30:13
    36:11 76:2,3
**REDIRECT**
    85:1
**reduced**
    27:6
**refer**
    27:17
**reference**
    20:21 27:16
    29:22 30:13
    43:19 58:23
**referenced**
    59:23 60:12
**referred**
    10:3
**referring**
    11:6,23 15:9
    18:20 33:13
**regard**
    54:25
**regarding**
    7:8,24 12:25
    15:2 17:15
    18:1 32:2
    41:25 46:25
    47:22 52:13
    64:2 79:4
**regular**
    9:15
**Reiner**
    6:7 80:2
    88:18
**related**
    8:14,15,18
    9:4,5,7,20
    22:7,18 52:8
    55:17 56:3,
    24 57:3
    58:18 63:15
    69:1 72:2
    86:17
**relating**
    55:19
**relation**
    35:18

**relationship**
    38:7 41:14,
    15,21 59:1
**relative**
    16:14 78:22
**released**
    41:11,25
**relevant**
    79:18
**relief**
    44:23 53:4
**relieve**
    45:25 47:9,
    10 52:20
    55:15 81:19
**relieved**
    44:19 45:19
    46:19 49:9
    50:18,23
    51:17 52:5,
    10,12 53:10
    54:20 56:7
    63:20,23
**relieving**
    46:12,25
**relocate**
    27:24,25
    28:8 29:3
    31:6
**relocating**
    27:4,10,21
**relocation**
    28:25
**remember**
    21:11 59:25
    65:14 85:8
**reminder**
    68:2
**reminding**
    65:18
**removed**
    45:9 51:4
**rephrase**
    51:22
**replace**
    55:4

**report**
    11:13 35:6
**reported**
    57:17
**reporter**
    4:5 15:25
    30:17 60:3,6
    88:20,22
**reporting**
    14:14 32:3
    55:14
**represent**
    4:21
**representing**
    6:7
**reputation**
    63:22
**request**
    5:21 11:9
**requested**
    28:5 31:6
    76:11,14
    86:7
**requesting**
    46:1
**required**
    23:6
**requires**
    26:16 46:13
    55:8
**resident**
    52:18 66:19
**residents**
    69:24
**resigned**
    50:9
**resisted**
    73:15
**resistent**
    72:16
**resolution**
    26:24
**resolve**
    11:1,2
**resolved**
    38:14

John Pate
June 14, 2023

respect
  7:13 27:15
  74:16
respond
  5:5 35:24
  61:23
responded
  35:25
response
  12:21 61:22
responsibilit
ies
  27:8 28:16
  31:10 66:8
responsibilit
y
  39:8 61:12
  66:25 78:16
  84:2
rested
  8:1
restructuring
  23:17 24:21
restructuring
s
  23:1
rests
  47:1
result
  11:4 15:17
  40:25 53:9
resulted
  42:5
resulting
  67:10
retaining
  42:11
retaliate
  83:17
retaliated
  14:13,19,23
  30:22 31:1
retaliating
  42:7 83:5
retaliation
  10:15 15:3,
  6,15,17,20

16:9 54:22
56:8 70:19,
25
retaliatory
  31:17,25
  83:2
retired
  83:12
reverse
  49:18,19
reversed
  49:17
reversing
  49:21
review
  11:12 13:7
  17:19 42:16
  61:21
reviewed
  17:20 41:24
reviewing
  22:9
ride
  76:23
right
  5:1 16:6
  17:13 19:10,
  11,12,13,15
  20:16 25:17
  32:12 38:25
  39:20 48:25
  71:13 85:16,
  25 88:5
rights
  83:17 87:25
rise
  48:20
risk
  49:20
road
  79:25
rode
  76:21,24
role
  22:6 66:4,7
  70:2 71:16

room
  34:9,14
  35:4,5
  40:14,15
rose
  49:8
routed
  61:18
rule
  15:23
rules
  5:4 66:8
run
  50:11

_____

S

safety
  82:23
salary
  45:10
save
  48:12 50:12
saying
  15:22 16:5
  30:25 32:4
  39:2 44:9
  47:2,13
  51:20 57:24
  77:9,10
says
  10:11 47:5
  88:8
scheduled
  18:12
scope
  26:14
screen
  6:7 9:23,24
  13:22 16:17
  21:20 32:20
  60:2
screened
  23:12
scroll
  19:14,19

search
  24:9
seasoned
  83:11
second
  30:11 39:21
  46:7,11
secret
  40:10,21
sections
  20:20
see
  4:17,18 6:6
  9:24 16:11,
  12 21:20
  26:23 35:21
  39:2 41:15
  53:17,18
  57:22 80:12
seeing
  62:6 79:25
segregated
  48:25
segregation
  52:22
send
  12:18 17:19
  61:19 68:2
sends
  75:12
senior
  82:19
sentence
  39:21 51:13
separate
  52:19
separated
  7:5
separation
  8:20 9:9
September
  32:22 50:18
  52:5 63:12
  64:8,15 65:1
  81:11
sergeant
  10:14 21:25

John Pate
June 14, 2023

29:11 34:8,
10,11,12
36:1,3,4,14,
21 38:6,25
39:3,6
40:16,17
48:23,24
49:1,3,4,6,
7,8 50:21
52:8,24 53:1
59:19 70:23
71:7,15,18
72:24
**Sergio**
4:22 8:4,7,
25 9:2,8,11,
17,19 10:2,
13 12:25
13:16,19
14:6,11,19,
23 15:2
16:7,14 17:7
21:24 22:23
23:24 24:8
25:13 26:8,
10 27:15,24
29:3,4,14
30:22 31:18
32:6,16,18,
23 34:7
37:21 44:16,
19,22 46:25
47:23 49:15
50:18 51:14,
17 52:4
54:21,22
55:17 56:7,
8,24 57:10,
13,18,23
58:1,5,6
63:8,11
64:11,14
65:6 66:22
67:18 68:12
69:10 70:14,
18,22,25
71:2,14,19
72:1 73:3,10
74:7 75:1,3

79:19 81:3,
4,19 83:6
84:16
**Sergio's**
55:24
**series**
5:17 10:23
11:24 17:23
42:9,10
**serious**
44:10,13
53:23 54:16
**server**
33:24
**set**
16:20 19:1,2
**seven**
57:11
**several**
40:14 53:18
67:23 74:22
**share**
9:23 60:2
80:15
**sharing**
32:20
**short**
51:6 53:19
76:4
**shortly**
23:25 24:3
29:24
**shot**
49:12 78:25
**show**
11:24 18:14
48:12
**showed**
12:1
**showing**
41:12
**shown**
62:21,22,25
**shunning**
27:3
**sign**
46:14 47:15

**signature**
17:21 19:22,
23 21:6 25:5
26:22,25
**signature's**
25:8
**signed**
21:4 26:15
46:16 47:11,
14 60:14
81:18
**sit**
11:15 40:22
75:13 78:9
**sitting**
37:20
**situation**
37:18 38:14
44:5,10
48:6,7 51:12
54:9 72:19
78:25 79:1,2
88:8
**situations**
11:3 63:19
**slides**
30:18
**social**
42:18,22
43:16
**socialize**
8:11
**socialized**
8:13
**somebody's**
36:9
**someone's**
52:1
**something's**
50:4
**sort**
58:6
**space**
31:7
**speak**
32:1 36:3,4
39:13 41:9

43:12
**speaking**
30:15 37:22
41:10
**speaks**
43:11,12
**special**
70:8
**specific**
11:17,20
14:18,22
15:1,8 18:5
33:25 60:20
82:6
**specifically**
14:20 21:3
24:25 26:8
31:18 57:13
64:13,14
67:17 71:23
86:20
**speculate**
38:8
**speculation**
33:19
**spending**
26:14,17
**spoke**
35:25 38:5
41:18 43:18
46:6 63:16
85:6 87:18
**spoken**
13:15,25
**spread**
11:8
**squad**
34:8,12,14
35:4,5
**staff**
22:14 24:15
28:12,22
34:20 41:21
43:11 46:18
47:6,8
56:18,19
58:3 77:18

78:21,23
83:13
**stand**
40:11 48:14
**standard**
40:12
**standpoint**
86:9
**star**
85:25
**start**
23:22 24:12
80:25
**started**
5:24 27:3
31:3 51:13
81:4 85:22
**starting**
24:15 31:8
**state**
4:2 23:21
32:1,15
49:16
**stated**
23:3 36:13
41:24 48:20
55:3 57:16,
17 63:6
64:18 69:23
70:12 72:7
74:14 86:22
**statement**
36:10,21
40:11,12
54:22 86:7,8
87:8
**statements**
73:9
**states**
38:16,21
42:6
**stating**
30:21 73:9
**station**
27:22 28:20
88:3

**Statistically**
78:24
**statute**
62:2 88:1
**Stearns**
4:20 80:14
**Steel**
32:24 34:8,
10,11,18
36:1,3,4,14,
21,24 37:22
38:6,17,22,
23,25 39:13,
23 40:17,24
41:4,12
42:1,5,7,11,
15,25 43:3,
19 44:1
46:11 48:23,
24 49:1,3,7,
8 52:9,24
53:1 58:23
59:2,8,12,16
85:7,22
86:8,16,21,
23 87:19
88:3
**Steel's**
34:12 38:7
39:3 49:4,6
**Steven**
14:16 23:22
25:17,19,23
27:15,23
29:2 31:17
32:9,11
36:23 38:17,
21 39:11,16,
22 40:1,23
41:3 44:15,
18,21 47:21
50:3 51:14
53:12 54:20
56:6 57:6,12
58:4 62:19,
25 63:2,7,10
64:7,10,13
77:1,16

86:14,16,19
**stop**
6:25 7:3
32:20
**stopped**
29:1
**straw**
70:5
**street**
49:1
**stressful**
48:7
**strict**
57:1
**strike**
88:5
**strikes**
50:5
**stripping**
44:24
**structure**
23:3 24:22
**stuff**
5:6 9:5
**style**
26:1
**subject**
15:15 18:7
36:20 62:12
69:16
**subjectivenes
s**
48:19
**submittal**
67:9
**submitted**
30:5 31:19
32:16 61:2
**submitting**
30:23 81:13
**subordinates**
26:5
**subpoena**
75:12
**subpoenaed**
75:11

**subsequent**
12:23,24
**subsequently**
18:24 41:2
71:11
**substandard**
27:5
**sues**
10:14
**sufficient**
77:25 78:7,
10
**suite**
28:16,17
49:1
**summarized**
43:23
**summarizing**
65:25
**Sunday**
33:7,8,10
**superiors**
11:10
**supervised**
28:11
**supervisor**
49:2
**support**
31:23 58:12
**supports**
50:16
**suppress**
71:8 74:2
**sure**
18:15 27:21
39:9 43:1
51:23,25
56:2 68:17
79:24 80:17
**swear**
4:5
**Switzerland**
33:24
**sworn**
4:11 18:6
82:11,15,18
86:7

John Pate
June 14, 2023

**T**

take
  5:18 15:25
  25:13,15
  36:10 44:16
  61:1 70:14,
  18 75:23
  80:8 86:6
taken
  4:1 76:4
  84:11
taking
  32:6,15
  44:25 45:1
  48:3 85:15
talk
  9:2 11:16
  18:24 29:13
  43:14 57:8
  58:22 67:19
talked
  8:22,24 9:4
  13:15 18:11
  57:7 59:23
  82:9
talking
  16:1,4 54:8
  85:25
tasar
  44:4
tased
  86:24,25
taser
  32:23 34:5,
  10 35:18
  46:10 50:19
  52:9 54:8,21
  69:1
tasered
  34:11 39:6
tasing
  53:13,18
  54:12
team
  54:6 55:4

tell
  21:2 58:4
  61:22 69:20
  70:13,17
  74:7,9 77:1,
  3 78:3 82:25
  83:4,8,15,25
  84:5,9,15,21
  86:19
telling
  57:22
tenure
  10:24 14:15
  53:12
term
  86:15
terminate
  73:2
terminated
  34:16 42:14
  43:2,5,6,21,
  24 71:11
termination
  42:6 43:23
  71:17 73:19
  84:16
terms
  31:7 45:2,11
  49:6
test
  25:13,15
  34:11
testified
  4:12 36:24
testify
  5:25 75:6,9,
  11 79:3,4,11
testimony
  4:6 6:4
  13:16 47:20
  59:25
text
  10:1,2,7,8
  11:24 12:1
Thank
  4:19 5:23

thing
  39:1 84:13
things
  11:2 15:15
  20:25 27:4,
  10 43:13,16
  45:9,13 51:8
  54:3 55:12
think
  5:16 26:18
  31:9 43:19,
  22 45:23
  49:8,12,14
  50:7,8,12,13
  51:13 57:24
  75:22 82:9
  85:23
third
  23:18
thought
  38:4 46:22
  49:11 51:18
  76:7
thousand
  53:16 54:13
threatened
  34:13,23
  35:3,5 69:11
threats
  71:17
three
  50:5,7,8
  57:10 62:15
  65:16,22,23
  66:14,16,17
  67:11,20
  80:6
three-way
  68:20 73:19
threshold
  69:12
Thursday
  12:11
tied
  58:8,9
time
  6:15 7:4

  8:24 9:21
  11:13 16:1
  22:12 23:8
  24:13,19
  25:22 30:10,
  11 31:5,7
  32:1,2 35:4,
  9,11 37:5
  38:5,7 41:1,
  8 43:4 48:15
  51:6 65:21
  73:15 75:21
  77:21 78:2,
  18 79:24
  80:2,10
  83:14
timeframe
  53:19 69:4
timeline
  17:4
timely
  67:3,6,8,9
times
  9:14 11:1
  16:21 57:10
  63:14 67:20
  74:16,22
  80:13
today
  5:25 6:7
  37:20 40:11
  47:20 70:6
  75:13,20
  78:9 79:5,18
  80:10
told
  32:5 35:6
  39:25 43:6
  55:7 72:23
  73:2,12 77:5
top
  28:24 52:1,
  24
touch
  43:15
trace
  33:23

John Pate
June 14, 2023

track
21:1
tracking
21:9
transaction
17:22 30:4,
16 46:15
Transcribed
88:20
transcript
16:2 32:13
transcripts
13:12
transiting
24:17
transition
24:13
treated
26:12 27:15
72:10
treatment
34:19 81:3
trial
75:6,7,10,14
79:3,10
true
35:8 54:16
72:25
trust
56:15 58:6
trusted
55:5
trusts
57:17
truth
4:6,7
truthful
6:4
truthfully
5:25
try
27:12 71:7
72:16
trying
17:3 50:12,
15 86:3,11

Tube
43:18
turning
44:4
two
10:6 16:1
24:11,18
49:25 50:6
61:18 76:13
83:9 84:24
88:5
type
21:10,13
27:2 31:19
32:17 37:24
41:21 62:14
64:5 67:6
70:19 71:20,
21
typically
7:17 24:9
28:13,16
50:4 61:19
typo
24:1
typographical
24:1

———————————

U

Uh-huh
12:2,4 20:6
34:25
uh-huhs
5:6
ultimate
46:24 47:12
ultimately
7:25 66:16
70:22 81:18
unauthorized
39:22 40:7,
8,20
unclear
5:10
undermining
49:22

underneath
7:16
understand
4:24 5:11
8:6 15:22
16:5 18:13
35:14 42:2
48:17 86:11
understanding
14:9 50:17,
20 51:15,16,
19 52:3 53:3
82:4
understood
5:14 17:2
21:23 39:20
48:18
unilateral
54:6
unilaterally
55:8
unique
53:20,22
54:9
updated
78:11,17
upset
55:13
user
34:2

———————————

V

vaguely
14:8,9
various
20:20,22
27:10 31:9
34:20 40:16
43:11 45:12
51:8 54:4
56:19,20
63:23 64:3,
11
varying
11:14

vehicle
27:5 45:6,12
63:24 76:24
verbal
5:5 34:8
52:17
verbalize
5:7
verbalized
10:22
verbally
37:16 64:4
67:15
verify
86:24
version
21:3
vicinity
45:7
video
12:7 16:11
videos
13:9
viewing
20:4
violate
83:16
voluntarily
75:14,18,19
vote
69:16

———————————

W

waive
88:14,19
want
11:17 33:6
35:12,13
49:20 52:3
55:3 56:16,
17 58:5
75:19 84:11
87:3,5,17
88:1,6,7,15,
16

John Pate
June 14, 2023

wanted
  11:22 28:8,
  10 29:3 48:9
  53:3 55:4,5
  69:20
waste
  56:9
wasting
  57:14
Watch
  13:9
way
  16:13 35:16
  38:9 41:16
  50:15 68:16
  74:2 75:4
  80:5 83:23
  85:16
ways
  61:18 63:23
week
  9:1,2 57:11
  67:19,20
weekly
  24:14
Weeks
  65:14
weird
  32:12
went
  22:25 23:1
  26:13 34:18
  72:6 73:8
  85:21
whatsoever
  9:6,16 63:4
When's
  6:15
whistleblower
  30:12,14
  59:24 60:11,
  24 62:4,9
  64:6 70:15
  71:1,20 72:2
  73:4 83:16
Williams
  43:22

with8
  48:10
witness
  4:8 13:20
  80:8 86:1
  87:12,20
word
  40:9 47:4
  74:15
wording
  20:25
words
  83:3
work
  11:9 15:12,
  17 43:7 45:3
  67:25 80:15
  83:21
worked
  25:20 43:8
  48:25 49:1,3
  52:24,25
  59:9
working
  6:19,25 7:3
  23:22 24:6
  58:2 59:1,12
workplace
  10:24 70:20
  71:22 73:5
writing
  26:12,19
  29:15,23
  30:23 31:19,
  24 32:7,17
  53:5 55:1
  64:4 65:14,
  15 66:12
  83:5
written
  10:22
wrong
  38:12
wrongdoing
  17:3
wrongful
  9:22

wrote
  10:17 12:20
  35:2 53:6

-------

X

-------

X,y,z
  57:23

-------

Y

-------

yeah
  23:24 33:9
  38:19 40:20
  42:3 53:22
  67:2 69:4,5
  74:13 76:8,
  21 88:18
year
  17:7
years
  42:11 82:14