IN THE UNITED STATES DISTRICT COURT IN AND FOR
SOUTHERN DISTRICT, FLORIDA

CASE NO. 1:22-CV-20748-LENARD/LOUIS

SERGIO PEREZ,

    Plaintiff,

vs.

CITY OF OPA-LOCKA AND STEVEN BARREIRA,

    Defendants.

_____/

VIDEOTAPED DEPOSITION OF CHIEF STEVEN BARREIRA

TAKEN ON BEHALF OF THE PLANTIFF

OCTOBER 27, 2022
11:00 A.M. TO 3:20 P.M.

ALL PARTIES APPEARED REMOTELY
PURSUANT TO
FLORIDA SUPREME COURT ORDER AOSC20-23

REPORTED BY:
JADA PENA, COURT REPORTER
NOTARY PUBLIC, STATE OF FLORIDA



877.291.3376
www.UCRinc.com

2

```
 1              APPEARANCES OF COUNSEL
 2 ON BEHALF OF THE PLANTIFF:
 3      BRIAN H. POLLACK, ESQUIRE.
        FAIR LAW FIRM
 4      135 SAN LORENZO AVENUE, SUITE 770
        CORAL GABLES, FLORIDA 33146-1878
 5      305-230-4884
        BRIAN@FAIRLAWATTORNEY.COM
 6      (REMOTELY VIA ZOOM)
 7 ON BEHALF OF THE DEFENDANT:
 8      JONATHAN HOWARD RAILEY, ESQUIRE.
        JOHNSON ANSELMO MURDOCH BURKE ET AL
 9      2455 EAST SUNRISE BOULEVARD, SUITE 1000
        FORT LAUDERDALE, FLORIDA 33304-3113
10      954-463-0100
        RAILEY@JAMBG.COM
11      (REMOTELY VIA ZOOM)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

4

```
 1              INDEX OF EXHIBITS
 2 EXHIBIT        DESCRIPTION        PAGE
 3   1     APPLICATION          16
 4   2     LETTER OF RESIGNATION       17
 5   3     AFFIDAVIT         25
 6   4     PEREZ 452, 454        59
 7   5     PEREZ 271         104
 8   6     PEREZ 262, EMAIL        111
 9   7     EMAIL          114
10   8     PEREZ 259         119
11   9     SOLE SOURCE LETTER       144
12   10    PLANTIFF, 264, 265        149
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

```
 1              INDEX OF EXAMINATION
 2 WITNESS: CHIEF STEVEN BARREIRA
                        PAGE
 3 DIRECT EXAMINATION:
        BY BRIAN H. POLLACK, ESQUIRE        5
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

5

```
 1    VIDEOTAPED DEPOSITION OF CHIEF STEVEN BARREIRA
 2              OCTOBER 27, 2022
 3 Thereupon:
 4       CHIEF STEVEN JOSEPH BARREIRA
 5 was called as a witness, and after having been first
 6 duly sworn, testified as follows:
 7       THE COURT REPORTER:  Today's date is October
 8 27, 2002.  The approximate time is 11:01 a.m.
 9   We are here for deposition of Case Number
10 1:22-CV-20748-LENARD/LOUIS.
11   I am Court Reporter Jada Pena with Universal
12 Court Reporting.  Will Counsels please introduce
13 themselves for the record?
14       MR. POLLACK:  Good morning.  Brian Pollack on
15 behalf of the Plaintiff, Sergio Perez.
16       MR. RAILEY:  Good morning.  Jonathan Railey
17 for the City of Opa-Locka.
18       THE COURT REPORTER:  Thank you.  You may
19 proceed.
20              DIRECT EXAMINATION
21 BY MR. POLLACK:
22   Q   Good morning, Mr. Barreira.  My name is Brian
23 Pollack.  I represent Sergio Perez here to go through
24 and ask you some questions in regards to his case
25 against the City of Opa-Locka, the sole Defendant in the
```



Barreira, Steven Chief   10-27-2022

---

**6**

1  case.

2      If you don't understand any of my questions,

3  let me know.  I'm sure you've been through this drill

4  before.

5      If you need a break, let me know.  As long as

6  it's not between a question and answer, I'll try to

7  accommodate you.

8      And if you just don't understand or don't know

9  where I'm trying to get at, or what kind of answer I'm

10  getting, just let me know and I'll try to ask you

11  questions so you and I could be on the same page. Fair

12  enough?

13  A  Yes, sir.

14  Q  Okay.  Have you ever been known by any other

15  names?

16  A  No, sir.

17  Q  I'm going to skip, Jonathan, the Social

18  Security and the residential address since I'm sure if

19  we need them for purposes of subpoena, we can get them,

20  but I don't think it's necessary to put that stuff on

21  the record. Same thing, are you okay with putting your

22  date of birth on the record?

23  A  Sure.

24  Q  Okay.

25  A  It's March 20, 1972.

---

**7**

1  Q  All right.  Are you married?

2  A  Yes, sir.

3  Q  How long have you been married?

4  A  Oh, gosh, since October '99.

5  Q  What's your wife's name?

6  A  Is that really relevant?

7  Q  If there's an objection, Jonathan will let

8  you-- Mr. Railey will let you know whether he doesn't

9  want you to answer, or something is privileged, or out

10  of bounds. I'm just trying to going through some

11  backgrounds. So, if you can give me her name?

12      MR. RAILEY:  Let me just place one objection,

13      because if he gives her last name, it potentially

14      discloses his home address, which is protected

15      under 119. So, I'm instructing him not to answer

16      this question.

17      MR. POLLACK:  So, we can mark the question and

18      answer as confidential then, which would remove it

19      from the transcript.

20      MR. RAILEY:  Yeah, I can't prevent you from

21      answering the question if -- with the stipulation

22      that he's going to mark it as confidential and not

23      do anything with that information, with that

24      understanding --

25      MR. POLLACK:  Yeah.

---

**8**

1      MR. POLLACK:  -- then you provide the name.

2  A  Molly.

3  BY MR. POLLACK:

4  Q  Same last name?

5  A  Yes.

6  Q  And while you were the chief of police at the

7  City of Opa-Locka, were you living with anybody who was

8  over the age of 18?

9  A  No, sir.

10  Q  Have you taken any medications or suffer from

11  any medical conditions that would affect your memory or

12  ability to testify truthfully here today?

13  A  No, sir.

14  Q  And you understand you took an oath to tell

15  the truth?

16  A  Yes, sir.

17  Q  Can we rely on your testimony as the truth?

18  A  Yes, sir.

19  Q  Do you understand that the oath you gave to

20  tell the truth today is the same oath that you give if

21  you're testifying in Court at the trial of this case?

22  A  Yes, sir.

23  Q  Does that mean we can rely on your answers as

24  honest questions -- honest responses to my questions?

25  A  Yes, sir.

---

**9**

1  Q  Did you review any documents in anticipation

2  of today's deposition?

3  A  Review any documents when?  In total, since I

4  got -- first got the subpoena?  Yes, sir.

5  Q  Yes.  What did you review?

6  A  Just paperwork, meeting notes, messages, e-

7  mails, whatever I had.

8  Q  Okay.  You mentioned paperwork, what kind of

9  paperwork were you're referencing?

10  A  Meeting notes.

11  Q  Meeting notes of meetings with whom?

12  A  Notes from meetings with your client, the

13  deputy chief, staff members of City of Opa-Locka.

14  Q  Were those meeting notes that you prepared, or

15  did someone else prepared it?

16  A  I did.

17  Q  Were copies of those notes left at OLPD?

18  A  I'm not sure.  I know I provided them to the

19  Attorney.

20  Q  The notes were from how many different

21  meetings?

22  A  I don't recall the exact number, sir.

23  Q  You said you also reviewed messages?

24  A  Yes, sir.

25  Q  Messages exchanged with whom?

---



Barreira, Steven Chief   10-27-2022

**10**

1    A   Various individual throughout the city, I
2 can't give you the exact count of who.  All of that
3 information, sir, was provided to the Attorney,
4 everything I had.
5    **Q   Okay.  So, if we had made a request on the**
6 **city to provide messages that you've exchanged with**
7 **witnesses, those are messages that you would have**
8 **expected to be provided.  Is that right?**
9    MR. RAILEY:  Object to the form.  You can
10    answer.
11    A   When you said "request to the city," I have no
12 idea what the city did with any of my stuff.  This is
13 just the stuff that I had.
14 BY MR. POLLACK:
15    **Q   Okay.  All right.  Do you have any social**
16 **media accounts?**
17    A   Yes, sir.
18    **Q   Facebook?**
19    A   Yes, sir.
20    **Q   Instagram?**
21    A   Yes, sir.
22    **Q   Twitter?**
23    A   I got accounts, but I believe there's nothing
24 on it. But yes, sir.
25    **Q   On Instagram, do you have an account name that**

**11**

1 **you go under?**
2    A   I couldn't tell you off the top of my head,
3 sir. I don't hardly ever use it.
4    **Q   Do you post on Instagram?**
5    A   If it does, it's one of those automatic ones
6 through Facebook.  So, I can't say I never did, but I
7 can tell you it's very rarely used.
8    **Q   Do you -- under Facebook, do you go by your**
9 **own name or a different name?**
10    A   No, sir.  My name.
11    **Q   While you were working at the City of Opa-**
12 **Locka Police Department, were you posting on Facebook?**
13    A   I'm sure.
14    **Q   What about afterwards?**
15    A   I'm sure.
16    **Q   When did you graduate from high school?**
17    A   1990.
18    **Q   From where?**
19    A   Diman Regional Vocational Technical High
20 School.
21    **Q   Where is that?**
22    A   Fall River, Massachusetts.
23    **Q   From there, you moved down to Florida?**
24    A   Yes, sir.
25    **Q   That was in, what, the Jacksonville-St.**

**12**

1 **Augustine area?**
2    A   Yes, sir.
3    **Q   And then you attended St. Johns River College?**
4    A   Yes, sir.
5    **Q   You got an Associate of Science in Criminal**
6 **Justice Technology from St. Johns River College in about**
7 **'93?**
8    A   Give or take, I'm not sure of the exact date.
9 But yes, sir, I have an associate's degree from St.
10 Johns River State College.
11    **Q   Did you obtain any degrees before you started**
12 **at Saint Leo University in 2011?**
13    A   And you're talking about any other degrees
14 other than the two?
15    **Q   Correct.**
16    A   No, sir.  Just the two.
17    **Q   And then the next time you started was towards**
18 **your bachelor's degree at Saint Leo University in -- was**
19 **it 2011?**
20    A   I can't tell you the exactness of the dates.
21 But yes, sir, I went to Saint Leo University.  Yes, sir.
22    **Q   And were those courses that you attended,**
23 **online or in-person?**
24    A   They were online, sir.
25    **Q   And then you received a Bachelor of Arts in**

**13**

1 **Criminal Justice from Saint Leo University in about**
2 **2013?**
3    A   Give or take.  Again, not on the dates.  But
4 yes, sir, I have a bachelor's degree from Saint Leo
5 University.  Yes, sir.
6    **Q   Was your education at Saint Leo University**
7 **subsidized by an employer for whom you were working at**
8 **the time?**
9    A   Partially.
10    **Q   Which employer was that?**
11    A   Jacksonville Sheriff's Office.
12    **Q   You started at Jacksonville Sheriff's Office**
13 **in about '94?**
14    A   Yes, sir.  October of 1994.
15    **Q   And why did you resign -- or why did you**
16 **retire on January 3rd, 2017?**
17    A   I became a staff member at Clay County
18 Sheriff's Office.
19    **Q   When you left the Jacksonville Sheriff's**
20 **Office, at that point you were an active sergeant?**
21    A   Yes, sir.
22    **Q   When you went to the Clay County Sheriff's**
23 **Office, in what position did you start there?**
24    A   Well, I believe my classification at that time
25 was Senior Sergeant, and I started as an Assistant Chief



14

1 of Community Affairs with Clay County Sheriff's Office.
2     **Q   You worked your way up to being a Patrol**
3 **Chief?**
4     A   Yes, sir.
5     **Q   What's a -- what is a Patrol Chief's**
6 **responsibilities?**
7     A   I was in charge of the entire patrol division-
8 - uniform patrol division.  I also had community
9 affairs, PIO, SROs, and I think that was about it.  But
10 I was in charge of the deployment, any disciplinary
11 issues, finance, you know, financial budgeting, all
12 that.
13     **Q   Prior to coming to OLPD, have you ever been**
14 **responsible for conducting or supervising Internal**
15 **Affairs investigations?**
16     A   Define "responsible for", because I had --
17 while at the Jacksonville Sheriff's Office I had
18 conducted internal investigations on my personnel.
19         But if you're asking me for like a particular
20 unit, I was never assigned to the internal affairs unit,
21 no.
22     **Q   While you were at the Jacksonville Sheriff's**
23 **Office, were you a part of a police union?**
24     A   Yes, sir.
25     **Q   How about while you were at the Clay County**

15

1 **Sheriff's Office, were you part of a union in that**
2 **employment?**
3     A   No, sir.
4     **Q   Was there a collective bargaining agreement in**
5 **effect for non-command staff officers at the Clay County**
6 **Sheriff's Office?**
7     A   No, sir.
8     **Q   And then why did you leave the Clay County**
9 **Sheriff's Office?**
10     A   Election of a new sheriff.
11     **Q   And what did that mean?**
12     A   Well, when a new sheriff comes in, they want
13 to replace their staff members.  That was in part, and
14 the other part of that was, I had suffered from COVID-19
15 and had significant physical issues that I was dealing
16 with.
17     **Q   Got you.  What was your next work after Clay**
18 **County Sheriff's Office?**
19     A   Between the Clay County Sheriff's Office and
20 Opa-Locka PD, I was a contract Operation Section Chief
21 for the Florida Division of Emergency Management.
22     **Q   Okay.  And that was from about January to**
23 **April of 2021?**
24     A   Approximately.  Yes, sir.
25     **Q   How do you find out about the job opening for**

16

1 **Chief of Police at Opa-Locka PD?**
2     A   Online.  I'm not sure what format.
3     **Q   And then you sent in a written job application**
4 **on March 10th, 2021?**
5     A   I can't attest to the date, but I did send in
6 an application.  Yes, sir.
7     **Q   Let me just jump forward a little bit. Where**
8 **are you working now?**
9     A   I work at Ascension Health.
10     **Q   And your role at Ascension is as the full-**
11 **time security manager?**
12     A   Yes, sir.
13     **Q   Did you start in that position in January of**
14 **2022?**
15     A   Yes.
16     **Q   All right.  I'll just mark this as Exhibit 1.**
17 **Can you see what I have on the screen?**
18         (Thereupon, Plaintiffs' Exhibit 1 was entered
19         into the record.)
20     A   Yes, sir.
21 BY MR. POLLACK:
22     **Q   Okay.  This is -- this was produced by the**
23 **City of Opa-Locka, 2987 through 2992.  Is that your**
24 **handwriting on this document?  I'll go through the pages**
25 **slower this time.**

17

1     A   Yes, sir.
2     **Q   Okay.  Any information on this application for**
3 **employment is true and correct?**
4     A   To the best of my knowledge.  Yes, sir.
5     **Q   Okay.  All right.  And then as the, I guess,**
6 **on the book end of this, you resigned from your**
7 **employment at the City of Opa-Locka on October 21st,**
8 **2021?**
9     A   I won't attest to the date.  But yes, sir.
10     **Q   Okay.  I'll mark this as Exhibit 2, and see if**
11 **this helps you out with the date.**
12         (Thereupon, Plaintiffs' Exhibit 2 was entered
13         into the record.)
14 BY MR. POLLACK:
15     **Q   When you resigned from your employment with**
16 **the City of Opa-Locka, did you do so by way of a letter**
17 **of resignation?**
18     A   I did.
19     **Q   On what I've put up as Exhibit 2, is that the**
20 **letter of resignation?**
21     A   It appears to be.  Yes, sir.
22     **Q   From you to City Manager, Pate?**
23     A   Yes, sir.
24     **Q   Did you indicate in the letter the reasons why**
25 **you are resigning?**



18

1     A  I don't think it's technically listed in
2  there.  No, sir.  I mean, no, I don't see it.  Well,
3  kind of, I guess, just a matter of interpretation, sir.
4     Q  And you indicate that there are ideological
5  and leadership style differences?
6     A  Yes, sir.
7     Q  Now, let me back up for a second.  Let me take
8  this down.  When you applied for the Chief of Police
9  position at Opa-Locka PD, is it true that you are not
10  the only candidate that applied?
11     A  I have no idea.  You'd have to ask her Opa-
12  Locka for that.  I don't know how many people applied.
13     Q  Okay.  I mean, as for how many people, but was
14  it your understanding that there were other applicants?
15     A  I had an interview with another individual
16  towards the end of it.  But like I said, I don't know
17  how many people applied to the position.
18     Q  You mentioned interview, how many interviews
19  did you have before getting the position?
20     A  I can't give you a number.  A lot.
21     Q  Do you remember the people whom you've
22  interviewed with?
23     A  I can name, yeah, a couple of them.  John
24  Pate, I interviewed individually with all of the members
25  of the DS.  I interviewed with your client, and also

19

1  Jenkins was in one of the interviews.
2     Q  And as a result of the interviews that you
3  went through, you are hired as the Opa-Locka PD?
4     A  Yes, sir.
5     MR. RAILEY:  Form.
6  BY MR. POLLACK:
7     Q  And you were then sworn in on April 16th,
8  2021?
9     A  I can't attest to the dates.  But yes, sir, I
10  was sworn in.
11     Q  As the Chief of Police, was one of your
12  responsibilities determining whether to hire or not an
13  applicant for a law enforcement role?
14     A  I definitely had an input.  Yes, sir.
15     Q  And what kind of input was that?
16     A  I'm not really sure what you mean.
17     Q  Well, I asked you if your responsibilities
18  included determining whether or not to hire a law
19  enforcement applicant, and you said you had an input.
20     I mean, if you said no, you didn't want to
21  hire somebody at the Opa-Locka Chief -- as the Opa-Locka
22  Chief of Police, was it your expectation that the city
23  would not then hire that person?
24     A  That would be my expectation.  Yes, sir.  But I
25  also would have -- in the hiring process, I also believe

20

1  in panels and the input of those that work for me, or
2  those that are directly involved in the process.
3     So, if they said they didn't -- depending on
4  who it was, if they said they didn't want to hire
5  anybody, I would also take that into consideration as
6  well.
7     Q  Okay.  Did you have occasion to hire anybody
8  as a law enforcement officer while you were the Chief of
9  Police at Opa-Locka?
10     A  Yes, sir.
11     Q  Who did you hire?
12     A  I have no idea.  The name wise, I have no
13  idea.
14     Q  Okay.  How many officers did you hire?
15     A  No idea, sir.  I don't recall.
16     Q  As the Chief of Police, did you believe it was
17  important for a law enforcement officer candidate to be
18  truthful in providing the information in his or her
19  application for employment?
20     A  Do I think it's -- to the best of -- as long
21  as it's not an intentional departure from the truth,
22  yes.
23     Q  I mean, when you apply for employment with the
24  City of Opa-Locka, is it your understanding that the
25  application is done under penalty of perjury

21

1     A  Under penalty of perjury, no.  I wouldn't say
2  it would be under penalty of perjury, I think it would
3  be more of a hire that individual or not.
4     And again, it goes back to the it goes back to
5  the intent of the applicant.  So, if an applicant says,
6  you know, I graduated in January, but it was really
7  March or April.  Is that, you know, a deal killer?  Does
8  that mean that they willfully departed?  No.  That's
9  something that, you know, if they purposely gave false
10  information, that's a different story.
11     Q  Okay.  And I want to go back to Exhibit 1 for
12  just a second, and I'll direct your attention to Page 4
13  of that, which is the city's 2990.  Can you see that on
14  your screen?
15     A  Yes, sir.
16     Q  Okay.  And that's your signature at the bottom
17  of the page?
18     A  Yes, sir.
19     Q  And there's a certification.  Do you see that?
20     A  Are you talking about underneath the veteran's
21  preference claim or -- oh okay, yes, sir, I see that.
22     Q  Okay.  And the certification is -- and please
23  correct me if I'm reading this wrong, "I hereby certify
24  that all statements made on this application is true and
25  correct, and that any misstatements or omission of



Barreira, Steven Chief   10-27-2022

22

1 material facts in the application, or the hiring process
2 will result in disqualification or termination of
3 employment." Do you see that?
4    A   Yes, sir.
5    Q   Okay. And so, based on your having signed
6 this application for employment, is it your
7 understanding that the information that an applicant
8 places on their application for employment with the City
9 of Opa-Locka is done, is made based on those statements
10 being true?
11    A   That would be the assumption, yes.
12    Q   Okay. In fact, that's what the applicant is
13 attesting to and which you attested to. Is that correct?
14    A   Sure.
15    Q   And if you found out that an applicant made a
16 misstatement or omitted material facts in the
17 application or the hiring process as the Chief of
18 Police, you can recommend that that person will either
19 be disqualified from consideration or that their
20 employment be terminated. Is that also true?
21    A   Depending on the intent and depending on the
22 nature of the thing. Yes, sir.
23    Q   And also based on the application for
24 employment where it says that any misstatement or
25 omission of material fact in the application or the

23

1 hiring process will result in disqualification or
2 termination of employment. Do you see that?
3    A   That's what it says on there. Yes, sir.
4    Q   Okay. And as the Chief of Police at Opa-
5 Locka Police Department, you are responsible for
6 maintaining the integrity of the department. Is that
7 true?
8    A   To the best of my ability.
9    Q   And to the best of your ability, does that
10 mean that if you learned of a misstatement or omission
11 of a material fact in an application for employment,
12 that you would request that an investigation to be
13 conducted as to the circumstances?
14    MR. RAILEY:  Form.
15    THE WITNESS:  I'm sorry?
16    MR. RAILEY:  Go ahead.
17    A   Depends on -- again, sir. You know, being an
18 Attorney for a lawsuit, you know that it's not only just
19 the letter of the law, it's also the spirit of law. And
20 when you start talking about an employment application,
21 it all depends on the overall circumstances involved in
22 the application process.
23       What was the nature? What was the discrepancy
24 or the issue that was pointed out or learned at a later
25 date? What was the severity? What's the impact?

24

1       Again, it's a case by case, but it also
2 depends on the nature of what we're talking about. If
3 it was significant and severe, then it would be
4 something to look into. Yes, sir. If it's something
5 minor, that could be easily rectified, then the answer
6 would be no.
7 BY MR. POLLACK:
8    Q   Okay. When you separated from the
9 Jacksonville Sheriff's Office, did you complete an
10 affidavit of separation in connection with your
11 departure?
12    A   I have no idea. I don't recall.
13    Q   Did you complete one when you departed from a
14 Opa-Locka?
15    A   A what, sir?
16    Q   An affidavit of separation where you attest to
17 the circumstances that you left, which in your case
18 would be, you voluntarily resigned while not under
19 investigation?
20    A   I didn't -- I don't recall filling out
21 anything other than that letter or a letter of
22 resignation.
23    Q   In the course of your considering applicants
24 for hire at the Opa-Locka Police Department, did you
25 review applicant files?

25

1    A   In the overall process, yes. However, a lot
2 of the weight of those applications in the interviews
3 was placed on your client, Gavin Perez, and Deputy Chief
4 Jenkins.
5       At least in a majority of the process and
6 review and consideration at that point, they typically
7 brought it to me at the end towards the tail end of the
8 process. So, yes.
9    Q   They would bring it to you along with the
10 narrative report as to what the findings were based on
11 the investigation into the applicant's background?
12    A   Narrative, they would bring me a narrative
13 report. No, sir.
14    Q   Would they talk with you about their findings?
15    A   They would talk to me about what their
16 opinions on it. Yes, sir.
17    Q   All right. Besides the application for
18 employment that we reviewed as Exhibit 1, did you also
19 complete an affidavit in connection with your
20 application to the City of Opa-Locka Police Department,
21 which I've marked as Exhibit 3?
22       (Thereupon, Plaintiffs' Exhibit 3 was entered
23       into the record.)
24    A   Yes, sir.
25 BY MR. POLLACK:



Barreira, Steven Chief   10-27-2022

26

1    Q   Did you complete this document under the
2  penalty of perjury?
3    A   If it says -- if it lists on there under
4  penalty of perjury, then I would say yes, that's -- that
5  is my signature.
6    Q   Okay.
7    A   But I didn't complete all of it.  That bottom
8  piece isn't mine.
9    Q   Understood.  The bottom piece looks like it
10  was completed by Destiny Wilson who notarized your
11  signature?
12    A   All right.
13    Q   And in this affidavit of applicant, you
14  indicated that you completed your employment application
15  as true and correct, and then all other information you
16  furnished in connection with your application for
17  employment is also true and correct. Do you see that?
18    A   Yes, sir.
19    Q   And I'm not saying that you provided any
20  misinformation, I'm just asking about the application
21  process and what applicants at the Opa-Locka Police
22  Department attest to using your documents as the
23  example.
24        And so, in your experience, in addition to
25  completing an application for employment with the City

27

1  of Opa-Locka, yourself as an applicant also completed an
2  affidavit where you attested that all of the information
3  you are giving in connection with your application for
4  employment was true and correct. Do you understand that?
5    A   Yes, sir.  I mean, the automatic assumption is
6  that the information that's provided on an application
7  is accurate, true, and correct to the best of that
8  individual's knowledge.
9        And again, as it indicated in one of the other
10  forms that you showed me, if we find out that if, you
11  know, if they do indicate that, you know, is not true,
12  depending on the nature of what the violation is, and
13  how severe it is, and what exactly the information was
14  or was not presented, it could be a basis for
15  termination.  So, yes.
16    Q   Understood.  And I didn't go through some
17  other customary background questions because I know
18  you've been through background checks before.
19        So, I didn't need to ask.  And this is
20  referring to the document that I have as Exhibit Number
21  3 is a perfect example of that where at question number
22  4, you know, not only would you have to disclose whether
23  you were the subject of some kind of criminal
24  investigation in your application, but you also
25  indicated that you never had a criminal record sealed or

28

1  expunged in response to Question 4.  Do you see that?
2    A   Correct.
3    Q   Okay.  Likewise, the next question involves
4  whether your -- you were currently under investigation
5  at the time of your application with any -- and I'm
6  trying -- any agency or administrative proceeding for
7  any wrongdoing, and you indicated no to that as well?
8    A   You're indicating if I was under
9  investigation?
10    Q   Correct.  And I'm saying that -- and I don't
11  mean to speak over you, and that's probably bad form on
12  my part.  But at the time of your application, you were
13  not under investigation, you weren't the subject of any
14  investigation, civil, criminal, or administrative, and
15  you indicated, no?
16    A   If I was, I didn't know about it.
17    Q   Fair enough.  And we know that that happens.
18  I'm not saying that you were, but that's the application
19  process?
20    A   Okay.  Yes, sir.
21    Q   That in Question number 6, it asks whether you
22  separated or resigned from a previous criminal justice
23  employment while under investigation, and you indicated
24  that that was false.  Meaning, that had never happened
25  to you.  Fair enough?

29

1    A   Correct.
2    Q   Is that true?
3    A   Yes.
4    Q   Okay.  Why is that important to know whether
5  an applicant resigned from a previous criminal justice
6  employment while they are under investigation?
7    A   I think it's important to know as much as
8  possible about the applicant, not just in that one
9  particular area.
10    Q   Understood, but why would it be important to
11  know whether somebody resigned while they were under
12  investigation?
13    A   Why would it be important?  Again, it's --
14  everything is important, including whether they resigned
15  while under investigation, then, you know, the question
16  would be is, what was the nature of the investigation,
17  why.
18        I know recent changes in, you know, Florida
19  Statute, police policy, and all that concerning prior
20  records and disciplinary actions of officers has come
21  more into play in recent days.
22        But I mean, again, if you're asking me if one-
23  - if that's important, yes, sir.  It is important.  But
24  it is one of many pieces.
25        And again, it goes back to, did they willfully



Barreira, Steven Chief   10-27-2022

30

1  depart, or did they not?  If they were under
2  investigation, what was the nature of the investigation?
3        And I can tell you, and I think you're very
4  well aware of this, or I'm sure you are.  Opa-Locka
5  faces a tremendous amount of challenges, and one of them
6  being the fact that it is absolutely the lowest, not
7  including its reputation, but in fact, it is the lowest
8  paid, or at least it was when I was there, the lowest
9  paid law enforcement agency in the entire region.
10       Q    And I understand that.  Is it also important
11 to know whether someone resigned while under
12 investigation so that the department could conduct an
13 investigation into the circumstances of that departure
14 and what the investigation was?
15       A    Yes, sir.
16       Q    I mean, if somebody resigned in lieu of
17 discipline, that would be important for you to know,
18 about an applicant.  Isn't that right?
19       A    I would want to know.  Yes, sir.
20       Q    And if someone resigned before they could be
21 disciplined from another department, that's also
22 something you would want to know as the Chief of Police
23 who made a recommendation as to whether to hire or not
24 this applicant?
25       A    I would want to know as much as I could.  Yes,

31

1  sir.
2        Q    And, in fact, you'd want to know, not just as
3  much as you could, you'd want to know whether they
4  resigned during the pendency of an investigation so that
5  you could find out what were the circumstances for which
6  they were being investigated.  Is that right?
7        A    That's a fair assessment.
8        Q    And if -- and then you get into an applicant
9  who -- you know, it'd be important to know if that
10 applicant was being investigated for their truthfulness
11 in order to decide whether you wanted that applicant at
12 your department, right?
13       A    I'm sorry, could you repeat that one for me
14 again?
15       Q    Sure.  One of the worlds of investigations
16 that an officer could be investigated by a prior
17 employer as for their honesty, or dishonesty, right?
18       A    Correct.
19       Q    And as a law enforcement officer, that's one
20 of the paramount concerns that you would have as the
21 Chief of Police is to try to make sure that the
22 personnel that you're hiring are honest and trustworthy
23 individuals.  Is that right?
24       A    That's the goal.  Yes, sir.
25       Q    I mean, you know, I have heard your interview

32

1  with FDLE.  I understand how you feel about the law
2  enforcement profession, and I think we're on the same
3  page with that.
4        And I think that it's important to maintain
5  the integrity of the law enforcement profession, and I'm
6  sure you feel the same way?
7        A    Yes, sir.
8        Q    And, you know, there's different ways of
9  maintaining the integrity of the profession.  And one of
10 which is to make sure, or try to make sure to the best
11 of our ability that the law enforcement officers that
12 we're hiring are truthful and honest individuals.  Do
13 you agree with that?
14       A    Yes, sir.
15       Q    All right.
16       A    I'm sorry if you all can hear that, I'm not
17 sure.
18       Q    There's a little bit of background, but if it
19 gets annoying, you all will let you know, or Jade, our
20 stenographer will let you know.
21       Do you still keep in touch with Michael Steel?
22       A    Him and multiple individuals, I've spoken to,
23 yes.
24       Q    When you say "him and multiple individuals",
25 you're referring to other individuals who are employed

33

1  by or were employed by the City of Opa- Locka?
2        A    Yes, sir.
3        Q    Do you exchange -- have you exchanged e- mails
4  with Michael Steel since your departure from the
5  department?
6        A    Exchanged e-mails, yes.  Personal ones, yes,
7  along with a few others.
8        Q    Okay.  And I'm going to focus on him for --
9        A    Oh, sure.
10       Q    -- obvious reasons, the purpose of the case.
11 But when you indicate you've exchanged personal
12 e- mails, does that mean that those e-mails did not
13 discuss or address business that was going on at the
14 Opa-Locka Police Department?
15       A    Correct.
16       Q    And what kinds of things did you discuss, or
17 were discussed by e-mail?
18       A    I think the primary e-mail was the lawsuit
19 that your client filed, and I believe he was the active
20 Police Chief, or active -- I think it was when he was
21 active Police Chief that we had.
22       Majority of our conversations, and if you're
23 looking for any of those e-mails, I would recommend
24 going to -- I think he sent them from his work e- mail.
25 So, they should be on record there.



Barreira, Steven Chief   10-27-2022

---

34

1   Q   Did you respond to any of his e-mails?
2   A   I'm assuming, yes.  But I don't know.
3   Q   And then the follow up question would be, when
4  you responded to those e-mails, would you be responding
5  to the work e-mail address so that I could go ahead and
6  just request those e-mail strings from Opa-Locka?
7   A   I wouldn't be able to confirm.  I would say
8  yes, but you'd have to go back and pull his e-mail
9  history.  Everything's in the open man, and you want to
10  know it would be on there.  Nothing secret squirrel
11   Q   Got you.  Besides exchanging e-mails with
12  Mr. Steel, did you text with him?
13   A   Yes, sir.
14   Q   The texts with Mr. Steel, were those ongoing
15  after you resigned from your employment at Opa-Locka?
16   A   Yes.  Yes, sir.
17   Q   Do you know whether those texts were on the
18  cell phone issued to him by the City or on a different
19  phone?
20   A   No idea, sir.  You'd have to ask him.
21       MR. POLLACK:  And I'm kind of pensive for a
22  second, just because -- and John, this may be an
23  open dialogue, but I'm trying to just -- to figure
24  out how would be the best way to get those e-mails
25  and texts, not just from Opa-Locka, and I would

---

35

1  think that Mr. Barreira would be -- or will be a
2  lot more cooperative than Mr. Steel at this point
3  in providing that through a subpoena.
4       I don't know how to address that.  So, maybe
5  that's something that we can talk about.  Because
6  obviously, subpoenaing those records would require
7  me to get an address, and I just want to bring that
8  up.
9       So, John, we can talk about it afterwards.  You
10  can talk to Mr. Barreira about whether a subpoena
11  is necessary or how because, you know, I'm not
12  saying that if I subpoenaed those documents from
13  Mr. Steel, I would or would not get them all out.
14       But I wanted to make sure that I got both ends
15  of a conversation and to double check to make sure
16  that I wasn't reliant on one source and doing my
17  job.  So, I may ask you for copies of those e-mails
18  and texts.
19  BY MR. POLLACK:
20   Q   And so, my question I guess to you,
21  Mr. Barrera is, have you deleted or discarded any of
22  those e-mails or texts that you exchanged with Mr. Steel
23  since leaving the employment of Opa-Locka?
24   A   My personal e-mail, I don't know.  That I
25  couldn't tell you, I'd say no.  I can tell you most of

---

36

1  the conversations had a lot to do with when he was
2  assigned as the interim chief asking me questions about
3  vehicles, and what to do, and leadership type questions,
4  but -- so, everything I have has been -- everything that
5  I had was already been provided, so.
6   Q   And what about with regard to the text
7  messages?  Because you mentioned that some of the issues
8  that were discussed by e-mail involve the lawsuit that
9  my client filed?
10   A   I did not say that, sir.  I never said we
11  discussed the lawsuit.  Well, excuse me, let me rephrase
12  that.  He sent me a cop -- as the Chief, he sent me a
13  copy of the lawsuit.  So, yes.
14   Q   Okay.  And I'm not saying that there was any
15  other discussion, but since you mentioned it, and so, in
16  connection with the text messages, what was the nature
17  of those texts that you exchanged with Michael Steel?
18   A   Same thing, mostly prayers.  Questions, you
19  know, hey, doing this, what do you think about this kind
20  of deal.
21   Q   Got you.
22   A   But again, for the record, he was not -- he is
23  not the only one.  I've had conversation with DS
24  members, other members of the department in same
25  fashion, so.

---

37

1   Q   Have you had any discussions with any
2  personnel employed by the Opa-Locka Police Department
3  about Mr. Steel since Friday?
4   A   Friday of last week.  Yes, sir.
5   Q   Okay.  And were those discussions concerning
6  the circumstances under which Mr. Steel was let go from
7  the department?
8   A   One of them was.  Yes, sir.
9   Q   Who was that with?
10   A   Harborough.
11   Q   Before Michael Steel was let go from the City
12  where he -- did you have discussions with personnel
13  employed by the City of Opa-Locka about his having been
14  on leave?
15   A   He had told me that.
16   Q   How frequently were you speaking with
17  Mr. Steel?
18   A   Every couple of weeks, not frequently.
19   Q   For how long would you have these
20  conversations?  I'm saying, in other words, would you be
21  talk -- would you be on the phone with them for 20
22  minutes?  Would you be on the phone for two minutes?
23  What would be an average?
24       MR. RAILEY:  Form.
25   A   I didn't time it.  That we weren't on the

---



38

1  phone for hours. I'm not much of a phone guy. So, we
2  weren't on the phone for hours, but a couple of minutes.
3  BY MR. POLLACK:
4      Q   Did you talk about this lawsuit?
5      A   About the lawsuit. Well, I've spoken with
6  Steel about the lawsuit, yes, sir, especially when he
7  was -- again, he was interim chief with the Opa-Locka
8  Police Department.
9          So, yes. And I believe he was conveying some
10  information he had spoken with the City Manager at the
11  time kind of situation.
12     Q   Turning towards my client, is it true that you
13  relieved him of duty on September 10th, 2021?
14     A   What was the date of my resignation?
15     Q   October --
16     A   Okay. Define -- and you'd have to define
17  "relieve him of duty."
18     Q   Okay. Put him on pay leave.
19     A   No, sir. I did not.
20     Q   Did you put him on unpaid leave?
21     A   No, sir. I did not.
22     Q   How did my client, Sergio Perez, end up on
23  leave as of September 10th, 2021?
24     A   Now, don't hold me to the date, sir, because I
25  couldn't give you that. But I can tell you, when the

39

1  investigation started underway and FDLE was in the
2  process, your client was the subject.
3          I've never been faced with a police staff
4  member who had an accusation, a criminal accusation
5  placed against him.
6          However, I had conversations with the City
7  Manager, I had brought captain -- the then Captain Perez
8  into my office.
9          I had a conversation with him, let him know
10  that, obviously, I had -- you know, I had some concerns,
11  just based on the overall nature of it and, you know, we
12  needed to let the process roll, the way the process
13  would roll with the investigation be conducted, you
14  know, fairly objectively, that kind of thing.
15         I didn't really get into -- I didn't ask him
16  anything concerning the case, he made a couple of
17  spontaneous statements. But at that point, I just
18  instructed him to work from home, that was the
19  instructions, handle his units and his assigned duties
20  from the house.
21         So, I don't know if you want to consider that
22  relieving him of duty, but at that point, he was sent
23  home from work, because we had already received in some
24  allegations that he was attempting to, you know,
25  circumvent.

40

1          He had reached out to reached out to Steel and
2  I did not hear this from Steel, but it had reached out
3  to Steel to try to, you know, why are you doing this?
4  You know, why are you doing this investigation kind of
5  deal.
6          So, I didn't know if any of that was true. I
7  didn't inquire about it because we had a criminal
8  investigation ongoing and we had Garrity -- with Garrity
9  rules and so forth, I was going to let FDLE handle their
10  investigation to its conclusion and then obviously
11  handle administratively anything else that followed.
12     Q   For how long were you intending to have him
13  work from home?
14     A   Till the conclusion of the investigation. He
15  still had the same responsibilities. He still had the
16  same title and he still had the same pay.
17     Q   I mean, this probably is an obvious question
18  and answer, but I'm going to ask it anyway because I'm a
19  lawyer and we do stupid stuff like that.
20         As the Chief of Police at Opa-Locka at the
21  time, did you believe that to be the appropriate course
22  of action being having, at the time, Captain Perez, work
23  from home in the position of Captain until such time as
24  the -- as FDLE completed its investigation with his same
25  ranking pay?

41

1      A   If you're asking me in my personal opinion, do
2  I think that that was the best option? No, but I also
3  was not the final authority in that matter.
4      Q   What did you think was the best option?
5      A   I would have at least, you know, if you have
6  an officer under criminal investigation, you have --
7  have a lot of concerns depending upon the nature of it.
8  You don't want an officer under investigation out there
9  working on the streets.
10         So, one way or another he would -- I can't
11  assign him administratively because he was already in
12  administrative. He already had those type of duties.
13  So, it's not like I could remove him from the streets.
14         So, in light of what we were dealing with,
15  again, I'm sure if you did a little bit of research,
16  it's pretty rare for you to find a law enforcement
17  executive, a law enforcement staff member under a
18  criminal investigation.
19         Normally, my practice would be if they're
20  under investigation, if it was an officer, I would
21  remove them from the streets. I would take away their
22  law enforcement privileges at the time in order to
23  enforce the law and place them on administrative duty,
24  same pay, pending the conclusion of the investigation.
25     Q   And what about for command staff member who is



42

1 already in any administrative position?
2     A   Again, then you're in a conundrum.  Again, I
3 wasn't the final authority on it.  I had spoken with the
4 City Manager.  And at the time, that seemed to be at
5 least initially an option, maybe not the best option,
6 but an option.
7     Q   I mean, didn't the City Manager direct you
8 before that to not take any adverse action against
9 Captain Perez until such time as an investigation were
10 concluded?
11        MR. RAILEY:  Form.
12     A   Instructed me not to take any action against
13 him.  I can tell you this, sir.  Everything that was
14 done was done after conferring with the City Manager.
15 There was nothing that was done without his knowledge.
16 BY MR. POLLACK:
17     Q   So, everything was done after conferring with
18 the City Manager --
19     A   Correct.
20     Q   -- does that mean that you obtained his
21 approval or you may -- or you discussed the issue with
22 him?
23     A   Define "obtained."  I mean, it wasn't like a
24 formal, hey, here's an approval, but he gave the nod,
25 okay, he's the boss.  He was the ultimate

43

1 responsibility.
2        I had meetings with him before, during and
3 say, after, but I left prior to that point.  But yes,
4 before and during, we had conversations concerning
5 Captain Perez, the situation.
6        And I believe in that situation, the City
7 Manager was actually crying or cried at one point saying
8 that he didn't want this, you know, kind of situation to
9 occur.  So, he was very well aware of the content of the
10 conversation.
11     Q   And there's a difference between being aware
12 of an action and approving an action.  So, is it your
13 testimony that John Pate approved of placing Sergio
14 Perez on a status where he would continue to perform his
15 administrative duties from home?  Go ahead.
16     A   If he's your boss, and you explained to him
17 what the situation is, and you and him have a
18 discussion, I cannot tell you the specifics of that
19 conversation.
20        But I can tell you that at least at that time,
21 it was my impression that he was aware and approved of
22 any action.
23        I would think as the Chief of Police, if I
24 have somebody comes to me, and they tell me that they're
25 fixing to take an action.

44

1        If I disagreed with that action, or I thought
2 that action was inappropriate, I would, as the
3 supervisor, either direct that not to happen, or alter
4 it in some form or fashion or allow it to continue.
5     Q   Got you.  So, what you're telling us
6 unequivocally is that you never received a direction
7 from Pate, the City Manager, to not take any actions
8 against Captain Perez until such time as the
9 investigation into the situation between Perez and --
10 concluded?
11     A   Okay.  But see here's -- let me say this.  If
12 you look at a timeline, he could have said in the
13 initial part.  In the initial -- when this investigation
14 first came out, Mr. Pate was adamant that this was a
15 training incident.
16        And I was not convinced that it was a training
17 incident, matter of fact, I was not convinced of
18 anything.  I was more along the lines of, let us
19 complete a full, accurate, objective investigation and
20 determine -- let the investigation determine the outcome
21 and that's not going with any preconceived notions.
22        Did he say at any point, hey, let's not take
23 any action against Perez until whatever, I won't sit
24 here and tell you that he did not at some point.
25        But I can also tell you in that process, if he

45

1 said that initially we had a conversation afterwards,
2 and said here.  And again, it would be a definition of
3 what is your definition of "action against Perez."
4        Having him work from home is no different than
5 when COVID-19 was here, there was no change to his
6 status or pay.
7        So, it is no different than me having him or
8 assigning him to a different position.  But I can tell
9 you that, again, nothing was conducted without Mr. Pate
10 knowing about it.
11        And if Mr. Pate had any objections or anything
12 like that, he was the ultimate say so in the city, and
13 had he directed me not to do it.  Trust me, there are
14 many things that I would have done differently, but he's
15 the boss, and he was aware of it, and he could have at
16 any given moment, altered or change that situation.
17     Q   In sending Captain Perez home and having him
18 continue his work duties pending the outcome of the
19 investigation, did you provide him with any memoranda or
20 any documents to reflect his modified assignment?
21        MR. RAILEY:  Form.
22     A   Anything official, I don't recall other than
23 the conversation.  But again, sending him home to work
24 is not necessarily, again, with no change of status pay
25 or anything like that.



Barreira, Steven Chief   10-27-2022

46

1    Providing your memorandum to work from home, I
2 would assume, being a police executive, that he would
3 understand the nature or circumstances and rationale
4 behind my actions.
5 BY MR. POLLACK:
6    Q   For someone who's a member of the command
7 staff, as a captain in the Opa-Locka Police Department,
8 did Captain Perez traditionally work out of an office in
9 the police department building?
10   A   Is that -- are you asking me that, sir?
11   Q   Yes.
12   A   Did he work from an office?  Yes, sir.
13   Q   And I asked if he worked from an office within
14 the police department building?
15   A   He did.
16   Q   And until the -- let me back up.  From the
17 beginning of your tenure at Opa-Locka Police Department,
18 was it your experience that Captain Perez would perform
19 his duties from within his office at the police
20 department?
21   A   Partially.
22   Q   What do you mean partially?
23   A   He also went out into the field, yes, sir. It
24 wasn't exclusively -- I don't think any of us work
25 exclusively in an office but.  So, it was a combination

47

1 of the field and the office.  Yes, sir.
2    Q   And when you relegated Captain Perez to
3 working from home, besides the location of where he was
4 going to perform his administrative duties, was it also
5 your expectation or your direction that Captain Perez
6 would not also work in the field?
7    MR. RAILEY:  Form.
8    A   You're asking me if I told him not to work in
9 the field?
10 BY MR. POLLACK:
11   Q   Yes.
12   A   I'm not sure.  I don't recall having that
13 statement, no.
14   Q   Your direction to Captain Perez was to work
15 from home?
16   A   To handle his units and work from the house,
17 yes.
18   Q   Was there any written clarification of the
19 directive provided to Captain Perez as to whether he
20 should or should not continue his field operation?
21   A   Any written communication we had --
22   Q   Yes.
23   A   -- Captain Perez is very, very smart, very,
24 very smart individual.  We had a very -- we had a
25 conversation and he does not hesitate to ask or inquire

48

1 any, about any particular questions.
2    And had there been any questions concerning
3 that, I would have assumed he would have asked it at the
4 time.  But if you're asking writing formal stuff, no.  I
5 don't recall anything formally, no.
6    Q   Having worked in law enforcement for whatever,
7 25 years, almost 30 --
8    A   Yes, sir.
9    Q   -- do you understand the importance of written
10 documentation in your profession?
11   MR. RAILEY:  Form.
12   A   Depending on the circumstance, yes.  I also
13 understand the importance of verbal communication versus
14 written as well.
15 BY MR. POLLACK:
16   Q   Have you received training on written
17 directives and management?
18   A   I've had multiple executive leadership
19 training.  I'm not sure what a particular area you're
20 looking for.  I've had a lot of training, almost 30
21 years.  So, I'm not sure what specific area you're
22 referring to.
23   Q   Well, did you receive training on in law
24 enforcement arena on the importance of providing written
25 direction to subordinate law enforcement officers?

49

1    A   Providing written direction on certain
2 circumstances, yes.  Not in all circumstances, no.
3    Q   When you are giving someone new orders, is
4 that a circumstance in which you should give written
5 direction or directives?
6    MR. RAILEY:  Form.
7    A   No, sir.  Because if I did that, if I gave - -
8 if I wrote a written policy for every time I gave
9 somebody direction, sir, I would never leave the front
10 end of a computer.
11   Every single order that's ever been given, I
12 can't -- you can't even document that.  That would be
13 counterproductive.
14 BY MR. POLLACK:
15   Q   Did you ever send Captain Perez an e-mail --
16   A   I've sent -- sorry.
17   Q   -- about what you intended for him to do or
18 not do when you sent him to work from home?
19   A   I can't recall, sir.  Opa-Locka PD e-mail,
20 that's what I would probably refer you to, the Opa-
21 Locka Police Department e-mails, you can pull them all
22 up.  Everything that's there is there.
23   Q   But when you changed someone's office, you
24 send them an e-mail, right?
25   MR. RAILEY:  Form.



50

1    A   Changed somebody's office, define "changing
2  their office."
3  BY MR. POLLACK:
4    Q   Your new office assignment will be, fill in
5  the blank?
6    A   Depends -- yeah, sure. It depends. I mean,
7  there's no set rule, sir. There's no -- when I do this,
8  I do. When I do that. I don't.
9    Q   Well, while you were at the Opa-Locka Police
10 Department, did you or did you not send e-mails to
11 members of the command staff when you would change their
12 office location within the police department building?
13   A   If you're asking me if I sent Captain Perez,
14 sir, an e-mail concerning changing of his office, I
15 believe I did, sir.
16   Q   And then when you sent him to work from home,
17 which would be another change in his office location,
18 you did not send him an e-mail. Is that true?
19       MR. RAILEY: Form.
20       MR. POLLACK: Directing him to work from home?
21   A   Well, let me say this, I sent Cap -- if you're
22 asking about the initial office change, sir, that was
23 actually conducted after a conversation with the City
24 Manager and the Deputy City Manager concerning Captain
25 Perez's relationship, and the circumstances of him

51

1  working with Deputy Chief Jenkins.
2       So, in that essence, having had a conversation
3  with the city manager concerning the office move, which
4  was again conversed with a City Manager because that was
5  an instruction to me, then that's -- I'm assuming that
6  that's likely the reason why I put that particular one
7  in writing, sir.
8    Q   Then we get to this situation where you told
9  me you had a conversation with the City Manager about
10 directing Captain Perez to work from home, but you don't
11 put that in an e-mail, and I'm just wondering why?
12   A   Sir, there were, but I'm just -- for that
13 particular reason, sir, there are multiple things that I
14 had conducted both with him, Jenkins, other staff
15 members, other city that wasn't particularly put in
16 writing.
17       It was a conversation, he understood it. He
18 didn't seem to have any questions about it. Had he had
19 questions, or had there been continued issues, had there
20 been anything that would have risen to the level of
21 warranting more concern or a documented record, then I
22 like most likely would have constructed an e-mail.
23       But Captain Perez has been given multiple
24 instructions on various occasions concerning many, many
25 topics that were not recorded in written format.

52

1    Q   But being sent home is a significant
2  experience for a member of the command staff, isn't it?
3    A   I would say that's a subjective statement,
4  sir. Significant based -- Captain Perez, you're talking
5  about post COVID where people were working from home and
6  still continue to this day to work from home.
7    Q   You and I know we're not talking about someone
8  who's asked to work from home or directed to work from
9  home because of COVID in the workplace, right?
10   A   It wasn't because of COVID.
11   Q   Okay. So, let's move past the COVID issue.
12   A   Okay.
13   Q   You've got a member of the command staff to --
14   A   That's accused -- I'm sorry, sir. But that is
15 accused of committing a criminal act under investigation
16 by FDLE.
17   Q   Okay. Does that mean he's guilty?
18   A   No, sir. It does not.
19   Q   And in your testimony to the FDLE
20 investigators, you identified, I think it was what you
21 thought was over 10 people in the department who were
22 under investigation for different criminal acts, right,
23 that you know?
24   A   Actually, sir. I think the last count what
25 about criminal -- the last count, I think I estimated at

53

1  approximately 50% of the agency is actually under
2  investigation.
3    Q   How many of them did you send home?
4    A   All the ones that I had -- that were actually
5  under criminal investigation, they were all relieved of
6  duty. The ones that I knew about that were active.
7  Yes, sir.
8       They are actually more to an extent. They
9  weren't just sent home. So, he was actually -- the
10 typical process was to remove their gun and badge and
11 have them sit in to perform administrative duties.
12   Q   And how many was that?
13   A   I can't give you an exact count, sir.
14   Q   What about an estimate? If you were talking
15 Department of 43 officers and you said about half. So,
16 you've got about 20 people that were under investigation
17 for various criminal acts --
18   A   But not criminal --
19   Q   -- you've told me that you've sent -- that you
20 can't remember how many you sent home. What about a
21 ballpark?
22   A   Okay. So, let me clarify for just a second,
23 sir, if I may. When I say under investigation, that is
24 also administrative investigation, not necessarily
25 criminal investigations.



Barreira, Steven Chief   10-27-2022

54

1    The ones that I believe were criminal
2 investigations, I was never -- it was not confirmed. If
3 we have a confirmed criminal investigation and ongoing,
4 as the Chief of Police, if I was made aware of any of my
5 officers that were under active criminal investigation,
6 active criminal investigation. I would take that, you
7 know, have them perform administrative duties.
8    I'm sure as an Attorney, you would understand
9 that I would not want a law enforcement officer who's
10 under investigation, guilty or innocent otherwise, until
11 the conclusion of the investigation just based on the
12 nature of our work, to be out there performing a law
13 enforcement function if, in fact, those criminal
14 allegations are correct.
15    So, ballpark estimate, I don't know, two,
16 three criminal investigations. And again, that's a
17 guess. So, I don't know. You'd have to refer to the
18 Opa- Locka internal investigation records.
19    Q   Do you distinguish being under criminal
20 investigation from being charged with a crime?
21    A   No, sir.
22    Q   So, what you're seeing was that the criminal
23 investigation, there were two or three as a guess who
24 were charged, and those were the officers who were
25 placed on administrative duties?

55

1    A   Define "charged." If under cri -- so, sir, I
2 think if I have an officer and I -- and this is an
3 example. I have an officer that has a criminal
4 investigation ongoing with another agency for sexual
5 battery per se, you would not want that individual out
6 there patrolling the streets as a uniformed police
7 officer with the rest authority pending the outcome of
8 that investigation.
9    That's just like the example I'm giving
10 whether they're the outcome of the investigation so that
11 they're charged, then you're talking about shifting it
12 as Garrity does from criminal to administrative, and
13 then the administrative process would come into play,
14 whatever that determination would be.
15    So, I apologize, sir, I'm not really sure if
16 you're talking about the charging, if you're talking
17 about the convictions, I'm not -- you know, I can't give
18 you an accurate count, sir, because I was not there very
19 long. So, I don't recall.
20    Q   Let's unpack that a little bit.
21    A   Okay.
22    Q   Because I think you asked me questions to
23 which you know the answers. So, let's go ahead and see
24 if we can find that out.
25    In your mind, there's a law enforcement

56

1 officer who's been in this profession for 28 years. Is
2 there a distinction to you between being under
3 investigation for potential crime and being actually
4 charged with a crime?
5    A   Is there a distinction? Yes.
6    Q   Okay. So, with that distinction, you
7 indicated that there were possibly two or three
8 individuals who you placed on administrative duties,
9 because they had been -- and I'm trying to find out
10 their circumstances of whether they were under
11 investigation, or formally charged?
12    A   Well, sir, you asked me to guess. I told you
13 I didn't know.
14    Q   Okay. And I'm asking you what the status was
15 that prompted you to change their work duties while you
16 were the Chief of Police at the City of Opa-Locka? Was
17 it because they were under an investigation, or is it
18 because they were formally charged with a criminal act?
19    A   Okay. So, I'll tell you this, and as a
20 general thing you said with the law enforcement
21 experience.
22    If a law enforcement officer is under
23 investigation, okay, that would be obviously, you know,
24 the assumption of innocence until proven guilty,
25 complete, thorough, accurate, and objective

57

1 investigation being conducted.
2    You take steps to mitigate any potential
3 liability and potential risk, both to shield the agency
4 and also the employee depending on the nature of what's
5 going on.
6    So, with that being said, if there is an
7 active criminal investigation, then you're talking about
8 reassignment, or shift of duties, or administrative, or
9 location changes, or any of those kinds of things.
10    Because right now, the assumption is and, you
11 know, with the PBA and union you can't, you know,
12 there's no action to be taken because you don't know
13 what the outcome of the investigation is.
14    If you're asking the distinction between that
15 and actually being charged with a criminal act, once
16 you're charged with a criminal act, sir, then the
17 difference is one gets sent home to continue working,
18 the other one, the one gets sent home because they're
19 terminated, depending upon, you know, being charged with
20 a criminal and actual conviction.
21    Q   And that distinction that you mentioned
22 between actions taken once somebody is charged, once
23 somebody is under investigation, and then possibly once
24 somebody is convicted. Are there policies at the Opa-
25 Locka Police Department directing what to do in these

Barreira, Steven Chief   10-27-2022

58

1  different situations with your law enforcement officers?
2      A   The policies of the Opa-Locka Police
3  department are a train wreck.  That's about the best I
4  can describe that.  It's extremely vague, overly vague,
5  not specific, not best practice.
6      Q   So, to answer my question, is it a true
7  statement that as the former Chief of Police for Opa-
8  Locka, the policies for the department are not clear on
9  what to do when an officer is charged under
10  investigation, or actually convicted involving crime?
11      MR. RAILEY:  Form.
12      A   I would have to refer to that specific policy
13  which I do not have in front of me.
14  BY MR. POLLACK:
15      Q   Which policy would you refer to?
16      A   Which I would have referred to, well, code of
17  conduct, discipline for starters, I'd also referred to
18  the contract.
19      Q   The contract meaning the PBA?
20      A   Yes, sir.
21      Q   Excuse me, the collective bargaining agreement
22  with the City, not the PBA?
23      A   Yes, sir.
24      Q   I'll show you what I've marked as Exhibit 4,
25  which is the Opa-Locka Police Department disciplinary

59

1  procedures, which is Perez 452 to 454.
2      (Thereupon, Plaintiffs' Exhibit 4 was entered
3      into the record.)
4  BY MR. POLLACK:
5      Q   I'm assuming you've seen this document before?
6      A   Sure.
7      Q   And this was one of the procedures that you
8  indicated you would refer to or need to refer to in
9  order to determine what the policy with the department's
10  procedures were for officers who were under
11  investigation, charged with a crime, or convicted,
12  right?  This was one of them?
13      A   You said referred to before, I would
14  definitely look at it.  Sure.
15      Q   Well, I mean, before -- why would you look at
16  it?
17      A   Why I would, I'm not really sure.  You always
18  kind of, you always refer to that.  You tried to do
19  that, you know, refresh your memory about the standard
20  practice.
21      Q   While you were the Chief of Police, were you
22  obligated to consult the department's procedures in
23  effect to determine what actions you should be taking,
24  if any?
25      MR. RAILEY:  Form.

60

1      A   So, policies and procedures don't cover every
2  feasible aspect.  They provide general direction and
3  guidance, but they can't cover every potential scenario.
4  And I don't even think they're designed to do so.
5  BY MR. POLLACK:
6      Q   Did you consult with directive 100.05
7  disciplinary procedures that I've marked as Exhibit 4
8  before taking any actions with regard to Captain Perez?
9      A   I'm not sure.
10      MR. RAILEY:  Brian, I don't know if you
11  notice, but your notes are on the screen.  You're
12  sharing it.  I'm not sure if you care about them.
13      MR. POLLACK:  Oh.  How about now?
14      MR. RAILEY:  I don't see them anymore.
15  BY MR. POLLACK:
16      Q   Should you have consulted directive 10.05
17  before taking any actions with regard to Captain Perez?
18      MR. RAILEY:  Form.
19      A   Again, sir, I would say that's subjective.
20  BY MR. POLLACK:
21      Q   So, in your opinion, it was not necessary to
22  consult the department's policies and procedures, before
23  sending Captain Perez to work from home while you were
24  the active Chief of Police.  Is that what you're saying?
25      A   No, sir.  I'm not saying that all, sir.  But I

61

1  will also say that in the disciplinary procedures
2  policy, there's also nothing that mentions a staff
3  member potentially or allegedly tasing another
4  department member.
5      Q   Okay.  Because it's true that policies and
6  procedures don't specifically address every potential
7  scenario that a law enforcement officer could get into,
8  right?
9      A   No, sir.  You try to make the best decision,
10  you've got to make the best decision possible for all
11  parties involved.
12      Q   And so, the question was, should you have
13  consulted the policies and procedures before sending
14  Captain Perez to work from home?
15      MR. RAILEY:  Form.
16      A   I'm sorry.
17  BY MR. POLLACK:
18      Q   What was your answer?  I didn't catch that
19      A   The same as before.  So, that's a subjective
20  question.  Should I have, that's just a matter of
21  opinion, sir.
22      Q   And what's yours?  Should you have done it?
23      A   Should I have?  It depends.  It depends on
24  what the circumstances were, the nature of the timing.
25  I don't know if I did or did not, sir, at this



62

1 particular time.
2   Q  So, as we sit here today, about a year out
3 from when you resigned, you are unable to testify with
4 any degree of certainty as to whether you did or did not
5 consult the policies and procedures before directing
6 Captain Perez to work from home on or about September
7 10th, 2021. Is that correct?
8   A  I cannot testify whether I did, or I didn't,
9 or when I did. I know I have looked at the policy. But
10 when I did, I'm not sure in relation to the thing.
11        But also, with the understanding that the
12 action I was taking against Perez to work from the house
13 was not necessarily considered discipline, or which
14 would warrant disciplinary actions, again, since at that
15 time investigation was ongoing and there was no change
16 in his status pay, or title. It's simple location
17 change.
18   Q  Let's talk about that simple location change
19 for a second. When Captain Perez worked out of the Opa-
20 Locka Police Department as a Captain, would he walk into
21 the department through the front door?
22        MR. RAILEY: Form.
23   A  No idea.
24 BY MR. POLLACK:
25   Q  Would you see him in the department?

63

1   A  I would see him in the department, yes.
2   Q  Would he be wearing department issued
3 clothing?
4   A  Not always.
5   Q  During regular business hours, would he be
6 wearing normal department issued clothing?
7   A  Not always.
8   Q  When would he not?
9   A  Depending on the nature of what he was doing
10 that day, what his status was, whether he was teaching
11 at the college. I mean, it would be -- it depends, it
12 varied.
13   Q  More often than not, would Captain Perez show
14 up at the department in his uniform?
15   A  If you're asking me to show up in the same
16 uniform, no. He had -- they would vary. So, I guess
17 that it -- I can't give you a percentage, sir. I don't
18 know. I can tell you it varied, that's all I can say.
19   Q  In my question was, more often than not, would
20 Captain Perez show up to the department while in
21 uniform, not the same uniform?
22   A  I would say more so when I started than when
23 closer towards the end.
24   Q  Is there a level of respect that comes with an
25 officer's rank?

64

1   A  I would hope so. Not exclusively, but yes,
2 sir. I would hope so.
3   Q  When you walk through the department after
4 achieving or being appointed to a higher rank, is there
5 a different feeling that you have as an officer, the
6 level of achievement?
7   A  When you get promoted?
8   Q  Yes.
9   A  I would hope so. Yes, sir.
10   Q  Does that feeling also carry with it a sense
11 of pride?
12   A  Again, subjective, sir. I would say that what
13 really matter would help the individual.
14   Q  For you. You can only speak for yourself.
15   A  Okay.
16   Q  Do you have a sense of pride after you got
17 promoted and walked through the department with, you
18 know, another badge -- excuse me, another Chevron,
19 another strike, another bar?
20   A  If you're asking me my personal opinion, sir,
21 the answer would be yes and no, because I'm not a real
22 big title person. And there are -- there is respect for
23 the position and respect for the person.
24        And position is leading, person is what is
25 usually impactful in that agency. And again, it's

65

1 personal and subjective. But to me personally, I would
2 rather have them respect me as a person than an
3 additional Chevron, or title, or whatever.
4   Q  And I'm distinguishing respect from pride. All
5 right. Respect is what's earned and what other people
6 demonstrate. Pride is how you feel inside.
7        And so, my question to you is, when you get a
8 promotion and you get another Chevron, another strike,
9 another bar, when you walk into the department and you
10 walk around the next day with that higher rank, do you
11 have an additional sense of pride and accomplishment
12 when you walk through?
13   A  Those is with the individual. I mean, I think
14 anybody would. But again, I apologize, sir, but I think
15 it depends on the individual.
16   Q  And the only individual I can ask question to
17 today is you. So, I'm asking your opinion, how you
18 would feel?
19   A  Pride in getting another -- you know, it's - -
20 I hate to sound overly vague, but, you know, it depends
21 on the position.
22        Sometimes I've been given positions, or
23 titles, or, you know, statuses that necessarily weren't
24 exactly at that moment in time when I was looking for my
25 career. So, it's a give or take, yes, I have on



877.291.3376
www.UCRinc.com

Barreira, Steven Chief   10-27-2022

66

1  occasion, and no, I haven't.  So, I guess the answer
2  would be yes and no.
3       Q   And isn't there a difference between being
4  sent home to work because of COVID and being sent home
5  because your boss finds out that you're under an
6  investigation?
7       MR. RAILEY:  Form.
8       A   Again, sir, if you're asking me my personal
9  opinion, as the Chief of Police, I have responsibility
10  to the citizens of Opa-Locka.  I have responsibility to
11  the City of Opa-Locka.  I have responsibility to the
12  Opa-Locka Police Department.
13       The whole does not -- there is no one
14  individual in any agency, including the Chief of Police
15  that's more responsible, or more important than the
16  whole. You have an investigation, you have an issue at
17  the time when you start talking about the potential.
18       Sir, you're an Attorney, you know what is the
19  potential liability of having somebody on staff that's
20  accused of a -- that's under a criminal investigation.
21       I'm sure this would be a different
22  conversation if somebody, an officer who is under
23  criminal investigation committed another act, we start
24  talking about the issues, legal liability, issues that
25  could be experienced by an agency for allowing that

67

1  individual to continue to operate unrestricted, or
2  unopposed, or just in the same operation.
3       So, failing to take action could prevent --
4  could provide just as much liability as taking action in
5  general.
6       Again, at the time, having consulted and
7  talked with the City Manager, the decision was made that
8  at the time, you know, I've never been faced with --
9  again, a staff member is usually not those individuals
10  who are accused of criminal acts, at least not the ones
11  that I've ever worked around.
12       So, it was kind of a unique situation.  But at
13  the time, that felt like the best thing for all parties
14  involved, including Captain Perez, to ensure there have
15  been issues he -- with Captain Perez, sometimes with his
16  conduct and trying to protect him from any future issues
17  or any issues within the agency.
18       So, it felt like the best decision to make.
19  So, if you're asking if there's a difference, I don't
20  know.  That's -- you'd have to ask Captain Perez how he
21  felt about the move.  But I can tell you, as a whole, it
22  was done for the betterment of the City, the agency, and
23  Captain Perez.
24  BY MR. POLLACK:
25       Q   Do you think it's important to have followed

68

1  the department's policies and procedures as the Chief of
2  police?
3       A   So, I'll say this, sir, Mr. Pollack.  My first
4  goal, again, coming in as Chief of Police was to get the
5  Opa-Locka Police Department accredited through FCAC.
6       Looking at their policies and procedures, I'm
7  sure, you know, if any of you all had been involved in
8  any lawsuits against the City of Opa-Locka, or the Opa-
9  Locka Police Department, you know that the policies and
10  procedures of the Opa-Locka Police Department are not in
11  sync or not all in sync with best practices within the
12  agency.
13       They are not consistent with FCAC standards.
14  There are multiple conflicts within the existing policy
15  manuals.  So, because of that, that pretense - - that in
16  and of itself creates potential issues with following
17  that particular policy.
18       You asking me, do I say we should
19  intentionally not follow a policy?  Then the answer to
20  that, sir, is no.  In general, you should.
21       But again, if you have conflicts and policy,
22  if you have holes or issues that are not necessarily
23  addressed, like a staff member involved in a criminal
24  conduct act, you have to act in the best interest of the
25  citizens, the agency, the City, and the involved

69

1  officer. So, I hope that answers that question.
2       Q   I mean, the criminal act that we're talking
3  about involves a "he said, she said" event.  Does it
4  not?
5       MR. RAILEY:  Form.
6       MR. POLLACK:  Or he said, he said event?
7       MR. RAILEY:  Form.
8       A   All I know about it was the accusation, sir. I
9  don't know when kind of is -- what the situation of it
10  because it was referred to FDLE.  All criminal acts, as
11  you know, start off as a "he said, she said" until you
12  can start gathering evidence and interviewing witnesses
13  and actually develop a case. So, yes, that's how it
14  started.  But that's -- then again, that's how most of
15  them start.
16  BY MR. POLLACK:
17       Q   Isn't that what you did when you found out
18  about the incident involving Captain Perez and Mr. Steel
19  as you started gathering evidence and interviewing
20  witnesses?
21       A   I did not.
22       Q   When the incident occurred on September 1st,
23  2021, you did not know about it on or about that day. Is
24  that correct?
25       A   When the incident occurred?  No. Captain Perez



70

1  did not, as a staff member didn't notify him.
2  **Q   He did not.**
3  A   He did not.
4  **Q   Nor did the sub -- nor did the person who**
5  **accused Captain Perez, Michael Steel, he didn't text**
6  **you, e-mail you, or walk into your office and indicate**
7  **that something had happened. Is that correct?**
8  A   No, sir. I wasn't there that day, but I would
9  have the assumption that a staff member, a member of the
10  command staff would -- should know to notify the Chief
11  of Police. But no, sir. He did not. He did not
12  contact me.
13  **Q   I mean, he had your cell phone because he had**
14  **been texting you including when he was -- when you were**
15  **still working there, right?**
16  MR. RAILEY:  Form.
17  A   I'm going to say yes. A lot of people have my
18  number, a lot more people.
19  BY MR. POLLACK:
20  **Q   I mean, I'm sure they did. I'm sure you got,**
21  **you know, tons of contacts in your phone, but we're**
22  **talking about Michael Steel, and he's someone who has**
23  **your phone number, and I'm just confirming that he had**
24  **your cell phone number while you were the Chief of**
25  **Police at the City of Opa-Locka during your employment?**

71

1  MR. RAILEY:  Form.
2  A   I believe he did, sir. But I also know that
3  Perez did as well.
4  BY MR. POLLACK:
5  **Q   Okay. And so, Steel maintains that he was**
6  **battered, right? That he was hit by a taser. Is that**
7  **correct?**
8  MR. RAILEY:  Form.
9  A   He maintains -- all I know is what the initial
10  thing. Yes, sir. That was the allegation that was
11  made.
12  BY MR. POLLACK:
13  **Q   Okay. We're going to -- we can go about it**
14  **this way if you like. Michael Steel is the other person**
15  **that was involved in an alleged incident involving**
16  **Sergio Perez, right?**
17  A   Yes, sir.
18  **Q   And you didn't hear anything from Michael**
19  **Steel until he called you on your cell phone, what was**
20  **it?  September 7th, 8th, 9th, or 10?**
21  A   No, sir.
22  **Q   Okay. Did you call Michael Steel on 7th, 8th,**
23  **9th, or 10th, to talk about the incident?**
24  A   Okay. No, sir. To clarify, no. I had come
25  back from days off and had gone to the City's benefits

72

1  fair or benefits signup.
2  I was contacted by John Pate concerning an e-
3  mail message that had had been sent to the DS about
4  making multiple allegations, multiple statements
5  concerning the City officials. I don't even remember
6  all of the content of that particular e-mail that had
7  been sent to DS.
8  Mr. Pate contacted me on the phone and asked
9  me if I had seen the e-mail, or I guess, an e-mail that
10  he had sent me, and I advised him that I did not, and
11  that I would check it.
12  I continued on with my business, but he called
13  me back. And knowing when he called me back asking me
14  to check it, I knew that there was some degree of
15  urgency with it.
16  So, I went and checked the e-mail, saw the
17  message from, or to the DS from an unknown individual,
18  multiple accusations, again, a lot of the material that
19  was in that form was very subjective. It was just a
20  matter of opinion.
21  There was one statement in there concerning
22  the incident involving Perez and Steel. Shock and awe,
23  I couldn't believe it, not something I would first
24  initially assume.
25  Contacted the City Manager and had a

73

1  discussion with him, told him, we discussed next course
2  of action. I told him, I would contact Steel and try to
3  determine if that in fact happened because there was no
4  real -- at that point, it was just -- again, with all
5  the subjective material, if the incident had actually
6  occurred.
7  At that point, I reached out to Sergeant Steel
8  to meet me. We didn't discuss the incident, but I had a
9  meeting.
10  **Q   As the Chief of Police, am I correct that you**
11  **are the ultimate decision maker on any internal affairs**
12  **investigation?**
13  MR. RAILEY:  Form.
14  A   I would have to say no, because the final
15  deter -- when we talk about an internal investigation,
16  if the final outcome of that internal investigation is
17  termination, then no, sir, I am not the final authority
18  on that. The City Manager is the individual who makes
19  that decision.
20  BY MR. POLLACK:
21  **Q   Okay. In an internal affairs investigation,**
22  **and you've -- have you ever -- let me back up for a**
23  **second.**
24  **You've been the subject of an internal affairs**
25  **investigation when you are with Jacksonville, right?**



74

1   A   Um-hum.
2   Q   That's a yes?
3   A   Yes, sir.
4   Q   And you understand that the outcome of
5   internal affairs investigations are sustained, not
6   sustained, sustained in part, right?
7   A   Right.
8   Q   So, internal affairs investigations don't
9   decide whether someone continues to be employed with the
10   department or not.  They're designed to find out and to
11   determine whether someone did or did not violate a
12   policy or procedure, right?
13   A   The general overarching purpose of an internal
14   investigation, yes, sir, is to determine the facts of a
15   particular case or circumstance.
16   Q   And so, as the Chief of Police at Opa-Locka,
17   your role is to be the ultimate decision maker to
18   determine whether an internal affairs investigation is
19   sustained, not sustained, or sustained in part. Is that
20   correct?
21   A   No, sir.
22   Q   Okay.
23   A   But not in Opa-Locka.
24   Q   In Opa-Locka, the Chief has no role in the
25   internal affairs investigation?

75

1        MR. RAILEY:  Object to form.
2      A   That is, sir, they --  The City Manager, and I
3   know also that Captain Perez and Jenkins on certain
4   circumstances in the internal cases have -- I won't say
5   that -- when you say ultimate decision maker, I would
6   have to say generally.
7        But if you're looking at ultimate, then I
8   would have to say, the City Manager because there have
9   been investigations including the investigation against
10   Captain Perez in which I received word that the City
11   Manager was attempting to influence or impact the
12   outcome of that investigation.
13   BY MR. POLLACK:
14   Q   Who signs off as to whether an internal
15   affairs investigation is sustained, not sustained, or
16   sustained in part at the City of Opa-Locka?
17   A   I would say, again, generally it would be the
18   Chief of Police.  However, there have been cases in
19   which the City Manager, John Pate had done that.
20   Q   Are you aware of situations in which John Pate
21   signed off as the -- on an internal affairs
22   investigation making a finding?
23   A   I believe so.  Yes, sir.  Especially while
24   there was no Chief there.  Yes, sir.
25   Q   Well, if you -- how would you know about that

76

1   if you weren't the Chief, right, that means you weren't
2   employed there?
3   A   You get -- this individual when the -- there
4   was a circumstance, I can't remember what the particular
5   case was, but there was a circumstance in which Mr. Pate
6   had signed off on it.
7   Q   So, what you're saying --
8   A   -- and the issue while I was there.
9   Q   I'm sorry?
10   A   And the issue came back while I was employed.
11   Q   And so, you saw a disposition form for an
12   internal affairs investigation that Mr. Pate had signed
13   off on.  Is that what you're telling us?
14   A   That I saw one, I believe there was a case.
15   You'd have to go back, sir, to validate that.  I would
16   tell you though, I would suggest going back and looking
17   at internal investigation files and case conclusions
18   even while I was there.  There would be who signed off
19   on, that would be able to confirm that issue.
20   Q   Not my question.
21   A   Okay.
22   Q   My question was very specific, which was, with
23   your two eyes, have you seen a disposition form for an
24   internal affairs investigation at the Opa- Locka Police
25   Department that Mr. Pate signed?

77

1   A   I haven't seen any.
2   Q   Okay.
3   A   Including all -- and I may say this, including
4   all of those that preceded me.
5   Q   So, was there an officer at Opa-Locka Police
6   Department who was responsible for initiating internal
7   affairs investigations?
8   A   That could be initiating an investigation or
9   investigating internal issues?
10   Q   I'm starting at the very beginning, which is
11   initiating an internal affairs investigation.
12   A   Any of the staff members could initiate an
13   internal investigation.  And technically, we're moving
14   towards, even a line level supervisor could technically
15   initiate depending on the nature.
16        In my experience, depending on the nature of
17   the violation, whether it be serious or minor, can
18   initiate disciplinary action.
19   Q   Which means that you could have initiated an
20   internal affairs investigation?
21   A   Yes.
22   Q   And with regard to Michael Steel, you did not
23   initiate an investigation before speaking with him.  Is
24   that correct?
25   A   Based on the very broad, very subjective



Barreira, Steven Chief   10-27-2022

78

1 letter, and a conversation with Mr. Pate, I had a brief
2 conversation with Sergeant Steel.  It was informal.
3 There was no formal investigation which would warrant
4 recording under the bill, Officer Bill of Rights or any
5 of that circumstance.
6       The simple question was, I've received
7 information that this might have occurred, did it or did
8 it not.  And once it was revealed that the allegation
9 was, in fact, true came in from -- coming from Steel.
10       I'm not saying the allegation was proven true,
11 but that the allegation itself was made, situation was
12 halted due to the fact that obviously, a formal
13 investigation would be warranted, and then pretty much
14 ended that conversation.
15       And I -- again, we made contact with the City
16 Manager, and we ended up having a meeting between
17 myself, the internal affairs investigator, and Mr. Pate.
18 I don't know if anybody else was there, but I recall
19 those individuals being there.
20    **Q   Isn't the purpose of an internal affairs**
21 **investigation to find out whether someone violated a**
22 **policy or rule or not?**
23    A   Is that the purpose of an internal
24 investigation?  Yes, sir.  But it also -- it could also
25 spiral into whether there are other violations. I don't

79

1 think it's exclusive to one particular thing. But yes,
2 sir, I think it's a fact-finding investigation.
3    **Q   And I know you give me a long-winded answer.**
4 **And so, I just wanted to get a yes or no whether you**
5 **could have initiated an internal affairs investigation**
6 **into the allegation by -- not by, but I guess the**
7 **allegation involving the incident between Steel and**
8 **Perez?**
9       **You could have initiated an internal affairs**
10 **investigation by requesting that the internal affairs --**
11 **the Officer-in-charge conduct an investigation, right?**
12    A   I believe I did, sir.
13    **Q   Well, that's not the first thing you did when**
14 **you found out about the incident, correct?**
15    A   No.  The first thing I did was contact the
16 City Manager.
17    **Q   And then after you contacted the City Manager,**
18 **you contacted Mr. Steel?**
19    A   Correct.
20    **Q   When what you should have done instead of**
21 **contacting Mr. Steel to find out for yourself what**
22 **happened is to contact the internal affairs**
23 **investigators so that investigation could be commenced,**
24 **right?**
25       MR. RAILEY:  Form.

80

1    A   That's a subjective statement, sir.  You said,
2 "what should have."  That is a matter of your opinion,
3 sir.
4       I would say this, Opa-Locka Police Department,
5 there are a lot of concerns with the integrity and
6 honesty of a lot of the officers and command staff
7 members.
8       And at that point, with my experience being
9 there, to be completely frank and honest with you, sir,
10 I didn't have a whole lot of trust in a lot of people
11 there.
12       So, you asked what I should have done.  I
13 think that's just a matter of subjective matter of the
14 thing, and it was a very, very broad, accusatory type
15 letter.  I'm pretty sure you probably already have a
16 copy.  If not, I'm sure it's out there.
17       But I need to define that, because I --
18 honestly, I couldn't believe that an accusation would be
19 made like that against a command staff member.
20 BY MR. POLLACK:
21    **Q   But when you say you needed to find out,**
22 **you're finding out based on ask -- based on talking to**
23 **the supposed victim about what happened, right?**
24    A   No, sir.  You got to define -- and I
25 apologize.  I'm not trying to get -- I'm just -- did I

81

1 find out that the accusation was true?  Yes.  Did I try
2 to find out about the investigation?  No, sir.
3       Finding out whether an internal case needed to
4 be initiated after conferring with the City Manager,
5 finding out if an internal affairs case needed to be
6 initiated.
7       If there was, in fact, an allegation of
8 misconduct, or in this case, an allegation of criminal
9 misconduct.  If an allegation in fact did exist, then a
10 more formal investigation would need to be initiated.
11       So, I needed to find out if the accusation
12 itself was true, or if it was just a matter of that big
13 subjective letter.
14    **Q   Isn't that what IA does, though?  Doesn't IA**
15 **find out if an accusation is true?**
16    A   If you're asking me IA and other, I believe
17 I've answered.  At that point, sir, I had very little
18 confidence and trust in the Opa-Locka Police Department,
19 including the internal affairs investigator, that the
20 incident would have been handled objectively based on
21 the totality of the circumstances.
22       My only sole reason for contacting that, it
23 was to confirm that the allegation did in fact exit, not
24 the incident, stopped it immediately, and proceeded with
25 the process and initiated a formal internal



Barreira, Steven Chief   10-27-2022

82

1  investigation.
2      Q   So, what you did then was you called Mr. Steel
3  on the phone and said, "Hey, is this true?  Is this what
4  you're accusing?"
5      A   Yes, sir.
6      Q   And then you hung up, then went and called IA
7  and said, "Yeah, that's the accusation.  You guys need
8  to go ahead and conduct an investigation?"
9      MR. RAILEY:  Form.
10     A   No, sir.
11 BY MR. POLLACK:
12     Q   Okay.  Because what you did instead was, you
13 talked to Mr. Steel, and then he said, "Let's go meet by
14 the airport?"
15     MR. RAILEY:  Object to form.
16     A   No.  Did we contact Mr. Steel?  Yes.  We met.
17 BY MR. POLLACK:
18     Q   And you met by the airport, right?
19     MR. RAILEY:  Form.
20     A   We met somewhere in Opa-Locka.
21 BY MR. POLLACK:
22     Q   Well, you met somewhere in Opa-Locka, and the
23 somewhere in Opa-Locka is by the airport.  Isn't that
24 what you told the FDLE investigators when you provided
25 them with a statement?

83

1      A   I don't know where I met him at, sir.  I met
2  him at a business.  I was there for five months.  Was it
3  near the airport?  It could have been.  It was in that
4  general area.
5          I'm not arguing the fact, sir, that it was.
6  It could have been near the airport.  It could have been
7  in the airport.  I mean --.
8      Q   Is that a normal meeting place to speak with
9  an officer about an incident that occurred at work?
10     MR. RAILEY:  Form.
11     MR. POLLACK:  It's not.  Is it?
12     A   The answer to that -- no.  Well, sir, let me
13 clarify this.
14     MR. RAILEY:  Form.
15     A   So, the answer of your question, sir, you're
16 asking about normal.  I would say under normal
17 conditions.  No, sir.  It is not normal.  Under normal
18 Police Department, sir.  No, sir.  It's not normal.
19         However, we are not talking about normal, we
20 are talking about the vast culture of corruption in an
21 agency that is extremely challenged.
22     I as the Chief of Police at that point, only
23 being there for five months, again, had very little
24 confidence and really, and anybody in that particular
25 circumstance.

84

1          So, if you're asking me if it was normal, sir?
2  No.  It was not normal, what is also if you read my
3  FDLE, which is also one of the reasons why I felt that
4  it was a good thing that the investigation was handled
5  outside of the Opa-Locka Police Department by an
6  independent agency who could be more objective.
7  BY MR. POLLACK:
8      Q   So, the phone call that occurred was from your
9  cell phone was to Steel's cell phone to have this
10 meeting.  Is that right?
11     A   Yes, sir.
12     Q   And Steel --
13     A   Well, let me rephrase that.  Let me take that
14 back.  I'm not sure.  I think that actually might have
15 actually even been handled through dispatch.  I'm not
16 positive on that.  I might have contacted dispatch.
17     Q   And then Steel suggested to you to meet at a
18 location near the airport, where meetings occurred,
19 right?  That's what you told FDLE in your recorded
20 statement?
21     A   I believe -- if that's what I said then, sir,
22 then that would be the case.  But you're asking me now,
23 I don't remember.
24     Q   And so, the suggestion about meeting at a
25 location other than the police department, according to

85

1  at least your prior testimony to FDLE, that was proposed
2  by Mr. Steel, right?
3      A   It could have been.
4      Q   I mean, would you have known about a meeting
5  place near the airport?
6      A   No, sir.
7      Q   And is there any reason why you couldn't have
8  just called Mr. Steel and asked him if the allegation
9  was true, and let that be the end of it?
10     A   I could do a lot of things, sir.  I could have
11 video conferenced him.  I could have called him on the
12 phone.  I could have sent him a letter.
13         I think it was just at that particular time,
14 at that particular moment, it was a circumstance I would
15 rather meet in person.  That way you can, you know, you
16 get -- you know, communication is only 10% of what you
17 say.
18         So, just asking a simple question.  And again,
19 I just needed to know if a formal investigation needed
20 to be conducted.  I don't know if, at that point, I
21 didn't know if Captain Perez had, in fact, committed the
22 act or not.  That wasn't my primary concern.
23         My primary concern was to conduct an accurate,
24 thorough and objective investigation to get to the
25 bottom of the circumstance, to determine what exactly



86

1 happened.
2    **Q   Did you also refer Mr. Steel to FDLE for**
3 **failing to report the incident in a time at all?**
4    A   Well, I'm sorry, what was that?  I'm sorry,
5 sir.
6    **Q   Did you report Mr -- you said that you**
7 **reported or you requested FDLE to come in and**
8 **investigate the situation, right, involving Captain**
9 **Perez, at the subject?**
10    A   I spoke with the SAC in Tampa, and I also
11 spoke with the local FDLE agent.  Yes, sir.
12    **Q   And your request was to investigate Captain**
13 **Perez at the time.  Was it not?**
14    A   Not specifically Captain Perez, sir.  To
15 investigate the incident.
16    **Q   Okay.  Did you directed any investigation be**
17 **conducted about Mr. Steel's failure to report the**
18 **incident?**
19    A   So, after the conversation that I had with
20 Steel, I cannot tell you, sir, of the exact date and
21 time or how, but I can tell you what was within a
22 relative short period, I had a meeting, as I indicated
23 earlier with the City Manager and the internal affairs
24 investigator.
25       We had a conversation concerning this this

87

1 particular incident.  In that conversation, I'm not sure
2 who exactly had said it, whether it was Mr. Pate or the
3 internal affairs, they made the accusation or presented
4 that there was a possibility that Sergeant Steel was, in
5 fact, departing from the truth and that this issue would
6 be, you know, it was fabricated and all those kinds of
7 things.
8       Again, I didn't make a determination as to
9 anybody's guilt or innocence until the investigation is
10 complete.  That issue was discussed in that meeting, and
11 in that meeting, we had talked about during the
12 investigation, or at least in the initial part of it, if
13 it was determined that Sergeant Steel was, in fact,
14 departing from the truth, then obviously, in that
15 circumstance, he would be subject to, you know, to
16 disciplinary action and, you know, depending on the
17 nature of prosecution, or whatever the circumstances
18 might be.  That discussion was had at that table.
19       Again, my primary goal, sir, was to try to
20 find out what really happened.  I needed -- before I can
21 make a determination, I needed to know what exactly had
22 occurred.
23    **Q   After you met with Sergeant Steel, you were**
24 **confident that he was tased, right?**
25       MR. RAILEY:  Form.

88

1    A   Was I confident that he was tased?  I don't
2 know.  I didn't know.  I was assuming that something
3 had-- I was confident that something had occurred.
4       What that was, I have no idea or the
5 circumstances surrounding it.  I mean, he could have
6 fallen on something.  I had -- again, I had no idea.  So,
7 for me to say that he was tased, that's not -- that
8 wasn't the case.
9 BY MR. POLLACK:
10    **Q   And you've seen other individuals who'd been**
11 **tased in your work, right?**
12    A   Yes, sir.
13    **Q   And you had seen -- had you been teased at**
14 **all?**
15    A   Yes.
16    **Q   You've been tased with the prongs and that**
17 **leave a mark?**
18    A   I didn't have the prongs.  I had the taser.  It
19 felt just as bad.  Didn't feel any better.
20    **Q   I will take your word for it, and I'm sure**
21 **Jonathan will too.  But not only did you talk with Mr.**
22 **Steel, but he showed you photographs on his phone of an**
23 **area that he claimed had been struck with a taser,**
24 **right?**
25    A   As he was answering the question of whether

89

1 the incident occurred or not, he held up his phone and I
2 saw a picture of a person's side.  I didn't know if it
3 was his side or not, and it looked like, I guess, the
4 best way I could describe it would be a red bull's eye.
5    **Q   When Mr. Steel was showing you this picture,**
6 **was it your understanding that the picture he was**
7 **showing you was depicting his back?**
8    A   I think that's how he was presenting it.
9    **Q   And so, the narrative that Mr. Steel was**
10 **telling you was that he had been tased and these, the**
11 **pictures reflected what happened to him when he was**
12 **tased?**
13    A   Pretty much.  Yes, sir.
14    **Q   Okay.  When you go back to the Police**
15 **Department itself, do you take a look at the Axiom Taser**
16 **that Captain Perez had?**
17    A   No, sir.
18    **Q   Did you, at any time before it was turned over**
19 **to FDLE, look at the Taser that Captain Perez had?**
20    A   I did not.
21    **Q   Did you speak with anybody at the department**
22 **after meeting with Mr. Steel to find out what they**
23 **either saw or heard?**
24    A   No, sir.  I didn't want to conduct the
25 investigation.  Knowing the circumstances, obviously,



90

1  you know, you have the officer bill of rights to
2  consider, and recording statements and all, gathering
3  all the evidence, knowing the circumstance of that. No,
4  sir, I would not do that.  All I wanted to know was the
5  outcome of the investigation at that point.
6      Q    Did you tell Steel to be careful?
7      A    I have no idea what I told him.  I told
8  everybody to be careful.  Actually, everybody was
9  telling me to be careful.
10     Q    If you told them that, what did you -- because
11 I think you said it in your FDLE statement, what did you
12 mean?
13     A    I don't know the context of the FDLE
14 statement, sir, when I say -- I mean, I don't know what
15 my thought process was at that particular time. I'm not
16 saying I did say it or I'm not saying.  I didn't say it,
17 but I don't remember what the circumstances were.
18     Q    Were you the one who made Steel the subject of
19 an IA, or did somebody else do that?
20     A    I believe that -- and I'm not going to guess.
21 I'll just tell you it wasn't me.  I know, in the
22 conversation that I had had with, that meeting with the
23 City Manager and the internal affairs investigation.
24          Like I indicated if, in the process -- again,
25 like we talked about if Sergeant Steel was, in fact,

91

1  departing from the truth, or if the, you know, there
2  were evidence, or the investigation, you know, whatever
3  initially led to, since your client was the subject at
4  that particular time.
5          But if in the investigation or interviews, if
6  it was determined that Sergeant Steel was, in fact,
7  lying, then he would become -- and I know that was a
8  conversation at the table who exactly said it, I'm not
9  really sure.
10     Q    Wasn't Steel dereliction of his duties if he
11 never reported the incident himself?
12          MR. RAILEY:  Form.
13     A    Technically, sir, both of them would be.
14 BY MR. POLLACK:
15     Q    I mean, likewise, wouldn't Mr. Steel have been
16 in dereliction of his duties by not informing anyone at
17 the department that he suffered a work- related injury?
18     A    Derelict in a work-relation -- again, sir, I
19 think, to be honest and to be fair, it was both Sergeant
20 Steel's responsibility to report the incident, but it
21 was also Captain Perez's responsibility.
22     Q    Well, if Captain Perez denied that anything
23 happened, what's he going to report?  Hey, guys, nothing
24 happened?
25          MR. RAILEY:  Form.

92

1      A    You know, I don't know.  I can't answer that
2  question, sir.  If in his mind -- again, it's a
3  subjective thing.  In his mind, if he thinks nothing
4  happened, then, you know, then no.
5  BY MR. POLLACK:
6      Q    Aren't we talking about a binary issue,
7  though?  Not a subjective issue, a binary issue where
8  you either have an obligation or you don't?
9      A    No.
10     Q    And for Mr. Steel, if he -- if his claim is
11 that he was injured on the job by another officer, at
12 the very least, didn't he have an obligation under the
13 City's policies and procedures as well as the
14 department's, to timely report a workplace accident or
15 injury?
16          MR. RAILEY:  Form.
17     A    Well, I think, sir, if I can be honest and
18 frank, I think that the question itself is also with --
19 you're talking about Sergeant Steel which, I would tell
20 you, had that as his responsibility if he suffers a
21 work-related injury, or if he has something on work.
22 Yes, sir.  It is his responsibility under Workers' Comp
23 and so forth to report his injury in a timely manner,
24 just like it is the responsibility for any employee or
25 associate.

93

1          But again, if, you know, under the assumption
2  that -- and of course, I don't know what the legal
3  outcome was, but under the assumption that Perez was
4  found not guilty or is not guilty, then your argument is
5  correct, sir.
6          But if in fact it is, then it's also a
7  supervisory and command staff's responsibility to report
8  any incidents relating to subordinates or issues.
9  BY MR. POLLACK:
10     Q    I mean, likewise, it would have been your
11 responsibility to report it, right?  Once you knew about
12 it, you had an obligation to notify IA, once you got the
13 e-mail from Pate, and once you read it, you had an
14 obligation to notify IA?
15     A    It depends on what your -- I did notify them,
16 sir.  I think your question is, just in the order that I
17 notified them, but they were notified.
18     Q    Correct.  It's in the order.  Once you receive
19 the e-mail from Pete where there's a suggestion of an
20 incident that occurred where one officer is alleged to
21 have -- the e-mail claims that one officer battered
22 another.  At that point, shouldn't you have notified IA?
23     A    I mean, if you're, you know, take all -- I'm
24 trying to think of the right word, because in Yiddish,
25 it's "mishegoss".



94

1      But, you know, take all of the other nonsense
2  going on at Opa-Locka, take that out of the picture,
3  just for the sake of the question.
4      If you're doing things by the book, and you're
5  not considering these outside -- let's call them forces.
6  When you get an e-mail that says there's an incident
7  that occurred where one officer injures another officer
8  in the department building, shouldn't you go and, at
9  least, make the notification to IA so they can start
10  taking the first step?
11      MR. RAILEY:  Form.
12      A   I would not say that you would automatically
13  initiate a formal investigation on incidents unless you
14  know it rises to that level.
15      And I say that because first off, the internal
16  affairs investigator at Opa-Locka is one person.  And I
17  can tell you, based on the number of IA complaints and
18  investigations, he is completely overworked, and
19  completely understaffed.  So, there are a lot of issues
20  with that.
21      So, would he have time to look at it in a
22  timely manner?  I don't know.  I can tell you that there
23  are a lot of issues on that front.
24      If you're asking if you should in a perfect
25  world?  In a perfect world, you can.  There's actually a

95

1  process I was looking at doing where internal
2  investigations are tracked, and historically, and you
3  can look on things like that.
4      But if that system does not exist at Opa-
5  Locka, it existed in other agencies that I was at where
6  internal -- where a complaint would be automatically
7  logged, and then where it went.  But it also depends,
8  like I said, it also depends on the nature of the
9  investigation.
10      You got serious misconduct, you got minor
11  misconduct, and then you have to determine whether an
12  incident or an allegation -- at this point, an
13  allegation of criminal misconduct or misconduct even
14  exists before you launch a full -- if I did that, sir,
15  with every single thing that was ever presented to me
16  while I was at that agency, sir, that gentleman, there
17  isn't enough hours in the day or paper in the printer
18  that would be able to appropriately investigate, because
19  there would be too many holes and he wouldn't be able
20  to-- and we'd be having another conversation about an
21  investigation and how that investigation was handled.
22  So, I'm not --
23  BY MR. POLLACK:
24      Q   So, to distill your answer down, and if we
25  were in a perfect world, then am I correct that your

96

1  answer would have been, yes, I would have reported it
2  to IA?
3      MR. RAILEY:  Form.
4      A   Not necessarily IA.  Again, that depends on
5  the nature.  So, you're asking me, depending on the
6  nature.
7      Listen, if I -- in a perfect world, I'd have
8  an internal affairs investigator for every single
9  complaint, every complaint, including the minor and
10  major would have an investigator complete a full
11  investigation, statements, you know, all those things.
12      But unfortunately, you know, just like in
13  prosecutors, you can't prosecute every single case.  You
14  have to be disseminated between serious and minor.  So,
15  whether you know you have a combined -- as soon as I
16  realized, sir, that we had a serious allegat -- we had
17  an actual allegation or a serious allegation of
18  misconduct, internal affairs was notified.
19      As soon as I realized as I -- as soon as the
20  complaint was, in fact, verified, then internal affairs
21  was notified.  We had a meeting between myself, City
22  Manager, and the internal affairs investigator, like I
23  said.
24  BY MR. POLLACK:
25      Q   But you get forwarded an e-mail indicating

97

1  that one officer tased another officer, and you're
2  saying that notification to you in writing is not enough
3  for you to have notified internal affairs.
4      If we were in a perfect world, if we had an
5  internal affairs investigation who had all the time in
6  the world to conduct these investigations, you didn't
7  have all this other, you know, nonsense going on between
8  the personnel, you get an e-mail like that.
9      A   Call --
10      Q   This one officer tased another officer in the
11  workplace?
12      A   Call me naive, sir, call me naive.  But I
13  would tend to not think that a staff member who's
14  supposed to be the cream of the crop would be involved
15  in any form or circumstance in that kind of incident.
16  That's the first thing.
17      And then secondly, in a perfect world, I
18  wouldn't have an e-mail with that on it.  Secondly, if
19  you read the letter, there are multiple, multiple
20  accusations and windows, the active comments, derogatory
21  statements, all kinds of things in there, which would
22  tend to discredit, or at least minimize the impact per
23  se, or the seriousness of the allegation of a command
24  staff member allegedly tasing one of another department
25  member, it tends to take away.



98

1      Had it been a single message, a single letter
2 with that one accusation on it, I think it would have
3 dispelled a little bit more of the concern, per se.
4      But if you have a letter with dozens upon
5 dozens of things being spewed out of there, it tends to
6 distract to take away.  Plus, it was anonymous for, you
7 know, exactly, it was not -- there was no particular
8 owner where the complaint had actually been made from.
9      So, with that, you know, in the circumstances,
10 based on, again, based on what you know at the time and
11 what you got, I thought that was the most appropriate
12 course of action to at least disseminate that piece from
13 all the other remaining items.
14     **Q   Right.  So, instead of sending it to IA, you**
15 **called Steel and met with him at some clandestine**
16 **location?**
17     MR. RAILEY:  Object to the form.
18     MR. POLLACK:  Right?
19   A   Clandestine?
20 BY MR. POLLACK:
21     **Q   Yeah.**
22   A   I would not classify it as clandestine.  I
23 mean, clandestine, I think that's a little far.  Did I
24 meet him in the city?  Yes.
25     Again, was it a very brief conversation?  Yes.

99

1 Was my goal and purpose just to confirm the allegation?
2 Yes.  Did I investigate it from that point?  No, sir.  I
3 did not.  I initiated an internal investigation after
4 that conversation.
5     **Q   Well, what time of day did you meet him?**
6   A   It was daylight.
7     **Q   Was Steel on duty at the time?**
8   A   I can't answer that question, sir.
9     **Q   Were you on duty at the time?**
10   A   I'm assuming I was.  I'm always on duty.
11     **Q   Did you document anywhere the date and time**
12 **and the circumstances of your meeting?**
13   A   No.  It would be in that conversation.  I
14 would imagine it would be when after I had the meeting
15 with the internal affairs and the City Manager, that
16 would be the date that that was initiated.  So, it would
17 be relative to that timeframe.
18     **Q   And so, we're talking about a meeting that's**
19 **not clandestine, but we're also talking about a meeting,**
20 **and tell me if this is true, that we don't have a date,**
21 **we don't have a time, we don't have an exact location,**
22 **and we don't have a document memorializing your**
23 **conversation or meeting, right?**
24     MR. RAILEY:  Object to form.
25   A   Not exactly, sir.

100

1 BY MR. POLLACK:
2     **Q   I'm sorry.**
3   A   I wouldn't say that, sir.
4     **Q   Okay.**
5   A   I wouldn't say that.  I would say we know the
6 date.  We don't know the specific time.  I can give you
7 the daylight hours.
8     I mean, if we go back to that particular day,
9 go back to the internal investigation when it was, in
10 fact, initiated.  Go back to that paperwork, that
11 particular date, I can give you the hours of sunlight,
12 and I can tell you generally in that, you know,
13 afternoon.  I would say it was 12 o'clock on.
14     I forgot everything that you had actually
15 asked me --
16     **Q   The date.**
17   A   And you asked -- I'm sorry, sir, I do
18 remember.  And you asked if the incident was recorded,
19 or documented, I would have to say, yes, sir, and it
20 should be especially in the internal affairs file when,
21 in fact, it was, you know, on such and such a date I met
22 with, and none of the conversations I had were secret.
23     That information was conveyed, and it was
24 conveyed to the internal affairs investigator and to, as
25 you said, you had FDLE, it was conveyed to FDLE.

101

1     So, it was recorded on multiple phones, both
2 audio and documented.  So, to say that it wasn't
3 recorded, I would say that'd be an understatement.
4     **Q   Okay.  What I meant to say was, it's true that**
5 **you didn't document in a memo, any of the information**
6 **just told me, right?**
7   A   I don't document -- I'm not documenting this
8 interview in memos.  I didn't document anything on a
9 memo.
10     **Q   But you're right, because we have a Court**
11 **Reporter and a video -- and this is a video.  So, it's**
12 **all being documented.  So, let's not go there, okay?**
13 **Can we agree on that?**
14   A   For this incident.  Yes, sir.
15     **Q   Okay.  So, what we're talking about is your**
16 **meeting with Mr. Steel, and can we agree that you did**
17 **not prepare a memorandum summarizing or documenting**
18 **your**
19 **meeting with him at or around the time of that event?**
20   A   If you're talking about an investigation, I
21 would let the investigation --
22     **Q   I'm talking about -- I don't want to go off on**
23 **a whole --**
24   A   So, I didn't -- I don't record every -- to
25 answer your question, sir.  I didn't record every single
conversation that I had, ever had in the City, plus or



102

1  minus.  I had multiple conversations about multiple
2  accusations of misconduct about multiple individuals
3  while I was the Chief of Police there.
4        Again, if I had documented or created a memo
5  for every single allegation that was ever made against
6  any of the officers, I would never leave -- I would
7  never stop writing, sir.
8        Based on the circumstances and nature of the
9  complaint, and the documentation would be presented in
10  my testimony for, either, if I was asked by FDLE and
11  conducted in the administrative and the internal
12  investigation, all of the information that I had has
13  always been forthcoming, and it has always been to the
14  point of, this is the incident, this is what happened.
15        If you're asking me to memorialize if I was
16  asked by FDLE or the investigating agency to complete a
17  written statement, I would have completed a written
18  statement at that particular time.
19        This was a conversation just only solely for
20  the fact of determining whether an allegation, not
21  whether your client was guilty or innocent, but just
22  whether an allegation of misconduct was in fact made.
23  And if it was, then to initiate a formal, a more formal
24  investigation.
25        Q   My simple question to you, and you can answer

103

1  **with a yes or no and then explain your answer if you**
2  **need to do it further is, whether or not you prepared a**
3  **memorandum or a document in writing memorializing your**
4  **meeting with Mr. Steel at or around the time of the**
5  **meeting, yes or no?**
6        A   No.
7        MR. RAILEY:  All right.  Brian, we've been
8  going two-and-half hours.  I'm sure the Court
9  Reporter wants a break too.  Is there a time we can
10  take maybe five minutes?
11        MR. POLLACK:  Sure.  We can take five.
12        (Thereupon, a short discussion was held off
13        record.)
14        (Deposition resumed.)
15  BY MR. POLLACK:
16        Q   **All right.  So, getting back to, you know,**
17  **this issue of, you know, the internal affairs**
18  **investigation and notifying.  Once you had this meeting**
19  **with City Manager, Pate, with Briton, and I think who**
20  **was in charge of internal affairs at the time, and**
21  **yourself.**
22        **Was there anybody else who you met with when**
23  **this internal affairs investigation started in that**
24  **meeting?**
25        A   I think that was everybody in the room, I

104

1  believe.  I don't think there was anybody else, but
2  don't hold me to it.  But that was the meeting in
3  Mr. Pate's conference room.
4        Q   **And then what day roundabout was that meeting?**
5        A   I want to say it was the same day.
6        Q   **Which same day?**
7        A   The day of the phone call and the meeting.
8        Q   **So, the same day as the meeting and the phone**
9  **call that you had with Steel is the same day in which**
10  **you met with Pate and Briton in Pate's conference room?**
11        A   Yes, sir.  I believe so.  Yes, sir.
12        Q   **Okay.  How long after that meeting did you**
13  **decide to send Mr. Perez to work from home?**
14        A   Whatever the date was, sir, that you
15  mentioned, I don't know that.  I can't recall the
16  specific date.  It was a while afterwards.  I mean, it
17  wasn't definitely wasn't immediate.
18        Q   **And what I'm going to show you, I will mark as**
19  **Exhibit 5.**
20        (Thereupon, Plaintiffs' Exhibit 5 was entered
21        into the record.)
22  BY MR. POLLACK:
23        Q   **Let me see if you recognize what I've put on**
24  **the screen as Exhibit 5, which is Perez 271.  Do you**
25  **recognize that document?**

105

1        A   No, sir.  I didn't draft it.
2        Q   **Is that your signature at the top?**
3        A   I got to be honest with you, don't really
4  looked like it.  I won't say that it's not, but I also
5  will not say that it is.  That doesn't look familiar to
6  me at all.
7        Q   **Have you seen this document before?**
8        A   It does not look familiar to me, sir, at all.
9        Q   **Meaning, this does not look like a document**
10  **you've ever seen before?**
11        A   I don't recognize it.  No, sir.
12        Q   **So, what you're seeing is that, this document**
13  **does not bear your signature -- does not bear your**
14  **initials?**
15        A   That doesn't look like my initials.  No, sir.
16  Like I said, I say and it is right, saying it isn't, but
17  that does not look familiar to me at all.
18        Q   **Do you know why this would have been in**
19  **Mr. Perez's and Captain Perez's employment file?**
20        MR. RAILEY:  Form.
21        A   Not a clue, sir.
22  BY MR. POLLACK:
23        Q   **Because this indicates that Captain Perez was**
24  **relieved of his work duties as of September 10, 2021.**
25  **Does it not?**



106

1    A   I haven't had a chance to completely read it,
2   but it appears to be such.  Yes, sir.  But that does not
3   appear to be my initials.
4        Q   Do you know whose initials they are?
5    A   Not a clue.
6        Q   And as a -- let me back up for a second.  This
7   indicates that Mr. -- Captain Perez is supposed to
8   remain at his home from 08:00 a.m. until 04:00 p.m.
9   daily.  Does it not?
10   A   I'm not sure where were you finding that,
11  which bullet point is that?
12       Q   First one?
13   A   Remain at duty hours, 08:00 to 06:00 -- like I
14  said, sir, this document doesn't look familiar to me at
15  all.  So, looking at it that -- I mean, it says, effect
16  of a nearly duty hours, 08:00 to 04:00, I don't recall
17  ever signing anything like this.
18       Q   And you don't recall ever creating or having
19  your assistant create any document like this?
20   A   No, sir.
21       Q   Do you know whether this was given to Perez?
22   A   I have no idea.  Yeah, I have no idea.
23       Q   Do you see at the bottom where it has a
24  signature for acknowledgment.  Above, it says, Captain
25  Sergio Perez, and a date of September 10th?

107

1    A   Yes, sir.  I see that area.
2        Q   So, I guess the plot thickens on this, huh?
3    A   I would say so.
4        Q   It keeps getting more interesting
5    A   Yeah, this is interesting.
6        Q   Did you issue any written counseling
7   statements or write-ups to Mr. Steel?
8    A   Did I issue any?  No.  No, sir.
9        Q   Based on the pictures that Mr. Steel showed
10  you from his phone, and what he told you when you had
11  that meeting in early September, were you convinced at
12  the time that he was tased?
13   A   That he was tased, my gut was telling me yes,
14  but convinced, no.  Did I suspect something occurred?
15  Yes.  But again, that just because, and just because
16  even if he was tased, that doesn't explain the
17  circumstances of the tased, you know, or the intent, or
18  anything surrounding that.  So, hence the investigation,
19  so.
20       Q   Had you ever used one of those Axiom tasers
21  before, the double one?
22   A   Never.  No, sir.
23       Q   Have you ever had an occasion while in the
24  course of your duty to discharge a taser?
25   A   Discharge a taser, multiple times.  Yes, sir.

108

1        Q   When you discharge a taser, does the taser
2   mechanism or does the taser itself, besides sending out
3   the elements with the wires, with the current, does it
4   have anything else that goes off to indicate that the
5   taser had been deployed?
6    A   Yes.  Typically, there's a little they have a
7   confetti -- oh, wow.  I used that term.  I don't know
8   what the technical term is, but it's sort of a very
9   small type confetti.  At least the ones that I have
10  experienced, and I don't have much experience in axiom
11  ones.  So, I don't know that.  Yes.
12       Q   And that's what I was getting at is,
13  typically, in your experience when a taser with a charge
14  is given off or is discharged, the taser also gives off
15  some indication that had been discharged, like,
16  confetti, or glitter, or something to show that it had
17  been fired?
18   A   Yes, sir.
19       Q   And the taser that -- let me back up.  Did you
20  or did you ask anybody at the Opa-locka Police
21  Department to look and see whether any taser, live
22  tasers had been discharged?
23   A   Ask anybody any live taser at?
24       Q   You know, in early September?
25   A   No.  I tried to avoid -- I tried to avoid any

109

1   direct involvement in the investigation at all.  So,
2   relating to that incident, no.
3        Q   When a taser is discharged, is there a loud
4   noise that's also emitted?
5    A   I don't know the definition of loud.  But I'll
6   tell you, there's usually a pop.  Again, just based on
7   my experience with the tasers that I have accustomed to,
8   there's usually a pop.
9        Q   Are there cameras, video cameras inside the
10  Opa-Locka Police Department?
11   A   There are cameras inside the Police
12  Department.  Yes, sir.
13       Q   Is there a camera inside the office where
14  Mr. Steel claims that taser was discharged at him?
15   A   Honestly, sir, I don't know.
16       Q   Had anyone reported to you that there was a
17  problem with the camera in the room where Mr. Steel was
18  when he claims a taser was discharged at him?
19   A   They didn't.  I don't recall hearing anything
20  about that.
21       Q   And same question with regard to the video
22  recording.  If there were a camera in the room that
23  Steel was in when he claims he was tasered, did anybody
24  report to you that there was a problem or deletion of
25  video images that had been recorded of that area?



Barreira, Steven Chief   10-27-2022

110

1        MR. RAILEY:  Form.
2     A   No, sir.  Not that I recall.
3  BY MR. POLLACK:
4     Q   Had you fired Robert DeMoya?
5     A   Did I fire -- did I terminate Robert DeMoya?
6  No, sir.  The City Manager did.
7     Q   So, there would be -- how would that have
8  happened?
9     A   Conclusion of an investigation, make a
10 recommendation, look at -- assess the internal
11 investigation findings, make a recommendation and have a
12 conversation with the City Manager, and then make that
13 determination.
14    Q   And who make -- so, conduct an investigation,
15 make a recommendation, and have a conversation with the
16 City Manager, and then make that, review the findings
17 and make a determination. Who is making these
18 determinations?
19    A   Well, it depends.  Like I said, I had
20 conversations with the City Manager discussing
21 specifically even the DeMoya's case, and we discussed
22 the outcome as well, and we were pretty much in
23 agreement with termination, or pursuing termination.
24    Q   And so, as a result, you sent out an e-mail
25 indicating that Robert DeMoya had been terminated on

111

1  July 7th, 2021, at about 10:50 in the morning?
2     A   I can't attest to the date and time.  But yes,
3  sir.
4     Q   I'll share what I've marked as Exhibit 6, it's
5  Perez 262.  Do you recognize this e-mail?
6        (Thereupon, Plaintiffs' Exhibit 6 was entered
7         into the record.)
8     A   It looks about right.  Yes, sir.
9  BY MR. POLLACK:
10    Q   And that's an e-mail that you sent on July
11 7th, 2021, at 10:55 a.m. concerning the termination of
12 Mr. DeMoya?
13    A   Yes, sir.  I also sent out a subsequent one,
14 but yes, sir, that was the first e-mail.  Yes, sir.
15    Q   After this e-mail had Mr -- had Captain Perez
16 spoken with you about the problem with that e- mail?
17       MR. RAILEY:  Form.
18    A   I spoke with multiple people.  So, I can tell
19 you again, we discussed Opa-Locka and the uniqueness of
20 Opa-Locka and it include, I know you've made mentioned
21 about policies, and the agreement, collective bargaining
22 agreement.
23       There was really no mention about this, or an
24 actual termination letter.  There is some overview on
25 the process concerning the adversarial hearing and the

112

1  hearing with the City Manager.
2        Being new to the process and having had that
3  conversation with the City Manager, I released this
4  e-mail prematurely.
5        But I can tell you within a very, very short
6  period of time, and let me say this also.  When I
7  first got there at the City, having with his extensive
8  experience -- excuse me.
9        With his extensive experience, I guess, as a
10 union rep, the City Manager and I and everybody had a
11 discussion that kind of acting in an advisory capacity
12 knew Perez was very, very knowledgeable in that area and
13 assisting in that area.
14       But like I said, I had sent this out
15 prematurely, and then I had to send out very, very
16 shortly thereafter, another e-mail, I guess, retracting
17 this this particular message.
18    Q   Understood.  So, you mentioned within -- you
19 sent this e-mail that you had, you spoke with multiple
20 people about this e-mail shortly after you sent it.  And
21 one of the people that you indicated you had spoken with
22 was Captain Perez?
23    A   I did.
24    Q   Did you indicate that he had been a union rep,
25 and so was knowledgeable about the collective bargaining

113

1  agreement?
2     A   He's a very smart guy.  I'll give credit where
3  credit is due.  He is a very intelligent, very
4  intelligent young man.
5     Q   And my question was, did you testify that he
6  was the person who had been a union rep and was
7  knowledgeable about the collective bargaining agreement?
8     A   From what I was advised, I was not there when
9  he was a union rep.  But what I was advised, that he was
10 the prior agency union rep.
11    Q   And at, you know -- let me back up for a
12 second.  And so, you discuss with Captain Perez that
13 there was a process that had to be followed when there
14 was going to be an adverse action like this, taken
15 against a police officer?
16    A   I'm sorry, I didn't follow what you mean.
17 Could you say that again?
18    Q   Did you talk to Mr. Perez, Captain Perez,
19 about the requirements of the collective bargaining
20 agreement in order to take an adverse action, like the
21 termination of employment for a police officer?
22    A   We had discussed it.  Yes, sir.
23    Q   Following that discussion with Sergio, did you
24 then issue or send out another e-mail?
25    A   I did.



114

1   Q   And in that second e-mail or subsequent e-
2   mail that you sent out, did you rescind the termination
3   of Officer DeMoya's employment?
4   A   Yes, sir. I did.
5   Q   And what I'll show you is Exhibit 7. Is that
6   the e-mail that we're talking about where you rescinded
7   and said he hasn't been terminated?
8       (Thereupon, Plaintiffs' Exhibit 7 was entered
9       into the record.)
10  A   That looks correct, sir.
11  BY MR. POLLACK:
12  Q   And that's because Robert DeMoya was afforded
13  the due process requirements required by the collective
14  bargaining agreement before he could be terminated. Is
15  that right?
16  A   Correct. But it should be stated that even at
17  that letter, it was basically just the letter
18  informing he was never out of any pay benefits or any of
19  that kind of stuff. Obviously, there's the letter
20  itself, but yes.
21      MR. POLLACK: And just for the record, Exhibit
22  7 was Perez 263.
23  BY MR. POLLACK:
24  Q   We're referring back to my Exhibit 6,
25  according to your e-mail that you sent out department

115

1   wide, you indicated that Mr. DeMoya should be treated as
2   a visitor from there on after -- from thereafter. Is
3   that correct?
4   A   I believe that the actual format for this came
5   from Captain Perez. So, yes.
6   Q   Okay. So, he told you what the format was --
7   A   Right.
8   Q   -- for the e-mail?
9   A   Yes, sir.
10  Q   But he wasn't consulted as to what the
11  procedure was to terminate an officer. Is that correct,
12  before this e-mail was sent?
13  A   On this particular case, no, sir.
14  Q   Am I also correct that you did not consult
15  with a collective bargaining agreement before sending
16  out the e-mail that I had shown as Exhibit 6, where you
17  were indicating that Officer DeMoya had been terminated?
18      MR. RAILEY: Form.
19  A   If I recall correctly, sir, neither the
20  collective bargaining agreement, nor Opa-Locka policy
21  mentions anything about a letter.
22  BY MR. POLLACK:
23  Q   What was it you're saying neither --
24  A   Mentions anything about a letter.
25  Q   Did you tell Mr. DeMoya that he had been fired

116

1   before sending this e-mail?
2   A   I don't recall. I know we had had a meeting.
3   I don't know what the content of that conversation was.
4   Q   So, you're saying you don't know whether you
5   told Mr. DeMoya he was fired before you sent out a
6   department wide e-mail, telling everybody he was fired,
7   you didn't give him that courtesy?
8   A   Sir, it was -- I will tell you that it I erred
9   in the fact that I sent that letter out prematurely.
10      Did I tell him that he was fired? No, sir.
11  My standard thing was is that I will be pursuing
12  termination. Not necessarily that he was "fired."
13      The message was sent out because I had had a
14  conversation with the City Manager, and I erred in
15  sending out that letter prior to having that adversarial
16  hearing.
17      But again, he was not -- other than the actual
18  physical e-mail, he was not technically terminated. He
19  was never out of any benefits, or lost pay, or any of
20  that kind of stuff. It was an error on my part, to send
21  out that letter.
22  Q   He was just really embarrassed, right, when
23  you get when it goes out to your peers that you're
24  fired, and then you walk in the next day. That's an
25  embarrassing situation, right?

117

1       MR. RAILEY: Form.
2   A   About embarrassing as a Chief having to recant
3   an e-mail he sent out to the entire agency. Yes, sir.
4   BY MR. POLLACK:
5   Q   And you mentioned something, and I don't want
6   to let it go that the policies and procedures of the
7   Opa-Locka Police Department do not reference the CBA.
8   Is that what you said?
9       MR. RAILEY: Form.
10  A   No. They mentioned the collective bargaining
11  agreement, they don't mention the letter.
12  BY MR. POLLACK:
13  Q   Okay. They don't mention sending a letter?
14  A   Correct.
15  Q   And when you spoke with -- was it just City
16  Manager, Pate, or was there others who you spoke with
17  about terminating Officer DeMoya?
18  A   I spoke with City Manager. I don't know if I
19  had spoken to anybody else, but I knew I had spoken to
20  Mr. Pate.
21  Q   Did Mr. Pate indicate to you during your
22  discussions that there is a CBA in place, a collective
23  bargaining agreement, and you needed to follow those
24  procedures in order to formally terminate Mr. DeMoya?
25  A   No, sir. Not specifically, but I mean, it's



877.291.3376
www.UCRinc.com

118

1 kind of understood.
2 **Q   What do you mean "it's kind of understood?"**
3   A   I mean, it's understood that you would follow
4 the CBA and policies and procedures.
5 **Q   Why did you want to move Sergio's office?**
6   A   I had a conversation -- as I indicated
7 earlier, sir, I had a conversation with the City
8 Manager, the Deputy City Manager, and they had discussed
9 the relationship between Sergio Perez and Jenkins, and
10 that was a topic that was discussed.
11 **Q   And what did that have to do with moving his**
12 **office?**
13   A   You'd have to ask them, sir.
14 **Q   I mean, you sent the e-mail --**
15   A   Um-hum.
16 **Q   -- that you've been looking at office**
17 **assignments and are contemplating moving his office to**
18 **the CID side of the building.**
19   A   Operationally, it made sense.  But again,
20 having a conversation with Mr. Pate -- and you'd have to
21 forgive me, I don't know what his name is, the Assistant
22 City Manager, they had talked about that relationship as
23 well.
24       But operationally it made sense, office
25 assignments coming all day long.  What I really wanted

119

1 to do was have the internal affairs investigator close
2 to me.  So, that way, I have more of a straight line
3 between myself and any IA investigations.  The way -- I
4 guess, the way, that's the way it used to be from what I
5 was advised.
6 **Q   What I'll mark as Exhibit 8 is Perez 259 to**
7 **261.**
8       (Thereupon, Plaintiffs' Exhibit 8 was entered
9       into the record.)
10 BY MR. POLLACK:
11 **Q   All right.  E-mail at the top, do you**
12 **recognize it?**
13   A   Yes, sir.
14 **Q   Okay.  And it doesn't indicate that you had**
15 **been contemplating office assignments with anybody else.**
16 **It indicates that you were looking at office**
17 **assignments, and that you were contemplating moving.**
18 **Captain Perez's office.  Do you see that?**
19   A   That is not inaccurate.  Yes.
20 **Q   Okay.  And then Captain Perez, on the next**
21 **day, July 27, indicates to you that he's concerned about**
22 **the move, right?**
23   A   Um-hum, sir.
24 **Q   And he's concerned that it's -- he's being**
25 **moved to an area that's in disrepair and has mold?**

120

1   A   Yes, sir.
2 **Q   And so, now you're going to take one of the**
3 **senior members of the command staff and move him to a**
4 **moldy old office?**
5   A   I also considered in moving him into the other
6 wing of the building where the patrol section was, and
7 there was also a funding source for a remodel
8 downstairs.
9       Had that -- had the remodel of the funding
10 source going through, my intention was to move him down
11 there, moved him down there anyway.
12 **Q   And that may be however, what you indicated in**
13 **your e-mail and what actually transpired was, you were**
14 **going to move him to the CID side of the building,**
15 **right?**
16   A   Well, it never transpired.  He was -- he never
17 moved, sir.  It was just -- I was just letting him know
18 it was being contemplated, it's being thought of.
19       And I believe my -- if I'm not mistaken, I
20 believe it even indicates in my e-mail that this is not
21 immediate, or even definitive.  That is just a thought.
22 I think it's important for command staff members to be
23 closer to their individuals.
24       Again, there was a conversation with the City
25 Manager concerning the relationship between him and

121

1 Jenkins.  But that's -- that was kind of decide the
2 point, but that was definitely part of it as well.
3 **Q   And so, there's a couple more e-mails where,**
4 **you know, you indicate, "Hey, if the morning of Tuesday,**
5 **July 27, 2021, if the condition is a problem, come see**
6 **me.  You need to discuss the current condition of that**
7 **area, decide what options are available to your current**
8 **personnel that are working in the area", right?**
9   A   Yes, sir.  That was if the area was in
10 disarray, that's the individual where Captain Perez's
11 personnel were actually assigned.
12       So, if it was technically in such disarray,
13 then then I needed to find out as, did he know about it?
14 What is he doing about it?  What can we do to help
15 resolve it?
16 **Q   And then again, on August 2nd, you send an e-**
17 **mail to Captain Perez with a copy to the Nikeya Jenkins**
18 **that you have been contemplating this office move,**
19 **right?  "I have been contemplating this office move and**
20 **I have decided it's the best option for decentralization**
21 **of management and active supervision of direct reports."**
22   A   Um-hum.
23 **Q   And then, Mr. Captain Perez questions about**
24 **the motive behind the time and attention being given to**
25 **moving his workstation?**



122

1    A   Yeah, moving workstations in any law
2 enforcement agency, moving workstations is a very --
3 it's very fluid thing.  It happens all the time.
4        I mean, it happens multiple times in multiple
5 police agencies, current work assignments, deployments,
6 moving offices, it's not -- that it is not anything
7 unusual.  I was actually kind of surprised that his, you
8 know, his response, to be honest.
9    Q   And the curious thing about these e-mails is,
10 you indicated that when there were other personnel
11 changes that went on such as sending Captain Perez to
12 work from home, you would do that by a discussion.
13        But when you're talking about moving offices,
14 you do it by e-mail.  Why the distinction?
15        MR. RAILEY:  Object to form.
16        THE WITNESS:  I'm sorry.
17        MR. RAILEY:  Go ahead.
18    A   Could you go back to the first e-mail I had
19 sent?  Okay.  I can tell you, based on -- this was based
20 because this had a conversation with the City Manager
21 and the Deputy City Manager, and this was the discussion
22 that was put out there.  That's why I put this in there,
23 or recorded it on an e-mail.
24 BY MR. POLLACK:
25    Q   All right.  But you also told me that when you

123

1 talked to the -- that you talked to the City Manager
2 about sending Sergio to work from home, right?
3    A   Yes, sir.
4    Q   I mean, I'm correcting my recollection of
5 that.  That's what the testimony will reflect when we
6 have the transcript.  Isn't that correct?
7    A   Yeah.
8    Q   And yet that action wasn't reflected in an
9 e-mail.  Is it?
10    A   Sir, yeah, we can keep -- all I'm telling you
11 is, not every conversation I had with Perez was actually
12 recorded.  There are multiple conversations I had with
13 him about multiple subjects.
14        Some of them were recorded on in e-mails, some
15 of them were not.  Some of them were, you know, phone
16 discussions.  Some of them were, you know, in-person.
17        I mean, I can't give you an explanation, sir,
18 of why that particular incident was not recorded on why
19 I told him that he could -- you should work from the
20 house until you had a conversation with the City
21 Manager.
22        And to be honest with you, to be -- in my
23 personal opinion, again, he wasn't -- he was not
24 demoted.  He wasn't without pay.  He didn't have any
25 particular issues.  It was simply, take charge of your

124

1 unit, work at it from the field, work at it from home
2 and address it like that.  I did not record it on -- if
3 you're asking me why I didn't, I don't know.  I didn't
4 record everything.
5    Q   If Sergio is at home working after September
6 10th, 2021, I mean, he would have been working under
7 you, wouldn't he?
8    A   As the Chief of Police.  Yes, sir.
9    Q   And he would have had to report to you on
10 different items on which he was working, right?
11    A   I would assume, yes.  He should.
12    Q   Sure.  And if you're not getting e-mails and
13 reports from Sergio for weeks on end, wouldn't that have
14 been concerning to you?
15    A   Sir, to be honest with you, I wasn't there
16 weeks on end.  I had left the agency very shortly after
17 that message.  There wasn't any weeks on end to do it
18 with.
19    Q   Well, I mean, you didn't leave in the month of
20 September.  Did you?
21    A   I know my letter had October on it.  But I
22 think I had gone out of town.  I'm not really sure, but
23 it wasn't -- I mean, we're talking -- I'm not even sure
24 that it happened on the 10th.  I can't tell you that
25 that's the exact date.  But it was, you know, two weeks,

125

1 three weeks, I left the agency.
2    Q   I mean, because we marked this as Exhibit 2
3 just to put a timestamp on it.  You left Oct -- your
4 resignation was effective, October 21st.
5    A   Okay.
6    Q   And Sergio stopped working in the office in
7 some capacity, September 10th, that would be six weeks.
8    A   I'm not sure of that date, but okay.
9    Q   He received --
10    A   I'm not saying it's not.  I'm just saying
11 that--
12    Q   Well, let's look at it.  Let's go through
13 those dates, right?
14    A   Okay.  Sure.
15    Q   All right.  We have September 10th, 2021,
16 where, you know, it looks like Sergio signed that he was
17 relieved of duty that day?
18    A   I think we've already discussed this letter,
19 sir.
20    Q   Right.  We discussed it.  It's not your
21 initials at the top and you hadn't seen this before, but
22 you can't say whether or not Sergio signed it or didn't
23 sign it, right?
24    A   I can't attest -- like I said, I can't say I
25 did or I didn't.  I do not recognize this, and that does



Barreira, Steven Chief   10-27-2022

126

1 not appear, I'm not saying it's not, but it does not
2 appear to be my signature. So, I have no idea of the
3 authenticity of any of these.
4    **Q   I didn't ask you about that. What I asked you**
5 **was, the date that Sergio stopped working in the office**
6 **would have been September 10th, 2021, at least based on**
7 **this memo, which although you may not have authored or**
8 **signed, it appears that Sergio did?**
9    MR. RAILEY:  Object to the form.
10    A  You're asking me to attest to a document I
11 can't, I can't -- is that a --
12 BY MR. POLLACK:
13    **Q   I'm not asking you -- okay. Let me ask it a**
14 **different way. Is it true that you had -- that you**
15 **created no documentation to identify the date on which**
16 **you directed Sergio to cease working in the office?**
17    A  Cease working in the office, to work from
18 home. No, sir. I did not create a -- I didn't create
19 anything in writing.
20    **Q   Okay.**
21    A  No, sir.
22    **Q   So, if Sergio continued working from home**
23 **after this, whatever date it is, we should expect to see**
24 **work-related e-mails from Sergio, work-related reports**
25 **from Sergio after September 10th until at least the date**

127

1 **that you resigned, right?**
2    MR. RAILEY:  Form.
3    A  Or relatively close to. Yes, sir.
4 BY MR. POLLACK:
5    **Q   Would you have been calling Sergio on his cell**
6 **phone?**
7    A  I don't know if I would be calling on a cell
8 phone. Again, I would again, say to check with the Opa-
9 Locka Police, the Police Department, check with the IT,
10 check in e-mail record. If it's there, it would be
11 recorded and documented in in the e-mails.
12    I can't -- I will not say with 100% certainty,
13 but I will tell you that I'm pretty sure we had some e-
14 mail messages exchanged, yes.
15    **Q   Okay. And without a written directive from**
16 **you as to Sergio Perez, his status, on or after**
17 **September 10th, 2021, you can understand why things may**
18 **have been confusing. Could you not?**
19    MR. RAILEY:  Object to the form.
20    A  Without a written -- again, maybe there's an
21 assumption, but I would assume that most police staff
22 members, in my experience of almost 30 years, command
23 staff members are usually the cream of the crop.
24    They are usually a little smarter than the
25 average bear, and I would assume that in the

128

1 conversation that I had with Perez, who is a very
2 intelligent individual, that any confusion if he did
3 experience any, would -- he would have communicated that
4 to me in some form or fashion.
5 BY MR. POLLACK:
6    **Q   Unless you get a written directive, right?**
7    MR. RAILEY:  Form.
8    A  Unless you get a written directive. He would
9 have questioned me there a couple of times, he would
10 have questioned me on anything in writing as well.
11 BY MR. POLLACK:
12    **Q   You're saying that if Sergio got a written**
13 **directive that bears your name that tells him he's**
14 **relieved of duty, at that point --**
15    A  I didn't give him the memo of relieving him of
16 duties, sir.
17    **Q   I didn't whether you -- I didn't ask your**
18 **participation in it at all.**
19    A  Okay.
20    **Q   I'm asking you do you think it would have been**
21 **confusing for a member of a command staff who you just**
22 **told to go work from home, to then receive a directive,**
23 **a memorandum saying you are now relieved of duty?**
24    MR. RAILEY:  Form.
25 BY MR. POLLACK:

129

1    **Q   I'm just asking whether you believe that to be**
2 **confused -- would have would have caused him confusion?**
3    MR. RAILEY:  Form.
4    A  I'm not inside Sergio Perez's head, sir.
5 BY MR. POLLACK:
6    **Q   Okay.**
7    A  I don't know whether he was confused by that
8 or not. I can tell you that what I know of Sergio
9 Perez, that had he had been confused, he would not have
10 had -- at least my experience with him, he would not
11 have an issue, written directive, e-mail or otherwise of
12 communicating that concern to anybody within the city.
13 BY MR. POLLACK:
14    **Q   So, so that we can be absolutely clear on**
15 **this. Is it your testimony that the document that I**
16 **marked as Exhibit 5, Perez Bates Number 271, and I'll**
17 **put it on the screen so that there's no confusion about**
18 **the document we're talking about for anybody who reads**
19 **this transcript.**
20    **This, the document that's titled "Memorandum**
21 **to Captain Sergio Perez, dated September 10th, 2021,**
22 **from Steven Barreira, Chief of Police, Subject: Relieved**
23 **of duty(ROD) with initials in blue pen near your name."**
24 **You did not author this document. Is that correct?**
25    A  As I stated earlier, I cannot attest to



130

1  whether I did or did not.  And my testimony is, I cannot
2  tell you I did or did not.  I do not recall ever seeing
3  this form.
4       I'm not saying I didn't, and I can say that it
5  appears at this time that that is not my initials.  So
6  that would be my testimony.
7       I don't recall this document at all, and I
8  would definitely call it into question, but I am not
9  telling you that it is not.  But I'm also not telling you
10  that it is.  I do not recall this, seeing this, seeing
11  this message at all.
12       Q   I'm trying to distill this a little bit
13  because this document comes from Mr. Captain Perez's
14  personnel file at Opa-Locka Police Department.
15       A   I don't even know we get into his file, sir.
16       Q   I'm sorry?
17       A   His personnel file from the Chief's office or
18  from HR?
19       Q   This was provided to us --
20       A   Okay.
21       Q   -- by the City clerk, I believe, or the
22  records custodian.
23       A   Okay.
24       Q   So, I don't believe there's any supposition
25  that Sergio went into anyone's file and pull this out.

131

1  This was a document that was provided to us.
2       And so, my question is, is this a reliable
3  document in your opinion?
4       MR. RAILEY:  Form.
5       A   If I don't recall it, sir, I'm going to say
6  right now until verified the initials, or whatever we
7  have to do, I don't recognize this form at all.
8       So, whether it is or it isn't, I can't attest
9  to it.  I don't know what else I can tell you about it,
10  sir.  I do not recognize ever seeing this.
11       Again, not saying yes, not saying no under
12  testimony.  I'm just telling you I do not recognize this
13  document or initialing in this document at all.
14       I can tell you in the conversation I had with
15  Perez in my office was advising him to work from the
16  house, maintain everything that he had, maintained his
17  current assignment, no loss in pay.  Just to -- again,
18  to work from the house.  So, this -- my official answer
19  is, I do not recall this document or signing this
20  document at all.
21  BY MR. POLLACK:
22       Q   And, in fact, this document would contradict
23  your recollection of what your directions were to
24  Captain Perez.  Is that true?
25       A   No, sir.  Not at all.  I don't know about this

132

1  date.  I can tell you the conversation that I had with
2  him in my office when this occurred, it could have been
3  afterwards.  I don't know the timing of this thing.
4       If this was not on the day -- I will say this
5  was not on the day that I had a conversation with
6  Captain Perez, I can tell you that.  That is my sworn
7  testimony.
8       I had a conversation with Captain Perez, he
9  worked from the house.  If this thing was generated, it
10  was definitely not on that day.
11       So, if this was on the same day, then yes,
12  sir.  The answer to you is I definitely questioned the
13  authenticity of this form.  That was not -- he was sent
14  to work from the house.  Nothing more, nothing less,
15  best of my knowledge.
16       Q   And so, your testimony is that you never
17  directed that Captain Perez be relieved of his work
18  duties?
19       A   Not that I recall.  No, sir.  And I will say
20  if I did, if it did, at any point, it would be under the
21  direction or consent of the City Manager.  So,
22  everything was passed by him, but I don't recall that
23  document or doing that.
24       Q   While you're at Opa-Locka Police Department,
25  were you aware of the financial oversight that the City

133

1  was placed under?
2       A   Yes, sir.
3       Q   What's your understanding as to why the City
4  was under financial oversight?
5       A   I believe it had to do with the previous or
6  historical financial dealings of the City,
7  misappropriation and so forth.
8       Q   And you were aware that the City is in a dire
9  financial situation as a result of the department's
10  dealings, right?
11       A   Depends on what your definition of dire is,
12  but I know they have some budgetary issues.  But then
13  again, most cities and police agencies do as well.
14       Q   Well, their budgetary issues were worse than
15  other cities, right, to the point that the government
16  had to get involved and overlook what was being spent,
17  right?
18       MR. RAILEY:  Form.
19       A   I'm sorry, I don't know what the motive was,
20  sir, for the oversight.  I don't know -- I don't think
21  it was an amount thing.  I think it was a management in
22  use thing.
23       But again, I can't -- you'd have to go back,
24  and I don't know the historical.  So, I can't answer
25  that question.



Barreira, Steven Chief   10-27-2022

134

1 BY MR. POLLACK:
2    Q   Did anybody explained to you why the City was
3 under financial oversight?
4    A   Briefly.  I'm sure there was discussions I
5 had.
6    Q   With who?
7    A   I can't give you an answer.  I don't know.
8 Multiple people, casual conversations, conversations
9 with the City Manager.  I don't know if anybody ever
10 really got into the details of it, but it was discussed
11 that it is under financial oversight from the, I guess,
12 the governor's office.
13    Q   And so, as a result of it being under
14 financial oversight, would it be important to make sure
15 that the expenditures that the police department was
16 making were prudent?
17    A   Would it be responsible for whether it's under
18 oversight or not.
19    Q   And in your role as Police Chief at Opa-
20 Locka, were you responsible for complying with the
21 Procurement Code in committing the City to financial
22 obligations?
23    A   I would be subject to the Procurement Code,
24 but I will tell you this.  It is an absolutely unique
25 and very interesting process.

135

1    Q   When you say that you were subject to the
2 Procurement Code, does that mean that you had to follow
3 the Procurement Code?
4    A   Everybody that works for the City has to.
5    Q   Did you follow the Procurement Code while you
6 were the Chief at Opa-Locka?
7    A   To the best of my ability.  Yes, sir.
8    Q   You said, "to the best of your ability." What
9 does that caveat mean?
10    A   I'm not really sure how to explain that one.
11 Did I follow it to the best of my ability?  I believe
12 all my actions were consistent with it.  If that's what
13 you're asking.
14    Q   So, as we sit here today, is it fair to say
15 that you believe your actions at the City of Opa- Locka
16 complied with the City's Procurement Code?
17    A   I believe so.
18    Q   Were you authorized to commit the City to a
19 financial obligation exceeding $3,500?
20    A   I don't know what the specific Procurement
21 Code numbers or amounts are with the City.  If you ask
22 me now, I have no idea.
23    Q   Did you sign any contracts or agreements to
24 commit the City or its Police Department to any
25 financial obligations exceeding, I don't know, $3,000

136

1 while you're the Police Chief?
2    A   If you're referring to the Lexipol, I did sign
3 the agreement.  However, I did not submit the agreement.
4    Q   Were you -- wasn't it the City Manager who was
5 supposed to sign that contract?
6    A   I wouldn't know.  I never really received any
7 financial training from the City or the City Manager.
8 But I know he's responsible in the end for the
9 purchases.
10    Q   Was that one of the complications in allowing
11 you to do your job that you didn't get the training that
12 you needed?
13    A   Was it complicated?  Sure, it didn't make it
14 easier.  However, I will say that, again, it's a very
15 unique process, very inconsistent.
16       There's a lot of -- I mean, in essence, a
17 purchase can technically go through the DS four or five
18 times for approvals, be approved on one end and then
19 have to go through another process, same amount, same
20 thing goes through a second or third time.
21       So, my experience with budgeting is a lot
22 different than that.  But yes, it is very confusing, but
23 challenging, yes -- no, excuse me.  Not impossible, but
24 yes.
25    Q   No.  And I'm not suggesting it's impossible.

137

1 I'm just saying, would the process have been made easier
2 had you received better training on how to navigate that
3 process?
4       MR. RAILEY:  Form.
5    A   I think that implied anything.
6 BY MR. POLLACK:
7    Q   And I mean, here, you know, at least with
8 respect to the procurement process, what you said was,
9 you know, you didn't get any training from the City or
10 the City Manager, right?
11    A   Correct.
12    Q   Were there other subject areas in which you
13 would have liked to receive better or more training from
14 the City on how its policies and/or procedures were?
15       MR. RAILEY:  Form.
16    A   I can't think of anything specific over -- off
17 the top of my head.  But I'll tell you that, at any
18 given time, in any given circumstance, I'll take
19 training in anything, especially in a new environment,
20 new situation, and as unique as that City is.
21 BY MR. POLLACK:
22    Q   When you came into your role in April of 2021
23 as the Police Chief, did anybody sit down with you to
24 orient you on the policies and procedures in the
25 department itself?



877.291.3376
www.UCRinc.com

Barreira, Steven Chief   10-27-2022

138

1    A   I don't recall anything formal.
2    Q   I know your walk, you know, your -- I guess
3 the best expression is, you know, you're running to
4 catch up to a speeding train.
5        When you're jumping into this role as the
6 Police Chief, did you have the opportunity when you
7 started to review, cover to cover, the SOPs for the
8 department?
9    A   I had actually requested it ahead of time, but
10 I never got those.  So, coming into the agency when I
11 first started, can I tell you under sworn testimony that
12 I read it cover to cover?  No.  Can I tell you that I
13 was aggressively even actively trying to accomplish
14 that?  Yes.
15    Q   Was there anyone from the Commission or the
16 City Manager's office who reached out to find out
17 whether you had reviewed the City's policies and
18 procedures?
19    A   I don't remember.  I can't recall.
20    Q   Likewise, have you had an opportunity to
21 review either prior to or while you were working for the
22 City, its policies and procedures?
23    A   Had an opportunity to review the City's
24 policies and procedures?
25    Q   Yes.  In other words, the personnel procedures

139

1 and/or the Procurement Code?
2    A   Same answer as I did with the SOPs.
3    Q   In other words, you requested them before,
4 didn't get them, and you were making best efforts to
5 review them while you're working there?
6    A   Correct.  Yes, sir.
7    Q   Before signing the Lexipol agreement, did you
8 receive approval from the City Commission?
9    A   I can't swear to it.  I have to look at the
10 actual record of DS.  But I believe that it had been
11 discussed and put through.
12        I don't know.  Like I said, it goes through
13 multiple times.  I will tell you this that the Lexipol
14 was something that was already in discussion, that was
15 already in place prior to me getting there because of
16 the City Manager's experience with Lexipol and his prior
17 agency in Chicago.
18    Q   And Lexipol was a source to obtain
19 standardized policies and procedures?
20    A   My goal -- yes, sir.  My goal, like I had
21 mentioned earlier was to get the agency accredited
22 through FCAC.
23        One of the things that are required, my
24 actual-- I was actually advocating for what they call
25 DMS, which you have to have in order to be accredited

140

1 through FCAC.
2        So, that was my original go to, to help us
3 organize the policies, but however, Lexipol after having
4 been introduced to it.
5        I don't know everybody that had been in that
6 discussion.  I know the City Manager was one of them.  I
7 know the Deputy City Manager.  I don't know if Perez was
8 or not.
9        But after having a discussion with Lexipol,
10 they provided -- I mean, I think they represent 8,000-
11 9,000 police agencies or first responder type agencies.
12        But they provided what I was lacking at Opa-
13 Locka was a lot of professional executive experience to
14 help me develop policy, but they helped development,
15 provided free training, the verification of receipt and
16 acknowledgement amongst the officers, and they also
17 provided legal representation for any legal challenges
18 made to policies and procedures.
19    Q   You worked at several different Police
20 Department Sheriff's Offices before you came to Opa-
21 Locka, correct?
22    A   Yes, sir.
23    Q   And I'm sure you have colleagues that moved on
24 from those departments into other departments within the
25 state of Florida.  Is that right?

141

1    A   Yes, sir.
2    Q   And so, you know, I would expect for an
3 officer like yourself, who's got a, you know, a nice
4 career.  You don't have any blemishes on your career,
5 that you got a lot of friends in a lot of different
6 departments and different levels of the ranks at these
7 different departments within Florida, right?
8    A   Yes, sir.
9    Q   And was there anything that prevented you from
10 reaching out to any of these other, you know, colleagues
11 who worked in the command staff at any of these other
12 departments to request that they provide you with copies
13 of their policies and procedures to use as models for
14 those to be implemented in the City of Opa-Locka?
15    A   Some of them did.  I use some of the materials
16 that I had.  But again, it's got to be unique to the
17 particular situation.  You talked about the collective
18 bargaining agreement, policies have to be consistent
19 with that collective bargaining agreement, which you
20 know is very unique to a particular agency.
21        So, those policies wouldn't necessarily have
22 applied directly, or they know they'd have to be changed
23 and manipulated, or changed, you know, updated.
24        Some of the agencies were not accredited,
25 which was, I guess, it wasn't my particular goal.  I



142

1 reached out to some of the other agencies.  I know
2 Deputy Chief had reached out to some of the other local
3 agencies.
4        And I got to be honest with you, as a person,
5 individual trained in accreditation, some of those
6 policies are were, again, overly vague, not very
7 directive.  So, that was not the direction that I felt
8 that our agency needed to be moved in.
9        So, to answer your question is yes.  Yes.  I
10 did, you know, I had some examples from other, we had
11 some examples from other nearby agencies, but they also
12 didn't provide either the training, the verification,
13 the legal backing that at that time, Lexipol could
14 provide.
15    Q   And you're saying that you believe that the
16 Assistant Chief had received policies and/or procedures
17 from other area agencies while you were the Chief of
18 Police?
19    A   I don't think they weren't incorporated, but I
20 know she had reached out to some of the local,
21 surrounding some of the other surrounding agencies. So,
22 there are definitely other agencies involved or other
23 agency information that was out there.
24    Q   And I understand there's -- we're talking in
25 general and I'm trying to get specific.  So, my specific

143

1 question is, did Opa-Locka receive policies and
2 procedures from other local agencies at the request of
3 the Assistant Chief while you were the Chief of Police?
4    A   You'd have to ask her.
5    Q   Okay.  So, you don't know?
6    A   No.
7    Q   Okay.  When -- did you make any requests of
8 other agencies to provide Opa-Locka with their policies
9 and procedures from accredited agencies?
10    A   Did I request?  I know I spoke with -- when we
11 were reviewing Lexipol, I spoke with one of the agencies
12 in somewhere around Cocoa Beach area, that was utilizing
13 Lexipol to see if it was something worthwhile.
14        Other agency policies, I had some -- again, I
15 had some personal ones on record from other agencies,
16 mostly in North Florida which doesn't happen typically
17 fit in very well with some of the things going on in
18 South Florida.
19        It wasn't -- it wouldn't fit with some of the
20 agency practices including the collective bargaining
21 agreement.  Were there other policies considered? Sure.
22 Anything that was presented would be viewed and
23 worthwhile.
24        I think I even gave Jenkins, and possibly
25 Perez, a uniform policy, a sample uniform policy from an

144

1 accredited agency to try to mirror and mimic.  So, yes.
2 If you're asking if there was input, then I guess my
3 answer would be yes.
4    Q   So, but my question was involved with whether
5 you requested policies and procedures from other
6 accredited law enforcement agencies in South Florida
7 while you were the Chief of Police.
8        I know you indicated that you spoke to an
9 agency in Cocoa Beach who had used Lexipol, and that you
10 had policies and procedures from several agencies in
11 North Florida in your possession already.
12        But my question is whether while you were the
13 Chief of Police, you reached out to other accredited
14 agencies to ask for copies of their policies and
15 procedures?
16    A   I did not directly, but my Deputy Chief had,
17 or at least indicated to me that she had.
18    Q   I'll show you what I've marked as Plaintiffs'
19 Exhibit 9.  It's an eight-page Exhibit.  Do you recognize
20 this page?
21        (Thereupon, Plaintiffs' Exhibit 9 was entered
22        into the record.)
23    A   The sole source letter, yes.
24 BY MR. POLLACK:
25    Q   The second page is an invoice from Lexipol

145

1 for, it looks like almost $40,000 -- almost $54,000?
2    A   I don't recognize it, but yes, sir.  It
3 appears to be an invoice.
4    Q   And it's dated May 3rd, 2021.  So, that would
5 have come to the police department while you were there.
6 Is that right?
7    A   I can't say it would come to the Police
8 Department, but it would come to the City in some form
9 or fashion or another, yes.
10    Q   And does the Police Department building have
11 the same address as the City hall?
12    A   I couldn't answer that question, sir.  I
13 believe so.
14    Q   And this is the agreement for use of
15 subscription material, which is the fourth page of
16 Exhibit 9.  Is that your signature at the bottom?
17    A   It is.
18    Q   This was directed to John Pate's attention.
19 Was it not?
20    A   It was.
21    Q   Was your signing this document to commit the
22 City to a significant expense in compliance with the
23 City's Procurement Code?
24        MR. RAILEY:   Form.
25    A   It depends.  Me signing it prior to all the



Barreira, Steven Chief   10-27-2022

146

1 other process, I would say yes. However, this was not
2 supposed to be forwarded to Lexipol at that time when I
3 signed it and submitted it.
4 BY MR. POLLACK:
5     Q   So, why sign it before it's supposed to be
6 submitted?
7     A   I signed the agreement and forwarded it to the
8 City Manager for final approval and the acquire - -
9 requisition that needed to be filed in order to purchase
10 it. Not knowing the Opa-Locka's particular process. I
11 do know you have to have a requisition before you could
12 purchase a particular item.
13    Q   When did you learn that you should not have
14 signed it?
15    MR. RAILEY:  Form.
16    A   To be honest with you, I never learned that I
17 was not supposed to sign it. Signing it, with all due
18 respect, sir, signing it wasn't a particular issue. It
19 was getting forwarded to Lexipol which I have no idea
20 how that happened prior to it going to the City Manager.
21 That was the issue.
22 BY MR. POLLACK:
23    Q   Your e-mail at the department was
24 SBarrera@opalockapd.com. Was it not?
25    A   I couldn't tell you, sir.

147

1    Q   I mean, was there another e-mail that you used
2 at the department?
3    A   I couldn't tell you the exact e-mail, sir.
4    Q   And your testimony is that you never really
5 knew what the process was, as far as signing or not
6 signing?
7    A   I wasn't sure whether I should have signed - -
8 should sign the agreement or not. That is true.
9 However, again, it was -- I don't know how it got to
10 Lexipol.
11    It was given to my staff assistant and it was
12 supposed to go to the City Manager, because I knew the
13 requisition process and so forth. He was the one who
14 advocated for Lexipol. So, obviously, he needed to be
15 aware and kept in loop on that process.
16    Q   You said you knew the requisition process, but
17 I thought you said a moment ago you weren't sure the
18 requisition process?
19    A   In general requisition. I know when you
20 purchase stuff for the City, you have to have a
21 requisition.
22    Now, again, Opa-Locka is very, very unique.
23 There are a lot of nuances, it has to go through four or
24 five times. I mean, it's -- I know when you're
25 purchasing with the government, you have to have a

148

1 requisition. So, and that doesn't matter where you are
2 at.
3    Q   And your understanding is that the Commission
4 had already approved the Lexipol agreement before you
5 signed it?
6    A   I believe so. But again, the agreement was
7 not supposed to go through, the agreement was given to
8 the staff assistant to go to the City Manager.
9    Q   And then when did you learn that it hadn't
10 been approved previously?
11    A   I can't give you a date or time.
12    Q   I mean, was it while you're working at Opa-
13 Locka, afterwards?
14    A   Yes.  No.  it was while I was employed.
15    Q   A week, two weeks, a month after you signed
16 it?
17    A   I don't want to guess, sir. I don't know.
18    Q   I mean, how did you find out that you
19 shouldn't have signed it?
20    A   Still, again, never found out I shouldn't have
21 signed it. I found out that that they had received it.
22 It shouldn't have gone to them.
23    When I found out that it went to them, I don't
24 know the specific date and time -- or let me rephrase
25 it.

149

1    How it got to them, I don't believe the City--
2 I don't know if it went to the City Manager or not. So,
3 from what I understand, it did not, so, but I can't
4 confirm that. But that's that was the intended location
5 of that particular agreement.
6    Q   And when did you find out that the City
7 Commission had not previously approved the Lexipol
8 agreement or expenditure?
9    A   I couldn't give you specifics. I don't want
10 to guess, sir.
11    Q   Okay. I mean, but you knew -- I'll show you
12 what I've marked as Plaintiffs' Exhibit 10, 264-265.
13    (Thereupon, Plaintiffs' Exhibit 10 was entered
14    into the record.)
15 BY MR. POLLACK:
16    Q   You know, about a week after you signed it,
17 that there was a problem, right?
18    A   Yeah, on this letter. Yes, sir. I guess
19 that's when I realized that it had not gone to the City
20 Manager.
21    Apparently, it went through. However, I did
22 make contact with Lexipol to clarify, and they pretty
23 much held everything, nullified anything. So, the City
24 wasn't actually committed to any money until it could go
25 through the process.



150

1       But it would, again, that agreement letter was
2   not -- I didn't sign the requisition, as a matter of
3   fact, when the Lexipol did go through the appropriate
4   Opa-Locka procurement process.
5       I'm not even the one who signed the
6   requisition even then.  So, I did sign the agreement
7   letter, the agreement letter was not supposed to
8   technically go to Lexipol at that given time, it was
9   supposed to go to the City Manager's office.
10      I can't attest to this, but my staff assistant
11  was relatively new.  I don't know when she started, and
12  I don't know how it got to, directly to Lexipol as far
13  as the agreement is concerned.
14      So, but once that -- and again, I couldn't
15  testify to the timeframe, but it was a week later or
16  whatever.  Then as soon as the error was learned, I
17  contacted Lexipol and they pretty much put everything on
18  hold and a kibosh until it could go through the
19  appropriate process through the City, which it did.
20      Q   While you're the Chief of Police, did you
21  reassign any sworn officers to work in code enforcement?
22      A   No, sir.  Not that I recall.  I can't think of
23  any.
24      Q   Is code enforcement a position for which
25  someone needs to be a sworn officer?

151

1       A   No, sir.  Not that I believe, no.
2       Q   While you were the Chief of Police, did you
3   observe Michael Steele t have engaged in any retaliatory
4   actions?
5           MR. RAILEY:  Form.
6       A   Did I observed Michael Steel?  No, sir.
7   BY MR. POLLACK:
8       Q   The position that he held while you were the
9   Chief of Police was what?
10      A   I don't know the technical name for it.  I
11  guess he was the Inventory Sergeant at Arms, something.
12  He was in charge of -- he was a patrol sergeant, but I
13  guess he also had, like inventory.  I don't recall what
14  the technical name was for his position.
15      Q   Did he have a number of subordinate officers
16  who reported to him directly?
17      A   He had officers reporting to him.  How many, I
18  have no idea.
19      Q   Were those direct reports?
20      A   Yeah, direct reports.  Yes.  I believe so.
21      Q   Who were his direct reports?
22      A   Not me, sir.  You'd have to look at the copy
23  of the roll call, or the roll call for that -- those
24  particular dates.
25      Q   Did you make -- excuse me.  Was Michael Steel

152

1   the subject of an internal affairs investigation before
2   you resigned?
3       A   I don't know if it was an internal
4   investigation, but I've been -- I don't know if it was
5   an internal investigation there.  There was some --
6   there was an attempt for discipline, yes.  Him and
7   another particular officer.
8       Q   You said there was an attempt for discipline.
9   What does that mean?
10      A   They were trying there -- I guess they never
11  really wrote him up, but I know they were trying to
12  write him up for failure to notify command staff.
13      Q   About what?
14      A   I don't know if it was a double shooting, a
15  homicide.  Apparently, he had responded to an incident,
16  and I want to say it was like 15 minutes before he
17  notified command staff, and I know the City Manager and
18  Captain Rogers and Deputy Chief we're looking at writing
19  him up for failure to notifying command.
20      Q   And so, what you're saying is, as far as you
21  understand it, Michael Steel was not the subject of any
22  other internal affairs investigations other than the one
23  involving his failure to notify command staff about a
24  double shooting while you were the Chief?
25      A   None that I can recall, sir.  None that I'm

153

1   aware of now, no.
2       Q   Did you have a discussion with City Manager,
3   Pate, about making Michael Steel the subject of an
4   internal affairs investigation?
5       A   In relation to just?
6       Q   In general?
7       A   I'm not sure what -- in what charge.  Other
8   than -- like, we talked about, originally, at the
9   meeting concerning the tasing incident we had talked
10  about if it is found in the investigation that there is
11  evidence that he willfully departed, stuff like that.
12      But other than that, I don't recall him ever
13  telling me to make him the subject of an internal
14  investigation.
15      Q   And so, you did not direct that he'd be a
16  subject of an investigation for failure to report that
17  incident.  Is that correct?
18      A   He was already.  They were already looking at
19  the disciplinary process.
20      Q   What do you mean, they were already?  Who was
21  looking at the disciplinary process?
22      A   Deputy Chief Jenkins, and I know the City
23  Manager got involved, and Captain Rogers.
24      Q   And they were already looking at the
25  discipline process for what?

154

1    A   Not reporting.
2    Q   Okay.  So, you're saying that there was no
3  internal affairs investigation that was -- that you
4  requested be open involving Michael Steel for failure to
5  report the taser incident?
6    A   I don't know what -- you know, I don't open an
7  internal investigation.  I wouldn't open an internal
8  investigation anyway because of Garrity rules.
9        So, if that investigation initially was
10  handled by FDLE, and because it was criminal in nature,
11  we obviously wouldn't pursue anything.
12        I wouldn't pursue anything administratively
13  until the conclusion of that criminal investigation.
14  Once that was done, then obviously, you work on the
15  administrative side.
16        I wouldn't take action against anybody related
17  to that particular case, unless it was egregious.  But
18  you're going to take action, because administratively,
19  because you have to wait till the criminal investigation
20  is done.
21    Q   So, what you're saying is that, if Sergio
22  Perez was relieved of duty, that would have been
23  improper because the criminal investigation had not yet
24  completed?
25        MR. RAILEY:  Form.

155

1  BY MR. POLLACK:
2    Q   If he had been relieved of duty as of
3  September 10th per that memo that you did not --
4    A   If he was disciplined, then I would say yes.
5  If he was relieved -- if you're talking about an
6  assignment, two completely different, in my opinion, two
7  completely different animals.
8        If you're talking about if he was, in fact,
9  discipline, sir, then I wouldn't say, yes.  That would
10  be -- if I disciplined him prior to the FDLE
11  investigation conclusion, then yes.
12        As you well know, I would have been an error.
13  But taking preemptive steps, you know, as long as just
14  not disciplinary loss of, you know, loss of pay, loss of
15  rank, loss of status, tadada.  As long as that's not
16  done, then and I wouldn't have done that with either one
17  of them until the conclusion of the investigation.
18    Q   And you believe that that would -- that's
19  improper to relieve someone of their rank or to decrease
20  their pay until the criminal charges have been resolved,
21  right?
22        MR. RAILEY:  Form.
23    A   I would -- if there was an internal
24  investigation, per se, and it was for a criminal act.
25  Typically, and in my experience in law enforcement, if

156

1  there's a criminal act, you know, officers can be
2  reassigned.  I usually have -- you know, they'll do
3  whatever until the conclusion of the criminal
4  investigation.
5        Once the criminal investigation is concluded,
6  then you go ahead and the pursue the administrative
7  investigation and taking action administratively on that
8  side.
9        Definitely conclude the criminal investigation
10  first before -- I would conclude the criminal
11  investigation first, prior to administering any
12  discipline, the administratively.
13  BY MR. POLLACK:
14    Q   So, administrative -- and so, in following up
15  on that administering discipline, that would -- you
16  would wait for the criminal investigation to conclude
17  before reducing someone's rank.  Is that true?
18    A   I would.
19    Q   You would wait?
20    A   If you're asking me personally --
21    Q   Yes.
22    A   -- yes, sir.  I would.
23    Q   And the same question, before you reduce
24  someone's pay, you would wait until the criminal
25  investigation had been completed.  Is that correct?

157

1    A   Before I issued any discipline, I would wait.
2    Q   And I want to get specific for a reason.  And
3  so, I'm asking you before you would reduce someone's
4  pay, you would wait for the criminal investigation to
5  have completed?
6    A   I would, yes.
7    Q   What about before stripping an officer of his
8  service issued firearms?  Would you wait for the
9  criminal investigation to complete before taking away
10  their service issued firearm?
11        MR. RAILEY:  Form.
12    A   If you're asking me, no.  I wouldn't wait.  It
13  depends on the nature of the original complaint.  As long
14  as there's no reduction in pay, what I have them do is
15  really at the discretion of the agency, I mean, the
16  needs of the agents.
17  BY MR. POLLACK:
18    Q   I guess from what you can recall, is there a
19  procedure that Opa-Locka and its Police Department need
20  to follow in order to reduce an officer's pay and rank?
21    A   A policy?
22    Q   Yes.  Or procedure?
23    A   I'd have to refer back to the policies.
24    Q   As we sit here today, you don't remember?
25    A   To see what is specifically mentioned for



Barreira, Steven Chief   10-27-2022

158

1  reduction in pay.
2  **Q   Do you know whether the City considered**
3  **Captain Perez to be relieved of duty as of September**
4  **10?**
5          MR. RAILEY:  Form.
6      A   I can't attest to what the City thoughts are.
7  BY MR. POLLACK:
8      **Q   If there was any confusion on what the City**
9  **thought Captain Perez's status was, would it be as a**
10 **result of you not documenting what you intended for him?**
11         MR. RAILEY:  Form.
12     A   Well, sir, according to what you presented me
13 earlier, that form would document it.  But like we
14 talked about, I don't recall that at all.
15         So, if there was any confusion, I would
16 imagine.  I can just say if it was me, and that was my
17 situation.  If there was any confusion, I would
18 definitely want to inquire as to, you know, who, what,
19 when, where, why, how.
20         I mean, how did that situation happened and
21 get clarification, get clarification myself if there was
22 any confusion.  So, documentation or no documentation.
23         MR. RAILEY:  It is 03:17.  I'm not sure how
24     much longer you intended to go, but I know we
25     discussed at 03:15 adjournment.

159

1          MR. POLLACK:  Okay.  I mean, we can adjourn.
2  I'm going to have more questions.
3          MR. RAILEY:  I just didn't know if you're
4  about to go on a whole another line of questioning,
5  it doesn't make sense.  I don't think --
6          MR. RAILEY:  Yeah, no.  I mean, I'm going to
7  start going off on some things.  So, I mean, it's
8  not going to be I'm going to be done in, you know,
9  half-an-hour.  So, Mr. Barreira, if you need to go,
10 then we can -- we're going to have reschedule this
11 for another day.
12         THE WITNESS:  Okay.  Yeah, please.  Thank you.
13 I appreciate it.  Just reach out and I'll make my
14 schedule available.  It doesn't matter at all.  We
15 can definitely work it through.
16         MR. POLLACK:  Okay.  All right.  So, we'll
17 just adjourn this.  Jonathan, I'll send you the
18 Exhibits and then we can just kind of go from
19 there.
20         And then Jade, I know you put in the chat
21 where to send the Exhibits, and then if you can
22 also put in there just your e-mail just so we --
23 just so John and I have it.  That makes things
24 easier.
25         MR. RAILEY:  Once again.

160

1          THE WITNESS:  So, if I may, I know typically,
2  we have a thing, there's a way to read in order to
3  confirm what I'm testifying, or is it not a
4  possibility?  If I need to do that now or at the
5  conclusion of the other?
6          MR. POLLACK:  I mean, it's usually at the
7  conclusion since we're suspending the deposition.
8  It's not going to be -- I think it's pending,
9  right, John?
10         MR. RAILEY:  I mean, yeah.  Are you ordering?
11 And if so, then he would read it.  But if you're
12 not asking it to be transcribed, then it would be
13 at the end if you are ordering it.
14         MR. POLLACK:  Yeah, I'm not ordering right
15 now.
16         MR. RAILEY:  Okay.
17         THE WITNESS:  Yeah, I'm just asking you.  I
18 just didn't know.
19         MR. RAILEY:  Yeah, he said -- no, that's a
20 fair question.  We'll have you read at the end.
21         THE WITNESS:  All right.  Thank you.
22         MR. POLLACK:  You can go.  You don't have to
23 wait for this.  We're just sorting out some
24 administrative things.
25         THE WITNESS:  Mr. Pollack, good talking to

161

1  you, sir.
2          MR. POLLACK:  Thank you.  Likewise.
3          THE COURT REPORTER:  Mr. Railey, thank you,
4  sir.
5          MR. RAILEY:  Of course.  Okay.
6          (Deposition concluded at 3:19 p.m.)
7          (Reading and signing of the deposition by the
8          witness has been reserved.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Barreira, Steven Chief  10-27-2022

---

162

1                CERTIFICATE OF REPORTER
2    STATE OF FLORIDA
3    COUNTY OF BROWARD
4
5        I, JADA PENA, Court Reporter and Notary Public for
6    the State of Florida, do hereby certify that I was
7    authorized to and did digitally report and transcribe
8    the foregoing proceedings, and that the transcript is a
9    true and complete record of my notes.
10       I further certify that I am not a relative,
11   employee, attorney or counsel of any of the parties, nor
12   am I a relative or employee of any of the parties'
13   attorneys or counsel connected with the action, nor am I
14   financially interested in the action.
15
         Witness my hand this 28TH day of NOVEMBER, 2022.
16
17
18
19
20
21
22   _____
     JADA PENA, COURT REPORTER
23   NOTARY PUBLIC, STATE OF FLORIDA
     Commission No.: HH 159075
24   Commission Exp: 08/01/2025
25

---

163

1                CERTIFICATE OF OATH
2    STATE OF FLORIDA
3    COUNTY OF BROWARD
4
5        I, JADA PENA, the undersigned authority, certify
6    that STEVEN BARREIRA, CHIEF OF POLICE, appeared before
7    me remotely pursuant to Florida Supreme Court Order A
8    OSC20- 23 and was duly sworn on the 27TH of OCTOBER,
9    2022.
10
         Witness my hand this 28TH day of NOVEMBER, 2022.
11
12
13
14
15
16
17
18
19
20   _____
     JADA PENA, COURT REPORTER
21   NOTARY PUBLIC, STATE OF FLORIDA
     Commission No.: HH 159075
22   Commission Exp: 08/01/2025
23
24
25

---

164

1    DATE:   11/28/2022
     TO:     STEVEN BARREIRA, CHIEF OF POLICE
2    C/O
     JOHNSON ANSELMO MURDOCH BURKE ET AL
3    2455 EAST SUNRISE BOULEVARD SUITE 1000
     FORT LAUDERDALE, FLORIDA 33304-3113
4    954-463-0100
5    IN RE: SERGIO PEREZ VS. CITY OF OPA-LOCKA & STEVEN
     BARREIRA
6    CASE NO.: 1:22-CV-20748-LENARD/LOUIS
7
     Dear STEVEN BARREIRA,
8
        Please take notice that on OCTOBER 27, 2022, you
9    gave your deposition in the above-referenced matter.  At
     that time, you did not waive signature.  It is now
10   necessary that you sign your deposition.  You may do so
     by contacting your own attorney or the attorney who took
11   your deposition and make an appointment to do so at
     their office.  You may also contact our office at the
12   below number, Monday - Friday, 9:00 AM - 5:00 PM, for
     further information and assistance.
13      If you do not read and sign your deposition within
     thirty (30) days, the original, which has already been
14   forwarded to the ordering attorney, may be filed with
     the Clerk of the Court.
15      If you wish to waive your signature, sign your name
     in the blank at the bottom of this letter and promptly
16   return it to us.
17   Very truly yours,
18   JADA PENA,
     Universal Court Reporting
19   (954)712-2600
20
     I do hereby waive my signature.
21
22   _____
23   STEVEN BARREIRA, CHIEF OF POLICE
24   Cc: via transcript:
         JONATHAN HOWARD RAILEY, ESQUIRE
25

---

165

1                    ERRATA SHEET
2    I wish to make the following changes, for the following
     reasons:
3
     PAGE NO.  LINE NO.
4
     _____ _____ CHANGE_____
5
                     REASON_____
6
     _____ _____ CHANGE_____
7
                     REASON_____
8
     _____ _____ CHANGE_____
9
                     REASON_____
10
     _____ _____ CHANGE_____
11
                     REASON_____
12
     _____ _____ CHANGE_____
13
                     REASON_____
14
     _____ _____ CHANGE_____
15
                     REASON_____
16
     _____ _____ CHANGE_____
17
                     REASON_____
18
     _____ _____ CHANGE_____
19
                     REASON_____
20
     _____ _____ CHANGE_____
21
                     REASON_____
22
     _____ _____ CHANGE_____
23
                     REASON_____
24
25   _____   _____
     SIGNATURE          DATE

---



UNIVERSAL
COURT REPORTING

| | | | |
|---|---|---|---|
| **$** | **10th** 16:4 | **20** 6:25 37:21 | 129:16 |
| **$3,000** 135:25 | 38:13,23 62:7 | 53:16 | **27TH** 163:8 |
| **$3,500** 135:19 | 71:23 106:25 | **2002** 5:8 | **28** 56:1 |
| **$40,000** 145:1 | 124:6,24 | **2011** 12:12,19 | **28TH** 162:15 |
| **$54,000** 145:1 | 125:7,15 | **2013** 13:2 | 163:10 |
| | 126:6,25 | **2017** 13:16 | **2987** 16:23 |
| **0** | 127:17 129:21 | **2021** 15:23 | **2990** 21:13 |
| **03:15** 158:25 | 155:3 | 16:4 17:8 | **2992** 16:23 |
| **03:17** 158:23 | **11/28/2022** | 19:8 38:13,23 | **2nd** 121:16 |
| **04:00** 106:8,16 | 164:1 | 62:7 69:23 | |
| **06:00** 106:13 | **11:00** 1:17 | 105:24 | **3** |
| **08/01/2025** | **11:01** 5:8 | 111:1,11 | **3** 4:5 25:21,22 |
| 162:24 163:22 | **111** 4:8 | 121:5 124:6 | 27:21 |
| **08:00** | **114** 4:9 | 125:15 126:6 | **3:19** 161:6 |
| 106:8,13,16 | **119** 4:10 7:15 | 127:17 129:21 | **3:20** 1:17 |
| | **12** 100:13 | 137:22 145:4 | **30** 48:7,20 |
| **1** | **135** 2:4 | **2022** 1:17 5:2 | 127:22 164:13 |
| **1** 4:3 16:16,18 | **144** 4:11 | 16:14 162:15 | **305-230-4884** |
| 21:11 25:18 | **149** 4:12 | 163:9,10 | 2:5 |
| **1:22-CV-20748-** | **15** 152:16 | 164:8 | **33146-1878** 2:4 |
| **LENARD/LOUIS** | **159075** 162:23 | **21st** 17:7 | **33304-3113** 2:9 |
| 1:2 5:10 | 163:21 | 125:4 | 164:3 |
| 164:6 | **16** 4:3 | **23** 163:8 | **3rd** 13:16 |
| **10** 4:12 52:21 | **16th** 19:7 | **2455** 2:9 164:3 | 145:4 |
| 71:20 105:24 | **17** 4:4 | **25** 4:5 48:7 | |
| 149:12,13 | **18** 8:8 | **259** 4:10 119:6 | **4** |
| 158:4 | **1972** 6:25 | **261** 119:7 | **4** 4:6 21:12 |
| **10%** 85:16 | **1990** 11:17 | **262** 4:8 111:5 | 27:22 28:1 |
| **10.05** 60:16 | **1994** 13:14 | **263** 114:22 | 58:24 59:2 |
| **10:50** 111:1 | **1st** 69:22 | **264** 4:12 | 60:7 |
| **10:55** 111:11 | | **264-265** 149:12 | **43** 53:15 |
| **100%** 127:12 | **2** | **265** 4:12 | **452** 4:6 59:1 |
| **100.05** 60:6 | **2** 4:4 | **27** 1:17 5:2,8 | **454** 4:6 59:1 |
| **1000** 2:9 164:3 | 17:10,12,19 | 119:21 121:5 | |
| **104** 4:7 | 125:2 | 164:8 | **5** |
| | | **271** 4:7 104:24 | **5** 3:3 4:7 |



104:19,20,24
129:16

**5:00** 164:12

**50%** 53:1

**59** 4:6

---

**6**

**6** 4:8 28:21
111:4,6
114:24 115:16

---

**7**

**7** 4:9
114:5,8,22

**770** 2:4

**7th** 71:20,22
111:1,11

---

**8**

**8** 4:10 119:6,8

**8,000** 140:10

**8th** 71:20,22

---

**9**

**9** 4:11
144:19,21
145:16

**9,000** 140:11

**9:00** 164:12

**93** 12:7

**94** 13:13

**954)712-2600**
164:19

**954-463-0100**
2:10 164:4

**99** 7:4

**9th** 71:20,23

---

**A**

**a.m** 1:17 5:8
106:8 111:11

**ability** 8:12
23:8,9 32:11
135:7,8,11

**able** 34:7
76:19
95:18,19

**about** 11:14
12:6,13
13:1,13
14:9,25
15:22,25
21:20 23:20
24:2 25:14,15
26:20 28:16
29:8 30:18
32:1
35:5,9,10
36:2,6,19
37:3,13
38:4,5,6 40:7
41:25 45:10
48:1 49:17
50:22 51:9,18
52:5,7,25
53:6,14,15,16
,20
55:11,16,17
57:7 58:3
59:19
60:12,13
62:2,6,18
66:17,24
67:21
69:3,8,18,23
70:22
71:13,23 72:3
73:15 75:25

79:14 80:23
81:2
83:9,16,19,20
84:24 85:4
86:17 87:11
90:25 92:6,19
93:11 95:20
99:18,19
101:15,19,21
102:1,2
109:20
111:1,8,16,21
,23 112:20,25
113:7,19
114:6
115:21,24
117:2,17
118:22 119:21
121:13,14,23
122:9,13
123:2,13
126:4
129:17,18
131:9,25
141:17 149:16
152:13,23
153:3,8,10
155:5,8 157:7
158:14 159:4

**Above** 106:24

**above-**
**referenced**
164:9

**absolutely**
30:6 129:14
134:24

**accident** 92:14

**accommodate**
6:7

**accomplish**

138:13

**accomplishment**
65:11

**according**
84:25 114:25
158:12

**account** 10:25

**accounts**
10:16,23

**accreditation**
142:5

**accredited**
68:5
139:21,25
141:24 143:9
144:1,6,13

**accurate** 27:7
44:19 55:18
56:25 85:23

**accusation**
39:4 69:8
80:18
81:1,11,15
82:7 87:3
98:2

**accusations**
72:18 97:20
102:2

**accusatory**
80:14

**accused**
52:14,15
66:20 67:10
70:5

**accusing** 82:4

**accustomed**
109:7

**achievement**



64:6

**achieving** 64:4

**acknowledgemen
t** 140:16

**acknowledgment**
106:24

**acquire** 146:8

**act** 52:15
56:18
57:15,16
66:23 68:24
69:2 85:22
155:24 156:1

**acting** 112:11

**action** 40:22
42:8,12
43:12,22,25
44:1,2,23
45:3 57:12
62:12 67:3,4
73:2 77:18
87:16 98:12
113:14,20
123:8
154:16,18
156:7
162:13,14

**actions** 29:20
44:7 46:4
57:22 59:23
60:8,17 62:14
135:12,15
151:4

**active** 13:20
33:19,20,21
53:6 54:5,6
57:7 60:24
97:20 121:21

**actively**

**acts** 52:22
53:17 67:10
69:10

**actual** 57:20
96:17 111:24
115:4 116:17
139:10,24

**actually** 43:7
50:23 52:24
53:1,4,8,9
56:3 57:15
58:10 69:13
73:5 84:14,15
90:8 94:25
98:8 100:14
120:13 121:11
122:7 123:11
138:9 139:24
149:24

**adamant** 44:14

**addition** 26:24

**additional**
65:3,11

**address** 6:18
7:14 33:13
34:5 35:4,7
61:6 124:2
145:11

**addressed**
68:23

**adjourn**
159:1,17

**adjournment**
158:25

**administering**
156:11,15

**administrative**
28:6,14

**administrative
ly** 40:11
41:11
154:12,18
156:7,12

**adversarial**
111:25 116:15

**adverse** 42:8
113:14,20

**advised** 72:10
113:8,9 119:5

**advising**
131:15

**advisory**
112:11

**advocated**
147:14

**advocating**
139:24

**affairs**
14:1,9,15,20
73:11,21,24
74:5,8,18,25
75:15,21
76:12,24
77:7,11,20
78:17,20
79:5,9,10,22
81:5,19 86:23
87:3 90:23
94:16

41:12,23 42:1
43:15 47:4
53:11,24
54:7,25
55:12,13 56:8
57:8 102:11
154:15
156:6,14
160:24

**administrative
ly** 40:11
41:11
154:12,18
156:7,12

**affect** 8:11

**affidavit** 4:5
24:10,16
25:19 26:13
27:2

**afforded**
114:12

**after** 5:5
15:17 34:15
42:14,17 43:3
50:23 64:3,16
79:17 81:4
86:19 87:23
89:22 99:3,14
104:12 111:15
112:20 115:2
124:5,16
126:23,25
127:16
140:3,9
148:15 149:16

**afternoon**
100:13

**afterwards**
11:14 35:9
45:1 104:16
132:3 148:13

**again** 13:3
21:4 23:17
24:1 27:9
29:13,22,25
31:14 36:22
38:7 41:15

96:8,18,20,22
97:3,5 99:15
100:20,24
103:17,20,23
119:1
152:1,22
153:4 154:3



42:2
45:2,9,23,24
51:4 54:16
60:19 62:14
64:12,25
65:14 66:8
67:6,9
68:4,21 69:14
72:18 73:4
75:17 78:15
83:23 85:18
87:8,19 88:6
90:24 91:18
92:2 93:1
96:4 98:10,25
102:4 107:15
109:6 111:19
113:17 116:17
118:19 120:24
121:16 123:23
127:8,20
131:11,17
133:13,23
136:14 141:16
142:6 143:14
147:9,22
148:6,20
150:1,14
159:25

**against** 5:25
39:5 42:8,12
44:8,23 45:3
62:12 68:8
75:9 80:19
102:5 113:15
154:16

**age** 8:8

**agencies** 95:5
122:5 133:13
140:11 141:24
142:1,3,11,17
,21,22

143:2,8,9,11,
15
144:6,10,14

**agency** 28:6
30:9 53:1
55:4 57:3
64:25
66:14,25
67:17,22
68:12,25
83:21 84:6
95:16 102:16
113:10 117:3
122:2 124:16
125:1 138:10
139:17,21
141:20
142:8,23
143:14,20
144:1,9
157:15

**agent** 86:11

**agents** 157:16

**aggressively**
138:13

**ago** 147:17

**agree** 32:13
101:13,16

**agreement** 15:4
58:21 110:23
111:21,22
113:1,7,20
114:14
115:15,20
117:11,23
136:3 139:7
141:18,19
143:21 145:14
146:7 147:8
148:4,6,7

149:5,8
150:1,6,7,13

**agreements**
135:23

**ahead** 23:16
34:5 43:15
55:23 82:8
122:17 138:9
156:6

**airport**
82:14,18,23
83:3,6,7
84:18 85:5

**AL** 2:8 164:2

**all** 1:18 7:1
10:2,15 14:11
16:16 17:5
18:24 21:24
23:21 25:17
26:7,12,15
27:2 29:19
32:15,16,19
35:13 49:2,21
53:4,5 60:25
61:10 63:18
65:4 67:13
68:7,11
69:8,10 71:9
72:6 73:4
77:3,4 86:3
87:6 88:14
90:2,3,4
93:23 94:1
96:11
97:5,7,21
98:13 101:12
102:12
103:7,16
105:6,8,17
106:15 109:1
118:25 119:11

122:3,25
123:10 125:15
128:18
130:7,11
131:7,13,20,2
5 135:12
145:25 146:17
158:14
159:14,16
160:21

**allegat** 96:16

**allegation**
71:10
78:8,10,11
79:6,7
81:7,8,9,23
85:8 95:12,13
96:17 97:23
99:1
102:5,20,22

**allegations**
39:24 54:14
72:4

**alleged** 71:15
93:20

**allegedly** 61:3
97:24

**allow** 44:4

**allowing** 66:25
136:10

**almost** 48:7,20
127:22 145:1

**along** 25:9
33:7 44:18

**already** 36:5
39:23
41:11,12 42:1
80:15 125:18
139:14,15



```
144:11 148:4
153:18,20,24
164:13
also 9:23 14:8
  18:25 19:25
  20:5 22:20,23
  23:19 24:1
  25:18 26:17
  27:1,24
  30:10,21 41:2
  44:25 46:23
  47:4,6 48:12
  53:24 57:4
  58:17 61:1,2
  62:11 64:10
  71:2 75:3
  78:24 84:2,3
  86:2,10 91:21
  92:18 93:6
  95:7,8 99:19
  105:4 108:14
  109:4 111:13
  112:6 115:14
  120:5,7
  122:25 130:9
  140:16 142:11
  151:13 159:22
  164:11
alter 44:3
altered 45:16
although 126:7
always
  59:17,18
  63:4,7 99:10
  102:13
am 5:11
  73:10,17
  95:25 115:14
  130:8
  162:10,12,13
```

```
164:12
amongst 140:16
amount 30:5
  133:21 136:19
amounts 135:21
and/or 137:14
  139:1 142:16
animals 155:7
annoying 32:19
anonymous 98:6
another 18:15
  30:21 41:10
  50:17 55:4
  61:3 64:18,19
  65:8,9,19
  66:23 92:11
  93:22 94:7
  95:20
  97:1,10,24
  112:16 113:24
  136:19 145:9
  147:1 152:7
  159:4,11
ANSELMO 2:8
  164:2
answer 6:6,9
  7:9,15,18
  10:10 24:5
  40:18 58:6
  61:18 64:21
  66:1 68:19
  79:3 83:12,15
  92:1 95:24
  96:1 99:8
  101:24 102:25
  103:1 131:18
  132:12 133:24
  134:7 139:2
  142:9 144:3
```

```
145:12
answered 81:17
answering 7:21
  88:25
answers 8:23
  55:23 69:1
anticipation
  9:1
any 6:2,14
  8:10,11 9:1,3
  10:12,15
  12:11,13
  14:10 17:2
  21:25 22:24
  26:19
  28:5,6,7,13
  33:23 34:1
  35:21 36:14
  37:1 40:6
  42:1,8,12
  43:22
  44:7,21,22,23
  45:11,16,19,2
  0 46:24
  47:18,21
  48:1,2 51:18
  54:4 57:2,9
  59:24 60:8,17
  62:4 66:14
  67:16,17
  68:7,8 73:11
  77:1,12 78:4
  85:7 86:16
  88:19 89:18
  92:24 93:8
  97:15 101:5
  102:6 106:19
  107:6,8
  108:21,23,25
  114:18 116:19
  119:3 122:1
```

```
123:24 124:17
126:3 128:2,3
130:24 132:20
135:23,24
136:6
137:9,17,18
140:17
141:4,10,11
143:7 149:24
150:21,23
151:3 152:21
156:11 157:1
158:8,15,17,2
2 162:11,12
anybody 8:7
  20:5,7 65:14
  78:18 83:24
  89:21 103:22
  104:1
  108:20,23
  109:23 117:19
  119:15
  129:12,18
  134:2,9
  137:23 154:16
anybody's 87:9
anymore 60:14
anyone 91:16
  109:16 138:15
anyone's
  130:25
anything 7:23
  24:21 39:16
  40:11 44:18
  45:11,22,25
  48:5 51:20
  71:18 91:22
  101:8 106:17
  107:18 108:4
  109:19
  115:21,24
```



122:6 126:19
128:10
137:5,16,19
138:1 141:9
143:22 149:23
154:11,12

anyway 40:18
120:11 154:8

anywhere 99:11

AOSC20-23 1:19

apologize
55:15 65:14
80:25

Apparently
149:21 152:15

appear 106:3
126:1,2

APPEARANCES
2:1

appeared 1:18
163:6

appears 17:21
106:2 126:8
130:5 145:3

applicant
19:13,19 21:5
22:7,12,15
24:25 26:13
27:1 29:5,8
30:18,24
31:8,10,11

applicants
18:14 24:23
26:21

applicant's
25:11

application
4:3 16:3,6

17:2 20:19,25
21:24
22:1,6,8,17,2
3,25
23:11,20,22
25:17,20
26:14,16,20,2
5 27:3,6,24
28:5,12,18

applications
25:2

applied
18:8,10,12,17
141:22

apply 20:23

appointed 64:4

appointment
164:11

appreciate
159:13

appropriate
40:21 98:11
150:3,19

appropriately
95:18

approval
42:21,24
139:8 146:8

approvals
136:18

approved
43:13,21
136:18
148:4,10
149:7

approving
43:12

approximate

5:8

approximately
15:24 53:1

April 15:23
19:7 21:7
137:22

area 12:1 29:9
48:19,21 83:4
88:23 107:1
109:25
112:12,13
119:25
121:7,8,9
142:17 143:12

areas 137:12

arena 48:24

Aren't 92:6

arguing 83:5

argument 93:4

Arms 151:11

around 65:10
67:11 101:18
103:4 143:12

Arts 12:25

Ascension
16:9,10

ask 5:24 6:10
18:11 27:19
34:20 35:17
39:15 40:18
47:25 65:16
67:20 80:22
108:20,23
118:13
126:4,13
128:17 135:21
143:4 144:14

asked 19:17

46:13 48:3
52:8 55:22
56:12 72:8
80:12 85:8
100:15,17,18
102:10,16
126:4

asking 14:19
26:20 29:22
36:2 41:1
46:10 47:8
48:4 50:13,22
56:14 57:14
63:15 64:20
65:17 66:8
67:19 68:18
72:13 81:16
83:16 84:1,22
85:18 94:24
96:5 102:15
124:3
126:10,13
128:20 129:1
135:13 144:2
156:20
157:3,12
160:12,17

asks 28:21

aspect 60:2

assess 110:10

assessment
31:7

assign 41:11

assigned 14:20
36:2 39:19
121:11

assigning 45:8

assignment
45:20 50:4



131:17 155:6

**assignments**
118:17,25
119:15,17
122:5

**assistance**
164:12

**assistant**
13:25 106:19
118:21 142:16
143:3 147:11
148:8 150:10

**assisting**
112:13

**associate** 12:5
92:25

**associate's**
12:9

**assume** 46:2
72:24 124:11
127:21,25

**assumed** 48:3

**assuming** 34:2
51:5 59:5
88:2 99:10

**assumption**
22:11 27:5
56:24 57:10
70:9 93:1,3
127:21

**attempt**
152:6,8

**attempting**
39:24 75:11

**attended**
12:3,22

**attention**
21:12 121:24

145:18

**attest** 16:5
17:9 19:9
24:16 26:22
111:2 125:24
126:10 129:25
131:8 150:10
158:6

**attested** 22:13
27:2

**attesting**
22:13

**attorney** 9:19
10:3 23:18
54:8 66:18
162:11
164:10,14

**attorneys**
162:13

**audio** 101:2

**August** 121:16

**Augustine** 12:1

**authenticity**
126:3 132:13

**author** 129:24

**authored** 126:7

**authority** 41:3
42:3 55:7
73:17 163:5

**authorized**
135:18 162:7

**automatic** 11:5
27:5

**automatically**
94:12 95:6

**available**
121:7 159:14

**AVENUE** 2:4

**average** 37:23
127:25

**avoid** 108:25

**aware** 30:4
43:9,11,21
45:15 54:4
75:20 132:25
133:8 147:15
153:1

**away** 41:21
97:25 98:6
157:9

**awe** 72:22

**axiom** 89:15
107:20 108:10

---
B
---

**Bachelor** 12:25

**bachelor's**
12:18 13:4

**back** 18:7
21:4,11 29:25
34:8 46:16
71:25 72:13
73:22
76:10,15,16
84:14 89:7,14
100:8,9,10
103:16 106:6
108:19 113:11
114:24 122:18
133:23 157:23

**background**
25:11
27:17,18
32:18

**backgrounds**
7:11

**backing** 142:13

**bad** 28:11
88:19

**badge** 53:10
64:18

**ballpark** 53:21
54:15

**bar** 64:19 65:9

**bargaining**
15:4 58:21
111:21 112:25
113:7,19
114:14
115:15,20
117:10,23
141:18,19
143:20

**Barreira**
1:8,15 3:2
5:1,4,22
35:1,10
129:22 159:9
163:6
164:1,5,7,23

**Barrera** 35:21

**based**
22:5,9,23
25:10 39:11
52:4 54:11
77:25 80:22
81:20 94:17
98:10 102:8
107:9 109:6
122:19 126:6

**basically**
114:17

**basis** 27:14

**Bates** 129:16



battered 71:6
93:21

battery 55:5

Beach 143:12
144:9

bear 105:13
127:25

bears 128:13

became 13:17

because 7:13
14:16 27:17
34:22 35:5,11
36:7 38:24
39:23 40:7,18
41:11 49:7
51:4 52:9,10
55:18,22
56:9,17,18
57:10,12,18
61:5 64:21
66:4,5 68:15
69:10 70:13
73:3,14 75:8
80:17 82:12
90:10 93:24
94:15 95:18
101:10 105:23
107:15 114:12
116:13 122:20
125:2 130:13
139:15 147:12
154:8,10,18,1
9,23

become 91:7

before 6:4
12:11 18:19
27:18 30:20
37:11 42:8
43:2,4
59:5,13,15

60:8,17,22
61:13,19 62:5
77:23 87:20
89:18 95:14
105:7,10
107:21 114:14
115:12,15
116:1,5
125:21
139:3,7
140:20
146:5,11
148:4
152:1,16
156:10,17,23
157:1,3,7,9
163:6

beginning
46:17 77:10

behalf 1:16
2:2,7 5:15

behind 46:4
121:24

believe 10:23
13:24 19:25
20:16 33:19
38:9 40:21
43:6 50:15
54:1 71:2
72:23 75:23
76:14 79:12
80:18 81:16
84:21 90:20
104:1,11
115:4
120:19,20
129:1
130:21,24
133:5
135:11,15,17
139:10 142:15
145:13 148:6

149:1
151:1,20
155:18

below 164:12

benefits 71:25
72:1 114:18
116:19

besides 25:17
34:11 47:3
108:2

best 17:4
20:20 23:8,9
27:7 32:10
34:24 41:2,4
42:5 58:3,5
61:9,10
67:13,18
68:11,24 89:4
121:20 132:15
135:7,8,11
138:3 139:4

better 88:19
137:2,13

betterment
67:22

between 6:6
15:19 43:11
44:9 56:2
57:14,22 66:3
78:16 79:7
96:14,21 97:7
118:9 119:3
120:25

big 64:22
81:12

bill 78:4 90:1

binary 92:6,7

birth 6:22

bit 16:7 32:18

41:15 55:20
98:3 130:12

blank 50:5
164:15

blemishes
141:4

blue 129:23

book 17:6 94:4

boss 42:25
43:16 45:15
66:5

both 35:14
51:14 57:3
91:13,19
101:1

bottom 21:16
26:7,9 85:25
106:23 145:16
164:15

BOULEVARD 2:9
164:3

bounds 7:10

break 6:5
103:9

Brian 2:3 3:3
5:14,22 60:10
103:7

BRIAN@FAIRLAWA
TTORNEY.COM
2:5

brief 78:1
98:25

Briefly 134:4

bring 25:9,12
35:7

Briton 103:19
104:10



UNIVERSAL
COURT REPORTING

**broad** 77:25
80:14

**brought** 25:7
39:7

**BROWARD** 162:3
163:3

**budgetary**
133:12,14

**budgeting**
14:11 136:21

**building**
46:9,14 50:12
94:8 118:18
120:6,14
145:10

**bullet** 106:11

**bull's** 89:4

**BURKE** 2:8
164:2

**business** 33:13
63:5 72:12
83:2

---
        C
---
**C/O** 164:2

**call** 71:22
84:8 94:5
97:9,12
104:7,9 130:8
139:24 151:23

**called** 5:5
71:19
72:12,13
82:2,6
85:8,11 98:15

**calling**
127:5,7

**came** 44:14

76:10 78:9
115:4 137:22
140:20

**camera**
109:13,17,22

**cameras**
109:9,11

**can** 6:19
7:11,17
8:17,23 10:9
11:7 16:17
18:23 21:13
22:18 30:3
32:16
35:5,9,10,25
38:25 42:13
43:20 44:25
45:8 49:21
55:24 58:4
63:18 64:14
65:16 67:21
69:12 71:13
77:17 85:15
86:21 87:20
92:17
94:9,17,22,25
95:3
100:6,11,12
101:13,16
102:25
103:9,11
111:18 112:5
121:14 122:19
123:10 127:17
129:8,14
130:4
131:9,14
132:1,6
136:17
138:11,12
152:25 156:1
157:18 158:16

159:1,10,15,1
8,21 160:22

**candidate**
18:10 20:17

**cannot** 43:18
62:8 86:20
129:25 130:1

**can't** 7:20
10:2 11:6
12:20 16:5
18:20 19:9
41:10
49:12,19
53:13,20
55:17 57:11
60:3 63:17
76:4 92:1
96:13 99:8
104:15 111:2
123:17 124:24
125:22,24
126:11 127:12
131:8
133:23,24
134:7 137:16
138:19 139:9
145:7 148:11
149:3
150:10,22
158:6

**Cap** 50:21

**capacity**
112:11 125:7

**captain** 39:7
40:22,23 42:9
43:5 44:8
45:17
46:7,8,18
47:2,5,14,19,
23 49:15
50:13,24

51:10,23 52:4
60:8,17,23
61:14
62:6,19,20
63:13,20
67:14,15,20,2
3 69:18,25
70:5 75:3,10
85:21
86:8,12,14
89:16,19
91:21,22
105:19,23
106:7,24
111:15 112:22
113:12,18
115:5
119:18,20
121:10,17,23
122:11 129:21
130:13 131:24
132:6,8,17
152:18 153:23
158:3,9

**care** 60:12

**career** 65:25
141:4

**careful**
90:6,8,9

**carry** 64:10

**case** 1:2
5:9,24 6:1
8:21 24:1,17
33:10 39:16
69:13 74:15
76:5,14,17
81:3,5,8
84:22 88:8
96:13 110:21
115:13 154:17
164:6



cases 75:4,18

casual 134:8

catch 61:18
  138:4

caused 129:2

caveat 135:9

CBA 117:7,22
  118:4

Cc 164:24

cease
  126:16,17

cell 34:18
  70:13,24
  71:19 84:9
  127:5,7

certain 49:1
  75:3

certainty 62:4
  127:12

CERTIFICATE
  162:1 163:1

certification
  21:19,22

certify 21:23
  162:6,10
  163:5

challenged
  83:21

challenges
  30:5 140:17

challenging
  136:23

chance 106:1

change
  45:5,16,24
  50:11,17,22

56:15
62:15,17,18
165:4,6,8,10,
12,14,16,18,2
0,22

changed 49:23
  50:1
  141:22,23

changes 29:18
  57:9 122:11
  165:2

changing
  50:1,14

charge 14:7,10
  103:20 108:13
  123:25 151:12
  153:7

charged
  54:20,24
  55:1,11
  56:4,11,18
  57:15,16,19,2
  2 58:9 59:11

charges 155:20

charging 55:16

chat 159:20

check 35:15
  72:11,14
  127:8,9,10

checked 72:16

checks 27:18

Chevron 64:18
  65:3,8

Chicago 139:17

chief 1:15 3:2
  5:1,4 8:6
  9:13 13:25
  14:3 15:20

16:1 18:8
19:11,21,22
20:8,16 22:17
23:4 25:3
30:22 31:21
33:20,21
36:2,12 38:7
40:20 43:23
51:1 54:4
56:16 58:7
59:21 60:24
66:9,14
68:1,4
70:10,24
73:10
74:16,24
75:18,24 76:1
83:22 102:3
117:2 124:8
129:22 134:19
135:6 136:1
137:23 138:6
142:2,16,17
143:3
144:7,13,16
150:20
151:2,9
152:18,24
153:22 163:6
164:1,23

Chief's 14:5
  130:17

CID 118:18
  120:14

circumstance
  48:12 49:4
  74:15 76:4,5
  78:5 83:25
  85:14,25
  87:15 90:3
  97:15 137:18

circumstances

23:13,21
24:17 30:13
31:5 37:6
46:3 49:2
50:25 56:10
61:24 75:4
81:21 87:17
88:5 89:25
90:17 98:9
99:12 102:8
107:17

circumvent
  39:25

cities
  133:13,15

citizens 66:10
  68:25

city 1:8
  5:17,25 8:7
  9:13
  10:1,6,11,12
  11:11 16:23
  17:7,16,22
  19:22 20:24
  22:8 25:20
  26:25 33:1
  34:18
  37:11,13
  38:10 39:6
  42:4,7,14,18
  43:6 44:7
  45:12
  50:23,24
  51:3,4,9,15
  56:16 58:22
  66:11 67:7,22
  68:8,25 70:25
  72:5,25 73:18
  75:2,8,10,16,
  19 78:15
  79:16,17 81:4
  86:23 90:23



96:21 98:24
99:15 101:25
103:19
110:6,12,16,2
0
112:1,3,7,10
116:14
117:15,18
118:7,8,22
120:24
122:20,21
123:1,20
129:12 130:21
132:21,25
133:3,6,8
134:2,9,21
135:4,15,18,2
1,24 136:4,7
137:9,10,14,2
0 138:16,22
139:8,16
140:6,7
141:14
145:8,11,22
146:8,20
147:12,20
148:8
149:1,2,6,19,
23 150:9,19
152:17
153:2,22
158:2,6,8
164:5
**city's** 21:13
71:25 92:13
135:16
138:17,23
145:23
**civil** 28:14
**claim** 21:21
92:10

**claimed** 88:23
**claims** 93:21
109:14,18,23
**clandestine**
98:15,19,22,2
3 99:19
**clarification**
47:18 158:21
**clarify** 53:22
71:24 83:13
149:22
**classification**
13:24
**classify** 98:22
**Clay** 13:17,22
14:1,25
15:5,8,17,19
**clear** 58:8
129:14
**clerk** 130:21
164:14
**client** 9:12
18:25 25:3
33:19 36:9
38:12,22 39:2
91:3 102:21
**close** 119:1
127:3
**closer** 63:23
120:23
**clothing**
63:3,6
**clue** 105:21
106:5
**Cocoa** 143:12
144:9
**code** 58:16

134:21,23
135:2,3,5,16,
21 139:1
145:23
150:21,24
**colleagues**
140:23 141:10
**collective**
15:4 58:21
111:21 112:25
113:7,19
114:13
115:15,20
117:10,22
141:17,19
143:20
**college**
12:3,6,10
63:11
**combination**
46:25
**combined** 96:15
**come** 29:20
55:13 71:24
86:7 121:5
145:5,7,8
**comes** 15:12
43:24 63:24
130:13
**coming** 14:13
68:4 78:9
118:25 138:10
**command** 41:25
46:6 50:11
52:2,13 70:10
80:6,19 93:7
97:23
120:3,22
127:22 128:21
141:11

152:12,17,19,
23
**commenced**
79:23
**comments** 97:20
**Commission**
138:15 139:8
148:3 149:7
162:23,24
163:21,22
**commit**
135:18,24
145:21
**committed**
66:23 85:21
149:24
**committing**
52:15 134:21
**communicated**
128:3
**communicating**
129:12
**communication**
47:21 48:13
85:16
**community**
14:1,8
**Comp** 92:22
**complaint** 95:6
96:9,20 98:8
102:9 157:13
**complaints**
94:17
**complete**
24:9,13 25:19
26:1,7 44:19
56:25 87:10
96:10 102:16



157:9 162:9

completed
26:10,14 27:1
40:24 102:17
154:24 156:25
157:5

completely
80:9 94:18,19
106:1 155:6,7

completing
26:25

compliance
145:22

complicated
136:13

complications
136:10

complied
135:16

complying
134:20

computer 49:10

concern 51:21
85:22,23 98:3
129:12

concerned
119:21,24
150:13

concerning
29:19 37:5
39:16 43:4
48:2 50:14,24
51:3,24
72:2,5,21
86:25
111:11,25
120:25 124:14
153:9

concerns 31:20
39:10 41:7
80:5

conclude
156:9,10,16

concluded
42:10 44:10
156:5 161:6

conclusion
40:10,14
41:24 54:11
110:9 154:13
155:11,17
156:3 160:5,7

conclusions
76:17

condition
121:5,6

conditions
8:11 83:17

conduct 30:12
58:17 67:16
68:24 79:11
82:8 85:23
89:24 97:6
110:14

conducted
14:18 23:13
39:13 45:9
50:23 51:14
57:1 85:20
86:17 102:11

conducting
14:14

conference
104:3,10

conferenced
85:11

conferring
42:14,17 81:4

confetti
108:7,9,16

confidence
81:18 83:24

confident
87:24 88:1,3

confidential
7:18,22

confirm 34:7
76:19 81:23
99:1 149:4
160:3

confirmed
54:2,3

confirming
70:23

conflicts
68:14,21

confused
129:2,7,9

confusing
127:18 128:21
136:22

confusion
128:2
129:2,17
158:8,15,17,2
2

connected
162:13

connection
24:10 25:19
26:16 27:3
36:16

consent 132:21

consider 39:21
90:2

consideration
20:5 22:19
25:6

considered
62:13 120:5
143:21 158:2

considering
24:23 94:5

consistent
68:13 135:12
141:18

constructed
51:22

consult 59:22
60:6,22 62:5
115:14

consulted
60:16 61:13
67:6 115:10

contact 70:12
73:2 78:15
79:15,22
82:16 149:22
164:11

contacted
72:2,8,25
79:17,18
84:16 150:17

contacting
79:21 81:22
164:10

contacts 70:21

contemplated
120:18

contemplating
118:17



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

119:15,17
121:18,19

**content** 43:9
72:6 116:3

**context** 90:13

**continue** 43:14
44:4 45:18
47:20 52:6
57:17 67:1

**continued**
51:19 72:12
126:22

**continues** 74:9

**contract** 15:20
58:18,19
136:5

**contracts**
135:23

**contradict**
131:22

**conundrum** 42:2

**conversation**
35:15 36:23
39:9 43:10,19
45:1,23 47:25
50:23
51:2,9,17
66:22
78:1,2,14
86:19,25 87:1
90:22 91:8
95:20 98:25
99:4,13,23
101:25 102:19
110:12,15
112:3
116:3,14
118:6,7,20
120:24 122:20

123:11,20
128:1 131:14
132:1,5,8

**conversations**
33:22 36:1
37:20 39:6
43:4 100:22
102:1 110:20
123:12 134:8

**conversed** 51:4

**conveyed**
100:23,24,25

**conveying** 38:9

**convicted**
57:24 58:10
59:11

**conviction**
57:20

**convictions**
55:17

**convinced**
44:16,17
107:11,14

**cooperative**
35:2

**cop** 36:12

**copies** 9:17
35:17 141:12
144:14

**copy** 36:13
80:16 121:17
151:22

**CORAL** 2:4

**correct** 12:15
17:3 21:23,25
22:13
26:15,17
27:4,7

28:2,10 29:1
31:18 33:15
42:19 54:14
62:7 69:24
70:7 71:7
73:10 74:20
77:24
79:14,19
93:5,18 95:25
114:10,16
115:3,11,14
117:14 123:6
129:24 137:11
139:6 140:21
153:17 156:25

**correcting**
123:4

**correctly**
115:19

**corruption**
83:20

**could** 6:11
24:5 27:14
30:12,20,25
31:3,5,13,16
34:5 41:13
44:12 45:15
61:7 66:25
67:3,4
77:8,12,14,19
78:24
79:5,9,23
83:3,6 84:6
85:3,10,11,12
88:5 89:4
113:17 114:14
122:18 123:19
127:18 132:2
142:13 146:11
149:24 150:18

**couldn't** 11:2

35:25 38:25
72:23 80:18
85:7 145:12
146:25 147:3
149:9 150:14

**counsel** 2:1
162:11,13

**counseling**
107:6

**Counsels** 5:12

**count** 10:2
52:24,25
53:13 55:18

**counterproduct
ive** 49:13

**County**
13:17,22
14:1,25
15:5,8,18,19
162:3 163:3

**couple** 18:23
37:18 38:2
39:16 121:3
128:9

**course** 24:23
40:21 73:1
93:2 98:12
107:24 161:5

**courses** 12:22

**Court**
1:1,19,24
5:7,11,12,18
8:21 101:10
103:8 161:3
162:5,22
163:7,20
164:14,18

**courtesy** 116:7



cover 60:1,3
138:7,12

COVID
52:5,9,10,11
66:4

COVID-19 15:14
45:5

cream 97:14
127:23

create 106:19
126:18

created 102:4
126:15

creates 68:16

creating
106:18

credit 113:2,3

cri 55:1

cried 43:7

crime 54:20
56:3,4 58:10
59:11

criminal 12:5
13:1 27:23,25
28:14,22 29:5
39:4 40:7
41:6,18
52:15,22,25
53:5,17,18,25
54:1,3,5,6,13
,16,19,22
55:3,12 56:18
57:7,15,16,20
66:20,23
67:10 68:23
69:2,10 81:8
95:13
154:10,13,19,

23 155:20,24
156:1,3,5,9,1
0,16,24
157:4,9

crop 97:14
127:23

crying 43:7

culture 83:20

curious 122:9

current 108:3
121:6,7 122:5
131:17

currently 28:4

custodian
130:22

customary
27:17

――――――
D

daily 106:9

date 5:7 6:22
12:8 16:5
17:9,11 23:25
38:14,24
86:20
99:11,16,20
100:6,11,16,2
1 104:14,16
106:25 111:2
124:25 125:8
126:5,15,23,2
5 132:1
148:11,24
164:1 165:25

dated 129:21
145:4

dates 12:20
13:3 19:9

125:13 151:24

day 52:6 63:10
65:10 69:23
70:8 95:17
99:5 100:8
104:4,5,6,7,8
,9 116:24
118:25 119:21
125:17
132:4,5,10,11
159:11 162:15
163:10

daylight 99:6
100:7

days 29:21
71:25 164:13

deal 21:7
36:20 40:5

dealing 15:15
41:14

dealings
133:6,10

Dear 164:7

decentralizati
on 121:20

decide 31:11
74:9 104:13
121:1,7

decided 121:20

decision
61:9,10
67:7,18
73:11,19
74:17 75:5

decrease
155:19

Defendant 2:7
5:25

Defendants 1:9

define 14:16
38:16 42:23
50:1 55:1
80:17,24

definitely
19:14 59:14
104:17 121:2
130:8
132:10,12
142:22 156:9
158:18 159:15

definition
45:2,3 109:5
133:11

definitive
120:21

degree 12:9,18
13:4 62:4
72:14

degrees
12:11,13

deleted 35:21

deletion
109:24

demonstrate
65:6

demoted 123:24

DeMoya
110:4,5,25
111:12 114:12
115:1,17,25
116:5
117:17,24

DeMoya's
110:21 114:3

denied 91:22



depart 30:1

departed 21:8
24:13 153:11

departing
87:5,14 91:1

department
11:12 23:5,6
24:24 25:20
26:22
30:12,21
31:12 33:5,14
36:24 37:2,7
38:8
46:7,9,14,17,
20 49:21
50:10,12
52:21 53:15
57:25
58:3,8,25
61:4
62:20,21,25
63:1,2,6,14,2
0 64:3,17
65:9 66:12
68:5,9,10
74:10 76:25
77:6 80:4
81:18 83:18
84:5,25
89:15,21
91:17 94:8
97:24 108:21
109:10,12
114:25 116:6
117:7 127:9
130:14 132:24
134:15 135:24
137:25 138:8
140:20
145:5,8,10
146:23 147:2
157:19

departments
140:24
141:6,7,12

department's
59:9,22 60:22
68:1 92:14
133:9

departure
20:21 24:11
30:13 33:4

depending 20:3
22:21 27:12
41:7 48:12
57:4,19 63:9
77:15,16
87:16 96:5

depends
23:17,21 24:2
50:6 61:23
63:11
65:15,20
93:15 95:7,8
96:4 110:19
133:11 145:25
157:13

depicting 89:7

deployed 108:5

deployment
14:10

deployments
122:5

deposition
1:15 5:1,9
9:2 103:14
160:7 161:6,7
164:9,10,11,1
3

deputy 9:13
25:3 50:24

51:1 118:8
122:21 140:7
142:2 144:16
152:18 153:22

Derelict 91:18

dereliction
91:10,16

derogatory
97:20

describe 58:4
89:4

DESCRIPTION
4:2

designed 60:4
74:10

Destiny 26:10

details 134:10

deter 73:15

determination
55:14 87:8,21
110:13,17

determinations
110:18

determine
44:20 59:9,23
73:3
74:11,14,18
85:25 95:11

determined
87:13 91:6

determining
19:12,18
102:20

develop 69:13
140:14

development
140:14

dialogue 34:23

didn't 19:20
20:3,4 24:20
26:7 27:16,19
28:16 37:25
39:15 40:6,7
42:7 43:8
51:18 56:13
61:18 62:8
70:1,5 71:18
73:8 80:10
85:21 87:8
88:2,18,19
89:2,24 90:16
92:12 97:6
101:5,8,23,24
105:1 109:19
113:16 116:7
123:24
124:3,19
125:22,25
126:4,18
128:15,17
130:4
136:11,13
137:9 139:4
142:12 150:2
159:3 160:18

difference
43:11 57:17
66:3 67:19

differences
18:5

different 9:20
11:9 21:10
32:8 34:18
45:4,7,8
52:22 58:1
64:5 66:21
124:10 126:14
136:22 140:19



141:5,6,7
155:6,7

**differently**
45:14

**digitally**
162:7

**Diman** 11:19

**dire** 133:8,11

**direct** 3:3
5:20 21:12
42:7 44:3
109:1 121:21
151:19,20,21
153:15

**directed** 45:13
52:8 86:16
126:16 132:17
145:18

**directing**
50:20 51:10
57:25 62:5

**direction** 44:6
47:5,14 48:25
49:1,5,9 60:2
132:21 142:7

**directions**
131:23

**directive**
47:19 60:6,16
127:15
128:6,8,13,22
129:11 142:7

**directives**
48:17 49:5

**directly** 20:2
141:22 144:16
150:12 151:16

**disagreed** 44:1

**disarray**
121:10,12

**discarded**
35:21

**discharge**
107:24,25
108:1

**discharged**
108:14,15,22
109:3,14,18

**disciplinary**
14:10 29:20
58:25 60:7
61:1 62:14
77:18 87:16
153:19,21
155:14

**discipline**
30:17 58:17
62:13 152:6,8
153:25 155:9
156:12,15
157:1

**disciplined**
30:21
155:4,10

**disclose** 27:22

**discloses** 7:14

**discredit**
97:22

**discrepancy**
23:23

**discretion**
157:15

**discuss**
33:13,16 73:8
113:12 121:6

**discussed**

33:17 36:8,11
42:21 73:1
87:10 110:21
111:19 113:22
118:8,10
125:18,20
134:10 139:11
158:25

**discussing**
110:20

**discussion**
36:15 43:18
73:1 87:18
103:12 112:11
113:23
122:12,21
139:14
140:6,9 153:2

**discussions**
37:1,5,12
117:22 123:16
134:4

**dishonesty**
31:17

**dispatch**
84:15,16

**dispelled** 98:3

**disposition**
76:11,23

**disqualificati
on** 22:2 23:1

**disqualified**
22:19

**disrepair**
119:25

**disseminate**
98:12

**disseminated**

96:14

**distill** 95:24
130:12

**distinction**
56:2,5,6
57:14,21
122:14

**distinguish**
54:19

**distinguishing**
65:4

**distract** 98:6

**DISTRICT** 1:1

**division**
14:7,8 15:21

**DMS** 139:25

**document** 16:24
26:1 27:20
49:12 59:5
99:11,22
101:5,7,8
103:3 104:25
105:7,9,12
106:14,19
126:10
129:15,18,20,
24 130:7,13
131:1,3,13,19
,20,22 132:23
145:21 158:13

**documentation**
48:10 102:9
126:15 158:22

**documented**
51:21 100:19
101:2,12
102:4 127:11

**documenting**
101:7,17



158:10

**documents**
9:1,3 26:22
35:12 45:20

**doesn't** 7:8
81:14
105:5,15
106:14 107:16
119:14 143:16
148:1
159:5,14

**done** 20:25
22:9
42:14,15,17
45:14 61:22
67:22 75:19
79:20 80:12
154:14,20
155:16 159:8

**don't** 6:2,8,20
9:22 11:3
18:1,2,12,16
20:15
24:12,20
28:10 34:2
35:4,24 38:24
39:21 41:8
45:22 46:24
47:12 48:5
50:8 51:10
54:15,17
55:19 57:12
60:1,4,10,14
61:6,25 63:17
67:19 69:9
72:5 74:8
78:18,25 83:1
84:23 85:20
88:1
90:13,14,17
92:1,8 93:2
94:22

99:20,21,22
100:6
101:7,21,23
104:1,2,15
105:3,11
106:16,18
108:7,10,11
109:5,15,19
116:2,3,4
117:5,11,13,1
8 118:21
124:3 127:7
129:7
130:7,15,24
131:5,7,9,25
132:3,22
133:19,20,24
134:7,9
135:20,25
138:1,19
139:12
140:5,7 141:4
142:19 143:5
145:2 147:9
148:17,23
149:1,2,9
150:11,12
151:10,13
152:3,4,14
153:12 154:6
157:24 158:14
159:5 160:22

**door** 62:21

**double** 35:15
107:21
152:14,24

**down** 11:23
18:8 95:24
120:10,11
137:23

**downstairs**

120:8

**dozens** 98:4,5

**draft** 105:1

**drill** 6:3

**DS** 18:25 36:23
72:3,7,17
136:17 139:10

**due** 78:12
113:3 114:13
146:17

**duly** 5:6 163:8

**during** 31:4
43:2,4 63:5
70:25 87:11
117:21

**duties** 39:19
41:12 43:15
45:18 46:19
47:4 53:11
54:7,25
56:8,15 57:8
91:10,16
105:24 128:16
132:18

**duty** 38:13,17
39:22 41:23
53:6
99:7,9,10
106:13,16
107:24 125:17
128:14,23
154:22 155:2
158:3

**duty(ROD**
129:23

_____
          E
_____

**earlier** 86:23
118:7 129:25

139:21 158:13

**early** 107:11
108:24

**earned** 65:5

**easier** 136:14
137:1 159:24

**easily** 24:5

**EAST** 2:9 164:3

**education** 13:6

**effect** 15:5
59:23 106:15

**effective**
125:4

**efforts** 139:4

**egregious**
154:17

**eight-page**
144:19

**either** 22:18
44:3 89:23
92:8 102:10
138:21 142:12
155:16

**Election** 15:10

**elements** 108:3

**else** 9:15
40:11 78:18
90:19 103:22
104:1 108:4
117:19 119:15
131:9

**e-mail**
33:17,18
34:5,6,8
35:24 36:8
49:15,19,24
50:14,18



51:11,22 70:6
72:6,9,16
93:13,19,21
94:6 96:25
97:8,18
110:24
111:5,10,14,1
5
112:4,16,19,2
0 113:24
114:1,6,25
115:8,12,16
116:1,6,18
117:3 118:14
119:11
120:13,20
122:14,18,23
123:9 127:10
129:11 146:23
147:1,3
159:22

**EMAIL** 4:8,9

**e-mails**
33:6,12,23
34:1,4,11,24
35:17,22
49:21 50:10
121:3 122:9
123:14 124:12
126:24 127:11

**embarrassed**
116:22

**embarrassing**
116:25 117:2

**Emergency**
15:21

**emitted** 109:4

**employed** 32:25
33:1 37:2,13
74:9 76:2,10

148:14

**employee** 57:4
92:24
162:11,12

**employer**
13:7,10 31:17

**employment**
15:2
17:3,7,15
20:19,23
22:3,6,8,20,2
4 23:2,11,20
25:18
26:14,17,25
27:4 28:23
29:6 34:15
35:23 70:25
105:19 113:21
114:3

**end** 17:6 18:16
25:7 38:22
49:10 63:23
85:9
124:13,16,17
136:8,18
160:13,20

**ended** 78:14,16

**ends** 35:14

**enforce** 41:23

**enforcement**
19:13,19
20:8,17 30:9
31:19
32:2,5,11
41:16,17,22
48:6,24,25
54:9,13 55:25
56:20,22 58:1
61:7 122:2
144:6

150:21,24
155:25

**engaged** 151:3

**enough** 6:12
28:17,25
95:17 97:2

**ensure** 67:14

**entered** 16:18
17:12 25:22
59:2 104:20
111:6 114:8
119:8 144:21
149:13

**entire** 14:7
30:9 117:3

**environment**
137:19

**ERRATA** 165:1

**erred** 116:8,14

**error** 116:20
150:16 155:12

**especially**
38:6 75:23
100:20 137:19

**ESQUIRE** 2:3,8
3:3 164:24

**essence** 51:2
136:16

**estimate** 53:14
54:15

**estimated**
52:25

**ET** 2:8 164:2

**event** 69:3,6
101:18

**every** 37:18
49:8,11

60:1,3 61:6
95:15
96:8,9,13
101:23,24
102:5 123:11

**everybody** 90:8
103:25 112:10
116:6 135:4
140:5

**everything**
10:4 29:14
36:4 42:13,17
49:22 100:14
124:4 131:16
132:22 149:23
150:17

**Everything's**
34:9

**evidence**
69:12,19 90:3
91:2 153:11

**exact** 9:22
10:2 12:8
53:13 86:20
99:21 124:25
147:3

**exactly** 27:13
65:24 85:25
87:2,21 91:8
98:7 99:25

**exactness**
12:20

**EXAMINATION**
3:1,3 5:20

**example** 26:23
27:21 55:3,9

**examples**
142:10,11

**exceeding**



135:19,25

**exchange** 33:3

**exchanged** 9:25
10:6
33:3,6,11
35:22 36:17
127:14

**exchanging**
34:11

**exclusive** 79:1

**exclusively**
46:24,25 64:1

**excuse** 36:11
58:21 64:18
112:8 136:23
151:25

**executive**
41:17 46:2
48:18 140:13

**Exhibit** 4:2
16:16,18
17:10,12,19
21:11
25:18,21,22
27:20 58:24
59:2 60:7
104:19,20,24
111:4,6
114:5,8,21,24
115:16
119:6,8 125:2
129:16
144:19,21
145:16
149:12,13

**Exhibits** 4:1
159:18,21

**exist** 81:9
95:4

**existed** 95:5

**existing** 68:14

**exists** 95:14

**exit** 81:23

**Exp** 162:24
163:22

**expect** 126:23
141:2

**expectation**
19:22,24 47:5

**expected** 10:8

**expenditure**
149:8

**expenditures**
134:15

**expense** 145:22

**experience**
26:24 46:18
52:2 56:21
77:16 80:8
108:10,13
109:7 112:8,9
127:22 128:3
129:10 136:21
139:16 140:13
155:25

**experienced**
66:25 108:10

**explain** 103:1
107:16 135:10

**explained**
43:16 134:2

**explanation**
123:17

**expression**
138:3

**expunged** 28:1

**extensive**
112:7,9

**extent** 53:8

**extremely** 58:4
83:21

**eye** 89:4

**eyes** 76:23

------

F

**fabricated**
87:6

**Facebook** 10:18
11:6,8,12

**faced** 39:3
67:8

**faces** 30:5

**fact** 22:12,25
23:11 30:6,7
31:2 44:17
54:13 73:3
78:9,12
81:7,9,23
83:5 85:21
87:5,13 90:25
91:6 93:6
96:20
100:10,21
102:20,22
116:9 131:22
150:3 155:8

**fact-finding**
79:2

**facts** 22:1,16
74:14

**failing** 67:3
86:3

**failure** 86:17

152:12,19,23
153:16 154:4

**fair** 2:3 6:11
28:17,25 31:7
72:1 91:19
135:14 160:20

**fairly** 39:14

**Fall** 11:22

**fallen** 88:6

**false** 21:9
28:24

**familiar**
105:5,8,17
106:14

**far** 98:23
147:5 150:12
152:20

**fashion** 36:25
44:4 128:4
145:9

**FCAC** 68:5,13
139:22 140:1

**FDLE** 32:1 39:1
40:9,24
52:16,19
69:10 82:24
84:3,19 85:1
86:2,7,11
89:19
90:11,13
100:25
102:10,16
154:10 155:10

**feasible** 60:2

**feel** 32:1,6
65:6,18 88:19

**feeling**
64:5,10



felt
  67:13,18,21
  84:3 88:19
  142:7

few 33:7

field 46:23
  47:1,6,9,20
  124:1

figure 34:23

file 100:20
  105:19
  130:14,15,17,
  25

filed 33:19
  36:9 146:9
  164:14

files 24:25
  76:17

fill 50:4

filling 24:20

final 41:3
  42:3
  73:14,16,17
  146:8

finance 14:11

financial
  14:11 132:25
  133:4,6,9
  134:3,11,14,2
  1 135:19,25
  136:7

financially
  162:14

find 15:25
  27:10 31:5
  41:16 55:24
  56:9 74:10
  78:21 79:21

80:21
  81:1,2,11,15
  87:20 89:22
  121:13 138:16
  148:18 149:6

finding 75:22
  80:22 81:3,5
  106:10

findings
  25:10,14
  110:11,16

finds 66:5

fire 110:5

firearm 157:10

firearms 157:8

fired 108:17
  110:4 115:25
  116:5,6,10,12
  ,24

FIRM 2:3

first 5:5 9:4
  44:14 68:3
  72:23
  79:13,15
  94:10,15
  97:16 106:12
  111:14 112:7
  122:18 138:11
  140:11
  156:10,11

fit 143:17,19

five 83:2,23
  103:10,11
  136:17 147:24

fixing 43:25

Florida
  1:1,19,25
  2:4,9 11:23

15:21 29:18
  140:25 141:7
  143:16,18
  144:6,11
  162:2,6,23
  163:2,7,21
  164:3

fluid 122:3

focus 33:8

follow 34:3
  68:19 113:16
  117:23 118:3
  135:2,5,11
  157:20

followed 40:11
  67:25 113:13

following
  68:16 113:23
  156:14 165:2

follows 5:6

forces 94:5

foregoing
  162:8

forgive 118:21

forgot 100:14

form 10:9 19:5
  23:14 28:11
  37:24 42:11
  44:4 45:21
  47:7 48:11
  49:6,25 50:19
  58:11 59:25
  60:18 61:15
  62:22 66:7
  69:5,7 70:16
  71:1,8 72:19
  73:13 75:1
  76:11,23
  79:25

82:9,15,19
  83:10,14
  87:25
  91:12,25
  92:16 94:11
  96:3 97:15
  98:17 99:24
  105:20 110:1
  111:17 115:18
  117:1,9
  122:15 126:9
  127:2,19
  128:4,7,24
  129:3 130:3
  131:4,7
  132:13 133:18
  137:4,15
  145:8,24
  146:15 151:5
  154:25 155:22
  157:11
  158:5,11,13

formal 42:24
  48:4 78:3,12
  81:10,25
  85:19 94:13
  102:23 138:1

formally 48:5
  56:11,18
  117:24

format 16:2
  51:25 115:4,6

former 58:7

forms 27:10

FORT 2:9 164:3

forth 40:9
  92:23 133:7
  147:13

forthcoming
  102:13



forward 16:7

forwarded
96:25
146:2,7,19
164:14

found 22:15
69:17 79:14
93:4
148:20,21,23
153:10

four 136:17
147:23

fourth 145:15

frank 80:9
92:18

free 140:15

frequently
37:16,18

Friday 37:3,4
164:12

friends 141:5

from 7:19,20
8:10 9:12,20
11:16,18,23
12:6,9 13:1,4
15:14,22
17:6,15,22
20:21 22:19
24:8,13 28:22
29:5 30:21
33:4,24
34:6,15,25
35:12 37:6,11
39:18,20
40:2,13,23
41:13,21
43:15 44:7
45:4
46:1,12,13,16

,19
47:3,15,16
49:18
50:16,20
51:10
52:5,6,8
54:20 55:12
60:23 61:14
62:3,6,12
65:4 67:16
71:18,25
72:17 78:9
84:8 87:5,14
91:1 93:13,19
98:8,12 99:2
104:13 106:8
107:10 113:8
115:2,5 119:4
122:12
123:2,19
124:1,13
126:17,22,24,
25 127:15
128:22 129:22
130:13,17,18
131:15,18
132:9,14
134:11 136:7
137:9,13
138:15 139:8
140:24 141:9
142:10,11,17
143:2,9,15,25
144:5,10,25
149:3 157:18
159:18

front 49:9
58:13 62:21
94:23

full 16:10
44:19 95:14
96:10

function 54:13

funding
120:7,9

furnished
26:16

further 103:2
162:10 164:12

future 67:16

────────────

G

GABLES 2:4

Garrity 40:8
55:12 154:8

gathering
69:12,19 90:2

gave 8:19 21:9
42:24 49:7,8
143:24 164:9

Gavin 25:3

general 56:20
60:2 67:5
68:20 74:13
83:4 142:25
147:19 153:6

generally
75:6,17
100:12

generated
132:9

gentleman
95:16

get 6:9,19
31:8 34:24
35:7,13 39:15
51:8 61:7
64:7 65:7,8
68:4 76:3
79:4 80:25

85:16,24 94:6
96:25 97:8
116:23
128:6,8
130:15 133:16
136:11 137:9
139:4,21
142:25 157:2
158:21

gets 32:19
57:17,18

getting 6:10
18:19 65:19
103:16 107:4
108:12 124:12
139:15 146:19

give 7:11 8:20
10:2 12:8
13:3 18:20
38:25 49:4
53:13 55:17
63:17 65:25
79:3 100:6,11
113:2 116:7
123:17 128:15
134:7 148:11
149:9

given 45:16
49:11 51:23
65:22 106:21
108:14 121:24
137:18 147:11
148:7 150:8

gives 7:13
108:14

giving 27:3
49:3 55:9

glitter 108:16

go 5:23 11:1,8
16:24 21:11



23:16 27:16
34:5,8
37:6,11 43:15
55:23 71:13
76:15 82:8,13
89:14 94:8
100:8,9,10
101:12,21
117:6
122:17,18
125:12 128:22
133:23
136:17,19
140:2
147:12,23
148:7,8
149:24
150:3,8,9,18
156:6 158:24
159:4,9,18
160:22

**goal** 31:24
68:4 87:19
99:1 139:20
141:25

**goes** 21:4
29:25 108:4
116:23 136:20
139:12

**going** 6:17
7:10,22
33:8,13,24
40:9,18 44:21
47:4 57:5
70:17 71:13
76:16 90:20
91:23 94:2
97:7 103:8
104:18 113:14
120:2,10,14
131:5 143:17
146:20 154:18

159:2,6,7,8,1
0 160:8

**gone** 71:25
124:22 148:22
149:19

**good**
5:14,16,22
84:4 160:25

**gosh** 7:4

**government**
133:15 147:25

**governor's**
134:12

**graduate** 11:16

**graduated** 21:6

**guess** 17:5
18:3 35:20
54:17,23
56:12 63:16
66:1 72:9
79:6 89:3
90:20 107:2
112:9,16
119:4 134:11
138:2 141:25
144:2 148:17
149:10,18
151:11,13
152:10 157:18

**guidance** 60:3

**guilt** 87:9

**guilty** 52:17
54:10 56:24
93:4 102:21

**gun** 53:10

**gut** 107:13

**guy** 38:1 113:2

**guys** 82:7
91:23

---

H

---

**had** 9:7
10:4,5,13
14:8,16,17
15:14,15
18:15
19:14,19
27:25 28:24
33:21
36:1,5,23
37:1,15 38:10
39:4,6,7,9,10
,23
40:1,2,7,8,15
,16 41:12
42:3 43:2,4
45:1,11,13
47:21,24
48:2,18,20
51:2,9,14,18,
19 53:4 56:9
63:16 68:7
70:7,13,23
71:24,25
72:3,6,9,10,2
5 73:5,8
75:19 76:6,12
78:1 81:17
83:23 85:21
86:19,22,25
87:2,11,18,21
88:3,6,13,18,
23
89:10,16,19
90:22 92:20
93:12,13
96:16,21
97:4,5 98:1,8
99:14
100:14,22,25

101:25
102:1,4,12
103:18 104:9
106:1
107:10,20,23
108:5,9,15,16
,22 109:16,25
110:4,19,25
111:15
112:2,10,14,1
5,19,21,24
113:6,13,22
115:16,17,25
116:2,13
117:19
118:6,7,8,22
119:14 120:9
122:18,20
123:11,12,20
124:9,16,21,2
2 126:14
127:13 128:1
129:9,10
131:14,16
132:1,5,8
133:5,16
134:5 135:2
137:2
138:9,17,20,2
3 139:10,20
140:5 141:16
142:2,10,16,2
0 143:14,15
144:9,10,16,1
7 148:4,21
149:7,19
151:13,17
152:15 153:9
154:23 155:2
156:25

**hadn't** 125:21
148:9



**half** 53:15

**half-an-hour**
159:9

**hall** 145:11

**halted** 78:12

**hand** 162:15
163:10

**handle** 39:19
40:9,11 47:16

**handled** 81:20
84:4,15 95:21
154:10

**handwriting**
16:24

**happen** 44:3
143:16

**happened** 28:24
70:7 73:3
79:22 80:23
86:1 87:20
89:11
91:23,24 92:4
102:14 110:8
124:24 146:20
158:20

**happens** 28:17
122:3,4

**Harborough**
37:10

**hardly** 11:3

**has** 29:20 36:4
51:23 55:3
70:22 74:24
92:21
102:12,13
106:23 119:25
135:4 147:23
161:8 164:13

**hasn't** 114:7

**hate** 65:20

**have** 6:14 7:3
8:10
10:7,11,15,25
12:9 13:4
14:13 16:17
18:11,19
19:25 20:7,12
24:12
27:20,22
31:20,25 33:3
34:8,20 35:21
36:4
37:1,12,19
38:16 40:12
41:5,6,7
43:17,24
44:12
45:14,15
48:3,16
51:18,20,22
53:11
54:3,7,17
55:2,3
58:12,13,16
60:16
61:12,20,22,2
3 62:9
64:5,16
65:2,11,25
66:9,10,11,16
67:14,20,25
68:21,22,24
70:9,17
73:14,22
75:4,6,8,18
76:15,23
77:19 78:7
79:5,9,20
80:2,10,12,15
81:20 83:3,6

84:9,14,16
85:3,4,7,10,1
1,12
88:4,5,18
90:1,7 91:15
92:8,12
93:10,21,22
94:21 95:11
96:1,7,10,14,
15 97:3,7,18
98:2,4
99:20,21,22
100:19 101:10
102:17
105:7,18
106:22 107:23
108:4,6,10
109:7
110:7,11,15
118:11,13,20
119:1,2
121:18,19,20
123:6,24
124:6,9,13
125:15
126:2,6,7
127:5,18
128:3,9,10,20
129:2,9,11
131:7 132:2
133:12,23
135:22 136:19
137:1,13
138:6,20
139:9,25
140:23
141:4,18,21,2
2 143:4
145:5,10
146:11,13,19
147:7,20,25
148:19,20,22
151:3,15,18,2

2 153:2
154:19,22
155:12,16,20
156:2
157:5,14,23
159:2,10,23
160:2,20,22

**haven't** 66:1
77:1 106:1

**having** 5:5
22:5 37:13
40:22
45:4,7,17
47:12 48:6
51:2 66:19
67:6 78:16
95:20 106:18
112:2,7
116:15 117:2
118:20
140:3,9

**he** 7:8,13
33:19,20,24
36:1,12,22
37:12,15
38:6,7,9,10
39:16,22,24
40:1,14,15,16
41:10,11,12
42:24,25
43:8,9,14,21
44:12,22,24,2
5 45:12,13,15
46:2,12,13,15
,23
47:3,19,25
48:3 51:17,18
53:9 62:20
63:2,5,8,9,10
,16 67:15,20
69:3,6,11
70:2,3,5,11,1



3,14,23
71:2,5,6,9,19
72:10,12,13
82:13
87:15,24
88:1,5,7,22,2
3,25
89:1,6,8,10,1
1
91:7,10,17,23
92:3,10,11,12
,20,21
94:18,21
95:19
107:10,12,13,
16 109:18,23
112:24
113:3,5,9
114:7,14,17,1
8 115:6,10,25
116:5,6,10,12
,17,18,22
117:3 120:16
121:13,14
123:19,23,24
124:6,7,9,10,
11 125:9,16
128:2,3,8,9
129:7,9,10
131:16
132:8,13
147:13,14
151:8,11,12,1
3,15,17
152:15,16
153:11,18
155:2,4,5,8
160:11,19

**head** 11:2
129:4 137:17

**Health** 16:9

**hear** 32:16

40:2 71:18

**heard** 31:25
89:23

**hearing** 109:19
111:25 112:1
116:16

**he'd** 153:15

**held** 89:1
103:12 149:23
151:8

**help** 64:13
121:14
140:2,14

**helped** 140:14

**helps** 17:11

**hence** 107:18

**her** 7:11,13
18:11 20:18
143:4

**here** 5:9,23
8:12 44:24
45:2,5 62:2
135:14 137:7
157:24

**hereby** 21:23
162:6 164:20

**here's** 42:24
44:11

**he's** 7:22
42:25 43:16
45:14 52:17
70:22 113:2
119:21,24
128:13 136:8

**hesitate** 47:25

**hey** 36:19
42:24 44:22

82:3 91:23
121:4

**HH** 162:23
163:21

**high** 11:16,19

**higher** 64:4
65:10

**him** 7:15
32:22,24 33:8
34:12,18,20
38:13,17,18,2
0
39:5,9,15,18,
22 40:12
41:11,13
42:13,22
43:2,16,17
45:4,7,8,17,1
9,23 47:8
49:17,18
50:16,18,20,2
5 51:14 62:25
63:1 67:16
70:1 72:10
73:1,2 77:23
83:1,2
85:8,11,12
89:11 90:7
98:15,24 99:5
101:18
109:14,18
116:7,10
120:3,5,10,11
,14,17,25
123:13,19
128:13,15
129:2,10
131:15
132:2,22
151:16,17
152:6,11,12,1
9 153:12,13

155:10 158:10

**himself** 91:11

**hire**
19:12,18,21,2
3
20:4,7,11,14
21:3 24:24
30:23

**hired** 19:3

**hiring** 19:25
22:1,17 23:1
31:22 32:12

**his** 5:24 7:14
20:18 33:24
34:1,8 37:13
39:19 40:24
42:15,20
43:14
45:5,18,20
46:19
47:4,16,20
50:14,17
62:16
63:10,14
67:15 88:22
89:1,3,7
91:10,16
92:2,3,10,20,
22,23 105:24
106:8 107:10
112:7,9
118:11,17,21
121:25
122:7,8
127:5,16
130:15,17
131:16 132:17
139:16
151:14,21
152:23 157:7

**historical**



133:6,24

**historically**
95:2

**history** 34:9

**hit** 71:6

**hold** 38:24
104:2 150:18

**holes** 68:22
95:19

**home** 7:14
39:18,23
40:13,23
43:15
45:4,17,23
46:1 47:3,15
49:18
50:16,20
51:10
52:1,5,6,8,9
53:3,9,20
57:17,18
60:23 61:14
62:6 66:4
104:13 106:8
122:12 123:2
124:1,5
126:18,22
128:22

**homicide**
152:15

**honest** 8:24
31:22 32:12
80:9 91:19
92:17 105:3
122:8 123:22
124:15 142:4
146:16

**honestly** 80:18
109:15

**honesty** 31:17
80:6

**hope** 64:1,2,9
69:1

**hours** 38:1,2
63:5 95:17
100:7,11
103:8
106:13,16

**house** 39:20
47:16 62:12
123:20
131:16,18
132:9,14

**HOWARD** 2:8
164:24

**HR** 130:18

**huh** 107:2

**hung** 82:6

---

I

**IA** 81:14,16
82:6 90:19
93:12,14,22
94:9,17
96:2,4 98:14
119:3

**I'd** 35:25
58:17 96:7
157:23

**idea** 10:12
18:11
20:12,13,15
24:12 34:20
62:23 88:4,6
90:7 106:22
126:2 135:22
146:19 151:18

**identified**

52:20

**identify**
126:15

**ideological**
18:4

**I'll** 6:6,10
16:16,24
17:10 21:12
56:19 58:24
68:3 90:21
109:5 111:4
113:2 114:5
119:6 129:16
137:17,18
144:18 149:11
159:13,17

**I'm**
6:3,9,17,18
7:10,15 9:18
11:13,15 12:8
16:2 19:16
21:23 23:15
26:19,20
28:5,10,18
30:4 31:13
32:5,16 33:8
34:2,21,23
35:11 36:14
37:20 38:1
40:18 41:15
47:12
48:19,21
51:5,11,12
52:14 54:8
55:9,15,17
56:9,14
59:5,17
60:9,12,25
61:16 62:10
64:21 65:4,17
66:21 68:6
70:17,20,23

76:9 77:10
78:10
80:15,16,25
83:5 84:14,15
86:4 87:1
88:20
90:15,16,20
91:8 93:23
95:22 99:10
100:2,17
101:7,21
103:8 104:18
106:10 113:16
120:19 122:16
123:4,10
124:22,23
125:8,10
126:1,13
127:13 128:20
129:1,4
130:4,9,12,16
131:5,12
133:19 134:4
135:10 136:25
137:1 140:23
142:25 150:5
152:25 153:7
157:3 158:23
159:2,6,8
160:3,14,17

**images** 109:25

**imagine** 99:14
158:16

**immediate**
104:17 120:21

**immediately**
81:24

**impact** 23:25
75:11 97:22

**impactful**



64:25

**implemented**
141:14

**implied** 137:5

**importance**
48:9,13,24

**important**
20:17
29:4,7,10,13,
14,23
30:10,17 31:9
32:4 66:15
67:25 120:22
134:14

**impossible**
136:23,25

**impression**
43:21

**improper**
154:23 155:19

**inaccurate**
119:19

**inappropriate**
44:2

**incident**
44:15,17
69:18,22,25
71:15,23
72:22 73:5,8
79:7,14
81:20,24 83:9
86:3,15,18
87:1 89:1
91:11,20
93:20 94:6
95:12 97:15
100:18 101:14
102:14 109:2
123:18 152:15

153:9,17
154:5

**incidents** 93:8
94:13

**include** 111:20

**included** 19:18

**including**
29:14 30:7
66:14 67:14
70:14 75:9
77:3 81:19
96:9 143:20

**inconsistent**
136:15

**incorporated**
142:19

**independent**
84:6

**INDEX** 3:1 4:1

**indicate** 17:24
18:4 27:11
33:11 70:6
108:4 112:24
117:21 119:14
121:4

**indicated**
26:14 27:9,25
28:7,15,23
56:7 59:8
86:22 90:24
112:21 115:1
118:6 120:12
122:10
144:8,17

**indicates**
105:23 106:7
119:16,21
120:20

**indicating**

28:8 96:25
110:25 115:17

**indication**
108:15

**individual**
10:1 18:15
21:3 47:24
55:5 64:13
65:13,15,16
66:14 67:1
72:17 73:18
76:3 121:10
128:2 142:5

**individually**
18:24

**individuals**
31:23
32:12,22,24,2
5 56:8 67:9
78:19 88:10
102:2 120:23

**individual's**
27:8

**influence**
75:11

**informal** 78:2

**information**
7:23 10:3
17:2 20:18
21:10 22:7
26:15
27:2,6,13
38:10 78:7
100:23 101:5
102:12 142:23
164:12

**informing**
91:16 114:18

**initial** 44:13

50:22 71:9
87:12

**initialing**
131:13

**initially** 42:5
45:1 72:24
91:3 154:9

**initials**
105:14,15
106:3,4
125:21 129:23
130:5 131:6

**initiate**
77:12,15,18,2
3 94:13
102:23

**initiated**
77:19 79:5,9
81:4,6,10,25
99:3,16
100:10

**initiating**
77:6,8,11

**injured** 92:11

**injures** 94:7

**injury** 91:17
92:15,21,23

**innocence**
56:24 87:9

**innocent** 54:10
102:21

**in-person**
12:23 123:16

**input**
19:14,15,19
20:1 144:2

**inquire** 40:7



47:25 158:18

**inside** 65:6
109:9,11,13
129:4

**Instagram**
10:20,25 11:4

**instead** 79:20
82:12 98:14

**instructed**
39:18 42:12

**instructing**
7:15

**instruction**
51:5

**instructions**
39:19 51:24

**integrity** 23:6
32:5,9 80:5

**intelligent**
113:3,4 128:2

**intended** 49:17
149:4
158:10,24

**intending**
40:12

**intent** 21:5
22:21 107:17

**intention**
120:10

**intentional**
20:21

**intentionally**
68:19

**interest** 68:24

**interested**
162:14

**interesting**
107:4,5
134:25

**interim** 36:2
38:7

**internal**
14:14,18,20
54:18
73:11,15,16,2
1,24
74:5,8,13,18,
25 75:4,14,21
76:12,17,24
77:6,9,11,13,
20
78:17,20,23
79:5,9,10,22
81:3,5,19,25
86:23 87:3
90:23 94:15
95:1,6
96:8,18,20,22
97:3,5
99:3,15
100:9,20,24
102:11
103:17,20,23
110:10 119:1
152:1,3,5,22
153:4,13
154:3,7
155:23

**interpretation**
18:3

**interview**
18:15,18
31:25 101:8

**interviewed**
18:22,24,25

**interviewing**

69:12,19

**interviews**
18:18 19:1,2
25:2 91:5

**into** 16:19
17:13 20:5
24:4 25:11,23
29:21 30:13
31:8 39:8,15
44:9 46:23
55:13 59:3
61:7 62:20
65:9 70:6
78:25 79:6
104:21 111:7
114:9 119:9
120:5
130:8,15,25
134:10 137:22
138:5,10
140:24 144:22
149:14

**introduce** 5:12

**introduced**
140:4

**inventory**
151:11,13

**investigate**
86:8,12,15
95:18 99:2

**investigated**
31:6,10,16

**investigating**
77:9 102:16

**investigation**
23:12 24:19
25:11 27:24
28:4,9,13,14,
23
29:6,12,15,16

30:2,12,13,14
31:4 39:1,13
40:4,8,10,14,
24
41:6,8,18,20,
24 42:9
44:9,13,19,20
45:19
52:15,22
53:2,5,16,23,
24
54:3,5,6,10,1
1,18,20,23
55:4,8,10
56:3,11,17,23
57:1,7,13,23
58:10 59:11
62:15
66:6,16,20,23
73:12,15,16,2
1,25
74:14,18,25
75:9,12,15,22
76:12,17,24
77:8,11,13,20
,23
78:3,13,21,24
79:2,5,10,11,
23 81:2,10
82:1,8 84:4
85:19,24
86:16 87:9,12
89:25 90:5,23
91:2,5 94:13
95:9,21 96:11
97:5 99:3
100:9
101:19,20
102:12,24
103:18,23
107:18 109:1
110:9,11,14
152:1,4,5



153:4,10,14,16
154:3,7,8,9,13,19,23
155:11,17,24
156:4,5,7,9,11,16,25
157:4,9

**investigations**
14:15,18
31:15 53:25
54:2,16
74:5,8 75:9
77:7 94:18
95:2 97:6
119:3 152:22

**investigator**
78:17 81:19
86:24 94:16
96:8,10,22
100:24 119:1

**investigators**
52:20 79:23
82:24

**invoice** 144:25
145:3

**involve** 36:8

**involved** 20:2
23:21 61:11
67:14
68:7,23,25
71:15 97:14
133:16 142:22
144:4 153:23

**involvement**
109:1

**involves** 28:3
69:3

**involving**
58:10 69:18

71:15 72:22
79:7 86:8
152:23 154:4

**isn't** 26:8
30:18 52:2
66:3 69:17
78:20 81:14
82:23 95:17
105:16 123:6
131:8

**issue** 23:24
42:21 52:11
66:16
76:8,10,19
87:5,10
92:6,7 103:17
107:6,8
113:24 129:11
146:18,21

**issued** 34:18
63:2,6
157:1,8,10

**issues** 14:11
15:15 36:7
51:19 66:24
67:15,16,17
68:16,22 77:9
93:8 94:19,23
123:25
133:12,14

**it'd** 31:9

**item** 146:12

**items** 98:13
124:10

**its** 30:7
40:10,24
135:24 137:14
138:22 157:19

**it's** 6:6,20,25
11:5,7 18:1

20:20,21
23:18,19
24:1,4
29:7,13 32:4
41:13,16 58:4
61:5 62:16
64:25
65:19,25
67:25 79:1,2
80:16
83:11,18 92:2
93:6,18,25
101:4,11
105:4 108:8
111:4 117:25
118:2,3
119:24
120:18,22
121:20
122:3,6
125:10,20
126:1 127:10
134:17
136:14,25
141:16 144:19
145:4 146:5
147:24 159:7
160:6,8

**itself** 68:16
78:11 81:12
89:15 92:18
108:2 114:20
137:25

**I've** 17:19
25:21 32:22
36:23 38:5
39:3 48:18,20
49:16 58:24
60:7 65:22
67:8,11 78:6
81:17 104:23
111:4 144:18

149:12 152:4

---

### J

**Jacksonville**
13:11,12,19
14:17,22 24:9
73:25

**Jacksonville-St** 11:25

**Jada** 1:24 5:11
162:5,22
163:5,20
164:18

**Jade** 32:19
159:20

**January** 13:16
15:22 16:13
21:6

**Jenkins** 19:1
25:4 51:1,14
75:3 118:9
121:1,17
143:24 153:22

**job** 15:25 16:3
35:17 92:11
136:11

**John** 18:23
34:22 35:9
43:13 72:2
75:19,20
145:18 159:23
160:9

**Johns**
12:3,6,10

**JOHNSON** 2:8
164:2

**Jonathan** 2:8
5:16 6:17 7:7
88:21 159:17



164:24

**JOSEPH** 5:4

**July** 111:1,10
119:21 121:5

**jump** 16:7

**jumping** 138:5

**just** 6:8,10
7:10,12 9:6
10:13 12:16
16:7,16 18:3
21:12 23:18
26:20 29:8
31:2
34:6,22,23,25
35:7 39:11,17
51:11,12
53:9,22 54:11
55:9 61:20
67:2,4 70:23
72:19 73:4
79:4 80:13,25
81:12
85:8,13,18,19
88:19 90:21
92:24 93:16
94:3 96:12
99:1 101:6
102:19,21
107:15 109:6
114:17,21
116:22 117:15
120:17,21
125:3,10
128:21 129:1
131:12,17
137:1 153:5
155:13 158:16
159:3,13,17,1
8,22,23
160:17,18,23

**justice** 12:6

13:1 28:22
29:5

_____

K

**keep** 32:21
123:10

**keeps** 107:4

**kept** 147:15

**kibosh** 150:18

**killer** 21:7

**kind** 6:9 9:8
18:3 19:15
27:23 34:21
36:19 38:11
39:14 40:4
43:8 59:18
67:12 69:9
97:15 112:11
114:19 116:20
118:1,2 121:1
122:7 159:18

**kinds** 33:16
57:9 87:6
97:21

**knew** 53:6
72:14 93:11
112:12 117:19
147:5,12,16
149:11

**know**
6:3,5,8,10
7:8 9:18
14:11
18:12,16
21:6,7,9
23:17,18
27:11,17,22
28:16,17
29:4,7,11,15,
18

30:11,17,19,2
2,25
31:2,3,9,25
32:8,19,20
34:2,10,17
35:4,11,24
36:19
39:9,10,11,14
,21,24
40:3,4,6 41:5
43:8 52:7,23
54:7,15,17
55:17,23
56:13,23
57:11,12,19
59:19 60:10
61:25 62:9
63:18 64:18
65:19,20,23
66:18 67:8,20
68:7,9
69:8,9,11,23
70:10,21
71:2,9
75:3,25 78:18
79:3 83:1
85:15,16,19,2
0,21
87:6,15,16,21
88:2 89:2
90:1,4,13,14,
21 91:1,2,7
92:1,4
93:1,2,23
94:1,14,22
96:11,12,15
97:7
98:7,9,10
100:5,6,12,21
103:16,17
104:15 105:18
106:4,21
107:17

108:7,11,24
109:5,15
111:20 113:11
116:2,3,4
117:18 118:21
120:17
121:4,13
122:8
123:15,16
124:3,21,25
125:16 127:7
129:7,8
130:15
131:9,25
132:3
133:12,19,20,
24 134:7,9
135:20,25
136:6,8
137:7,9
138:2,3
139:12
140:5,6,7
141:2,3,10,20
,22,23
142:1,10,20
143:5,10
144:8 146:11
147:9,19,24
148:17,24
149:2,16
150:11,12
151:10
152:3,4,11,14
,17 153:22
154:6
155:12,13,14
156:1,2
158:2,18,24
159:3,8,20
160:1,18

**knowing** 45:10
72:13 89:25

90:3 146:10

**knowledge** 17:4
27:8 42:15
132:15

**knowledgeable**
112:12,25
113:7

**known** 6:14
85:4

———————
L

**lacking** 140:12

**last** 7:13 8:4
37:4 52:24,25

**later** 23:24
150:15

**LAUDERDALE** 2:9
164:3

**launch** 95:14

**law** 2:3
19:13,18
20:8,17 23:19
30:9 31:19
32:1,5,11
41:16,17,22,2
3 48:6,23,25
54:9,12 55:25
56:20,22 58:1
61:7 122:1
144:6 155:25

**lawsuit** 23:18
33:18
36:8,11,13
38:4,5,6

**lawsuits** 68:8

**lawyer** 40:19

**leadership**
18:5 36:3

48:18

**leading** 64:24

**learn** 146:13
148:9

**learned**
23:10,24
146:16 150:16

**least** 25:5
30:8 41:5
42:5 43:20
67:10 85:1
87:12 92:12
94:9 97:22
98:12 108:9
126:6,25
129:10 137:7
144:17

**leave** 15:8
37:14
38:18,20,23
49:9 88:17
102:6 124:19

**leaving** 35:23

**led** 91:3

**left** 9:17
13:19 24:17
43:3 124:16
125:1,3

**legal** 66:24
93:2 140:17
142:13

**Leo**
12:12,18,21
13:1,4,6

**less** 132:14

**let's** 44:22
52:11
55:20,23
62:18 82:13

94:5 101:12
125:12

**letter** 4:4,11
17:16,20,24
23:19 24:21
78:1 80:15
81:13 85:12
97:19 98:1,4
111:24
114:17,19
115:21,24
116:9,15,21
117:11,13
124:21 125:18
144:23 149:18
150:1,7
164:15

**letting** 120:17

**level** 51:20
63:24 64:6
77:14 94:14

**levels** 141:6

**Lexipol** 136:2
139:7,13,16,1
8 140:3,9
142:13
143:11,13
144:9,25
146:2,19
147:10,14
148:4
149:7,22
150:3,8,12,17

**liability** 57:3
66:19,24 67:4

**lieu** 30:16

**light** 41:14

**likely** 51:6,22

**likewise** 28:3

91:15 93:10
138:20 161:2

**line** 77:14
119:2 159:4
165:3

**lines** 44:18

**listed** 18:1

**Listen** 96:7

**lists** 26:3

**little** 16:7
32:18 41:15
55:20 81:17
83:23 98:3,23
108:6 127:24
130:12

**live** 108:21,23

**living** 8:7

**local** 86:11
142:2,20
143:2

**location** 47:3
50:12,17 57:9
62:16,18
84:18,25
98:16 99:21
149:4

**Locka** 11:12
18:12 23:5
33:1 49:21
54:18 57:25
58:8 62:20
68:9 76:24
95:5 127:9
134:20 135:15
140:13,21
148:13

**logged** 95:7

**long** 6:5 7:3



20:20 37:19
40:12 55:19
104:12 118:25
155:13,15
157:13

**longer** 158:24

**long-winded**
79:3

**look** 24:4
44:12
59:14,15
89:15,19
94:21 95:3
105:5,8,9,15,
17 106:14
108:21 110:10
125:12 139:9
151:22

**looked** 62:9
89:3 105:4

**looking** 33:23
48:20 65:24
68:6 75:7
76:16 95:1
106:15 118:16
119:16 152:18
153:18,21,24

**looks** 26:9
111:8 114:10
125:16 145:1

**loop** 147:15

**LORENZO** 2:4

**loss** 131:17
155:14,15

**lost** 116:19

**lot** 18:20 25:1
35:2 36:1
41:7 48:20
70:17,18

72:18
80:5,6,10
85:10
94:19,23
136:16,21
140:13 141:5
147:23

**loud** 109:3,5

**lowest**
30:6,7,8

**lying** 91:7

---

M

**made** 10:5
21:24 22:9,15
30:23 39:16
54:4 67:7
71:11
78:11,15
80:19 87:3
90:18 98:8
102:5,22
111:20
118:19,24
137:1 140:18

**mail** 33:24
72:3 111:16
114:2 121:17
127:14

**mails** 9:7
33:3,12

**maintain** 32:4
131:16

**maintained**
131:16

**maintaining**
23:6 32:9

**maintains**
71:5,9

**major** 96:10

**majority** 25:5
33:22

**make** 31:21
32:10
35:14,15
61:9,10 67:18
87:8,21 94:9
110:9,11,12,1
4,15,16,17
134:14 136:13
143:7 149:22
151:25 153:13
159:5,13
164:11 165:2

**maker** 73:11
74:17 75:5

**makes** 73:18
159:23

**making** 72:4
75:22 110:17
134:16 139:4
153:3

**man** 34:9 113:4

**management**
15:21 48:17
121:21 133:21

**manager** 16:11
17:22 38:10
39:7
42:4,7,14,18
43:7 44:7
50:24
51:3,4,9 67:7
72:25 73:18
75:2,8,11,19
78:16
79:16,17 81:4
86:23 90:23
96:22 99:15

103:19
110:6,12,16,2
0 112:1,3,10
116:14
117:16,18
118:8,22
120:25
122:20,21
123:1,21
132:21 134:9
136:4,7
137:10
140:6,7
146:8,20
147:12 148:8
149:2,20
152:17
153:2,23

**Manager's**
138:16 139:16
150:9

**manipulated**
141:23

**manner** 92:23
94:22

**manuals** 68:15

**many** 9:20
18:12,13,17,1
8 20:14 29:24
45:14 51:24
53:3,12,20
95:19 151:17

**March** 6:25
16:4 21:7

**mark** 7:17,22
16:16 17:10
88:17 104:18
119:6

**marked** 25:21
58:24 60:7



111:4 125:2
129:16 144:18
149:12

**married** 7:1,3

**Massachusetts**
11:22

**material**
22:1,16,25
23:11 72:18
73:5 145:15

**materials**
141:15

**matter** 18:3
41:3 44:17
61:20 64:13
72:20 80:2,13
81:12 148:1
150:2 159:14
164:9

**may** 5:18 34:22
35:17 42:21
53:23 77:3
120:12 126:7
127:17 145:4
160:1
164:10,11,14

**maybe** 35:4
42:5 103:10
127:20

**me** 6:3,5,10
7:11,12 14:19
16:7 18:7
20:1 21:23
25:7,12,15
27:10 29:22
31:13 35:7
36:2,11,12
37:15 38:24
41:1 42:12
43:24 44:11

45:7,13
46:10,16 47:8
50:13,21
51:5,9
53:19,22
55:22 56:12
58:13,21
63:15
64:18,20
65:1,2 66:8
68:18 70:12
72:8,9,10,13
73:8,22 77:4
79:3 81:16
83:12
84:1,13,22
88:7 90:9,21
95:15 96:5
97:12 99:20
100:15 101:6
102:15
104:2,23
105:6,8,17
106:6,14
107:13 108:19
112:6,8
113:11 118:21
119:2 121:6
122:25 124:3
126:10,13
128:4,9,10
135:22 136:23
139:15 140:14
144:17 145:25
148:24
151:22,25
153:13 156:20
157:12
158:12,16
163:7

**mean** 8:23
15:11 18:2,13
19:16,20

20:23 21:8
23:10 27:5
28:11 29:22
30:16 31:25
33:12 40:17
42:7,20,23
46:22 50:6
52:17 59:15
63:11 65:13
69:2 70:13,20
83:7 85:4
88:5 90:12,14
91:15
93:10,23
98:23 100:8
104:16 106:15
113:16 117:25
118:2,3,14
122:4
123:4,17
124:6,19,23
125:2 135:2,9
136:16 137:7
140:10
147:1,24
148:12,18
149:11 152:9
153:20 157:15
158:20
159:1,6,7
160:6,10

**meaning** 28:24
58:19 105:9

**means** 76:1
77:19

**meant** 101:4

**mechanism**
108:2

**media** 10:16

**medical** 8:11

**medications**
8:10

**meet** 73:8
82:13 84:17
85:15 98:24
99:5

**meeting**
9:6,10,11,14
73:9 78:16
83:8 84:10,24
85:4 86:22
87:10,11
89:22 90:22
96:21
99:12,14,18,1
9,23
101:16,18
103:4,5,18,24
104:2,4,7,8,1
2 107:11
116:2 153:9

**meetings**
9:11,12,21
43:2 84:18

**member** 13:17
39:4 41:17,25
46:6 52:2,13
61:3,4 67:9
68:23 70:1,9
80:19
97:13,24,25
128:21

**members** 9:13
15:13 18:24
36:24 50:11
51:15 77:12
80:7 120:3,22
127:22,23

**memo** 101:5,9
102:4 126:7



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

128:15 155:3

**memoranda**
45:19

**memorandum**
46:1 101:17
103:3 128:23
129:20

**memorialize**
102:15

**memorializing**
99:22 103:3

**memory** 8:11
59:19

**memos** 101:8

**mention** 111:23
117:11,13

**mentioned** 9:8
18:18 36:7,15
57:21 104:15
111:20 112:18
117:5,10
139:21 157:25

**mentions** 61:2
115:21,24

**message**
72:3,17 98:1
112:17 116:13
124:17 130:11

**messages**
9:6,23,25
10:6,7
36:7,16
127:14

**met**
82:16,18,20,2
2 83:1 87:23
98:15 100:21
103:22 104:10

**Michael** 32:21
33:4 36:17
37:11 70:5,22
71:14,18,22
77:22
151:3,6,25
152:21 153:3
154:4

**might** 78:7
84:14,16
87:18

**mimic** 144:1

**mind** 55:25
92:2,3

**mine** 26:8

**minimize** 97:22

**minor** 24:5
77:17 95:10
96:9,14

**minus** 102:1

**minutes** 37:22
38:2 103:10
152:16

**mirror** 144:1

**misappropriati
on** 133:7

**misconduct**
81:8,9
95:10,11,13
96:18
102:2,22

**mishegoss**
93:25

**misinformation**
26:20

**misstatement**
22:16,24

23:10

**misstatements**
21:25

**mistaken**
120:19

**mitigate** 57:2

**models** 141:13

**modified** 45:20

**mold** 119:25

**moldy** 120:4

**Molly** 8:2

**moment** 45:16
65:24 85:14
147:17

**Monday** 164:12

**money** 149:24

**month** 124:19
148:15

**months** 83:2,23

**more** 21:3
29:21 35:2
44:18 51:21
53:8
63:13,19,22
66:15 70:18
81:10 84:6
98:3 102:23
107:4 119:2
121:3 132:14
137:13 159:2

**morning**
5:14,16,22
111:1 121:4

**most** 35:25
51:22 69:14
98:11 127:21
133:13

**mostly** 36:18
143:16

**motive** 121:24
133:19

**move** 51:3
52:11 67:21
118:5 119:22
120:3,10,14
121:18,19

**moved** 11:23
119:25
120:11,17
140:23 142:8

**moving** 77:13
118:11,17
119:17 120:5
121:25
122:1,2,6,13

**much** 29:7
30:25 31:3
38:1 67:4
78:13 89:13
108:10 110:22
149:23 150:17
158:24

**multiple**
32:22,24
48:18
51:13,23
68:14 72:4,18
97:19 101:1
102:1,2
107:25 111:18
112:19 122:4
123:12,13
134:8 139:13

**MURDOCH** 2:8
164:2

**my** 5:22 6:2
8:24 10:12



11:2,10 13:24
14:18 17:4
19:24 23:8
26:5 28:12
35:16,20,24
36:9
38:12,14,22
39:8 41:1,19
43:21 46:4
54:4 58:6
63:19 64:20
65:7,24 66:8
68:3 70:17
72:12
76:20,22
77:16 80:8
81:22 84:2
85:22,23
87:19 90:15
99:1
102:10,25
105:15 106:3
107:13 109:7
113:5 114:24
116:11,20
120:10,19,20
123:4,22
124:21 126:2
127:22 129:10
130:1,5,6
131:2,15,18
132:2,6,15
135:7,11,12
136:21 137:17
139:20,23
140:2 141:25
142:25
144:2,4,12,16
147:11 150:10
155:6,25
158:16 159:13
162:9,15
163:10 164:20

myself 78:17
96:21 119:3
158:21

—————————
    N
—————————
naive 97:12
name 5:22
7:5,11,13
8:1,4 10:25
11:9,10 18:23
20:12 118:21
128:13 129:23
151:10,14
164:15
names 6:15
narrative
25:10,12 89:9
nature 22:22
23:23 24:2
27:12 29:16
30:2 36:16
39:11 41:7
46:3 54:12
57:4 61:24
63:9 77:15,16
87:17 95:8
96:5,6 102:8
154:10 157:13
navigate 137:2
near 83:3,6
84:18 85:5
129:23
nearby 142:11
nearly 106:16
necessarily
45:24 53:24
62:13 65:23
68:22 96:4
116:12 141:21

necessary 6:20
35:11 60:21
164:10
need 6:5,19
27:19 59:8
80:17 81:10
82:7 103:2
121:6 157:19
159:9 160:4
needed 39:12
80:21
81:3,5,11
85:19
87:20,21
117:23 121:13
136:12 142:8
146:9 147:14
needs 150:25
157:16
neither
115:19,23
never 11:6
14:20 27:25
28:24 36:10
39:3 44:6
49:9 54:2
67:8 91:11
102:6,7
107:22 114:18
116:19 120:16
132:16 136:6
138:10 146:16
147:4 148:20
152:10
new 15:10,12
49:3 50:4
112:2
137:19,20
150:11
next 12:17

15:17 28:3
65:10 73:1
116:24 119:20
nice 141:3
Nikeya 121:17
no 1:2 6:16
8:9,13 10:11
11:10 12:16
14:21 15:3,7
18:2,11 19:20
20:12,15
21:1,8
24:6,12 25:13
28:7,15 34:20
35:25
38:19,21 41:2
45:4,5,7,24
47:13 48:4,5
49:2,7 50:7
52:18 54:21
57:12 60:25
61:9 62:15,23
63:16 64:21
66:1,2,13
68:20 69:25
70:8,11
71:21,24
73:3,14,17
74:21,24
75:24 78:3
79:4,15 80:24
81:2 82:10,16
83:12,17,18
84:2 85:6
88:4,6
89:17,24
90:3,7 92:4,9
98:7 99:2,13
103:1,5,6
105:1,11,15
106:20,22
107:8,14,22


UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

108:25 109:2
110:2,6
111:23 115:13
116:10
117:10,25
126:2,15,18,2
1 129:17
131:11,17,25
132:19 135:22
136:23,25
138:12 143:6
146:19 148:14
150:22
151:1,6,18
153:1 154:2
157:12,14
158:22 159:6
160:19 162:23
163:21 164:6
165:3

**nod** 42:24

**noise** 109:4

**non-command**
15:5

**none** 100:22
152:25

**nonsense** 94:1
97:7

**nor** 70:4
115:20
162:11,13

**normal** 63:6
83:8,16,17,18
,19 84:1,2

**Normally** 41:19

**North** 143:16
144:11

**not** 6:6
7:15,22 9:18

12:8 13:3
16:2 18:9
19:12,16,18,2
3 20:21 21:3
23:18 24:18
26:19
27:11,14,22
28:13,18 29:8
30:1,6,23
31:2 32:16
33:12 34:25
35:11,13
36:10,14,22,2
3 37:18
38:1,19,21
40:2 41:3,13
42:5,8,12
44:3,7,16,17,
21,22,24
45:13,24
47:6,8,12,20,
25 48:19,21
49:2,18
50:10,18
51:25 52:7,18
53:18,24
54:2,9
55:15,15,17,18
58:5,8,13,22
59:17
60:9,12,21,25
61:25
62:4,10,13
63:4,7,8,13,1
9,21 64:1,21
66:13 67:9,10
68:10,11,13,1
9,22
69:4,21,23
70:1,2,3,11
72:10,23
73:17
74:5,10,11,19

,23 75:15
76:20 77:22
78:8,10,22
79:6,13
80:16,25
81:23
83:5,11,17,18
,19
84:2,14,15
85:22
86:13,14 87:1
88:7,21
89:1,3,20
90:4,15,16,20
91:8,16 92:7
93:4 94:5,12
95:4,22 96:4
97:2,13
98:7,22
99:3,19,25
101:7,12,17
102:20 103:2
105:4,5,8,9,1
3,17,21,25
106:2,5,9,10
110:2 113:8
115:14
116:12,17,18
117:7,25
119:19
120:19,20
122:6
123:11,15,18,
23
124:2,12,22,2
3
125:8,10,20,2
2,25
126:1,7,13,18
127:12,18
129:4,8,9,10,
24
130:1,2,4,5,8

,9,10
131:10,11,12,
19,25
132:4,5,10,13
,19 134:18
135:10
136:3,23,25
140:8 141:24
142:6,7
144:16 145:19
146:1,10,13,1
7,24 147:5,8
148:7
149:2,3,7,19
150:2,5,7,22
151:1,22
152:21
153:7,15
154:1,23
155:3,14,15
158:10,23
159:8
160:3,8,12,14
162:10
164:9,13

**notarized**
26:10

**Notary** 1:25
162:5,23
163:21

**notes**
9:6,10,11,12,
14,17,20
60:11 162:9

**nothing** 10:23
34:10 42:15
45:9 61:2
91:23 92:3
132:14

**notice** 60:11
164:8



notification
  94:9 97:2

notified
  93:17,22
  96:18,21 97:3
  152:17

notify 70:1,10
  93:12,14,15
  152:12,23

notifying
  103:18 152:19

notions 44:21

NOVEMBER
  162:15 163:10

now 16:8 18:7
  38:24 57:10
  60:13 84:22
  120:2 128:23
  131:6 135:22
  147:22 153:1
  160:4,15
  164:9

nuances 147:23

nullified
  149:23

number 5:9
  9:22 18:20
  27:20,21
  28:21
  70:18,23,24
  94:17 129:16
  151:15 164:12

numbers 135:21

———————
      O
———————

oath
  8:14,19,20
  163:1

Object 10:9

75:1 82:15
98:17 99:24
122:15 126:9
127:19

objection
  7:7,12

objections
  45:11

objective
  44:19 56:25
  84:6 85:24

objectively
  39:14 81:20

obligated
  59:22

obligation
  92:8,12
  93:12,14
  135:19

obligations
  134:22 135:25

observe 151:3

observed 151:6

obtain 12:11
  139:18

obtained
  42:20,23

obvious 33:10
  40:17

obviously 35:6
  39:10 40:10
  56:23 78:12
  87:14 89:25
  114:19 147:14
  154:11,14

occasion 20:7
  66:1 107:23

occasions
  51:24

occur 43:9

occurred
  69:22,25 73:6
  78:7 83:9
  84:8,18 87:22
  88:3 89:1
  93:20 94:7
  107:14 132:2

o'clock 100:13

Oct 125:3

October 1:17
  5:2,7 7:4
  13:14 17:7
  38:15 124:21
  125:4 163:8
  164:8

off 11:2 69:11
  71:25
  75:14,21
  76:6,13,18
  94:15 101:21
  103:12
  108:4,14
  137:16 159:7

office
  13:11,12,18,2
  0,23
  14:1,17,23
  15:1,6,9,18,1
  9 24:9 39:8
  46:8,12,13,19
  ,25 47:1
  49:23
  50:1,2,4,12,1
  4,17,22 51:3
  70:6 109:13
  118:5,12,16,1
  7,24

119:15,16,18
120:4
121:18,19
125:6
126:5,16,17
130:17 131:15
132:2 134:12
138:16 150:9
164:11

officer
  20:8,17
  31:16,19
  41:6,8,20
  54:9 55:2,3,7
  56:1,22 58:9
  61:7 64:5
  66:22 69:1
  77:5 78:4
  83:9 90:1
  92:11
  93:20,21 94:7
  97:1,10
  113:15,21
  114:3
  115:11,17
  117:17 141:3
  150:25 152:7
  157:7

Officer-in-
  charge 79:11

officers 15:5
  20:14 29:20
  32:11 48:25
  53:15 54:5,24
  58:1 59:10
  80:6 102:6
  140:16 150:21
  151:15,17
  156:1

officer's
  63:25 157:20



offices
122:6,13
140:20

official 45:22
131:18

officials 72:5

often 63:13,19

oh 7:4 21:21
33:9 60:13
108:7

okay
6:14,21,24
9:8 10:5,15
15:22 16:22
17:2,5,10
18:13 20:7,14
21:11,16,21,2
2 22:5,12
23:4 24:8
26:6 28:3,20
29:4 33:8
36:14 37:5
38:16,18
42:25 44:11
52:11,12,17
53:22 55:21
56:6,14,19,23
61:5 64:15
71:5,13,22,24
73:21 74:22
76:21 77:2
82:12 86:16
89:14 100:4
101:4,12,15
104:12 115:6
117:13
119:14,20
122:19
125:5,8,14
126:13,20
127:15 128:19

129:6
130:20,23
143:5,7
149:11 154:2
159:1,12,16
160:16 161:5

old 120:4

OLPD 9:17
14:13

omission 21:25
22:25 23:10

omitted 22:16

on 1:16 2:2,7
5:14
6:11,20,22
8:17,23
10:5,24,25
11:4,12
13:3,16 14:18
16:4,17,24
17:2,6,7,19
19:7 20:3
21:13,24
22:5,8,9,21,2
3 23:3,17,21
24:2
25:3,10,16
26:3 27:6,12
28:11 32:2
33:8,13,25
34:10,17,18
35:16
37:14,21,22,2
5
38:2,13,18,20
,22 39:11
41:9,23 42:3
43:14
48:12,16,23,2
4 49:1 51:24
54:11,25 56:8

57:4,5 58:8
60:11 61:23
62:6 63:9
65:15,21,25
66:19
69:22,23
71:19,22
72:8,12
73:11,18
75:3,21
76:6,13,19
77:15,16,25
80:22 81:20
82:3 84:16
85:11 87:16
88:6,22
92:11,21
93:15
94:2,13,17,23
95:3,8 96:4,5
97:7,18
98:2,10
99:7,9,10
100:13,21
101:1,8,13,21
102:8 104:23
107:2,9 109:6
110:25
111:10,24
115:2,13
116:20 119:20
121:16
122:11,19,23
123:14,18
124:2,9,10,13
,16,17,21,24
125:3
126:6,15
127:5,7,16
128:10
129:14,17
132:4,5,10,11
133:11 136:18

137:2,14,24
140:23 141:4
143:15,17
147:15 149:18
150:17 154:14
156:7,15
157:13 158:8
159:4,7 163:8
164:8

once
57:15,22,23
78:8
93:11,12,13,1
8 103:18
150:14 154:14
156:5 159:25

one 7:12 11:5
19:1,11 24:13
27:9
29:8,22,24
30:5
31:13,15,19
32:9 35:16
36:23 37:8
41:10 43:7
51:6 57:17,18
59:7,12 66:13
72:21 76:14
79:1 84:3
90:18
93:20,21
94:7,16
97:1,10,24
98:2 106:12
107:20,21
111:13 112:21
120:2 135:10
136:10,18
139:23 140:6
143:11 147:13
150:5 152:22
155:16



ones 11:5 33:6
  53:4,6 54:1
  67:10
  108:9,11
  143:15
ongoing 34:14
  40:8 54:3
  55:4 62:15
online
  12:23,24 16:2
only 18:10
  23:18 27:22
  36:23 64:14
  65:16 81:22
  83:22 85:16
  88:21 102:19
Opa 11:11
  18:11 23:4
  33:1 49:20
  54:18 57:24
  58:7 62:19
  68:8 76:24
  95:4 127:8
  134:19 135:15
  140:12,20
  148:12
opa-locka 1:8
  5:17,25 8:7
  9:13 15:20
  16:1,23
  17:7,16 18:9
  19:3,21
  20:9,24 22:9
  24:14,24
  25:20 26:21
  27:1 30:4
  33:14
  34:6,15,25
  35:23 37:2,13
  38:7 40:20
  46:7,17 49:19

50:9 56:16
  58:2,25
  66:10,11,12
  68:5,8,10
  70:25
  74:16,23,24
  75:16 77:5
  80:4 81:18
  82:20,22,23
  84:5 94:2,16
  109:10
  111:19,20
  115:20 117:7
  130:14 132:24
  135:6 141:14
  143:1,8
  147:22 150:4
  157:19 164:5
Opa-locka
  108:20
Opa-Locka's
  146:10
open 34:9,23
  154:4,6,7
opening 15:25
operate 67:1
operation
  15:20 47:20
  67:2
operationally
  118:19,24
opinion 41:1
  60:21 61:21
  64:20 65:17
  66:9 72:20
  80:2 123:23
  131:3 155:6
opinions 25:16
opportunity

138:6,20,23
option 41:2,4
  42:5,6 121:20
options 121:7
order 1:19
  31:11 41:22
  49:11 59:9
  93:16,18
  113:20 117:24
  139:25 146:9
  157:20 160:2
  163:7
ordering
  160:10,13,14
  164:14
orders 49:3
organize 140:3
orient 137:24
original 140:2
  157:13 164:13
originally
  153:8
OSC20 163:8
other 6:14
  12:13,14
  15:14 18:14
  24:21 26:15
  27:9,17 32:25
  36:15,24
  37:20 45:22
  51:14,15
  57:18 65:5
  71:14 78:25
  81:16 84:25
  88:10 94:1
  95:5 97:7
  98:13 116:17
  120:5 122:10
  133:15 137:12

138:25 139:3
  140:24
  141:10,11
  142:1,2,10,11
  ,17,21,22
  143:2,8,14,15
  ,21 144:5,13
  146:1 152:22
  153:7,12
  160:5
others 33:7
  117:16
otherwise
  54:10 129:11
our 32:11,19
  33:22 54:12
  142:8 164:11
out 7:9 15:25
  17:11 22:15
  23:24 24:20
  27:10 31:5
  34:24 35:13
  40:1,2 41:8
  44:14 46:8,23
  54:12 55:5,24
  56:9 62:2,19
  66:5 69:17
  73:7 74:10
  78:21
  79:14,21
  80:16,21,22
  81:1,2,3,5,11
  ,15 87:20
  89:22 94:2
  98:5 108:2
  110:24 111:13
  112:14,15
  113:24
  114:2,18,25
  115:16
  116:5,9,13,15
  ,19,21,23



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

117:3  121:13
122:22  124:22
130:25  138:16
141:10
142:1,2,20,23
144:13
148:18,20,21,
23  149:6
159:13  160:23

**outcome** 44:20
45:18  55:7,10
57:13  73:16
74:4  75:12
90:5  93:3
110:22

**outside** 84:5
94:5

**over** 8:8  28:11
52:21  89:18
137:16

**overall** 23:21
25:1  39:11

**overarching**
74:13

**overlook**
133:16

**overly** 58:4
65:20  142:6

**oversight**
132:25
133:4,20
134:3,11,14,1
8

**overview**
111:24

**overworked**
94:18

**own** 11:9
164:10

**owner** 98:8

---
P
---
**p.m** 1:17  106:8
161:6

**page** 3:2  4:2
6:11  21:12,17
32:3
144:20,25
145:15  165:3

**pages** 16:24

**paid** 30:8,9

**panels** 20:1

**paper** 95:17

**paperwork**
9:6,8,9
100:10

**paramount**
31:20

**part** 14:23
15:1,13,14
28:12  44:13
74:6,19  75:16
87:12  116:20
121:2

**partially** 13:9
46:21,22

**participation**
128:18

**particular**
14:19  29:9
48:1,19
51:6,13  62:1
68:17  72:6
74:15  76:4
79:1  83:24
85:13,14  87:1
90:15  91:4
98:7  100:8,11

102:18  112:17
115:13
123:18,25
141:17,20,25
146:10,12,18
149:5  151:24
152:7  154:17

**particularly**
51:15

**parties** 1:18
61:11  67:13
162:11,12

**passed** 132:22

**past** 52:11

**Pate** 17:22
18:24  43:13
44:7,14
45:9,11
72:2,8
75:19,20
76:5,12,25
78:1,17  87:2
93:13  103:19
104:10
117:16,20,21
118:20  153:3

**Pate's**
104:3,10
145:18

**patrol**
14:2,5,7,8
120:6  151:12

**patrolling**
55:6

**pay** 38:18
40:16,25
41:24  45:6,24
62:16  114:18
116:19  123:24
131:17

155:14,20
156:24
157:4,14,20
158:1

**PBA** 57:11
58:19,22

**PD** 15:20  16:1
18:9  19:3
49:19

**peers** 116:23

**pen** 129:23

**Pena** 1:24  5:11
162:5,22
163:5,20
164:18

**penalty** 20:25
21:1,2  26:2,4

**pendency** 31:4

**pending** 41:24
45:18  55:7
160:8

**pensive** 34:21

**people**
18:12,13,17,2
1  52:5,21
53:16  65:5
70:17,18
80:10  111:18
112:20,21
134:8

**per** 55:5  97:22
98:3  155:3,24

**percentage**
63:17

**Perez** 1:5
4:6,7,8,10
5:15,23  25:3
38:22  39:7



40:22 42:9
43:5,14
44:8,9,23
45:3,17
46:8,18
47:2,5,14,19,
23 49:15
50:13
51:10,23 52:4
59:1
60:8,17,23
61:14
62:6,12,19
63:13,20
67:14,15,20,2
3 69:18,25
70:5 71:3,16
72:22 75:3,10
79:8 85:21
86:9,13,14
89:16,19
91:22 93:3
104:13,24
105:23
106:7,21,25
111:5,15
112:12,22
113:12,18
114:22 115:5
118:9
119:6,20
121:17,23
122:11 123:11
127:16 128:1
129:9,16,21
131:15,24
132:6,8,17
140:7 143:25
154:22 158:3
164:5

**Perez's** 50:25
91:21 105:19
119:18 121:10

129:4 130:13
158:9

**perfect** 27:21
94:24,25
95:25 96:7
97:4,17

**perform** 43:14
46:18 47:4
53:11 54:7

**performing**
54:12

**period** 86:22
112:6

**perjury** 20:25
21:1,2 26:2,4

**person** 19:23
22:18
64:22,23,24
65:2 70:4
71:14 85:15
94:16 113:6
142:4

**personal**
33:6,11 35:24
41:1 64:20
65:1 66:8
123:23 143:15

**personally**
65:1 156:20

**personnel**
14:18 31:22
37:2,12 97:8
121:8,11
122:10
130:14,17
138:25

**person's** 89:2

**Pete** 93:19

**phone** 34:18,19

37:21,22
38:1,2
70:13,21,23,2
4 71:19 72:8
82:3 84:8,9
85:12 88:22
89:1 104:7,8
107:10 123:15
127:6,8

**phones** 101:1

**photographs**
88:22

**physical** 15:15
116:18

**picture**
89:2,5,6 94:2

**pictures** 89:11
107:9

**piece** 26:8,9
98:12

**pieces** 29:24

**PIO** 14:9

**place** 7:12
41:23 83:8
85:5 117:22
139:15

**placed** 25:3
39:5 54:25
56:8 133:1

**places** 22:8

**placing** 43:13

**Plaintiff** 1:6
5:15

**Plaintiffs**
16:18 17:12
25:22 59:2
104:20 111:6
114:8 119:8

144:18,21
149:12,13

**PLANTIFF** 1:16
2:2 4:12

**play** 29:21
55:13

**please** 5:12
21:22 159:12
164:8

**plot** 107:2

**plus** 98:6
101:25

**PM** 164:12

**point** 13:20
25:6 35:2
39:17,22
43:3,7
44:22,24
73:4,7 80:8
81:17 83:22
85:20 90:5
93:22 95:12
99:2 102:14
106:11 121:2
128:14 132:20
133:15

**pointed** 23:24

**police** 8:6
11:12 14:23
16:1 18:8
19:11,22
20:9,16 22:18
23:4,5 24:24
25:20 26:21
29:19 30:22
31:21
33:14,20,21
37:2 38:8
39:3 40:20
43:23



46:2,7,9,14,1
7,19 49:21
50:9,12 54:4
55:6 56:16
57:25
58:2,7,25
59:21 60:24
62:20
66:9,12,14
68:2,4,5,9,10
70:11,25
73:10 74:16
75:18 76:24
77:5 80:4
81:18
83:18,22
84:5,25 89:14
102:3 108:20
109:10,11
113:15,21
117:7 122:5
124:8
127:9,21
129:22 130:14
132:24 133:13
134:15,19
135:24 136:1
137:23 138:6
140:11,19
142:18 143:3
144:7,13
145:5,7,10
150:20
151:2,9
157:19 163:6
164:1,23

**policies** 57:24
58:2,8
60:1,22
61:5,13 62:5
68:1,6,9
92:13 111:21
117:6 118:4

137:14,24
138:17,22,24
139:19
140:3,18
141:13,18,21
142:6,16
143:1,8,14,21
144:5,10,14
157:23

**policy** 29:19
49:8 58:12,15
59:9 61:2
62:9
68:14,17,19,2
1 74:12 78:22
115:20 140:14
143:25 157:21

**Pollack** 2:3
3:3
5:14,21,23
7:17,25 8:1,3
10:14 16:21
17:14 19:6
24:7 25:25
34:21 35:19
38:3 42:16
46:5 47:10
48:15 49:14
50:3,20 58:14
59:4
60:5,13,15,20
61:17 62:24
67:24 68:3
69:6,16 70:19
71:4,12 73:20
75:13 80:20
82:11,17,21
83:11 84:7
88:9 91:14
92:5 93:9
95:23 96:24
98:18,20

100:1
103:11,15
104:22 105:22
110:3 111:9
114:11,21,23
115:22
117:4,12
119:10 122:24
126:12 127:4
128:5,11,25
129:5,13
131:21 134:1
137:6,21
144:24
146:4,22
149:15 151:7
155:1 156:13
157:17 158:7
159:1,16
160:6,14,25
161:2

**pop** 109:6,8

**position** 13:23
16:13
18:9,17,19
40:23 42:1
45:8 64:23,24
65:21 150:24
151:8,14

**positions**
65:22

**positive** 84:16

**possession**
144:11

**possibility**
87:4 160:4

**possible** 29:8
61:10

**possibly** 56:7
57:23 143:24

**post** 11:4 52:5

**posting** 11:12

**potential** 56:3
57:2,3 60:3
61:6 66:17,19
68:16

**potentially**
7:13 61:3

**practice** 41:19
58:5 59:20

**practices**
68:11 143:20

**prayers** 36:18

**preceded** 77:4

**preconceived**
44:21

**preemptive**
155:13

**preference**
21:21

**prematurely**
112:4,15
116:9

**prepare** 101:17

**prepared**
9:14,15 103:2

**presented**
27:14 87:3
95:15 102:9
143:22 158:12

**presenting**
89:8

**pretense** 68:15

**pretty** 41:16
78:13 80:15
89:13 110:22
127:13 149:22



150:17

**prevent** 7:20
67:3

**prevented**
141:9

**previous** 28:22
29:5 133:5

**previously**
148:10 149:7

**pride** 64:11,16
65:4,6,11,19

**primary** 33:18
85:22,23
87:19

**printer** 95:17

**prior** 14:13
29:19 31:16
43:3 85:1
113:10 116:15
138:21
139:15,16
145:25 146:20
155:10 156:11

**privileged** 7:9

**privileges**
41:22

**probably** 28:11
40:17 49:20
80:15

**problem**
109:17,24
111:16 121:5
149:17

**procedure**
74:12 115:11
157:19,22

**procedures**
59:1,7,10,22

60:1,7,22
61:1,6,13
62:5
68:1,6,10
92:13
117:6,24
118:4
137:14,24
138:18,22,24,
25 139:19
140:18 141:13
142:16
143:2,9
144:5,10,15

**proceed** 5:19

**proceeded**
81:24

**proceeding**
28:6

**proceedings**
162:8

**process** 19:25
20:2 22:1,17
23:1,22
25:1,5,8
26:21 28:19
39:2,12 44:25
53:10 55:13
81:25
90:15,24 95:1
111:25 112:2
113:13 114:13
134:25
136:15,19
137:1,3,8
146:1,10
147:5,13,15,1
6,18 149:25
150:4,19
153:19,21,25

**procurement**

134:21,23
135:2,3,5,16,
20 137:8
139:1 145:23
150:4

**produced** 16:22

**profession**
32:2,5,9
48:10 56:1

**professional**
140:13

**promoted**
64:7,17

**promotion** 65:8

**prompted** 56:15

**promptly**
164:15

**prongs**
88:16,18

**proposed** 85:1

**prosecute**
96:13

**prosecution**
87:17

**prosecutors**
96:13

**protect** 67:16

**protected** 7:14

**proven** 56:24
78:10

**provide** 8:1
10:6 45:19
60:2 67:4
141:12
142:12,14
143:8

**provided** 9:18

10:3,8 26:19
27:6 36:5
47:19 82:24
130:19 131:1
140:10,12,15,
17

**providing**
20:18 35:3
46:1 48:24
49:1

**prudent** 134:16

**Public** 1:25
162:5,23
163:21

**pull** 34:8
49:21 130:25

**purchase**
136:17
146:9,12
147:20

**purchases**
136:9

**purchasing**
147:25

**purpose** 33:10
74:13
78:20,23 99:1

**purposely** 21:9

**purposes** 6:19

**pursuant** 1:19
163:7

**pursue**
154:11,12
156:6

**pursuing**
110:23 116:11

**put** 6:20 17:19
38:18,20



51:6,11,15
104:23 122:22
125:3 129:17
139:11 150:17
159:20,22

**putting** 6:21

---

Q

**question** 6:6
7:16,17,21
27:21
28:1,3,21
29:15 34:3
35:20 40:17
58:6 61:12,20
63:19 65:7,16
69:1 76:20,22
78:6 83:15
85:18 88:25
92:2,18 93:16
94:3 99:8
101:24 102:25
109:21 113:5
130:8 131:2
133:25 142:9
143:1
144:4,12
145:12 156:23
160:20

**questioned**
128:9,10
132:12

**questioning**
159:4

**questions** 5:24
6:2,11 8:24
27:17
36:2,3,18
48:1,2
51:18,19
55:22 121:23

159:2

---

R

**Railey** 2:8
5:16
7:8,12,20
10:9 19:5
23:14,16
37:24 42:11
45:21 47:7
48:11 49:6,25
50:19 58:11
59:25
60:10,14,18
61:15 62:22
66:7 69:5,7
70:16 71:1,8
73:13 75:1
79:25
82:9,15,19
83:10,14
87:25
91:12,25
92:16 94:11
96:3 98:17
99:24 103:7
105:20 110:1
111:17 115:18
117:1,9
122:15,17
126:9
127:2,19
128:7,24
129:3 131:4
133:18
137:4,15
145:24 146:15
151:5 154:25
155:22 157:11
158:5,11,23
159:3,6,25
160:10,16,19,
22 161:3,5

164:24

**RAILEY@JAMBG.C
OM** 2:10

**rank** 63:25
64:4 65:10
155:15,19
156:17 157:20

**ranking** 40:25

**ranks** 141:6

**rare** 41:16

**rarely** 11:7

**rather** 65:2
85:15

**rationale** 46:3

**RE** 164:5

**reach** 159:13

**reached** 40:1,2
73:7 138:16
142:1,2,20
144:13

**reaching**
141:10

**read** 84:2
93:13 97:19
106:1 138:12
160:2,11,20
164:13

**reading** 21:23
161:7

**reads** 129:18

**real** 64:21
73:4

**realized**
96:16,19
149:19

**really** 7:6

19:16 21:6
39:15 55:15
59:17 64:13
83:24 87:20
91:9 105:3
111:23 116:22
118:25 124:22
134:10 135:10
136:6 147:4
152:11 157:15

**reason** 51:6,13
81:22 85:7
157:2
165:5,7,9,11,
13,15,17,19,2
1,23

**reasons** 17:24
33:10 84:3
165:2

**reassign**
150:21

**reassigned**
156:2

**reassignment**
57:8

**recall** 9:22
20:15
24:12,20
45:22 47:12
48:5 49:19
55:19 78:18
104:15
106:16,18
109:19 110:2
115:19 116:2
130:2,7,10
131:5,19
132:19,22
138:1,19
150:22 151:13
152:25 153:12



157:18 158:14

**recant** 117:2

**receipt** 140:15

**receive** 48:23
93:18 128:22
137:13 139:8
143:1

**received** 12:25
39:23 44:6
48:16 75:10
78:6 125:9
136:6 137:2
142:16 148:21

**recent**
29:18,21

**recognize**
104:23,25
105:11 111:5
119:12 125:25
131:7,10,12
144:19 145:2

**recollection**
123:4 131:23

**recommend**
22:18 33:23

**recommendation**
30:23
110:10,11,15

**record** 5:13
6:21,22 16:19
17:13 25:23
27:25 33:25
36:22 51:21
59:3
101:23,24
103:13 104:21
111:7
114:9,21
119:9 124:2,4

127:10 139:10
143:15 144:22
149:14 162:9

**recorded** 51:25
84:19 100:18
101:1,3
109:25 122:23
123:12,14,18
127:11

**recording** 78:4
90:2 109:22

**records** 29:20
35:6 54:18
130:22

**rectified** 24:5

**red** 89:4

**reduce** 156:23
157:3,20

**reducing**
156:17

**reduction**
157:14 158:1

**refer** 49:20
54:17
58:12,15
59:8,18 86:2
157:23

**reference**
117:7

**referencing**
9:9

**referred**
58:16,17
59:13 69:10

**referring**
27:20 32:25
48:22 114:24
136:2

**reflect** 45:20
123:5

**reflected**
89:11 123:8

**refresh** 59:19

**regard** 36:6
60:8,17 77:22
109:21

**regards** 5:24

**region** 30:9

**Regional** 11:19

**regular** 63:5

**related** 91:17
154:16

**relating** 93:8
109:2

**relation** 62:10
153:5

**relationship**
50:25
118:9,22
120:25

**relative** 86:22
99:17
162:10,12

**relatively**
127:3 150:11

**released** 112:3

**relegated** 47:2

**relevant** 7:6

**reliable** 131:2

**reliant** 35:16

**relieve** 38:17
155:19

**relieved** 38:13

53:5 105:24
125:17
128:14,23
129:22 132:17
154:22
155:2,5 158:3

**relieving**
39:22 128:15

**rely** 8:17,23

**remain**
106:8,13

**remaining**
98:13

**remember** 18:21
53:20 72:5
76:4 84:23
90:17 100:18
138:19 157:24

**remodel**
120:7,9

**remotely** 1:18
2:6,11 163:7

**remove** 7:18
41:13,21
53:10

**rep** 112:10,24
113:6,9,10

**repeat** 31:13

**rephrase** 36:11
84:13 148:24

**replace** 15:13

**report**
25:10,13
86:3,6,17
91:20,23
92:14,23
93:7,11
109:24 124:9



153:16 154:5
162:7

**reported** 1:24
86:7 91:11
96:1 109:16
151:16

**Reporter** 1:24
5:7,11,18
101:11 103:9
161:3
162:1,5,22
163:20

**reporting** 5:12
151:17 154:1
164:18

**reports** 121:21
124:13 126:24
151:19,20,21

**represent** 5:23
140:10

**representation**
140:17

**reputation**
30:7

**request**
10:5,11 23:12
34:6 86:12
141:12
143:2,10

**requested** 86:7
138:9 139:3
144:5 154:4

**requesting**
79:10

**requests** 143:7

**require** 35:6

**required**
114:13 139:23

**requirements**
113:19 114:13

**requisition**
146:9,11
147:13,16,18,
19,21 148:1
150:2,6

**reschedule**
159:10

**rescind** 114:2

**rescinded**
114:6

**research** 41:15

**reserved** 161:8

**residential**
6:18

**resign** 13:15

**resignation**
4:4 17:17,20
24:22 38:14
125:4

**resigned**
17:6,15 24:18
28:22
29:5,11,14
30:11,16,20
31:4 34:15
62:3 127:1
152:2

**resigning**
17:25

**resolve** 121:15

**resolved**
155:20

**respect** 63:24
64:22,23
65:2,4,5

137:8 146:18

**respond** 34:1

**responded** 34:4
152:15

**responder**
140:11

**responding**
34:4

**response** 28:1
122:8

**responses** 8:24

**responsibiliti
es** 14:6
19:12,17
40:15

**responsibility**
43:1
66:9,10,11
91:20,21
92:20,22,24
93:7,11

**responsible**
14:14,16 23:5
66:15 77:6
134:17,20
136:8

**rest** 55:7

**result** 19:2
22:2 23:1
110:24 133:9
134:13 158:10

**resumed** 103:14

**retaliatory**
151:3

**retire** 13:16

**retracting**
112:16

**return** 164:16

**revealed** 78:8

**review** 9:1,3,5
24:25 25:6
110:16
138:7,21,23
139:5

**reviewed** 9:23
25:18 138:17

**reviewing**
143:11

**right** 7:1
10:8,15 16:16
17:5 25:17
26:12 30:18
31:6,12,17,23
32:15 49:24
52:9,22 57:10
59:12 61:8
65:5 70:15
71:6,16 73:25
74:6,7,12
76:1 79:11,24
80:23 82:18
84:10,19 85:2
86:8 87:24
88:11,24
93:11,24
98:14,18
99:23
101:6,10
103:7,16
105:16 111:8
114:15 115:7
116:22,25
119:11,22
120:15
121:8,19
122:25 123:2
124:10
125:13,15,20,



23 127:1
128:6 131:6
133:10,15,17
137:10 140:25
141:7 145:6
149:17 155:21
159:16
160:9,14,21

**rights** 78:4
90:1

**risen** 51:20

**rises** 94:14

**risk** 57:3

**River** 11:22
12:3,6,10

**Robert**
110:4,5,25
114:12

**Rogers** 152:18
153:23

**role** 16:10
19:13
74:17,24
134:19 137:22
138:5

**roll** 39:12,13
151:23

**room** 103:25
104:3,10
109:17,22

**roundabout**
104:4

**rule** 50:7
78:22

**rules** 40:9
154:8

**running** 138:3

———————
S
———————

**SAC** 86:10

**said** 9:23
10:11 18:16
19:19,20
20:3,4 36:10
44:12 45:1,2
53:15 56:20
57:6 59:13
69:3,6,11
80:1
82:3,7,13
84:21 86:6
87:2 90:11
91:8 95:8
96:23 100:25
105:16 106:14
110:19 112:14
114:7 117:8
125:24 135:8
137:8 139:12
147:16,17
152:8 160:19

**Saint**
12:12,18,21
13:1,4,6

**sake** 94:3

**same** 6:11,21
8:4,20 32:2,6
36:18,24
40:15,16,24
41:24 61:19
63:15,21 67:2
104:5,6,8,9
109:21 132:11
136:19 139:2
145:11 156:23

**sample** 143:25

**SAN** 2:4

**saw** 72:16
76:11,14
89:2,23

**say** 11:6 21:1
26:4 32:24
34:7 35:25
36:10 43:3
44:11,22
45:12 50:21
52:3 53:23
60:19 61:1
63:18,22
64:12 68:3,18
70:17 73:14
75:4,5,6,8,17
77:3 80:4,21
83:16 85:17
88:7 90:14,16
94:12,15
100:3,5,13,19
101:2,3,4
104:5
105:4,5,16
107:3 112:6
113:17
125:22,24
127:8,12
130:4 131:5
132:4,19
135:1,14
136:14 145:7
146:1 152:16
155:4,9
158:16

**saying** 26:19
28:10,18
35:12 36:14
37:20 43:7
60:24,25 76:7
78:10 90:16
97:2 105:16
115:23 116:4

125:10 126:1
128:12,23
130:4 131:11
137:1 142:15
152:20
154:2,21

**says** 21:5
22:24 23:3
26:3 94:6
106:15,24

**SBarrera@opalo
ckapd.com**
146:24

**scenario** 60:3
61:7

**schedule**
159:14

**school**
11:16,20

**Science** 12:5

**screen** 16:17
21:14 60:11
104:24 129:17

**se** 55:5 97:23
98:3 155:24

**sealed** 27:25

**second** 18:7
21:12 34:22
53:22 62:19
73:23 106:6
113:12 114:1
136:20 144:25

**secondly**
97:17,18

**secret** 34:10
100:22

**section** 15:20
120:6



security 6:18
  16:11

see 16:17
  17:10 18:2
  21:13,19,21
  22:3 23:2
  26:17 28:1
  44:11 55:23
  60:14 62:25
  63:1 104:23
  106:23 107:1
  108:21 119:18
  121:5 126:23
  143:13 157:25

seeing 54:22
  105:12
  130:2,10
  131:10

seem 51:18

seemed 42:4

seen 59:5 72:9
  76:23 77:1
  88:10,13
  105:7,10
  125:21

send 16:5
  49:15,24
  50:10,18 53:3
  104:13 112:15
  113:24 116:20
  121:16
  159:17,21

sending
  45:17,23
  60:23 61:13
  98:14 108:2
  115:15
  116:1,15
  117:13 122:11
  123:2

senior 13:25
  120:3

sense 64:10,16
  65:11
  118:19,24
  159:5

sent 16:3
  33:24 36:12
  39:22
  49:16,18
  50:13,16,21
  52:1
  53:9,19,20
  57:17,18 66:4
  72:3,7,10
  85:12 110:24
  111:10,13
  112:14,19,20
  114:2,25
  115:12
  116:5,9,13
  117:3 118:14
  122:19 132:13

separated 24:8
  28:22

separation
  24:10,16

September
  38:13,23 62:6
  69:22 71:20
  105:24 106:25
  107:11 108:24
  124:5,20
  125:7,15
  126:6,25
  127:17 129:21
  155:3 158:3

sergeant
  13:20,25 73:7
  78:2
  87:4,13,23

90:25 91:6,19
  92:19
  151:11,12

Sergio 1:5
  5:15,23 38:22
  43:13 71:16
  106:25 113:23
  118:9 123:2
  124:5,13
  125:6,16,22
  126:5,8,16,22
  ,24,25
  127:5,16
  128:12
  129:4,8,21
  130:25 154:21
  164:5

Sergio's 118:5

serious 77:17
  95:10
  96:14,16,17

seriousness
  97:23

service
  157:8,10

set 50:7

several 140:19
  144:10

severe 24:3
  27:13

severity 23:25

sexual 55:4

share 111:4

sharing 60:12

she 69:3,11
  142:20 144:17
  150:11

SHEET 165:1

sheriff
  15:10,12

Sheriff's
  13:11,12,18,1
  9,22
  14:1,17,22
  15:1,6,9,18,1
  9 24:9 140:20

shield 57:3

shift 57:8

shifting 55:11

Shock 72:22

shooting
  152:14,24

short 86:22
  103:12 112:5

shortly
  112:16,20
  124:16

should 33:25
  47:20 49:4
  59:23 60:16
  61:12,20,22,2
  3 68:18,20
  70:10 79:20
  80:2,12 94:24
  100:20 114:16
  115:1 123:19
  124:11 126:23
  146:13
  147:7,8

shouldn't
  93:22 94:8
  148:19,20,22

show 58:24
  63:13,15,20
  104:18 108:16


UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

114:5 144:18
149:11

**showed** 27:10
88:22 107:9

**showing** 89:5,7

**shown** 115:16

**side** 89:2,3
118:18 120:14
154:15 156:8

**sign** 125:23
135:23
136:2,5
146:5,17
147:8 150:2,6
164:10,13,15

**signature**
21:16 26:5,11
105:2,13
106:24 126:2
145:16
164:9,15,20
165:25

**signed** 22:5
75:21
76:6,12,18,25
125:16,22
126:8
146:3,7,14
147:7
148:5,15,19,2
1 149:16
150:5

**significant**
15:15 24:3
52:1,4 145:22

**signing** 106:17
131:19 139:7
145:21,25
146:17,18

147:5,6 161:7

**signs** 75:14

**signup** 72:1

**simple**
62:16,18 78:6
85:18 102:25

**simply** 123:25

**since** 6:18 7:4
9:3 33:4
35:23 36:15
37:3 62:14
91:3 160:7

**single** 49:11
95:15 96:8,13
98:1 101:24
102:5

**sir** 6:13,16
7:2
8:9,13,16,18,
22,25
9:4,22,24
10:3,17,19,21
,24
11:3,10,24
12:2,4,9,16,2
1,24
13:4,5,14,21
14:4,24
15:3,7,24
16:6,12,20
17:1,4,9,21,2
3 18:2,3,6
19:4,9,14,24
20:10,15
21:15,18,21
22:4,22
23:3,17
24:4,15
25:13,16,24
26:18 27:5

28:20 29:23
30:15,19
31:1,24
32:7,14 33:2
34:13,16,20
36:10 37:4,8
38:6,19,21,24
42:13
46:10,12,23
47:1 48:8
49:7,9,19
50:7,14,15,22
51:7,12,13
52:4,14,18,24
53:7,13,23
54:21
55:1,15,18
56:12 57:16
58:20,23
60:19,25
61:9,21,25
63:17
64:2,9,12,20
65:14 66:8,18
68:3,20 69:8
70:8,11
71:2,10,17,21
,24 73:17
74:3,14,21
75:2,23,24
76:15 78:24
79:2,12
80:1,3,9,24
81:2,17
82:5,10
83:1,5,12,15,
17,18
84:1,11,21
85:6,10
86:5,11,14,20
87:19 88:12
89:13,17,24
90:4,14

91:13,18
92:2,17,22
93:5,16
95:14,16
96:16 97:12
99:2,8,25
100:3,17,19
101:14,24
102:7
104:11,14
105:1,8,11,15
,21
106:2,14,20
107:1,8,22,25
108:18
109:12,15
110:2,6
111:3,8,13,14
113:22
114:4,10
115:9,13,19
116:8,10
117:3,25
118:7,13
119:13,23
120:1,17
121:9
123:3,10,17
124:8,15
125:19
126:18,21
127:3 128:16
129:4 130:15
131:5,10,25
132:12,19
133:2,20
135:7
139:6,20
140:22
141:1,8
145:2,12
146:18,25
147:3 148:17



877.291.3376
www.UCRinc.com

149:10,18
150:22
151:1,6,22
152:25 155:9
156:22 158:12
161:1,4

**sit** 44:23
53:11 62:2
135:14 137:23
157:24

**situation**
38:11
43:5,6,8,17
44:9 45:16
51:8 67:12
69:9 78:11
86:8 116:25
133:9 137:20
141:17
158:17,20

**situations**
58:1 75:20

**six** 125:7

**skip** 6:17

**slower** 16:25

**small** 108:9

**smart** 47:23,24
113:2

**smarter** 127:24

**social** 6:17
10:15

**sole** 4:11 5:25
81:22 144:23

**solely** 102:19

**some** 5:24 7:10
27:16,23 36:7
38:9 39:10,23
44:4,24 72:14

98:15 108:15
111:24
123:14,15,16
125:7 127:13
128:4 133:12
141:15,24
142:1,2,5,10,
11,20,21
143:14,15,17,
19 145:8
152:5 159:7
160:23

**somebody** 19:21
29:11 30:16
43:24 49:9
57:22,23,24
66:19,22
90:19

**somebody's**
50:1

**someone** 9:15
30:11,20 46:6
49:3 52:7
70:22 74:9,11
78:21 150:25
155:19

**someone's**
49:23
156:17,24
157:3

**something** 7:9
21:9 24:4
30:22 35:5
70:7 72:23
88:2,3,6
92:21 107:14
108:16 117:5
139:14 143:13
151:11

**sometimes**

65:22 67:15

**somewhere**
82:20,22,23
143:12

**soon** 96:15,19
150:16

**SOPs** 138:7
139:2

**sorry** 23:15
31:13 32:16
49:16 52:14
61:16 76:9
86:4 100:2,17
113:16 122:16
130:16 133:19

**sort** 108:8

**sorting** 160:23

**sound** 65:20

**source** 4:11
35:16
120:7,10
139:18 144:23

**South** 143:18
144:6

**SOUTHERN** 1:1

**speak** 28:11
64:14 83:8
89:21

**speaking** 37:16
77:23

**specific** 48:21
58:5,12 76:22
100:6 104:16
135:20 137:16
142:25 148:24
157:2

**specifically**
61:6 86:14

110:21 117:25
157:25

**specifics**
43:18 149:9

**speeding** 138:4

**spent** 133:16

**spewed** 98:5

**spiral** 78:25

**spirit** 23:19

**spoke** 86:10,11
111:18 112:19
117:15,16,18
143:10,11
144:8

**spoken** 32:22
38:5,10 42:3
111:16 112:21
117:19

**spontaneous**
39:17

**squirrel** 34:10

**SROs** 14:9

**St** 12:3,6,9

**staff** 9:13
13:17 15:5,13
39:3 41:17,25
46:7 50:11
51:14 52:2,13
61:2 66:19
67:9 68:23
70:1,9,10
77:12 80:6,19
97:13,24
120:3,22
127:21,23
128:21 141:11
147:11 148:8
150:10



152:12,17,23

staff's 93:7

standard 59:19
116:11

standardized
139:19

standards
68:13

start 13:23
16:13 23:20
66:17,23
69:11,12,15
94:9 159:7

started
12:11,17
13:12,25 39:1
63:22
69:14,19
103:23
138:7,11
150:11

starters 58:17

starting 77:10

state 1:25
12:10 140:25
162:2,6,23
163:2,21

stated 114:16
129:25

statement
47:13 52:3
58:7 72:21
80:1 82:25
84:20
90:11,14
102:17,18

statements
21:24 22:9
39:17 72:4

90:2 96:11
97:21 107:7

STATES 1:1

status 43:14
45:6,24 56:14
62:16 63:10
127:16 155:15
158:9

statuses 65:23

Statute 29:19

Steel 32:21
33:4 34:12,14
35:2,13,22
36:17
37:3,6,11,17
38:6 40:1,2,3
69:18 70:5,22
71:5,14,19,22
72:22 73:2,7
77:22 78:2,9
79:7,18,21
82:2,13,16
84:12,17
85:2,8
86:2,20
87:4,13,23
88:22
89:5,9,22
90:6,18,25
91:6,10,15
92:10,19
98:15 99:7
101:16 103:4
104:9 107:7,9
109:14,17,23
151:6,25
152:21 153:3
154:4

Steele 151:3

Steel's 84:9

86:17 91:20

stenographer
32:20

step 94:10

steps 57:2
155:13

Steven 1:8,15
3:2 5:1,4
129:22 163:6
164:1,5,7,23

still 32:21
40:15,16 52:6
70:15 148:20

stipulation
7:21

stop 102:7

stopped 81:24
125:6 126:5

story 21:10

straight 119:2

streets
41:9,13,21
55:6

strike 64:19
65:8

strings 34:6

stripping
157:7

struck 88:23

stuff 6:20
10:12,13
40:19 48:4
114:19 116:20
147:20 153:11

stupid 40:19

style 18:5

sub 70:4

subject 27:23
28:13 39:2
73:24 86:9
87:15 90:18
91:3 129:22
134:23 135:1
137:12
152:1,21
153:3,13,16

subjective
52:3 60:19
61:19 64:12
65:1 72:19
73:5 77:25
80:1,13 81:13
92:3,7

subjects
123:13

submit 136:3

submitted
146:3,6

subordinate
48:25 151:15

subordinates
93:8

subpoena 6:19
9:4 35:3,10

subpoenaed
35:12

subpoenaing
35:6

subscription
145:15

subsequent
111:13 114:1

subsidized
13:7



suffer 8:10

suffered 15:14
   91:17

suffers 92:20

suggest 76:16

suggested
   84:17

suggesting
   136:25

suggestion
   84:24 93:19

SUITE 2:4,9
   164:3

summarizing
   101:17

sunlight
   100:11

SUNRISE 2:9
   164:3

supervising
   14:14

supervision
   121:21

supervisor
   44:3 77:14

supervisory
   93:7

supposed 80:23
   97:14 106:7
   136:5
   146:2,5,17
   147:12 148:7
   150:7,9

supposition
   130:24

Supreme 1:19

163:7

sure 6:3,18,23
   9:18 11:13,15
   12:8 16:2
   19:16 22:14
   30:4 31:15,21
   32:6,10,17
   33:9 35:14,15
   41:15 47:12
   48:19,21 50:6
   54:8 55:15
   59:6,14,17
   60:9,12 62:10
   66:21 68:7
   70:20
   80:15,16
   84:14 87:1
   88:20 91:9
   103:8,11
   106:10
   124:12,22,23
   125:8,14
   127:13
   134:4,14
   135:10 136:13
   140:23 143:21
   147:7,17
   153:7 158:23

surprised
   122:7

surrounding
   88:5 107:18
   142:21

suspect 107:14

suspending
   160:7

sustained
   74:5,6,19
   75:15,16

swear 139:9

sworn 5:6
   19:7,10 132:6
   138:11
   150:21,25
   163:8

sync 68:11

system 95:4

_____
          T
_____

table 87:18
   91:8

tadada 155:15

tail 25:7

take 12:8 13:3
   18:7 20:5
   41:21 42:8,12
   43:25 44:7,22
   54:6 57:2
   65:25 67:3
   84:13 88:20
   89:15 93:23
   94:1,2 97:25
   98:6
   103:10,11
   113:20 120:2
   123:25 137:18
   154:16,18
   164:8

taken 1:16
   8:10 57:12,22
   113:14

taking 59:23
   60:8,17 62:12
   67:4 94:10
   155:13 156:7
   157:9

talk 25:14,15
   35:5,9,10
   37:21 38:4
   62:18 71:23

73:15 88:21
   113:18

talked 67:7
   82:13 87:11
   90:25 118:22
   123:1 141:17
   153:8,9
   158:14

talking 12:13
   21:20 23:20
   24:2 52:4,7
   53:14
   55:11,16 57:7
   66:17,24 69:2
   70:22 80:22
   83:19,20
   92:6,19
   99:18,19
   101:15,19,21
   114:6 122:13
   124:23 129:18
   142:24
   155:5,8
   160:25

Tampa 86:10

tased 87:24
   88:1,7,11,16
   89:10,12
   97:1,10
   107:12,13,16,
   17

taser 71:6
   88:18,23
   89:15,19
   107:24,25
   108:1,2,5,13,
   14,19,21,23
   109:3,14,18
   154:5

tasered 109:23



**tasers** 107:20
108:22 109:7

**tasing** 61:3
97:24 153:9

**teaching** 63:10

**teased** 88:13

**technical**
11:19 108:8
151:10,14

**technically**
18:1 77:13,14
91:13 116:18
121:12 136:17
150:8

**Technology**
12:6

**tell** 8:14,20
11:2,7 12:20
30:3 35:25
38:25 42:13
43:18,20,24
44:24,25 45:8
56:19 63:18
67:21 76:16
86:20,21
90:6,21 92:19
94:17,22
99:20 100:12
109:6 111:18
112:5 115:25
116:8,10
122:19 124:24
127:13 129:8
130:2
131:9,14
132:1,6
134:24 137:17
138:11,12
139:13 146:25
147:3

**telling** 44:5
76:13 89:10
90:9 107:13
116:6 123:10
130:9 131:12
153:13

**tells** 128:13

**tend** 97:13,22

**tends** 97:25
98:5

**tenure** 46:17

**term** 108:7,8

**terminate**
110:5 115:11
117:24

**terminated**
22:20 57:19
110:25
114:7,14
115:17 116:18

**terminating**
117:17

**termination**
22:2 23:2
27:15 73:17
110:23
111:11,24
113:21 114:2
116:12

**testified** 5:6

**testify** 8:12
62:3,8 113:5
150:15

**testifying**
8:21 160:3

**testimony** 8:17
43:13 52:19
85:1 102:10

123:5 129:15
130:1,6
131:12
132:7,16
138:11 147:4

**text** 34:12
36:6,16 70:5

**texting** 70:14

**texts**
34:14,17,25
35:18,22
36:17

**than** 12:14
24:21 35:2
45:4,7,22
63:13,19,22
65:2 66:15
84:25 116:17
127:24 133:14
136:22 152:22
153:8,12

**thank** 5:18
159:12 160:21
161:2,3

**that** 6:20
7:6,22,23
8:11,19,20,23
9:14
10:2,6,7,8,13
,25 11:21,25
12:22
13:10,20,24
14:9,12
15:1,11,13,14
,15,22
16:13,23
17:19
18:4,9,10,12,
14
19:2,15,22,23
,24

20:1,2,5,24
21:3,7,8,9,13
,19,21,24,25
22:3,7,11,13,
15,18,19,20,2
4
23:2,6,9,10,1
2,18,24
24:5,17,21
25:6,18
26:4,7,14,17,
19
27:2,4,6,7,10
,11,20,21,25
28:1,7,10,17,
18,21,24
29:2,4,8,19
30:6,10,12,13
,17,18
31:4,6,9,11,1
3,16,20,21,22
,23
32:3,4,11,13,
16
33:12,13,19,2
1 34:5
35:1,3,4,5,7,
12,14,16,22,2
4
36:4,7,8,10,1
2,14,17
37:9,15,25
38:12,25
39:10,14,17,1
8,21,22,24
40:6,11,19,21
41:2,3
42:4,8,13,15,
20
43:3,6,8,13,1
8,20,21,24
44:1,2,3,6,14
,16,24,25



45:1,9,12,14,16,25
46:2,10,18
47:5,12 48:3
49:4,7,12
50:8,18,22
51:2,4,5,6,11,12,13,15,20,25
52:14,17,23
53:4,6,12,16,19,23
54:1,5,6,9,22
55:3,5,8,10,14,20,24
56:6,7,15,23
57:6,14,21
58:4,7,12
59:7,18,19
60:7,24,25
61:1,2,5,7,18
62:7,11,14,18
63:10,17,24
64:5,10,12,25
65:10,23,24
66:5,24,25
67:7,11,13
68:9,15,17,20,22
69:1,2,17,23,24
70:7,8,9,23
71:2,5,6,10,15
72:3,6,9,10,11,14,18,19
73:3,4,7,10,16,18,19
74:4,19
75:2,3,5,10,12,19,25
76:1,12,13,14,15,19,25

77:4,8,19,24
78:5,7,8,11,12,14,23
79:10,23
80:2,8,17,18,19
81:1,12,14,17,19,22,23
82:23
83:3,5,8,9,12,21,22,24
84:3,4,8,10,13,14,16,22
85:1,9,13,14,15,20,22
86:4,6,19
87:1,4,5,10,11,13,14,18,24
88:1,2,3,4,7,16,23
89:6,9,10,16,19
90:3,4,5,10,15,19,20,22
91:4,6,7,17,22
92:1,11,18,20
93:2,3,16,20,21,22
94:2,6,7,12,14,15,20,22,23
95:3,4,5,14,15,16,18,21,25
96:4,16
97:1,2,8,13,15,18
98:2,9,11,12
99:2,4,8,13,15,16,17,20
100:3,5,8,10,12,14,23
101:2,4,13,16,18,25

102:5,12,18
103:23,25
104:2,4,9,12,14,15,25
105:2,4,5,12,15,17,23
106:2,7,10,11,15
107:1,9,11,12,13,15,16,18
108:4,7,9,11,15,16,19
109:2,7,14,16,20,22,24,25
110:2,7,12,16,25
111:10,14,16
112:2,11,12,13,19,21,24
113:5,9,12,13,17,23
114:1,2,5,6,10,15,16,17,19,25
115:1,3,4,11,14,16,17,25
116:3,7,8,9,10,11,12,15,20,21,23
117:6,8,22
118:3,10,11,16,22
119:2,14,16,17,18,19,21,24
120:9,12,20,21
121:1,2,6,8,9,18
122:6,7,10,11,12,22,25
123:1,5,6,8,18,19
124:2,13,17,2

4
125:7,8,11,16,17,25
126:4,5,8,11,14
127:1,13,21,25
128:1,2,3,12,13,14
129:1,7,8,9,12,14,15,17,24
130:4,5,6,9,10,25
131:1,16,24
132:1,5,6,10,13,16,17,19,22,23,25
133:8,15,25
134:11,15
135:1,2,4,9,10,15
136:5,10,11,14,22
137:2,5,17,20
138:11,12,14
139:10,13,14,23
140:2,5,23,25
141:5,9,12,16,19
142:7,8,13,15,23 143:12,22
144:8,9,17
145:4,6,12,16
146:2,9,13,16,20,21
147:1,4,8,15
148:1,3,9,18,21,23
149:4,5,6,17,19
150:1,8,14,22
151:1,8,23



152:9,25
153:10,11,12,
15,16,17
154:2,3,9,13,
14,17,21,22
155:3,9,16,18
156:7,15,17,2
5 157:19
158:13,14,16,
20 159:23
160:4
162:6,8,10
163:6
164:8,9,10

**that'd** 101:3

**that's**
21:8,10,16
22:12 23:3
26:4 27:6
28:11,18
29:23 30:21
31:7,19,24
35:5 44:21
49:11,20,22
51:5,6
52:3,14 54:16
55:9 58:3
60:19
61:19,20
63:18
66:15,19,20
67:20
69:13,14 74:2
79:13 80:1,13
82:7 84:19,21
88:7 89:8
97:16 98:23
99:18 108:12
109:4 111:10
114:12 116:24
119:4,25
121:1,10

122:22 123:5
124:25 129:20
135:12
149:4,19
155:15,18
160:19

**their** 15:13
22:8,19
25:14,15
31:10,17 40:9
41:21 50:2,11
53:10
56:10,15 68:6
120:23 133:14
141:13 143:8
144:14
155:19,20
157:10 164:11

**them** 6:19 9:18
18:23 30:5
33:24 35:13
37:8,21
41:21,23
49:21,24
53:3,11 54:7
59:12
60:12,14 65:2
69:15 82:25
90:10 91:13
93:15,17 94:5
118:13
123:14,15,16
139:3,4,5
140:6 141:15
148:22,23
149:1 155:17
157:14

**themselves**
5:13

**then** 7:18 8:1
12:3,17,25
15:8 16:3

17:5 19:7,23
24:3,5
26:4,15 29:15
31:8 34:3
39:7 40:10
42:2 50:16
51:5,8,21
55:11,13
57:7,16,23
68:19 69:14
73:17 75:7
78:13 79:17
81:9
82:2,6,13
84:17,21,22
87:14 91:7
92:4 93:4,6
95:7,11,25
96:20 97:17
102:23 103:1
104:4
110:12,16
112:15 113:24
116:24 119:20
121:13,16,23
128:22 132:11
133:12 136:18
144:2 148:9
150:6,16
154:14
155:4,9,11,16
156:6
159:10,18,20,
21 160:11,12

**there** 11:23
13:23 15:4
18:2,4,14
23:3 26:3
30:8 33:25
34:10 36:14
41:8 42:15
45:5,13 47:18
48:2 49:22

51:12,13,19
54:12,23
55:6,18
56:2,5,7
57:6,24 62:15
63:24 64:4,22
66:3,13 67:14
68:14 70:8,15
72:14,21 73:3
75:8,18,24
76:2,3,5,8,14
,18 77:5
78:3,18,19,25
80:5,9,11,16
81:7 83:2,23
85:7 87:4
91:1 94:19,22
95:16,19
97:19,21
98:5,7 101:12
102:3
103:9,22
104:1
109:3,9,11,13
,16,22,24
110:7
111:23,24
112:7
113:8,13
115:2
117:16,22
120:7,11,24
122:10,22
123:12
124:15,17
127:10 128:9
134:4 137:12
138:15
139:5,15
141:9
142:22,23
143:21 144:2
145:5

147:1,23
149:17
152:5,6,8,10
153:10 154:2
155:23 157:18
158:8,15,17,2
1 159:19,22

**thereafter**
112:16 115:2

**there's** 7:7
10:23 21:19
32:8,18 43:11
50:7 55:25
57:12 61:2
67:19 93:19
94:6,25 108:6
109:6,8
114:19 121:3
127:20 129:17
130:24 136:16
142:24 156:1
157:14 160:2

**Thereupon** 5:3
16:18 17:12
25:22 59:2
103:12 104:20
111:6 114:8
119:8 144:21
149:13

**these** 37:19
57:25 89:10
94:5 97:6
110:17 122:9
126:3
141:6,10,11

**they** 12:24
15:12 20:3,4
21:8,9
25:6,9,12,14,
15 27:11
29:6,11,14,25

30:1,20
31:3,6 33:25
43:24 53:5,8
56:9,10,17,18
60:2,3 63:16
68:13 70:20
75:2 87:3
89:22 93:17
94:9 106:4
108:6 109:19
117:10,11,13
118:8,22
127:24 133:12
139:24
140:10,12,14,
16 141:12,22
142:11,19
148:21 149:22
150:17
152:10,11
153:18,20,24

**they'd** 141:22

**they'll** 156:2

**they're** 41:19
43:24
55:10,11
57:18 60:4
74:10

**thickens** 107:2

**thing** 6:21
22:22 36:18
39:14 56:20
62:10 67:13
71:10
79:1,13,15
80:14 84:4
92:3 95:15
97:16 116:11
122:3,9
132:3,9
133:21,22

136:20 160:2

**things** 33:16
45:14 51:13
57:9 85:10
87:7 94:4
95:3 96:11
97:21 98:5
127:17 139:23
143:17
159:7,23
160:24

**think** 6:20
14:9 18:1
20:20 21:2
29:7 30:3
32:2,4
33:18,20,24
35:1 36:19
41:2,4 43:23
46:24
52:20,24,25
55:2,22 60:4
65:13,14
67:25 79:1,2
80:13 84:14
85:13 89:8
90:11 91:19
92:17,18
93:16,24
97:13 98:2,23
103:19,25
104:1 120:22
124:22 125:18
128:20
133:20,21
137:5,16
140:10 142:19
143:24 150:22
159:5 160:8

**thinks** 92:3

**third** 136:20

**thirty** 164:13

**this** 6:3 7:16
8:21 10:12
16:16,22,24,2
5
17:2,6,10,11
18:8 21:23,24
22:6 26:1,13
27:19 30:4,24
34:22 35:2
36:19 38:4
40:2,3,4,17
42:13 43:8
44:11,13,14
50:7,21 51:8
52:6 55:2
56:1,19
59:5,7,12
61:25 66:21
68:3 71:14
76:3 77:3
78:7 80:4
81:8 82:3
83:13 84:9
86:25 87:5
89:5 95:12
97:7,10 99:20
101:7,11,14
102:14,19
103:17,18,23
105:7,9,12,18
,23
106:6,14,17,1
9,21 107:2,5
111:5,15,23
112:3,6,14,17
,19,20 113:14
115:4,12,13
116:1 120:20
121:18,19
122:19,20,21,
22
125:2,18,21,2



877.291.3376
www.UCRinc.com

5 126:7,23
129:15,19,20,
24
130:3,5,7,10,
11,12,13,19,2
5
131:1,2,7,10,
12,13,18,19,2
2,25
132:2,3,4,9,1
1,13 134:24
138:5 139:13
144:20
145:14,18,21
146:1 149:18
150:10
159:10,17
160:23 162:15
163:10 164:15

**thorough** 56:25
85:24

**those** 9:14,17
10:7 11:5
12:22 20:1,2
22:9 25:2
33:12,23
34:4,6,14,17,
24
35:6,12,17,22
36:17 37:5
41:12
54:13,24 57:9
65:13 67:9
77:4 78:19
87:6 96:11
107:20 117:23
125:13 138:10
140:24
141:14,21
142:5
151:19,23

**though** 76:16

81:14 92:7

**thought** 44:1
52:21 90:15
98:11
120:18,21
147:17 158:9

**thoughts** 158:6

**three** 54:16,23
56:7 125:1

**through** 5:23
6:3 7:10 11:6
16:23,24 19:3
27:16,18 35:3
62:21 64:3,17
65:12 68:5
84:15 120:10
125:12
136:17,19,20
139:11,12,22
140:1 147:23
148:7
149:21,25
150:3,18,19
159:15

**throughout**
10:1

**till** 40:14
154:19

**time** 5:8 12:17
13:8,24
16:11,25
28:5,12 37:25
38:11
40:21,22,23
41:22 42:4,9
43:20 44:8
48:4 49:8
62:1,15 65:24
66:17
67:6,8,13

85:13
86:3,13,21
89:18 90:15
91:4 94:21
97:5 98:10
99:5,7,9,11,2
1 100:6
101:18 102:18
103:4,9,20
107:12 111:2
112:6 121:24
122:3 130:5
136:20 137:18
138:9 142:13
146:2
148:11,24
150:8 164:9

**timeframe**
99:17 150:15

**timeline** 44:12

**timely**
92:14,23
94:22

**times** 107:25
122:4 128:9
136:18 139:13
147:24

**timestamp**
125:3

**timing** 61:24
132:3

**title** 40:16
62:16 64:22
65:3

**titled** 129:20

**titles** 65:23

**today** 8:12,20
62:2 65:17
135:14 157:24

**today's** 5:7
9:2

**told** 37:15
47:8 51:8
53:19 56:12
73:1,2 82:24
84:19 90:7,10
101:6 107:10
115:6 116:5
122:25 123:19
128:22

**tons** 70:21

**took** 8:14
164:10

**top** 11:2 105:2
119:11 125:21
137:17

**topic** 118:10

**topics** 51:25

**total** 9:3

**totality** 81:21

**touch** 32:21

**towards** 12:17
18:16 25:7
38:12 63:23
77:14

**town** 124:22

**tracked** 95:2

**traditionally**
46:8

**train** 58:3
138:4

**trained** 142:5

**training**
44:15,16
48:16,19,20,2
3 136:7,11



137:2,9,13,19
140:15 142:12

**transcribe**
162:7

**transcribed**
160:12

**transcript**
7:19 123:6
129:19 162:8
164:24

**transpired**
120:13,16

**treated** 115:1

**tremendous**
30:5

**trial** 8:21

**tried** 59:18
108:25

**true** 17:3 18:9
21:24
22:10,20 23:7
26:15,17
27:4,7,11
29:2 38:12
40:6 50:18
58:6 61:5
78:9,10
81:1,12,15
82:3 85:9
99:20 101:4
126:14 131:24
147:8 156:17
162:9

**truly** 164:17

**trust** 45:13
80:10 81:18

**trustworthy**
31:22

**truth**
8:15,17,20
20:21 87:5,14
91:1

**truthful** 20:18
32:12

**truthfully**
8:12

**truthfulness**
31:10

**try** 6:6,10
31:21 32:10
40:3 61:9
73:2 81:1
87:19 144:1

**trying** 6:9
7:10 28:6
34:23 56:9
67:16 80:25
93:24 130:12
138:13 142:25
152:10,11

**Tuesday** 121:4

**turned** 89:18

**Turning** 38:12

**Twitter** 10:22

**two** 12:14,16
37:22
54:15,23 56:7
76:23 124:25
148:15 155:6

**two-and-half**
103:8

**type** 36:3
41:12 80:14
108:9 140:11

**typical** 53:10

**typically** 25:6

108:6,13
143:16 155:25
160:1

_____

U
_____

**ultimate** 42:25
45:12 73:11
74:17 75:5,7

**Um-hum** 74:1
118:15 119:23
121:22

**unable** 62:3

**under** 7:15
11:1,8 20:25
21:1,2 24:18
26:1,3
28:4,8,13,23
29:6,11,15
30:1,11 37:6
41:6,8,17,20
52:15,22
53:1,5,16,23
54:5,10,19
55:1
56:2,10,17,22
57:23 58:9
59:10
66:5,20,22
78:4 83:16,17
92:12,22
93:1,3 124:6
131:11 132:20
133:1,4
134:3,11,13,1
7 138:11

**underneath**
21:20

**undersigned**
163:5

**understaffed**

94:19

**understand**
6:2,8 8:14,19
27:4 30:10
32:1 46:3
48:9,13 54:8
74:4 127:17
142:24 149:3
152:21

**understanding**
7:24 18:14
20:24 22:7
62:11 89:6
133:3 148:3

**understatement**
101:3

**understood**
26:9 27:16
29:10 51:17
112:18
118:1,2,3

**underway** 39:1

**unequivocally**
44:6

**unfortunately**
96:12

**uniform** 14:8
63:14,16,21
143:25

**uniformed** 55:6

**union** 14:23
15:1 57:11
112:10,24
113:6,9,10

**unique** 67:12
134:24 136:15
137:20
141:16,20
147:22



uniqueness
111:19

unit 14:20
124:1

UNITED 1:1

units 39:19
47:16

Universal 5:11
164:18

University
12:12,18,21
13:1,5,6

unknown 72:17

unless 94:13
128:6,8
154:17

unopposed 67:2

unpack 55:20

unpaid 38:20

unrestricted
67:1

until 40:23
42:9 44:8,23
46:16 54:10
56:24 69:11
71:19 87:9
106:8 123:20
126:25 131:6
149:24 150:18
154:13
155:17,20
156:3,24

unusual 122:7

up 14:2 17:19
18:7 34:3
35:8 38:22
46:16 49:22
63:14,15,20

73:22 78:16
82:6 89:1
106:6 108:19
113:11 138:4
152:11,12,19
156:14

updated 141:23

upon 41:7
57:19 98:4

urgency 72:15

us 44:5,18
46:24 76:13
130:19 131:1
140:2 164:16

use 11:3
133:22
141:13,15
145:14

used 11:7
107:20 108:7
119:4 144:9
147:1

using 26:22

usually 64:25
67:9 109:6,8
127:23,24
156:2 160:6

utilizing
143:12

―――――――――
            V
vague 58:4
65:20 142:6

validate 76:15

varied
63:12,18

various 10:1
51:24 53:17

vary 63:16

vast 83:20

vehicles 36:3

verbal 48:13

verification
140:15 142:12

verified 96:20
131:6

versus 48:13

veteran's
21:20

via 2:6,11
164:24

victim 80:23

video 85:11
101:11
109:9,21,25

VIDEOTAPED
1:15 5:1

viewed 143:22

violate 74:11

violated 78:21

violation
27:12 77:17

violations
78:25

visitor 115:2

Vocational
11:19

voluntarily
24:18

vs 1:7 164:5

―――――――――
            W
wait 154:19

156:16,19,24
157:1,4,8,12
160:23

waive
164:9,15,20

walk 62:20
64:3
65:9,10,12
70:6 116:24
138:2

walked 64:17

want 7:9 15:12
19:20 20:4
21:11
30:19,22,25
31:2,3 34:9
35:7 39:21
41:8 43:8
54:9 55:5
89:24 101:21
104:5 117:5
118:5 148:17
149:9 152:16
157:2 158:18

wanted 31:11
35:14 79:4
90:4 118:25

wants 103:9

warrant 62:14
78:3

warranted
78:13

warranting
51:21

wasn't 35:16
42:3,23 46:24
51:15 52:10
70:8 85:22
88:8 90:21



91:10 101:2
104:17 115:10
123:8,23,24
124:15,17,23
136:4 141:25
143:19 146:18
147:7 149:24

**way** 14:2 17:16
32:6 34:24
39:12 41:10
71:14 85:15
89:4
119:2,3,4
126:14 160:2

**ways** 32:8

**we** 5:9 6:19
7:17 8:17,23
10:5 25:18
27:10 28:17
33:21 35:5,9
36:10 37:25
38:1 39:11,23
40:7,8,19
41:14 43:4
45:1 47:21,24
51:8 54:3
55:24 62:2
66:23 68:18
71:13
73:1,8,15
78:15,16
82:16,20
83:19 86:25
87:11 90:25
92:6 95:24
96:16,21 97:4
99:20,21,22
100:5,6,8
101:10,13,16
103:9,11
110:21,22
111:19 113:22

116:2 121:14
123:5,10
125:2,15,20
126:23 127:13
129:14 130:15
131:6 135:14
142:10 143:10
153:8,9
154:11 157:24
158:13,24
159:1,10,14,1
8,22 160:2

**wearing** 63:2,6

**we'd** 95:20

**week** 37:4
148:15 149:16
150:15

**weeks** 37:18
124:13,16,17,
25 125:1,7
148:15

**weight** 25:2

**we'll** 159:16
160:20

**went** 12:21
13:22 19:3
46:23 72:16
82:6 95:7
122:11 130:25
148:23
149:2,21

**were** 8:6,7
9:9,20
11:11,12
12:22,24
13:7,20
14:22,23,25
15:1 18:14
19:7 20:8
25:10 27:23

28:4,12,18
29:11 30:1
31:5,6
33:1,17
34:14,17 36:8
37:5,16 40:12
41:14 42:9
50:9 51:12,25
52:5,21
53:4,5,6,14,1
6
54:1,5,23,24
56:7,10,16,17
,18 59:10,21
60:23 61:24
70:14,24
87:23 90:17
91:2 93:17
95:25 97:4
100:22 106:10
107:11 109:22
110:22 115:17
119:16,17
120:13 121:11
122:10
123:14,15,16
131:23 132:25
133:8,14
134:16,20
135:1,6,12
137:14 138:21
139:4 141:24
142:6,17
143:3,11
144:7,12
145:5
151:2,8,21
152:10,11,24
153:18,20,24

**we're** 24:2
32:2,12 52:7
69:2 70:21
77:13

99:18,19
101:15 114:6
124:23 129:18
142:24 152:18
159:10 160:7

**Were** 9:14,17
90:18 99:9
135:18 136:4
137:12 143:21
151:19

**We're** 71:13
114:24 160:23

**weren't** 28:13
37:25 38:2
53:9 65:23
76:1 142:19
147:17

**we've** 103:7
125:18

**what** 6:9 9:5,8
10:12
11:14,25
13:23 14:5
15:11,17
16:2,17 17:19
19:15,16
22:12
23:3,23,25
24:2,15
25:10,15
26:21
27:12,13
29:16 30:2,14
31:5 33:16
36:3,6,16,19
37:23 38:14
41:4,14,25
43:17 44:5
45:3 46:22
48:19,21
49:17,20



52:20,24
53:14,20
54:22 56:14
57:13,25
58:9,24
59:9,23 60:24
61:18,24
63:9,10
64:12,24 65:5
66:18 69:9,17
71:9,19
76:4,7,13
79:20,21
80:2,12,23
81:14
82:2,3,12,24
84:2,19,21
85:16,25
86:4,21
87:20,21 88:4
89:11,22
90:7,10,11,14
,17 93:2,15
98:10,11 99:5
101:4,15
102:14
104:4,18,23
105:12 107:10
108:8,12
111:4
113:8,9,16
114:5
115:6,10,23
116:3 117:8
118:2,11,21,2
5 119:4,6
120:12,13
121:7,14
123:5 126:4
129:8
131:9,23
133:11,16,19
135:8,12,20

137:8 139:24
140:12 144:18
147:5
149:3,12
151:9,13
152:9,13,20
153:7,20,25
154:6,21
157:7,14,18,2
5
158:6,8,10,12
,18 160:3

**whatever** 9:7
44:23 48:6
55:14 65:3
87:17 91:2
104:14 126:23
131:6 150:16
156:3

**what's** 7:5
14:5 23:25
57:4 61:22
65:5 91:23
133:3

**when** 9:3 10:11
11:16
13:19,22
15:12 17:15
18:8 20:23
23:20 24:8,13
30:8 32:24
33:11,20 34:3
36:1 38:6,25
44:13 45:5
47:2
49:3,18,23
50:7,8,11,16
53:23 58:9
62:3,9,10,19
63:8,22
64:3,7
65:7,9,12,24

66:17
69:9,17,22,25
70:14 72:13
73:15,25 75:5
76:3 79:13,20
80:21 82:24
89:5,11,14
90:14 94:6
99:14
100:9,20
103:22 107:10
108:1,13
109:3,18,23
112:6
113:8,13
116:22,23
117:15
122:10,13,25
123:5 132:2
135:1 137:22
138:5,6,10
143:7,10
146:2,13
147:19,24
148:9,23
149:6,19
150:3,11
158:19

**where** 6:9
11:18,21 16:7
22:24 24:16
27:2,21 37:12
43:14 47:3
51:8 52:5
83:1 84:18
92:7 93:19,20
94:7
95:1,5,6,7
98:8
106:10,23
109:13,17
113:2 114:6
115:16 120:6

121:3,10
125:16 148:1
158:19 159:21

**whether** 7:8
19:12,18
27:22 28:4,21
29:4,11,14
30:11,23
31:3,11 34:17
35:10 47:19
55:10 56:10
62:4,8 63:10
74:9,11,18
75:14 77:17
78:21,25 79:4
81:3 87:2
88:25 95:11
96:15
102:20,21,22
103:2 106:21
108:21 116:4
125:22 128:17
129:1,7 130:1
131:8 134:17
138:17
144:4,12
147:7 158:2

**which** 7:14,18
13:10 21:13
22:13 24:17
25:21 31:5
32:10 37:6
49:4 50:17
51:3 55:23
58:13,15,16,2
5 59:1 62:13
75:10,19,20
76:5,22
77:10,19 78:3
84:3 92:19
97:21
104:6,9,24



106:11 124:10
126:7,15
137:12 139:25
141:19,25
143:16 145:15
146:19
150:19,24
164:13

**while** 8:6
11:11
14:17,22,25
20:8 24:18
28:23
29:6,11,15
30:11 50:9
56:15 59:21
60:23 63:20
70:24 75:23
76:8,10,18
95:16 102:3
104:16 107:23
132:24 135:5
136:1 138:21
139:5 142:17
143:3
144:7,12
145:5
148:12,14
150:20
151:2,8
152:24

**who** 8:7 10:2
20:4,11 26:10
30:23 31:9
32:25 37:9
39:4 41:25
52:21
54:23,24 56:8
59:10 66:22
67:10 70:4,22
73:18 75:14
76:18 77:6

84:6 87:2
90:18 91:8
97:5
103:19,22
110:14,17
113:6 117:16
128:1,21
129:18 134:6
136:4 138:16
141:11 144:9
147:13 150:5
151:16,21
153:20 158:18
164:10

**who'd** 88:10

**whole** 66:13,16
67:21 80:10
101:22 159:4

**whom** 9:11,25
13:7 18:21

**who's** 46:6
52:8 54:9
56:1 97:13
141:3

**whose** 106:4

**why** 13:15 15:8
17:24
29:4,10,13,17
40:3,4
51:6,11
59:15,17 84:3
85:7 105:18
118:5
122:14,22
123:18 124:3
127:17 133:3
134:2 146:5
158:19

**wide** 115:1
116:6

**wife's** 7:5

**will** 5:12
7:7,8 22:2,18
23:1 32:19,20
35:1 50:4
61:1 88:20,21
104:18 105:5
116:8,11
123:5
127:12,13
132:4,19
134:24 136:14
139:13

**willfully** 21:8
29:25 153:11

**Wilson** 26:10

**windows** 97:20

**wing** 120:6

**wires** 108:3

**wise** 20:12

**wish** 164:15
165:2

**with** 5:11 6:21
7:21,23 8:7
9:11,12,25
10:6,12 14:1
15:16
17:11,15
18:15,22,24,2
5 20:23 22:8
24:10
25:9,14,19
26:16,25 27:3
28:5
32:1,3,13,21
33:4,7
34:11,12,14
35:22
36:1,6,16,17,
23

37:1,9,12,16,
21 38:5,7,10
39:3,6,9,13
40:8,24 41:14
42:3,14,17,21
43:2 44:1,21
45:19,24
50:23
51:1,3,4,9,14
54:20 55:4,7
56:4,6,18,20
57:6,11,15,16
,19 58:1,22
59:9,11
60:6,8,17
62:3,11 63:24
64:10,17
65:10,13
67:7,8,15
68:11,13,16
72:12,15
73:1,4,25
74:9 76:22
77:22,23
78:1,2,15
80:5,8,9
81:4,24 82:25
83:8
86:10,11,19,2
3 87:23
88:16,21,23
89:21,22
90:22 92:18
94:20 95:15
97:18
98:2,4,9,15
99:15 100:22
101:16,18
103:1,4,19,22
104:9,10
105:3
108:3,13
109:7,17,21



**UNIVERSAL**
**COURT REPORTING**

877.291.3376
www.UCRinc.com

110:12,15,20,
23 111:16,18
112:1,3,7,9,1
9,21
113:12,23
115:15 116:14
117:15,16,18
118:7,11,20
119:15 120:24
121:17 122:20
123:11,12,20,
22 124:15,18
127:8,9,12
128:1
129:10,23
131:14
132:1,5,8
133:5
134:6,9,20
135:12,16,21
136:21
137:7,23
139:2,16
140:9
141:12,19
142:4
143:8,10,11,1
7,19 144:4
145:22
146:16,17
147:25 149:22
153:2 155:16
162:13 164:14

**within**
46:13,19
50:12 67:17
68:11,14
86:21
112:5,18
129:12 140:24
141:7 164:13

**without** 42:15

45:9 123:24
127:15,20

**witness** 3:2
5:5 23:15
122:16 159:12
160:1,17,21,2
5 161:8
162:15 163:10

**witnesses** 10:7
69:12,20

**wondering**
51:11

**won't** 17:9
44:23 75:4
105:4

**word** 75:10
88:20 93:24

**words** 37:20
138:25 139:3

**work** 15:17
16:9 20:1
33:24 34:5
39:18,23
40:13,22
45:4,18,23
46:1,8,12,24
47:6,8,14,16
49:18
50:16,20
51:10 52:6,8
54:12 56:15
60:23 61:14
62:6,12 66:4
83:9 88:11
91:17 92:21
104:13 105:24
122:5,12
123:2,19
124:1 126:17
128:22

131:15,18
132:14,17
150:21 154:14
159:15

**worked** 14:2
46:13 48:6
62:19 67:11
132:9 140:19
141:11

**Workers** 92:22

**working** 11:11
13:7 16:8
41:9 47:3
51:1 52:5
57:17 70:15
121:8
124:5,6,10
125:6
126:5,16,17,2
2 138:21
139:5 148:12

**workplace** 52:9
92:14 97:11

**work-related**
92:21 126:24

**work-relation**
91:18

**works** 135:4

**workstation**
121:25

**workstations**
122:1,2

**world** 94:25
95:25 96:7
97:4,6,17

**worlds** 31:15

**worse** 133:14

**worthwhile**

143:13,23

**would** 7:18
8:11 10:7
19:23,24,25
20:5 21:2
22:11 23:12
24:3,6,18
25:9,12,14,15
26:4 27:22
29:10,13,16
30:17,19,22,2
5 31:20 33:23
34:3,4,7,10,2
4,25
35:1,6,13
37:19,20,21,2
2,23 39:13
41:5,10,19,20
,21 43:14,23
44:2 45:2,14
46:2,18 47:6
48:3
49:9,12,20
50:11,17
51:20,22 52:3
54:6,8,9
55:5,13,14
56:23
58:12,15,16
59:8,13,15,17
60:19
62:14,20,25
63:1,2,5,8,11
,13,16,19,22
64:1,2,9,12,1
3,21
65:1,14,18
66:2,21
70:8,10
72:11,23
73:2,14
75:5,8,17,25
76:15,16,18,1



9 78:3,13
80:4,18
81:10,20
83:16 84:22
85:4,14
87:5,15 89:4
90:4 91:7,13
92:19 93:10
94:12,21
95:6,18,19
96:1,10
97:13,14,21
98:2,22
99:13,14,16
100:5,13,19
101:3,20
102:6,9,17
105:18 107:3
110:7 118:3
122:12
124:6,9,11
125:7 126:6
127:5,7,8,10,
21,25
128:3,8,9,20
129:2,9,10
130:6,8
131:22 132:20
134:14,17,23
137:1,13
141:2 143:22
144:3
145:4,7,8
146:1 150:1
154:22
155:4,9,12,18
,23
156:10,15,16,
18,19,22,24
157:1,3,4,6,8
158:9,13,15,1
7 160:11,12

**wouldn't** 21:1

34:7 91:15
95:19 97:18
100:3,5
124:7,13
136:6 141:21
143:19
154:7,11,12,1
6 155:9,16
157:12

**wow** 108:7

**wreck** 58:3

**write** 152:12

**write-ups**
107:7

**writing** 48:4
51:7,16 97:2
102:7 103:3
126:19 128:10
152:18

**written** 16:3
47:18,21
48:9,14,16,24
49:1,4,8
51:25 102:17
107:6
127:15,20
128:6,8,12
129:11

**wrong** 21:23

**wrongdoing**
28:7

**wrote** 49:8
152:11

———————
Y
———————
**yeah** 7:20,25
18:23 50:6
82:7 98:21
106:22 107:5

122:1
123:7,10
149:18 151:20
159:6,12
160:10,14,17,
19

**year** 62:2

**years** 48:7,21
56:1 127:22

**yes** 6:13 7:2
8:5,16,18,22,
25 9:4,5,24
10:17,19,21,2
4 11:24
12:2,4,9,21
13:4,5,14,21
14:4,24 15:24
16:6,12,15,20
17:1,4,9,21,2
3 18:6
19:4,9,14,24
20:10,22
21:15,18,21
22:4,11,22
23:3 24:4
25:1,8,16,24
26:4,18
27:5,15 28:20
29:3,23
30:15,19,25
31:24
32:7,14,23
33:2,6
34:2,8,13,16
36:13 37:4,8
38:6,9 43:3
46:11,12,23
47:1,11,17,22
48:8,12 49:2
53:7 56:5
58:20,23 63:1
64:1,8,9,21

65:25 66:2
69:13 70:17
71:10,17
74:2,3,14
75:23,24
77:21 78:24
79:1,4 81:1
82:5,16 84:11
86:11
88:12,15
89:13 92:22
96:1 98:24,25
99:2 100:19
101:14
103:1,5
104:11 106:2
107:1,13,15,2
5 108:6,11,18
109:12
111:2,8,13,14
113:22
114:4,20
115:5,9 117:3
119:13,19
120:1 121:9
123:3
124:8,11
127:3,14
131:11 132:11
133:2 135:7
136:22,23,24
138:14,25
139:6,20
140:22
141:1,8 142:9
144:1,3,23
145:2,9 146:1
148:14 149:18
151:20 152:6
155:4,9,11
156:21,22
157:6,22

**yet** 123:8



154:23

**Yiddish** 93:24

**you** 5:18,24
6:2,5,7,8,10,
11,14,21
7:1,3,8,9,11,
20
8:1,6,7,10,14
,19,20
9:1,5,8,14,23
10:2,7,9,11,1
5,25
11:1,2,4,7,8,
11,12,16,23
12:3,5,11,17,
20,22,25
13:7,12,15,19
,20,22,23
14:2,11,13,22
,23,25
15:1,8,17,25
16:3,8,13,17
17:6,11,15,16
,22,24,25
18:4,8,9,18,1
9,20,21
19:2,3,7,16,1
7,19,20
20:7,8,11,14,
16,23
21:6,7,9,13,1
9,20
22:3,13,15,18
23:2,5,10,12,
17,18,20
24:8,9,13,16,
17,18,24
25:9,14,18
26:1,13,14,15
,17,19
27:2,3,4,10,1
1,22,23,24,25

28:1,4,7,11,1
2,13,15,18,21
,23,25
29:15,18
30:3,4,17,22
31:3,5,8,9,11
,13,20,25
32:1,6,8,13,1
6,19,20,21,24
33:3,11,16
34:1,4,9,11,1
2,15,17
35:9,11,17,20
,21,22,25
36:7,15,17,18
,19,21
37:1,12,16,19
,20,21,22
38:4,12,20,25
39:10,11,13,2
1,24
40:3,4,12,21
41:4,5,6,8,15
,16
42:7,13,20,21
43:8,16,17,18
,20
44:5,6,12,24,
25 45:9,19
46:10,22 47:2
48:9,16,23
49:3,4,12,15,
17,18,20,21,2
3
50:9,10,11,16
,18 51:8,9,10
52:7,20,23
53:3,13,14,15
,19,20
54:6,8,19
55:5,17,18,22
,23
56:2,6,8,12,1

4,15,19,20,23
57:2,10,11,12
,19,21
58:15,24
59:7,8,13,15,
17,18,19,21,2
3
60:6,10,12,16
,23
61:9,12,22
62:3,4,25
63:17,18
64:3,5,7,14,1
6,17
65:6,7,8,9,10
,12,17,19,20,
23
66:16,17,18
67:8,21,25
68:7,9,18,20,
21,22,24
69:11,17,19,2
3
70:6,14,20,21
,24
71:14,18,19,2
2 73:10,22,25
74:4
75:5,20,25
76:1,3,11,16,
23 77:19,22
79:3,4,9,13,1
4,17,18,20
80:1,9,12,15,
21,24
82:2,6,7,12,1
8,22,24
84:2,17,19
85:4,7,15,16
86:2,6,7,16,2
0,21
87:6,15,16,23
88:13,21,22

89:5,7,10,14,
15,18,21
90:1,6,10,11,
18,21 91:1,2
92:1,4,8,20
93:1,11,12,13
,18,22,23
94:1,6,8,12,1
3,17,22,24,25
95:2,10,11,14
96:11,12,13,1
5,25
97:2,3,6,7,8,
19
98:4,6,9,10,1
1,14
99:5,9,11
100:6,11,12,1
4,17,18,21,25
101:5,16
102:25
103:1,2,16,17
,18,22
104:9,10,12,1
4,18,23,24
105:3,7,18
106:4,10,18,2
1,23
107:6,10,11,1
7,20,23
108:1,19,20,2
4 109:6,16,24
110:4,24
111:5,10,16,1
9
112:5,18,19,2
0,21,24
113:5,11,12,1
6,17,18,23
114:2,5,6,25
115:1,6,14,16
,25
116:4,5,7,8,2



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

3,24
117:5,8,15,16
,21,23
118:2,3,5,14
119:11,14,16,
17,18,21
120:12,13
121:4,6,16,18
122:7,10,12,1
4,18,19,25
123:1,10,15,1
6,17,19,20,22
124:7,9,14,15
,19,20,24,25
125:3,16,21,2
2
126:4,7,13,14
,16
127:1,5,13,16
,17,18
128:6,8,17,20
,21,23
129:1,8,24
130:2,9
131:9,12,14
132:1,6,12,16
,25 133:8
134:2,7,20,24
135:1,2,5,8,1
5,18,21,23
136:4,11,12
137:2,7,8,9,1
2,17,22,23,24
138:2,3,6,11,
12,17,20,21
139:3,4,7,13,
25
140:19,20,23
141:2,3,4,5,9
,10,12,17,19,
23
142:4,10,15,1
7 143:3,5,7

144:5,7,8,9,1
2,13,18,19
145:5
146:11,13,16,
25
147:1,3,4,16,
17,19,20,25
148:1,4,9,11,
15,18
149:6,9,11,16
150:20
151:2,8,25
152:2,8,20,24
153:2,15,20
154:3,6,14,19
155:3,12,13,1
4,18
156:1,2,6,15,
19,23,24
157:3,4,8,18,
24
158:2,10,12,1
8,24
159:8,9,12,17
,20,21
160:10,13,17,
20,21,22
161:1,2,3
164:8,9,10,11
,13,15

**you'd** 18:11
31:2,3
34:8,20 38:16
54:17 67:20
76:15
118:13,20
133:23 143:4
151:22

**young** 113:4

**your** 6:21 7:5
8:11,17,23
9:12 11:8

12:18 13:6
14:2 15:17
16:10,23
17:6,15
18:14,25
19:11,17,22
20:24
21:12,14,16
22:5,6 23:9
24:10,17,23
25:3,19
26:10,14,16,2
2,24 27:3,24
28:4,5,12
31:12,25
33:4,19 34:15
39:2 43:12,16
45:3
46:1,17,18
47:5,14 48:10
50:4 52:19
55:25 58:1
59:19
60:11,21
61:18 65:17
66:5
70:6,13,21,23
,24,25 71:19
74:17 76:23
80:2 83:15
84:8,19 85:1
86:12
88:11,20 89:6
90:11 91:3
93:4,10,15,16
95:24,25
99:12,22
101:15,17,24
102:21
103:1,3
105:2,13
106:19 107:24
108:13 114:25

116:23 117:21
120:13 121:7
123:25
125:3,20
128:13,17
129:15,23
131:3,23
132:16
133:3,11
134:19
135:8,15
136:11 137:22
138:2 141:4
142:9 144:11
145:16,21
146:23 147:4
148:3 159:22
164:9,10,11,1
3,15

**you're** 8:21
9:9 12:13
14:19 28:8
29:22 30:3
31:22 32:25
33:22 41:1
42:2 44:5
47:8
48:4,19,21
50:13,21 52:4
54:22
55:11,16
57:7,14,16
60:11,24
63:15 64:20
66:5,8,18
67:19 75:7
76:7,13 80:22
81:16 82:4
83:15 84:1,22
92:19 93:23
94:4,24 96:5
97:1
101:10,19

UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

```
102:15 105:12
115:23
116:4,23
120:2 122:13
124:3,12
126:10 128:12
132:24 135:13
136:1,2
138:3,5 139:5
142:15 144:2
147:24 148:12
150:20 152:20
154:2,18,21
155:5,8
156:20 157:12
159:3 160:11
```

**yours** 61:22
  164:17

**yourself** 27:1
  64:14 79:21
  103:21 141:3

**you've** 6:3
  10:6 18:21
  27:18 33:11
  52:13
  53:16,19 59:5
  61:10
  73:22,24
  88:10,16
  105:10 111:20
  118:16

---
Z
---
**ZOOM** 2:6,11



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com