

**RC LAW GROUP**

3900 Hollywood Boulevard, Suite 301
Hollywood, FL 33021

**August 5, 2022**

**Darvin Williams**
Interim City Manager
City of Opa Locka
780 Fisherman Street,
Opa-Locka, FL 33054

Dear Mr. Williams:

On June 15, 2022 the City of Opa Locka ("the City") entered into an agreement with my firm to investigate various complaints and allegations of workplace harassment, discrimination and retaliation, at the City's Police Department, by Captain Michael Steel. The City sought an independent investigation from outside its own organizational structure. The Scope of Services called for objective investigative services and recommendations regarding the complaints. In this role, I was given complete freedom to investigate the matter by gathering and reviewing relevant records and interviewing relevant witnesses. The agreement also required preparing a report of my findings and meeting with you regarding my recommendations. This document summarizes my investigation and serves as the report of my findings and recommendations.

Very Truly Yours,

*Ria Chattergoon*
Ria Chattergoon



RC LAW GROUP

3900 Hollywood Boulevard, Suite 301
Hollywood, FL 33021

**Investigation of Complaints**

I was contracted by the City to conduct an impartial investigation of the complaints filed by 10 employees of the City's Police Department ("Department"). The filed complaints involved conduct of harassment, hostile work environment, discrimination and retaliation by Captain Michael Steel. I was provided with copies of all complaints filed with the Human Resources Department and other documentation that was provided to me by certain employees. During my investigation, I also identified and interviewed two additional employees who were named as witnesses. In preparation for all interviews, I reviewed the relevant Collective Bargaining Agreement ("CBA"), City Codes/Ordinances, the City's Personnel Administrative Regulations, Equal Employment Opportunity Commission ("EEOC") guidelines and relevant case law. I was provided a private setting to interview City employees without input or participation by the City's Human Resources staff or City Management. The purpose of this report is to relate the findings of my investigation and is the product of the above described process.

**Stage 1:  Review of Governing Documents**

**Collective Bargaining Agreement**:  The CBA ratified by the City and the Dade County Police Benevolent Association ("PBA") is inapplicable to the current investigation.  Currently the CBA is only applicable to "All full-time, permanent, sworn police officers, corporals and sergeants employed by the City of Opa Locka, Florida."  *See* CBA, Article 1. Recognition. Because Michael Steel is a Captain, the CBA is inapplicable to my findings.

**The City's Personnel Administrative Regulations:**

The City codifies its commitment to protecting individuals from discrimination and harassment. The relevant sections are cited here:

**PROHIBITION AGAINST DISCRIMINATION AND HARASSMENT 1-108**

Prohibited harassment is unwelcome verbal or physical conduct by an employee or any individual including residents, consultants, vendors, or contractors, that denigrates or shows hostility or aversion toward an employee and/or his or her relatives, friends, or associates because of his race, color, sex, religion, age, national origin, disability, veteran status or other status protected by law and that:



RC LAW GROUP

3900 Hollywood Boulevard, Suite 301
Hollywood, FL 33021

- Has the purpose or effect of creating an intimidating, hostile, abusive or offensive working environment; or
- Has the purpose or effect of unreasonably interfering with an individual's work performance; or
- Otherwise adversely affects an individual's work performance.

**<u>Other Forms of Unlawful Harassment Specifically Prohibited</u>**

This policy specifically prohibits harassment on the basis of any characteristics protected by local, state and federal anti-discrimination laws. Unlawful harassment is defined as verbal or physical conduct that segregates or shows hostility or aversion toward an individual because of any characteristics protected by law, including but not limited to race, color, national origin, religion, disability, gender, age, veteran's status, or sexual preference.

Examples of the types of behavior that can lead to unlawful harassment may include, but are not limited to, the following statements, behaviors, or documents:

• Epithets, slurs, or negative stereotyping that relate to the characteristics protected by law noted above;
• Threatening, intimidating, or hostile acts that relate to the characteristics protected by law noted above;
• Written or graphic material that denigrates or shows hostility or aversion toward an individual or group because of the characteristics protected by law noted above; and
• Acts that are intended to be "jokes" or "pranks" but that are hostile or demeaning with regard to race, color, religion, gender, national origin, age, disability, veteran status or other status protected by law.

Tel: (954) 400-1620        www.therclawgroup.com        Fax: (954) 400-1676



RC LAW GROUP

3900 Hollywood Boulevard, Suite 301
Hollywood, FL 33021

The City believes that each employee should be given an equal right to succeed based on his or her abilities and job performance without being bothered or distracted by offensive behavior on the part of other employees.

**Complaint Procedure**

Each Department Director and employee is responsible for creating an atmosphere free of discrimination and harassment, sexual or otherwise. Employees are responsible for respecting the rights of their co-workers.

Any employee who has a question, concern or complaint of discrimination or harassment based on race, color, gender, religion, age, national origin, disability, veteran status, or other protected status must immediately report the incident to the Human Resources Director. If the incident occurs when the Human Resources Director is unavailable, the employee shall immediately complete an incident report and deliver it to the Assistant City Manager. If, for any reason, an employee feels uncomfortable reporting the situation to the Human Resources Director, or the Assistant City Manager, the employee should send a written complaint to the City Manager.

**Investigation of Complaints**

All reports of alleged unlawful conduct will be promptly and thoroughly investigated, and the City will act to ensure that any improper conduct ceases immediately and corrective action is taken to prevent a reoccurrence. The City of Opa-Locka will inform the complaining employee of the resolution of the complaint as appropriate. Employees who have been found to have violated this policy will be subject to disciplinary action up to and including termination.



RC LAW GROUP

3900 Hollywood Boulevard, Suite 301
Hollywood, FL 33021

### Confidentiality
All complaints will be treated confidentially, to the extent practical, for an effective resolution.

### No Retaliation
No employee will suffer adverse employment consequences as a result of making a good faith complaint or taking part in the investigation of a complaint. Any employee, who feels that retaliatory action has been taken at any time because he or she complained of unlawful harassment, or participated in an investigation, immediately should report that action to the Assistant City Manager.

### STAGE 2: EEOC GUIDELINES

The EEOC reference manual was reviewed and utilized for guidance as a result of some of the complaints from employees. The following sections are taken directly from the EEOC and relevant cases.[1]

### Conducting A Thorough Investigation
Because discrimination often is subtle, and there rarely is a "smoking gun," determining whether race played a role in the decision making requires examination of all of the surrounding facts and circumstances. The presence or absence of any one piece of evidence often will not be determinative. Sources of information can include witness statements, including consideration of their credibility; documents; direct observation; and statistical evidence such as EEO-1 data, among others

### Race/Color Discrimination & Work Situations
The law forbids discrimination when it comes to any aspect of employment, including hiring, firing, pay, job assignments, promotions,

---

[1] See EEOC Compl. Man., Vol. I, Sec. 26.

[2] I reviewed the Personnel Changes Memorandum distributed via email, dated February 11, 2022, to the City by

Tel: (954) 400-1620        www.therclawgroup.com        Fax: (954) 400-1676



RC LAW GROUP

3900 Hollywood Boulevard, Suite 301
Hollywood, FL 33021

layoff, training, fringe benefits, and any other term or condition of employment.

**Potential Evidence of Racial Disparate Treatment**

*Race-related statements (oral or written) made by decisionmakers or persons influential to the decision.* Race-related statements include not only slurs and patently biased statements, but also "code words" that are purportedly neutral on their face but which, in context, convey a racial meaning. The credibility of the witnesses attesting to discriminatory statements, and the credibility of the witnesses denying them, are critical to determining whether such statements actually were made. If racially discriminatory statements were made, their importance will depend on their egregiousness and how closely they relate – in time and content – to the decision in question. For example, a statement that there are "too many Asians" in a department, made by a hiring official when discussing applicants, would be strong evidence supporting an Asian American's failure-to-hire claim. Such a statement also would support a claim of hostile work environment by Asian American employees.

*Comparative treatment evidence.* This is evidence as to whether the claimant was treated the same as, or differently than, similarly situated persons of a different race. Such evidence is not always required, but a difference in the treatment of similarly situated persons of different races is probative of discrimination because it tends to show that the treatment was not based on a nondiscriminatory reason. Conversely, an employer's consistent treatment of similarly situated persons of different races tends to support its contention that no discrimination occurred. Comparator evidence that supports either party's position must be weighed in light of all the circumstances. For example, if the group of similarly situated persons who were treated better than the claimant included persons of the claimant's race, that would weaken his or her claim, but it would not be conclusive proof of nondiscrimination because the balance of the evidence overall might still more convincingly point to discrimination.



RC LAW GROUP

3900 Hollywood Boulevard, Suite 301
Hollywood, FL 33021

Identification of persons who are similarly situated to the claimant should be based on the nature of the allegations, the alleged nondiscriminatory reasons, and other important factors suggested by the context, but should not be based on unduly restrictive standards.

*Relevant background facts.* Specific employment decisions and issues should not be looked at in isolation. Other information that can shed light on whether the employer's adverse employment decision was motivated by race includes the employer's treatment of other employees (or customers, etc.), race-related attitudes, the work environment generally, and the context of the challenged employment decision. The point is that background evidence can help determine the employer's state of mind and otherwise provide important context.

*Relevant personnel policies.* An employer's deviation from an applicable personnel policy, or a past practice, can support an inference of a discriminatory motive. Conversely, acting in conformance with a consistently applied nondiscriminatory policy or practice would suggest there is no such motive.

### STAGE 3:  SUMMARY OF INTERVIEWS PROCESS

The City coordinated all interviews of all complainants and witnesses. While there were 10 formal complaints filed, I identified additional witnesses to be interviewed to ensure a neutral investigation was conducted. Each witness received a calendar invite to meet at the Human Resources conference room. The witnesses were not told who they were meeting with or why, until they arrived. Once the witnesses arrived, I introduced myself and explained why I was hired and the process of the interviews. I allowed each witness the opportunity to reject the interview if they chose, however, every person chose to move forward with the interview. All interviews, but one, were conducted in person in the Human Resources conference room. One interview was conducted via Zoom video conference because of scheduling issues.

Each interview began with a scripted introduction of why I was hired by the City and the reason for the interview. A rubric of general questions was asked of each witness and then specific questions relative to each complainant or witness were asked. Witnesses were encouraged to speak freely and to answer in a narrative form to ensure the sharing of as much information as possible. Witnesses were given my contact information and encouraged to

Tel: (954) 400-1620          www.thercclawgroup.com          Fax: (954) 400-1676



3900 Hollywood Boulevard, Suite 301
Hollywood, FL 33021

follow up with me if anything came to mind after our interviews.  Three people followed up with me after their interviews.

To date, I have not interviewed Captain Steel as he has elected his preference to review this report prior to any interview, pursuant to his Bill of Rights under Fla. Stat. §112.532.

### Factual Findings

The interviews of 11 of the 13 employees revealed a consistent narrative regarding Captain Michael Steel's management style and retaliatory conduct during his time as Acting Chief of Police. The following facts are deemed credible based on the convergence of facts from a broad range of witnesses, interviewed independently from one another. The voluminous facts and evidence have been condensed for this report.

The issues with Captain Steel began on February 11, 2022, when then City Manager, James Wright, promoted Captain Steel from Police Sergeant to Police Captain and named him as Acting Chief of Police, on the same day.[2] It was alleged that from the onset of his appointment as Acting Chief, Captain Steel was overly consumed with his position of power. Despite knowing he was named Acting Chief and that the Department was searching and interviewing for a new Chief of Police, Captain Steel placed an order from Lou's Police Distributors for new uniforms with "Chief Steel" embroidered and other emblems indicating that he was "Chief." Captain Steel completed this order without using the proper requisition procedures. The invoices for Captain Steel's order are approximately $584.18 and are currently being processed.[3]

Captain Steel also instructed other officers to refer to him as "Chief" despite the fact that he was in an acting capacity and it was not the practice of the Department to refer to an Acting Chief as "Chief."[4] In his position of Acting Chief, Captain Steel ordered and took receipt of equipment that was purchased by the City for officers. He also began distributing these items

---

[2] I reviewed the Personnel Changes Memorandum distributed via email, dated February 11, 2022, to the City by Assistant Chief of Police Nikeya Jenkins indicating these changes, as well as the resignation of Chief Dennis Jackson.
[3] I obtained the requisition forms to ensure the veracity of these facts.
[4] Every witness interviewed confirmed this fact.



3900 Hollywood Boulevard, Suite 301
Hollywood, FL 33021

himself. This was not the procedure or policy of the Department as there was one individual with issuing authority for property.[5]

According to the witnesses interviewed, upon being appointed, Captain Steel began using his position of power to retaliate against members of a squad who complained about him in 2019 and against those individuals who previously supervised him.[6]  For example, during the first supervisory meeting with command staff and Sergeants, Captain Steel stated that "he will not be retaliating against anyone."  The individuals who were present at that meeting were baffled by his statement.  During the meeting, he further stated, "subordinates must fear us" and "fear authority." Captain Steel later directed the Executive Secretary to remove this language from the minutes of that meeting.  When she objected, he informed her that he was giving her an order and made her remove the statement.[7]

Three days later, on February 25, 2022, Captain Steel instructed the Executive Secretary to draft a termination letter for Tyree Johnson and Sergio Perez.  When she informed him that the City Manager's Office had the responsibility for terminations, he became angry.  He almost immediately retaliated against her by changing her working hours even though he knew she was a single mother and that it would cause issues with her childcare. Captain Steel's direction to terminate Sgt. Sergio Perez is problematic as Sgt. Perez was already in the process of suing the City for a previous incident involving Captain Steel. Although the termination did not proceed, the action evidences a direct attempt to retaliate against Sgt. Perez. In fact, one witness who was interviewed stated that he specifically advised Captain Steel not to retaliate against Sgt. Perez, but that he did not heed his advice.

In addition to these actions, Captain Steel directed supervisory officers to discipline their subordinates for incidents that did not warrant disciplinary actions and for which supervising officers specifically objected.  When these supervisory officers objected, Captain Steel informed

---

[5] Prior to becoming Acting Chief, Captain Steel made copies of the keys to the property room, giving himself access to the City's property, including evidence, at anytime without the knowledge of the Property and Evidence Specialist.  Then Captain Sergio Perez and Chief Barrera confiscated the keys and access upon being informed what then Sgt. Steel had done. It is unclear whether Captain Steel was disciplined for his actions.

[6] On September 25, 2019, then Sgt. Steel, supervised the midnight shift.  Seven of the officers of the midnight shift submitted a complaint against Sgt. Steel for failing to supervise per the Standard Operating Procedure. Four of the officers who filed a formal complaint in this matter were members of that midnight squad.

[7] I reviewed both versions of that meeting's minutes to confirm that there was a removal of the statement. I confirmed the removal, which could be deemed a violation of Public Records Act, Fla. Stat.§119.



RC LAW GROUP

3900 Hollywood Boulevard, Suite 301
Hollywood, FL 33021

them that he was "giving them an order."  Fearing that Captain Steel would retaliate against them and because they are required to follow the chain of command, these supervisory officers relented. Captain Steel also ordered welfare checks on certain officers without cause.  On one occasion, he conducted welfare checks himself, for no cause and without informing anyone in the Department that he was doing so.  There were also two reported incidents of Captain Steel following one officer in his car. During his time as Acting Chief, Captain Steel also rewrote annual evaluations, including information that was contrary to the supervising officer's opinion.

Witnesses alleged that in an attempt to show the extent of his power, Captain Steel also prepared written warnings for certain officers, presented it to them and then rescinded those written warnings.[8] Captain Steel also opened matters previously adjudicated and closed by the former Chief of Police, without providing any justification. He further subjected one officer to disciplinary action for a second time for the same incident. He also removed officers from certain squads without any reason.

On becoming Acting Chief, Captain Steel also removed one Captain from the Administrative wing where the command staff customarily sat. Captain Steel stated that he needed an office for Internal Affairs, despite the fact that three other offices were empty and available. Captain Steel also gave non-command staff access to the Administrative wing of the Department.  He allegedly provided at least one non-administrative/command staff with a key card, though I was unable to confirm that fact. Furthermore, Captain Steel directed certain individuals to violate chain of command and directly report to him, by passing a Black Captain.

During his time as Acting Chief, Captain Steel took possession of the keys to the Department's personnel file room.  At least two witnesses claimed that certain files/documents were missing from the file room during that time. This allegation could not be substantiated without having a detailed list of all files/documents previously maintained in that file room compared to what was remaining. However, pictures of the file room before and after Captain Steel's possession of the file room key were presented to me. I noticed a definite change in the number of the files in the drawers in these before and after pictures.

 I further discovered that Captain Steel used his position to pressure employees and officers to attend Commission meetings to speak positively about then City Manager, James

---

[8] I reviewed these written warnings to confirm this fact.



RC LAW GROUP

3900 Hollywood Boulevard, Suite 301
Hollywood, FL 33021

Wright, who was under scrutiny at the time. On other occasions, he used his position to pressure employees not to attend meetings in an attempt to avoid support for certain issues. When these employees refused to abide by Captain Steel's requests, they were subjected to ill treatment by Captain Steel and became fearful of retaliation.

During my investigation, I discovered that prior to be being placed on administrative leave, Captain Steel used a key to access the City Manager's Office without the City Manager's authorization or knowledge. Captain Steel was captured on video surveillance and an employee witnessed him leaving the City Manager's office at around 7:30 a.m.  When confronted, Captain Steel stated that former City Manager James Wright gave him a key and asked him to retrieve personal items. When asked why he did not simply inform the City Manager, Captain Steel had no response.  Captain Steel was also not forthcoming about the items he removed from the City Manager's office.  While he provided a list of the items he removed, Captain Steel failed to include a box of files.  When confronted with the removal of the files, he claimed that he it "slipped his mind."  To date, it is unknown what documents were included in the box of files that were removed.

As mentioned above, Captain Steel did not always follow the policies and procedures of the Department. For example, Captain Steel hired an officer for the Department and negotiated a salary for this officer, without the City Manager's approval, without informing Human Resources or complying with the City's hiring procedures, and without informing his officers. By the time the City Manager and Human Resources were informed, the officer in question had already resigned her former position. Captain Steel placed the City and the officer in a precarious position. Furthermore, Captain Steel traveled to Orlando without completing the proper leave paperwork, without informing the Department and without properly naming an Acting Chief in his absence.

During my investigation, one of the notable issues I discovered was Captain Steel's differential treatment of Black male officers as compared to White and/or White Hispanic officers. For example, and as mentioned above, Captain Steel conducted welfare checks of the Black officers if they took a day off but did not do the same for White or Hispanic officers. Captain Steel also directed supervisors to discipline Black officers for immaterial matters, yet did not do the same for White or Hispanic officers.  As discussed above, the officer who was disciplined twice for the same incident was Black. On one occasion, Captain Steel attempted to terminate a Black Captain who did not have any prior disciplinary record. When he was ordered

Tel: (954) 400-1620          www.therclawgroup.com          Fax: (954) 400-1676



RC LAW GROUP

3900 Hollywood Boulevard, Suite 301
Hollywood, FL 33021

by the City Manager to refrain from creating a chain of complaints, Captain Steel ignored the order and attempted to discipline that Black Captain. He later rescinded that disciplinary action. On another occasion, Captain Steel attempted to intimidate a Black officer who had interest in applying for the Street Crimes Unit. Captain Steel made it clear that he intended to hire a retired officer (White) for the position. In a meeting with the Street Crimes Unit, Captain Steel made the two Black officers who were on the unit leave the room without providing a reason, leaving the only two Hispanic officers to meet with the individuals. The Black officer never received an interview for the position and the position was given to the White officer.[9]

Captain Steel's appointment as Acting Chief and his subsequent actions created an immediate decline of morale in the Department.  Some of the individuals interviewed reported experiencing physical manifestations of the stress and anxiety they suffered. One individual expressed that he had a tightening of his chest and a panic attack as a result of the fear of retaliation he believed Captain Steel could bestow upon him. Several of the individuals, informed me of the need to take time off as a result of the stress they felt as a result of Captain Steel's actions.  One individual suffered a panic attack at work, during a meeting with Captain Steel and fire rescue was called. Of the witnesses interviewed, 10 out of the 13 individuals immediately began searching and interviewing for other jobs outside of the City. The vast majority of the witnesses expressed that they felt a sense of relief when Captain Steel was placed on administrative leave. All witnesses stated that they felt that morale in the Department dramatically increased since he was placed on leave.

In addition to the conduct and actions described above, it was obvious that many of the officers in the Department lack respect for Captain Steel.  Many referred to him as a "coward" and provided examples of Captain Steel leaving the scene of a shooting or pursuit of a suspect. Of the witnesses interviewed, all voiced their disapproval of returning Captain Steel to a position of power. Eighty percent of individuals interviewed indicated that if Captain Steel returned to the Department, they would resign.  I was also informed that this was the general consensus of the Department and that at least half of the Department would immediately resign if he returned.

---

[9] Only these two officers applied for the position.



RC LAW GROUP

3900 Hollywood Boulevard, Suite 301
Hollywood, FL 33021

## CONCLUSION

Following my investigation, including interviews and a review of the complaints and additional material provided to me, I have grave concerns regarding legal implications of returning Captain Steel to the Department and recommend termination.  As an initial matter, Captain Steel's actions towards certain individuals were retaliatory in nature. For the officers who made complaints against then Sgt. Steel in 2019, it is clear that Captain Steel used his position to retaliate against them by affecting the terms and privileges of their employment. Captain Steel further used his position to retaliate against officers who previously supervised him. Secondly, Captain Steel's specific actions against the Black male officers in the Department expose the City to potential discrimination and retaliation claims. Should these officers decide to file charges of discrimination and pursue a lawsuit, there could be sufficient evidence to support such claims. Third, the City risks losing up to half of its police force if Captain Steel is returned to his employment. Even if returned in a lower rank, there is a concern that should another City Manager promote Captain Steel in the future, he may rise to another position of power. A mass resignation could be catastrophic for the City's already understaffed Department. Finally, a review of certain information provided to me revealed that Captain Steel's eligibility for employment, specifically, his eligibility to become a police officer could be brought into question. Should this evidence be verified, the City will have grounds for immediate termination despite the findings discussed above.

As a further recommendation, a training on harassment and reporting of harassment should be conducted for the Department, if one has not already been completed this year. Additionally, each employee of the Department should be reminded of their ability to access the City's Employee Assistance Program and encouraged to utilize it when needed.