## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-20748-CIV-LENARD/LOUIS

**SERGIO PEREZ,**

      Plaintiff,

**v.**

**CITY OF OPA-LOCKA,**

      Defendant.

_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

    **THIS CAUSE** is before the Court on Defendant City of Opa-Locka's ("the City")

Motion for Summary Judgment, ("Motion," D.E. 52), filed June 23, 2023.  Plaintiff, Sergio

Perez, filed a Response on July 26, 2023, ("Response," D.E. 57), and the City filed a Reply

on August 2, 2023, ("Reply," D.E. 59).  Upon review of the Motion, Response, Reply, and

the record, the Court finds as follows.

## I.    Background[1]

---

[1]      The facts contained in this section are taken from Plaintiff's Second Amended Complaint ("SAC," D.E. 37) and the parties' Statements of Material Facts and Exhibits.  See, Defendant's Statement of Undisputed Facts, ("Def.'s Facts," D.E. 53, "Def.'s Exs.," D.E. 53-1 through 53-11), Plaintiff's Response to Defendant's Statement of Material Facts and Additional Facts in Response, ("Pl.'s Facts," D.E. 58, "Pl.'s Exs.," D.E. 58-1 through 58-14), and Defendant's Reply Statement of Facts, ("Def.'s Reply Facts," D.E. 60).  The facts are undisputed unless otherwise noted.

During all relevant periods, Plaintiff served as a Captain in the City's police department until his demotion to the rank of Sergeant on or about January 12, 2022.  (Def.'s Facts ¶ 1.)

John Pate ("City Manager Pate") served as City Manager from October 2019 to February 1, 2022.  (Pl.'s Facts ¶ 3.)

Steven Barreira ("Chief Barreira") served as the City's Chief of Police from April 2021 through his voluntary resignation on October 21, 2021.  (Def.'s Facts ¶ 10.)

Dennis Jackson II ("Interim Chief Jackson") assumed the position of Interim Chief of Police on November 15, 2021.  (SAC ¶ 47.)

Michael Steel ("then-Sergeant Steel or then-Interim Chief Steel") held the rank of Sergeant with the City's Police Department in September 2021.  (Def.'s Facts ¶ 32.)

### A.    The Taser Incident

On September 1, 2021, Plaintiff discharged a Taser 7 with a blue training cartridge that does not result in the discharge of electrical current and that is covered with a "Velcro" hook fabric—which is known as a Hook and Loop Training cartridge—in the vicinity of then-Sergeant Steel.  ("the Taser Incident," SAC ¶ 27, Def's Facts ¶ 32.)  Plaintiff explained the incident as follows in his deposition:

Q.· All right.  Let's talk about what the complaint refers to and what we'll refer to, because I think you know what I'm talking about, an event that occurred September 1, 2021, between you and Michael Steel. ·We'll call it the taser incident. ·Do you know what I'm referring to when I say taser incident?

A.· Yes.

Q.· On September 1, 2021, what rank or position did you hold with the city?

2

A.· Captain.

Q.· Tell me your version of events with respect to the taser incident on September 1, 2021.

A.· My version of events?  This was a demonstration of a new taser device that we had just received. ·I demonstrated it in several offices prior to entering Michael Steel's office. ·I deployed it with training cartridges that did not have the traditional prongs nor did they emit any electricity.

As we have done in the past, me and Steel and other officers, I deployed it in his office.· I tried to startle him and scare him because that's a known thing in the law enforcement community, everybody's afraid of the noise of the taser, and he pointed his real taser at me.· We joked around and that was it.· He didn't tell me that any of the Velcro ends had struck him at the time.· And I don't know if you have any more questions other than that, but I don't know what else to tell you.· I mean, I deployed it in Tequila Brown's office prior to Michael Steel, I deployed it in the presence of Chief Steven Barreira at the time.  I deployed it -- I did a deployment demonstration for Mohan Britton, the internal affairs investigator.

And, again, in my role as a captain I was in charge of procurement, issuing equipment, I oversaw all of these things. ·So naturally, you know, it was me and nobody else in the department that would, you know, handle the new equipment and make decisions as to where it went.

(Pl.'s Ex. 1 at 50:12-25, 51:1–25.)[2]  On September 6, 2021, City Manager Pate received an

anonymous email claiming that Plaintiff fired a taser and struck then-Sergeant Steel.  (Pl.'s

Ex. 6, Pate Decl. ¶ 14.)  In response, City Manager Pate directed Chief Barreira to initiate

an Internal Affairs investigation.  (Id. ¶ 15.)  City Manager Pate instructed Chief Barreira

to take no adverse actions against Plaintiff until after the completion of the Internal Affairs

investigation.  (Id. ¶ 16.)  Chief Barreira conducted an unauthorized, clandestine meeting

---

[2]      For all transcripts, the Court uses the pagination in the original document.  For all other documents, the Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

with then-Sergeant Steel before the completion of an Internal Affairs investigation.  (Id. ¶ 18.)[3]

On September 9, 2021, then-Sergeant Steel notified the City of his intent to sue. (SAC ¶ 42.)

On September 10, 2021, Chief Barreira relieved Plaintiff of duty with pay pending the outcome of the Internal Affairs investigation.  ("The First Adverse Employment Action," Pl.'s Ex. 10.)  Plaintiff was required to relinquish all city-owned property, including his police uniform, badge, firearm, laptop computer, police radio, and all keys and access cards to the police department and police vehicles.  (Id.)  Plaintiff was further prohibited from having outside employment as well as from representing himself as a police officer and/or taking any police/law enforcement action.  (Id.)

On September 28, 2021, Plaintiff's attorney sent a letter to City Manager Pate that Plaintiff contends constitutes a whistleblower complaint.  (Def.'s Facts ¶ 42.)

In October 2021, Chief Barreira voluntarily resigned from the City and had no further involvement in any personnel decisions relating to Plaintiff's employment.  (Def.'s Facts ¶ 39.)

On November 15, 2021, Dennis Jackson II assumed the position of Interim Chief of Police and immediately reinstated Plaintiff to duty as a Captain with the City's police department.  (SAC ¶ 47.)

---

[3]     Defendant disputes the "unauthorized, clandestine" characterization.  (Def.'s Reply Facts ¶ 74.)  However, on a motion for summary judgment, the Court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

Plaintiff was charged with criminal battery for the taser incident in January 2022. (Def's Facts ¶ 51.)  Following the criminal charge, City Manager Pate demoted Plaintiff from Captain to Sergeant effective January 14, 2022.  ("The Second Adverse Employment Action," Def's Facts ¶ 52.)

### B.    Complaints of Financial Mismanagement

Plaintiff complained to Chief Barreira regarding three separate instances of financial mismanagement (collectively, "the complaints of financial mismanagement").

### 1.    Contraband Storage Fees

First, in June 2021, Plaintiff began complaining to Chief Barreira—using his City-issued email with his City signature block—that the City was wasting approximately $1,200 per month on storing contraband that was seized during an investigation at a flea market more than 90 days earlier.  (SAC ¶ 80, Def.'s Facts ¶ 15.)  Plaintiff raised concerns to Chief Barreira about the unnecessary expenditure of $1,200 per month on storage fees "more than five times . . . via email . . . and there were conversations in the workplace in addition to those emails."  (Pl.'s Facts ¶ 11.)  Plaintiff had been instructed by Chief Barreira "to analyze whether the items seized were legitimately or lawfully obtained by the city" and to generally "ensure that the flea market investigation was handled properly."  (Pl.'s Facts ¶ 11.)  Plaintiff suggested selling the seized property at auction so the City could avoid paying the monthly storage fees.  (SAC ¶ 81.)

### 2.    K-9 Costs

Second, the City paid a significant amount of money to purchase and equip a K-9, to upfit a police vehicle, and to train a police officer.  (SAC ¶ 84.)  However, in July 2021,

Chief Barreira directed that the K-9 not be placed into service until after a new policy was put into place, resulting in the waste of taxpayer funds for over a week.  (SAC ¶ 87.) Plaintiff testified that he participated in the purchase of the K-9, "spearheaded" the K-9 unit, and described the K-9 unit as his "baby."  (Def.'s Facts ¶ 19.)  All purported concerns raised by Plaintiff pertaining to the K-9 deployment were authored by Plaintiff using his City-issued email with his City signature block, while in the workplace, or while discussing City business outside of the workplace.  (Def.'s Facts ¶ 20.)  Plaintiff does not dispute that Chief Barreira advised him that he did not want to deploy the K-9 until the City's K-9 policy was updated.  (Def.'s Facts ¶ 21.)

### 3. Lexipol Contract

Third, Chief Barreira indicated that he wanted to contract with a company called Lexipol to provide services in connection with updating and implementing the City of Opa-Locka Police Department's policies and procedures.  (SAC ¶ 88.)  Plaintiff objected and complained to Chief Barreira "several times" about the waste of taxpayer funds resulting from Chief Barreira's failure to follow the City's procurement code and committing Defendant to an unnecessary $53,000 contract with Lexipol.  (Pl.'s Facts ¶ 24.)  Plaintiff believes that Captain Barreira relieved him of duty with pay on September 10, 2021, "as a result of raising concerns pertaining to the Lexipol issue."  (Id.)

Later, in December 2021 or early January 2022, Plaintiff sent an email to the City Attorney at the direction of Interim Chief Jackson "regarding the requested rescindment of the Lexipol contract[.]"  (Pl.'s Ex. 1 at 106:20–25.)

6

Plaintiff only possessed information and knowledge relating to Lexipol by virtue of his position in the police department and his emails to Chief Barreira concerning Lexipol were sent from his City-issued email with his City signature block.  (Def.'s Facts ¶¶ 26, 27.)

## C.      The September 28, 2021 Letter

On September 28, 2021, Plaintiff's attorney sent a letter to City Manager Pate. (Def.'s Facts ¶ 42.)  Plaintiff contends that the letter constitutes a whistleblower complaint. (Id.)  The letter asserts that the allegations against Plaintiff "stem from a particular set of facts, misapprehensions, and falsehoods, that occurred well before the alleged incident that took place in the office of Sergeant Michael Steel on September 1, 2021."  ("September 28, 2021 Letter," Pl.'s Ex. 7 at 1.)  The letter does not specifically reference Plaintiff's complaints of financial mismanagement.  It rather states that Plaintiff expressed "serious concerns about the working environment that is being created," and avers that "the adversarial actions being taken against [Plaintiff] have been done with malicious intent to discredit and defame [him]."  (Id. at 2.)

## D.      Refusal to approve performance evaluation

Plaintiff alleges that in retaliation for his filing this lawsuit, then-Interim Police Chief Steel refused to approve his 2021–2022 performance evaluation until his Total Ratings Score of 4.38 out of 5 was reduced and negative commentary was added.  (SAC ¶¶ 191–194.)  Nevertheless, it is undisputed that then-Interim Police Chief Steel "never 'refused' to approve Plaintiff's 2021-2022 evaluation because Plaintiff sued the City, because Plaintiff contends to be a whistleblower, or because Plaintiff submitted any other

alleged complaint to the City." (Def's Facts ¶ 54.)  It is further undisputed that no one "at the City instructed then-Interim Police Chief Steel to not approve or modify Plaintiff's 2021-2022 evaluation because Plaintiff sued the City, because Plaintiff claims to be an alleged whistleblower, or because Plaintiff submitted any other alleged complaint." (Def.'s Facts ¶ 55.)  Moreover, it is undisputed that then-Interim Police Chief Steel "never took any improper action with respect to Sergio Perez's 2021-2022 performance evaluation," and neither retaliated nor took "any improper action associated with Plaintiff's employment at the City." (Def.'s Facts ¶¶ 56–58.)  Finally, it is undisputed that "Plaintiff's pay was never reduced, his benefits were never taken away, and his job duties remained the same during the period of time his performance evaluation was pending approval," and that "Plaintiff received all of the $2,500.00 longevity bonus owed to him in connection with the City's ultimate approval of his 2021-2022 performance evaluation." (Def.'s Facts ¶¶ 59– 60.)[4]

### E.    Procedural Posture

On September 27, 2022, Plaintiff filed the operative SAC asserting four causes of action:

- <u>Count I:</u> Procedural Due Process violation under 42 U.S.C. § 1983 against the City, (D.E. 37 ¶¶ 18–75.);

- <u>Count II:</u> First Amendment violation (retaliation for objecting to financial mismanagement) under 42 U.S.C. § 1983 against the City, (<u>id.</u> ¶¶ 76–99.);

---

[4]      Plaintiff effectively abandons his claims concerning his 2021–2022 performance evaluation.  Plaintiff also makes no reference to the performance evaluation in his Response.

- <u>Count III:</u> Florida public-sector Whistleblower Act violation against the City, (<u>id.</u> ¶¶ 100–161.);

- <u>Count IV:</u> First Amendment violation (retaliation for filing this lawsuit) under 42 U.S.C. § 1983 against the City, (<u>id.</u> ¶¶ 162–203.)

## II.    Legal Standard

On a motion for summary judgment, the Court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970). Summary judgment can be entered on a claim only if it is shown "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In addition, under Federal Rule of Civil Procedure 56(f)(1), the Court may grant summary judgment for the non-moving party "[a]fter giving notice and a reasonable time to respond." Fed. R. Civ. P. 56(f)(1); <u>see also</u> <u>Gentry v. Harborage Cottages-Stuart, LLLP</u>, 654 F.3d 1247, 1261 (11th Cir. 2011). The Supreme Court has explained the summary judgment standard as follows:

> [T]he plain language of [Rule 56] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986) (internal quotation omitted). The trial court's function at this juncture is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Anderson v.</u>

Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).  A dispute about a material fact is genuine if the evidence is such that a reasonable fact-finder could return a verdict for the nonmoving party.  Id. at 248; see also Barfield v. Brierton, 883 F.2d 923, 933 (11th Cir. 1989).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323.  Once the movant makes this initial demonstration, the burden of production, not persuasion, shifts to the nonmoving party.  The nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324; see also Fed. R. Civ. P. 56(c).  In meeting this burden the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  That party must demonstrate that there is a "genuine issue for trial." Id. at 587.  An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Id.

## III.    Discussion

Defendant asserts that summary judgment is warranted because Plaintiff abandoned Counts I and IV.  (See Reply at 1–2).  On Count II, Defendant argues Plaintiff failed to establish (1) a valid First Amendment retaliation claim, and (2) a basis for municipal

liability under <u>Monell v. Dep't of Soc. Servs. of City of New York</u>, 436 U.S. 658, 691 (1978). (<u>See</u> Mot. 6–13, 15.) Finally, on Count III, Defendant argues Plaintiff failed to establish that he engaged in statutorily protected activity; and, in any event, his asserted protected activity was not the cause of any adverse employment actions. (<u>See</u> Mot. 15–20.)

### A.   <u>Counts I and IV</u>

The Court agrees that Plaintiff has abandoned Counts I and IV. The Response argues that summary judgment should be denied on Counts II and III—but Plaintiff wholly omits any reference to Counts I and IV. (<u>See generally,</u> Resp.). Indeed, the words "Count I" and "Count IV" appear nowhere in Plaintiff's Response. (<u>See id.</u>)

"Failure to respond to an argument seeking summary judgment constitutes abandonment of that argument and warrants the entry of summary judgment." <u>Pecora v. Prime Sec. All., Inc.</u>, 2022 WL 19302229, at *7 (S.D. Fla. Mar. 3, 2022); citing <u>Jones v. Bank of Am., N.A.</u>, 564 F. App'x 432, 434 (11th Cir. 2014) (noting that "when a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned" and granting defendant's motion for summary judgment because plaintiffs failed to respond to certain arguments); <u>see also</u> Local Rule 7.1(c)(1) (failure to oppose a motion may be deemed sufficient cause to grant the motion by default).

Because Plaintiff fails to acknowledge—let alone substantively address and rebut—Defendant's arguments on Counts I and IV, these claims are deemed abandoned and summary judgment is appropriate.

**B.**     <u>Count II</u>

Count II alleges that the City violated Plaintiff's First Amendment rights under 42 U.S.C. § 1983 when he suffered adverse employment actions in retaliation for objecting to the City's financial mismanagement.  (<u>See</u> SAC ¶¶ 76–99).  For the following reasons, the Court finds that summary judgment is appropriate because—viewing the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party— Plaintiff fails to establish a First Amendment violation.

**1.     First Amendment Violation**

The City argues that summary judgment should be granted on Count II because Plaintiff spoke in his capacity as a police Captain concerning the City's alleged financial mismanagement and not as a citizen on a matter of public concern.  (<u>See</u> Mot. 6–10.)  The City thus asserts under <u>Garcetti v. Ceballos</u>, 547 U.S. 410 (2006), that Plaintiff's speech is not protected by the First Amendment.  (<u>See id.</u>)  Plaintiff counters that he was speaking as a citizen on matters of public concern regarding the City's expenditures on the storage of seized contraband, deployment of a police K-9, and contemplation of utilizing a service called Lexipol.  (<u>See</u> Resp. 5–10.)

Second, even assuming Plaintiff's speech is protected by the First Amendment, the City argues it is still entitled to summary judgment because it possessed adequate justification—namely, the taser incident—for treating Plaintiff differently from other members of the general public.  (<u>See</u> Mot. 11–13.)  Plaintiff counters that the adverse employment actions were "a direct and proximate result of his complaints about the gross financial mismanagement" rather than the taser incident.  (Resp. 13.)

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . . ."  U.S. Const. amend. I.  "Speech by citizens on matters of public concern lies at the heart of the First Amendment, which 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people[.]'"  Lane v. Franks, 573 U.S. 228, 235–36 (2014) (quoting Roth v. United States, 354 U.S. 476, 484 (1957)).  "This remains true when speech concerns information related to or learned through public employment.  After all, public employees do not renounce their citizenship when they accept employment, and [the Supreme] Court has cautioned time and again that public employers may not condition employment on the relinquishment of constitutional rights."  Id.  "There is considerable value, moreover, in encouraging, rather than inhibiting, speech by public employees.  For '[g]overnment employees are often in the best position to know what ails the agencies for which they work.'"  Id. (quoting Waters v. Churchill, 511 U.S. 661, 674 (1994) (plurality opinion)).

However, the Government has a "countervailing interest in controlling the operation of its workplaces."  Id. (citing Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty. Ill., 391 U.S. 563, 568 (1968)).  Thus, a court analyzing whether the employee's interest or the government's interest should prevail in cases where the government seeks to curtail the speech of its employees requires "balanc[ing] . . . the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  Pickering, 391 U.S. at 568.

The parties primarily rely on the following three Supreme Court decisions concerning First Amendment protections for public employees: <u>Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty. Ill.</u>, 391 U.S. 563 (1968); <u>Garcetti v. Ceballos</u>, 547 U.S. 410 (2006), and <u>Lane v. Franks</u>, 573 U.S. 228 (2014).  The Court briefly summarizes the facts and holdings of each.

In <u>Pickering</u>, a public high school teacher was fired for submitting a letter to the editor of a local newspaper that was critical of the school board's handling of tax proposals to raise new revenue for schools.  391 U.S. at 564.  The Supreme Court held that the teacher's statements were protected by the First Amendment, and "absent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish a basis for his dismissal from public employment."  <u>Id.</u> at 574.

In <u>Garcetti</u>, the Supreme Court addressed the question of "whether the First Amendment protects a government employee from discipline based on speech made pursuant to the employee's official duties."  547 U.S. at 413.  In that case, a deputy district attorney was disciplined for an internal memorandum he wrote concerning misrepresentations in an affidavit used by police to obtain a search warrant.  <u>See id.</u> at 420. The Supreme Court held that because the deputy district attorney's "expressions were made pursuant to his duties as a calendar deputy," his speech was unprotected employee speech. <u>Id.</u> at 420–21.

Finally, in <u>Lane</u>, the former director of a community college program for underprivileged youth was fired after providing truthful sworn testimony, compelled by

subpoena, at the criminal public corruption trials of a former program employee.  573 U.S. at 231–32.  In holding that "the First Amendment protects a public employee who provides truthful sworn testimony, compelled by subpoena, outside the scope of his ordinary job responsibilities[,]" the Supreme Court found that the sworn testimony in <u>Lane</u> "is far removed from the speech at issue in <u>Garcetti</u>—an internal memorandum prepared by a deputy district attorney for his supervisors recommending dismissal of a particular prosecution."  <u>Id</u>. at 238–39.

Furthermore, the <u>Garcetti</u> Court announced a two-step inquiry to determine whether a public employee's speech is entitled to First Amendment protection:

> The first requires determining whether the employee spoke as a citizen on a matter of public concern.  If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech.  If the answer is yes, then the possibility of a First Amendment claim arises.  The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.

547 U.S. at 418 (citing <u>Pickering</u>, 391 U.S. at 568).

### i.    Citizen Speech on a Matter of Public Concern

In describing the first step in this inquiry, the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  <u>Garcetti</u>, 547 U.S. at 421.  The Supreme Court identified as relevant two factors that, considered in isolation, are not dispositive: first, whether the speech occurs in the workplace; and second, whether the speech concerns the subject matter of the employee's job.  <u>See id.</u> at 420-21.  However, the "controlling

factor" in <u>Garcetti</u> was that the plaintiff's statements were made pursuant to job duties.  <u>Id.</u>
at 421.

First, it is undisputed that Plaintiff's complaints of financial mismanagement
occurred in the workplace.  As discussed, Plaintiff authored all relevant emails from his
City-issued email with his City signature block and he also made in-person complaints in
the workplace.  Simply put, Plaintiff complained to his superiors at work.  He did not go
to the press, the City Commission, or any outside agency.  Indeed, Plaintiff's complaints
were entirely insulated in his place of employment.

Second, the Court notes that although Plaintiff plausibly alleged that he complained
about the City's financial mismanagement as a citizen on a matter of public concern
sufficient to survive the City's Motion to Dismiss on Count II (<u>see</u> D.E. 36 at 24) the record
now undermines his claim on summary judgment.  In his deposition, Plaintiff testified as
follows:

> Q.· At the time of the taser incident, again September 1, 2021, what were
> your job duties?
>
> A.· I was the administrative captain.· It included procurement, it included
> supervision of staff.· It's just a wide range of things operationally for the
> police department.
>
> Q.· A lot of administrative items?
>
> A.· Yes.· Like procurement, discipline, I supervise specialty units, the Street
> Crimes Unit. I was responsible for outfitting police vehicles. I oversaw
> civilian staff as well, records management, property and evidence.  All of
> those things fell under my purview.

(Pl.'s Ex. 1 at 79:14–25, 80:1.)  Nevertheless, Plaintiff seeks to draw a distinction claiming:

"I didn't have an obligation to report financial mismanagement and that wasn't a part of

my job description or duties." (Id. at 102:6–8.)  Crediting Plaintiff's description of his job duties, the Court now addresses his three categories of asserted protected speech.

## I.      Contraband Storage Fees

In his deposition, Plaintiff explained that "the Criminal Investigations Division, which is one of the divisions that I oversaw, made an arrest and confiscated what would have been tens of thousands of dollars in equipment that was stolen or otherwise unaccounted for" at a flea market in the City.  (Pl.'s 's Ex. 1 at 126:17–21.)  Plaintiff played a role both in the initial arrest and seizure at the flea market as well as in the decisions that followed.  (See id. at 128:3–5, 129:15–18.)  Plaintiff testified that, "the law says that when we confiscate something that is unclaimed or we cannot verify who the owner is we have -- we're able to auction that off after 90 days." (Id. 127:7–10.)  Plaintiff sought to do so to save the City money on storage fees.  (See id. at 127:15–17.)  Regarding the storage costs, Plaintiff testified as follows:

Q.· Did you help choose where to store these items?

A.· Yes.

Q.· Okay.

A.· So because they were evidence they needed to be secured in one of our facilities and there needed to be cameras that monitored them. ·We couldn't just put them anywhere.

Q.· In that capacity that's how you learned how much the city was paying per month to store the items; correct?

A. Yes

(Pl.'s Ex. 1 at 129:15–25, 130:1.)  Plaintiff additionally claims he was instructed by Chief Barreira "to analyze whether the items seized were legitimately or lawfully obtained by the city" and to generally "ensure that the flea market investigation was handled properly." (Pl.'s Facts ¶ 11.)

The undisputed evidence shows that Plaintiff was not a low-ranking officer merely following the orders of others.   Rather, he possessed discretion, authority, and responsibility for the seized contraband.  Plaintiff was familiar with these seizures because they were part of his job duties as an administrative Captain.  He testified that he oversaw the Criminal Investigations Division that made the arrests, participated in confiscating the stored contraband, and assisted in deciding where the contraband would be stored.  He further testified that his role in the oversight, participation, and decision-making regarding the storage of the contraband allowed him to learn the amount the City was paying to store the contraband.

As discussed, Plaintiff argues that his "job duties did not involve financial responsibility, management, or reporting."  (Resp. at 6.)  Plaintiff also attempts to draw a distinction arguing that "[i]nvestigating whether items were 'legitimately or lawfully obtained' differs from investigating the 'expenditure.'"  (Resp. at 10.)  His arguments fail to persuade.  According to Plaintiff, his job as administrative Captain encompassed "a wide range of things operationally for the police department."  (Pl.'s Ex. 1 at 18–19.) Considering the totality of the circumstances, the Court concludes that the facts—derived wholly from Plaintiff's testimony—establish that his complaints about the contraband

storage fees concerned the subject matter of his job.  The Court thus concludes that Plaintiff's speech concerning the contraband storage fees is unprotected employee speech.

## II.      K-9 Costs

Plaintiff does not dispute that he participated in the purchase of the K-9, "spearheaded" the K-9 unit, and described the K-9 unit as his "baby."  (Def.'s Facts ¶ 19.) The record shows that Plaintiff's speech—concerning alleged financial mismanagement stemming from the delayed deployment of a newly-purchased police K-9—was made pursuant to his job duties and not as a citizen on a matter of public concern.  The Court thus concludes that Plaintiff's speech concerning the K-9 costs is unprotected employee speech.

## III.      Lexipol Contract

Plaintiff does not dispute that he only possessed information relating to Lexipol by virtue of his position in the police department.  (Def.'s Facts ¶ 26.)  Plaintiff testified that he learned of the Lexipol contract while he was on duty at the police station when Chief Barreira "informed all of his staff, to include me, that he wanted to go with Lexipol.· And he made me . . .  sit in a meeting -- or a Zoom meeting in regards to Lexipol." (Pl.'s Ex. 1 at 108:9–21.)  He further agrees he was on duty when he raised his concerns.  (See id. at 108:13–15.)  Furthermore, because Plaintiff had "been there a long time" and was "familiar with the policies that we have in the department," he knew that any proposed contract over $25,000 had to be brought before the City Commission and objected to Chief Barreira's failure to do so.  (Id. 104:17–25, 105:1–5.)  Plaintiff further testified that:

19

[T]he city's under financial oversight.· The city has a limited amount of funding and monies.· And committing the city to pay $53,000 a year in addition to other fees associated with this was just not needed.· Aside from it not being needed, Steven Barreira didn't have the authority to go into contract with Lexipol, but he signed the agreement and it never went before the commission to be approved. The commission approved it after the fact because they were already committed to pay for it because he went into agreement with Lexipol.

Q.· That agreement was subsequently reversed; correct?

A.· I sent an email, that the city has, at the direction of – what's his name -- at the direction of Dennis Jackson where he directed me to send the city attorney an email to see how we could rescind or get out of the Lexipol thing because it was not needed.  And he agreed with me when he came onboard. ·We have relationships with many jurisdictions and if we wanted to update any policies it was just a matter of making a phone call and say, "Hey, can you send me your policies?" and us, you know, incorporating those same policies as ours.· So committing the city for all this money was just not needed, it was wrong, and it was an unnecessary expenditure[.]

(Id. at 105:18–25, 106:1–18.)[5]  Public employees do not relinquish their First Amendment

rights, and they are often in the best position to know what ails the agencies for which they

work.  See Lane, 573 U.S. at 235–36.  Indeed, the public-school teacher in Pickering and

public agency director in Lane spoke of financial mismanagement learned of through their

---

[5]        Plaintiff does not know whether the money was returned to the City.  (See id. at 107:14–15 ("I'm not sure, you would have to ask the City.").)  According to the City:

Within a short time after Chief Barreira commenced employment at the City, a proposed Lexipol agreement was sent to him.  (Def.'s Facts ¶ 25.)  The City Manager knew about this.  (Id.)  Chief Barreira signed the agreement and gave it to his staff assistant to send to the City Manager for approval.  (Id.)  For whatever reason, the agreement did not make it to [City Manager] Pate but rather was sent to Lexipol.  (Id.)  When the inadvertent error was realized, Lexipol advised that it would nullify the agreement and treat it as void.  (Id.) The City never spent any monies in connection with Chief Barreira's inadvertent execution of that particular agreement and Lexipol never provided any services to the City.  (Id.)

(Mot. at 9).

respective public employment. However, Plaintiff's speech—wholly insulated in the workplace and made pursuant to his job duties as an administrative Captain—is far removed from the public-school teacher's letter to the editor in <u>Pickering</u> or the public agency director's sworn trial testimony in <u>Lane</u>. Rather, Plaintiff's speech mirrors the deputy district attorney's internal memo in <u>Garcetti</u>. <u>See also Vila v. Padron</u>, 484 F.3d 1334, 1340 (11th Cir. 2007) (holding that vice president's statements raising concerns about the legality of a public college's actions were not entitled to First Amendment protection); <u>Battle v. Bd. of Regents for Georgia</u>, 468 F.3d 755, 761 (11th Cir. 2006) (Speech by employee of state university's Office of Financial Aid and Veterans Affairs to university officials about inaccuracies and signs of fraud in student files was made pursuant to her official responsibilities and did not involve a "matter of public concern" as required for First Amendment retaliation claim.).

In sum, Plaintiff spoke as an employee—and not a citizen—for First Amendment purposes. <u>See Garcetti</u>, 547 U.S. at 418. Accordingly, Plaintiff has no First Amendment cause of action based on his employer's reaction to the speech and summary judgment is due to be granted on Count II.

### ii. Adequate Justification for Treating Plaintiff Differently

Assuming <u>arguendo</u> that Plaintiff spoke as a citizen on a matter of public concern, summary judgment is still warranted. As discussed, when an employee spoke as a citizen on a matter of public concern, the Court must then proceed to the second question of "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." <u>Garcetti</u>, 547 U.S. at

418 (citing <u>Pickering</u>, 391 U.S. at 568) ("<u>Pickering</u> balance"). Here, the <u>Pickering</u> balance overlaps with the Eleventh Circuit's requirement that "the speech must have played a substantial part in the adverse employment action." <u>Green v. Finkelstein</u>, 73 F.4th 1258, 1263 (11th Cir. 2023); <u>see also Gattis v. Brice</u>, 136 F.3d 724, 726 (11th Cir. 1998) ("To survive summary judgment, Gattis must therefore make a showing sufficient to permit a reasonable jury to find that his protected speech was a substantial or motivating factor behind his demotion.").

Construing the evidence in the light most favorable to Plaintiff, the City had an adequate justification—namely, the taser incident and resulting criminal charge—for treating him differently from any other member of the general public. Plaintiff concedes this point in his deposition testimony:

> Q.· What adverse action was taken against you because of alleged raised concerns to Steven Barreira pertaining to the Lexipol issue?
>
> A.· Well, to be fair it had to do with the Lexipol issue, I challenged him on the termination of Robert DeMoya, I challenged him on the misuse of our newly acquired K9, and I had a meeting with John Pate and him in John Pate's office at my request where I outlined all of these things. **And soon thereafter, September 1st and September 10th came an opportunity to remove me**.

(Pl.'s Ex. 1 at 109:22–25, 110:1–7 (emphasis added).) As discussed, Plaintiff began complaining to Chief Barreira concerning the contraband storage fees in June 2021 and his complaints concerning the K-9 costs followed in July 2021. Plaintiff fails to specify the exact timing of his complaints about the Lexipol contract; however, the Court accepts that Plaintiff made complaints concerning Lexipol prior to the September 1, 2021 taser incident. (<u>See</u> Pl.'s Facts ¶ 24) (explaining that Plaintiff objected and complained "several times"

about the Lexipol contract and Plaintiff believes Chief Barreira relieved him of duty with pay on September 10, 2021, because of him "raising concerns pertaining to the Lexipol issue.")

On this record, the Court concludes that the September 1, 2021 taser incident was an intervening act of misconduct by Plaintiff and an independent justification for the first adverse employment action—namely, Plaintiff's September 10, 2021 suspension with pay. In other words, the taser incident severed any causal connection between Plaintiff's complaints of financial mismanagement and the first adverse employment action. See Henderson v. FedEx Express, 442 F. App'x 502, 506 (11th Cir. 2011) ("Intervening acts of misconduct can break any causal link between the protected conduct and the adverse employment action."); Hankins v. AirTran Airways, Inc., 237 F. App'x 513, 520–21 (11th Cir. 2007) ("This intervening act of misconduct, which was plainly in violation of Rules 1 and 14 of AirTran Airways Crew Member Handbook, severed the causal connection (if any) between Hankins' initial complaint of discrimination and AirTran's decision to terminate her employment....Despite a close proximity in time between these events, the evidence establishes that Hankins' flagrant act of misconduct broke the causal chain."); DeLeon v. ST Mobile Aerospace Eng'g, Inc., 684 F. Supp. 2d 1301, 1325–26 (S.D. Ala. 2010) ("The Eleventh Circuit has made clear that even if a plaintiff is terminated in close temporal proximity to a complaint of discrimination, a plaintiff's intervening act of misconduct severs the causal connection between the employee's initial complaint of discrimination and the decision to terminate her employment.... Specifically, Plaintiffs' intervening act of misconduct—failing to report for work when scheduled—severed the

causal connection between their initial complaint of harassment and MAE's decision to terminate their employment."); Hall v. Teva Pharm. USA, Inc., 214 F. Supp. 3d 1281, 1293 (S.D. Fla. 2016) (employee's misconduct in violating employer's electronic communications policy served to sever any causal connection between her termination and any protected activity).

Plaintiff thus fails to present sufficient evidence to establish the causation issue on the first adverse employment action.  Plaintiff does not dispute that the taser incident occurred.  Nevertheless, he argues in his Response that he was relieved of duty with pay on September 10, 2021 in retaliation for his complaints of financial mismanagement rather than the taser incident.  (See Resp. 13–14.)  However, "[a]t the summary judgment stage, the district court [is] not required to accept as true the allegations in [Plaintiff's] complaint regarding the reason why he was terminated."  Cox v. Clayton Cnty. Sch. Dist., 763 F. App'x 817, 819 (11th Cir. 2019).  Plaintiff's allegations must be supported by evidence allowing a jury to find that the adverse employment actions occurred because of his complaints of financial mismanagement.  See id.  Aside from City Manager Pate's speculation that "it's potentially possible that [Captain Barreira] retaliated," Plaintiff offers none.  (Pl.'s Ex. 2 at 31:1.)  The Court thus concludes that Plaintiff has failed to make a sufficient showing to permit a reasonable jury to conclude that his statements "played a substantial part in the adverse employment actions."  Green, 73 F.4th at 1263.  Rather, the record reveals that the taser incident severed any causal connection between Plaintiff's complaints of financial mismanagement and his relief of duty with pay on September 10, 2021.

The Court reaches the same conclusion regarding the second adverse employment action—namely, Plaintiff's demotion from Captain to Sergeant following him being charged with misdemeanor battery for the taser incident in January 2022. After the taser incident and first adverse employment action in September 2021, Chief Barreira voluntarily resigned from the City in October 2021 and had no further involvement in any personnel decisions relating to Plaintiff's employment. Then, in December 2021 or early January 2022, Plaintiff sent an email to the City Attorney at the direction of Interim Chief Jackson "regarding the requested rescindment of the Lexipol contract[.]" (Pl.'s Ex. 1 at 106:20–25.) Subsequently, in January 2022, Plaintiff was charged with criminal battery for the taser incident, and he was demoted from Captain to Sergeant by City Manager Pate effective January 14, 2022.

On this record, the Court concludes that Plaintiff's misdemeanor battery charge for the taser incident was an intervening act of misconduct by Plaintiff and an independent justification for the second adverse employment action. In other words, the misdemeanor battery charge severed any causal connection between Plaintiff's complaints of financial mismanagement and the second adverse employment action. See Henderson, 442 F. App'x at 506; see also Hankins, 237 F. App'x at 520–21; DeLeon, 684 F. Supp. 2d at 1325–26; Hall, 214 F. Supp. 3d at 1293. The Court again concludes that Plaintiff has failed to make a sufficient showing to permit a reasonable jury to conclude that his statements "played a substantial part in the adverse employment actions." Green, 73 F.4th at 1263. Rather, the record reveals that Plaintiff's misdemeanor charge for the taser incident severed any causal

connection between his complaints of financial mismanagement and the second adverse employment action.

The Court additionally concludes that the taser incident constituted adequate justification for treating Plaintiff differently from any member of the general public. Municipalities, like the City here, "need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." Garcetti, 547 U.S. at 418.  Moreover, police departments have even more specialized concerns than a normal government office. See Hansen v. Soldenwagner, 19 F.3d 573, 577 (11th Cir. 1994) ("a police department is a paramilitary organization with a need to secure discipline, mutual respect, trust, and particular efficiency among the ranks due to its status as a quasi-military entity different from other public employers."); see also Busby v. City of Orlando, 931 F.2d. 764, 773 (11th Cir. 1991) (police departments have a compelling interest in maintaining "the police department's reputation.").

Plaintiff argues he "was accused of misdemeanor battery, which was not 'unprecedented' within the Defendant's Police Department, as two sergeants (Hugo Alvarez and Jacksonville Pelaez) had been under criminal investigation but not suspended." (Pla.'s Facts ¶ 34.)  Nevertheless, Plaintiff can point to no other officer being under investigation for misdemeanor battery *on a fellow officer* much less another officer charged for misdemeanor battery *on a fellow officer.* (Compare Def.'s Facts ¶ 33, 34, with Pl.'s Facts ¶ 33, 34.)

Plaintiff places substantial emphasis on Chief Barreira (a) conducting what Plaintiff characterizes as an "unauthorized, clandestine meeting" with then-Sergeant Steel concerning the taser incident, and (b) suspending Plaintiff with pay before completion of an Internal Affairs investigation.  Plaintiff argues that Chief Barreira and then-Sergeant Steel colluded against him in retaliation for his complaints of financial mismanagement in the days leading up to his September 10, 2021 suspension with pay while ignoring the fact that Plaintiff shot a taser in the vicinity of then-Sergeant Steel on September 1, 2021.

As discussed, Plaintiff admits in his deposition testimony to shooting a taser in the vicinity of then-Sergeant Steel, and he can point to no other officer being under criminal investigation for misdemeanor battery *on a fellow officer* much less another officer charged for misdemeanor battery *on a fellow officer*.  Yet, at the same time, Plaintiff asks the Court to pretend that the taser incident never occurred and the relevant decisionmakers imposed the adverse employment actions solely as retaliation for his complaints of financial mismanagement.  The Court is unpersuaded by Plaintiff's argument and concludes that there is no genuine issue for trial.  See Anderson, 477 U.S. at 249–50.

Simply put, the City was entitled—and indeed, required to—investigate an alleged battery claim involving one officer shooting a taser in the vicinity of another officer inside the police department.  See Hansen, 19 F.3d at 573; see also Busby, 931 F.2d at 773.  The City was further justified in suspending Plaintiff with pay from September 10, 2021 through November 15, 2021 as well as demoting Plaintiff from Captain to Sergeant following him being criminally charged with misdemeanor battery for the taser incident.

In conclusion, given the seriousness of the taser incident and the pendency of an investigation, the City had adequate justification for treating Plaintiff differently by relieving him with pay on September 10, 2021.  Furthermore, the City had adequate justification to demote Plaintiff following him being criminally charged with misdemeanor battery for the taser incident in January 2022.  Accordingly, summary judgment is appropriate on Count II.[6]

### C.    <u>Count III</u>

Generally, retaliation claims under the Florida Whistle-blower Act are analyzed in the same manner as claims brought under Title VII of the Civil Rights Act of 1964.  <u>See Sierminski v. Transouth Fin. Corp.</u>, 216 F.3d 945, 950–51 (11th Cir.2000); <u>see also Rice–Lamar v. City of Fort Lauderdale</u>, 853 So.2d 1125, 1132–33 (Fla. 4th DCA 2003).  "To establish a *prima facie* claim for retaliation under Florida's Whistle-blower Act, ... a plaintiff must demonstrate: (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) there is a causal relation between the two events."  <u>Florida Dep't of Children & Families v. Shapiro</u>, 68 So.3d 298, 305–06 (Fla. 4th DCA 2011) (citations omitted).

### 1.    **Protected Activity**

Florida's public-sector Whistle-blower Act ("FWA") protects public employees from termination or other adverse action based on protected "disclosures."  Fla. Stat.

---

[6]    Because Plaintiff fails to establish a First Amendment claim, the Court will not address the second issue of whether Plaintiff established a basis for municipal liability under <u>Monnell.</u>

§ 112.3187.  "To prevail, a plaintiff must meet the separate requirements set out in the statute's subsections (4), (5), (6), and (7).  Failing to meet the requirements of any one of these subsections defeats a claim."  <u>Smith v. City of Tallahassee</u>, 2018 WL 6714325, at \*2 (N.D. Fla. Dec. 13, 2018), <u>aff'd</u>, 789 F. App'x 783 (11th Cir. 2019).

Subsection (4) requires a "disclosure of information."

Subsection (5) requires the disclosed information to include either:

(a) Any violation or suspected violation of any federal, state, or local law, rule, or regulation committed by an employee or agent of an agency or independent contractor which creates and presents a substantial and specific danger to the public's health, safety, or welfare.

(b) Any act or suspected act of gross mismanagement, malfeasance, misfeasance, gross waste of public funds, suspected or actual Medicaid fraud or abuse, or gross neglect of duty committed by an employee or agent of an agency or independent contractor.

Subsection (6) requires the disclosure to be made to a state or local agency or official or federal entity with authority to investigate or remedy any alleged impropriety.

Subsection (7) requires the disclosure to be made in one of several specific ways— as relevant here, either on the disclosing employee's "own initiative in a written and signed complaint" or by an employee who was "requested to participate in an investigation, hearing, or other inquiry" conducted by a state or local agency or official or federal entity. Fla. Stat. § 112.3187(4)–(7).

Defendant argues that Plaintiff's September 28, 2021 letter from his attorney does not meet the FWA's definition of a "written and signed complaint."  <u>Id.</u> § 112.3187(7). Plaintiff "agrees that he cannot pursue a claim under Fla. Stat. § 112.3187 *as a result of the letter* sent by this counsel[.]"  (Resp. 3.)  Rather, Plaintiff states that his FWA claim is

premised on both the September 28, 2021 letter and his complaints of financial mismanagement.  (<u>See id.</u> 16–18; <u>see also</u> SAC 14–21.)  The Court will thus examine Plaintiff's letter as well as his individual complaints of financial mismanagement.

### i.       September 28, 2021 Letter

In the letter, Plaintiff—through his attorney—references "serious concerns about the working environment" in the police department and further alleges that Plaintiff has been wrongly discredited and defamed and that his September 10, 2021 suspension with pay "stem[s] from a particular set of facts, misapprehensions, and falsehoods" that predated the September 1, 2021 taser incident.  (<u>See generally</u> Sept. 28, 2021 Letter).  This was a "disclosure of information."  Fla. Stat. § 112.3187(4).  The disclosure was made to City Manager Pate, an individual with authority to remedy any alleged impropriety.  <u>Id</u>. § 112.3187(6).

As discussed, the City argues that the letter fails to meet the requirements of subsection (7) because it was not written or signed by Plaintiff.  (<u>See</u> Mot. 17–18).  The Court notes that Plaintiff was cc'ed in the letter and it was written by an attorney on his behalf.  The City points to no authority showing that such attorney letters fail to meet the requirements of subsection (7).  The Court thus concludes that the letter was "a written and signed complaint" wherein Plaintiff disclosed information on his "own initiative" through his counsel.  <u>Id</u>. § 112.3187(7).  Plaintiff thus satisfies the terms of subsections (4), (6), and (7).

Turning to remaining subsection (5), the Court finds that the September 28, 2021 letter references neither a "violation of any federal, state, or local law, rule, or regulation,"

nor does it identify any act of "gross mismanagement, malfeasance, misfeasance, gross waste of public funds . . . or gross neglect of duty," sufficient to trigger the FWA's protections.  Fla. Stat. § 112.3187(5); see also Pickford v. Taylor Cnty. Sch. Dist., 298 So. 3d 707, 711 (Fla. 1st DCA 2020) (holding that former substitute teacher's letter sent to elementary school principal disputing his pay rate was not statutorily protected disclosure under the FWA because it failed to identify any violation of law, rule, or policy that would present a substantial and specific danger to the public's health, safety, or welfare, nor did it identify any act of misfeasance, malfeasance, or other gross conduct that would have triggered the FWA's protections.); Henley v. City of N. Miami, 329 So. 3d 791, 794–95 (Fla. 3rd DCA 2021) (holding that emails that city's acting budget director sent to city manager and deputy city manager, allegedly recommending certain cuts in proposed budget to avoid deficit, did not constitute protected activity under the FWA because the e-mails did not identify any violation of law or any act of supposed gross mismanagement or misfeasance).

As discussed, the letter makes no specific reference to Plaintiff's complaints of financial mismanagement.  At most, the letter asserts that the allegations against Plaintiff "stem from a particular set of facts, misapprehensions, and falsehoods, that occurred well before the alleged incident that took place in the office of Sergeant Michael Steel on September 1, 2021."  (Sept. 28, 2021 Letter at 1.)  The letter further states that Plaintiff expressed "serious concerns about the working environment" being created by Captain Perez.  (Id.).  It proceeds alleging that "Sergeant Steel only reported this alleged incident after the City of Opa-Locka Mayor and elected officials received an anonymous email

31

describing a completely fabricated incident."[7]   (Id. at 2.)   The letter then laments that "[d]uring the last City Commission meeting, a business owner's daughter . . . found it necessary to defame, disparage, and discredit [Plaintiff]."   (Id.)   Finally, the letter concludes by averring that "the adversarial actions being taken against [Plaintiff] have been done with malicious intent to discredit and defame [him]."   (Id.)

The primary focus of the letter is Plaintiff.   He complains about the disparaging comments made against him, his working environment, and generally claims he has been discredited and defamed.   Until whistle-blower protection is mentioned in the final paragraph, the document reads like a letter of intent to sue for defamation of character. While the letter speaks at length about Plaintiff's asserted hardships, poor treatment by the City, and damaged reputation—it omits any reference to "the public's health, safety, or welfare."   Fla. Stat. § 112.3187(2).   The Court thus concludes that the letter fails under subsection (5) as it is primarily focused on matters of personal—rather than public concern. See Pickford, 298 So. 3d at 711; see also Henley, 329 So. 3d at 794–75.   Because the September 28, 2021 letter did not meet the terms of subsection (5), it was not protected. Fla. Stat. § 112.3187(5).

### ii.   Contraband Storage Fees

To recap, in June 2021, Plaintiff began complaining to Chief Barreira that the City was wasting approximately $1,200 per month on storing contraband that was seized during an investigation at a flea market.   (SAC ¶ 80, Def.'s Facts ¶ 15.)   Plaintiff raised concerns

---

[7]   Plaintiff admits to shooting a taser in the vicinity of then-Sergeant Steel in his SAC and deposition testimony.   The taser incident was not "completely fabricated."

to Chief Barreira about the unnecessary expenditure of $1,200 per month on storage fees "more than five times . . . via email . . . and there were conversations in the workplace in addition to those emails." (Pl.'s Facts ¶ 11.)  Plaintiff made these complaints as he had been instructed by Chief Barreira "to analyze whether the items seized were legitimately or lawfully obtained by the city" and to generally "ensure that the flea market investigation was handled properly." (Pl.'s Facts ¶ 11.)  Plaintiff suggested selling the seized property at auction so the City could avoid paying the monthly storage fees. (SAC ¶ 81.)

Because Plaintiff had been "requested to participate in an investigation" concerning the flea market contraband, the Court finds that a "written and signed complaint" was not required.  Fla. Stat. § 112.3187(7); see also Burden v. City of Opa Locka, 2012 WL 4764592, at *14 (S.D. Fla. Oct. 7, 2012) ("Contrary to Defendant's suggestion, disclosures made pursuant to an investigation or inquiry need not be made via written and signed complaints or on the initiative of the one disclosing.").  Plaintiff thus satisfies the terms of subsection (7).  The Court further finds that Plaintiff's emails and verbal complaints constituted "disclosure[s] of information."  Fla. Stat. § 112.3187(4).  These disclosures were made to Chief Barreira—at least arguably, an "appropriate local official" with authority to remedy the alleged impropriety.  Id. § 112.3187(6).  Plaintiff thus satisfies the requirements of subsections (4), (6), and (7).

Turning to remaining subsection (5), the disclosures do not identify a "violation of any federal, state, or local law, rule, or regulation . . . which creates and presents a substantial and specific danger to the public's health, safety or welfare." Id.

§ 112.3187(5)(a).  Plaintiff identifies no such law, rule, or regulation—much less one that endangers public health, safety, or welfare.  (See Resp. at 16–18.)

Plaintiff's most colorful argument is that his disclosures are covered in subsection (5)(b) as disclosures of "gross mismanagement" or "gross waste of public funds."  Fla. Stat. § 112.3187(5)(b).  The Act defines "[g]ross mismanagement" to mean "a continuous pattern of managerial abuses, wrongful or arbitrary and capricious actions, or fraudulent or criminal conduct which may have a substantial adverse economic impact."  Id. § 112.3187(3)(e).  However, "gross waste of public funds" is not defined.  Relying on the definition of "gross mismanagement," the Court finds that $1,200 per month in storage fees is insufficient to "have a substantial adverse economic impact" on the City.  Id.

Additionally, Plaintiff has provided no authority—and the Court can find none—where disputes over budgetary concerns satisfied subsection (5)(b)'s definition of "gross mismanagement" or "gross waste of public funds."  To the contrary, state and federal courts have found the opposite.  See Henley, 329 So. 3d at 794–95 (finding that emails recommending certain cuts in city's proposed budget to avoid deficit did not constitute protected activity under subsection (5)); McAlpin v. Sneads, 61 F.4th 916, 929 (11th Cir. 2023) (finding that plaintiff's public opposition statements to budget cuts in the police department were not disclosures of gross mismanagement under subsection (5)).

Finally, it is undisputed that Chief Barreira asked Plaintiff to investigate whether the contraband seized from the flea market was lawfully obtained by the City.  (Def.'s Facts ¶ 11) ("Chief Barreira received word that the seizures were not legitimate and he therefore wanted to understand the seizure process, ensure that the process was legitimate, and

34

confirm whether the City was lawfully entitled to seize the contraband."); (Pl.'s Facts ¶ 11)
([Chief] Barreira instructed [Plaintiff] "to analyze whether the items seized were
legitimately or lawfully obtained by the city.").  Simply put, Chief Barreira needed to know
whether the items were lawfully obtained before he could put them up for auction.

His actions were justified, and the undisputed facts show no "pattern of managerial abuses"
or other wrongdoing by Chief Barreira related to the contraband storage fees.  Because
Plaintiff's disclosures did not meet the terms of subsection 5(a) or (b), they are not
protected.

### iii.    K-9 Costs

As discussed, all of Plaintiff's complaints regarding the police K-9 were made orally
or by email.  Plaintiff's complaints were "disclosure[s] of information," and they were
made to Chief Barreira—at least arguably, an "appropriate local official" with authority to
remedy the alleged impropriety.  Fla. Stat. § 112.3187(4), (6).  Plaintiff's disclosures thus
meet the terms of subsections (4) and (6).

However, unlike the contraband storage fees, Plaintiff's complaints regarding the
K-9 costs were not made in the course of his participation "in an investigation, hearing, or
other inquiry conducted by any agency[.]"  Fla. Stat. § 112.3187(7).  As such, the
disclosures were required to be made in a "written and signed complaint."  Id; see also
Burden, 2012 WL 4764592, at *19 ("Since Plaintiffs have pointed to no facts indicating
that Riley was instructed to participate in a relevant investigation or inquiry, this complaint
was required to be in writing.").  Because the disclosures fail to meet the terms of
subsection (7), they were not protected.

Assuming arguendo that Plaintiff satisfied subsection (7), the disclosures also fail under subsection (5).  Plaintiff's disclosures do not identify a "violation of any federal, state, or local law, rule, or regulation . . .  which creates and presents a substantial and specific danger to the public's health, safety or welfare."  Id. § 112.3187(5)(a).  Moreover, like the contraband storage fees, the one-week delay in deploying the K-9 fails to meet subsection (5)(b)'s definition of "gross mismanagement" or "gross waste of public funds." Finally, Plaintiff admits to being advised that the delay was due to Chief Barreira requiring an update to the City's K-9 policy.  (Def.'s Facts ¶ 21).  Chief Barreira's actions were again justified, and the undisputed facts show no "pattern of managerial abuses" or other wrongdoing by Chief Barreira related to the K-9 costs.  Because Plaintiff's disclosures fail to meet the terms of subsections (5) and (7), they are not protected.

### iv.   Lexipol Contract

As discussed, all of Plaintiff's complaints concerning the Lexipol contract were made orally or by email.   The Court again finds that Plaintiff's complaints were "disclosure[s] of information," made to "appropriate local official[s]," sufficient to satisfy the terms of subsections (4) and (6).  Fla. Stat. § 112.3187(4), (6).  However, once again, the complaints were not made in the course of his participation "in an investigation, hearing, or other inquiry conducted by any agency[.]"  Fla. Stat. § 112.3187(7).  As such, the disclosures were required to be made in a "written and signed complaint."  Id; see also Burden, 2012 WL 4764592, at *19.  Because the disclosures fail to meet the terms of subsection (7), they were not protected.

36

### 2.      Adverse Employment Action

The City agrees that Plaintiff's January 2022 demotion constitutes an adverse employment action.  (See Reply 5.)   The City, however, argues that Plaintiff's paid suspension in September 2021 does not qualify.  (See Mot. 10; Reply 4–5.)  Plaintiff's main contention is that he was prohibited from working off-duty jobs while suspended with pay, thus resulting in a loss of approximately $3,500 a week.  (Pl.'s Facts ¶¶ 67, 76.)

The FWA defines "adverse personnel action" to include, among other things, the "suspension, transfer, or demotion of any employee or the withholding of bonuses, the reduction in salary or benefits, or any other adverse action taken against an employee[.]"  Fla. Stat. § 112.3187(3)(a).  Given the liberal construction of the FWA, the Court finds that Plaintiff "suffered an adverse employment action" in both his September 2021 paid suspension and January 2022 demotion.  Shapiro, 68 So.3d at 305.

### 3.      Causal Relation

Assuming arguendo that Plaintiff "engaged in protected activity" sufficient to establish a prima facie case under the FWA, the Court notes that the same causal relation analysis applicable to Count II applies with equal force here.  For the previously explained reasons, the Court concludes that Plaintiff has failed to make a sufficient showing to permit a reasonable jury to conclude that his statements "played a substantial part in the adverse employment actions."  Green, 73 F.4th at 1263.  Rather, the Court again concludes that the taser incident—and resulting criminal charge—were intervening acts of misconduct by Plaintiff that severed any causal connection between Plaintiff's complaints of financial mismanagement and the alleged adverse employment actions.  See Henderson, 442 F.

App'x at 506; see also Hankins, 237 F. App'x at 520–21; DeLeon, 684 F. Supp. 2d at 1325–26; Hall, 214 F. Supp. 3d at 1293.

## IV.    Conclusion

Accordingly, it is **ORDERED AND ADJUDGED** that:

1.    Defendant's Motion for Summary Judgment **(D.E. 52)** is **GRANTED**;

2.    Final Judgment will be entered by separate Order;

3.    All deadlines are **TERMINATED**; and

4.    This case is now **CLOSED**.

**DONE AND ORDERED** in Chambers at Miami, Florida this 19th day of September, 2023.

*Joan A. Lenard*

**JOAN A. LENARD**
**UNITED STATES DISTRICT JUDGE**